UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENCOMPASS INSURANCE COMPANY OF MASSACHUSETTS,<br><br>                    Plaintiff,<br><br>        vs.<br><br>JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, ADVANCED SPINE CENTERS, INC. D/B/A FIRST SPINE REHAB, FUTURE MANAGEMENT CORPORATION, EDWARD KENNEDY, BRIAN J. CULLINEY, D.C. AND JENNIFER McCONNELL, D.C.<br><br>                    Defendants. | CIVIL ACTION NO.:  05-11693 RCL |

**PLAINTIFF, ENCOMPASS INSURANCE COMPANY'S OPPOSITION AND
MEMORANDUM OF REASONS IN SUPPORT OF OPPOSITION TO THE (1) JOINT
MOTION TO DISMISS OF DEFENDANTS J. GIAMPA, F. GIAMPA, ADVANCED
SPINE CENTERS, INC. D/B/A FIRST SPINE REHAB, FUTURE MANAGEMENT
CORPORATION AND E. KENNEDY; AND (2) MOTION TO DISMISS OF
DEFENDANTS B. CULLINEY AND J. McCONNELL**

## I.     __INTRODUCTION__

The plaintiff, Encompass Insurance Company of Massachusetts (hereinafter "Encompass") respectfully requests that this Court enter an Order denying (1) defendants J. Giampa, F. Giampa, Advanced Spine Centers, Inc. d/b/a First Spine Rehab, Future Management Corporation and E. Kennedy's (hereinafter "Giampa defendants") joint motion to dismiss; and (2) Defendants B. Culliney and J. McConnell's (hereinafter "Culliney defendants") motion to dismiss (hereinafter collectively referred to as "motions to dismiss").

The primary arguments advanced in support of defendants' motions to dismiss are (1) Encompass failed to plead claims with requisite particularity, (2) Encompass failed to adequately plead the enterprise element of 18 USC § 1962(c), (3) Encompass' claims are time barred, and (4) Encompass failed to state a claim upon which relief can be granted with respect to Count V (conspiracy) and Count VII (intentional interference with contractual relations). The Culliney defendants further complain that the Amended Complaint lacks detail with respect to Culliney and McConnell. To the extent defendants raise collateral arguments, Encompass will address each argument separately, as warranted, below.[1]

## II.     __BACKGROUND__

Encompass respectfully refers the Court to the Memorandum of Law in Support of Plaintiff's Ex Parte Motion for Attachment of Real Property and Ex Parte Motion for Attachment by Trustee Process (Docket No. 8), previously filed with the Court.

## III.     __STANDARD OF REVIEW__

For purposes of a motion brought pursuant to Fed. R. Civ. P. 12(b)(6), the well-pled allegations of a complaint are entitled to a highly deferential reading and must be taken as true

---

[1] For instance, the Culliney defendants' collateral argument at page 8, footnote 2 that ¶¶ 288-289 of the Amended Complaint are "without probative value . . . wholly inappropriate, [and] clearly intended to prejudice Culliney before the Court" is meritless. Culliney's history of defrauding insurers is relevant (and admissible) to establish his fraudulent intent, knowledge, motive, and plan. Rule 404(b), Fed. R. Evid.

with all reasonable inferences drawn in favor of the plaintiff.  See Bowdoin Construction v. Rhode Island Trust National Bank, 869 F. Supp. 1004, 1006 (D. Mass. 1994) (RICO action).

The motion may be granted only if it appears beyond doubt that plaintiff can prove ***no set of facts*** in support of its claims. See Conley v. Gibson, 355 U.S. 41 (1957).  The burden is heavy on a party moving for dismissal.  The appropriate inquiry is whether the non-movant has set forth sufficient facts which, if proven, will support plaintiff's claim.  See Roma Construction Co. v. Arusso, 96 F.3d 566, 577 (1st Cir. 1996) (Lynch, J.,concurring) (reversing district court's dismissal of RICO claims and quoting NOW v. Scheidler, 510 U.S. 249 (1994) (explaining that complaint cannot be dismissed "if relief could be granted under any set of facts that could be proved consistent with the allegations") (emphasis added).

## IV.   ARGUMENT

### A.   IN COMPLIANCE WITH RULES 8 AND 9, ENCOMPASS' FIRST AMENDED COMPLAINT PROVIDES DEFENDANTS WITH SUFFICIENT NOTIFICATION OF THE PARTICULARIZED CLAIMS AGAINST THEM TO ALLOW FOR A RESPONSIVE PLEADING

Fed. R. Civ. P. 9(b) requires that the circumstances constituting fraud be stated with particularity but malice, intent, knowledge and other conditions of the mind may be averred generally.  Fed. R. Civ. P. 9(b); McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226 (1st Cir. 1980); Whelan v. Intergraph Corp., 889 F. Supp. 15, 19 (D. Mass. 1995).

A motion to dismiss for failure to meet the particularity requirements of Rule 9(b) may be properly characterized as a motion to dismiss for failure to state a claim. Shields v. Amoskeag Bank Shares, Inc., 766 F.Supp. 32, 39 (D.N.H. 1991).  In considering a Rule 9(b) motion, the Court must weigh this rule against the general notice pleading policy of Fed. R. Civ. P. 8.  See Kuney Int'l, SA v. DiIanni, 746 F. Supp. 234 (D. Mass. 1990).  Detailed facts are not required where allegations of fraud in the complaint set forth the specific basis for the claim.  See Hayduk

v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985); Whelan v. Intergraph Corp., 889 F. Supp. at 20 (citing

Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992)); Wexner v. First Manhattan Co., 902

F.2d 169, 172 (2d Cir. 1990) (explaining that pleading of a factual basis that gives rise to a strong

inference of fraudulent intent is sufficient under Rule 9).  In this case, the outline of the general

scheme to defraud alleged by Encompass provides defendants with sufficient notice of the

grounds on which Encompass' claims are based. (A.C. ¶¶ 36-38, 47, 57-59, 84-289, 310-314);

see New England Data Services, Inc. v. Becher, 829 F.2d 286, 291–92 (1st Cir. 1987)

(explaining purpose of Rule 9(b) is to (1) put defendants on notice to allow meaningful response;

(2) preclude baseless fraud claim as pretext to discover wrongdoing; and (3) safeguard

defendants from frivolous charges); see also National Credit Union Admin. Bd. v. Regine, 749 F.

Supp. 401, 405 (D. R.I. 1990) (declining to dismiss complaint for failure to specify acts of mail

fraud without allowing plaintiff discovery and where a general scheme to defraud was alleged).

   In the First Circuit, Rule 9 requires specification of the time, place and content of an alleged

false representation, but not the circumstances or evidence from which the fraudulent intent could

be inferred. Fed. R. Civ. P. 9(b); Hayduk, 775 F.2d at 443; Wehlan, 889 F. Supp. at 19.  This

interpretation of Rule 9 comports with its language and harmonizes Rule 9 with Rule 8, which

require pleadings be concise and direct, and at the same time fulfills the purpose of Rule 9 -- to give

adequate notice of the plaintiff's claim of fraud.  See Hayduk, 775 F.2d at 444; McGinty v. Beranger

Volkswagon, Inc., 633 F.2d 226, 228 (1st Cir. 1980).

   Thus if the complaint satisfies Rule 9(b) by adequately specifying the time, place and

content of the fraud (or mail fraud) allegations, the inquiry ends and the complaint is sustained.

Wehlan, 889 F.Supp. at 19.  If Rule 9(b) is not satisfied, the Court must decide whether to afford

plaintiff limited discovery and a chance to amend the complaint to supply the missing details.

Id.; see New England Data Service, Inc., 829 F.2d at 289; Regine, 749 F. Supp. at 405; see also

Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir. 1998) (applying Rule 9(b) with flexibility where facts allegedly concealed); Ray v. Karris, 780 F.2d 636, 645 (7th Cir. 1985) (permitting opportunity for liberal amendment to plead sufficient RICO allegations).

At page 5 of their memorandum, the Giampa defendants incorrectly conclude that the fraudulent scheme alleged by Encompass is premised primarily upon allegations that defendants (1) illegally employed runners, (2) submitted invoices for services which were not rendered, and (3) created and submitted invoices that were in noncompliance with the American Medical Association's Current Procedural Terminology (CPT) Code guidelines. While defendants have certainly engaged in such improper conduct, in their memorandum defendants miss the forest while staring at the trees. The gravamen of Encompass' First Amended Complaint is that defendants, operating as a cohesive unit, systematically and continuously defrauded Encompass through the creation of false medical documentation, submitted to Encompass with the intent to illegally obtain insurance payments. (A.C. ¶¶ 1, 64, 84-85, 90, 93, 95-100, 116, 123, 125, 127, 129, 131, 139, 141, 152, 158, 174, 182-185, 195-202, 208, 218-219, 222, 230-231, 234, 242-245, 252, 264-267, 283, 294, 304, 310, 324-325, 327, 330, 345-346, 358, 362, 371; Ex. 1, 3). All such allegations are made clearly and supported by, among other things, Encompass' expert medical review with reference to specific dates, patients, records and claims. (A.C. Ex. 1, 3).

Encompass' First Amended Complaint provides particularized pleading allegations sufficient to put defendants on notice of the wrongful conduct alleged. See e.g., A.C. ¶ 63; Ex. 1. Exhibit 1 details the results of Encompass' expert medical review of the First Spine patient files in connection with which Encompass demands damages. The specific indicia of fraud reflected in each patient file is described with particularity.

The Culliney defendants insist that Encompass fails to provide sufficient detail of their role in the insurance fraud scheme. Ironically, the Culliney defendants cite forty (40) paragraphs

from Encompass' Amended Complaint describing their involvement.  In doing so, the Culliney

defendants prove the *sufficiency* of the Amended Complaint.  Incredibly, on page 8 of their Rule

12 Memorandum, the Culliney defendants complain that "the amended complaint ***repeatedly***

makes general allegations that Culliney and/or McConnell administered and/or supervised and/or

directed ***certain*** chiropractic treatment which was ***excessive***."  (emphases added).  Clearly,

repeated allegations of excessive/fraudulent chiropractic treatments and submission of false

medical documentation to Encompass in connection with <u>certain</u> chiropractic treatments is alone

sufficient to defeat defendants' Motion to Dismiss.  Notwithstanding, Exhibit 1 to Encompass'

Amended Complaint describes the discreet false representations (contained in First Spine

medical records and invoices) advanced by defendants, including Culliney and McConnell,

regarding treatment allegedly administered and/or supervised by Culliney.

Further, Culliney and McConnell were the signatory chiropractors in connection with 163

of the 196 claims alleged.  (A.C. ¶ 57).  Accordingly they were either the signatory on the (1)

fraudulent narrative medical records, (2) fraudulent medical invoices, or both.  Moreover,

Culliney is a Future Management "team leader" responsible for oversight of numerous

chiropractic clinics, including First Spine Rehab (Lowell). (A.C. ¶¶ 34-37, 72).  McConnell and

J. Giampa are listed with the Board of Chiropractors as the chiropractors registered with First

Spine, Lowell.  Further, the preordained medical protocol and recipe of treatment was created

and/or controlled by J. Giampa, F. Giampa and E. Kennedy. (A.C. ¶¶ 307-324).

Encompass' well-pled allegations concerning defendants' employment of runners (i.e.,

persons paid for patient referrals in violation of Massachusetts law) is based, in part, on

information contained in pleadings and affidavits filed in collateral litigation involving the

Kennedy and Giampa brothers.  (A.C. ¶¶ 40-55).  Moreover, E. Kennedy (a moving defendant)

has already acknowledged defendants' illegal payments to facilitate referral of patients to chiropractic clinics within the Future Management enterprise.  See Tab 1.

Despite defendants' admitted personal knowledge regarding such matters, Encompass' First Amended Complaint provides an additional level of detail concerning the following:

- The defendants' improper payment for patient referrals (A. C. ¶¶ 37-55);

- The defendants' improper payment for patient referrals to personal injury attorneys (referred to in Future Management vernacular as "promotions") (A. C. ¶¶ 37-55);

- Improper kickbacks in the form of vouchers and gift certificates to potential patients in return for obtaining "treatment" at First Spine.  (A. C. ¶¶ 292-293).

In addition, all of the defendants are chiropractors (with the exception of E. Kennedy who is not a chiropractor but was President of Future Management) and are charged with notice of the Board of Chiropractors' Regulation prohibiting the payment for patients.  233 CMR 4.12 (2005).

Encompass supports its allegations regarding "treatment not rendered" and "CPT upcoding" based upon conclusions reached by its medical expert.  Encompass pleads its upcoding allegations with precision, providing the specific (1) initial office visit CPT codes (A.C. ¶ 70); (2) applicable requirements of the CPT Code Manual (A.C. ¶70); and (3) claims upon which defendants submitted false medical documents containing CPT upcoding (A.C. Ex. 1).

With respect to "treatment not rendered" (merely one of numerous indicia of fraud upon which Encompass bases its claims), Encompass details information obtained from former First Spine patients and employees concerning the chiropractic treatment they did (and did not) receive at First Spine (but in connection with which defendants submitted medical records and invoices to Encompass for payment via the U.S. Mail).  (A. C. ¶¶ 290-293).

In addition, Encompass' First Amended Complaint outlines the specific false representations contained in First Spine's false medical documentation ("Exemplar Claims" -- A.

C. ¶¶ 85-289; Ex. 1).  Contrary to the Giampa defendants' assertion (at page 6 of their memorandum) that Encompass fails to offer _evidence_ of the falsity of any invoice, Encompass' Amended Complaint (and exhibits incorporated therein) is replete with particularized facts detailing defendants' billing fraud scheme through the creation and submission of false medical documentation to Encompass to obtain payment of chiropractic invoices to which they were not entitled.  Id.

Encompass' investigation is ongoing and continues to uncover additional improper conduct of the defendants, corroborating the allegations in the Amended Complaint.  For example, Encompass continues to interview First Spine patients.  Former First Spine patients continue to report that they were "paid" by B. Culliney at the commencement of treatment at First Spine Lowell in violation of Massachusetts Law.  Mass. Gen. Laws ch. 266, §111C; 233 CMR 4.12.  Illustrative cases are annexed hereto at Tabs 2-8.

For all the forgoing reasons as well as the analysis below in section III B(i)-(iv), and upon consideration of the facts and all reasonable inferences in a light most favorable to Encompass, it is respectfully submitted that this Court deny defendants' motions to dismiss.

## B.    ENCOMPASS ADEQUATELY PLED ITS RICO CLAIMS

The leading, applicable case in this Circuit addressing the use of civil RICO to eradicate insurance fraud is Aetna Casualty Sur. Co. v. P&B Autobody, 43 F.3d 1546 (1st Cir. 1994). Encompass' First Amended Complaint must be read in light of this controlling decision.

To state a RICO claim a plaintiff must allege:  (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity.  Bowdoin Constr. Corp. v. Rhode Island Hosp. Trust Nat'l Bank, N.A., 869 F. Supp. 1006, 1009 (D. Mass 1994); see Reves v. Ernst & Young, 507 U.S. 170 (1993).  RICO liability attaches to those submitting a series of fraudulent insurance claims.  See Aetna, 43 F.3d at 1558-61 (interpreting the Reves decision).  It also applies to

business outsiders that influence the conduct of an innocent victim (i.e., Encompass) as well as the employees and their associates manipulating the aggressor enterprise to perpetrate a fraud. Id. Encompass' First Amended Complaint specifically alleges each of the above described elements.

### (i) CONDUCT

Encompass alleges that each of the defendants acting in concert, inter alia, participated in and conducted the affairs of the identified enterprises through repeated acts of mail fraud to advance false medical documentation with the intent to illegally obtain payment from Encompass (A.C. ¶¶53, 64, 68, 73 ,84-303, 327-329, 333, 346). Allegations of false medical documentation and mail fraud are detailed in Exhibits 1-2 to the First Amended Complaint.

### (ii) ENTERPRISE

In their motion to dismiss, the Giampa defendants complain that Encompass failed to sufficiently delineate the enterprise in connection with which the RICO defendants (J. Giampa, F. Giampa, and E. Kennedy) are alleged to have participated in, and/or conducted the affairs of, in violation of 18 U.S.C. §1962 (c).

The term "enterprise" includes any individual, partnership, corporation, association or other legal entity and any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. §1961(4). The First Circuit recognizes three different types of enterprise that can play host to RICO liability – *enterprise* (related to the company being manipulated to perpetrate a fraud, i.e. Future Management, First Spine, etc.), *innocent victim enterprise* (i.e., the target of the scam—Encompass, see Aetna, 43 F.3d at 1559-61), and *association-in-fact enterprise* in which a group of persons associate, formally or informally, for a common purpose to engage in a course of conduct. See U.S. v. Patrick, 248 F.3d 11, 19 (1st Cir.) cert. denied 2001 U.S. LEXIS 10670 (2001) (citing U.S. v. Turkette, 452 U.S. 576, 583 (1981)).

In this case, for purposes of **enterprise** liability, Encompass specifically alleges that the RICO defendants in Count I directly participated in and conducted the affairs of Future Management and First Spine which constitute enterprises within the meaning of RICO. (A. C. ¶¶ 14-15, 56, 59, 65, 69-70, 73-74, 77, 79, 337-339).

The Giampa defendants argue that Encompass' Amended Complaint is defective because Encompass fails to identify an enterprise, "distinct from a named defendant." While Encompass agrees with defendants' recitation of the law, see, e.g., Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001) (explaining that for purposes of RICO a "person" accused with the alleged wrongdoing must be separate and distinct from the enterprise), in this case, (as acknowledged by the Giampa defendants) Encompass "clearly identifies" the alleged enterprises (for purposes of Count I) as First Spine and Future Management. It is also equally clear that neither First Spine nor Future Management are named as defendants in Count I. Accordingly, Encompass' First Amended Complaint (Count I) properly alleges enterprises distinct from the defendants against whom relief is sought.

To the extent defendants argue that Encompass violated the rule that the "enterprise," cannot also be the "person" (and thus, a defendant) for the same conduct, defendants must not have understood the First Amended Complaint allegations. In Count I, wherein First Spine and Future Management are the identified enterprises. (A.C. ¶337-338), First Spine and Future Management are not named defendants. (A.C. ¶ 344).

First Spine and Future Management are named defendants only in connection with Count II (Innocent Victim Enterprise). In Count II, Encompass constitutes the enterprise. (A.C. ¶344). Federal Courts around the country have long recognized that an entity can be both the enterprise and the victim of racketeering activity. See Aetna, 43 F.3d at 1558; Sun Sav. & Loan Ass'n v. Dierdoff, 825 F.2d 187, 194-95 (9th Cir. 1987); U.S. v. Provenzano, 688 F.2d 194, 200 (3rd Cir.

9

1982); <u>U.S. v. Kovic</u>, 684 F.2d 512, 516-17 (7th Cir. 1982); <u>Chubb & Son, Inc. v. Kelleher</u>, 1998 U.S. Dist. LEXIS 22542, *39 (E.D.N.Y. Feb. 26, 1998).

The role of the individual RICO defendants is clearly designated throughout Encompass' First Amended Complaint.  The defendants' scheme was accomplished through the individual defendants' conduct of and participation in the affairs of the "clearly identified" enterprises in Count I – First Spine and Future Management Corporation.  Encompass does not rely on "vague accusations," rather Encompass makes stark and direct accusations that the individual defendants created fraudulent medical documentation and submitted same via the U.S. Mail to Encompass with the intent to illegally obtain insurance payments.  (A.C. ¶¶ 4-5, 35-40, 43, 53, 56, 59, 62-64, 73-76, 296-298, 305, 310-314, 318, 339).

For purposes of innocent victim enterprise liability, by submitting fictitious insurance claims, all of the defendants are alleged to have adversely affected the operation, business and property of Encompass -- an enterprise within the meaning of RICO.  (A.C. at ¶¶ 1, 38, 40, 43, 52, 62, 63, 64, 67, 68, 70, 81, 85-293, 304, 306, 345-346); <u>see</u> <u>Aetna</u>, 43 F.3d at 1558-61.

Thus, in Count II, the defendants are participating in the affairs of the plaintiff -- Encompass itself.  Accordingly, the defendants' concern of a pleading deficiency in Count II is unfounded.  Consequently, the Giampa Defendants' Motion to Dismiss Encompass' RICO claim against First Spine and Future Management must be denied.

### (iii)    <u>PATTERN</u>

To establish a "pattern" of racketeering activity a plaintiff must allege the existence of two or more "predicate acts" and that such acts are related and amount to or pose a threat of continued criminal activity.  <u>Aetna</u>, 43 F.3d at 1560-61 (finding series of fraudulent insurance claims "<u>easily</u>" constitutes ongoing RICO pattern).

In determining whether predicate conduct constitutes a "pattern," the Court considers "relatedness" and "continuity." <u>Feinstein</u>, 942 F.2d at 44-45. Relatedness exists where predicate acts are shown to have the same or similar purposes, results, participants, victims, or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated events. A fact specific allegation of a single common scheme can be used to satisfy the relatedness requirement. <u>Id</u>. All of these factors are present and have been alleged by Encompass. (A.C. ¶¶ 1, 5, 52, 58-59, 62-64, 69-70, 73, 78, 81, 82, 294-306, 316, 318, 324-325, 327, 330, 332, 334; Ex. 1-2).

Continuity is established if the predicate acts "amount to", or pose a "threat of," continued criminal activity. Under the "amounting to" approach, continuity may be shown by proof that the predicate acts "form a closed period of repeated conduct" or that such conduct constituted "are a regular way of conducting the enterprise." <u>U.S. v. Boylan</u>, 898 F.2d 230, 250 (1st Cir. 1990) <u>cert</u> <u>denied</u>, 498 U.S. 849 (1990).

Encompass has demonstrated the "regular way" that defendants conducted and participated in the affairs of the Future Management, First Spine, the Association-In-Fact enterprise and Innocent Victim (Encompass) enterprises by their repeated fraudulent conduct during the period identified in the Amended Complaint, 1998-present. (A.C. Ex. 1-3).

**(iv)    RACKETEERING ACTIVITY: MAIL FRAUD**

Racketeering activity is any act which amounts to a violation of the criminal statutes set forth at 18 U.S.C. §1961(1), including mail fraud, 18 U.S.C. §1341. In the First Circuit, the creation and submission of fraudulent insurance claims presupposes use of the mails in a RICO action and plaintiff need not show that the defendant personally placed the communication into the postal system. <u>Aetna</u>, 43 F.3d at 1560–61; <u>see</u> <u>Schmuck v. U.S.</u>, 489 U.S. 705, 711-15 (1989) (interpreting mail fraud statute).

To establish that defendants violated the mail fraud statute, plaintiff need only show that defendants engaged in a scheme to defraud with the specific intent to defraud and that they used the U.S. Mail in furtherance of their scheme, see, e.g., McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 790 (1st Cir.), regardless of the content of a particular mailing. Aetna, 43 F.3d at 1560-61 (quoting U.S. v. Maze 414 U.S. 395, 399 (1974)).

Importantly, it is not necessary that plaintiffs show that *each* defendant *personally* used the mail "but only that they acted 'with knowledge that the use of the mail will follow in the ordinary course of business, or [acted in circumstances] where such use can be reasonably foreseen.'" Id. (emphasis added). Because it is the scheme that is proscribed under §1341 (mail fraud), it is not necessary to establish that the intended victim was *actually* defrauded. See U.S. v. Morrow, 39 F.3d 1228, 1237 (1st Cir. 1994) (explaining the mailing at issue "did not itself involve any deception but it was 'incidental' to an essential element in the scheme, namely, the criss-cross of mailings that would reasonably be expected when false claims are submitted to insurance companies, are processed and ultimately paid, thereby making the fraud successful.") (emphasis added); U.S. v. Allard, 926 F.2d 1237 (1st Cir. 1991); Pereira v. U.S., 347 U.S. 1, 8-9 (1954) (explaining that liability rests even though mailing not intended); see also U.S. v. Contenti, 735 F.2d 628, 631 (1st Cir. 1984) (holding that mail fraud liability may be established when the mailing in question "is a normal concomitant of a transaction that is essential to the fraudulent scheme"); U.S. v. Martin, 694 F.2d 885, 890 (1st Cir. 1982) (holding refund checks mailed to insurance agent by insurance company sufficiently related to agent's fraudulent scheme to bring agent's conduct within mail fraud statute).

