UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| ENCOMPASS INSURANCE COMPANY OF MASSACHUSETTS, | ) ) ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, ADVANCED SPINE CENTERS, INC. d/b/a FIRST SPINE REHAB, FUTURE MANAGEMENT CORPORATION, FUTURE MANAGEMENT BUSINESS TRUST, EDWARD KENNEDY, BRIAN J. CULLINEY, D.C. and JENNIFER MCCONNELL, D.C., | ) ) ) ) ) ) ) ) | Case No. 05-11693 RCL |
| | ) | |
| Defendants/Counterclaim Plaintiffs. | ) | |

_____

### JOINT OPPOSITION OF DEFENDANTS/COUNTERCLAIM PLAINTIFFS TO PLAINTIFF/COUNTERCLAIM DEFENDANT'S OMNIBUS MOTION TO DISMISS COUNTERCLAIMS

Defendants/Counterclaim Plaintiffs Joseph D. Giampa, Frederick T. Giampa, Advanced

Spine Centers, Inc. d/b/a First Spine Rehab ("First Spine"), Edward Kennedy ("Kennedy"),

Brian J. Culliney, D.C. ("Culliney"), and Jennifer McConnell, D.C. ("McConnell") hereby

oppose Plaintiff/Counterclaim Defendant's Omnibus Motion to Dismiss Counterclaims.

<u>INTRODUCTION</u>

By its Motion to Dismiss, Plaintiff/Counterclaim Defendant Encompass Insurance

Company of Massachusetts ("Encompass") seeks the dismissal of three separate counterclaims

filed by the Defendants/Counterclaim Plaintiffs (collectively, the "Counterclaimants")[1].  In

_____

[1] The Counterclaimants filed three separate counterclaims: one by Joseph D. Giampa, Frederick T. Giampa, and First Spine (the "Giampa Counterclaim"); one by Kennedy (the "Kennedy Counterclaim"); and one by Culliney and McConnell (the "Culliney Counterclaim")(collectively, the "Counterclaims").

fashioning its arguments, Encompass either misstates or maneuvers around the relevant case law. However, once this case law is revealed, there can be no doubt that the Counterclaims have all been sufficiently pled, and should be allowed to proceed. As a result, the Motion to Dismiss must be denied in its entirety.

<u>PROCEDURAL HISTORY</u>

Encompass commenced this action on August 16, 2005, by filing and serving, among other pleadings, its original Complaint (Docket No. 1). The original Complaint was 30 pages long and contained 140 paragraphs of allegations. As against each of the Counterclaimants, the original Complaint alleged claims of fraud, civil conspiracy, intentional interference with business and contractual relationships, and violations of G.L. c. 93A. The original Complaint also alleged, as against all of the Counterclaimants except for Culliney and McConnell, certain violations of civil RICO.

A mere two days later, on August 18, 2005, Encompass issued a press release in which it named the Counterclaimants as defendants in a "$1.8 million dollar fraud lawsuit" and compared the Counterclaimants to "criminals" (the "Press Release"). A true and accurate copy of the Press Release is attached hereto as <u>Exhibit A.</u>

On September 6, 2005, the Counterclaimants filed two separate motions to dismiss; one on behalf of Joseph D. Giampa, Frederick T. Giampa, and First Spine, among other defendants (Docket No. 40),[2] and the other on behalf of Culliney and McConnell (Docket No. 42).[3] Each motion to dismiss sought the dismissal of all counts of the original Complaint as against the filing defendants. In response to the filing of these motions to dismiss, Encompass requested and

---

[2] The defendants Future Management Business Trust and Future Management Corporation were also parties to this motion to dismiss.

[3] As of that date, the remaining Counterclaimant, Edward Kennedy, was not yet represented by counsel.

received from the filing defendants their agreement to withdraw the previously filed motions so as to allow Encompass to first file an amended complaint.[4]

On September 30, 2005, Encompass filed its First Amended Complaint (Docket No. 56). The First Amended Complaint was 61 pages long and contained 374 paragraphs of allegations. Like its predecessor, the First Amended Complaint alleged, as against each of the Counterclaimants, claims of fraud, civil conspiracy, intentional interference with business and contractual relationships, and violations of G.L. c. 93A. The First Amended Complaint also alleged, like its predecessor, certain violations of civil RICO as against all of the Counterclaimants except for Culliney and McConnell.

On October 18, 2005, Joseph D. Giampa, Frederick T. Giampa, First Spine, Kennedy, and the Future Management defendants[5] filed a joint motion to dismiss all counts of the First Amended Complaint (Docket No. 57). On November 1, 2005, Culliney and McConnell similarly filed a joint motion to dismiss all counts of the First Amended Complaint (Docket No. 64). On November 21, 2005, Encompass filed its consolidated opposition to these motions to dismiss (Docket No. 68).