The controlling legal principles enunciated in Schmuck, Morrow and Aetna, apply with equal force to this case. The conclusion reached by the Court in Aetna that it could "reasonably be foreseen by each defendant, that either an insured, a claimant, a body shop or an appraiser

12

would use the mails in connection with each of the fraudulent claims, or that . . . [the insurer] would use the mails to send payment to the recipients," mirrors the nature and pattern of predicate acts in this case.  Aetna, 43 F.3d at 1560-1561.

Even a cursory review of the First Amended Complaint reveals that defendants repeatedly engaged in conduct in violation of 18 U.S.C. §1341.  Each and every claim paid to defendants was the product of multiple racketeering acts of mail fraud -- submission of false medical documentation to Encompass through the U.S. Mail.  (A.C. ¶¶ 294-306, 328-330, 333, 345-346).  Examples of such mailings are set forth with particularity. (A.C. Ex. 2).

Clearly, all of the false medical documentation [2] contain false representations that were directly conveyed to Encompass constitute individual predicate acts of mail fraud.   (A.C. ¶¶ 295-297; 327-329).    All of the documents cited in Exhibit 2 were received by Encompass from the defendants and/or from First Spine patients' and/or their counsel through the U.S. Mail. Further, it is beyond dispute that the U.S. Mail is the routine mode of conveyance for First Spine's billing and Encompass' claim-related documentation.[3]  (A.C. ¶¶ 294-303).

---

[2] On page 10 at footnote 3, the Culliney defendants attempt (albeit futilely) to distance themselves from the medical invoices generated in connection with First Spine false medical documentation.  However, in nearly every claim, McConnell, Culliney or both signed the respective Health Insurance Claim Forms ("HICFA" billing sheets) thereby acknowledging or certifying the following:

    (1)  any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of criminal acts punishable under law and may be subject to civil penalties; and

    (2)  the services shown on this form are medically indicated and necessary to the health of the patient and were personally furnished by me or furnished incident to my professional service by my employee under my immediate personal supervision.

  Copies of exemplar HICFA documents signed by Culliney and McConnell in connection with patients referred to in the Amended Complaint are annexed hereto at Tab 9.  There can be no reasonable debate that Culliney and McConnell were an integral part of the First Spine billing process.

[3] Beyond the false medical documentation, each of the involved insurance claim files contain additional mailings including (1) PIP Application(s); (2) police and/or operator's reports; (3) correspondence to and from First Spine and other medical providers; (4) correspondence to and from Encompass; (5) correspondence to and from the claimant and/or the claimants' counsel; (6) the insurance policy and related documentation, (7) premium checks, (8) insurance application; (9) appraisal documents, (10) payment checks, and (11) and other mailings that follow in the ordinary course of adjusting personal injury protection claim.  (A.C. ¶¶ 294-295, 299-300, 302, 329).  All claim-related mailings, even those of a "routine" nature, were an essential part of the perpetuation of the defendants'

In this case, Encompass pleads both fraud and mail fraud allegations, the sufficiency of which have been contested by defendants. In the context of both claims, the law requires Encompass to allege the time, place and content of the fraudulent representations. Hayduk, 775 F 2d at 443; Whelan, 889 F. Supp. at 19.

a)    Time

Encompass alleges that defendants created false medical documentation with the intent to illegally collect insurance proceeds from Encompass. With respect to its RICO claims, Encompass adequately notifies defendants of the timing of the alleged predicate acts (i.e., mail fraud) - - the dates the false medical documentation was generated and submitted via the U.S. Mail. The period encompassed in Encompass' First Amended Complaint is 1998 through present. (A.C. Ex. 2 (dates of predicate acts); Ex. 3 (dates of payment sent through U.S. mail)).

Further, specific referral to the dates that (1) documents were created and /or sent by defendants through the U.S. Mail (A.C. Ex. 1); (2) medical testing and/or treatment was allegedly performed by or at the direction of the counterclaim defendants (A.C. Ex. 2); and/or (3) medical billing was created and sent via the U.S. Mail (A.C. Ex. 3) is alleged in Exhibits 1-3 and incorporated by reference into the First Amended Complaint.

b)    Place

The location of the fraudulent representations is sufficiently plead (sufficient to put defendants on notice of the conduct alleged against them) to have occurred at or near the enterprises through which defendants perfected their scheme - - Future Management (73 Princeton Street, Chelmsford, Massachusetts) (A.C. ¶¶ 15, 338) and First Spine (410 School

---

scheme -- the reasonably foreseeable criss-cross of mailings expected when claims are submitted to an insurance company. Id. The fact that the fraudulent claims were accomplished, in part, through the routine use of the mails, had the effect of minimizing any suspicion about the claims, while at the same time improving the RICO defendants' "ability to carry out future frauds of the same kind." Morrow, 39 F.3d at 1237. (A.C. ¶¶ 332-333).

Street, Lowell, Massachusetts).  (A.C. ¶¶ 14, 337).    Thus, the location of the alleged fraudulent

activity has been plead with particularity sufficient to meet the requirements under Fed. R. Civ.

P. 9(b).  See New England Data Services, Inc., 829 F.2d at 286.

     c)    Content

The content of the counterclaim defendants' fraudulent representations is plead with

requisite particularity.  In connection with each of the patients identified in the chart contained at

Exhibit 1, Encompass alleges the specific nature of the misrepresentation(s) advanced in

connection with each individual claim.  (A.C. ¶¶ 62-64).

The specific false representations include, but are not limited to, false statements

contained in treatment records and fraudulent billing records, necessary to carry out the

insurance fraud scheme.  Each misrepresentation was made by or at the direction of defendants.

The specific fraudulent representation(s) contained within each patient's false medical

documentation is detailed in Amended Complaint Exhibit 1.  Moreover, in the 'Table of Selected

Mail Fraud,' Amended Complaint Exhibit 2, Encompass describes with specificity documents

issued by the defendants through the U.S. Mail in connection with claims wherein defendants

engaged in fraudulent medical billing practices.

In a similar RICO case predicated on mail and wire fraud, Corporacion Insular De

Seguros v. Munoz, 826 F. Supp. 599, 608 (D.P.R. 1993) the court was faced with a motion to

dismiss.  In denying the motion and holding that there was no need to further particularize the

Amended Complaint, the Munoz Court ruled that although certain predicate acts were not plead

with requisite specificity, the plaintiffs had nonetheless plead other important details that served

to put the defendants on notice of the claims being asserted against them, including the insurance

claim and check numbers, the amount of claim checks, and the names of the people involved.

(A.C. Ex. 1-3).  "With these facts in mind, the court must balance the dictates of Rule 9(b) as

interpreted by the First Circuit in <u>Becher</u> with the reality of the present situation where, despite some of the formal lacunae of the Complaint, <u>defendants have</u>, in all likelihood, <u>received the information necessary to defend against this action, and in any case, are probably in possession of the information that the plaintiff needs to fill in those gaps</u>." <u>Id</u>. at 609 (emphases added).

Likewise, Encompass' First Amended Complaint specifies (1) patient name; (2) claim number; (3) date of loss; (4) description of the type of documents mailed and misrepresentations communicated via the U.S. Mail; (5) amount(s) of payment(s); (6) date of payment(s); and (7) specific fraudulent misrepresentations. (A.C. Ex. 1-3). These allegations, together with the other specific factual allegations contained throughout the First Amended Complaint amply serve to put defendants on notice of the claims against them and permit them to file an Answer articulating defenses, if any. (A.C. ¶¶ 84-306).

Encompass has presented exhaustive factual notice concerning the fraudulent claims and defendants' involvement therewith. <u>Id.</u>; (A.C. ¶¶ 62-63; Ex. 1). Far from being a "fishing expedition," Encompass has already provided evidentiary support for its allegations. Affidavit of Michael Frustaci, D.C. (Docket No. 9). Doctor Frustaci reviewed defendants' medical documentation and corresponding claim files, and has concluded that First Spine records reveal defendants' fraudulent scheme. <u>Id.</u> Armed with this information, defendants cannot reasonably cry foul regarding adequate notice as they have ample information from which to formulate a responsive pleading.

For all the forgoing reasons, and considering the facts and all reasonable inferences in a light most favorable to Encompass, defendants' motions to dismiss must be denied.

### C.  <u>ENCOMPASS SUFFICIENTLY PLEAD ITS RICO CONSPIRACY CLAIM UNDER §1962 (d)</u>

Liability on a claim under 18 U.S.C. §1962(d) is proved against a defendant by

showing (1) the existence of an enterprise affecting interstate commerce (see III B(ii) supra),

(2) that defendant knowingly joined the conspiracy to participate in the conduct of the affairs

of the enterprise (A.C. ¶¶ 1, 351-352, 365), (3) that defendant participated in the conduct of

the affairs of the enterprise (see Section III B(ii) supra), and (4) that the defendants did so

through a pattern of racketeering activity by agreeing to commit, or in fact committing, two

or more predicate offenses. (see Section III B(iii)-(iv) supra). See Boylan, 898 F.2d at 241.

The major difference between a violation of §1962(c) (Count I) and a violation of

§1962(d) based on §1962(c) (Count III) is the required element for 1962(d) liability that

defendant knowingly joined a conspiracy to violate §1962(c). However, under §1962(d),

predicate conduct (i.e., mail fraud) is not an element required to be proven. To prove a violation

of §1962(d), it is enough to prove that a defendant agreed with one or more other conspirators

that two predicate offenses be committed. See Boylan, 898 F.2d at 252.

Encompass need not prove a conspiracy to defraud in which each of the defendants

conspired directly with one or more persons associated with Future Management and/or First

Spine. Moreover, is not necessary to find that each defendant knew all the details or the full

extent of the conspiracy, including the identity and role of every other conspirator. See Boylan,

898 F.2d at 242 (holding that "RICO conspiracy does not demand . . . that all defendants

participate in all racketeering acts, know of the entire conspiratorial sweep, or be acquainted with

all other defendants"). Instead, Encompass must demonstrate that the defendant(s) agreed with

one or more co-conspirators to participate in the conspiracy. Moreover, it is not necessary for

the conspiratorial agreement to be express, so long as its existence "can plausibly be inferred

from words, actions, and the interdependence of activities and persons involved." U.S. v.

Concemi, 957 F.2d 942, 950 (1st Cir. 1992). In this case, from the allegations plead in

Encompass' First Amended Complaint, the finder of fact reasonably could determine that,

although each defendant may not have been cognizant of the entire sweep of the conspiracy, each defendant knew that he or she was a part of a larger fraudulent scheme.  And a defendant who does not know the "entire conspiratorial sweep" is nevertheless jointly and severally liable, in the civil context, for all acts in furtherance of the conspiracy.  See Aetna, 43 F.3d at 1562.

From actions, words and deeds attributed to defendants against whom the RICO conspiracy is alleged, it can be reasonably inferred (especially at this procedural posture and considering Encompass' allegations as true, as required under Rule 12) that defendants, J. Giampa, F. Giampa and E. Kennedy, agreed to and did in fact take steps in furtherance of the fraudulent medical billing scheme documented in Encompass' First Amended Complaint.

For all the forgoing reasons, considering the facts and all reasonable inferences in the First Amended Complaint in a light most favorable to Encompass, defendants' motions to dismiss must be denied.

### D.    ENCOMPASS' CLAIMS FALL WITHIN THE APPLICABLE LIMITATIONS PERIOD

The Giampa defendants incorrectly state both the facts and controlling law in support of their contention that Encompass' federal RICO claims are time barred.[4]  The United States Supreme Court has ruled that a four-year statute of limitations applies to civil RICO claims. Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 156 (1987) ("federal policies that lie behind RICO and the practicalities of RICO litigation make the selection of the four-year statute of limitations for Clayton Act actions . . . the most appropriate limitations period for RICO actions"); see The Lares Group II v. Tobin, 47 F. Supp. 2d 223 (D.R.I. 1999) (granting summary judgment in civil RICO case on statute of limitations defect after discovery).

---

[4] The frivolousness of this position is underscored by the fact that the Culliney defendants prudently avoid the issue altogether.

The Malley-Duff Court did not specify the date upon which a civil RICO action accrues and the limitations period begins to run, or whether and under what circumstances, the equitable tolling doctrine of "fraudulent concealment" may extend the time for a plaintiff to file suit.  In Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997), the Court addressed the issue of "fraudulent concealment" and its applicability to the limitations period in a civil RICO action, concluding that "'fraudulent concealment' in the context of civil RICO embodies a 'due diligence requirement.'"  Klher, 521 U.S. at 196; see Rodriguez v. Banco Central, 917 F.2d 664 (1st Cir. 1990) (holding that First Circuit applies injury - discovery rule).

In 2000, the United States Supreme Court addressed the split between circuits regarding which injury accrual rule should apply in the RICO context.  In Rotella v. Wood, 528 U.S. 549 (2000), the Court rejected the injury and pattern discovery rule applied in a minority circuits. While the Court declined to "settle upon a final rule," it left intact the injury-discovery accrual rule followed by the First Circuit as announced primarily in Rodriguez, 917 F.2d at 665.  Later, in The Lares Group, II, 221 F.3d at 43, then Chief Judge Torruella, confirmed that in the aftermath of Rotella, the injury-discovery rule remains the law of the First Circuit.

Thus, the limitations analysis is not as surgically precise as defendants insist.  The four-year window requires this Court to consider all of the well-pled federal RICO injuries that Encompass, in the exercise of due diligence, discovered *or* should have discovered within that period.  Id.

The Giampa defendants insist that Encompass knew of its injury at the time each insurance payment was made.  Giampa Defendants' Memorandum at 10-11.  Obviously, had Encompass known that the payments it was making to defendants were for bogus claims, such payments would not have been made.  It defies logic that Encompass knew of its injuries when it

made such payments, which at the time were made in good faith upon Encompass' belief that the claims were legitimate.

Encompass is not held to <u>discovery</u> of its injury at the precise moment injury (payment) occurs. To so conclude under the facts in this case would make Encompass a knowing participant in its own victimization. All that is necessary is that Encompass demonstrate that defendants wrongfully concealed their actions, preventing it from discovering its cause of action within the statutory period despite Encompass' due diligence "in attempting to ferret out the claim." <u>The Lares Group II</u>, 47 F. Supp. 2d at 231 (citing <u>Berkson v. Del Monte Corp.</u>, 743 F.2d 53, 55 (1st Cir.), <u>cert. denied</u> 470 U.S. 1056 (1985)); <u>see</u> <u>Hodas v. Sherburne, Powers & Needham, P.C.</u>, 938 F. Supp. 60, 63 (D. Mass. 1996).

Encompass has yet to uncover the full extent of its injury. The facts do not support a finding that Encompass was, or should have been, cognizant of its RICO injuries upon payment of individual claims, which payments were made in good-faith reliance upon defendants' deceitful representations. To hold otherwise would fault Encompass for its "blameless ignorance" anent circumstances that defendants affirmatively concealed. <u>Urie v. Thompson</u>, 337 U.S. 163, 169-70 (1949); (A.C. ¶¶ 304-305, 332). Rather this Court must diligently protect the victim of such conduct consistent with RICO's purpose as an "aggressive initiative to supplement old remedies and develop new methods for fighting crime." <u>Sedima,</u> 473 U.S. at 498. As the United States Supreme Court recognized over one hundred years ago:

> It is certainly true that length of time is no bar to a trust clearly established; and, in a case where fraud is imputed and proved, length of time ought not, upon principles of eternal justice, to be admitted to repel relief. On the contrary, it would seem that the length of time during which the fraud has been successfully concealed and practiced, is rather an aggravation of the offence, and calls more loudly upon the court of equity to grant ample and decisive relief.

<u>McIntire v. Pryor</u>, 173 U.S. 38, 55 (1899) (quoting <u>Prevost v. Gratz</u>, 19 U.S. (6 Wheat.) 481 (1821)).

Encompass expressly alleges that defendants engaged in a secretive, ongoing conspiracy involving a close-knit, limited number of conspirators who submitted false medical documentation to Encompass over the course of several years. Because of the clandestine nature of defendants' fraud operation, Encompass did not discover its federal RICO injuries until Encompass subjected the First Spine medical documentation collectively to expert medical review beginning in May of 2005.

Further exalting form over substance, the Giampa defendants complain on pages 11-12 of their motion that Encompass does not adequately allege the elements of fraudulent concealment. Encompass alleges as follows:

> 45.    Payment of improper referral fees by the defendants was not disclosed to Encompass.
>
> ***
>
> 304.    The defendants' fraudulent scheme went undetected until Encompass had sustained substantial financial injury. The nature of defendants' fraudulent scheme was self-concealing by its very nature -- false medical reports and false invoices appearing legitimate on their face.
>
> 305.    The defendants intentionally concealed the fraudulent medical billing scheme from Encompass.
>
> ***
>
> 331.    As a result of and in reasonable reliance upon these misleading documents and misrepresentations, Encompass by their agents and employees issued drafts to First Spine for the benefit of Count I Defendants that would not otherwise have been paid.
>
> 332.    The Count I Defendants' pattern of fraudulent claims, each appearing legitimate on its face, also prevented Encompass

from discovering the fraudulent scheme for a long period of
time enabling them to continue without being detected.

The defendants' ability to conceal their fraudulent scheme was enhanced by the position of trust

medical providers are typically accorded in the transaction of insurance-based medical claims.

See United States v. Hoogenboom, 209 F.3d 665, 671 (7th Cir. 2000) (recognizing that medical

"providers occupy positions of trust with respect to private or public insurers . . . [and] enjoy

significant discretion and . . . lack of supervision in determining the type and quality of services

that are necessary and apparent for their patients. This forces [insurers] . . . to depend . . . on a

presumption of honesty when dealing with statements received from medical professionals."). [5]

        As evidenced by the First Amended Complaint and the Affidavits of Michael Bruno and

Michael Frustaci, D.C., Encompass employed due diligence in investigating claims. Encompass

maintained an active and professional Special Investigation Unit to investigate suspicious claims

including claims advanced by defendants' patients. Investigations were conducted within the

confines of applicable law in light of Encompass' business judgment. See Affidavit of Michael

Bruno, Docket No. 10.

---

[5] See also U.S. v. Liss, 265 F.3d 1220, 1229-1230 (11th Cir. 2001) (upholding abuse of trust enhancement when a physician receives kickbacks for patient referrals); United States v. Hoogenboom, 209 F.3d 665, 671 (7th Cir. 2000) (upholding abuse of trust enhancement for psychologist who billed Medicare for services that had not been performed or services not performed as billed); United States v. Sherman, 160 F.3d 967, 969-71 (3d Cir. 1998) (upholding abuse of trust enhancement based on physician's abuse of trust with respect to defrauded insurance company); United States v. Ntshona, 156 F.3d 318, 321 (2d Cir. 1998) (upholding abuse of trust enhancement where a physician defrauded Medicare by signing false claims); United States v. Iloani, 143 F.3d 921, 922-23 (5th cir. 1998) (upholding abuse of trust enhancement based on chiropractor's position of trust with respect to insurance company, where a chiropractor conspired with patients to submit fraudulent bills to insurance companies); United States v. Rutgard, 116 F.3d 1270, 1293 (9th Cir. 1997) (upholding abuse of trust enhancement for ophthalmologist who made false entries in his medical records); United States v. Adam, 70 F.3d 776, 782 (4th Cir.1995) (upholding abuse of trust enhancement for an internist who took illegal kickbacks from a cardiologist in exchange for patient referrals).
        In analyzing the Abuse of Trust enhancement for sentencing purposes in a criminal case, the Seventh Circuit, in United States v. Vivit, 214 F.3d 908 (7th Cir. 2000) held:

        The medical providers that Vivit failed to perform raise more troubling
        questions. To conceal his ongoing fraud from insurers, Vivit engaged in
        rudimentary examination procedures better designed to generate additional visits
        in his attendance log than to diagnose injury.

Id. at 922, 924.

Moreover, the present procedural posture of this case -- construing facts and reasonable inferences in a light favorable to Encompass -- requires that the issue of whether Encompass was duly diligent in the discovery of its injury be decided by the trier of fact. See, e.g., J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1260 (1st Cir. 1996); Liberty Mutual Ins. Co. v. Allen S. Rosenthal, CA. No. 95-12362-RGS (D. Mass. 1999) (RICO-insurance fraud); compare Sleeper v. Kidder, Peabody & Co., 480 F. Supp. 1264, 1266 (D. Mass. 1979) (deciding issue as a matter of law only when *nothing on the record supports an inference that a RICO Plaintiff acted with the requisite diligence*).

Contrary to the Giampa defendants' blind assertions, Encompass did not discover its injury (RICO, 93A, common law fraud or otherwise) until it subjected the defendants' medical records to a collective medical review beginning in 2005. Id. Accordingly, the applicable limitations period begins in 2005.[6]

For all the forgoing reasons, and considering the facts and all reasonable inferences in the Amended Complaint in a light most favorable to Encompass, defendants' motions to dismiss must be denied.

### E. ENCOMPASS HAS SUFFICENTLY ALLEGED ITS CIVIL CONSPIRACY CLAIM UNDER PREVAILING MASSACHUSETTS LAW

A claim for civil conspiracy requires a plaintiff to demonstrate that the defendant agreed and combined with at least one other person to accomplish an unethical, unfair, deceptive, wrongful and/or illegal purpose and that the defendants acting in unison had some "peculiar power of coercion" over the plaintiff that they would not have had if acting independently, see Jurgens v. Abraham, 616 F. Supp. 1381, 1386 (D. Mass. 1985), or that the defendants undertook

---

[6] Even assuming that a portion of the claims alleged in Encompass' Amended Complaint are barred by the applicable limitation period, as the Giampa defendants correctly point out, the only claims that would be time barred would be those claims in connection with which Encompass should have discovered its injury prior to August 16, 2001. Thus, even crediting defendants' erroneous analysis that all claims paid prior to August 16, 2001 are late. Encompass would still have alleged $ 467,125 in damages within the applicable limitation period. See Tab 10.

some tortuous act in furtherance of the conspiratory agreement.  See Aetna, 43 F.3d at 1563-1564; *Restatement (Second) of Torts,* §876 (1977).  Proof of a conspiracy under Massachusetts law will make all members of the conspiracy jointly and severally liable to plaintiff.  See New England Foundation Co. v. Reed, 209 Mass. 556 (1911).

Encompass' cause of action for civil conspiracy under Massachusetts law is established under circumstances substantially similar to those outlined in section 876 of the Restatement (Second) of Torts, which provides as follows:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.

Moreover, an inference of an implied agreement can reasonably be drawn from the conduct of multiple parties.  See, e.g., Orszulak v. Bujnevicie, 355 Mass. 157, 158-159 (1969); Nelson v. Nason, 343 Mass. 220, 222 (1961).  The so-called "substantial assistance" doctrine, although not explicitly adopted in Massachusetts, has been cited with favor in Massachusetts appellate decisions, is premised upon proof that the defendant actively acknowledged that his/her assistance was contributing to a common tortious plan.  "In the tort field the doctrine appears to be reserved for application to facts which manifest a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result." Stock v. Fife, 13 Mass. App. Ct. 75, 82 n. 10 (1982).