On June 5, 2006, after hearing oral argument from all parties, the Court dismissed Counts I and II (civil RICO violations) and Count VI (Fraud) of the First Amended Complaint for failure to plead fraud with the particularity required by Fed. R. Civ. P. 9(b), and ordered that Encompass have 30 days to correct this pleading deficiencies by filing a second amended complaint. Though the Court denied *without prejudice* the dismissal of Counts III and V, civil RICO and

---

[4] This agreement (which included Edward Kennedy, who had since retained counsel) is reflected in the Notice of Filing First Amended Complaint and Withdrawal of Motions to Dismiss Without Prejudice filed by Encompass on September 16, 2005 (Docket No. 49).

[5] The "Future Management defendants" are the defendants Future Management Corporation and Future Management Business Trust.

common law conspiracy claims, respectively, it indicated that it was uncertain as to the viability

of these claims, and expected to be in a better position to judge subsequent to Encompass filing a

second amended complaint.  See Clerks Notes and Electronic Order dated June 5, 2006.

On July 5, 2006, Encompass filed its Second Amended Complaint (Docket No. 75).

Though substantially more lengthy than the First Amended Complaint (153 pages and 802

paragraphs of allegations), the Second Amended Complaint made the identical claims as its

immediate predecessor, except that it also included civil RICO claims against Culliney and

McConnell.

On August 25, 2006, the defendants filed a joint motion to dismiss Counts I-III (civil

RICO), Count V (Civil Conspiracy) and Count VI (Fraud) of the Second Amended Complaint

(Docket No. 79).  On September 5, 2006, Encompass filed its opposition (Docket No. 82).

During oral argument on November 13, 2006, the Court spent a significant amount of time

expressing its skepticism that Encompass had remedied its prior failure to plead fraud with

particularity.  Then, after adjourning to chambers to consider the Second Amended Complaint

further, the Court ruled that, at least as to the allegations at Paragraphs 85-99, the Second

Amended Complaint had satisfied Fed. R. Civ. P. 9(b).  The Court therefore denied defendants'

joint motion to dismiss.  See Clerks Notes and Electronic Order dated November 13, 2006.

On December 13, 2006, each of the Counterclaimants answered the Second Amended

Complaint and filed counterclaims against Encompass.  On February 20, 2007, Encompass filed

its Motion to Dismiss.

ARGUMENT

I.     THE COUNTERCLAIMANTS HAVE PLED VIABLE CLAIMS OF DEFAMATION
       AGAINST ENCOMPASS.[6]

       In seeking dismissal of the defamation counterclaims, Encompass contends that: (1) the

Press Release is protected by the absolute litigation privileges; (2) the Counterclaimants have not

pled that the Press Release is false or misleading; and (3) the Counterclaimants have not pled that

Encompass was negligent or otherwise culpable in issuing the Press Release.  However, the

relevant law and/or facts prevent Encompass from converting any of these contentions into a

legitimate basis for dismissal.

       A.     The Absolute Litigation Privilege Does Not Apply to the Press Release.

       Any argument by Encompass that the absolute litigation privilege extends to the Press

Release is entirely debunked by this Court's own ruling in Davidson v. Cao, 211 F. Supp. 2d 264

(D. Mass. 2002).  In Davidson, the plaintiffs filed suit against the defendants alleging that the

defendants had misappropriated trade secrets regarding a possible cancer treatment.  Id. at 268-

272.  After the plaintiffs filed their complaint, one plaintiff, Abbott Laboratories ("Abbott"),

discussed the allegations of the lawsuit with (and disseminated certain false allegations in the

complaint to) the press, which published articles based upon those allegations in various

newspapers and scientific journals.  Id. at 272.  Based upon the dissemination of these false

allegations, the defendants filed counterclaims, asserting, among other things, that that they had

---

[6] Encompass makes an initial and overarching argument that to the extent any of the Counterclaims are based
exclusively upon the filing of this action, or allegations made by Encompass therein, they should be barred by
the absolute litigation privilege.  While it is crystal clear that this is not the case for any of the Counterclaims
asserted by Culliney, McConnell, or Kennedy, there may be some confusion relating to Count I of the Giampa
Counterclaim.  To the extend that Count I of the Giampa Counterclaim might be understood to be predicated
upon the fact of, or allegations made in, this action, that reading results from an error in draftsmanship which
counsel for the Giampa/First Spine defendants intends to correct immediately.

been defamed.  Id. at 273.  The plaintiffs moved to dismiss the counterclaims, and specifically sought dismissal of the defamation claims based upon the absolute litigation privilege.

In denying the plaintiffs' motion to dismiss the defamation claims, the Court first recognized the extremely narrow purpose of the litigation privilege as "permitting attorneys complete freedom of expression and candor in communications in their efforts to secure justice for their clients." Id. at 275 (quoting Sriberg v. Raymond, 370 Mass. 105, 108 (1976)).  The Court then went on to describe the discordance between this purpose, and the conduct for which plaintiffs were seeking protection, in stating that:

> Plaintiffs, however, did more than simply file the complaint.  They affirmatively and unnecessarily disseminated the complaint containing the false statements to the press.  Consequently their conduct falls squarely within the reach of the limitation to the privilege ….  Allowing defamation suits for communications to the news media will not generally inhibit parties or their attorneys from fully investigating their claims, and, therefore, does not interfere with the underlying policy rationale for the privilege.