The Culliney defendants incorrectly conclude that the Amended Complaint "fails to delineate the participation" of the individual defendants.  Encompass alleges that defendants

directly participated in and/or created and controlled the fraudulent medical billing scheme. (A.C. ¶¶ 56-64). McConnell and Culliney are the treating chiropractors in 163 of the 196 claims. (A.C. ¶¶ 57-59). Culliney is a team leader within the Future Management enterprise and is responsible for numerous clinics, including First Spine. (A.C. ¶¶ 35-36) McConnell and J. Giampa are listed with the Board of Chiropractors as the chiropractors registered with First Spine Lowell. It is further alleged that the preordained medical protocol and recipe of treatment was created by, controlled and overseen by the business principals, J. Giampa, F. Giampa and E. Kennedy. (A.C. ¶¶ 310-314). Specifically, Encompass alleges:

**McConnell:** Encompass alleges that McConnell administered and/or directed much of the treatment for the individuals identified in Amended Complaint Exhibit 3. Moreover, McConnell is listed as the Chiropractor of Record for the First Spine Clinic.[7]

**Culliney:** Culliney is the primary chiropractor charged with treating the patients alleged in Exhibit 3. Moreover, he is a Team Leader of the Future Management Enterprise and is responsible for numerous clinics, including First Spine. (A.C. ¶¶ 35-36)

**J. Giampa, F. Giampa, E. Kennedy:** J. Giampa , F. Giampa and E. Kennedy are the (1) shareholders of Future Management and (2) business principals of Future Management who oversaw and/or directed the preordained medical protocol and recipe of treatment that was implemented at First Spine, Lowell. (A.C. ¶ 310-314)

---

[7] Pursuant to proposed 233 Code of Massachusetts Regulations 5.03, entitled Duties of the Chiropractor of Record, McConnell is responsible for the following: (1) the Chiropractor of Record must be of good moral character; (2) the Chiropractor of Record is responsible for the chiropractic facility's compliance with the laws of the Commonwealth and the Board's rules and regulations; (3) the Chiropractor of Record shall cooperate with inspections or investigations conducted by the Board or its agents; (4) upon request of the Board or its agents, the Chiropractor of Record shall provide immediate access to and, if requested, copies of patient and business records; (5) the Chiropractor of Record must notify the Board within ten days of ceasing to serve as the Chiropractor of Record for the chiropractic facility; and (6) the Chiropractor of Record must notify the Board of any known disciplinary actions against any licensees and of any criminal convictions against an employee of the chiropractic facility. Such notice must be made to the Board within ten business days of such conviction or disciplinary action.

Consequently, in light of the conduct alleged with particularity in Encompass' First Amended Complaint, it can be reasonably inferred that an agreement existed between the individual defendants to engage in the concerted illegal effort.  For all the forgoing reasons, and considering the facts plead and all reasonable inferences therefrom in a light most favorable to Encompass, defendants' motions to dismiss must be denied.

### F.    **ENCOMPASS' COMMON LAW FRAUD CLAIM IS PLEAD WITH SUFFICIENT PARTICULARITY**

To prevail under its common law claim for fraud, Encompass must simply demonstrate by a preponderance of the evidence that the defendants misrepresented material facts upon which Encompass relied to its detriment.  See McMahon v. M & D Builders, Inc., 360 Mass. 54 (1971); Yorke v. Taylor, 332 Mass. 368 (1955).

 As articulated at Section III A-B above, Encompass has amply met its burden in the case at bar in light of its particular allegations that defendants engaged in a pattern of insurance fraud - - i.e., submission of false medical documentation through the U.S. Mail with the intent to illegally obtain insurance proceeds from Encompass.  Encompass alleges that defendants scheme was carried out through the individual misrepresentations contained in each and every individually identified false medical record detailed with requisite particularity and incorporated by reference (in accordance with Rule 10(c), Fed. R. Civ. P.), into Encompass' First Amended Complaint, upon which Encompass relied to its detriment in paying defendants' invoices.  Id.

For all the forgoing reasons (including the analysis at III, A and B above), and considering the facts and all reasonable inferences in the First Amended Complaint in a light most favorable to Encompass, defendants' motions to dismiss must be denied.

### G.    ENCOMPASS' CHAPTER 93A CLAIM IS SUFFICIENTLY PLEAD WITHIN THE APPROPRIATE LIMITIATION PERIOD

#### 1.    Statute of Limitation

The defendants challenge the timeliness of Encompass' 93A claim.  In opposition, Encompass respectfully directs the Court's attention to the statute of limitations argument articulated above at Section III D supra.

#### 2.    Encompass' Chapter 93A Claim Meets All Applicable Pleading Requirements

Chapter 93A claims do not require the heightened pleading standard mandated by Rule 9(b).  Notwithstanding the more relaxed standard afforded claims brought under 93A, Encompass maintains that for the same reasons its RICO and fraud claims have been pled with requisite particularity, its Chapter 93A allegations are equally particularized.  See Section III B(iv) supra.

However, heightened pleading is not required – "the concept of unfair or deceptive acts or practices made actionable by G.L.c. 93A goes far beyond the scope of the common law action for fraud and deceit and does not necessarily require similar pleading specificity."  U.S. Funding, Inc. of America v. Bank of Boston Corp., 28 Mass. App. Ct. 404 (1990) (citing Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703 (1975)); see also Li'l Peach of Massachusetts, Inc. v. Prendergast, 1996 Mass. Super. LEXIS 356 (August 14, 1996) (recognizing that "Massachusetts courts do not impose [particularity] requirement on c. 93A claimants").

In support of their contention that 93A claims require Rule 9(b) specificity, defendants rely on Wayne Invest., Inc. v. Gulf Oil Corp. 739 F.2d 11 (1st Cir. 1984) (hereinafter "Wayne"), in which the Court of Appeals affirmed the district court's dismissal of plaintiffs complaint on the basis of plaintiffs failure to plead *fraud* with particularity.  Importantly, with respect to the Chapter 93A claim advanced by the plaintiff in Wayne, dismissal appears not to have been

premised upon lack of pleading particularity, but rather, plaintiffs' failure to allege a state law diversity claim sufficient to withstand dismissal of the federal causes of action.  Id. at 15.

It is clear from the Wayne decision, that the basis for the court's affirmance of the dismissal was not premised upon any newly articulated requirement that ch. 93A claims fall within the pleading parameter of Rule 9(b).  The district court decision rested on the fact that plaintiff would not have satisfied the jurisdictional threshold for a diversity case.

For all the forgoing reasons, and considering the facts plead and all reasonable inferences therefrom in a light most favorable to Encompass, defendants' motions to dismiss must be denied.

**H.    ENCOMPASS ADEQUATELY ALLEGES ITS CLAIM FOR INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS BUSINESS AND CONTRACTUAL REALTIONSHIPS**

To prevail on a claim of intentional interference with advantageous contractual relationship, a plaintiff must prove (1) the existence of the contract or business relationship with contemplated economic benefits; (2) knowledge by the defendant of this relationship; (3) intentional interference with the advantageous relationship by the defendant for an improper purpose or by improper means; and (4) damages.   See Swansest Dev. Corp. v. City of Taunton, 423 Mass. 390, 397 (1995).

Encompass amply meets its burden in its First Amended Complaint.  The entire fraudulent medical billing conspiracy was carried out in order to illegally obtain insurance proceeds in connection with the insurance policy contracts issued by Encompass.  (A.C. ¶¶ 4-6). The First Spine patients were either the named policyholders or third-party beneficiaries under the insurance policy contracts.  Id.  The defendants were clearly on notice of this advantageous relationship whereas the entire conspiratorial sweep of their efforts was designed to create and submit false medical documentation to Encompass with the intent to obtain insurance proceeds.

<u>Id.</u>  The defendants cannot reasonably claim ignorance of this universally evident contractual relationship - - namely all defendants' documentation is produced in a form designed to result in insurance payments.  <u>Id.</u>  Encompass expressly alleges that all of defendants' conduct was undertaken intentionally and that the interference was carried out with the <u>improper purpose</u> to illegally obtain insurance proceeds to which defendants were not entitled through the improper means of creation and submission of false medical documentation.  (A.C. ¶¶ 3 and Exhibit 1). Encompass also sufficiently alleges that its damages resulted from defendants' intentional interference with the applicable insurance contracts.

That defendants intentionally and repeatedly submitted false medical documentation to Encompass for payment, without more, clearly forms the basis for a valid, well-pled intentional interference of contractual relations – i.e., Encompass paid First Spine on behalf of its insureds/claimants in connection with automobile insurance *contract* claims, in reliance on defendants' submission of false medical documentation.

For all the forgoing reasons, and considering the facts pled and all reasonable inferences therefrom in a light most favorable to Encompass, defendants' motions to dismiss must be denied.

**V.    <u>CONCLUSION</u>**

WHEREFORE, for all the foregoing reasons this Court should enter an Order denying defendants motions to dismiss and order that all defendants tender answers within 10 days.  In the alternative, should the court conclude that one or more of Encompass' claims are susceptible

to dismissal for failure to plead with requisite particularity, Encompass respectfully requests 30 days leave to amend.

Respectfully Submitted
*Encompass Insurance Company,*
By its Attorneys,

/s/ Nathan A. Tilden
_____
Richard D. King, Jr., BBO No.:  638142
Nathan A. Tilden, BBO No.:  647076
SMITH & BRINK, P.C.
122 Quincy Shore Drive
Quincy, MA  02171
Dated:  December 20, 2005          Tel:  (617) 770-2214

30

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPT.
CIVIL ACTION
DOCKET No.

**05-1458**

|  |  |
|---|---|
| EDWARD D. KENNEDY, individually, and as beneficiary of 13 KIDDER ROAD REALTY TRUST and derivatively, on behalf of the corporations FIRST HEALTH PRODUCTS INC. and ROBERT T. KENNEDY INC. d/b/a Kennedy Professional Supply, Plaintiffs<br><br>v.<br><br>JAMES KENNEDY, individually and as Trustee of 13 KIDDER ROAD REALTY TRUST; and ENTERPRISE BANK AND TRUST COMPANY, Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
MIDDLESEX

APR 29 2005

Edward J. Sullivan
CLERK

6660E000004/29/05CIVIL        240.00
6660E000004/29/05SUR CHARGE    15.00
6660E000004/29/05SUMMONS       10.00
6660E000004/29/05SECC          20.00

## VERIFIED COMPLAINT

### INTRODUCTION

1.     The Plaintiff in this action, Edward D. Kennedy, has brought this direct and derivative action against the above-named defendant, James Kennedy based upon, *inter alia*, a) his improper attempt to deprive the Plaintiff of his interest in the family businesses, Robert T. Kennedy Inc. d/b/a Kennedy Professional Supply ("Kennedy Supply") in which the Plaintiff is President and 50% shareholder; b) looting of the income generated by the businesses Kennedy Supply and First Health Products Inc. ("First Health") and assets held by 13 Kidder Road Realty Trust ("Kidder Trust"); c) breach of fiduciary obligations, d) self-dealing, e) wrongful exercise of dominion over the corporate and trust assets, f) continued refusal to permit joint control over the financial affairs of the corporations despite demand, g) waste, h) mismanagement, i) theft, j)

forgery, and k) fraud. The Plaintiff is therefore in need of immediate injunctive relief to preserve the remaining corporate and trust assets, and hereby requests the Court to Order the valuation and sale of the Plaintiff's shares in Kennedy Supply, First Health and Kidder Trust, or in the alternative, if the Court sees fit, order the dissolution of Kennedy Supply and First Health pursuant to Mass. Gen. Laws ch. 156D § 14.30 et als.

## PARTIES

2.      Plaintiff Edward D. Kennedy ("E. Kennedy") is an individual who resides in Westford, Middlesex County, Massachusetts. The Plaintiff is currently the President and 50% shareholder of Kennedy Supply and First Health.

3.      Plaintiff Robert T. Kennedy Inc. is a Massachusetts corporation with a current principal place of business at 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts doing business as Kennedy Professional Supply.

4.      Plaintiff First Health Products Inc. is a Massachusetts corporation with a current place of business at 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts.

5.      Plaintiff Edward Kennedy is also a 50% beneficiary of the Kidder Trust, a nominee trust, under a Declaration of Trust recorded at the Middlesex North County Registry of Deeds on June 2, 2000 at Book 10858, Pages 180 through 185. Kidder Trust is the owner of the Premises known as and numbered 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts.

6.      Kennedy Supply and First Health are engaged in the wholesale purchase and sale of health care products, equipment, and supplies to over 1000 chiropractors, chiropractic clinics, hospitals, medical doctors and physical therapists across New England and several other states

including, Florida, Oklahoma, Rhode Island, South Carolina, New Jersey, New York and Pennsylvania.

7.      Defendant James Kennedy ("J. Kennedy") is an individual who resides at 3 Kirby Lane, Chelmsford, Middlesex County, Massachusetts.  J. Kennedy is the Plaintiff's brother, Treasurer, and remaining 50% shareholder in Kennedy Supply and First Health.  J. Kennedy is a co-Trustee of the Kidder Trust.

8.      Defendant Enterprise Bank and Trust Company ("Enterprise Bank") is a Massachusetts banking corporation with a registered principal place of business in Tewksbury, Massachusetts and a banking facility located at 185 Littleton Road, Chelmsford, Massachusetts, which, at all times material hereto, was, and continues to be, the banking institution used by Kennedy Supply, First Health and the Kidder Trust.

## COMMON ALLEGATIONS OF FACT

9.      Kennedy Supply was formed in June 1981 by E. Kennedy and J. Kennedy's late father, Robert T. Kennedy, for the purpose of engaging in wholesale purchase and sale of medical supplies.  *See Articles of Organization of Robert T. Kennedy Inc. attached hereto at Exhibit A.*

10.      Kennedy Supply was formed by Robert Kennedy (its President), his wife, Esther Kennedy, (Treasurer), and his son, Plaintiff E. Kennedy (Clerk).  *See Exhibit A.*

11.      Initially, Robert Kennedy was the sole shareholder and operated and managed Kennedy Supply along with his two youngest sons, Henry and E. Kennedy.

12.    The middle child, J. Kennedy, was a carpet installer who possessed very little knowledge of the family business until Robert Kennedy brought him in to get actively involved in Kennedy Supply.

13    Over time, Kennedy Supply's business developed substantial contacts with individuals and companies in the chiropractic industry.

14.    Through these contacts, E. Kennedy decided to open medical offices to provide chiropractic services to the public.

15.    The first chiropractic/physical therapy office was opened in Lawrence, Massachusetts.

16.    Shortly thereafter, E. Kennedy contacted Dr. Joseph Giampa, a longtime friend who E. Kennedy knew to be a licensed chiropractor in Massachusetts for the purpose of becoming a partner in the new business venture.

17.    The new business, Future Management Corporation ("Future Management"), was formally organized in February 1997.

18.    Initially, the parties agreed that Future Management would have three shareholders, E. Kennedy, (25%), J. Kennedy (25%) and Joseph Giampa (50%).

19.    The creation of Future Management was also intended to benefit Kennedy Supply's business, as Kennedy Supply was to be Future Management's primary distributor of medical and chiropractic equipment and supplies.

20.    In order to focus on developing these respective businesses, E. Kennedy permitted J. Kennedy to assume more control over Kennedy Supply than J. Kennedy previously maintained.

4

21.     E. Kennedy agreed to have J. Kennedy operate the day to day management business, while E. Kennedy was in charge of overseeing Kennedy Supply's financial operations.

22.     By September 2003, E. Kennedy had expanded Future Management from 1 office in Lawrence, to over 60 offices in Massachusetts and across the United States, including, but not limited to Florida, Oklahoma, Connecticut, Rhode Island, South Carolina, New Hampshire, Pennsylvania, Illinois and Virginia.

23.     In 1996, E, Kennedy and J. Kennedy assumed full control over Kennedy Supply after Robert Kennedy retired from the family business.

24.     Prior to receiving a salary from Future Management, E. Kennedy was Kennedy Supply's President, and J. Kennedy, its Treasurer and Clerk and both received salaries from Kennedy Supply in the amount of $200,000.00 and $125,000.00 respectively.

25.     On or about July 20, 1998, E. Kennedy and J. Kennedy formed First Health, a sister corporation to Kennedy Supply, for the purpose of managing and handling various aspects of Kennedy Supply's business, including, but not limited to, administering Kennedy Supply's salaries.

26.     At all times material hereto, E. Kennedy has been the President of First Health and J. Kennedy, its Treasurer and Secretary.

27.     On or about June 2, 2000, Robert Kennedy sold the property located at 13 Kidder Road, Chelmsford, Massachusetts-- the principal place of business for both Kennedy Supply and First Health -- to E. Kennedy and J. Kennedy as co-Trustees of the 13 Kidder Road Realty Trust for Four Hundred and Fifty Thousand ($450,000.00) Dollars.

28.     Beginning on or about January 2000, E. Kennedy and J. Kennedy began receiving a salary from Future Management in the amount of $2,500.00 per week in addition to receiving stock dividends of approximately $130,000.00 per year.

29.     As a result, E. Kennedy and J. Kennedy stopped taking any salary from Kennedy Supply or First Health.

30.     In January 2004, J. Kennedy began to experience serious personal financial problems on account of his increased spending habits and changes in his lifestyle.

31.     Further exacerbating his financial problems, after separating from his wife Claudia Kennedy, J. Kennedy purchased a home in Chelmsford, Massachusetts for $625,000.00, and took frequent vacations with his girlfriend to various destinations in the Caribbean, and to Myrtle Beach, South Carolina.

32.     On January 22, 2004, pursuant to a Decree of Divorce in the Southern District in Hillsborough County, New Hampshire, Claudia Kennedy, was awarded the marital home in Nashua, New Hampshire, their mobile home in Albany, New Hampshire, and their real estate in Myrtle Beach, South Carolina. *A true and accurate copy of the Decree of Divorce dated January 22, 2004 in the matter of Kennedy v. Kennedy is attached hereto at Exhibit B.*

33.     The Decree of Divorce also Ordered that J. Kennedy pay $7,500.00 per month for child support payments for his two minor children, $5,000.00 per month in alimony payments, turn over all assets held in his 401(k) retirement account, plus pay an additional $15,000.00 per month for a period of seven years to Claudia Kennedy as payment for her share of the property division distributions in Future Management, Kidder Trust, First Health and Kennedy Supply. *See Exhibit B.*

6

34.     As part of its decree, the Court specifically stated that J. Kennedy was "not freely forthcoming with information regarding [his] assets" and failed to list several assets on his financial statements filed with the Court. *See Exhibit B.*

35.     Within hours after learning of the New Hampshire Court's Decree, J. Kennedy stated to E. Kennedy's wife, Tracy Kennedy, and her sister Peggy Arnett, that as a result of this decision from this Court, he was in desperate need of more money. *See Affidavit of Tracy Kennedy and Peggy Arnett attached hereto at Exhibits C and D, respectively.*

36.     Approximately two months later, E. Kennedy discovered that J. Kennedy had caused Kennedy Supply's bank accounts at Enterprise Bank to become overdrawn.

37.     Despite E. Kennedy's attempts to resume joint control over the operation and management of Kennedy Supply and First Health, J. Kennedy prohibited E. Kennedy from having any involvement in the business, notwithstanding E. Kennedy's 50% ownership interest.

38.     J. Kennedy and the two other shareholders of Future Management also conspired to freeze E. Kennedy out of Future Management and, as a result, assumed total control over Future Management, whose net profits had risen to over $3.7 million dollars.

39.     E. Kennedy later discovered documents at Kennedy Supply's office which revealed that J. Kennedy was using Kennedy Supply to enable Future Management to fraudulently borrow hundreds of thousands of dollars from various lending entities under the guise that Future Management was purchasing chiropractic equipment from Kennedy Supply.

40.     One such document included a Security Agreement between Future Management and a lending entity, Maruka U.S.A. Inc., in connection with the acquisition and financing of $71,537.20 in medical equipment, purchased from Kennedy Supply, for Future Management's

7

chiropractic office in New Bedford, Massachusetts. *A true and accurate copy of the letter and Security Agreement dated June 1, 2004 is attached hereto at Exhibit E.*

41.    Attached to the Security Agreement to Maruka U.S.A. Inc. included documents entitled "Certified Copy of Resolutions of Board of Directors" of Future Management Mass Business Trust and Future Management purportedly containing E. Kennedy's name and signature as Vice President of Future Management, authorizing and approving the loan from Maruka U.S.A. Inc. to Future Management. *See Exhibit E.*

42.    E. Kennedy never signed any of the documents with Maruka U.S.A. Inc. set out in Exhibit E.

43.    Attached to the Security Agreement was a personal Guarantee purportedly signed by E. Kennedy and witnessed by Kennedy Supply's office secretary, Maria King. *A copy of the personal Guarantee is attached hereto at Exhibit F.*

44.    E. Kennedy never signed the personal Guarantee set out in Exhibit F, either in the presence of Maria King, or otherwise.

45.    E. Kennedy also found several invoices from Kennedy Supply to Future Management offices which Future Management utilized to borrow over $765,479.70 from various other lending entities.

46.    These invoices reflected large equipment orders for chiropractic facilities owned by Future Management. However, several of these facilities were already fully equipped and one invoice stated that Kennedy Supply purportedly sold chiropractic equipment totaling $118,655.00 to Future Management for its clinic in Danbury, Connecticut -- a clinic that had been closed down for several months at the time of the issuance of that invoice. *True and accurate copies of the foregoing Invoices are attached hereto at Exhibit G.*

47.    E. Kennedy also discovered that J. Kennedy had been withdrawing funds from a line of credit at Enterprise Bank which was secured with a personal guarantee by E. Kennedy and J. Kennedy.

48.    On January 12, 2005, E. Kennedy, through counsel made formal demand to inspect the financial records of Kennedy Supply, Kidder Trust, and First Health.

49.    After reviewing the financial records, E. Kennedy discovered that substantial payments and disbursements totaling over Three Hundred Thousand ($300,000.00) dollars had been transferred by J. Kennedy from Kennedy Supply's accounts to himself, his personal attorneys, and to Future Management and its shareholders, including, but not limited to:

a.    Payments to American Express, MBNA credit card and Discover credit card payments in excess of $5,000.00 per month;

b.    Payments exceeding $37,000.00 to a Citizens Bank personal line of credit held in the name of James and Claudia Kennedy;

c.    Check dated March 10, 2004 payable to Future Management in the amount of $3,743.20;

d.    Check dated May 7, 2004 payable to Future Management in the amount of $1,700.00;

e.    Check payable to the law firm of Manchel & Brennan, P.C. dated May 10, 2004 in the amount of $2,277.49;

f.    Check payable to Fred Giampa dated June 10, 2004 for $8,000.00;

g.    Check payable to Joe Giampa dated June 10, 2004 for $25,000.00;

h.    Check payable to Fred Giampa dated July 13, 2004 for $4,500.00;

i.    Check payable to James Kennedy dated August 31, 2004 for $50,000.00;

j.    Check payable to Future Management dated September 21, 2004 for $113,000.00; and

k.    Check payable to Future Management dated December 13, 2004 in the amount of $6,521.96.

*True and accurate copies of the foregoing documents are attached hereto at Exhibit H.*

50.     E. Kennedy has never authorized the retention of Manchel & Brennan, P.C. by Kennedy Supply and, through counsel, formally informed them that they were not to be paid from Kennedy Supply's funds. *See attached letter from Stephen A. Greenbaum dated February 11, 2005 attached hereto at Exhibit I.*

51.     After discovering this information, E. Kennedy, through counsel, requested that Enterprise Bank refuse to accept any further checks or withdrawals from Kennedy Supply's accounts that did not possess dual signatures or authorizations from both E. Kennedy <u>and</u> J. Kennedy. *See attached letter from Stephen A. Greenbaum to Mary Jane Nardone, Vice President Commercial Lending, Enterprise Bank dated February 7, 2005 attached hereto at Exhibit J.*

52.     On February 10, 2005, Enterprise Bank informed E. Kennedy that it would not accept his request without the consent of J. Kennedy, or in the alternative, a court order. *See attached letter from Mary Jane Nardone dated February 10, 2005 attached hereto at Exhibit K.*

53.     At that time, E. Kennedy asked Ms. Nardone at Enterprise Bank about the status of the Kennedy Supply line of credit personally guaranteed by J. Kennedy and E. Kennedy.

54.     Ms. Nardone stated that the line of credit maintained a "zero" balance.

55.     When E. Kennedy instructed Ms. Nardone to take his name off of the account, Ms. Nardone assured E. Kennedy that she would, but in any event, due to the dispute that had arisen between the E. Kennedy and J. Kennedy, that Enterprise Bank would no longer lend any money to Kennedy Supply.

56.     E. Kennedy questioned J. Kennedy on several occasions about his continued use of Kennedy Supply's funds to pay for his increasing personal debts.

57.    While J. Kennedy admitted taking money from Kennedy Supply, he refused to reimburse any monies inappropriately withdrawn for his personal use back to Kennedy Supply or E. Kennedy.

58.    J. Kennedy further admitted to E. Kennedy in September 2004 that he had transferred money from Kennedy Supply to Future Management to pay for Future Management's payment for referrals to its chiropractic clinics across Massachusetts.

59.    Specifically, in a telephone conversation, J. Kennedy admitted to E. Kennedy that he had used money from Kennedy Supply and given it to Future Management and the Giampa brothers to pay for "runners", i.e. individuals paid to refer clients to Future Management's chiropractic offices.