Id.  at 275 (internal citations and quotations omitted)(emphasis added).[7]

This bright line exception to the litigation privilege is in complete accord with all of the relevant First Circuit and Massachusetts case law.  See Frazier v. Bailey, 957 F.2d 9920, 932 (1st Cir. 1992)(explaining that under Massachusetts law, if a communication otherwise subject to the litigation privilege is "unnecessarily or unreasonably published," it "is no longer privileged"); Taylor v. Swartwout, 445 F. Supp. 2d 98, 102 (D. Mass. 2006) ("unnecessary or unreasonable publication to parties outside the litigation can result in the loss of the litigation privilege"); Milford Power Limited Partnership v. New England Power Company, 918 F. Supp. 471, 485-486 (D. Mass. 1996)("Communications by a party to the news media regarding a judicial proceeding

---

[7] The cases cited by the plaintiffs in Davidson in support of a more expansive view of the litigation privilege are identical to many of those cited by Encompass, and were specifically rejected as inapposite by the Davidson Court.  Id. at 275 n.19.

have been found to be outside [the litigation] privilege because such communications do not advance the policy upon which the privilege rests"); Sullivan v. Birmingham, 11 Mass. App. Ct. 359, 362 (1981) (The litigation privilege "cannot be exploited as an opportunity to defame with immunity," and "may be lost by unnecessary or unreasonable publication to one for whom the occasion is not privileged").[8]

Encompass, like the plaintiffs in Davidson, made an affirmative and unnecessary dissemination to the public at large via the Press Release. As a result, the litigation privilege offers it no protection whatsoever.

B.     The Counterclaimants Have Clearly Pled that the Press Release Contains a False or Misleading Statements.

The Press Release contains several false or misleading statements. For example, Encompass, by means of the Press Release:

- Identified the Counterclaimants as "defendants in a $1.8 million dollar fraud lawsuit"[9];

- "[C]ommunicated defamatory statements about [Counterclaimants] to third parties"[10];

- "[G]rossly exaggerated both the nature of this case and the amount in controversy"[11].

Moreover, because Encompass filed the present action without any good faith basis for its allegations, it was reckless in issuing the Press Release at all.[12] While these allegations are

---

[8] See also Penobscott Indian Nation v. Key Bank of Maine, 112 F.3d 538, 560-61 (1st Cir. 1997)(media relations consultant engaged by party to a lawsuit denied litigation privilege protection for statements disseminated to the press that were "neither reasonable nor necessary for the effective disposition of the legal proceeding at issue")(applying Maine law); Asay v. Hallmark Cards, Inc., 594 F.2d 692, 698 (8th Cir 1979)("Thus, while a defamatory pleading is privileged, that pleading cannot be a predicate for dissemination of the defamatory matter to the public or third parties not connected with the judicial proceeding")(cited with approval in Sullivan, 11 Mass App. Ct. at 362).

[9] Culliney Counterclaim, ¶ 7; Kennedy Counterclaim, ¶ 6; Giampa Counterclaim, ¶ 13. (The Giampa Counterclaim actually makes reference to a "million dollar fraud case".)

[10] Culliney Counterclaim, ¶ 13, Kennedy Counterclaim, ¶ 13, Giampa Counterclaim, ¶ 33.

[11] Culliney Counterclaim, ¶ 8, Kennedy Counterclaim, ¶ 7. See also Giampa Counterclaim (alleging that the Press Release clearly implies that Encompass discovered evidence during its "six month investigation" of fraudulent conduct on the part of the Giampa/First Spine defendants).

sufficient to put Encompass on notice of the claims leveled against it, the Counterclaimant's allegations of defamation are further supported by facts apparent on the face of the Press Release.[13]  For instance, immediately after the Press Release names the Counterclaimants and accuses them of insurance fraud, it characterizes insurance fraud as a "crime" and describes the severe penalties Encompass has purportedly dispensed to such "criminals" and "crime syndicates."  These statements are blatantly misleading – Counterclaimants have not been charged with any crimes, let alone convicted – and obviously defamatory.  See Paul v. Davis, 424 U.S. 693, 697 (1976) ("Imputing criminal behavior to an individual is generally considered defamatory per se …."); Sousa v. Davenport, 3 Mass. App. Ct. 715, 715 (1975) (same).

Similarly, the allegations in the Counterclaims of "gross exaggeration" in the Press Release satisfy any obligation of the Counterclaimants to plead falsity as part of their prima facie case. See Culliney Counterclaim, ¶ 8, Kennedy Counterclaim, ¶ 7.  Any "exaggeration" represents something to be other than as it truly is – a "gross exaggeration" is plainly a falsehood.  See Webster's New World Dictionary 472 (3rd ed. 1988) (exaggerate: "to … write of as greater than is really so; magnify beyond the fact"); and id. at 595 (gross:  "glaring; flagrant; very bad").  Word games aside, the factual predicates upon which the Counterclaimants' allegations of falsity rest should be apparent, and are undoubtedly known to Encompass: (1) the original Complaint plainly did not allege a "$1.8 million dollar fraud claim" against the Counterclaimants, and (2) even if it had, such an allegation would have been made, by necessity, in bad faith.