60.    At the time J. Kennedy made this admission, he was aware that there was a law which was going to be passed by the Massachusetts legislature making the use of "runners" a criminal act.  The legislature subsequently passed Mass. Gen. Laws ch. 266 § 111C which imposed criminal sanctions for this practice.  *See copy of foregoing statute passed by Massachusetts legislature effective January 3, 2005 attached hereto at Exhibit L.*

61.    No longer able to jointly run and operate the business, E. Kennedy and K. Kennedy began negotiations for J. Kennedy to purchase E. Kennedy's 50% shares in Kennedy Supply, First Health, and his interest in Kidder Trust.

62.    After attempts to agree on a price for E. Kennedy's shares failed, the parties discussed selling Kennedy Supply, First Health and the building at 13 Kidder Road to outside third parties.  *See attached letter from J. Kennedy's counsel to E. Kennedy's counsel dated March 31, 2005 attached hereto at Exhibit M.*

11

63.    The parties continued the foregoing negotiations until April 14, 2005 when E. Kennedy discovered that J. Kennedy was continuing to deplete Kennedy Supply's assets by withdrawing $2,000.00 per week beginning in January 2005 for his personal use, and withdrawing $12,000.00 from Kennedy Supply's line of credit at Enterprise Bank – the same line of credit personally guaranteed by E. Kennedy.

64.    From or about January 1, 2004, J. Kennedy withdrew an additional $2,000.00 a month from Kennedy Supply's accounts to pay for a personal line of credit taken out jointly in his name and his ex-wife's name, held at Citizens Bank. *See attached general ledger at Exhibit N.*

65.    After an Order from the New Hampshire Probate Court that he pay off the outstanding line of credit, J. Kennedy issued a check from Kennedy Supply's checking account in the amount of $18,039.89. *See copy of check payable to Citizens Bank attached hereto at Exhibit O.*

66.    Furthermore, the $2,000.00 disbursement each month from Kennedy Supply for J. Kennedy's line of credit that was originally reflected on his tax returns as a payment of dividends, was subsequently omitted from Kennedy Supply's financial records prepared by its accountant, William Chapman. *See attached revised ledger from Kennedy Supply's accountant, William Chapman, attached hereto at Exhibit P.*

67.    In addition to the foregoing, following their father's death in April 2004, E. Kennedy is informed, believes, and hereby avers that J. Kennedy converted the proceeds from their father's life insurance policy held in the Kidder Trust and used those funds for his personal use.

68.     On March 31, 2005, the New Hampshire Probate Court found J. Kennedy in contempt for failing to pay Claudia Kennedy her portion of the property distribution in accordance with the Court's Order. *A true and accurate copy of the Court's Order is attached hereto at Exhibit Q.*

69.     As a result, the Court ordered that J. Kennedy pay Claudia Kennedy $68,214.00 in payment arrearages through November 2004 within 10 days of the date of the Order. *See Exhibit Q.*

70.     On April 15, 2005, Claudia Kennedy filed a Motion to Show Cause for J. Kennedy's failure to tender payment in accordance with the Court's second Order. *A true and accurate copy of the foregoing Motion is attached hereto at Exhibit R.*

71.     E. Kennedy is informed, believes, and hereby avers that J. Kennedy has failed to pay Claudia Kennedy $15,000.00 per month since November 2004 and is in default of the Court Order.

72.     J. Kennedy's conduct as aforesaid is wrongful and in direct violation of his obligations to Kennedy Supply, First Health, Kidder Trust, and to E. Kennedy.

73.     E. Kennedy, individually, and on behalf of Kennedy Supply, First Health and Kidder Trust, ("the Plaintiffs") are in need of immediate injunctive relief against J. Kennedy and Enterprise Bank in order to preserve the status quo and prevent the further dissipation the business' assets.

74.     In the absence of injunctive relief, the Plaintiffs' assets will be subject to continued waste and loss.

75.    E. Kennedy is informed, believes and hereby avers that his brother is financially unable to purchase his interests in Kennedy Supply and First Health, and all attempts to negotiate a sale of the business and the property at 13 Kidder Road to third parties have failed.

76.    Accordingly, following the imposition of a restraining order to preserve the status quo, the Plaintiffs hereby petition the Court for an accounting of all funds J. Kennedy misappropriated and converted from Kennedy Supply, First Health, and the Kidder Trust.

77.    The Plaintiffs are in further need of judicial intervention to either supervise the sale of the foregoing entities, or in the alternative, dissolve Kennedy supply and First Health.

### COUNT I – BREACH OF CONTRACT

78.    The Plaintiffs hereby repeat and re-allege paragraphs 1 through 77 above as if fully set forth herein.

79.    Based upon his conduct as set forth above, J. Kennedy is in breach of his contractual obligations to the Plaintiff and to Kennedy Supply, First Health, and Kidder Trust.

80.    The aforesaid breach of contract was knowing and willful.

81.    The Plaintiffs have suffered damages as a result of the same.

### COUNT II – BREACH OF FIDUCIARY DUTY

82.    The Plaintiffs hereby repeat and re-allege paragraphs 1 through 81 above as if fully set forth herein.

83.    Based upon his conduct as set forth above, J. Kennedy, as a partner, director, and shareholder in a close corporation is in breach of his fiduciary duty owed to the Plaintiffs.

84.    The aforesaid breach of fiduciary duty was knowing and willful.

85.    The Plaintiffs have suffered damages as a result of the same.

## COUNT III – BREACH OF DUTY OF GOOD FAITH AND LOYALTY

86. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 85 above as if fully set forth herein.

87. Based upon his conduct as set forth above, J. Kennedy as a partner, director, and shareholder in a close corporation, is in breach of his duty of utmost good faith and loyalty owed to the Plaintiffs.

88. The aforesaid breach of duty was knowing and willful.

89. The Plaintiffs have suffered damages as a result of the same.

## COUNT IV – CONVERSION

90. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 89 above as if fully set forth herein.

91. Based upon his conduct as set forth above, J. Kennedy has directly and indirectly converted funds and assets of Kennedy Supply, First Health, and the Kidder Trust, a portion of which properly belong to the Plaintiffs.

92. The aforesaid conversion was knowing and willful.

93. The Plaintiffs have suffered damages as a result of the same.

## COUNT V – FRAUD

94. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 93 above as if fully set forth herein.

95. Based upon his conduct as set forth above, J. Kennedy has defrauded the Plaintiff individually, and also Kennedy Supply, First Health and the Kidder Trust in having misappropriated and looted substantial sums of money from the foregoing entities.

96. The aforesaid fraudulent conduct was knowing and willful.

97. The Plaintiffs have suffered damages as a result of the same.

## COUNT VI – VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

98. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 97 above as if fully set forth herein.

99. Based upon his conduct as aforesaid, J. Kennedy has violated the covenant of good faith and fair dealing implied in every contract.

100. The aforesaid violation was knowing and willful.

101. The Plaintiffs have suffered damages as a result of the same.

## COUNT VII – NEGLIGENCE

102. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 101 above as if fully set forth herein.

103. Based upon his conduct as set forth above, J. Kennedy failed to exercise due care in the management and operation of Kennedy Supply, First Health, and the Kidder Trust and is thus guilty of negligence.

104. The Plaintiffs have suffered damages as a result of the same.

## COUNT VIII – UNJUST ENRICHMENT (ALL DEFENDANTS)

105. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 104 above as if fully set forth herein.

106.  J. Kennedy will be unjustly enriched if he is allowed to retain the funds that he either directly or indirectly misappropriated from Kennedy Supply, First Health, and/or the Kidder Trust.

107.  The Plaintiffs are entitled to an order from the Court that J. Kennedy disgorge all such amounts and deposit the same with the Court for appropriate distribution to the Plaintiffs.

## COUNT IX – CONSTRUCTIVE TRUST

108.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 107 above as if fully set forth herein.

109.  As set forth above, J. Kennedy misappropriated monies from Kennedy Supply, First Health, and the Kidder Trust for himself, and for the benefit of others, to which they were not entitled.

110.  The Plaintiffs are entitled to have the Court impose a constructive trust upon these monies, including any assets acquired with the same, for the benefit of the Plaintiffs.

## COUNT X – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

111.   The Plaintiffs hereby repeat and re-allege paragraphs 1 through 110 above as if fully set forth herein.

112.   J. Kennedy is a fiduciary to the Plaintiffs.

113.   J. Kennedy breached his fiduciary duties to the Plaintiff by his actions and omissions.

114.   J. Kennedy's breach has caused, and continues to cause the Plaintiff extreme emotional distress.

115.    The Plaintiff has suffered both physical and economic damages as a result of the defendants' actions and omissions as aforesaid.

## COUNT XI – ACCOUNTING

116.    The Plaintiffs hereby repeat and re-allege paragraphs 1 through 115 above as if fully set forth herein.

117.    The Plaintiffs are entitled to and hereby demand an accounting from J. Kennedy as to a) the operation of Kennedy Supply, First Health, and the Kidder Trust; b) all monies received directly and indirectly by J. Kennedy and any and all third parties from the operation of the businesses; c) all monies either loaned or borrowed by J. Kennedy or E. Kennedy on behalf of Kennedy Supply, First Health and the Kidder Trust after J. Kennedy assumed total control over the business; and d) copies of all Invoices to Future Management from February 2004 to the present.

## COUNT XII - DERIVATIVE RELIEF PURSUANT TO MASS. R. CIV. P. 23.1

118.    The Plaintiffs repeat and re-allege paragraphs 1 through 117, as if fully set forth herein.

119.    E. Kennedy is the President and 50% shareholder in Kennedy Supply and First Health.

120.    J. Kennedy currently possesses the remaining 50% interest and is the Treasurer and Clerk in the foregoing corporations.

121.    It would be futile for the Plaintiff to make a demand upon J. Kennedy to bring an action on behalf of the corporation, as the director, officer and other remaining shareholder is not disinterested, nor a majority shareholder, and is himself the wrongdoer.

122.    Based upon his conduct as set forth above, J. Kennedy has harmed the foregoing corporations.

123.    Kennedy Supply and First Health have suffered damages as a result of the same.

## COUNT XIII – DISSOLUTION

124.    The Plaintiffs hereby repeat and re-alleges paragraphs 1 through 123 above as if fully set forth herein.

125.    As a matter of law and contract, E. Kennedy is entitled to the dissolution of Kennedy Supply and First Health and distribution of one half of the net assets of the said corporations.

## COUNT XIV – INJUNCTIVE RELIEF AGAINST
## J. KENNEDY AND ENTERPRISE BANK

126.    The Plaintiffs hereby repeat and re-allege paragraphs 1 through 125 above as if fully set forth herein.

127.    The Plaintiffs are entitled to the issuance of an Injunction restraining and enjoining J. Kennedy, as well as his accountants, agents and attorneys, from:

a)    withdrawing, paying, wasting, or spending any monies of Kennedy Supply, First Health, and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining the written authorization of E. Kennedy;  and

b)    in any way dissipating, pledging or encumbering the assets of Kennedy Supply, First Health and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining written authorization by E. Kennedy;

c)    interfering with or prohibiting Edward Kennedy from having direct involvement in any aspect of Kennedy Supply, First Health, or the Kidder Trust including, but not limited to, their operation, management, any and all bank accounts, and decisions regarding any and all disbursements made from the foregoing entities' accounts; and

d)    using any income or assets of Kennedy Supply, First Health, or the Kidder Trust to pay the costs and expenses associated with this litigation.

128.    The Plaintiffs further request that the Court enter an order requiring Enterprise Bank to take any action necessary to prohibit J. Kennedy from:

a)    withdrawing, paying, wasting, transferring or spending any monies of Kennedy Supply, First Health, and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining the written authorization of E. Kennedy;  and

b)    in any way dissipating, pledging or encumbering the assets of Kennedy Supply, First Health and Kidder Trust, or take any action which would affect E. Kennedy' interests individually, for any reason whatsoever during the pendency of this action without first obtaining written authorization by E. Kennedy.


WHEREFORE, the Plaintiffs respectfully request that this Court grant the following relief:

1.    Issue a short order of notice with respect to prayer 2 below;

2.    After notice, issue a preliminary injunction restraining and enjoining 1) J. Kennedy, and 2) Enterprise Bank from permitting J. Kennedy, from conveying, transferring, wasting, pledging, encumbering and/or dissipating or interfering with any of the assets of Kennedy Supply, First Health and Kidder Trust, of every kind and description without prior written authorization from the Plaintiff, including, but not limited to, payment of his attorneys' fees and costs;

3.    Pursuant to Count I, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

4.    Pursuant to Count II, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

5.    Pursuant to Count III, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

6.    Pursuant to Count IV, award such damages as may be proven at trial and order the return of all assets which the Court finds to be wrongfully converted, and award reasonable attorney's fees, costs and interest;

7.    Pursuant to Count V, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

8.    Pursuant to Count VI, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

9.    Pursuant to Count VII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

10.    Pursuant to Count VIII, award such damages which may be proven at trial, including restitution of any profits J. Kennedy made on a corporate opportunity, repayment of

21

excess compensation to the entities, together with reasonable attorney's fees, costs and interests to the Plaintiffs.

11.    Pursuant to Count IX, award such damages as may be proven at trial and make a finding that the defendants are constructive trustees for the benefit of the Plaintiffs with respect to all assets wrongfully received by them, and award reasonable attorney's fees, costs and interest;

12.    Pursuant to Count X, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

13.    Pursuant to Count XI, order an accounting from the defendants as to a) the operation of Kennedy Supply, First Health, and the Kidder Trust; b) all monies received directly and indirectly by J. Kennedy and any and all third parties from the operation of the businesses; c) all monies either loaned or borrowed by J. Kennedy or E. Kennedy on behalf of Kennedy Supply, First Health and the Kidder Trust after J. Kennedy assumed total control over the business; and d) copies of all Invoices to Future Management from February 2004 to the present.

14.    Pursuant to Count XII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

15.    Pursuant to Count XIII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;  and

16.    Such other and further monetary, injunctive and declaratory relief as this Court deems just and proper.

THE PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE

Respectfully submitted,
EDWARD D. KENNEDY,
By his attorneys,

Stephen A. Greenbaum, Esquire
BBO No. 209360
Natalie R. Sika, Esquire
BBO No. 648408
GREENBAUM, NAGEL,
FISHER & HAMELBURG
200 High Street, 4th Floor
Boston, MA 02110
(617) 423-4300

Dated: April __, 2005

## VERIFICATION

I, Edward D. Kennedy, hereby state that I have personal knowledge with regard to the factual allegations contained in the within Verified Complaint and that the same are known by me to be true and accurate, with the exception of those statements expressly made upon information and belief, which statements I believe in good faith to be true and accurate. Additionally, I am personally familiar with the documents annexed to the Verified Complaint and know the same to be true copies of the originals of those documents.

Signed under the pains and penalties of perjury this 27 day of April, 2005

Edward D. Kennedy

COMMONWEALTH OF MASSACHUSETTS

EXAMINATION UNDER OATH

Witness:        Sokhira Yang

Insured:        Venken Srey

Claim/Loss No.:   03526598

Insurer:        Encompass Insurance Company

Date of Loss:     5/6/05

S&B File No.:     1075-0739

EXAMINATION OF SOKHIRA YANG, a witness called by and on behalf of the Insurer, before Susan Baxter, a Professional Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink P.C., 122 Quincy Shore Drive, Second Floor, Quincy, Massachusetts 02171, on Wednesday, October 26, 2005, commencing at 10:20 a.m.

**A P P E A R A N C E S**

Patrick M. Conran, Esquire
Smith & Brink, P.C.
122 Quincy Shore Drive
Second Floor
Quincy, Massachusetts  02171
(617) 770-2214

    COUNSEL FOR:  Encompass Insurance

Walter R. Choroszej, Esquire
One Center Plaza
Boston, Massachusetts 02108
(617) 723-4110

    COUNSEL FOR:  Sokhira Yang

- 2 -

**E X H I B I T S**

| NO. | DESCRIPTION |
|---|---|
| 1 | Photocopy of Massachusetts Driver's License |
| 2 | Police Report |
| 3 | Photocopy of VIP Card from Rosencrantz & Associates |
| 4 | Professional Fee Reduction Card produced by Ms. Sokhira Yang |
| 5 | Diagram of Accident Scene |

- 3 -

1 A. Yes.

2 Q. No other equipment was used?

3 A. No.

4 Q. Did you get any treatment on that first day?

5 A. No.

6 Q. Now, did Mr. Baez give you one of these cards?

7 A. Brian gave me one of those cards.

8 Q. Who's Brian?

9 A. He's the, I think the owner of First Spine.

10 Q. So you actually spoke to this Brian?

11 A. Yes.

12 Q. Do you know Brian's last name?

13 A. No.

14 Q. When did you speak to Brian?

15 A. I don't remember.

16 Q. Was it soon after the first evaluation or
17    examination?

18 A. Yes.

19 Q. Do you still have your card with you?

20 A. Yes.

21 Q. You have it with you today? Could you show it to
22    me, please?

23         MR. CONRAN: Let's mark this as
24         Exhibit 3.

- 36 -

1         (Whereupon, Exhibit No. 3 Photocopy of
2         VIP Card from Rosencrantz & Associates,
3         marked for identification.)

4 Q. When Brian gave you this card, did he explain what
5    the purpose of the card was?

6 A. No.

7 Q. What is your understanding as to what the card is
8    for?

9 A. I thought it was to get like a discount or
10   something.

11 Q. A discount on what?

12 A. On the accident case.

13 Q. A discount on your medical expenses or your
14   attorney's fees?

15 A. I think attorney's fees.

16 Q. Did he explain whether this card was for your
17   accident that we're here today for or if this was
18   for future accidents?

19 A. I'm not quite sure. He just gave it to me and
20   then when I gave it to the lawyer, he said that
21   it's for if you, like, tell somebody to -- like if
22   you recruit somebody to go to Rosencrantz or
23   something like that, and then in a future
24   accident, that's when you can use it.

- 37 -

1 Q. Okay. I understand.

2         MR. CHOROSZEJ: Counsel, for the record.
3    I think yesterday that Exhibit was given to
4    another client of Rosencrantz.

5         MR. CONRAN: That's my understanding,
6    yes.

7         MR. CHOROSZEJ: David had a field day
8    with it. But I just want to say for the
9    record that there is nothing illegal or
10   inappropriate for a profession that allows
11   itself to become like merchants, to promote
12   law firms and lawyers to get new business.
13   So I don't see that this line of questioning
14   is really getting us anywhere in terms of any
15   propriety regarding her right to have counsel
16   which is guaranteed by the Constitution of
17   the United States.

18         MR. CONRAN: I appreciate your input.

19 Q. Getting back to this card, let me get this
20   straight. You spoke to another attorney or you
21   spoke to Rubin?

22 A. Rubin.

23 Q. Rubin, and he said that you can give this to
24   somebody else and if they got into an accident,

- 38 -

1    they would get the discount?

2 A. Yeah, or something. I don't know. He said he
3    wasn't quite sure what that was for.

4 Q. Okay.

5 A. But of his assuming, that's what he assumed.

6 Q. He told you he had seen this card before?

7 A. I don't know if he told me that.

8 Q. Okay.

9         MR. CONRAN: I'm going to make a
10   photocopy. Let's go off the record for one
11   second while I make a photocopy of this and
12   give it back to you.

13         (Whereupon, a short break was taken.)

14         MR. CONRAN: I'm going to mark the card,
15   professional fee reduction card as Exhibit 4
16   that was produced today by Ms. Yang.

17         (Whereupon, Exhibit No. 4, Professional
18   Fee Reduction Card produced by Ms. Yang,
19   marked for identification.)

20 Q. Now, tell me about the treatment that you received
21   at First Spine?

22 A. Like what I had done?

23 Q. Exactly, yeah. What type of treatments did you
24   receive?

- 39 -

```
 1  A.  I don't know.  They would put me on machines.
 2  Q.  Can you describe the machine?
 3  A.  They had little shock -- I don't know what, like,
 4      little pads, like heat pads or something like
 5      that, and they would put it on my mid-back.
 6  Q.  These pads would be attached to wires and go to a
 7      machine?
 8  A.  Yeah.
 9  Q.  Would you get that treatment every single time?
10  A.  Usually, yes.
11  Q.  Usually.  Sometimes you wouldn't?
12  A.  Sometimes they would have the massage beds.
13  Q.  Okay.  This massage bed and there would be
14      rollers?
15  A.  Lie on it, yeah.
16  Q.  So would you sometimes get both of them at the
17      same time?
18  A.  No.
19  Q.  So for the most part you got the electrical muscle
20      stimulation which is the pads and the heat?
21  A.  Yes.
22  Q.  Did you get any treatment at the same time as
23      getting the electrical muscle stimulation?
24  A.  Like afterwards?
```

- 40 -

```
 1  Q.  At the same time like heat pads or anything like
 2      that?
 3  A.  No.
 4  Q.  Did they put heating pads --
 5  A.  They put heat pads on top.
 6  Q.  On top when they did the electrical muscle
 7      stimulation?
 8  A.  Yes.
 9  Q.  What other treatment did you receive?
10  A.  Then the doctors would come in and do adjustments.
11  Q.  Okay.  Would that be every single day of
12      treatment?
13  A.  Yes.
14  Q.  Would it be the same doctor or different doctors?
15  A.  Different doctors.
16  Q.  Would it be that Dr. Patel -- that's your own
17      doctor, I'm sorry.  Would it be the tall, Indian
18      doctor that you had mentioned?
19  A.  No.  After that day, that was the first time I saw
20      him -- the last time.
21  Q.  Now, can you name any of the doctors that actually
22      provided the manipulation to you?  Can you
23      describe any of them?
24  A.  Well, there was a lady, a girl -- a lady.  She was
```

- 41 -

```
 1      a woman.  She had short hair.
 2  Q.  Do you know her race or nationality?
 3  A.  Caucasian.
 4  Q.  Approximate age?
 5  A.  Early thirties.
 6  Q.  Anyone else?
 7  A.  Male.  He was tall, wore glasses.  He's also
 8      Caucasian.
 9  Q.  Approximate age?
10  A.  I don't know.
11  Q.  Would someone else provide the electrical muscle
12      stimulation treatment?
13  A.  They would have receptionists who would put that
14      on me.
15  Q.  Do you know the name of the receptionist?
16  A.  No.  There was three of them.
17  Q.  Three of them.
18  A.  Four.
19  Q.  Four, okay.  They're all women?
20  A.  Yes.
21  Q.  Can you describe these women?
22  A.  Three of them were Asian and one was Hispanic.
23  Q.  Now, in addition to the electrical muscle
24      stimulation, the heat pads, massage bed and the
```

- 42 -

```
 1      manipulation, any other treatment?
 2  A.  No.
 3  Q.  How many days a week would you go?
 4  A.  Probably three, three days a week.
 5  Q.  Was there a regular schedule; would you go Monday,
 6      Wednesday, Friday or just when you could get
 7      there?
 8  A.  No.  They gave me a schedule.
 9  Q.  Okay.  What days would you go?
10  A.  It usually would be Monday, Wednesday and
11      Thursday.
12  Q.  Was there a specific time you would normally go?
13  A.  Three.
14  Q.  3:00 p.m.?
15  A.  Yes.
16  Q.  How long would you be there for the treatment?
17  A.  Half an hour.
18  Q.  How would you get to the facility?
19  A.  My dad would drop me off.
20  Q.  He'd come back and pick you up?
21  A.  Yup.
22  Q.  Did you ever receive any vouchers from First Spine
23      for travel or gift certificates?
24  A.  Gift certificates.
```

- 43 -

DEPOSITION UNDER OATH OF SOKHIRA YANG

MiniDep by Kenson

1  Q. What kind of gift certificates would you get from
2     them?
3  A. Simon's gift card.
4  Q. Do you remember how much?
5  A. Fifty dollars.
6  Q. Do you still have that with you?
7  A. No.
8  Q. You used it to purchase something?
9  A. Yes.
10 Q. Do you recall what you purchased?
11 A. No.
12 Q. This is for a mall; correct?
13 A. Yes.
14 Q. Any particular mall or just any Simon's mall?
15 A. Any mall that you can use a Simon's gift card.
16 Q. Now, outside the gift certificate, did you receive
17    any other compensation from First Spine?
18 A. No.
19 Q. Do you know the address for First Spine?
20 A. No.
21 Q. It's in Lowell though?
22 A. Yes.
23 Q. Can you describe the building it's located in?
24 A. Small, brick building.