---

[12] Culliney Counterclaim, ¶ 10, Kennedy Counterclaim, ¶ 9. See also Giampa Counterclaim, ¶ 28 (alleging that Encompass filed a "defamatory press release" describing the allegations of a "frivolous lawsuit").

[13]  The Press Release is attached to the Counterclaims and is incorporated into the Counterclaims for all purposes.  Fed. R. Civ. P. 10(c).

1.     <u>The Original Complaint Does Not Allege a $1.8 Million Fraud</u>.

The original Complaint (the "Complaint") does not allege a $1.8 million dollar fraud.[14]

<u>First</u>, the Complaint clearly states that the total amount of payments made in connection with *all claims* alleged to have been tainted, *in whole or in part*, by some sort of fraud is $625,386.  <u>See</u> Complaint, ¶ 89(5) and Exhibit 2.  This means that even were we to unreasonably infer from the Complaint that Encompass intended to allege – though it clearly did not – that every payment for services identified by Encompass was induced by some sort of fraud by the defendants, the representation in the Press Release would still overstate the amount of the alleged fraud by approximately $1.2 million (or, put another way, would reflect the alleged fraud as being 3 times as large as what was actually alleged).

Most assuredly, Encompass will contend that it may, if successful under its statutory claims, recover treble its actual damages.  In addition to being entirely speculative, however, the potential availability of treble damages does not make this a $1.8 million dollar fraud case.  A $1.8 million dollar fraud case suggests a $1.8 million dollar fraud; in other words, a massive misappropriation the very magnitude of which disposes people to presume guilt as opposed to innocence.[15]  Instead, <u>at best</u>, Encompass might be considered to have alleged a $625,000 fraud with the possibility of a $1.8 million dollar recovery.

<u>Except that</u>, even the Complaint is not so bold as to allege that  *every* item on *every* invoice for chiropractic services identified by Encompass resulted from fraudulent conduct by the defendants.  In fact, the Complaint does not suggest even once that the patients at issue did not require <u>any</u> chiropractic services.  Instead, given its most reasonably reading, the Complaint

---

[14] The original Complaint would appear to be the only version of import for this analysis.  In any event, the analysis would be the same using subsequent versions of the Complaint.

[15] The inclination of the public at large toward this presumption was no doubt increased by Encompass comparing the defendants to "criminals" in its Press Release.

alleges that the defendants caused patients to receive excessive treatment. See Complaint, ¶ 49 for a laundry list of allegations against the defendants sounding in excessive treatment of legitimate patients.

Even assuming that the defendants caused each and every patient identified by Encompass to receive double the chiropractic treatment that was medically necessary (we are required to assume, because no reasonable inference can be drawn from the Complaint), the actual amount of the fraud alleged by the Complaint would approximately $300,000. As a result, even if the Counterclaimants were to stipulate that Encompass believed every word of every allegation of its Complaint, the Complaint would nevertheless still not allege a $1.8 million fraud, and the statement in the Press Release would therefore still be false.[16]

2.     The Counterclaimants Have Alleged That the Complaint Was Filed
in Bad Faith.

Moreover, the Counterclaimants have alleged that Encompass filed this action without any good faith basis for its allegations. This constitutes a second and entirely separate allegation of falsity aside from the allegation that the Complaint plainly misrepresents the substance of the Complaint (as described in Section B.1 above). By their allegations of bad faith, the Counterclaimants contend that Encompass does not even have a good faith basis for what, upon close review, might be a claim for some $300,000. Encompass tries to turn its contention that this action was "the result of a six-month investigation," into some sort of defense to the Counterclaimant's allegations of bad faith. This argument, however, should be given short

---

[16] Any claim by Encompass that "each of the statements in the Press Release is demonstrably true," see Motion to Dismiss, p. 11, is, thus, clearly unsupportable. In addition to being false, the Press Release was a transparent and ultimately successful attempt by Encompass to hinder the defendants' ability to defend this lawsuit by undermining their ability to operate professionally and, therefore, to finance a defense. There could be no other purpose for cavalierly broadcasting to the insurance industry and the public at large accusations that the defendants are criminals whose business is predicated upon providing "excessive" and "unwarranted" chiropractic treatment to their patients.

10

shrift.  The operative question when it comes to the Counterclaimant's claim of bad faith litigation is not what Encompass did before filing suit, but instead what Encompass reasonably believed at the time of its filing.