- 44 -

1  Q. Is it the front or the back of the building?
2  A. What do you mean?
3  Q. Is it the only thing in the building, is it the
4     only facility or only office in that building, if
5     you know?
6  A. Yeah.
7  Q. It was on the first floor?
8  A. Yes.
9  Q. It's a one or two-story building?
10 A. Well, it's just a building. It's like a little
11    building and right next to it is an auto shop.
12 Q. When you enter the front doors of this office, you
13    go to a receptionist?
14 A. Yes.
15 Q. And you check in?
16 A. Yes.
17 Q. Do you sign a sheet?
18 A. You write your name on the sign-in sheet.
19 Q. Do you have to pay any co-payment or anything like
20    that?
21 A. No.
22 Q. Then you're taken back into a back room for the
23    treatment?
24 A. Yes.

- 45 -

1  Q. What's back there, are there a number of beds or
2     any equipment?
3  A. There's beds and one of those, the bikes.
4  Q. Stationary bikes?
5  A. Yeah.
6  Q. Did you ever use those?
7  A. Yes.
8  Q. You did?
9  A. Yes. Towards my last, towards the end, that's
10    when I used it.
11 Q. So you did do stationary bikes. That was towards
12    near the end of your treatment?
13 A. Yeah.
14 Q. How long would you be on the bike for?
15 A. Twenty minutes.
16 Q. How often did you do the exercises on the bike?
17 A. I don't know. It was just towards the end,
18    anytime I would come in.
19 Q. So the last two or three weeks?
20 A. Yes.
21 Q. How many weeks were you actually getting
22    treatment?
23 A. What do you mean?
24 Q. You started on about June 2nd, how many weeks did

- 46 -

1     you go to? When did you stop treatment?
2  A. The end of September.
3  Q. By that time, were you still going three times a
4     week or were you going twice a week?
5  A. It was less, twice a week.
6  Q. Now, did you see any other equipment in the
7     building?
8  A. Yes, the weight lifts.
9  Q. Did you ever use that equipment?
10 A. No.
11 Q. Now, as a result of the treatment you received at
12    First Spine, I assume you were discharged?
13 A. Yes.
14 Q. Any pain?
15 A. No.
16 Q. Did the doctor ever talk to you about any
17    disability?
18 A. No.
19 Q. Did the doctor indicate to you that you shouldn't
20    work or go to school?
21 A. No.
22 Q. Now I don't know if I asked you this before, but
23    were you involved in any other accidents prior to
24    this one?

- 47 -











# COMMONWEALTH OF MASSACHUSETTS

## EXAMINATION UNDER OATH

| | |
|---|---|
| Witness: | Viengkhone Khammanivong |
| Insured: | Viengkhone Khammanivong |
| Claim/Loss No.: | 03528572 |
| Insurer: | Encompass Insurance Company |
| Date of Loss: | 06/18/05 |
| Smith & Brink File No.: | 1075-0743 |

**EXAMINATION OF Viengkhone Khammanivong,** a witness called by and on behalf of the Insurer, before Kathleen M. Mullin, a Professional Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith and Brink, P.C., 122 Quincy Shore Drive, Quincy, Massachusetts, 02171, on Tuesday, October 25, 2005, commencing at 10:10 a.m.

1   A.   I go to the chiropractic.

2   Q.   What chiropractor did you go to?

3   A.   First Spine.

4   Q.   How come you chose First Spine?

5   A.   I used to pass that very often, I know they were

6        there, so.

7   Q.   Where are they located?

8   A.   At Lowell.

9   Q.   Where in Lowell?  What street?

10  A.   Umm.

11  Q.   Do you know what street they are located on, sir?

12  A.   I cannot recall.

13  Q.   You don't know what street they are located on?

14  A.   School Street.

15  Q.   And you used to pass by there all the time?

16  A.   Yeah.

17  Q.   How did you choose your attorney?

18  A.   My friend gave me a card.

19  Q.   Your friend gave you a card?  Do you have that card

20       with you today?

21              MR. CHOROSZEJ:  Can I see that?

22  Q.   Your friend gave you this card?

23  A.   Yes.

24  Q.   I'm going to, again, take this card and when we have

1        an opportunity will label it as exhibit six.

2              **(Whereupon Exhibit No. 6, Business card,**

3              **was marked for identification.)**

4    Q.    When did your friend give you this card?

5    A.    Monday.

6    Q.    And that is the Monday after the accident, sir?

7    A.    Yes.

8    Q.    What is your friend's name?

9    A.    A person I know but I don't know the name of the

10         person, I know him from the community.  I asked that

11         I probably need a lawyer for my case.  When I go to

12         the therapy they said if you don't have a lawyer I

13         know lawyer so I gave this card.  I need a lawyer, I

14         need a card, so he handled that.

15   Q.    You went into the chiropractor and told them you

16         didn't have a lawyer; is that correct?

17   A.    Yes.

18   Q.    And then someone at the chiropractor referred you to

19         your attorney now; is that correct?

20   A.    Yes.

21   Q.    What is the name of the person that referred you to

22         Attorney Rosencranz?

23   A.    I don't know the name.

24   Q.    But that person is your friend?



# COMMONWEALTH OF MASSACHUSETTS

## EXAMINATION UNDER OATH

| | |
|---|---|
| Witness: | Jenifer Soneiga Hell |
| Insured: | Bun Sok |
| Claim/Loss No.: | 03547961 |
| Insurer: | Encompass Insurance Company |
| Date of Loss: | 09/04/04 |
| S&B File No.: | 28045.ENC |

**EXAMINATION OF JENIFER SONEIGA HELL**, a minor witness called by and on behalf of the Insurer, before Susan K. Arvidson, a Certified Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink, P.C., 122 Quincy Shore Drive, Second Floor, Quincy, Massachusetts, 02171, on Friday, March 18, 2005, commencing at 3:11 p.m.

1   Q.  Did anyone give you any money or anything to treat

2       there?

3   A.  (No response.)

4   Q.  Did you get any money?

5   A.  No.

6   Q.  Did your mom or your sister get any money?

7   A.  Yeah, we get money.  Yeah, we get money.

8   Q.  You got money from the clinic?  How much, do you

9       know?

10         **MS. BODARY HELL:**  No, we got like the

11       card, like some other store.

12         **MR. TILDEN:**  Like a Simon gift card or

13       something?

14         **MS. BODARY HELL:**  Yeah.

15         **MR. TILDEN:**  What else did you get,

16       anything else?

17         **MS. BODARY HELL:**  No.

18         **MR. TILDEN:**  All right, I'm all set.

19       Thanks, I appreciate your help.  You did a

20       good job.

21

22         **(Whereupon, the Examination Under Oath**

23       **was concluded at 3:20 p.m.)**

24

# COMMONWEALTH OF MASSACHUSETTS

## EXAMINATION UNDER OATH

| | |
|---|---|
| Witness: | Savet Non |
| Insured: | Savet Non |
| Claim/Loss No.: | 03544179 |
| Insurer: | Encompass Insurance Company |
| Date of Loss: | 07/14/04 |
| S&B File No.: | 27408.ENC |

**EXAMINATION OF SAVET NON**, a witness called by and on behalf of the Insurer, before Susan K. Arvidson, a Certified Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink, P.C., 122 Quincy Shore Drive, Quincy, Massachusetts, 02171, on Monday, December 27, 2004, commencing at 1:05 p.m.

*Lee and Associates*
*Certified Court Reporters*
*346 Washington • Suite 181 • Braintree, MA 02184*
*Voice/Fax 781-848-9693*

25

1       store, I go with my children.

2   Q.  Not the store, I'm talking about the hospital,

3       First Spine and Rehab.

4   A.  No, I told you already that I don't have any.

5   Q.  Actually, you didn't tell me.  You mentioned a

6       store, and we weren't talking about a store.

7   A.  Yes, I was stating that whether I was going to the

8       hospital or going to the store, that I don't have

9       anybody helping me, I always go with my children.

10  Q.  Do you know who treated your children at First

11      Spine and Rehab?

12  A.  I don't remember the doctor's name.

13  Q.  Was it a guy, a boy?

14  A.  Female.  Sometimes male.

15  Q.  You don't know either of their names?

16  A.  I overheard somebody call one of the doctors by

17      the name of Brian or something.  Brian, I don't

18      know.

19  Q.  Brian?

20  A.  Yeah, I think so, Brian.  The other one, I forget

21      the name.

22  Q.  Is Brian -- I believe from the records, you're

23      referring to Brian Culliney of First Spine.  Is he

24      a friend of yours?

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

26

1    A.   No.

2    Q.   Did he ever give you any gifts?

3    A.   He gave me something, but I was not treating

4         there, only my children treated.

5    Q.   What did he give you?

6    A.   Like my children had already told you, I believe,

7         that it was some sort of certificate or something.

8    Q.   What was the certificate for?

9    A.   They gave it to me, and then my children went and

10        used it.  It's for a meal somewhere, Chinese food.

11   Q.   What else did Dr. Culliney give to you or to your

12        children?

13   A.   They didn't give it to my children, he gave it to

14        me.

15   Q.   What else did he give to you?

16   A.   That certificate, that's all.

17   Q.   What about the tickets to the concert at Mohegan

18        Sun?

19   A.   Yes, he gave it to me and then I gave it to my

20        children.

21   Q.   The gift certificates to the Mohegan Sun?

22   A.   Because in that place, they give the doctor for

23        free.

24   Q.   So, the doctor gave you gift certificates to go to

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

```
 1        the Mohegan Sun, and you gave them to your
 2        children?
 3   A.   Yes, because my children wanted it.
 4   Q.   What was the gift certificate for at the Mohegan
 5        Sun?
 6   A.   It was a Cambodian group of artists that were
 7        coming there to give concert there from Cambodia.
 8   Q.   What else did the doctor give you?
 9   A.   That's all.
10   Q.   What did the doctor give directly to your
11        children?
12   A.   No.
13   Q.   He didn't give anything directly to your children?
14   A.   No.
15   Q.   What about gift certificates to the Simon Mall?
16   A.   I'm trying to remember.  Maybe, I forget.
17   Q.   How much money did he actually give to you?
18   A.   Not money, but certificate.  It's the equivalent
19        of about $50.
20   Q.   Did you ask him for money?
21   A.   I was asking him, like, could he help me with some
22        sort of food or something.
23   Q.   Money for food?
24   A.   Yes.
```

28

1    Q.  Is that when he gave you the gift certificates?

2    A.  Yes.

3    Q.  What did he say about the money for food?

4    A.  He didn't want to give it to me, but I was asking

5        him, you know, insisted on it, and he gave it to

6        me.

7    Q.  Were you disappointed when he gave you the gift

8        certificate rather than the money?

9    A.  No, I didn't say anything because I'm poor.

10   Q.  Did you take all your kids to get treatment every

11       time they went for treatment?

12   A.  Yes.

13   Q.  How long did it take for all of your children to

14       get their treatment?

15   A.  Sometimes 10 to 15 minutes.

16   Q.  Total for everybody?

17   A.  When we go in, we go in all at once.

18   Q.  What treatment did the children get?

19   A.  They put heat on their back, you know, I guess

20       heat pack, and then they put something flat on

21       their back, also.

22   Q.  Anything else?

23   A.  That is like every other week, so maybe every

24       month or two months or so.

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

# COMMONWEALTH OF MASSACHUSETTS

## EXAMINATION UNDER OATH

| | |
|---|---|
| Witness: | Marina Non |
| Insured: | Savet Non |
| Claim/Loss: | 03544179 |
| Insurer: | Encompass Insurance Company |
| Date of Loss: | 7/14/04 |
| File No.: | 27408.ENC |

EXAMINATION OF MARINA NON, a witness called by and on behalf of the Insurer, before Karen M. Parlee, a Professional Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink, P.C., on November 22, 2004 commencing at 10:32 a.m.

16

1   machine with the patches on your back, right?

2   A.   Yes.

3   Q.   And with that they give you the heat together?

4   A.   Heat and ice.

5   Q.   And ice?

6   A.   Yeah.

7   Q.   And that would be about ten to fifteen minutes?

8   A.   Just ten.

9   Q.   Ten minutes?

10  A.   Yeah.

11  Q.   And then from there the next thing you do -- what

12       would you do next the rolling bed?

13  A.   No, that was after like a month later.  They --

14       after that they -- they give us a short massage

15       like they crack our backs.

16  Q.   How long does that take?  When you say short --

17  A.   Only like one minute or so.

18  Q.   Okay.  And then you do the bike or some weight

19       training?

20  A.   That was after two months or a month.

21  Q.   Oh, okay.

22            And did anyone give you any money or

23       anything?

24  A.   No.

17

Q.  Gift certificates?

A.  Yeah, we got a gift certificate -- certificate for
    I think it was Simon -- Simon --

Q.  How come you got that?

A.  I don't know.

Q.  You have no idea?  No -- no one told you?

A.  It was -- I think it was like -- I don't know.

Q.  Okay.  Who got the gift certificates?

A.  I think it was my mom.  I don't know.  Someone --

Q.  How many did you get?

A.  Just one.

Q.  For you or for the whole family?

A.  I think it was for the whole family.

Q.  Do you remember how much it was?

A.  I think it was only like a five dollar
    certificate.  I don't know.

Q.  Oh.  Did you --

A.  And we got a China Buffet certificate.

Q.  Okay.  How much was that do you remember?

A.  I think it was a fifty dollar.

Q.  And did you get anything else while you were
    there?

A.  No.

Q.  Do you know if your mom or anyone else got

# COMMONWEALTH OF MASSACHUSETTS

## EXAMINATION UNDER OATH

| | |
|---|---|
| Witness: | Rada Non |
| Insured: | Savet Non |
| Claim/Loss: | 03544179 |
| Insurer: | Encompass Insurance Company |
| Date of Loss: | 7/14/04 |
| File No.: | 27408.ENC |

EXAMINATION OF RADA NON, a witness called by and on behalf of the Insurer, before Karen M. Parlee, a Professional Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink, P.C., on November 22, 2004 commencing at 9:49 a.m.

22

1    Q.  Who did you refuse medical treatment to?

2    A.  To -- to my mom and stuff.

3    Q.  She wanted to take you to the hospital?

4    A.  Yes.

5    Q.  And you said no?

6    A.  Yes.

7    Q.  Why?

8    A.  Because we thought we wasn't that -- we thought

9        our backs was -- was -- was just going to bother

10       us but it continued.

11   Q.  But you went to the actual therapy place that day?

12   A.  Yes.

13   Q.  About what time?

14   A.  Around -- around one or two.

15   Q.  How did you get there?

16   A.  My mom brought us there.

17   Q.  Who went?

18   A.  The whole family, my -- my older sister, my

19       younger sister, my older -- my younger -- my

20       younger brother and my mom.

21   Q.  Everyone who was in the car?

22   A.  Yes.

23   Q.  Did your mom get any treatment?

24   A.  No.

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

23

```
 1   Q.   How did you find that facility?

 2   A.   Through a friend.

 3   Q.   Who was that?

 4   A.   A friend that works there that works at the clinic

 5        also.

 6   Q.   Can I guess?

 7   A.   Sorry?

 8   Q.   What's her name Phally?

 9   A.   That's -- that's some guessing, yeah.

10   Q.   Yes.  That's her name, right?

11   A.   Yeah.

12   Q.   Yes.

13            MR. CHOROSZEJ:  I must say you're a very

14        excellent guesser.

15   (BY MR. TILDEN)

16   Q.   Yes.

17            Phally Smith, right?

18   A.   Yeah.

19   Q.   Yes.  How do you know her?

20   A.   My mom knows her.

21   Q.   How does she know her?

22   A.   Oh, I have no idea.

23   Q.   Did anyone give you any money or anything to treat

24        there?
```

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

24

1   A.   Yeah, they -- the -- I don't -- I forgot his name,

2        but he gave us gift certificates.

3   Q.   For what?

4   A.   Just -- just for -- for birthday, for -- for my

5        brother's birthday.

6   Q.   What were they for, the gift certificates?

7   A.   It was -- it was for -- for my brother cause --

8        cause -- cause his birthday was just close by.

9   Q.   Yes, but how much?

10  A.   Fifty.

11  Q.   To where?

12  A.   To the -- to the Simons Mall.

13  Q.   Did everyone get one or just your brother?

14  A.   Just my brother.

15  Q.   Which one?

16  A.   Mith.

17  Q.   Did you get anything?

18  A.   No.

19  Q.   How about the -- your sisters, did they get

20       anything?

21  A.   Yeah.  Well, yeah she -- she -- she got -- she got

22       --

23  Q.   Which one?

24  A.   Marina.

25

```
 1   Q.   What did she get?

 2   A.   I -- I don't remember.

 3   Q.   You don't remember what it was?

 4   A.   I know -- I believe it was a gift certificate also

 5        but...

 6   Q.   You don't know who gave it to you?

 7   A.   It -- it was -- it was a male doctor.

 8   Q.   Doctor Cullinie, Brian?

 9   A.   I believe so.

10   Q.   Any other male doctors there?

11   A.   No.

12   Q.   How come you didn't get anything?

13   A.   I -- oh, I just -- to be honest, I don't know, but

14        -- it was -- it was -- I was -- I didn't really

15        expect anything but --  He hasn't given us any --

16        he has given -- he has given my brother and sister

17        through the situation that my mom kept asking him

18        he didn't give us any.

19   Q.   I don't even understand what you mean by that.

20   A.   I'm sorry.  Since --

21   Q.   Why don't you just go slow and tell me what --

22        what you did or did not get?

23   A.   Oh, I -- I didn't get any just my younger brother

24        and sister.
```

26

1   Q.   What about your older sister?

2   A.   No.

3   Q.   Are you still treating there?

4   A.   No, we're done.

5   Q.   I don't understand why -- your mom kept asking him

6       about what?

7   A.   Oh she said do -- oh, like do -- do you have those

8       gift certificates that are -- or any money and

9       then he -- he got mad.

10   Q.   Why did he get mad?

11   A.   Too -- too much asking and then he wasn't in the

12      mood I guess.

13   Q.   Why was he giving them away to your sister's then?

14   A.   Oh, my sister -- oh it was -- it was just a little

15      token for her report card.

16   Q.   Oh, that's nice.

17             MR. TILDEN:  Let's just go off for a

18      second?

19               (OFF THE RECORD)

20  (BY MR. TILDEN)

21   Q.   When did your pain go away?

22   A.   Two months after.  Two and a half months after.

23   Q.   Two months?

24   A.   Yes.

27

1  Q.  Were you still treating after the two months?

2  A.  Yes.

3  Q.  Why?

4  A.  Oh, the -- that was just a -- all those sort of

5      fading away at the pain during those two and a

6      half months and then going onto three months.

7  Q.  The pain was gone, but you were still treating?

8  A.  No, it was -- the pain was just slowly fading away

9      because it used to be stronger when -- when I

10     first went there.

11 Q.  Okay.  So it ended sometime in September?

12 A.  Around October.

13 Q.  October?

14 A.  Yes.

15 Q.  All right.  When in October?

16 A.  Around October the 14th I believe -- the four --

17     the 13th, 14th, somewhere around there.

18 Q.  And when did you stop treating there?

19 A.  October 25th.

20 Q.  Two days before your birthday?

21 A.  Yes.

22 Q.  But you didn't get anything though, huh?

23 A.  No.

24 Q.  That doesn't seem fair.

28

```
1    A.   No.

2    Q.   How about your mom, did she get anything?

3    A.   She got two tickets to a concert.

4    Q.   Which concert?

5    A.   A Cambodian concert at Mohegan.

6    Q.   Do you know if anyone else was given anything in

7         your family, any cash or anything?

8    A.   Cash?  I don't remember cause some -- cause

9         sometime we were going in different -- different

10        schedules.  Because we usually sometime we go in a

11        whole pack of family to therapy and then sometime

12        I would go by myself.

13   Q.   Other than the tickets and the two gift

14        certificates to your little brother and sister do

15        you know if anyone in your family got anything

16        else?

17   A.   No, I don't think so.

18   Q.   Would you know I mean wouldn't they come home and

19        say hey look what I got today?

20   A.   Oh, they wouldn't tell me.

21   Q.   No, they don't -- why -- how come?

22   A.   They probably think I'll take it.

23   Q.   Oh, all right.  So you don't know if anyone else

24        got anything?
```

## COMMONWEALTH OF MASSACHUSETTS

### EXAMINATION UNDER OATH

Witness:              Mith Non

Insured:              Savet Non

Claim/Loss:           03544179

Insurer:              Encompass Insurance Company

Date of Loss:         7/14/04

File No.:             27408.ENC

EXAMINATION OF MITY NON, a witness called by and on behalf of the Insurer, before Karen M. Parlee, a Professional Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink, P.C., on November 22, 2004 commencing at 10:46 a.m.

6

```
 1        accident?

 2   A.   Yes.

 3   Q.   What part of your body?

 4   A.   My back spine -- lower and middle spine.

 5   Q.   Anywhere else?

 6   A.   It was a little pain and feeling in my arm, but

 7        then...

 8   Q.   Which arm?

 9   A.   It was my right arm.

10   Q.   Did you go somewhere to get some treatment?

11   A.   No, it was just a little temporary pain.

12   Q.   Did you go to a chiro at all?

13   A.   Oh, yeah.  Chiropractor, yeah.

14   Q.   Where did you go?

15   A.   First Spine.

16   Q.   And why did you go there?

17   A.   It was for the back.

18   Q.   Yes, but how come you went to that place?

19   A.   Cause my mom brought us there.

20   Q.   Do you know why she brought you there?

21   A.   I don't know.  Cause for our backs I guess.

22   Q.   Did you get any money or anything to treat there?

23   A.   We had a gift certificate for...

24   Q.   What did you get?
```

1    A.  We -- I just -- I didn't use it though.

2              MS. NON:  It was only one.

3    (BY THE WITNESS)

4    A.  It was only one.

5    Q.  How much was it for?

6    A.  I think it was fifty.

7    Q.  Do you know to where?

8    A.  It was to any mall.

9    Q.  And that was for the whole family?

10   A.  Yeah.

11   Q.  Did you they get anything else?

12   A.  No, I don't think so.

13   Q.  Did anyone else in your family get anything else?

14   A.  I don't know, I'm not sure.  I don't know.

15   Q.  Okay.

16   A.  I don't know.

17   Q.  All right.  Do you know your social security

18        number?

19   A.  I don't know it.  It was in my jacket.  I left it

20        out there.

21   Q.  Okay.  Is your jacket --

22              MR. CHOROSZEJ:  I can give it to you if

23        you like?