The Counterclaimants have each denied any wrongdoing, a position that Encompass is presently seeking to disprove as part of its discovery efforts.  The Counterclaimants are similarly entitled to disprove that the allegations of this lawsuit – which allegedly following on the heels of a six month investigation – were reasonably supported by the findings of that investigation or any other facts known or reasonably believed by Encompass.

3.    The Counterclaimants Have Made Sufficient Allegations that Encompass Was Negligent or Reckless in Issuing the Press Release.

There is absolutely no basis in fact or law for the Counterclaimants' defamation claims to be dismissed due to a "failure to plead <u>any</u> facts tending to show that Encompass was negligent in issuing its Press Release."  Motion to Dismiss, p. 12 (emphasis in original).  <u>First</u>, Encompass freely admits that each of the Counterclaims contains an allegation that Encompass was negligent in issuing the Press Release.  <u>Id</u>.  at 12.  According to the Supreme Court, the First Circuit, and Fed. R. Civ. P. 84, such an allegation of negligent conduct satisfies Fed. R. Civ. P. 8(a).  The First Circuit explained this reality in <u>Educadores Puertorriquenos En Accion v. Hernandez</u>, 367 F.3d 61 (1st Cir. 2004)("<u>Educadores</u>").  In <u>Educadores</u>, the Court, in ruling upon a motion to dismiss, stated that:

> [W]e note that the <u>Swierkiewicz</u> Court, 534 U.S. at 513 n. 4, embraced the illustrative pleading set forth in the forms appended to the Federal Rules of Civil Procedure.  The Court cited approvingly Form 9's "complaint for negligence in which plaintiff simply states in relevant part:  'On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then crossing said highway.'"  <u>Id</u>. (quoting Form 9); <u>cf</u>. Fed. R. Civ. P. 84 (explaining that the appended forms "are sufficient under the rules and are intended to indicate the simplicity and brevity of statement which the rules contemplate").

11

Id. at 67-68.

Even if Counterclaimants were required to plead specific facts supporting the contention that Encompass's conduct was either negligent, reckless, or intentional misconduct, they have done so. Contrary to Encompass's assertion that "not a single fact is plead to support" the allegation of negligence, the Counterclaims allege that the Press Release grossly exaggerated both the nature of the case and the amount in controversy,[17] Encompass intentionally engaged in this gross exaggeration in order to injure Counterclaimants,[18] and Encompass filed the underlying complaint without any good faith basis for its allegations.[19] These well-pleaded facts clearly suggest that Encompass's false statements were made intentionally, recklessly, or at the very least, negligently.

## II.   THE GIAMPA AND CULLINEY COUNTERCLAIMANTS CORRECTLY PLEADED A LANHAM ACT VIOLATION.

### A.   The Giampa and Culliney Counterclaimants Have Standing to Bring a Lanham Act Claim Pursuant to Binding First Circuit Precedent.

Encompass claims that the Giampa and Culliney Counterclaimants are without standing to bring their respective claims under The Lanham Act, 15 USCA §1125(a), because they are not "competitors" of Encompass. The express language of the Lanham Act, however, requires no such competition. Instead, the Lanham Act states quite clearly that its remedies are available to "any person who believes that he or she is or is likely to be damaged by" any act violating the statute. 15 U.S.C.A. §1125(a) (emphasis added). Consequently, the intent of Congress seems

---

[17] Culliney Counterclaim, ¶ 8; Kennedy Counterclaim, ¶ 7; Giampa Counterclaim, ¶ 35.
[18] Culliney Counterclaim, ¶ 9; Kennedy Counterclaim, ¶ 8; Giampa Counterclaim, ¶ 34.
[19] Culliney Counterclaim, ¶ 10; Kennedy Counterclaim, ¶ 9; Giampa Counterclaim, ¶ 12.

crystal clear; that the Lanham Act protect all persons from any actual or likely injury caused by acts violating the statute. [20]

Moreover, the First Circuit has specifically rejected the idea that a Lanham Act claim cannot lie where the plaintiff and the defendant are not in competition.  In Cashmere & Camel Hair Manufacturers Inst. v. Saks Fifth Avenue, the First Circuit articulated a five-factor test for a false advertising claim under the Lanham Act, pursuant to which a plaintiff must demonstrate that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

284 F.3d 302, 310-11(2002).  The Court then expressly stated that "the fact that [plaintiffs and defendants] are in different markets does not affect the analysis, so long as plaintiffs can prove a causal connection between the misrepresentations and the harm sustained."  Id. at 318 (emphasis added).[21]  See Bose Corp. v Consumers Union of United States, Inc., 181 U.S.P.Q. 543 (D. Mass. 1974)( "The Court is also of the opinion that a person alleging commercial injury, though not a competitor of the defendant, is entitled to bring suit under said section 43(a) [of the Lanham Act]); Thorn v Reliance Van Co.,

---

[20]  The acts violating the Lanham Act include conduct which:
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities ….
15 U.S.C.A. §1125(a)(1)(A) and (B).

[21] Plaintiffs were a fabric seller and a trade association, while defendants were a clothing manufacturer and several retailers.