24              MR. TILDEN:  All right.  I'll take it

PLEASE
DO NOT
STAPLE
IN THIS
AREA

APPROVED OMB-0938-0008

LISA BERTARELLI
P.O. BOX 9184
QUINCY MA 02269

**NOTES & RECORDS**
**ATTACHED**

PICA

## HEALTH INSURANCE CLAIM FORM

PICA

| 1. MEDICARE (Medicare #) | MEDICAID (Medicaid #) | CHAMPUS (Sponsor's SSN) | CHAMPVA (VA File #) | GROUP HEALTH PLAN (SSN or ID) XX | FECA BLK LUNG (SSN) | OTHER (ID) | 1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1) 03445147 B1 |
|---|---|---|---|---|---|---|---|

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) UONG PHAMARO | 3. PATIENT'S BIRTH DATE 12 01 1965 SEX M XX F | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) UONG PHAMARO |
|---|---|---|

| 5. PATIENT'S ADDRESS (No., Street) 57 LINCOLN STREET | 6. PATIENT RELATIONSHIP TO INSURED Self X Spouse Child Other | 7. INSURED'S ADDRESS (No., Street) 57 LINCOLN STREET |
|---|---|---|

| CITY LOWELL | STATE MA | 8. PATIENT STATUS Single X Married Other | CITY LOWELL | STATE MA |
|---|---|---|---|---|

| ZIP CODE 01851 | TELEPHONE (Include Area Code) (978) 275 9551 | Employed Full-Time Student Part-Time Student | ZIP CODE 01851 | TELEPHONE (INCLUDE AREA CODE) ( ) |
|---|---|---|---|---|

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) UONG PHAMARO | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (CURRENT OR PREVIOUS) YES X NO | a. INSURED'S DATE OF BIRTH 12 01 1965 SEX M X F |
|---|---|---|

| b. OTHER INSURED'S DATE OF BIRTH 12 01 1965 SEX M X F | b. AUTO ACCIDENT? YES X NO PLACE (State) | b. EMPLOYER'S NAME OR SCHOOL NAME |
|---|---|---|

| c. EMPLOYER'S NAME OR SCHOOL NAME | c. OTHER ACCIDENT? YES X NO | c. INSURANCE PLAN NAME OR PROGRAM NAME ENCOMPASS |
|---|---|---|

| d. INSURANCE PLAN NAME OR PROGRAM NAME CIGNA HEALTH CARE | 10d. RESERVED FOR LOCAL USE | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? X YES NO If yes, return to and complete item 9 a-d. |
|---|---|---|

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNATURE ON FILE

SIGNED _____ DATE _____

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
AUTHORIZATION ON FILE

SIGNED _____

| 14. DATE OF CURRENT: 05 10 2001 ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP) | 15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM TO |
|---|---|---|

| 17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE | 17a. I.D. NUMBER OF REFERRING PHYSICIAN | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM TO |
|---|---|---|

| 19. RESERVED FOR LOCAL USE | | 20. OUTSIDE LAB? YES NO $ CHARGES |
|---|---|---|

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)
1. 847.0    3. 847.2
2. _____    4. _____

| 22. MEDICAID RESUBMISSION CODE ORIGINAL REF. NO. |
|---|

| 23. PRIOR AUTHORIZATION NUMBER |
|---|

| 24. A. DATE(S) OF SERVICE From To | B. Place of Service | C. Type of Service | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS MODIFIER | E. DIAGNOSIS CODE | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. EMG | J. COB | K. RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|
| 05 14 2001 05 14 2001 | 11 | 1 | 99204 | 1 2 3 4 | 135 00 | 1 | | | | |
| 05 14 2001 05 14 2001 | | | E0943 | 1 2 3 4 | 50 00 | 1 | | | | |
| 05 14 2001 05 14 2001 | 11 | 1 | 99070 | 1 2 3 4 | 10 00 | 1 | | | | |
| 05 15 2001 05 15 2001 | 11 | 1 | 98940 | 1 2 3 4 | 50 00 | 1 | | | | |
| 05 15 2001 05 15 2001 | 11 | 1 | 97010 | 1 2 3 4 | 15 00 | 1 | | | | |
| 05 15 2001 05 15 2001 | 11 | 1 | 97014 | 1 2 3 4 | 30 00 | 1 | | | | |

| 25. FEDERAL TAX I.D. NUMBER SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) YES NO | 28. TOTAL CHARGE $ 290 00 | 29. AMOUNT PAID $ | 30. BALANCE DUE $ 290 00 |
|---|---|---|---|---|---|

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) 08 10 2001 | 32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office) | 33. PHYSICIAN'S SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE FIRST STREET REHAB 41 SCHOOL STREET LOWELL MA 01851 |
|---|---|---|

SIGNED _____ DATE _____

PIN# _____ GRP# _____

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)   PLEASE PRINT OR TYPE

FORM HCFA-1500 (12-90)
FORM OWCP-1500
FORM RRB-1500

Mfd. by Medical Arts Press
Call toll-free: 1-800-328-2179

**NOTICE:** Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

**MEDICARE AND CHAMPUS PAYMENTS:** A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary if this is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

## BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

## SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I (or any employee) who rendered services are not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

**NOTICE:** Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION
### (PRIVACY ACT STATEMENT)

We are authorized by HCFA, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

**FOR MEDICARE CLAIMS:** See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

**FOR OWCP CLAIMS:** Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

**FOR CHAMPUS CLAIMS:** PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

## MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Humans Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

**SIGNATURE OF PHYSICIAN (OR SUPPLIER):** I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

**NOTICE:** This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to HCFA, Office of Financial Management, P.O. Box 26684, Baltimore, MD 21207; and to the Office of Management and Budget, Paperwork Reduction Project (OMB-0938-0008), Washington, D.C. 20503.

PLEASE
DO NOT
STAPLE
IN THIS
AREA

ENCOMPASS
P.O. BOX 9184
QUINCY MA 02269

# HEALTH INSURANCE CLAIM FORM

| | PICA | | | | | | PICA | |

**1. MEDICARE** (Medicare #)   **MEDICAID** (Medicaid #)   **CHAMPUS** (Sponsor's SSN)   **CHAMPVA** (VA File #)   **GROUP HEALTH PLAN** (SSN or ID) [XX]   **FECA BLK LUNG** (SSN)   **OTHER** (ID)

**1a. INSURED'S I.D. NUMBER** (FOR PROGRAM IN ITEM 1)
03411511

**2. PATIENT'S NAME** (Last Name, First Name, Middle Initial)
NUON SARETH

**3. PATIENT'S BIRTH DATE** MM 02 DD 19 YY 1986   **SEX** M [ ] F [XX]

**4. INSURED'S NAME** (Last Name, First Name, Middle Initial)
NUON SARETH

**5. PATIENT'S ADDRESS** (No., Street)
184 SCHOOL STREET

**6. PATIENT RELATIONSHIP TO INSURED**
Self [X]   Spouse [ ]   Child [ ]   Other [ ]

**7. INSURED'S ADDRESS** (No., Street)
184 SCHOOL STREET

**CITY** LOWELL   **STATE** MA

**8. PATIENT STATUS**
Single [X]   Married [ ]   Other [ ]

**CITY** LOWELL   **STATE** MA

**ZIP CODE** 01854   **TELEPHONE** (Include Area Code) ( 978 ) 441 4192

Employed [ ]   Full-Time Student [ ]   Part-Time Student [ ]

**ZIP CODE** 01854   **TELEPHONE** (INCLUDE AREA CODE) ( )

**9. OTHER INSURED'S NAME** (Last Name, First Name, Middle Initial)
NUON SARETH

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT?** (CURRENT OR PREVIOUS)
YES [ ] NO [X]

**a. INSURED'S DATE OF BIRTH** MM 02 DD 19 YY 1986   **SEX** M [ ] F [X]

**b. OTHER INSURED'S DATE OF BIRTH** MM 02 DD 19 YY 1986   **SEX** M [ ] F [X]

**b. AUTO ACCIDENT?**   **PLACE (State)**
YES [ ] NO [ ]

**b. EMPLOYER'S NAME OR SCHOOL NAME**

**c. EMPLOYER'S NAME OR SCHOOL NAME**

**c. OTHER ACCIDENT?**
YES [ ] NO [X]

**c. INSURANCE PLAN NAME OR PROGRAM NAME**
ENCOMPASS

**d. INSURANCE PLAN NAME OR PROGRAM NAME**
BLUE CROSS/BLUE SHIELD OF MA

**10d. RESERVED FOR LOCAL USE**

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?**
YES [X]   NO [ ]   *If yes, return to and complete item 9 a-d.*

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**

**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED SIGNATURE ON FILE   DATE

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED AUTHORIZATION ON FILE

**14. DATE OF CURRENT:** ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP)
05 22 2001

**15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS.** GIVE FIRST DATE MM DD YY

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION**
FROM MM DD YY   TO MM DD YY

**17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE**

**17a. I.D. NUMBER OF REFERRING PHYSICIAN**

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES**
FROM MM DD YY   TO MM DD YY

**19. RESERVED FOR LOCAL USE**

**20. OUTSIDE LAB?**
YES [ ] NO [X]   **$ CHARGES**

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY.** (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)
1. 723 2
2. 719 41
3. 739 1
4. 847 0

**22. MEDICAID RESUBMISSION CODE**   ORIGINAL REF. NO.

**23. PRIOR AUTHORIZATION NUMBER**

| 24. A DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B Place of Service | C Type of Service | D PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS MODIFIER | E DIAGNOSIS CODE | F $ CHARGES | G DAYS OR UNITS | H EPSDT Family Plan | I EMG | J COB | K RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08 13 2001 | 08 13 2001 | 11 | 1 | 98940 | 1 2 3 4 | 50 00 | 1 | | | | |
| 08 13 2001 | 08 13 2001 | 11 | 1 | 97110 | 1 2 3 4 | 40 00 | 1 | | | | |
| 08 14 2001 | 08 14 2001 | 11 | 1 | 98940 | 1 2 3 4 | 50 00 | 1 | | | | |
| 08 14 2001 | 08 14 2001 | 11 | 1 | 97012 | 1 2 3 4 | 30 00 | 1 | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

**25. FEDERAL TAX I.D. NUMBER** SSN EIN
04-3394642   [XX]

**26. PATIENT'S ACCOUNT NO.**
1902498-1-17

**27. ACCEPT ASSIGNMENT?** (For govt. claims, see back)
YES [X]   NO [ ]

**28. TOTAL CHARGE**
$ 170 00

**29. AMOUNT PAID**
$ 0 00

**30. BALANCE DUE**
$ 170 00

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** I certify that the statements on the reverse apply to this bill and are made a part thereof.
BRIAN CUBITNEY C.
SIGNED 08 15 2001 DATE

**32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED** (If other than home or office)

**33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #**
FIRST SPINE & REHAB.
410 SCHOOL STREET
LOWELL MA 01851
PIN#   GRP#

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)   **PLEASE PRINT OR TYPE**

Mfd. by Medical Arts Press
Call toll-free: 1-800-328-3179

FORM HCFA-1500 (12-90)
FORM OWCP-1500   FORM RRB-1500
#29429

**NOTICE:** Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

**MEDICARE AND CHAMPUS PAYMENTS:** A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary if this is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

## BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

## SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

**NOTICE:** Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION
### (PRIVACY ACT STATEMENT)

We are authorized by HCFA, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

**FOR MEDICARE CLAIMS:** See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

**FOR OWCP CLAIMS:** Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

**FOR CHAMPUS CLAIMS:** PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

## MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Humans Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

**SIGNATURE OF PHYSICIAN (OR SUPPLIER):** I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

**NOTICE:** This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to HCFA, Office of Financial Management, P.O. Box 26684, Baltimore, MD 21207; and to the Office of Management and Budget, Paperwork Reduction Project (OMB-0938-0008), Washington, D.C. 20503.

PLEASE DO NOT STAPLE IN THIS AREA

ENCAMPASS
PATCHES
P.O. BOX 9184
QUINCY MA 02269-9184

**MEDICAL NOTES ATTACHED!**

| PICA | **HEALTH INSURANCE CLAIM FORM** | PICA |

**1. MEDICARE** (Medicare #) **MEDICAID** (Medicaid #) **CHAMPUS** (Sponsor's SSN) **CHAMPVA** (VA File #) **GROUP HEALTH PLAN** XX (SSN or ID) **FECA BLK LUNG** (SSN) **OTHER** (ID)  **1a. INSURED'S I.D. NUMBER** (FOR PROGRAM IN ITEM 1)  03486647T9 — 011

**2. PATIENT'S NAME (Last Name, First Name, Middle Initial)**
LAM VICH

**3. PATIENT'S BIRTH DATE** MM 3 DD 0 YY 1978   **SEX** M XX F

**4. INSURED'S NAME (Last Name, First Name, Middle Initial)**
LAM VICH

**5. PATIENT'S ADDRESS (No., Street)**
101 CAMPELL DR

**6. PATIENT RELATIONSHIP TO INSURED** Self X Spouse Child Other

**7. INSURED'S ADDRESS (No., Street)**
101 CAMPELL DR.

**CITY** LOWELL   **STATE** MA

**8. PATIENT STATUS** Single X  Married  Other

**CITY** LOWELL   **STATE** MA

**ZIP CODE** 01854   **TELEPHONE (Include Area Code)** ( 978 ) 455 1477

Employed  Full-Time Student  Part-Time Student

**ZIP CODE** 01854   **TELEPHONE (INCLUDE AREA CODE)** ( 978 )-455-1477

**9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)**
LAM VICH

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT? (CURRENT OR PREVIOUS)** YES NO X

**a. INSURED'S DATE OF BIRTH** MM 2 DD 01 YY 1978   **SEX** M X F

**b. OTHER INSURED'S DATE OF BIRTH** MM 2 DD 01 YY 1978   **SEX** M X F

**b. AUTO ACCIDENT?** YES NO X   **PLACE (State)**

**b. EMPLOYER'S NAME OR SCHOOL NAME**

**c. EMPLOYER'S NAME OR SCHOOL NAME**

**c. OTHER ACCIDENT?** YES NO X

**c. INSURANCE PLAN NAME OR PROGRAM NAME**
ENCOMPASS

**d. INSURANCE PLAN NAME OR PROGRAM NAME**
ATTORNEY JOHN KING ESQ.

**10d. RESERVED FOR LOCAL USE**

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?** YES NO X   If yes, return to and complete item 9 a-d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED  SIGNATURE ON FILE

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED  AUTHORIZATION ON FILE

**14. DATE OF CURRENT** MM 1 DD 00 YY 2002 **ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP)**

**15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE** MM DD YY

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION** FROM MM DD YY TO MM DD YY

**17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE**

**17a. I.D. NUMBER OF REFERRING PHYSICIAN**

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES** FROM MM DD YY TO MM DD YY

**19. RESERVED FOR LOCAL USE**

**20. OUTSIDE LAB?** YES NO   **$ CHARGES**

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)**
1. 847 0
2. 739 1
3. 719 41
4. 847 2

**22. MEDICAID RESUBMISSION CODE**   **ORIGINAL REF. NO.**

**23. PRIOR AUTHORIZATION NUMBER**

| 24. A | | | | | B | C | D | | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DATE(S) OF SERVICE** From → To | | | | | **Place of Service** | **Type of Service** | **PROCEDURES, SERVICES, OR SUPPLIES** (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | **DIAGNOSIS CODE** | **$ CHARGES** | **DAYS OR UNITS** | **EPSDT Family Plan** | **EMG** | **COB** | **RESERVED FOR LOCAL USE** |
| MM DD YY | MM DD YY | | | | | | | | | | | | | | |
| 02 03 2003 | 02 03 2003 | | | | 11 | 11 | 98940 | | 1 2 3 4 | 50 00 | 1 | | | | Y36311 |
| 02 03 2003 | 02 03 2003 | | | | 11 | 11 | 97012 | -54 | 1 2 3 4 | 20 00 | 1 | | | | Y36311 |
| 02 06 2003 | 02 06 2003 | | | | 11 | 11 | 98940 | | 1 2 3 4 | 50 00 | 1 | | | | Y36311 |
| 02 06 2003 | 02 06 2003 | | | | 11 | 11 | 97010 | | 1 2 3 4 | 25 00 | 1 | | | | Y36311 |
| 02 06 2003 | 02 06 2003 | | | | 11 | 11 | 97014 | | 1 2 3 4 | 40 00 | 1 | | | | Y36311 |

**25. FEDERAL TAX I.D. NUMBER** 04-3394642   SSN EIN XX

**26. PATIENT'S ACCOUNT NO.** 190714 53-1 14

**27. ACCEPT ASSIGNMENT?** (For govt. claims, see back) YES NO

**28. TOTAL CHARGE** $ 185 00

**29. AMOUNT PAID** $ 0 00

**30. BALANCE DUE** $ 185 00

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** I certify that the statements on the reverse apply to this bill and are made a part thereof.
SIGNED  02 28 2003  DATE

**32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)**

**33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #**
FIRST SPINE & REHAB.
410 SCHOOL STREET
LOWELL, MA 01851
978-459-6620
PIN#   GRP#

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)   **PLEASE PRINT OR TYPE**
FORM CMS-1500 (12/90), FORM RRB-1500,
FORM OWCP-1500
#29429 - Medical Arts Press

Mfd. by Medical Arts Press
Call toll-free: 1-800-328-2179

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND CHAMPUS PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary if this is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION
(PRIVACY ACT STATEMENT)

We are authorized by CMS, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR CHAMPUS CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Humans Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0008. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, N2-14-26, 7500 Security Boulevard, Baltimore, Maryland 21244-1850

CNA
LISA BERTARELLI X620
P.O. BOX 9184
QUINCY MA 02269-9184

PLEASE
DO NOT
STAPLE
IN THIS
AREA

☐☐ PICA

# HEALTH INSURANCE CLAIM FORM

PICA ☐☐

| 1. MEDICARE (Medicare #) | MEDICAID (Medicaid #) | CHAMPUS (Sponsor's SSN) | CHAMPVA (VA File #) | GROUP HEALTH PLAN (SSN or ID) XX | FECA BLK LUNG (SSN) | OTHER (ID) | 1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1) 03417806 |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) MEN HOEURN | 3. PATIENT'S BIRTH DATE MM 02 DD 03 YY 1955 M☐ SEX F☒X | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) MEN HOEURN |

| 5. PATIENT'S ADDRESS (No., Street) 145 WOBURN ST | 6. PATIENT RELATIONSHIP TO INSURED Self ☒ Spouse ☐ Child ☐ Other ☐ | 7. INSURED'S ADDRESS (No., Street) 145 WOBURN ST |
| CITY LOWELL | STATE MA | 8. PATIENT STATUS Single ☒ Married ☐ Other ☐ | CITY LOWELL | STATE MA |
| ZIP CODE 01852 | TELEPHONE (Include Area Code) (978) 446 7873 | Employed ☐ Full-Time Student ☐ Part-Time Student ☐ | ZIP CODE 01852 | TELEPHONE (INCLUDE AREA CODE) ( ) |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) MEN HOEURN | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (CURRENT OR PREVIOUS) ☐ YES ☒ NO | a. INSURED'S DATE OF BIRTH MM 02 DD 03 YY 1955 M☐ SEX F☒ |
| b. OTHER INSURED'S DATE OF BIRTH MM 02 DD 03 YY 1955 M☐ SEX F☒ | b. AUTO ACCIDENT? ☐ YES ☒ NO PLACE (State) | b. EMPLOYER'S NAME OR SCHOOL NAME |
| c. EMPLOYER'S NAME OR SCHOOL NAME | c. OTHER ACCIDENT? ☐ YES ☒ NO | c. INSURANCE PLAN NAME OR PROGRAM NAME CNA |
| d. INSURANCE PLAN NAME OR PROGRAM NAME ATTORNEY WILLIAM J. EARLY | 10d. RESERVED FOR LOCAL USE | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? ☒ YES ☐ NO If yes, return to and complete item 9 a-d. |

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED  SIGNATURE ON FILE    DATE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED  AUTHORIZATION ON FILE

| 14. DATE OF CURRENT: MM 01 DD 20 YY 2001 ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP) | 15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM MM DD YY TO MM DD YY |
| 17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE | 17a. I.D. NUMBER OF REFERRING PHYSICIAN | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM MM DD YY TO MM DD YY |
| 19. RESERVED FOR LOCAL USE | | 20. OUTSIDE LAB? ☐ YES ☒ NO $ CHARGES |

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)
1. ∟ 847 1
2. ∟ 723 2
3. ∟
4. ∟

| 22. MEDICAID RESUBMISSION CODE | ORIGINAL REF. NO. |
| 23. PRIOR AUTHORIZATION NUMBER |

| 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. Place of Service | C. Type of Service | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS MODIFIER | E. DIAGNOSIS CODE | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. EMG | J. COB | K. RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|
| 03 08 2001 03 08 2001 | 11 | 1 | 98940 | 1 2 3 | 50 00 | 1 | | | | |
| 03 08 2001 03 08 2001 | 11 | 1 | 97010 | 1 2 3 | 15 00 | 1 | | | | |
| 03 08 2001 03 08 2001 | 11 | 1 | 97014 | 1 2 3 | 30 00 | 1 | | | | |
| 03 09 2001 03 09 2001 | 11 | 1 | 98940 | 1 2 3 | 50 00 | 1 | | | | |
| 03 09 2001 03 09 2001 | 11 | 1 | 97010 | 1 2 3 | 15 00 | 1 | | | | |
| 03 09 2001 03 09 2001 | 11 | 1 | 97014 | 1 2 3 | 30 00 | 1 | | | | |

| 25. FEDERAL TAX I.D. NUMBER 04-3394642 SSN ☐ EIN ☒ | 26. PATIENT'S ACCOUNT NO. 1855885-111 | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) ☐ YES ☐ NO | 28. TOTAL CHARGE $ 190 00 | 29. AMOUNT PAID $ | 30. BALANCE DUE $ |

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
JENNIFER MCCONNELL D.C.
SIGNED  03 21 2001  DATE

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)

33. PHYSICIAN'S SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #
FIRST IN SPINE REHAB
410 SCHOOL STREET
LOWELL MA 01851
PIN#  GRP#

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)

**PLEASE PRINT OR TYPE**

FORM HCFA-1500 (12-90)
FORM OWCP-1500
FORM RRB-1500
Mfd. by Medical Arts Press
#29429

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

Case 3:05-cv-01693-RCL    Document 70-16    Filed 12/20/2005    Page 8 of 9

**NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.**

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND CHAMPUS PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary if this is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION
(PRIVACY ACT STATEMENT)

We are authorized by HCFA, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR CHAMPUS CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Humans Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to HCFA, Office of Financial Management, P.O. Box 26684, Baltimore, MD 21207; and to the Office of Management and Budget, Paperwork Reduction Project (OMB-0938-0008), Washington, D.C. 20503.

PLEASE
DO NOT
STAPLE
IN THIS
AREA

ENCOMPASS
P.O. BOX 9184
QUINCY MA 02269

APPROVED OMB-0938-0008

☐☐ PICA

# HEALTH INSURANCE CLAIM FORM

PICA ☐☐

| 1. MEDICARE (Medicare #) | MEDICAID (Medicaid #) | CHAMPUS (Sponsor's SSN) | CHAMPVA (VA File #) | GROUP HEALTH PLAN (SSN or ID) XX | FECA BLK LUNG (SSN) | OTHER (ID) | 1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1) 03467194 |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE | SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
TAYLOR PAUL | MM 12 DD 18 YY 1958 | M XX F ☐ | GARCIA MARION

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
821 BRIDGE STREET LOWE | Self X Spouse ☐ Child ☐ Other ☐ |

| CITY LOWELL | STATE MA | 8. PATIENT STATUS | CITY | STATE |
| | | Single X Married ☐ Other ☐ | |

| ZIP CODE 01850 | TELEPHONE (Include Area Code) (978) 441 1421 | Employed ☐ Full-Time Student ☐ Part-Time Student ☐ | ZIP CODE | TELEPHONE (INCLUDE AREA CODE) ( ) |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) TAYLOR PAUL | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (CURRENT OR PREVIOUS) YES ☐ NO X | a. INSURED'S DATE OF BIRTH MM DD YY | SEX M ☐ F X |

| b. OTHER INSURED'S DATE OF BIRTH MM 12 DD 18 YY 1958 | SEX M X F ☐ | b. AUTO ACCIDENT? YES ☐ NO ☐ PLACE (State) | b. EMPLOYER'S NAME OR SCHOOL NAME |

| c. EMPLOYER'S NAME OR SCHOOL NAME | c. OTHER ACCIDENT? YES ☐ NO ☐ | c. INSURANCE PLAN NAME OR PROGRAM NAME ENCOMPASS |

| d. INSURANCE PLAN NAME OR PROGRAM NAME ATTORNEY MARK SALOMONE | 10d. RESERVED FOR LOCAL USE | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? X YES ☐ NO If yes, return to and complete item 9 a-d. |

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

| 12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED SIGNATURE ON FILE | 13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED AUTHORIZATION ON FILE |

| 14. DATE OF CURRENT: ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP) 01 30 2002 | 15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM MM DD YY TO MM DD YY |

| 17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE | 17a. I.D. NUMBER OF REFERRING PHYSICIAN | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM MM DD YY TO MM DD YY |

| 19. RESERVED FOR LOCAL USE | | 20. OUTSIDE LAB? YES ☐ NO X | $ CHARGES |

| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)
1. 739 3
2. 847 2
3. 723 2
4. 847 0 | 22. MEDICAID RESUBMISSION CODE | ORIGINAL REF. NO. |
| | 23. PRIOR AUTHORIZATION NUMBER |

| 24. A DATE(S) OF SERVICE From MM DD YY To MM DD YY | B Place of Service | C Type of Service | D PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS MODIFIER | E DIAGNOSIS CODE | F $ CHARGES | G DAYS OR UNITS | H EPSDT Family Plan | I EMG | J COB | K RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|
| 03 04 2002 03 04 2002 | 11 | 11 | 98940 | 1 2 3 4 | 50 00 | 1 | | | | |
| 03 04 2002 03 04 2002 | 11 | 11 | 97010 | 1 2 3 4 | 25 00 | 1 | | | | |
| 03 04 2002 03 04 2002 | 11 | 11 | 97014 | 1 2 3 4 | 40 00 | 1 | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| 25. FEDERAL TAX I.D. NUMBER SSN EIN 04-3394642 XX | 26. PATIENT'S ACCOUNT NO. 1908309-1-8 | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) X YES ☐ NO | 28. TOTAL CHARGE $ 115 00 | 29. AMOUNT PAID $ 0 00 | 30. BALANCE DUE $ 115 00 |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
JENNIFER MCCONNELL D.C.
SIGNED 03 04 2002 DATE | 32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office) | 33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #
FIRST SPINE & REHAB
410 SCHOOL STREET
LOWELL MA 01851
PIN# GRP# |

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)    **PLEASE PRINT OR TYPE**

Mfd. by Medical Arts Press
Call toll-free 1-800-328-2179

FORM HCFA-1500 (12-90),  FORM RRB-1500,
FORM OWCP-1500
#29429 - Medical Arts Press

**NOTICE:** Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

**MEDICARE AND CHAMPUS PAYMENTS:** A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary if this is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION
(PRIVACY ACT STATEMENT)

We are authorized by HCFA, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

**FOR MEDICARE CLAIMS:** See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

**FOR OWCP CLAIMS:** Department of Labor, Privacy Act of 1974. "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40. Wed Feb. 28, 1990. See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated. Republished.