736 F.2d 929, (3rd Cir. 1984); New Colt Holding Corp. v RJG Holdings of Fla., Inc., 312

F. Supp 2d 195 (D. Conn. 2004); Rosenfeld v W.B. Saunders, Div. of Harcourt Brace

Jovanovich, Inc., 728 F. Supp 236 (S.D.N.Y. 1990), aff'd, 923 F.2d 845 (2nd Cir. 1990).

        To counter the text of the Lanham Act, and without acknowledging the First Circuit's

holding in Cashmere & Camel Hair Manufacturers, Encompass cites dicta from Podiatrist

Assoc., Inc. v. La Cruz Azul de Puerto Rico, Inc., 336 F.3d 6 (1st Cir. 2003), which notes that a

number of federal courts have adopted a four-part test for defining "commercial advertising or

promotion" under the Lanham Act, one of which is that the speaker of the allegedly false

statement be a "competitor of the plaintiff in some line of trade or commerce." Id. at 19 (dicta).

The First Circuit did nothing in Podiatrist Assoc. to suggest its adoption of the "competition"

prong of this test, but instead proceeded to confirm dismissal of the plaintiff's Lanham Act claim

on wholly separate grounds – plaintiff's failure to allege "commercial speech." Id. at 19-21.

        Because commercial competition between plaintiff and defendant is not a prerequisite for

a valid Lanham Act claim, the Giampa and Culliney Counterclaimants have standing to pursue

their respective Lanham Act claims against Encompass.[22]

---

[22] Even if the Court in Podiatrist Association had adopted the four-part test relied upon by Encompass, that adoption would not constitute binding precedent. Whenever there is a conflict between the opinions of three-judge appellate panels in the same circuit, the first case to decide the issue becomes binding precedent, unless and until it is overruled by that same court of appeals sitting en banc or by the Supreme Court. See, e.g., McMellon v. United States, 387 F.3d 329, 332-334 (4th Cir. 2004) (en banc); United States v. Jackson, 220 F.3d 635, 639 (5th Cir. 2000); Kovacevich v. Kent State Univ., 224 F.3d 806, 821-825 (6th Cir. 2000); Haynes v. Williams, 88 F.3d 898, 900 n.4 (10th Cir. 1996); Walker v. Mortham, 158 F.3d 1177, 1188-1189 (11th Cir. 1998). Since a three-judge panel of the First Circuit ruled in Cashmere & Camel Hair Manufacturers that a Lanham Act plaintiff need not compete in the same market as a defendant to maintain its claim, any contrary holding by the three-judge panel in Podiatrist Association must, as a matter of law, be disregarded.

B.    The Counterclaimants Allege that Encompass's Press Release Was False or Misleading.

Encompass argues that the Counterclaimants' Lanham Act claims must fail because each of the statements contained in the Press Release 'is demonstrably true on the face of the record." Motion to Dismiss, p. 9.  Clearly this is not true.  See infra Section I.B.  Moreover, even if it were true, it would not be dispositive on the issue because the Lanham Act allows recovery for statements made which are literally true but misleading in context.  See 15 U.S.C.A. § 1125(a) (imposing liability for a "false or misleading description [or representation] of fact").  Thus, even assuming that Encompass could make a showing of literal truth as to all of the statements made in the Press Release, truth is not a complete defense to a Lanham Act claim.

III.    THE COUNTERCLAIMANTS CORRECTLY PLED THEIR TORTIOUS INTERFERENCE CLAIMS.

The Culliney and Giampa Counterclaims each include two counts for tortious interference: one count alleging interference with the Counterclaimants' relationships with named persons or entities (Culliney Counterclaim, Count II; Giampa Counterclaim, Count I); and a separate count alleging interference with the relationships between the Culliney and Giampa Counterclaimants and a described class of their patients, prospective patients, and insurers other than Encompass (Culliney Counterclaim, Count III; Giampa Counterclaim, Count III).  The Kennedy Counterclaim alleges tortious interference only as to named individuals (Kennedy Count II).

A.    Encompass Intended Its Interference.

The only argument directed by Encompass against both tortious interference counts claims that the Counterclaimants have failed to allege facts showing that Encompass "actually

intended to interfere."[23]   Although not acknowledged by Encompass, the Counterclaimants did

allege that Encompass issued the Press Release with the purpose and effect of damaging their

reputation and so interfered with their business relationships.[24]   The Federal Rules of Civil

Procedure, moreover, specifically allow plaintiffs to allege intent generally.[25]   See Fed. R. Civ.

P. 9(b).   Thus, the Counterclaimants have properly pled intent under Rules 8(a) and 9(b).   See

also Wesson v. Leone Enters., 437 Mass. 708 (2002) (Massachusetts law assumes that a person

intends the natural and probable consequences of his or her actions); Commonwealth v. Soares,

51 Mass. App. Ct. 273, 279 (2001) (same).

    Because Encompass raises no other argument against the claims of tortious interference

with named individuals, the Court must deny the Motion to Dismiss as to Count II of the

Culliney Counterclaim, Count II of the Kennedy Counterclaim, and Count I of the Giampa

Counterclaim.