**FOR CHAMPUS CLAIMS:** PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Humans Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

**SIGNATURE OF PHYSICIAN (OR SUPPLIER):** I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing date sources, gathering and maintaining data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to HCFA, Office of Financial Management, P.O. Box 26684, Baltimore, MD 21207; and to the Office of Management and Budget, Paperwork Reduction Project (OMB-0938-0008), Washington, D.C. 20503.

PLEASE DO NOT STAPLE IN THIS AREA

APPROVED OMB-0938-0008

CARRIER

ENCOMPASS
SHARON ROGERS 62091
P.O. BOX 9167
QUINCY MA 02269

PICA

# HEALTH INSURANCE CLAIM FORM

PICA

| 1. MEDICARE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (FOR PROGRAM IN ITEM 1) |
|---|---|---|---|---|---|---|---|---|
| (Medicare #) | (Medicaid #) | (Sponsor's SSN) | (VA File #) | XX (SSN or ID) | (SSN) | (ID) | 03461410HM 78 | |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE | SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|---|
| CHANTHA BUNTHY | 02 27 1975 | M X  F | CHANTHA BUNTHY |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| 31 IOWA STREET | Self X  Spouse  Child  Other | 31 IOWA STREET |

| CITY | STATE | 8. PATIENT STATUS | CITY | STATE |
|---|---|---|---|---|
| LOWELL | MA | Single X  Married  Other | LOWELL | MA |

| ZIP CODE | TELEPHONE (Include Area Code) | | ZIP CODE | TELEPHONE (INCLUDE AREA CODE) |
|---|---|---|---|---|
| 01852 | ( 978 ) 937 5377 | Employed  Full-Time Student  Part-Time Student | 01852 | ( 978 )-937-5377 |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|
| CHANTHA BUNTHY | | UF 38415468 |

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (CURRENT OR PREVIOUS) | a. INSURED'S DATE OF BIRTH | SEX |
|---|---|---|---|
| 7010113001 | YES  X NO | 02 27 1975 | M X  F |

| b. OTHER INSURED'S DATE OF BIRTH | SEX | b. AUTO ACCIDENT? | PLACE (State) | b. EMPLOYER'S NAME OR SCHOOL NAME |
|---|---|---|---|---|
| 02 27 1975 | M X  F | YES  X NO | | $1170.50 |

| c. EMPLOYER'S NAME OR SCHOOL NAME | c. OTHER ACCIDENT? | c. INSURANCE PLAN NAME OR PROGRAM NAME |
|---|---|---|
| | YES  X NO | ENCOMPASS |

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. RESERVED FOR LOCAL USE | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? |
|---|---|---|
| AETNA | | X YES  NO  If yes, return to and complete item 9 a-d. |

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   SIGNATURE ON FILE   DATE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   AUTHORIZATION ON FILE

| 14. DATE OF CURRENT: ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY (LMP) | 15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION |
|---|---|---|
| 01 15 2002 | | FROM    TO |

| 17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE | 17a. I.D. NUMBER OF REFERRING PHYSICIAN | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES |
|---|---|---|
| | | FROM    TO |

| 19. RESERVED FOR LOCAL USE | | 20. OUTSIDE LAB?  YES  X NO | $ CHARGES |
|---|---|---|---|

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)

1. 739 1      3. 847 2
2. 847 0      4. 847 1

22. MEDICAID RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. | A. DATE(S) OF SERVICE From — To | | B. Place of Service | C. Type of Service | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS  MODIFIER | E. DIAGNOSIS CODE | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. EMG | J. COB | K. RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 05 09 2002 | 05 09 2002 | 11 | 11 | 98940 | 1 2 3 | 50 00 | 1 | | | | |
| 2 | 05 09 2002 | 05 09 2002 | 11 | 11 | 97110 | 1 2 3 | 55 00 | 1 | | | | |
| 3 | 05 13 2002 | 05 13 2002 | 11 | 11 | 98940 | 1 2 3 | 50 00 | 1 | | | | |
| 4 | 05 13 2002 | 05 13 2002 | 11 | 11 | 97110 | 1 2 3 | 55 00 | 1 | | | | |
| 5 | 05 14 2002 | 05 14 2002 | 11 | 11 | 98940 | 1 2 3 | 50 00 | 1 | | | | |
| 6 | 05 14 2002 | 05 14 2002 | 11 | 11 | 97110 | 1 2 3 | 55 00 | 1 | | | | |

| 25. FEDERAL TAX I.D. NUMBER | SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. BALANCE DUE |
|---|---|---|---|---|---|---|
| 04-3394642 | XX | 1907766-1-19 | X YES  NO | $ 315 00 | $ 00 | $ 315 00 |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) | 32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office) | 33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE # |
|---|---|---|
| JENNIFER MCCONNELL D.C. | | FIRST SPINE & REHAB |
| SIGNED 05 21 2002  DATE | | 410 SCHOOL STREET |
| | | LOWELL, MA 01851 |
| | | PIN#   GRP# |

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)   PLEASE PRINT OR TYPE   FORM CMS-1500 (12-90), FORM RRB-1500, FORM OWCP-1500

Mfd. by Medical Arts Press   Printed on Recycled Paper   #29429 - Medical Arts Press
Call toll-free: 1-800-328-2179   Use with Envelope #14145 (gummed) or #14146 (self-seal)

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND CHAMPUS PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary if this is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

## BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

## SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I (or any employee) who rendered services are not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION
(PRIVACY ACT STATEMENT)

We are authorized by CMS, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed. Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR CHAMPUS CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

## MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Humans Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0008. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, N2-14-26, 7500 Security Boulevard, Baltimore, Maryland 21244-1850

## POST AUGUST 16, 2001 PAYMENTS

| CLAIM NUMBER | DOL | AMOUNT PAID | DATE PAID | LAST | FIRST |
|---|---|---|---|---|---|
| 03420810 | 04/02/01 | $1,943.00 | 08/16/01 | PHAN | NICKIE |
| 03420777 | 04/01/01 | $1,115.00 | 08/21/01 | MEN | OEUN |
| 03420777 | 04/01/01 | $1,010.00 | 08/21/01 | KHENT | KHEN |
| 03420777 | 04/01/01 | $1,115.00 | 08/21/01 | SOK | SART |
| 03402742 | 09/08/00 | $555.00 | 09/21/01 | DUONGCHACK | WILSON |
| 03402742 | 09/08/00 | $1,585.00 | 09/24/01 | DUONGCHACK | WILSON |
| 03415449 | 11/25/00 | $3,508.00 | 09/25/01 | KHIM | RUMCHEK |
| 03415524 | 11/26/00 | $1,395.00 | 09/25/01 | KEO | EATH |
| 03402742 | 09/08/00 | $415.00 | 09/26/01 | DUONGCHACK | WILSON |
| 03402742 | 09/08/00 | $415.00 | 09/26/01 | DUONGCHACK | WILSON |
| 03414660 | 11/01/00 | $3,885.00 | 09/27/01 | TI | OUK |
| 03448910 | 08/14/01 | $2,119.00 | 10/19/01 | SENG | MUTH |
| 03448910 | 08/14/01 | $1,854.00 | 10/19/01 | CHIV | SUNNAK |
| 03448910 | 08/14/01 | $2,015.00 | 10/19/01 | SENG | SIVINARY |
| 03448741 | 08/06/01 | $2,099.00 | 10/23/01 | DOUNG | KATIE |
| 03420810 | 04/02/01 | $205.00 | 10/24/01 | PHAN | NICKIE |
| 03445147 | 05/10/01 | $1,652.00 | 11/12/01 | UONG | PHAMARO |
| 03447628 | 06/25/00 | $4,101.00 | 11/12/01 | NGETH | VEASHA |
| 03447628 | 06/25/00 | $4,256.00 | 11/12/01 | NGETH | SAMNANG |
| 03448741 | 08/06/01 | $605.00 | 11/16/01 | DOUNG | KATIE |
| 03381790 | 12/14/98 | $2,236.00 | 11/27/01 | CHUM | SOPHALA |
| 03381790 | 12/14/98 | $1,558.00 | 11/27/01 | CHUM | SOPHALA |
| 03444156 | 03/06/01 | $4,100.00 | 11/28/01 | KHUANPHET | ANIRUT |
| 03445702 | 05/28/01 | $270.00 | 12/11/01 | PHO | MICHAEL |
| 03445702 | 05/28/01 | $3,614.00 | 12/11/01 | PHO | MICHAEL |
| 03445147 | 05/10/01 | $1,870.00 | 12/17/01 | UM | SOPHEA |
| 03456762 | 09/06/01 | $2,789.00 | 01/30/02 | HOU | SAROEUN |
| 03456762 | 09/06/01 | $1,614.00 | 01/30/02 | NOU | PAMELA |
| 03420810 | 04/02/01 | $1,920.00 | 01/30/02 | REAL | BIN |
| 03415524 | 11/26/00 | $2,805.00 | 02/04/02 | KEO | EATH |
| 03442397 | 02/17/01 | $1,880.00 | 02/11/02 | SOM | THANH |
| 03391026 | 07/26/00 | $110.00 | 02/19/02 | PHOUNG | LE |
| 03391026 | 07/26/00 | $110.00 | 02/19/02 | PHOUNG | LE |
| 03402742 | 09/08/00 | $2,810.00 | 02/19/02 | TANG | SACHA |
| 03456832 | 09/08/01 | $105.00 | 02/28/02 | SOUM | MIKE |
| 03448910 | 08/14/01 | $1,341.00 | 03/04/02 | SENG | SIVINARY |
| 03448910 | 08/14/01 | $540.00 | 03/04/02 | SENG | MUTH |
| 03448910 | 08/14/01 | $951.00 | 03/04/02 | SENG | MUTH |
| 03448910 | 08/14/01 | $175.00 | 03/04/02 | CHIV | SUNNAK |
| 03456832 | 09/08/01 | $2,590.00 | 03/06/02 | SOUM | MIKE |
| 03456762 | 09/06/01 | $973.00 | 03/07/02 | HOU | SAROEUN |
| 03341477 | 10/29/99 | $695.00 | 03/20/02 | LANG | PHALLY |
| 03445147 | 05/10/01 | $2,497.00 | 03/20/02 | UONG | PHAMARO |
| 03467194 | 01/30/02 | $1,040.00 | 03/21/02 | TAYLOR | PAUL |
| 03448741 | 08/06/01 | $180.00 | 03/29/02 | DOUNG | KATIE |
| 03456832 | 09/08/01 | $2,433.00 | 04/01/02 | OU | DALIN |
| 03448741 | 08/06/01 | $257.00 | 04/03/02 | DOUNG | KATIE |

## POST AUGUST 16, 2001 PAYMENTS

| CLAIM NUMBER | DOL | AMOUNT PAID | DATE PAID | LAST | FIRST |
|---|---|---|---|---|---|
| 03445147 | 05/10/01 | $2,249.00 | 04/08/02 | UM | SOPHEA |
| 03461410 | 01/15/02 | $2,000.00 | 04/08/02 | ROS | SARATH |
| 03461410 | 01/15/02 | $2,000.00 | 04/08/02 | CHANTHA | BUNTHY |
| 03419107 | 02/18/01 | $330.00 | 04/11/02 | SOK | KHAWAII |
| 03419107 | 02/18/01 | $1,615.00 | 04/11/02 | SARATH | HEANO |
| 03448910 | 08/14/01 | $434.00 | 04/12/02 | SENG | SIVINARY |
| 03448910 | 08/14/01 | $1,699.00 | 04/12/02 | SENG | MUTH |
| 03456832 | 09/08/01 | $1,717.00 | 04/12/02 | OU | DALIN |
| 03456832 | 09/08/01 | $1,947.00 | 04/12/02 | SOUM | MIKE |
| 03459630 | 11/26/01 | $1,465.00 | 04/15/02 | IT | TOUN |
| 03459630 | 11/26/01 | $1,475.00 | 04/18/02 | HUM | HUN |
| 03459630 | 11/26/01 | $2,261.00 | 04/18/02 | PEI | TUY |
| 03467194 | 01/30/02 | $1,178.00 | 05/13/02 | TAYLOR | PAUL |
| 03459630 | 11/26/01 | $77.00 | 05/14/02 | IT | TOUN |
| 03448910 | 08/14/01 | $2,489.00 | 05/21/02 | SENG | VANDARY |
| 03439611 | 05/19/00 | $2,875.00 | 06/06/02 | YANG | SOKHAN |
| 03442397 | 02/17/01 | $394.00 | 06/12/02 | SOM | THANH |
| 03419107 | 02/18/01 | $600.00 | 07/02/02 | NEANG | KIM |
| 03468725 | 03/18/02 | $2,030.00 | 07/15/02 | KRAPOMROTH | KHIM |
| 03468725 | 03/18/02 | $2,440.00 | 07/15/02 | SOPHAY | PORTH |
| 03468725 | 03/18/02 | $2,000.00 | 07/15/02 | PHOEUN | SAM |
| 03469203 | 03/29/02 | $3,351.00 | 07/16/02 | BAN | KIMSAT |
| 03419107 | 02/18/01 | $270.00 | 07/17/02 | NEANG | KIM |
| 03462771 | 02/24/02 | $1,495.00 | 07/18/02 | PHAN | SAVUTH |
| 03462771 | 02/24/02 | $1,726.00 | 07/18/02 | SO | NHEOP |
| 03462771 | 02/24/02 | $1,975.00 | 07/18/02 | SO | PAULIKA |
| 03462771 | 02/24/02 | $2,356.00 | 07/18/02 | SO | CHERTRA |
| 03462771 | 02/24/02 | $1,735.00 | 07/18/02 | SO | PHAECTRA |
| 03408504 | 02/23/01 | $3,505.00 | 07/23/02 | MEAS | KEVIN |
| 03468725 | 03/18/02 | $345.00 | 07/24/02 | KRAPOMROTH | KHIM |
| 03468725 | 03/18/02 | $285.00 | 07/24/02 | SOPHAY | PORTH |
| 03374831 | 07/18/98 | $177.00 | 07/31/02 | ROUM | SAROEUT |
| 03470133 | 04/20/02 | $3,101.00 | 08/02/02 | MENG | BUNKEA |
| 03470133 | 04/20/02 | $1,901.00 | 08/02/02 | SIM | ROCKENNA |
| 03456832 | 09/08/01 | $180.00 | 08/09/02 | OU | DALIN |
| 03445338 | 05/16/01 | $4,547.00 | 08/21/02 | CHHIM | PHYRUM |
| 03462436 | 02/13/02 | $1,805.00 | 08/21/02 | CHHAIM | RY |
| 03462436 | 02/13/02 | $1,585.00 | 08/21/02 | PIN | BOEUK |
| 03462436 | 02/13/02 | $1,620.00 | 08/26/02 | CHHEAN | SAR |
| 03462436 | 02/13/02 | $175.00 | 08/28/02 | CHANTHA | BUNTHY |
| 03465736 | 06/04/02 | $2,456.00 | 09/06/02 | KANG | CHHANG |
| 03467477 | 02/07/02 | $1,450.00 | 09/06/02 | UNG | CHITHRA |
| 03467477 | 02/07/02 | $1,475.00 | 09/06/02 | LONG | PHOLLA |
| 03467477 | 02/07/02 | $1,560.00 | 09/06/02 | UNG | VOLAK |
| 03467477 | 02/07/02 | $1,025.00 | 09/06/02 | UNG | SOPHINNA |
| 03467477 | 02/07/02 | $1,640.00 | 09/06/02 | SAN | SAMNANG |
| 03465736 | 06/04/02 | $1,725.00 | 09/11/02 | PHOUN | PHALA |

## POST AUGUST 16, 2001 PAYMENTS

| CLAIM NUMBER | DOL | AMOUNT PAID | DATE PAID | LAST | FIRST |
|---|---|---|---|---|---|
| 03457313 | 09/22/01 | $472.00 | 09/12/02 | OEUN | TIM |
| 03408504 | 02/23/01 | $2,905.00 | 09/16/02 | KHUT | SAMNANG |
| 03445338 | 05/16/01 | $4,582.00 | 09/20/02 | SO | RATHA |
| 03465736 | 06/04/02 | $1,521.00 | 09/20/02 | PHOUN | PHALA |
| 03465736 | 06/04/02 | $1,045.00 | 09/20/02 | KANG | CHHANG |
| 03473966 | 07/15/02 | $1,883.00 | 09/23/02 | MELO | DIANE |
| 03475016 | 08/03/02 | $2,321.00 | 10/07/02 | TAING | SONG |
| 03469203 | 03/29/02 | $1,515.00 | 10/10/02 | BAN | KIMSAT |
| 03469203 | 03/29/02 | $1,515.00 | 10/10/02 | BAN | AT |
| 03468725 | 03/18/02 | $460.00 | 10/22/02 | KRAPOMROTH | KHIM |
| 03468725 | 03/18/02 | $1,220.00 | 10/22/02 | SOPHAY | PORTH |
| 03457321 | 09/21/01 | $1,995.00 | 11/07/02 | CHIV | SUNTAK |
| 03473966 | 07/15/02 | $1,782.00 | 11/07/02 | MELO | DIANE |
| 03464524 | 04/23/02 | $3,733.00 | 11/13/02 | SENG | MELODY |
| 03464524 | 04/23/02 | $3,613.00 | 11/13/02 | SENG | JERRY |
| 03464524 | 04/23/02 | $2,000.00 | 11/13/02 | SOK | MON |
| 03459630 | 11/26/01 | $1,038.00 | 12/02/02 | IT | TOUN |
| 03459630 | 11/26/01 | $640.00 | 12/02/02 | IT | TOUN |
| 03469371 | 04/04/02 | $2,326.00 | 12/06/02 | VAT | SAVANN |
| 03470054 | 04/19/02 | $4,411.00 | 12/07/02 | PANYA | MANILA |
| 03415760 | 11/26/00 | $1,765.00 | 12/09/02 | MOUN | SAVY |
| 03475016 | 08/03/02 | $580.00 | 12/12/02 | TAING | SONG |
| 03465736 | 06/04/02 | $1,890.00 | 12/31/02 | KONG | CHANDA |
| 03465736 | 06/04/02 | $1,281.00 | 12/31/02 | KONG | CHANDA |
| 03461410 | 01/15/02 | $550.00 | 01/06/03 | CHANTHA | BUN |
| 03486571 | 09/18/02 | $235.00 | 01/07/03 | UY | SOVANNA |
| 03479077 | 09/07/02 | $2,835.00 | 01/13/03 | PANYA | KHANM |
| 03479077 | 09/07/02 | $2,955.00 | 01/13/03 | PHONPHIPHAK | KONGKEO |
| 03465736 | 06/04/02 | $1,195.00 | 01/14/03 | PHOUN | PHALA |
| 03465736 | 06/04/02 | $525.00 | 01/14/03 | KONG | CHANDA |
| 03465736 | 06/04/02 | $1,135.00 | 01/14/03 | KANG | CHHANG |
| 03475016 | 08/03/02 | $220.00 | 01/15/03 | TAING | SONG |
| 03486642 | 10/16/02 | $440.00 | 01/15/03 | TITH | DEN |
| 03469510 | 04/07/02 | $349.00 | 01/17/03 | BUN | SAKHAN |
| 03438972 | 01/14/00 | $3,817.00 | 01/20/03 | MEJIA | ANGELA |
| 03470054 | 04/19/02 | $280.00 | 01/22/03 | PANYA | MANILA |
| 03474153 | 07/18/02 | $4,794.00 | 01/22/03 | CHHIM | PHYRUN |
| 03486571 | 09/18/02 | $1,768.00 | 01/22/03 | UY | LATH |
| 03459630 | 11/26/01 | $1,656.00 | 01/23/03 | IT | TOUN |
| 03459630 | 11/26/01 | $1,465.00 | 01/23/03 | IT | TOUN |
| 03479077 | 09/07/02 | $495.00 | 01/24/03 | PHONPHIPHAK | KONGKEO |
| 03486795 | 10/19/02 | $470.00 | 01/24/03 | YONN | SAVONN |
| 03486571 | 09/18/02 | $2,030.00 | 01/24/03 | UY | SOVANNA |
| 03487193 | 10/26/02 | $2,040.00 | 01/27/03 | UY | SOPHANNEE |
| 03485991 | 10/02/02 | $325.00 | 01/27/03 | SOK | PHEAKLEY |
| 03485991 | 10/02/02 | $260.00 | 01/27/03 | SOK | PHEAKLEY |
| 03485991 | 10/02/02 | $465.00 | 01/27/03 | CHAN | LY |