    B.    Encompass Knew that the Counterclaimants' Professional Relationships
          Were Vulnerable to Its Libel.

    Encompass argues that remaining tortuous interference counts fail:  (1) to plead facts

from which the Court may infer that Encompass knew of the relationships with which it

---

[23] The three cases Encompass cites in support of its argument that such fact pleading is necessary are inapposite.  In Spencer Companies v. Chase Manhattan Bank, N.A., the complaint "contain[ed] no allegation that [the defendant] acted with the intent to interfere."  81 B.R. 194, 204 (D. Mass. 1987).  Laser Labs, Inc. v. ETL Testing Laboratories, Inc., is a summary judgment decision finding that the plaintiff failed to muster sufficient evidence to go to trial on its claims – it cannot support the present motion to dismiss.  29 F. Supp. 2d 21, 23 (D. Mass. 1994).  Finally, Desrochers v. Tiax, LLC, 2003 Mass. Super. LEXIS 138 (May 1, 2003), denied the defendant's motion to dismiss a tortuous interference claim.  Id. at 20-22.

[24] Culliney Counterclaim, ¶¶ 9, 19, 24, 25; Kennedy Counterclaim, ¶¶ 8, 19; Giampa Counterclaim, ¶¶ 23, 28, 29.

[25] For a similar reason, Encompass's argument in footnote 10, stating that the Counterclaimants failed to plead facts supporting the required element of malice, is mistaken.  Rule 9(b) specifically allows "malice" or "other condition of mind" to be plead generally, as the Counterclaimants have done.  Fed. R. Civ. P. 9(b).  Even without the pleading standard applicable to conditions of mind, the Counterclaim alleges that Encompass accomplished its tortuous interference via the (defamatory) Press Release.  What more specific allegation of "improper means" would satisfy Encompass if this does not?

interfered, and (2) to identify the specific business relationships at issue. As to the first contention, Encompass obviously knew that the Counterclaimants had relationships with patients and other insurers. In fact, it is not disputed that Encompass knows the identities of many of the Counterclaimants' patients. See Encompass's Second Amended Complaint, *passim*. As well, Encompass is certainly aware that the Counterclaimants, like all independent healthcare professionals, have relationships with the numerous insurers.

As to the second contention, to the extent that the patients-and-insurers tortious interference claims were based solely on the Counterclaimants' "prospective" patients, Encompass might have a viable argument that no "advantageous relationship" had been alleged sufficient to base a claim on. See Laser Labs, 29 F. Supp. 2d at 23 (relationships with prospective customers too "inchoate" to survive summary judgment). The patients-and-insurers tortious interference claims however, are primarily based on the Counterclaimants' actual relationships with their patients and their patient's other insurers. Encompass does not pretend to doubt that these relationships are real and could be tortiously interfered with – but it demands that the Court require the Counterclaimants to specifically identify each such relationship. Such a requirement is contrary to the letter and the spirit of notice pleading, so it is unsurprising that Encompass can point to no authority requiring that result.[26] (Encompass must agree that no such requirement exists, since its Second Amended Complaint makes the equally general allegation that the defendants interfered with its relationship with "numerous insureds, policyholders, claimants, and others." Second Amended Complaint at ¶802.)

---

[26] The authority cited by Encompass, Boxcar Media, LLC v. Redneckjunk, LLC, 345 F. Supp. 2d 76 (D. Mass. 2004), is neither on point nor persuasive. First, Boxcar Media does not address a situation, like the present one, in which the counterclaim defendant is fully on notice of the nature and identity of most or all of the relationships at issue. Second, the tortious interference claim in Boxcar Media was so brief (22 words long) as to be essentially unintelligible – and the motion to dismiss granted by Boxcar Media was completely unopposed. Boxcar Media at 78.

Moreover, the Counterclaimants have hundreds, if not thousands, of patient and insurer relationships.  Encompass's bloated, 804-paragraph Second Amended Complaint already burdens this case to no purpose.  Requiring the Counterclaimants to replead in order to specifically identify each of their patients and patient's insurers would inevitably produce three more enormous pleadings, wasting the time and money of the parties (and the Court) yet again.

## IV.     THE COUNTERCLAIMANTS CORRECTLY PLEADED THEIR CHAPER 93A CLAIMS.

The sole argument advanced by Encompass for dismissal of the Counterclaimants' Chapter 93A claims is that all of the Counterclaimants' remaining claims must fail.  Because this is clearly not the case, the Chapter 93A claims of all of the Counterclaimants must survive..

<u>CONCLUSION</u>

For the foregoing reasons, the Defendants/Counterclaim Plaintiffs Joseph D. Giampa,

Frederick T. Giampa, Advanced Spine Centers, Inc. d/b/a First Spine Rehab, Edward Kennedy,

Brian J. Culliney, D.C., and Jennifer McConnell, D.C. hereby respectfully request that this

Honorable Court deny Encompass's Motion to Dismiss in its entirety.