## POST AUGUST 16, 2001 PAYMENTS

| CLAIM NUMBER | DOL | AMOUNT PAID | DATE PAID | LAST | FIRST |
|---|---|---|---|---|---|
| 03485991 | 10/02/02 | $280.00 | 01/27/03 | CHAN | LY |
| 03459630 | 11/26/01 | $1,465.00 | 01/29/03 | IT | TOUN |
| 03485151 | 09/16/02 | $470.00 | 01/29/03 | SOEUN | SUSIE |
| 03486642 | 10/16/02 | $440.00 | 01/29/03 | TITH | DEN |
| 03486642 | 10/16/02 | $2,270.00 | 01/31/03 | TITH | DEN |
| 03470054 | 04/19/02 | $210.00 | 02/01/03 | PANYA | MANILA |
| 03487016 | 10/23/02 | $465.00 | 02/03/03 | PHANTHAVONG | DIANE |
| 03487016 | 10/23/02 | $1,535.00 | 02/03/03 | PHANTHAVONG | DIANE |
| 03487016 | 10/23/02 | $510.00 | 02/03/03 | CHUM | RIDA |
| 03487016 | 10/23/02 | $1,490.00 | 02/03/03 | CHUM | RIDA |
| 03475016 | 08/03/02 | $1,145.00 | 02/03/03 | TAING | SONG |
| 03475016 | 08/03/02 | $210.00 | 02/03/03 | TAING | SONG |
| 03487193 | 10/26/02 | $420.00 | 02/04/03 | UY | SOPHANNEE |
| 03487193 | 10/26/02 | $365.00 | 02/04/03 | SAM | SAKUN |
| 03485151 | 09/16/02 | $445.00 | 02/04/03 | SOEUN | SUSIE |
| 03485151 | 09/16/02 | $465.00 | 02/04/03 | SOEUN | SUSIE |
| 03485151 | 09/16/02 | $400.00 | 02/04/03 | PHAY | RON |
| 03485151 | 09/16/02 | $2,320.00 | 02/04/03 | PHAY | RON |
| 03485151 | 09/16/02 | $140.00 | 02/04/03 | PHAY | RON |
| 03485151 | 09/16/02 | $2,040.00 | 02/04/03 | SOEUN | SUSIE |
| 03485151 | 09/16/02 | $575.00 | 02/04/03 | PHAY | RON |
| 03485991 | 10/02/02 | $210.00 | 02/04/03 | SOK | PHEAKLEY |
| 03485991 | 10/02/02 | $2,615.00 | 02/04/03 | CHAN | LY |
| 03485991 | 10/02/02 | $1,920.00 | 02/04/03 | SOK | PHEAKLEY |
| 03480962 | 11/18/02 | $2,345.00 | 02/05/03 | THENG | CHEA |
| 03486795 | 10/19/02 | $440.00 | 02/10/03 | YONN | SAVONN |
| 03486795 | 10/19/02 | $375.00 | 02/10/03 | YONN | SAVONN |
| 03486571 | 09/18/02 | $235.00 | 02/10/03 | UY | SOVANNA |
| 03486571 | 09/18/02 | $185.00 | 02/10/03 | UY | SOVANNA |
| 03485991 | 10/02/02 | $190.00 | 02/11/03 | CHAN | LY |
| 03475016 | 08/03/02 | $315.00 | 02/13/03 | TAING | SONG |
| 03470133 | 04/20/02 | $1,868.00 | 02/14/03 | MENG | BUNKEA |
| 03481235 | 11/27/02 | $1,910.00 | 02/17/03 | KONG | SALLY |
| 03449560 | 10/05/02 | $815.00 | 02/18/03 | SAMITH | MORN |
| 03415432 | 11/25/00 | $740.00 | 02/24/03 | PHAN | SOPHAL |
| 03457313 | 09/22/01 | $1,315.00 | 02/25/03 | OEUM | TIM |
| 03486795 | 10/19/02 | $2,770.00 | 02/26/03 | YONN | SAVONN |
| 03487016 | 10/23/02 | $895.00 | 02/26/03 | PHANTHAVONG | DIANE |
| 03487016 | 10/23/02 | $710.00 | 02/26/03 | CHUM | RIDA |
| 03481654 | 12/13/02 | $505.00 | 02/26/03 | NGETH | MAO |
| 03485151 | 09/16/02 | $140.00 | 02/26/03 | PHAY | RON |
| 03479384 | 09/17/02 | $525.00 | 02/27/03 | MEACH | MELINDA |
| 03487016 | 10/23/02 | $1,885.00 | 03/11/03 | PHANTHAVONG | DIANE |
| 03487016 | 10/23/02 | $1,300.00 | 03/18/03 | CHUM | RIDA |
| 03486642 | 10/16/02 | $115.00 | 03/24/03 | TITH | DEN |
| 03486642 | 10/16/02 | $415.00 | 03/24/03 | TITH | DEN |
| 03486642 | 10/16/02 | $600.00 | 03/24/03 | TITH | DEN |

## POST AUGUST 16, 2001 PAYMENTS

| CLAIM NUMBER | DOL | AMOUNT PAID | DATE PAID | LAST | FIRST |
|---|---|---|---|---|---|
| 03486642 | 10/16/02 | $420.00 | 03/24/03 | TITH | DEN |
| 03482803 | 01/21/03 | $2,155.00 | 03/26/03 | VEUK | THAVERE |
| 03486647 | 10/16/02 | $2,200.00 | 03/26/03 | LAM | VICH |
| 03486647 | 10/16/02 | $720.00 | 03/26/03 | LAM | VICH |
| 03486647 | 10/16/02 | $370.00 | 03/26/03 | LAM | VICH |
| 03486647 | 10/16/02 | $250.00 | 03/26/03 | LAM | VICH |
| 03485151 | 09/16/02 | $300.00 | 03/26/03 | PHAY | RON |
| 03485151 | 09/16/02 | $365.00 | 03/26/03 | PHAY | RON |
| 03485151 | 09/16/02 | $105.00 | 03/26/03 | PHAY | RON |
| 03487193 | 10/26/02 | $1,526.00 | 03/27/03 | SAM | SAKUN |
| 03485151 | 09/16/02 | $405.00 | 03/27/03 | SOEUN | SUSIE |
| 03485991 | 10/02/02 | $260.00 | 03/27/03 | SOK | PHEAKLEY |
| 03485991 | 10/02/02 | $300.00 | 03/27/03 | CHAN | LY |
| 03481654 | 12/13/02 | $585.00 | 03/31/03 | HEM | NHOEUN |
| 03481654 | 12/13/02 | $465.00 | 03/31/03 | HEM | NHOEUN |
| 03481654 | 12/13/02 | $2,115.00 | 03/31/03 | NGETH | MAO |
| 03481654 | 12/13/02 | $510.00 | 03/31/03 | HEM | NHOEUN |
| 03481654 | 12/13/02 | $465.00 | 03/31/03 | NGETH | MAO |
| 03485991 | 10/02/02 | $495.00 | 03/31/03 | SOK | PHEAKLEY |
| 03469757 | 04/15/02 | $1,290.00 | 04/02/03 | LAY | KHON |
| 03468665 | 03/15/02 | $4,894.00 | 04/03/03 | MAM | SITHA |
| 03468665 | 03/15/02 | $4,431.00 | 04/03/03 | NGETH | SITHA |
| 03482803 | 01/21/03 | $645.00 | 04/07/03 | VEUK | THAVERE |
| 03487016 | 10/23/02 | $645.00 | 04/08/03 | PHANTHAVONG | DIANE |
| 03468665 | 03/15/02 | $4,754.00 | 04/09/03 | NGETH | SAMNANG |
| 03490345 | 12/26/02 | $495.00 | 04/14/03 | MAO | RITHY |
| 03490345 | 12/26/02 | $575.00 | 04/14/03 | MAO | RITHY |
| 03490345 | 12/26/02 | $465.00 | 04/16/03 | MAO | RITHY |
| 03490345 | 12/26/02 | $465.00 | 04/16/03 | MAO | RITHY |
| 03480962 | 11/18/02 | $2,255.00 | 04/18/03 | THENG | CHEA |
| 03483838 | 02/14/03 | $2,000.00 | 04/21/03 | PHLONG | SOKEAN |
| 03481654 | 12/13/02 | $255.00 | 04/25/03 | NGETH | MAO |
| 03449560 | 10/05/02 | $1,615.00 | 05/01/03 | SAMITH | MORN |
| 03485151 | 09/16/02 | $470.00 | 05/01/03 | SOEUN | SUSIE |
| 03490345 | 12/26/02 | $210.00 | 05/02/03 | MAO | RITHY |
| 03449560 | 10/05/02 | $1,400.00 | 05/05/03 | SAMITH | MORN |
| 03485991 | 10/02/02 | $460.00 | 05/08/03 | SOK | PHEAKLEY |
| 03483838 | 02/14/03 | $1,795.00 | 05/14/03 | OEUR | BRANDO |
| 03482803 | 01/21/03 | $2,160.00 | 05/15/03 | VEUK | SARETH |
| 03482803 | 01/21/03 | $550.00 | 05/15/03 | VEUK | SARETH |
| 03482803 | 01/21/03 | $440.00 | 05/15/03 | VEUK | SARETH |
| 03482803 | 01/21/03 | $310.00 | 05/15/03 | VEUK | SARETH |
| 03482803 | 01/21/03 | $370.00 | 05/15/03 | VEUK | SARETH |
| 03482803 | 01/21/03 | $530.00 | 05/15/03 | VEUK | THAVERE |
| 03482803 | 01/21/03 | $460.00 | 05/15/03 | VEUK | THAVERE |
| 03482803 | 01/21/03 | $355.00 | 05/15/03 | VEUK | THAVERE |
| 03483246 | 02/07/03 | $390.00 | 05/15/03 | SIMS | PHATH |

## POST AUGUST 16, 2001 PAYMENTS

| CLAIM NUMBER | DOL | AMOUNT PAID | DATE PAID | LAST | FIRST |
|---|---|---|---|---|---|
| 03485151 | 09/16/02 | $470.00 | 05/16/03 | SOEUN | SUSIE |
| 03487016 | 10/23/02 | $645.00 | 05/19/03 | PHANTHAVONG | DIANE |
| 03487016 | 10/23/02 | $645.00 | 05/19/03 | CHUM | RIDA |
| 03464524 | 04/23/02 | $2,000.00 | 05/21/03 | SOK | MON |
| 03483246 | 02/07/03 | $630.00 | 05/23/03 | SIMS | PHATH |
| 03485151 | 09/16/02 | $175.00 | 05/28/03 | SOEUN | SUSIE |
| 03486795 | 10/19/02 | $365.00 | 05/29/03 | YONN | SAVONN |
| 03500623 | 03/28/03 | $1,428.00 | 05/29/03 | PHAL | CHANNAK |
| 03482803 | 01/21/03 | $630.00 | 06/02/03 | VEUK | THAVERE |
| 03487193 | 10/26/02 | $365.00 | 06/02/03 | SAM | SAKUN |
| 03469757 | 04/15/02 | $2,080.00 | 06/03/03 | LAY | KHON |
| 03482803 | 01/21/03 | $640.00 | 06/11/03 | VEUK | SARETH |
| 03483838 | 02/14/03 | $102.00 | 06/11/03 | PHLONG | SOKEAN |
| 03469203 | 03/29/02 | $210.00 | 06/19/03 | BAN | KIMSAT |
| 03481235 | 11/27/02 | $295.00 | 06/20/03 | KONG | SALLY |
| 03483246 | 02/07/03 | $490.00 | 06/20/03 | SIMS | PHATH |
| 03486795 | 10/19/02 | $175.00 | 06/24/03 | YONN | SAVONN |
| 03482803 | 01/21/03 | $520.00 | 06/25/03 | VEUK | SARETH |
| 03449560 | 10/05/02 | $530.00 | 07/01/03 | SAMITH | MORN |
| 03504615 | 06/07/03 | $1,140.00 | 07/16/03 | KMSAN | MOM |
| 03500338 | 03/24/03 | $550.00 | 07/17/03 | ROM | JIMMY |
| 03500338 | 03/24/03 | $400.00 | 07/17/03 | LIV | KONG |
| 03482803 | 01/21/03 | $328.00 | 07/18/03 | VEUK | THAVERE |
| 03500338 | 03/24/03 | $210.00 | 07/22/03 | ROM | JIMMY |
| 03500338 | 03/24/03 | $328.00 | 07/22/03 | LIV | KONG |
| 03419107 | 02/18/01 | $90.00 | 07/25/03 | SARATH | HEANO |
| 03459630 | 11/26/01 | $115.00 | 07/26/03 | PEI | TUY |
| 03482803 | 01/21/03 | $315.00 | 07/31/03 | VEUK | SARETH |
| 03504357 | 06/03/03 | $1,635.00 | 08/27/03 | SEM | SOKHAN |
| 03504357 | 06/03/03 | $1,553.00 | 08/27/03 | SEM | CHANTHA |
| 03504357 | 06/03/03 | $2,000.00 | 08/27/03 | SEM | SAKHOEUI |
| 03485991 | 10/02/02 | $420.00 | 08/29/03 | SOK | PHEAKLEY |
| 03504357 | 06/03/03 | $460.00 | 09/02/03 | TOCH | REATH |
| 03504357 | 06/03/03 | $2,060.00 | 09/02/03 | TOCH | REATH |
| 03504357 | 06/03/03 | $575.00 | 09/02/03 | DAM | CHANNAR |
| 03504357 | 06/03/03 | $1,860.00 | 09/04/03 | DAM | CHANNAR |
| 03504615 | 06/07/03 | $605.00 | 09/05/03 | CHEA | VANNAK |
| 03504357 | 06/03/03 | $371.00 | 09/08/03 | SEM | SOKHON |
| 03504357 | 06/03/03 | $317.00 | 09/08/03 | TOCH | REATH |
| 03504615 | 06/07/03 | $284.00 | 09/10/03 | CHEA | VANNAK |
| 03506712 | 07/11/03 | $2,000.00 | 09/15/03 | ROM | JOHN |
| 03506712 | 07/11/03 | $1,870.00 | 09/17/03 | LIV | KONG |
| 03504615 | 06/07/03 | $544.00 | 09/22/03 | CHEA | VANNAK |
| 03504357 | 06/03/03 | $384.00 | 09/23/03 | TOCH | REATH |
| 03504357 | 06/03/03 | $371.00 | 09/23/03 | SEM | SOKHON |
| 03504357 | 06/03/03 | $391.00 | 09/23/03 | DAM | CHANNAR |
| 03504615 | 06/07/03 | $252.00 | 09/29/03 | CHEA | VANNAK |

## POST AUGUST 16, 2001 PAYMENTS

| CLAIM NUMBER | DOL | AMOUNT PAID | DATE PAID | LAST | FIRST |
|---|---|---|---|---|---|
| 03506712 | 07/11/03 | $130.00 | 10/03/03 | LIV | KONG |
| 03459630 | 11/26/01 | $1,893.00 | 10/09/03 | HUM | HUN |
| 03459630 | 11/26/01 | $1,693.00 | 10/10/03 | BUN | JIM |
| 03459630 | 11/26/01 | $1,970.00 | 10/10/03 | PEI | TUY |
| 03500338 | 03/24/03 | $1,993.00 | 10/13/03 | LIV | KONG |
| 03500338 | 03/24/03 | $350.00 | 10/13/03 | LIV | KONG |
| 03500338 | 03/24/03 | $328.00 | 10/13/03 | LIV | KONG |
| 03504357 | 06/03/03 | $140.00 | 10/13/03 | DAM | CHANNAR |
| 03504615 | 06/07/03 | $177.00 | 10/17/03 | CHEA | VANNAK |
| 03504357 | 06/03/03 | $430.00 | 10/20/03 | SEM | SOKHOM |
| 03500338 | 03/24/03 | $1,705.00 | 10/22/03 | ROM | JIMMY |
| 03482803 | 01/21/03 | $175.00 | 10/29/03 | VEUK | SARETH |
| 03491823 | 05/23/03 | $1,362.00 | 10/29/03 | ROM | JOHN |
| 03504357 | 06/03/03 | $317.00 | 10/30/03 | TOCH | REATH |
| 03504357 | 06/03/03 | $177.00 | 11/05/03 | SEM | SOKHON |
| 03483838 | 02/14/03 | $1,465.00 | 11/06/03 | PHLONG | SOKEAN |
| 03504615 | 06/07/03 | $1,932.00 | 11/10/03 | CHEA | VANNAK |
| 03482803 | 01/21/03 | $630.00 | 11/11/03 | VEUK | THAVERE |
| 03504357 | 06/03/03 | $442.00 | 11/11/03 | SEM | SOKHOM |
| 03504615 | 06/07/03 | $420.00 | 11/13/03 | CHEA | VANNAK |
| 03504357 | 06/03/03 | $280.00 | 11/13/03 | TOCH | REATH |
| 03504357 | 06/03/03 | $282.00 | 11/13/03 | DAM | CHANNAR |
| 03504357 | 06/03/03 | $70.00 | 11/21/03 | SEM | SOKHOM |
| 03504357 | 06/03/03 | $1,880.00 | 11/21/03 | SEM | SAKHOEUI |
| 03504357 | 06/03/03 | $2,447.00 | 11/21/03 | SEM | CHANTHA |
| 03504357 | 06/03/03 | $1,540.00 | 11/21/03 | SEM | SOKHAN |
| 03510448 | 07/26/03 | $441.00 | 11/21/03 | SAMBATH | KIM |
| 03510448 | 07/26/03 | $321.00 | 11/21/03 | EANG | SOPHANNAR |
| 03483246 | 02/07/03 | $457.00 | 11/28/03 | SIMS | PHATH |
| 03483246 | 02/07/03 | $1,699.00 | 11/28/03 | SIMS | PHATH |
| 03483246 | 02/07/03 | $534.00 | 11/28/03 | SIMS | PHATH |
| 03504357 | 06/03/03 | $214.00 | 12/09/03 | SEM | SAKHOEUI |
| 03510448 | 07/26/03 | $107.00 | 12/10/03 | EANG | SOPHANNAR |
| 03510448 | 07/26/03 | $247.00 | 12/10/03 | SOK | SAMNANG |
| 03504357 | 06/03/03 | $210.00 | 12/11/03 | DAM | CHANNAR |
| 03500623 | 03/28/03 | $24.00 | 12/15/03 | PHAL | CHANNAK |
| 03510448 | 07/26/03 | $105.00 | 12/15/03 | SOK | SAMNANG |
| 03510448 | 07/26/03 | $2,961.00 | 12/16/03 | SAMBATH | KIM |
| 03438972 | 01/14/00 | $4,032.00 | 12/19/03 | DISLA | JUAN |
| 03468665 | 03/15/02 | $423.00 | 12/29/03 | NGETH | SITHA |
| 03468725 | 03/18/02 | $886.00 | 01/02/04 | SOPHAY | PORTH |
| 03448910 | 08/14/01 | $317.00 | 01/05/04 | SENG | SIVINARY |
| 03511086 | 09/18/03 | $277.00 | 01/16/04 | SAMITH | MORIN |
| 03511086 | 09/18/03 | $277.00 | 01/16/04 | SAMITH | MORIN |
| 03511086 | 09/18/03 | $531.00 | 01/16/04 | SAMITH | MORIN |
| 03511086 | 09/18/03 | $1,557.00 | 01/16/04 | SAMITH | MORIN |
| 03491088 | 04/15/03 | $770.00 | 01/22/04 | UY | SOPHANNEE |

## POST AUGUST 16, 2001 PAYMENTS

| CLAIM NUMBER | DOL | AMOUNT PAID | DATE PAID | LAST | FIRST |
|---|---|---|---|---|---|
| 03510448 | 07/26/03 | $225.00 | 01/30/04 | SAMBATH | KIM |
| 03506712 | 07/11/03 | $349.00 | 02/17/04 | LIV | KONG |
| 03506712 | 07/11/03 | $901.00 | 02/17/04 | ROM | JOHN |
| 03500338 | 03/24/03 | $1,705.00 | 02/19/04 | ROM | JIMMY |
| 03511086 | 09/18/03 | $415.00 | 02/19/04 | SAMITH | MORIN |
| 03505976 | 06/28/03 | $1,434.00 | 02/23/04 | KEO | KOTHATOM |
| 03500338 | 03/24/03 | $1,740.00 | 02/25/04 | ROM | JOHN |
| 03500338 | 03/24/03 | $320.00 | 02/25/04 | ROM | JOHN |
| 03465736 | 06/04/02 | $530.00 | 02/26/04 | KONG | CHANDA |
| 03500338 | 03/24/03 | $1,740.00 | 03/10/04 | ROM | JOHN |
| 03500338 | 03/24/03 | $320.00 | 03/10/04 | ROM | JOHN |
| 03511086 | 09/18/03 | $887.00 | 03/10/04 | SAMITH | MORIN |
| 03415432 | 11/25/00 | $330.00 | 03/11/04 | VORN | SARON |
| 03533438 | 01/19/04 | $1,310.00 | 03/23/04 | INTHABANE | MICHAEL |
| 03532767 | 01/10/04 | $1,740.00 | 04/12/04 | DELAVALLE | ROBERT |
| 03532767 | 01/10/04 | $2,525.00 | 04/12/04 | MOLINA | DEMETRI |
| 03532767 | 01/10/04 | $2,385.00 | 04/12/04 | CARRASQUILLO | ALMA |
| 03505976 | 06/28/03 | $1,900.00 | 04/14/04 | PHANTHANOUSINH | VANTP |
| 03483838 | 02/14/03 | $1,083.00 | 04/19/04 | OEUR | BRANDO |
| 03504357 | 06/03/03 | $107.00 | 04/27/04 | TOCH | REATH |
| 03530556 | 12/10/03 | $1,016.00 | 04/28/04 | TRUONG | KEN |
| 03530556 | 12/10/03 | $1,123.00 | 04/28/04 | TRUONG | KEN |
| 03530556 | 12/10/03 | $297.00 | 04/28/04 | TRUONG | KEN |
| 03420777 | 04/01/01 | $200.00 | 05/24/04 | MEN | OEUN |
| 03420777 | 04/01/01 | $695.00 | 05/24/04 | KHENT | KHEN |
| 03513997 | 10/27/03 | $862.00 | 06/01/04 | PEOV | KAN |
| 03513997 | 10/27/03 | $2,287.00 | 06/01/04 | RATH | CHARETH |
| 03513997 | 10/27/03 | $862.00 | 06/01/04 | RATH | KRISTINA |
| 03513997 | 10/27/03 | $2,302.00 | 06/04/04 | PHAN | SALEEN |
| 03513997 | 10/27/03 | $867.00 | 06/04/04 | KHIAOSOTH | VONGD |
| 03382948 | 02/02/99 | $1,625.00 | 06/08/04 | CHHU | SAROEUN |
| 03500623 | 03/28/03 | $24.00 | 06/16/04 | PHAL | CHANNAK |
| 03510448 | 07/26/03 | $105.00 | 06/16/04 | SOK | SAMNANG |
| 03510448 | 07/26/03 | $2,961.00 | 06/16/04 | SAMBATH | KIM |
| 03532353 | 01/02/04 | $478.00 | 06/23/04 | SONG | PAT |
| 03536789 | 03/16/04 | $665.00 | 07/08/04 | VONG | SAVY |
| 03508820 | 08/12/03 | $610.00 | 07/09/04 | MAM | KATHERINE |
| 03508820 | 08/12/03 | $1,478.00 | 07/09/04 | NUTH | KIM |
| 03481722 | 12/12/02 | $480.00 | 07/13/04 | HIM | SARON |
| 03481722 | 12/12/02 | $210.00 | 07/13/04 | HIM | SARON |
| 03481722 | 12/12/02 | $1,830.00 | 07/13/04 | HIM | SARON |
| 03461410 | 01/15/02 | $1,133.00 | 07/21/04 | CHANTHA | BUN |
| 03510448 | 07/26/03 | $225.00 | 08/04/04 | SAMBATH | KIM |
| 03540127 | 05/14/04 | $989.00 | 08/18/04 | SOK | SAM |
| 03481722 | 12/12/02 | $175.00 | 08/25/04 | HIM | SARON |
| 03508820 | 08/12/03 | $846.00 | 09/10/04 | NUTH | LINDA |

## POST AUGUST 16, 2001 PAYMENTS

| CLAIM NUMBER | DOL | AMOUNT PAID | DATE PAID | LAST | FIRST |
|---|---|---|---|---|---|
| 03508820 | 08/12/03 | $1,080.00 | 09/10/04 | MAM | KATHERINE |
| 03506013 | 06/12/03 | $2,520.00 | 09/16/04 | EANG | SOKUNTH |
| 03511086 | 09/18/03 | $1,674.00 | 09/22/04 | SUON | THEA |
| 03493502 | 12/08/03 | $2,000.00 | 10/05/04 | MELO | DIANE |
| 03540127 | 05/14/04 | $309.00 | 10/06/04 | SOK | SAM |
| 03461410 | 01/15/02 | $365.00 | 10/13/04 | CHANTHA | BUN |
| 03532767 | 01/10/04 | $1,740.00 | 10/13/04 | DELAVALLE | ROBERT |
| 03511086 | 09/18/03 | $2,830.00 | 10/22/04 | SUON | THEA |
| 03504357 | 06/03/03 | $802.00 | 10/25/04 | DAM | CHANNAR |
| 03461410 | 01/15/02 | $486.00 | 10/28/04 | CHANTHA | BUN |
| 03490345 | 12/26/02 | $2,315.00 | 11/08/04 | MAO | RITHY |
| 03504357 | 06/03/03 | $671.00 | 11/08/04 | TOCH | REATH |
| 03461410 | 01/15/02 | $693.00 | 11/11/04 | CHANTHA | BUN |
| 03536789 | 03/16/04 | $1,057.00 | 12/03/04 | VONG | SAVY |
| 03536789 | 03/16/04 | $278.00 | 12/03/04 | VONG | SAVY |
| 03331518 | 09/10/98 | $3,896.00 | 12/08/04 | HOK | TUT |
| 03493502 | 12/08/03 | $837.00 | 12/13/04 | MELO | DIANE |
| 03415432 | 11/25/00 | $300.00 | 12/16/04 | PHAN | SOPHAL |
| | | **$467,125.00** | | | |