Respectfully Submitted,
*Joseph D. Giampa, Frederick T. Giampa,*
*and Advanced Spine Centers, Inc. d/b/a*
*First Spine*
By their attorneys,


   /s/ Matthew J. Conroy
_____
Mathew J. Conroy (BBO# 566928)
Katherine A. Kurtz (BBO# 658026)
Belesi & Conroy, P.C.
114 Waltham Street
Lexington, MA 02421
(781) 862-8060

Respectfully Submitted
*Brian Culliney and Jennifer McConnell*
By their attorney,

   /s/ Thomas M. Ciampa
_____
Thomas M. Ciampa (BBO#566898)
Ciampa & Associates
20 Park Plaza, Suite 804
Boston, MA 02116
(617) 742-5955


Respectfully Submitted
*Edward Kennedy*
By his attorneys,

   /s/ Jeffrey Phillips
_____
Jeffrey Phillips (BBO# 398480)
Daniel Treger (BBO# 562147)
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
(617) 367-8787


Dated:  March 30, 2007

### **Certificate of Service**

I hereby certify that on this 30th day of March, 2007, this document filed through the ECF system pursuant to Local Rule 5.4 will be sent electronically to counsel of record for all other parties.

____/s/ Thomas M. Ciampa____

19



# NEWS

**FOR IMMEDIATE RELEASE**

Contact:    Bill Mellander
            (847) 402-5600

## Boston Area Chiropractors Named In Million-Dollar Fraud Case

LOWELL, Mass., August 18, 2005 --- Owners and employees of First Spine and Rehab, a Lowell Massachusetts chiropractic clinic, have been named as defendants in a $1.8 million fraud lawsuit --- the result of a six-month investigation led by Encompass Insurance Company of Massachusetts.

According to court documents, Joseph Giampa, Frederick Giampa and Edward Kennedy are accused of violating the Racketeer Influenced and Corrupt Organizations Act (RICO), the Massachusetts Consumer Protection Act and engaging in common law fraud and civil conspiracy.

Encompass filed suit in the U.S. District Court for the District of Massachusetts against the Giampas, Kennedy, as well as Brian Culliney, Jennifer McConnell, the company First Spine and Rehab of Lowell and Future Management Corporation.

According to the suit, the Giampas and other chiropractors in the Lowell clinic allegedly "engaged in a scheme to defraud insurance companies, including Encompass Insurance by submitting false, fraudulent and inflated chiropractic invoices containing excessive charges" and "demanding payment for excessive and/or non-existent and/or unwarranted chiropractic treatment through their chiropractic clinic."

Court documents say the Giampas are chiropractors who operate First Spine and Rehab in Lowell as well as more than 60 other clinics throughout New England and across the United States, including Florida, Oklahoma, Connecticut, Rhode Island, South Carolina, New Hampshire, Pennsylvania, Illinois and Virginia.

Special Investigators for Allstate Insurance Company, which operates Encompass Insurance, led the investigation.  Encompass is represented by the law firm of Smith & Brink, P.C. in Quincy.

"Insurance fraud is not a victimless crime – it costs consumers thousands of dollars every year through higher premiums," said Edward Moran, Allstate assistant vice-president for Special Investigations. "Encompass and the other Allstate companies are committed to providing competitively priced products to our customers -- fighting fraud is essential to that commitment."

-more-

# NEWS

page 2

Since 2001, Allstate companies have received more than $55 million in court judgments. Moran states, "these judgments against criminals range from individuals to sophisticated organized crime syndicates." In addition to financial victories, Allstate and Encompass SIU work closely with local, state, and federal authorities for criminal investigation and prosecution – resulting in arrests around the country, taking criminals off the street.

Insurance industry estimates put the overall yearly price tag for fraud at more than $80 billion dollars.

Encompass Insurance is a division of The Allstate Corporation (NYSE: ALL) devoted exclusively to independent agents, selling automobile, homeowner and related insurance to one million customers through a network of more than 2,700 independent insurance agents. Allstate is the exclusive administrator of Encompass personal automobile and home insurance policies issued by the insurance affiliates of CNA Financial Corporation.

The Allstate Corporation is the nation's largest publicly held personal lines insurer. Widely known through the "You're In Good Hands With Allstate®" slogan, Allstate helps individuals in approximately 17 million households protect what they have today and better prepare for tomorrow through approximately 13,600 exclusive agencies and financial professionals in the U.S. and Canada. Customers can access Allstate products and services such as auto insurance and homeowners insurance through Allstate agencies, or in select states at allstate.com and 1-800 Allstate®. Encompass[SM] and Deerbrook® Insurance brand property and casualty products are sold exclusively through independent agents. Allstate Financial Group provides life insurance, supplemental accident and health insurance, annuity, banking and retirement products designed for individual, institutional and worksite customers that are distributed through Allstate agencies, independent agencies, financial institutions and broker-dealers.

###