UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENCOMPASS INSURANCE COMPANY OF MASSACHUSETTS, <br><br> Plaintiff, <br><br> vs. <br><br> JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, ADVANCED SPINE CENTERS, INC., d/b/a FIRST SPINE REHAB, FUTURE MANAGEMENT CORPORATION, FUTURE MANAGEMENT BUSINESS TRUST, EDWARD KENNEDY, BRIAN J. CULLINEY, D.C. and JENNIFER McCONNELL, D.C. <br><br> Defendants. | Civil Action No.  1:05-cv-11693-RCL |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

NOW COMES the plaintiff, Encompass Insurance Company of Massachusetts (hereinafter "Encompass"), pursuant to Fed. R. Civ. P. 37 and Local Rule 37.1 and respectfully requests that this Honorable Court enter an Order COMPELLING defendant, Edward Kennedy (hereinafter "Kennedy"), to provide complete responses to Encompass' Request for Production of Documents.  Specifically, Edward Kennedy has refused to produce (or otherwise make available) a single piece of paper in connection with Encompass' document requests. Encompass hereby submits the within memorandum of law in support of the instant motion.  As grounds for this request, Encompass avers as follows:

## I.    BACKGROUND

This case is brought pursuant to Title 18 U.S.C. §1962, Racketeer Influenced and Corrupt Organizations Act, Mass. Gen. Laws, ch. 93A, the Massachusetts Consumer Protection Act, and Massachusetts common law of fraud and civil conspiracy.  The defendants

acting in concert participated in a concealed, evolving and continuous scheme and conspiracy to defraud Encompass. The geographic center of this conspiracy was First Spine Rehab, owned and operated by the Giampa chiropractors and Kennedy Brothers.

The objective of defendants' fraud scheme was to illegally obtain money from the plaintiff through the submission of false medical records and bills (hereinafter "false medical documentation") in connection with alleged motor vehicle accidents. The defendants collected substantial sums of money as payment in connection with such false medical documentation referencing alleged chiropractic treatment that was never rendered and/or was unnecessary, excessive and unrelated to covered claims. The defendants successfully executed this scheme to defraud by creating and submitting such false medical documentation to Encompass and others by way of the U.S. Mail.

On January 12, 2007, Encompass served upon Edward Kennedy plaintiff's Request for Production of Documents. See Plaintiff's First Request for Production of Documents, annexed hereto at Exhibit A. On March 6, 2007, Kennedy issued his responses to Encompass' Request for Production of Documents. See Defendant, Edward Kennedy's, Response to Plaintiff's Request for Production of Documents, annexed hereto at Exhibit B. Defendant's discovery responses are incomplete and do not reflect the true nature of the documents within defendant's care, custody or control. Encompass now brings this Motion to Compel requesting that this Court order defendant to provide true and accurate responses to Encompass' Request for Production of Documents.

## II.     STANDARD OF REVIEW

Modern instruments of discovery serve a useful purpose in that, together with pre-trial procedures, they make a trial less a game of blind man's bluff and more a fair contest with the

basic issues and facts disclosed to the fullest practicable extent.  United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958).  Pursuant to Rules 37(a)(2) Fed. R. Civ. P., when a party fails to answer interrogatories or respond to requests for production of documents, the requesting party may move for an order compelling discovery.  Included within this discretion is the power to compel a party to disclose information or otherwise cooperate in the discovery process.  The authority for this power lies with Fed. R. Civ. P. 37.  Specifically, Fed. R. Civ. P. 37(a)(2)(3) provides:

> **Evasive or Incomplete Disclosure, Answer or Response.**
> For purposes of this subdivision an evasive or incomplete disclosure, answer or response is to be treated as a failure to disclose, answer or respond.

Moreover, Fed. R. Civ. P. 34 governing requests for production of documents and things, provides that:

> Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on his behalf, to inspect and copy, any designated documents…or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served.

Subpart (b) of Rule 34 further states that "the party submitting the request may move for an order under Rule 37(a) with respect to any objection to or other failure to respond to the request or any part thereof, or any failure to permit inspection as requested."

In the instant case, plaintiff requested that defendant respond to discovery requests designed to discover information defendant possesses relating to the allegations set forth in plaintiff's Complaint and produce documents within his possession, custody or control.  The plaintiff's request(s) fall within the purview of Fed. R. Civ. P. 26 and 34 and does not seek the production of materials which are in any way privileged, either as attorney-client

communications or work-product.  Therefore, this Court is authorized to compel defendant to produce the request materials.

### III.    ARGUMENT

### A. DEFENDANT FAILED TO PRODUCE DOCUMENTS REGARDING FUTURE MANAGEMENT CORPORATION'S PURCHASE OF EQUIPMENT FROM KENNEDY SUPPLY AND PAYMENT FOR PATIENTS REFERRED TO FUTURE MANAGEMENT CLINICS THROUGHOUT MASSACHUSETTS (REQUESTS NOS. 1, 2, 3, 4, 6, 15, 16, 17, 18, 19, 20, 21, 22, 31, 32, 41)

In its document requests, Encompass requested defendant produce any and all documents relating to his sworn assertion that James Kennedy used Kennedy Supply Company to enable Future Management Corporation (hereinafter "FMC") to borrow money from various lenders to enable FMC to "purchase" chiropractic equipment from Kennedy Supply and pay for the referral of patients to various FMC clinics.  See Ex. A.  In addition, Encompass asked Edward Kennedy to produce documents and information related to the marketing and/or other efforts directed at soliciting patients to treat at the various Future Management Clinics.  The defendant objected to these requests stating that they are overly broad, unduly burdensome, seeking documents covered by the attorney-client and/or attorney work-product privilege, and not calculated to lead to the discovery of admissible evidence.  See Ex. B.  Moreover, defendant objected to many of plaintiff's requests regarding the payment of referral of patients and stating that no such documents are in defendant's "possession, custody or control." Id.

Encompass maintains that defendant's response to these narrowly-tailored requests are evasive and/or incomplete based on statements made by defendant in sworn materials filed in connection with other litigation.  In a Verified Complaint filed by defendant in the matter Kennedy, et. al. v. Kennedy, et. al., Middlesex Superior Court, C.A. No. MICV2005-01458, defendant advanced allegations that James Kennedy used Kennedy Supply Company to enable

FMC to borrow money from various lenders to enable FMC to "purchase" chiropractic equipment from Kennedy Supply. Because such allegations were set forth in a Verified Complaint, Encompass avers that no attorney-client privilege and/or work product objection can be raised by defendant in this matter. Encompass further maintains that the requested documents are relevant to the allegations set forth in its Complaint because such documents would tend to prove (or at least provide some indicia) or defendants' overall pattern and practice of insurance fraud. In the above-referenced Verified Complaint, defendant Edward Kennedy alleged that FMC and the Giampa brothers paid for the referral of patients and the use of runners to recruit these patients. See Verified Complaint at ¶¶ 57-60, annexed hereto at Exhibit C. The pertinent aspects of the Complaint read a follows:

- J. Kennedy further admitted to E. Kennedy in September, 2004 that he had transferred money from Kennedy Supply to Future Management to pay for Future Management's payment for referral to its chiropractic clinics across Massachusetts;

- Specifically, in a telephone conversation, J. Kennedy admitted to E. Kennedy that he had used money from Kennedy Supply and given it to Future Management and the Giampa brothers to pay for "runners", i.e. individuals paid to refer clients to Future Management's chiropractic offices;

- At the time J. Kennedy made this admission, he was aware that there was a law which was going to be passed by the Massachusetts legislature making the use of "runners" a criminal act. The legislature subsequently passed Mass. Gen. Laws ch. 266, § 111C which imposed criminal sanctions for this practice.

See Ex. C at ¶¶ 58-60.

5

Based on the allegations set forth in defendant's Verified Complaint, there can be no reasonable debate the documents requested by Encompass exist and are within the care, custody or control of defendant. Encompass maintains that defendant, in making the allegations in his Verified Complaint, relied on some form of documentation (or other evidence) to support his claims. Encompass demands that defendant be compelled to disclose (1) what documents exist, (2) the location of the documents, and (3) the identity of the person(s) who have physical possession of these documents. As such, Encompass respectfully requests that this Honorable Court compel any and all documents related to the allegations set forth in the above-referenced Verified Complaint.

Moreover, James Kennedy (Edward Kennedy's brother and business partner) testified that FMC maintained so-called "marketing logs" memorializing the marketing efforts of the various FMC clinics. Encompass has knowledge that various current and former FMC employees were actively engaged in FMC's marketing activities. According to the statements of these former employees, marketing was a major component of FMC's business operations. As such, Encompass maintains that defendant's statements regarding the non-existence of such marketing records are (at best) inaccurate.

Encompass further seeks documents and information relating to (1) monies paid to third parties, attorneys, referrers, runners, and (2) vouchers and V.I.P. cards. Any documents that memorialize whether patients were receiving payment or anything of value to treat at the FMC clinics is relevant to whether the alleged medical treatment they received was necessary and that the corresponding medical bills were reasonable. Moreover, Encompass seeks documents related to any other person (including FMC clinical assistant employees) receiving anything of

value for the referral of patients to First Spine. Encompass' requests are based upon its good-faith belief that the payment of referral monies was a common practice at FMC clinics.

In <u>Rivera v. Corrow and Encompass Ins. Co.</u>, Lowell District Court, C.A.. No. 0511-CV-2582, Jennifer McConnell, D.C., a former chiropractor employee of Future Management (and defendant in the case at bar) admitted that Future Management gave patients various inducements, including shopping mall and restaurant gift certificates. Through the testimony of former First Spine patients, it has come to Encompass' attention that FMC employees provided patients with so-called V.I.P. cards entitling the patients to receive a discount on "professional" (i.e., legal) fees. Specifically, FMCs have provided patients with gift certificates, gift cards and/or coupons for other goods/services in exchange for their treatment at Future Management clinics. Upon information belief, Future Management chiropractor and "team leader," Brain Culliney, was responsible for providing gift certificates to FMC patients. Moreover, First Spine clinical assistants have admitted to receiving "bonuses" or (1) the referral of patients to First Spine; and (2) the referral of First Spine patients to personal injury attorneys.

All of the foregoing supports Encompass' position that the payment of referral monies was a common practice at defendants' clinics. Therefore, information and documents that support these allegations are reasonably calculated to lead to the discovery of admissible evidence pursuant to Fed. R. Civ. P. 26. Edward Kennedy, as a principal and shareholder of Future Management, cannot, in good faith, claim, as he has in his responses to Encompass' discovery requests, that he does not have possession, custody or control over FMC corporate records and other related information. Any response to a request that states that the document

is not within the possession, custody or control of the responding party must be made in light of the federal jurisprudence, which imposes the obligation to obtain copies of documents known to be in the possession of third parties, where the responding party has the legal right to request such documents. See e.g., Searock v. Stripling, 736 F. 2d 650, 653 (11th Cir. 1984), (finding that the "primary dispositive issue is whether Stripling made a good faith effort to obtain the documents over which he indicated that he may have had control in whatever sense, and whether after making such a good faith effort he was unable to obtain and produce them"); Scott v. Arex, 124 F.R.D. 39, 41 (D. Conn. 1989) (holding that the party must attempt to obtain documents, or inform plaintiff's counsel by affidavit of "what precise attempts [he] made to obtain those documents, when he made them, and to whom his demands were addressed"); In re: Folding Carton Antitrust Litigation , 76 F.R.D. 420, 423 (N.D. Ill. 1977) (finding that "[a]t the very least, defendants should make inquiry of such former employees....[i]f the former employees do not cooperate, we can consider what further action may be required").

Even in the event that defendant has no such legal right to obtain responsive documents, the defendant should be required to state the last known custodian of the responsive documents and a description of the responsive documents. Accordingly, the Court should compel the production of all documents and information as requested by Encompass.

## B. DEFENDANT FAILED TO PRODUCE DOCUMENTS RELATED TO HIS ROLE IN THE TREATMENT OF FMC PATIENTS (REQUEST NOS. 4, 40)

The defendant responded to the above-referenced request stating that no such documents were in his care, custody or control. The defendant's response is wholly incomplete and/or inaccurate given testimony by current and former Future Management

employees.  With respect to patient treatment, Edward Kennedy is alleged to have actively participated and directed the treatment of Future Management patients.  See Affidavit of Michael Amato, annexed hereto at Exhibit D.  Upon information and belief, Edward Kennedy is not licensed to conduct or administer any type of patient care.  Despite his lack of qualifications, Edward Kennedy's employees have stated that Kennedy also instructed FMC employees regarding other clinical matters.

Edward Kennedy possesses information related to FMC's marketing activities.  As stated above, James Kennedy testified that FMC maintained so-called "marketing logs" memorializing the marketing efforts of the various FMC clinics.  Moreover, Encompass has knowledge that various current and former FMC employees were actively engaged in FMC's marketing activities.   According to the statements of these former employees, marketing was a major component of FMC's business operations.  As such, Encompass maintains that defendant's statements regarding the non-existence of such marketing records are inaccurate.

## C.  DEFENDANT FAILED TO PRODUCE DOCUMENTS AND/OR INFORMATION REGARDING EMPLOYEES RESPONSIBLE FOR PROVIDING MEDICAL TREATMENT (REQUESTS NOS. 29, 33, 34)

The plaintiff seeks documents and information regarding the identity of those individuals who provided any treatment to the patient(s) identified in plaintiff's Complaint, not limited to the treating physical therapist, chiropractor, medical doctor, and/or other signatory identified on plaintiff's billing records.  The defendant has failed to provide any information regarding any additional persons (so-called clinical assistants) providing supportive treatment modalities to the patients at issue.  The identity of such individuals is relevant to whether (1) the treatment rendered was medically necessary, and (2) the billing is compensable pursuant to

the AMA CPT code guidelines.  Therefore, such a request is reasonably calculated to lead to the discovery of admissible evidence.  Encompass seeks information regarding full time W-2 employees and independent contractors.  Encompass requests that this Court require defendant to produce documents and information relating to individuals employed or contracted by FMC in any capacity during the time treatment was rendered to the patients at issue.

Encompass anticipates that defendant will argue, in part, that testimony of clinic employees will be irrelevant because only the treating physical therapists, chiropractors, and/or medical doctors were directly involved in rendering the treatment to patients.  However, this is simply not the case.  Most of these facilities are small storefront clinics where treatment was rendered in a relatively small area.  A receptionist might have maintained a sign-in sheet or appointment book.  The receptionist would be able to say how long it took for treatment to be rendered.  Moreover, on February 15, 2007 and 16, 2007, two non-licensed employees of a FMC clinic (First Spine)—Phally Samith and Sokah Dy— testified in a related case that they—not licensed chiropractors or physicians—rendered nearly all patient treatment.  The time in which patients were in the clinics is certainly relative, probative, and material to whether the treatment was necessary and/or compensable.  Therefore, this Court should compel defendant to produce the requested documents regarding all individuals employed by defendants in compliance with Fed. R. Civ. P. 26 and 34.

**D. DEFENDANT FAILED TO PRODUCE DOCUMENTS AND INFORMATION REGARDING THE FEE SCHEDULES EMPLOYED BY FIRST SPINE (REQUESTS NO. 25, 26, 27, 39)**

Encompass has requested that defendant produce all documents and information related to the fee schedules utilized by First Spine.  Edward Kennedy has responded stating that no such information or documents is within his care, custody or control.  Based on information and belief, First Spine used fee schedules (or tables) that were specifically tailored for each insurance company.  See Affidavit of Kathy Duncan, annexed hereto at Exhibit E.  Upon information and belief the schedules/tables were developed and implemented by the defendant, Edward Kennedy, or his former wife/administrator of FMC, Tracy Kennedy.  Therefore, this Court should compel defendant, as principal and shareholder of FMC, to produce the requested documents in compliance with Fed. R. Civ. P. 26 and 34.

**E. DEFENDANT FAILED TO PRODUCE DOCUMENTS AND INFORMATION RELATING TO ELECTRONICALLY STORED INFORMATION (REQUESTS NOS. 28, 30)**

Encompass seeks documents and information regarding any and all documents relating to any computers, computer programs, or e-mail used by Edward Kennedy, First Spine, Future Management Corporation and ARMS and/or any of their employees in connection with the patients referenced in the Complaint.  Edward Kennedy has responded claiming that no such documentation is in his possession, custody or control.  Upon information and belief, defendants have been actively destroying original file materials (paper and electronic versions); however, defendants have provided no sworn materials (via affidavit or otherwise) to substantiate their document retention policy.  Moreover, deposition testimony has revealed that the principals routinely communicated to FMC employees by email.  FMC's current

bookkeeper, Gaynor Kohn, testified that all of FMC's bookkeeping is maintained electronically in QuickBooks software. Moreover, upon information and belief, all former tax records are stored on microfiche at FMC's headquarters. All of these documents (or electronically-stored information) are reasonable likely to lead to the discovery of admissible evidence regarding (1) the payment for the referral of patients; (2) the names of former employees; and (3) the transfer of monies to and from personal injury attorneys.

Encompass avers that the recent revisions to the Federal Rules of Civil Procedure regarding the maintenance and production of electronically stored information should be enforced in this matter. See generally Fed. R. Civ. P. 26 and 34. To date, defendants have likely destroyed hundreds (if not thousands) of pages of documents. However, defendants have not provided Encompass with a copy of their document retention policy. It is inconceivable to Encompass that defendants—during the course of litigation—may have engaged (and/or continue to engage) in the destruction of relevant, material evidence (to which numerous Future Management employees have testified to the existence) and now assert that such information and documentation does not exist. Encompass requests that this Court (1) order defendant's production of the requested electronically stored evidence, (2) order defendant to submit sworn affidavits attesting to the destruction of the requested information/documentation, (3) order defendant to provide evidence of FMC's document retention policy/litigation "hold(s)", (4) order defendant to state the last known custodian of the responsive documents and a description of the responsive documents, and/or (5) levy an award of sanctions against defendant for his wrongful, unjustified destruction relevant, material evidence.

**F. DEFENDANT FAILED TO PRODUCE DOCUMENTS AND INFORMATION REGARDING LICENSURE, DISCIPLINARY ACTIONS AND PRIOR LITIGATION (REQUESTS NOS. 23, 24, 37)**

Encompass is seeking documents and information regarding any prior disciplinary action and litigation involving Edward Kennedy.  In response, defendant objected stating that this request was over broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence in this matter.  Encompass, however, avers that such information is wholly relevant to the instant action.  In a Verified Complaint filed by defendant in the matter Kennedy, et. al. v. Kennedy, et. al., Middlesex Superior Court, C.A. No. MICV2005-01458, defendant advanced allegations that James Kennedy used Kennedy Supply Company to enable FMC to borrow money from various lenders to enable FMC to "purchase" chiropractic equipment from Kennedy Supply.  Because such allegations were set forth in a Verified Complaint, Encompass avers that no attorney-client privilege and/or work product objection can be raised by defendant in this matter.  Encompass further maintains that the requested documents are relevant to the allegations set forth in its Complaint because such documents would tend to prove (or at least provide some indicia) or defendants' overall pattern and practice of insurance fraud.  In the above-referenced Verified Complaint, it was alleged that FMC and the Giampa brothers paid for the referral of patients and the use of runners to recruit these patients.  See Verified Complaint at ¶¶ 57-60, annexed hereto at Exhibit C.  Moreover, Tracy Kennedy testified that she executed an affidavit in the aforementioned lawsuit, however, Encompass, despite its diligent search, has been unable to discover this sworn affidavit.  As such, Encompass requests that defendant be required to provide a true and accurate response to Encompass' request.

Moreover, Encompass is seeking documents and information regarding the licensure status and any related disciplinary action and/or litigation including the defendants. This request goes hand-in-hand with Encompass' request for the identity of the employees at the clinics, and information regarding who actually rendered the treatments at issue in this case. In Massachusetts, chiropractic assistants, unlike physical therapy assistants, do not need to be licensed. For example, an individual at defendants' clinic could be a receptionist at one minute and then be working in another capacity as a chiropractic assistant rendering treatment. Therefore, it is essential to know what training these individuals received, the supervision they had, whether any professional complaints were filed against them, and what documentation they completed regarding specific treatments they rendered at the clinics.

Encompass is also requesting the production of information relating to professional complaints. This Court should compel defendant to produce documents identifying all past and present employees so Encompass may begin looking into any and all professional complaints. In addition, defendant should disclose to defendant whether there are any additional criminal/civil/disciplinary charges against clinic employees that are not part of the public record. Encompass requests that this Court require defendant to provide this information to allow Encompass to adequately prepare its case for further discovery and trial.

## G. DEFENDANT FAILED TO PRODUCE DOCUMENTS AND INFORMATION REGARDING ASSET TRANSFERS AND/OR ASSETS HELD BEYOND THE JURISIDICTION OF THIS COURT (REQUESTS NOS. 12, 13)

Encompass is seeking documents and information regarding any and all assets held by defendant beyond the jurisdiction of this Court, the value of which exceeds $5,000. Encompass is also seeking documents and information regarding defendant's transfer of any assets/funds since January, 2005, the value of which exceed $5,000. The defendant responded

stating that these discovery requests were "overly broad, unduly burdensome, interposed solely to harass and annoy the defendant, and is not calculated to lead to the discovery of admissible evidence."

Encompass maintains that the requested discovery is relevant to its allegations regarding the transfer and/or misappropriation of corporate funds by defendant. Upon information and belief, Edward Kennedy siphoned Future Management corporate funds for this own personal use. See Affidavit of Joseph Giampa at ¶¶ 19-20, 23, 25, 27-28, annexed hereto at Exhibit F; Affidavit of William R. Chapman at ¶¶ 2, 4-6, annexed hereto at Exhibit G. In addition, the other principals of Future Management (James Kennedy, Joseph Giampa and Frederick Giampa) are alleged to have transferred corporate funds and/or assets to themselves for their own personal benefit. See Exhibit C at ¶¶ 57, 63, 84. Moreover, Edward Kennedy used Future Management corporate funds to pay for strippers and illegal narcotics. See Affidavit of James Kennedy at ¶¶ 12, 17, annexed hereto at Exhibit H.

Edward Kennedy and his wife, Tracy Kennedy, maintained corporate employee and accounting records in derogation of state and federal laws and regulations. See Affidavit of Annee L'Heureux at ¶ 5, annexed hereto at Exhibit I. Further, Edward Kennedy used Future Management funds to make improvements to his personal residence and often would co-mingle his personal expenses with Future Management's business expenses. See Affidavit of Gregory Taylor, annexed hereto at Exhibit J. Moreover, there were numerous billing problems during Edward Kennedy's tenure as a President of Future Management, none of which were ever addressed until Edward Kennedy was removed as President. See Affidavit of Brian Culliney at ¶ 14-15, annexed hereto at Exhibit K. Based on the foregoing, Encompass requests that this

Court enter an Order compelling defendant to provide true and accurate responses to

Encompass' discovery requests.

**IV.    CONCLUSION**

WHEREFORE, for all the foregoing reasons, plaintiff, Encompass Insurance Company,

respectfully requests that this Honorable Court enter an Order COMPELLING defendant,

Edward Kennedy, to provide true and accurate responses to Encompass' Request for Production

of Documents within twenty (20) days of this Court's Order.


Respectfully submitted,
*Encompass Insurance Company,*
By its attorneys,

/s/ Nathan A. Tilden
_____
Richard D. King, Jr., BBO#638142
Nathan A. Tilden, BBO#647076
Michael W. Whitcher, BBO#663451
SMITH & BRINK, P.C.
122 Quincy Shore Drive
Quincy, Massachusetts 02171
Dated:  April 6, 2007                          (617) 770-2214

**Certificate of Service**

I, Nathan A. Tilden, hereby certify that on this 6th day of April, 2007, this document was filed through the CM/ECF and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

_____/s/ Nathan A. Tilden_____

16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENCOMPASS INSURANCE COMPANY OF MASSACHUSETTS, <br><br> Plaintiff, <br><br> vs. <br><br> JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, ADVANCED SPINE CENTERS, INC., d/b/a FIRST SPINE REHAB, FUTURE MANAGEMENT CORPORATION, FUTURE MANAGEMENT BUSINESS TRUST, EDWARD KENNEDY, BRIAN J. CULLINEY, D.C. and JENNIFER McCONNELL, D.C. <br><br> Defendants. | Civil Action No.  1:05-cv-11693-RCL |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

NOW COMES the plaintiff, Encompass Insurance Company of Massachusetts (hereinafter "Encompass"), pursuant to Fed. R. Civ. P. 37 and Local Rule 37.1 and respectfully requests that this Honorable Court enter an Order COMPELLING defendant, Edward Kennedy (hereinafter "Kennedy"), to provide complete responses to Encompass' Request for Production of Documents.  Specifically, Edward Kennedy has refused to produce (or otherwise make available) a single piece of paper in connection with Encompass' document requests. Encompass hereby submits the within memorandum of law in support of the instant motion.  As grounds for this request, Encompass avers as follows:

## I.    BACKGROUND

This case is brought pursuant to Title 18 U.S.C. §1962, Racketeer Influenced and Corrupt Organizations Act, Mass. Gen. Laws, ch. 93A, the Massachusetts Consumer Protection Act, and Massachusetts common law of fraud and civil conspiracy.  The defendants

acting in concert participated in a concealed, evolving and continuous scheme and conspiracy to defraud Encompass.  The geographic center of this conspiracy was First Spine Rehab, owned and operated by the Giampa chiropractors and Kennedy Brothers.

The objective of defendants' fraud scheme was to illegally obtain money from the plaintiff through the submission of false medical records and bills (hereinafter "false medical documentation") in connection with alleged motor vehicle accidents.  The defendants collected substantial sums of money as payment in connection with such false medical documentation referencing alleged chiropractic treatment that was never rendered and/or was unnecessary, excessive and unrelated to covered claims.  The defendants successfully executed this scheme to defraud by creating and submitting such false medical documentation to Encompass and others by way of the U.S. Mail.

On January 12, 2007, Encompass served upon Edward Kennedy plaintiff's Request for Production of Documents.  <u>See</u> Plaintiff's First Request for Production of Documents, annexed hereto at Exhibit A.  On March 6, 2007, Kennedy issued his responses to Encompass' Request for Production of Documents.  <u>See</u> Defendant, Edward Kennedy's, Response to Plaintiff's Request for Production of Documents, annexed hereto at Exhibit B.  Defendant's discovery responses are incomplete and do not reflect the true nature of the documents within defendant's care, custody or control.  Encompass now brings this Motion to Compel requesting that this Court order defendant to provide true and accurate responses to Encompass' Request for Production of Documents.

## II.    <u>STANDARD OF REVIEW</u>

Modern instruments of discovery serve a useful purpose in that, together with pre-trial procedures, they make a trial less a game of blind man's bluff and more a fair contest with the

basic issues and facts disclosed to the fullest practicable extent.  United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958).  Pursuant to Rules 37(a)(2) Fed. R. Civ. P., when a party fails to answer interrogatories or respond to requests for production of documents, the requesting party may move for an order compelling discovery.  Included within this discretion is the power to compel a party to disclose information or otherwise cooperate in the discovery process.  The authority for this power lies with Fed. R. Civ. P. 37.  Specifically, Fed. R. Civ. P. 37(a)(2)(3) provides:

> **Evasive or Incomplete Disclosure, Answer or Response.**
> For purposes of this subdivision an evasive or incomplete disclosure, answer or response is to be treated as a failure to disclose, answer or respond.

Moreover, Fed. R. Civ. P. 34 governing requests for production of documents and things, provides that:

> Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on his behalf, to inspect and copy, any designated documents…or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served.

Subpart (b) of Rule 34 further states that "the party submitting the request may move for an order under Rule 37(a) with respect to any objection to or other failure to respond to the request or any part thereof, or any failure to permit inspection as requested."

In the instant case, plaintiff requested that defendant respond to discovery requests designed to discover information defendant possesses relating to the allegations set forth in plaintiff's Complaint and produce documents within his possession, custody or control.  The plaintiff's request(s) fall within the purview of Fed. R. Civ. P. 26 and 34 and does not seek the production of materials which are in any way privileged, either as attorney-client

communications or work-product. Therefore, this Court is authorized to compel defendant to produce the request materials.

### III.   ARGUMENT

### A.   DEFENDANT FAILED TO PRODUCE DOCUMENTS REGARDING FUTURE MANAGEMENT CORPORATION'S PURCHASE OF EQUIPMENT FROM KENNEDY SUPPLY AND PAYMENT FOR PATIENTS REFERRED TO FUTURE MANAGEMENT CLINICS THROUGHOUT MASSACHUSETTS (REQUESTS NOS. 1, 2, 3, 4, 6, 15, 16, 17, 18, 19, 20, 21, 22, 31, 32, 41)

In its document requests, Encompass requested defendant produce any and all documents relating to his sworn assertion that James Kennedy used Kennedy Supply Company to enable Future Management Corporation (hereinafter "FMC") to borrow money from various lenders to enable FMC to "purchase" chiropractic equipment from Kennedy Supply and pay for the referral of patients to various FMC clinics. See Ex. A. In addition, Encompass asked Edward Kennedy to produce documents and information related to the marketing and/or other efforts directed at soliciting patients to treat at the various Future Management Clinics. The defendant objected to these requests stating that they are overly broad, unduly burdensome, seeking documents covered by the attorney-client and/or attorney work-product privilege, and not calculated to lead to the discovery of admissible evidence. See Ex. B. Moreover, defendant objected to many of plaintiff's requests regarding the payment of referral of patients and stating that no such documents are in defendant's "possession, custody or control." Id.

Encompass maintains that defendant's response to these narrowly-tailored requests are evasive and/or incomplete based on statements made by defendant in sworn materials filed in connection with other litigation. In a Verified Complaint filed by defendant in the matter Kennedy, et. al. v. Kennedy, et. al., Middlesex Superior Court, C.A. No. MICV2005-01458, defendant advanced allegations that James Kennedy used Kennedy Supply Company to enable

FMC to borrow money from various lenders to enable FMC to "purchase" chiropractic equipment from Kennedy Supply. Because such allegations were set forth in a Verified Complaint, Encompass avers that no attorney-client privilege and/or work product objection can be raised by defendant in this matter. Encompass further maintains that the requested documents are relevant to the allegations set forth in its Complaint because such documents would tend to prove (or at least provide some indicia) or defendants' overall pattern and practice of insurance fraud. In the above-referenced Verified Complaint, defendant Edward Kennedy alleged that FMC and the Giampa brothers paid for the referral of patients and the use of runners to recruit these patients. See Verified Complaint at ¶¶ 57-60, annexed hereto at Exhibit C. The pertinent aspects of the Complaint read a follows:

- J. Kennedy further admitted to E. Kennedy in September, 2004 that he had transferred money from Kennedy Supply to Future Management to pay for Future Management's payment for referral to its chiropractic clinics across Massachusetts;

- Specifically, in a telephone conversation, J. Kennedy admitted to E. Kennedy that he had used money from Kennedy Supply and given it to Future Management and the Giampa brothers to pay for "runners", i.e. individuals paid to refer clients to Future Management's chiropractic offices;

- At the time J. Kennedy made this admission, he was aware that there was a law which was going to be passed by the Massachusetts legislature making the use of "runners" a criminal act. The legislature subsequently passed Mass. Gen. Laws ch. 266, § 111C which imposed criminal sanctions for this practice.

See Ex. C at ¶¶ 58-60.

Based on the allegations set forth in defendant's Verified Complaint, there can be no reasonable debate the documents requested by Encompass exist and are within the care, custody or control of defendant. Encompass maintains that defendant, in making the allegations in his Verified Complaint, relied on some form of documentation (or other evidence) to support his claims. Encompass demands that defendant be compelled to disclose (1) what documents exist, (2) the location of the documents, and (3) the identity of the person(s) who have physical possession of these documents. As such, Encompass respectfully requests that this Honorable Court compel any and all documents related to the allegations set forth in the above-referenced Verified Complaint.

Moreover, James Kennedy (Edward Kennedy's brother and business partner) testified that FMC maintained so-called "marketing logs" memorializing the marketing efforts of the various FMC clinics. Encompass has knowledge that various current and former FMC employees were actively engaged in FMC's marketing activities. According to the statements of these former employees, marketing was a major component of FMC's business operations. As such, Encompass maintains that defendant's statements regarding the non-existence of such marketing records are (at best) inaccurate.

Encompass further seeks documents and information relating to (1) monies paid to third parties, attorneys, referrers, runners, and (2) vouchers and V.I.P. cards. Any documents that memorialize whether patients were receiving payment or anything of value to treat at the FMC clinics is relevant to whether the alleged medical treatment they received was necessary and that the corresponding medical bills were reasonable. Moreover, Encompass seeks documents related to any other person (including FMC clinical assistant employees) receiving anything of

6

value for the referral of patients to First Spine.  Encompass' requests are based upon its good-faith belief that the payment of referral monies was a common practice at FMC clinics.

In <u>Rivera v. Corrow and Encompass Ins. Co.</u>, Lowell District Court, C.A.. No. 0511-CV-2582, Jennifer McConnell, D.C., a former chiropractor employee of Future Management (and defendant in the case at bar) admitted that Future Management gave patients various inducements, including shopping mall and restaurant gift certificates.  Through the testimony of former First Spine patients, it has come to Encompass' attention that FMC employees provided patients with so-called V.I.P. cards entitling the patients to receive a discount on "professional" (i.e., legal) fees.  Specifically, FMCs have provided patients with gift certificates, gift cards and/or coupons for other goods/services in exchange for their treatment at Future Management clinics.  Upon information belief, Future Management chiropractor and "team leader," Brain Culliney, was responsible for providing gift certificates to FMC patients.  Moreover, First Spine clinical assistants have admitted to receiving "bonuses" or (1) the referral of patients to First Spine; and (2) the referral of First Spine patients to personal injury attorneys.

All of the foregoing supports Encompass' position that the payment of referral monies was a common practice at defendants' clinics.  Therefore, information and documents that support these allegations are reasonably calculated to lead to the discovery of admissible evidence pursuant to Fed. R. Civ. P. 26.  Edward Kennedy, as a principal and shareholder of Future Management, cannot, in good faith, claim, as he has in his responses to Encompass' discovery requests, that he does not have possession, custody or control over FMC corporate records and other related information.  Any response to a request that states that the document

is not within the possession, custody or control of the responding party must be made in light of the federal jurisprudence, which imposes the obligation to obtain copies of documents known to be in the possession of third parties, where the responding party has the legal right to request such documents.  <u>See</u> e.g., <u>Searock v. Stripling</u>, 736 F. 2d 650, 653 (11th Cir. 1984), (finding that the "primary dispositive issue is whether Stripling made a good faith effort to obtain the documents over which he indicated that he may have had control in whatever sense, and whether after making such a good faith effort he was unable to obtain and produce them"); <u>Scott v. Arex</u>, 124 F.R.D. 39, 41 (D. Conn. 1989) (holding that the party must attempt to obtain documents, or inform plaintiff's counsel by affidavit of "what precise attempts [he] made to obtain those documents, when he made them, and to whom his demands were addressed"); <u>In re: Folding Carton Antitrust Litigation</u> , 76 F.R.D. 420, 423 (N.D. Ill. 1977) (finding that "[a]t the very least, defendants should make inquiry of such former employees....[i]f the former employees do not cooperate, we can consider what further action may be required").

Even in the event that defendant has no such legal right to obtain responsive documents, the defendant should be required to state the last known custodian of the responsive documents and a description of the responsive documents.  Accordingly, the Court should compel the production of all documents and information as requested by Encompass.

## B.  DEFENDANT FAILED TO PRODUCE DOCUMENTS RELATED TO HIS ROLE IN THE TREATMENT OF FMC PATIENTS (REQUEST NOS. 4, 40)

The defendant responded to the above-referenced request stating that no such documents were in his care, custody or control.  The defendant's response is wholly incomplete and/or inaccurate given testimony by current and former Future Management

8

employees.  With respect to patient treatment, Edward Kennedy is alleged to have actively

participated and directed the treatment of Future Management patients.  <u>See</u> Affidavit of

Michael Amato, annexed hereto at Exhibit D.  Upon information and belief, Edward Kennedy

is not licensed to conduct or administer any type of patient care.  Despite his lack of

qualifications, Edward Kennedy's employees have stated that Kennedy also instructed FMC

employees regarding other clinical matters.

Edward Kennedy possesses information related to FMC's marketing activities.  As

stated above, James Kennedy testified that FMC maintained so-called "marketing logs"

memorializing the marketing efforts of the various FMC clinics.  Moreover, Encompass has

knowledge that various current and former FMC employees were actively engaged in FMC's

marketing activities.   According to the statements of these former employees, marketing was a

major component of FMC's business operations.  As such, Encompass maintains that

defendant's statements regarding the non-existence of such marketing records are inaccurate.

**C. <u>DEFENDANT FAILED TO PRODUCE DOCUMENTS AND/OR INFORMATION
REGARDING EMPLOYEES RESPONSIBLE FOR PROVIDING MEDICAL
TREATMENT</u> (REQUESTS NOS. 29, 33, 34)**

The plaintiff seeks documents and information regarding the identity of those

individuals who provided any treatment to the patient(s) identified in plaintiff's Complaint, not

limited to the treating physical therapist, chiropractor, medical doctor, and/or other signatory

identified on plaintiff's billing records.  The defendant has failed to provide any information

regarding any additional persons (so-called clinical assistants) providing supportive treatment

modalities to the patients at issue.  The identity of such individuals is relevant to whether (1)

the treatment rendered was medically necessary, and (2) the billing is compensable pursuant to

the AMA CPT code guidelines.  Therefore, such a request is reasonably calculated to lead to the discovery of admissible evidence.  Encompass seeks information regarding full time W-2 employees and independent contractors.  Encompass requests that this Court require defendant to produce documents and information relating to individuals employed or contracted by FMC in any capacity during the time treatment was rendered to the patients at issue.

Encompass anticipates that defendant will argue, in part, that testimony of clinic employees will be irrelevant because only the treating physical therapists, chiropractors, and/or medical doctors were directly involved in rendering the treatment to patients.  However, this is simply not the case.  Most of these facilities are small storefront clinics where treatment was rendered in a relatively small area.  A receptionist might have maintained a sign-in sheet or appointment book.  The receptionist would be able to say how long it took for treatment to be rendered.  Moreover, on February 15, 2007 and 16, 2007, two non-licensed employees of a FMC clinic (First Spine)—Phally Samith and Sokah Dy— testified in a related case that they—not licensed chiropractors or physicians—rendered nearly all patient treatment.  The time in which patients were in the clinics is certainly relative, probative, and material to whether the treatment was necessary and/or compensable.  Therefore, this Court should compel defendant to produce the requested documents regarding all individuals employed by defendants in compliance with Fed. R. Civ. P. 26 and 34.

**D.  DEFENDANT FAILED TO PRODUCE DOCUMENTS AND INFORMATION REGARDING THE FEE SCHEDULES EMPLOYED BY FIRST SPINE (REQUESTS NO. 25, 26, 27, 39)**

Encompass has requested that defendant produce all documents and information related to the fee schedules utilized by First Spine.  Edward Kennedy has responded stating that no such information or documents is within his care, custody or control.  Based on information and belief, First Spine used fee schedules (or tables) that were specifically tailored for each insurance company.  See Affidavit of Kathy Duncan, annexed hereto at Exhibit E.  Upon information and belief the schedules/tables were developed and implemented by the defendant, Edward Kennedy, or his former wife/administrator of FMC, Tracy Kennedy.  Therefore, this Court should compel defendant, as principal and shareholder of FMC, to produce the requested documents in compliance with Fed. R. Civ. P. 26 and 34.

**E.  DEFENDANT FAILED TO PRODUCE DOCUMENTS AND INFORMATION RELATING TO ELECTRONICALLY STORED INFORMATION (REQUESTS NOS. 28, 30)**

Encompass seeks documents and information regarding any and all documents relating to any computers, computer programs, or e-mail used by Edward Kennedy, First Spine, Future Management Corporation and ARMS and/or any of their employees in connection with the patients referenced in the Complaint.  Edward Kennedy has responded claiming that no such documentation is in his possession, custody or control.  Upon information and belief, defendants have been actively destroying original file materials (paper and electronic versions); however, defendants have provided no sworn materials (via affidavit or otherwise) to substantiate their document retention policy.  Moreover, deposition testimony has revealed that the principals routinely communicated to FMC employees by email.  FMC's current

bookkeeper, Gaynor Kohn, testified that all of FMC's bookkeeping is maintained electronically in QuickBooks software.  Moreover, upon information and belief, all former tax records are stored on microfiche at FMC's headquarters.  All of these documents (or electronically-stored information) are reasonable likely to lead to the discovery of admissible evidence regarding (1) the payment for the referral of patients; (2) the names of former employees; and (3) the transfer of monies to and from personal injury attorneys.

Encompass avers that the recent revisions to the Federal Rules of Civil Procedure regarding the maintenance and production of electronically stored information should be enforced in this matter.  See generally Fed. R. Civ. P. 26 and 34.  To date, defendants have likely destroyed hundreds (if not thousands) of pages of documents.  However, defendants have not provided Encompass with a copy of their document retention policy.  It is inconceivable to Encompass that defendants—during the course of litigation—may have engaged (and/or continue to engage) in the destruction of relevant, material evidence (to which numerous Future Management employees have testified to the existence) and now assert that such information and documentation does not exist.  Encompass requests that this Court (1) order defendant's production of the requested electronically stored evidence, (2) order defendant to submit sworn affidavits attesting to the destruction of the requested information/documentation, (3) order defendant to provide evidence of FMC's document retention policy/litigation "hold(s)", (4) order defendant to state the last known custodian of the responsive documents and a description of the responsive documents, and/or (5) levy an award of sanctions against defendant for his wrongful, unjustified destruction relevant, material evidence.

**F. DEFENDANT FAILED TO PRODUCE DOCUMENTS AND INFORMATION REGARDING LICENSURE, DISCIPLINARY ACTIONS AND PRIOR LITIGATION (REQUESTS NOS. 23, 24, 37)**

Encompass is seeking documents and information regarding any prior disciplinary action and litigation involving Edward Kennedy. In response, defendant objected stating that this request was over broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence in this matter. Encompass, however, avers that such information is wholly relevant to the instant action. In a Verified Complaint filed by defendant in the matter <u>Kennedy, et. al. v. Kennedy, et. al.</u>, Middlesex Superior Court, C.A. No. MICV2005-01458, defendant advanced allegations that James Kennedy used Kennedy Supply Company to enable FMC to borrow money from various lenders to enable FMC to "purchase" chiropractic equipment from Kennedy Supply. Because such allegations were set forth in a Verified Complaint, Encompass avers that no attorney-client privilege and/or work product objection can be raised by defendant in this matter. Encompass further maintains that the requested documents are relevant to the allegations set forth in its Complaint because such documents would tend to prove (or at least provide some indicia) or defendants' overall pattern and practice of insurance fraud. In the above-referenced Verified Complaint, it was alleged that FMC and the Giampa brothers paid for the referral of patients and the use of runners to recruit these patients. <u>See</u> Verified Complaint at ¶¶ 57-60, annexed hereto at Exhibit C. Moreover, Tracy Kennedy testified that she executed an affidavit in the aforementioned lawsuit, however, Encompass, despite its diligent search, has been unable to discover this sworn affidavit. As such, Encompass requests that defendant be required to provide a true and accurate response to Encompass' request.

Moreover, Encompass is seeking documents and information regarding the licensure status and any related disciplinary action and/or litigation including the defendants. This request goes hand-in-hand with Encompass' request for the identity of the employees at the clinics, and information regarding who actually rendered the treatments at issue in this case. In Massachusetts, chiropractic assistants, unlike physical therapy assistants, do not need to be licensed. For example, an individual at defendants' clinic could be a receptionist at one minute and then be working in another capacity as a chiropractic assistant rendering treatment. Therefore, it is essential to know what training these individuals received, the supervision they had, whether any professional complaints were filed against them, and what documentation they completed regarding specific treatments they rendered at the clinics.

Encompass is also requesting the production of information relating to professional complaints. This Court should compel defendant to produce documents identifying all past and present employees so Encompass may begin looking into any and all professional complaints. In addition, defendant should disclose to defendant whether there are any additional criminal/civil/disciplinary charges against clinic employees that are not part of the public record. Encompass requests that this Court require defendant to provide this information to allow Encompass to adequately prepare its case for further discovery and trial.

## G. DEFENDANT FAILED TO PRODUCE DOCUMENTS AND INFORMATION REGARDING ASSET TRANSFERS AND/OR ASSETS HELD BEYOND THE JURISIDICTION OF THIS COURT (REQUESTS NOS. 12, 13)

Encompass is seeking documents and information regarding any and all assets held by defendant beyond the jurisdiction of this Court, the value of which exceeds $5,000. Encompass is also seeking documents and information regarding defendant's transfer of any assets/funds since January, 2005, the value of which exceed $5,000. The defendant responded

stating that these discovery requests were "overly broad, unduly burdensome, interposed solely to harass and annoy the defendant, and is not calculated to lead to the discovery of admissible evidence."

Encompass maintains that the requested discovery is relevant to its allegations regarding the transfer and/or misappropriation of corporate funds by defendant. Upon information and belief, Edward Kennedy siphoned Future Management corporate funds for this own personal use. See Affidavit of Joseph Giampa at ¶¶ 19-20, 23, 25, 27-28, annexed hereto at Exhibit F; Affidavit of William R. Chapman at ¶¶ 2, 4-6, annexed hereto at Exhibit G. In addition, the other principals of Future Management (James Kennedy, Joseph Giampa and Frederick Giampa) are alleged to have transferred corporate funds and/or assets to themselves for their own personal benefit. See Exhibit C at ¶¶ 57, 63, 84. Moreover, Edward Kennedy used Future Management corporate funds to pay for strippers and illegal narcotics. See Affidavit of James Kennedy at ¶¶ 12, 17, annexed hereto at Exhibit H.

Edward Kennedy and his wife, Tracy Kennedy, maintained corporate employee and accounting records in derogation of state and federal laws and regulations. See Affidavit of Annee L'Heureux at ¶ 5, annexed hereto at Exhibit I. Further, Edward Kennedy used Future Management funds to make improvements to his personal residence and often would co-mingle his personal expenses with Future Management's business expenses. See Affidavit of Gregory Taylor, annexed hereto at Exhibit J. Moreover, there were numerous billing problems during Edward Kennedy's tenure as a President of Future Management, none of which were ever addressed until Edward Kennedy was removed as President. See Affidavit of Brian Culliney at ¶ 14-15, annexed hereto at Exhibit K. Based on the foregoing, Encompass requests that this

Court enter an Order compelling defendant to provide true and accurate responses to

Encompass' discovery requests.

IV.    <u>**CONCLUSION**</u>

WHEREFORE, for all the foregoing reasons, plaintiff, Encompass Insurance Company,

respectfully requests that this Honorable Court enter an Order COMPELLING defendant,

Edward Kennedy, to provide true and accurate responses to Encompass' Request for Production

of Documents within twenty (20) days of this Court's Order.

<table>
<tr><td></td><td>Respectfully submitted,<br>*Encompass Insurance Company,*<br>By its attorneys,</td></tr>
<tr><td></td><td>/s/ Nathan A. Tilden</td></tr>
<tr><td></td><td>_____<br>Richard D. King, Jr., BBO#638142<br>Nathan A. Tilden, BBO#647076<br>Michael W. Whitcher, BBO#663451<br>SMITH & BRINK, P.C.<br>122 Quincy Shore Drive<br>Quincy, Massachusetts 02171</td></tr>
<tr><td>Dated:  April 6, 2007</td><td>(617) 770-2214</td></tr>
</table>

<u>**Certificate of Service**</u>

I, Nathan A. Tilden, hereby certify that on this 6th day of April, 2007, this document was filed through the CM/ECF and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

_____/s/ Nathan A. Tilden_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENCOMPASS INSURANCE COMPANY OF MASSACHUSETTS, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, ADVANCED SPINE CENTERS, INC. d/b/a FIRST SPINE REHAB, FUTURE MANAGEMENT CORPORATION, FUTURE MANAGEMENT BUSINESS TRUST, EDWARD KENNEDY, BRIAN J. CULLINEY, D.C. and JENNIFER MCCONNELL, D.C., | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Case No. 05-11693 RCL

### DEFENDANT EDWARD KENNEDY'S RESPONSE TO PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS

1.   Any and all documents relating to your sworn assertion that James Kennedy used Kennedy Supply Corporation to enable Future Management Corporation to fraudulently borrow hundreds of thousands of dollars from various leading entities under the guise that Future Management Corporation "purchased" chiropractic equipment from Kennedy Supply.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, seeks documents covered by the attorney-client and/or attorney work-product privilege, and is not calculated to lead to the discovery of admissible evidence.

1

2.    Any and all documents relating to your sworn assertion that James Kennedy transferred money from Kennedy Supply to Future Management to pay Future Management's payment for patients referred to Future Management clinics across Massachusetts.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, seeks documents covered by the attorney-client and/or attorney work-product privilege, and is not calculated to lead to the discovery of admissible evidence. Notwithstanding, and without waiving said objection, no such non-privileged documents are in the defendant's possession, custody or control?

3.    Any and all documents relating to the marketing efforts, strategies, and protocol employed by Future Management/First Spine.

RESPONSE

No such documents are in the possession, custody or control of the defendant.

4.    Any and all documents relating to the role you played as president of Future Management in:

(a)   The treatment of patients;

(b)   Marketing of services;

(c)   Business and financial aspects of running Future Management; and

2

(d)   Providing incentives for the referral of patients

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence.  Notwithstanding, and without waiving said objection, no such documents are in the defendant's possession, custody or control.

5.   All documents that are mentioned in or relate in any way to the plaintiff's Answers to the Defendant's First Set of Interrogatories.

RESPONSE

No such documents are in defendant's possession, custody or control.

6.   Any and all documents or records that relate in any way to monies (including, but not limited to bonuses) paid by any individual, including, but not limited to employees, police officers, insurance agents, exclusive representative producers, runners, cappers, sources, translators, cleaners, livery sources, independent paralegals, chasers, multi-service centers, attorneys, insurance adjusters, or other medical providers in connection with the referral of patients.

RESPONSE

No such document are in the defendant's possession, custody or control.

3

7.    Any and all documents that relate in any way to payment made to any employees who worked for the plaintiff in any capacity during the period in which any of the patients alleged in plaintiffs Complaint were treated. Include in your response any checks, income tax documents including W-2 Forms, 1099 Forms, receipts, bills, or other documents related thereto.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, irrelevant, and is not calculated to lead to permissible discovery.  Notwithstanding, and without waiving said objection, no documents relating in any way to employees of Future Management or First Spine are in the defendant's possession, custody or control.

8.    A resume and list of publications authored (in whole or in part) by the defendant's expert witness(es).

RESPONSE

Defendant has not determined who, if anyone, he will retain as an expert witness in this matter.  Defendant will make his expert disclosure as required by the terms of the scheduling order entered in this matter.

9.    Any and all documents which relate in any way to Encompass claimants and/or false medical documentation created by you, First Spine or any of the other defendants

RESPONSE

4

Defendant object to this request on the grounds that it is overly broad, unduly burdensome, not calculated to lead to the discovery of admissible evidence, and seeks privileged medical information.  Notwithstanding, and without waiving said objections, no such documents are in the defendant's possession, custody or control.

10.  Any and all reports, articles, AMA Guidelines, scholarly publications, treatises, or other documents that you intend to rely upon in the defense of this action.

RESPONSE

Defendant has not yet determined what documents he will rely upon to support his defense.  Defendant reserves the right to supplement this response prior to trial.

11.  Any and all documents which relate to and/or which you intend to use to contest, rebut or refute the findings and conclusions of Michael Frustaci, D.C., as set forth in his Affidavit filed by Encompass in support of its Motion for Attachment of Real Property and Motion for Attachment by Trustee Process.

RESPONSE

Defendant has not yet determined what documents he will rely upon to support his defense.   Defendant reserves the right to supplement this response prior to trial.

12.  Any and all documents which pertain to and/or evidence

5

the transfer by you of any assets or funds, the value of which exceeded $5,000.00, from January 1, 2005 through the present.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, interposed solely to harass and annoy the defendant, and is not calculated to lead to the discovery of admissible evidence.

13.  Any and all documents which pertain to and/or evidence any assets in which you have an interest located outside the United States, the value of which exceeds $5,000.00.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, interposed solely to harass and annoy the defendant, and is not calculated to lead to the discovery of admissible evidence.

14.  Any and all documents which pertain to and/or evidence the collection and subsequent transfer of accounts receivable from the date you first became aware of Encompass' investigation of you and/or First Spine from the commencement of this suit through the present.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, interposed solely to harass and annoy the defendant, and is not calculated to lead to the

discovery of admissible evidence.

15.  Any and all documents relating to monies paid by anyone to any third party for claim referral to First Spine in connection with an Encompass claim.

RESPONSE

No such documents are in the defendant's possession, custody or control.

16.  Any and all documents relating to monies paid by anyone to any third party for a claim referral to First Spine in connection with any motor vehicle claim.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, interposed solely to harass and annoy the defendant, and is not calculated to lead to the discovery of admissible evidence.

17.  Any and all documents relating to incentives given by First Spine to First Spine employees or to any third party for a claim referral in connection with an Encompass claim.

RESPONSE

No such documents are in the defendant's possession, custody or control.

18.  Any and all documents relating to incentives received from any third party in connection with an Encompass claim.

RESPONSE

7

No such documents are in defendant's possession, custody or control.

19. Any and all documents that relate to and/or identify person(s) from whom any defendant received any claim referrals from January 1, 1996 through the present.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, interposed solely to harass and annoy the defendant, and is not calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving said objections, no such documents are in the defendant's possession, custody or control.

20. Any and all documents that relate to and/or identify person(s) or entities to whom any defendant referred any insurance, auto and/or legal claims from January 1, 1996 through the present.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, interposed solely to harass and annoy the defendant, and is not calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving said objections, no such documents are in the defendant's possession, custody or control.

21. Any and all documents relating to monies paid to any

8

person(s), including but not limited to interpreters, independent
paralegals, multi service centers or any other individual by any
defendant in connection with the patient(s) identified in the
Complaint.

RESPONSE

No such documents are in the defendant's possession, custody
or control.

22.  Any and all documents relating to monies paid by any
person(s), including but not limited to interpreters, independent
paralegals, multi service centers or any other individual to the
defendant or any employee, or representative thereof in
connection with the patient(s) referenced in the Complaint.

RESPONSE

No such documents are in the defendant's possession, custody
or control.

23.  Any and all documents relating to any (1) professional
complaint(s) (including malpractice claims); (2) Board of
Registration of Chiropractors investigations, complaints, show
cause orders and/or consent agreements; (3) criminal actions;
and/or (4) lawsuits filed by or against you.

RESPONSE

Defendant objects to this request on the grounds that it is
overly broad, unduly burdensome, interposed solely to harass and
embarrass the defendant, seeks documents protected by the

attorney/client and/or work-product-privilege, and is not
calculated to lead to the discovery of admissible evidence.

24.  Any and all documents relating to any (1) professional
complaint(s) (including malpractice claims); (2) Board of
Registration of Chiropractors investigations, complaints, show
cause orders and/or consent agreements; (3) criminal actions;
and/or (4) lawsuits filed by or against First Spine employee(s).

RESPONSE

Defendant objects to this request on the grounds that it is
overly broad, unduly burdensome, interposed solely to harass and
embarrass the defendant, seeks documents
protected by the attorney/client privilege and\or the attorney
work-product privilege, and is not calculated to lead to the
discovery of admissible evidence.

25.  Any and all documents used or referred to by the
defendants, First Spine or any employee thereof in the
development of the fee schedules used during the period in which
the patient(s) underwent treatment, testing, examination, therapy
and/or physiotherapy.

RESPONSE

No such documents are in the defendant's possession, custody
or control.

26.  Any and all documents relating to fee schedules used by
the defendants, First Spine   or any employee thereof during the

10

period in which the patient(s) underwent treatment, testing,

examination, therapy and/or physiotherapy.

RESPONSE

No such documents are in the defendant's possession, custody

or control.

27.  Any and all documents that you rely upon to support

your claim that the prices charged by First Spine are reasonable.

RESPONSE

Defendant has not yet determined what documents he will rely

upon to support his defense.    Defendant reserves the right to

supplement this response prior to trial.

28.  Any and all documents relating to any

computers,computer programs, or e-mail used by the defendant,

First Spine.

RESPONSE

No such documents are in the defendant's possession, custody

or control.

29.  Any and all documents relating to payments made to any

employees who worked for the defendant, First Spine and/or the

clinics in any capacity during the period in which the

patients(s) underwent treatment, testing, examination, therapy

and/or physiotherapy. Include in your response any checks, income

tax documents including W-2 forms, 1099 Forms, receipts, bills,

or other documents related thereto.

RESPONSE

    Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, interposed solely to harass and embarrass the defendant, seeks documents protected by the attorney/client privilege, and is not calculated to lead to the discovery of admissible evidence. Notwithstanding, and without waiving said objection, no such documents are in the defendant's possession, custody or control.

    30. Any and all documents relating to the document destruction policy of the defendant First Spine with regard to documents maintained in the ordinary course of business.

RESPONSE

    No such documents are in the defendant's possession, custody or control.

    31. Any and all documents related to anything you did to attract patients or encourage the referral of patients.

RESPONSE

    No such documents are in the defendant's possession, custody or control.

    32. Any and all documents relating to Rosencranz and Associates' VIP card program.

RESPONSE

    No such documents are in the defendant's possession, custody or control.

12

33.  Any and all documents relating to the person(s) who oversaw the (1) medical treatment, and (2) billing in connection with the patients listed in the spreadsheet / V ~ annexed at Tab 1 to its Complaint.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, interposed solely to harass and embarrass the defendant, seeks documents protected by the attorney/client privilege, and is not calculated to lead to the discovery of admissible evidence.  Notwithstanding, and without waiving said objection, no such documents are in the defendant's possession, custody or control.

34.  Any and all documents relating to the person(s) who were responsible for (1)  training chiropractors regarding treatment of patients, billing protocols, (2) training chiropractic aides, and (3) personnel, including the hiring of all chiropractic and unlicensed employees.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, interposed solely to harass and embarrass the defendant, seeks documents protected by the attorney/client privilege, and is not calculated to lead to the discovery of admissible evidence.  Notwithstanding, and without waiving said objections, no such documents are in the defendant's

13

possession, custody or control.

36.  Any and all documents relating to false medical documentation in which you or anyone working in concert with you or at your direction and control created.

RESPONSE

No such documents are in the defendant's possession, custody or control.

37.  Any and all documents relating to all facts pertaining to any and all professional complaints, criminal actions or lawsuits filed by or against you, First Spine (Lowell) or any treating chiropractor of the patients listed in the chart attached at  Tab 1 of the Complaint for the period 1998 through the present, including in your answer the date of complaint, the authority, agency, and/or court in which any such complaint or lawsuit was filed, the name or names of the plaintiffs, defendants, and/or complainants, the complaint/docket number, and the status of any such complaint and/or lawsuit.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, seeks documents covered by the attorney-client and/or attorney work-product privilege, and is not calculated to lead to the discovery of admissible evidence.

38.  Any and all documents relating to informational meetings/seminars that you, First Spine and/or Future Management

14

had with personal injury attorneys including, but not limited to, the Law Offices of Mark E. Solomone, Dana M. Rosencranz, Louis Haskell, or John King and Associates.

RESPONSE

No such documents are in the defendant's possession, custody or control.

39.  Any and all documents relating to the individual(s) involved in the creation of the First Spine's/Future Management's fee schedule.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, interposed solely to harass and embarrass the defendant, seeks documents protected by the attorney/client privilege, and is not calculated to lead to the discovery of admissible evidence.

40.  Any and all documents relating to your role in:

(a)  The treatment of the patient(s) identified in the plaintiff's Complaint;.

(b)  The management of the plaintiff and/or treating clinic(s); and (c) The financial operations of the plaintiff and/or treating clinic(s).

RESPONSE

No such documents are in the defendant's possession, custody or control.

15

41.    Any and all documents relating to the payment of incentive(s) for (1) runners and/or (2) the referral of patients.

RESPONSE

Defendant objects to this request on the grounds that it is overly broad, unduly burdensome, interposed solely to harass and annoy the defendant, and is not calculated to lead to the discovery of admissible evidence.  Notwithstanding and without waiving said objections, no such documents are in the defendant's possession, custody or control.

Edward Kennedy
By his attorney

3|6|07

Jeffrey J. Phillips, Esq.
B.B.O. #398480
Daniel Treger, Esq.
B.B.O. #562147
Phillips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No. 617-367-8787

CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing on all parties or their attorney of record this by first class mail, postage prepaid.

Date: 3|6|07

Daniel Treger, Esq.

L:\futm017\kennedy.rsp.wpd

16

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPT.
CIVIL ACTION
DOCKET No.

05-1458

)
EDWARD D. KENNEDY, individually,                )
and as beneficiary of 13 KIDDER ROAD REALTY )
TRUST and derivatively, on behalf of the          )
corporations FIRST HEALTH PRODUCTS INC.   )
and ROBERT T. KENNEDY INC. d/b/a Kennedy )
Professional Supply,                                          )
               Plaintiffs       )
                                                                      )
v.                                                                          )
                                                                      )
                                                                      )
JAMES KENNEDY, individually and as          )
Trustee of 13 KIDDER ROAD REALTY TRUST;  )
and ENTERPRISE BANK AND TRUST             )
COMPANY,                                                      )
           Defendants     )
                                                                      )

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
MIDDLESEX

APR 29 2005

Edward J. Sullivan
CLERK

## VERIFIED COMPLAINT

6660E000004/29/05CIVIL       240.00
6660E000004/29/05SUR CHARGE   15.00
6660E000004/29/05SUMMONS      10.00
6660E000004/29/05SECC         20.00

### INTRODUCTION

1.    The Plaintiff in this action, Edward D. Kennedy, has brought this direct and

derivative action against the above-named defendant, James Kennedy based upon, *inter alia*, a)

his improper attempt to deprive the Plaintiff of his interest in the family businesses, Robert T.

Kennedy Inc. d/b/a Kennedy Professional Supply ("Kennedy Supply") in which the Plaintiff is

President and 50% shareholder; b) looting of the income generated by the businesses Kennedy

Supply and First Health Products Inc. ("First Health") and assets held by 13 Kidder Road Realty

Trust ("Kidder Trust"); c) breach of fiduciary obligations, d) self-dealing, e) wrongful exercise

of dominion over the corporate and trust assets, f) continued refusal to permit joint control over

the financial affairs of the corporations despite demand, g) waste, h) mismanagement, i) theft, j)

forgery, and k) fraud. The Plaintiff is therefore in need of immediate injunctive relief to preserve the remaining corporate and trust assets, and hereby requests the Court to Order the valuation and sale of the Plaintiff's shares in Kennedy Supply, First Health and Kidder Trust, or in the alternative, if the Court sees fit, order the dissolution of Kennedy Supply and First Health pursuant to Mass. Gen. Laws ch. 156D § 14.30 et als.

## PARTIES

2.    Plaintiff Edward D. Kennedy ("E. Kennedy") is an individual who resides in Westford, Middlesex County, Massachusetts. The Plaintiff is currently the President and 50% shareholder of Kennedy Supply and First Health.

3.    Plaintiff Robert T. Kennedy Inc. is a Massachusetts corporation with a current principal place of business at 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts doing business as Kennedy Professional Supply.

4.    Plaintiff First Health Products Inc. is a Massachusetts corporation with a current place of business at 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts.

5.    Plaintiff Edward Kennedy is also a 50% beneficiary of the Kidder Trust, a nominee trust, under a Declaration of Trust recorded at the Middlesex North County Registry of Deeds on June 2, 2000 at Book 10858, Pages 180 through 185. Kidder Trust is the owner of the Premises known as and numbered 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts.

6.    Kennedy Supply and First Health are engaged in the wholesale purchase and sale of health care products, equipment, and supplies to over 1000 chiropractors, chiropractic clinics, hospitals, medical doctors and physical therapists across New England and several other states

including, Florida, Oklahoma, Rhode Island, South Carolina, New Jersey, New York and Pennsylvania.

7.      Defendant James Kennedy ("J. Kennedy") is an individual who resides at 3 Kirby Lane, Chelmsford, Middlesex County, Massachusetts.  J. Kennedy is the Plaintiff's brother, Treasurer, and remaining 50% shareholder in Kennedy Supply and First Health.  J. Kennedy is a co-Trustee of the Kidder Trust.

8.      Defendant Enterprise Bank and Trust Company ("Enterprise Bank") is a Massachusetts banking corporation with a registered principal place of business in Tewksbury, Massachusetts and a banking facility located at 185 Littleton Road, Chelmsford, Massachusetts, which, at all times material hereto, was, and continues to be, the banking institution used by Kennedy Supply, First Health and the Kidder Trust.


## COMMON ALLEGATIONS OF FACT

9.      Kennedy Supply was formed in June 1981 by E. Kennedy and J. Kennedy's late father, Robert T. Kennedy, for the purpose of engaging in wholesale purchase and sale of medical supplies.  *See Articles of Organization of Robert T. Kennedy Inc. attached hereto at Exhibit A.*

10.     Kennedy Supply was formed by Robert Kennedy (its President), his wife, Esther Kennedy, (Treasurer), and his son, Plaintiff E. Kennedy (Clerk).  *See Exhibit A.*

11.     Initially, Robert Kennedy was the sole shareholder and operated and managed Kennedy Supply along with his two youngest sons, Henry and E. Kennedy.

3

12.     The middle child, J. Kennedy, was a carpet installer who possessed very little knowledge of the family business until Robert Kennedy brought him in to get actively involved in Kennedy Supply.

13      Over time, Kennedy Supply's business developed substantial contacts with individuals and companies in the chiropractic industry.

14.     Through these contacts, E. Kennedy decided to open medical offices to provide chiropractic services to the public.

15.     The first chiropractic/physical therapy office was opened in Lawrence, Massachusetts.

16.     Shortly thereafter, E. Kennedy contacted Dr. Joseph Giampa, a longtime friend who E. Kennedy knew to be a licensed chiropractor in Massachusetts for the purpose of becoming a partner in the new business venture.

17.     The new business, Future Management Corporation ("Future Management"), was formally organized in February 1997.

18.     Initially, the parties agreed that Future Management would have three shareholders, E. Kennedy, (25%), J. Kennedy (25%) and Joseph Giampa (50%).

19.     The creation of Future Management was also intended to benefit Kennedy Supply's business, as Kennedy Supply was to be Future Management's primary distributor of medical and chiropractic equipment and supplies.

20.     In order to focus on developing these respective businesses, E. Kennedy permitted J. Kennedy to assume more control over Kennedy Supply than J. Kennedy previously maintained.

21.     E. Kennedy agreed to have J. Kennedy operate the day to day management business, while E. Kennedy was in charge of overseeing Kennedy Supply's financial operations.

22.     By September 2003, E. Kennedy had expanded Future Management from 1 office in Lawrence, to over 60 offices in Massachusetts and across the United States, including, but not limited to Florida, Oklahoma, Connecticut, Rhode Island, South Carolina, New Hampshire, Pennsylvania, Illinois and Virginia.

23.     In 1996, E, Kennedy and J. Kennedy assumed full control over Kennedy Supply after Robert Kennedy retired from the family business.

24.     Prior to receiving a salary from Future Management, E. Kennedy was Kennedy Supply's President, and J. Kennedy, its Treasurer and Clerk and both received salaries from Kennedy Supply in the amount of $200,000.00 and $125,000.00 respectively.

25.     On or about July 20, 1998, E. Kennedy and J. Kennedy formed First Health, a sister corporation to Kennedy Supply, for the purpose of managing and handling various aspects of Kennedy Supply's business, including, but not limited to, administering Kennedy Supply's salaries.

26.     At all times material hereto, E. Kennedy has been the President of First Health and J. Kennedy, its Treasurer and Secretary.

27.     On or about June 2, 2000, Robert Kennedy sold the property located at 13 Kidder Road, Chelmsford, Massachusetts-- the principal place of business for both Kennedy Supply and First Health -- to E. Kennedy and J. Kennedy as co-Trustees of the 13 Kidder Road Realty Trust for Four Hundred and Fifty Thousand ($450,000.00) Dollars.

28.     Beginning on or about January 2000, E. Kennedy and J. Kennedy began receiving a salary from Future Management in the amount of $2,500.00 per week in addition to receiving stock dividends of approximately $130,000.00 per year.

29.     As a result, E. Kennedy and J. Kennedy stopped taking any salary from Kennedy Supply or First Health.

30.     In January 2004, J. Kennedy began to experience serious personal financial problems on account of his increased spending habits and changes in his lifestyle.

31.     Further exacerbating his financial problems, after separating from his wife Claudia Kennedy, J. Kennedy purchased a home in Chelmsford, Massachusetts for $625,000.00, and took frequent vacations with his girlfriend to various destinations in the Caribbean, and to Myrtle Beach, South Carolina.

32.     On January 22, 2004, pursuant to a Decree of Divorce in the Southern District in Hillsborough County, New Hampshire, Claudia Kennedy, was awarded the marital home in Nashua, New Hampshire, their mobile home in Albany, New Hampshire, and their real estate in Myrtle Beach, South Carolina. *A true and accurate copy of the Decree of Divorce dated January 22, 2004 in the matter of Kennedy v. Kennedy is attached hereto at Exhibit B.*

33.     The Decree of Divorce also Ordered that J. Kennedy pay $7,500.00 per month for child support payments for his two minor children, $5,000.00 per month in alimony payments, turn over all assets held in his 401(k) retirement account, plus pay an additional $15,000.00 per month for a period of seven years to Claudia Kennedy as payment for her share of the property division distributions in Future Management, Kidder Trust, First Health and Kennedy Supply. *See Exhibit B.*

34.     As part of its decree, the Court specifically stated that J. Kennedy was "not freely forthcoming with information regarding [his] assets" and failed to list several assets on his financial statements filed with the Court. *See Exhibit B.*

35.     Within hours after learning of the New Hampshire Court's Decree, J. Kennedy stated to E. Kennedy's wife, Tracy Kennedy, and her sister Peggy Arnett, that as a result of this decision from this Court, he was in desperate need of more money. *See Affidavit of Tracy Kennedy and Peggy Arnett attached hereto at Exhibits C and D, respectively.*

36.     Approximately two months later, E. Kennedy discovered that J. Kennedy had caused Kennedy Supply's bank accounts at Enterprise Bank to become overdrawn.

37.     Despite E. Kennedy's attempts to resume joint control over the operation and management of Kennedy Supply and First Health, J. Kennedy prohibited E. Kennedy from having any involvement in the business, notwithstanding E. Kennedy's 50% ownership interest.

38.     J. Kennedy and the two other shareholders of Future Management also conspired to freeze E. Kennedy out of Future Management and, as a result, assumed total control over Future Management, whose net profits had risen to over $3.7 million dollars.

39.     E. Kennedy later discovered documents at Kennedy Supply's office which revealed that J. Kennedy was using Kennedy Supply to enable Future Management to fraudulently borrow hundreds of thousands of dollars from various lending entities under the guise that Future Management was purchasing chiropractic equipment from Kennedy Supply.

40.     One such document included a Security Agreement between Future Management and a lending entity, Maruka U.S.A. Inc., in connection with the acquisition and financing of $71,537.20 in medical equipment, purchased from Kennedy Supply, for Future Management's

chiropractic office in New Bedford, Massachusetts. *A true and accurate copy of the letter and Security Agreement dated June 1, 2004 is attached hereto at Exhibit E.*

41.    Attached to the Security Agreement to Maruka U.S.A. Inc. included documents entitled "Certified Copy of Resolutions of Board of Directors" of Future Management Mass Business Trust and Future Management purportedly containing E. Kennedy's name and signature as Vice President of Future Management, authorizing and approving the loan from Maruka U.S.A. Inc. to Future Management. *See Exhibit E.*

42.    E. Kennedy never signed any of the documents with Maruka U.S.A. Inc. set out in Exhibit E.

43.    Attached to the Security Agreement was a personal Guarantee purportedly signed by E. Kennedy and witnessed by Kennedy Supply's office secretary, Maria King. *A copy of the personal Guarantee is attached hereto at Exhibit F.*

44.    E. Kennedy never signed the personal Guarantee set out in Exhibit F, either in the presence of Maria King, or otherwise.

45.    E. Kennedy also found several invoices from Kennedy Supply to Future Management offices which Future Management utilized to borrow over $765,479.70 from various other lending entities.

46.    These invoices reflected large equipment orders for chiropractic facilities owned by Future Management. However, several of these facilities were already fully equipped and one invoice stated that Kennedy Supply purportedly sold chiropractic equipment totaling $118,655.00 to Future Management for its clinic in Danbury, Connecticut -- a clinic that had been closed down for several months at the time of the issuance of that invoice. *True and accurate copies of the foregoing Invoices are attached hereto at Exhibit G.*

8

47.    E. Kennedy also discovered that J. Kennedy had been withdrawing funds from a line of credit at Enterprise Bank which was secured with a personal guarantee by E. Kennedy and J. Kennedy.

48.    On January 12, 2005, E. Kennedy, through counsel made formal demand to inspect the financial records of Kennedy Supply, Kidder Trust, and First Health.

49.    After reviewing the financial records, E. Kennedy discovered that substantial payments and disbursements totaling over Three Hundred Thousand ($300,000.00) dollars had been transferred by J. Kennedy from Kennedy Supply's accounts to himself, his personal attorneys, and to Future Management and its shareholders, including, but not limited to:

    a.    Payments to American Express, MBNA credit card and Discover credit card payments in excess of $5,000.00 per month;

    b.    Payments exceeding $37,000.00 to a Citizens Bank personal line of credit held in the name of James and Claudia Kennedy;

    c.    Check dated March 10, 2004 payable to Future Management in the amount of $3,743.20;

    d.    Check dated May 7, 2004 payable to Future Management in the amount of $1,700.00;

    e.    Check payable to the law firm of Manchel & Brennan, P.C. dated May 10, 2004 in the amount of $2,277.49;

    f.    Check payable to Fred Giampa dated June 10, 2004 for $8,000.00;

    g.    Check payable to Joe Giampa dated June 10, 2004 for $25,000.00;

    h.    Check payable to Fred Giampa dated July 13, 2004 for $4,500.00;

    i.    Check payable to James Kennedy dated August 31, 2004 for $50,000.00;

    j.    Check payable to Future Management dated September 21, 2004 for $113,000.00; and

    k.    Check payable to Future Management dated December 13, 2004 in the amount of $6,521.96.

*True and accurate copies of the foregoing documents are attached hereto at Exhibit H.*

50.    E. Kennedy has never authorized the retention of Manchel & Brennan, P.C. by Kennedy Supply and, through counsel, formally informed them that they were not to be paid from Kennedy Supply's funds.  *See attached letter from Stephen A. Greenbaum dated February 11, 2005 attached hereto at Exhibit I.*

51.    After discovering this information, E. Kennedy, through counsel, requested that Enterprise Bank refuse to accept any further checks or withdrawals from Kennedy Supply's accounts that did not possess dual signatures or authorizations from both E. Kennedy and J. Kennedy.  *See attached letter from Stephen A. Greenbaum to Mary Jane Nardone, Vice President Commercial Lending, Enterprise Bank dated February 7, 2005 attached hereto at Exhibit J.*

52.    On February 10, 2005, Enterprise Bank informed E. Kennedy that it would not accept his request without the consent of J. Kennedy, or in the alternative, a court order.  *See attached letter from Mary Jane Nardone dated February 10, 2005 attached hereto at Exhibit K.*

53.    At that time, E. Kennedy asked Ms. Nardone at Enterprise Bank about the status of the Kennedy Supply line of credit personally guaranteed by J. Kennedy and E. Kennedy.

54.    Ms. Nardone stated that the line of credit maintained a "zero" balance.

55.    When E. Kennedy instructed Ms. Nardone to take his name off of the account, Ms. Nardone assured E. Kennedy that she would, but in any event, due to the dispute that had arisen between the E. Kennedy and J. Kennedy, that Enterprise Bank would no longer lend any money to Kennedy Supply.

56.    E. Kennedy questioned J. Kennedy on several occasions about his continued use of Kennedy Supply's funds to pay for his increasing personal debts.

57.    While J. Kennedy admitted taking money from Kennedy Supply, he refused to reimburse any monies inappropriately withdrawn for his personal use back to Kennedy Supply or E. Kennedy.

58.    J. Kennedy further admitted to E. Kennedy in September 2004 that he had transferred money from Kennedy Supply to Future Management to pay for Future Management's payment for referrals to its chiropractic clinics across Massachusetts.

59.    Specifically, in a telephone conversation, J. Kennedy admitted to E. Kennedy that he had used money from Kennedy Supply and given it to Future Management and the Giampa brothers to pay for "runners", i.e. individuals paid to refer clients to Future Management's chiropractic offices.

60.    At the time J. Kennedy made this admission, he was aware that there was a law which was going to be passed by the Massachusetts legislature making the use of "runners" a criminal act.   The legislature subsequently passed Mass. Gen. Laws ch. 266 § 111C which imposed criminal sanctions for this practice.   *See copy of foregoing statute passed by Massachusetts legislature effective January 3, 2005  attached hereto at Exhibit L.*

61.    No longer able to jointly run and operate the business, E. Kennedy and K. Kennedy began negotiations for J. Kennedy to purchase E. Kennedy's 50% shares in Kennedy Supply, First Health, and his interest in Kidder Trust.

62.    After attempts to agree on a price for E. Kennedy's shares failed, the parties discussed selling Kennedy Supply, First Health and the building at 13 Kidder Road to outside third parties.   *See attached letter from J. Kennedy's counsel to E. Kennedy's counsel dated March 31, 2005 attached hereto at Exhibit M.*

63.     The parties continued the foregoing negotiations until April 14, 2005 when E. Kennedy discovered that J. Kennedy was continuing to deplete Kennedy Supply's assets by withdrawing $2,000.00 per week beginning in January 2005 for his personal use, and withdrawing $12,000.00 from Kennedy Supply's line of credit at Enterprise Bank – the same line of credit personally guaranteed by E. Kennedy.

64.     From or about January 1, 2004, J. Kennedy withdrew an additional $2,000.00 a month from Kennedy Supply's accounts to pay for a personal line of credit taken out jointly in his name and his ex-wife's name, held at Citizens Bank. *See attached general ledger at Exhibit N.*

65.     After an Order from the New Hampshire Probate Court that he pay off the outstanding line of credit, J. Kennedy issued a check from Kennedy Supply's checking account in the amount of $18,039.89. *See copy of check payable to Citizens Bank attached hereto at Exhibit O.*

66.     Furthermore, the $2,000.00 disbursement each month from Kennedy Supply for J. Kennedy's line of credit that was originally reflected on his tax returns as a payment of dividends, was subsequently omitted from Kennedy Supply's financial records prepared by its accountant, William Chapman. *See attached revised ledger from Kennedy Supply's accountant, William Chapman, attached hereto at Exhibit P.*

67.     In addition to the foregoing, following their father's death in April 2004, E. Kennedy is informed, believes, and hereby avers that J. Kennedy converted the proceeds from their father's life insurance policy held in the Kidder Trust and used those funds for his personal use.

68.     On March 31, 2005, the New Hampshire Probate Court found J. Kennedy in contempt for failing to pay Claudia Kennedy her portion of the property distribution in accordance with the Court's Order. *A true and accurate copy of the Court's Order is attached hereto at Exhibit Q.*

69.     As a result, the Court ordered that J. Kennedy pay Claudia Kennedy $68,214.00 in payment arrearages through November 2004 within 10 days of the date of the Order. *See Exhibit Q.*

70.     On April 15, 2005, Claudia Kennedy filed a Motion to Show Cause for J. Kennedy's failure to tender payment in accordance with the Court's second Order. *A true and accurate copy of the foregoing Motion is attached hereto at Exhibit R.*

71.     E. Kennedy is informed, believes, and hereby avers that J. Kennedy has failed to pay Claudia Kennedy $15,000.00 per month since November 2004 and is in default of the Court Order.

72.     J. Kennedy's conduct as aforesaid is wrongful and in direct violation of his obligations to Kennedy Supply, First Health, Kidder Trust, and to E. Kennedy.

73.     E. Kennedy, individually, and on behalf of Kennedy Supply, First Health and Kidder Trust, ("the Plaintiffs") are in need of immediate injunctive relief against J. Kennedy and Enterprise Bank in order to preserve the status quo and prevent the further dissipation the business' assets.

74.     In the absence of injunctive relief, the Plaintiffs' assets will be subject to continued waste and loss.

75.    E. Kennedy is informed, believes and hereby avers that his brother is financially unable to purchase his interests in Kennedy Supply and First Health, and all attempts to negotiate a sale of the business and the property at 13 Kidder Road to third parties have failed.

76.    Accordingly, following the imposition of a restraining order to preserve the status quo, the Plaintiffs hereby petition the Court for an accounting of all funds J. Kennedy misappropriated and converted from Kennedy Supply, First Health, and the Kidder Trust.

77.    The Plaintiffs are in further need of judicial intervention to either supervise the sale of the foregoing entities, or in the alternative, dissolve Kennedy supply and First Health.

## COUNT I – BREACH OF CONTRACT

78.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 77 above as if fully set forth herein.

79.  Based upon his conduct as set forth above, J. Kennedy is in breach of his contractual obligations to the Plaintiff and to Kennedy Supply, First Health, and Kidder Trust.

80.  The aforesaid breach of contract was knowing and willful.

81.  The Plaintiffs have suffered damages as a result of the same.

## COUNT II – BREACH OF FIDUCIARY DUTY

82.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 81 above as if fully set forth herein.

83.  Based upon his conduct as set forth above, J. Kennedy, as a partner, director, and shareholder in a close corporation is in breach of his fiduciary duty owed to the Plaintiffs.

84.  The aforesaid breach of fiduciary duty was knowing and willful.

85.  The Plaintiffs have suffered damages as a result of the same.

14

## COUNT III – BREACH OF DUTY OF GOOD FAITH AND LOYALTY

86.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 85 above as if fully set forth herein.

87.  Based upon his conduct as set forth above, J. Kennedy as a partner, director, and shareholder in a close corporation, is in breach of his duty of utmost good faith and loyalty owed to the Plaintiffs.

88.  The aforesaid breach of duty was knowing and willful.

89.  The Plaintiffs have suffered damages as a result of the same.

## COUNT IV – CONVERSION

90.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 89 above as if fully set forth herein.

91.  Based upon his conduct as set forth above, J. Kennedy has directly and indirectly converted funds and assets of Kennedy Supply, First Health, and the Kidder Trust, a portion of which properly belong to the Plaintiffs.

92.    The aforesaid conversion was knowing and willful.

93.    The Plaintiffs have suffered damages as a result of the same.

## COUNT V – FRAUD

94.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 93 above as if fully set forth herein.

95.  Based upon his conduct as set forth above, J. Kennedy has defrauded the Plaintiff individually, and also Kennedy Supply, First Health and the Kidder Trust in having misappropriated and looted substantial sums of money from the foregoing entities.

15

96. The aforesaid fraudulent conduct was knowing and willful.

97. The Plaintiffs have suffered damages as a result of the same.

## COUNT VI – VIOLATION OF THE COVENANT OF
## GOOD FAITH AND FAIR DEALING

98. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 97 above as if fully set forth herein.

99. Based upon his conduct as aforesaid, J. Kennedy has violated the covenant of good faith and fair dealing implied in every contract.

100. The aforesaid violation was knowing and willful.

101. The Plaintiffs have suffered damages as a result of the same.

## COUNT VII – NEGLIGENCE

102. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 101 above as if fully set forth herein.

103. Based upon his conduct as set forth above, J. Kennedy failed to exercise due care in the management and operation of Kennedy Supply, First Health, and the Kidder Trust and is thus guilty of negligence.

104. The Plaintiffs have suffered damages as a result of the same.

## COUNT VIII – UNJUST ENRICHMENT (ALL DEFENDANTS)

105. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 104 above as if fully set forth herein.

106.  J. Kennedy will be unjustly enriched if he is allowed to retain the funds that he either directly or indirectly misappropriated from Kennedy Supply, First Health, and/or the Kidder Trust.

107.  The Plaintiffs are entitled to an order from the Court that J. Kennedy disgorge all such amounts and deposit the same with the Court for appropriate distribution to the Plaintiffs.

## COUNT IX – CONSTRUCTIVE TRUST

108.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 107 above as if fully set forth herein.

109.  As set forth above, J. Kennedy misappropriated monies from Kennedy Supply, First Health, and the Kidder Trust for himself, and for the benefit of others, to which they were not entitled.

110.  The Plaintiffs are entitled to have the Court impose a constructive trust upon these monies, including any assets acquired with the same, for the benefit of the Plaintiffs.

## COUNT X – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

111.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 110 above as if fully set forth herein.

112.  J. Kennedy is a fiduciary to the Plaintiffs.

113.  J. Kennedy breached his fiduciary duties to the Plaintiff by his actions and omissions.

114.  J. Kennedy's breach has caused, and continues to cause the Plaintiff extreme emotional distress.

115.   The Plaintiff has suffered both physical and economic damages as a result of the defendants' actions and omissions as aforesaid.

## COUNT XI – ACCOUNTING

116.   The Plaintiffs hereby repeat and re-allege paragraphs 1 through 115 above as if fully set forth herein.

117.   The Plaintiffs are entitled to and hereby demand an accounting from J. Kennedy as to a) the operation of Kennedy Supply, First Health, and the Kidder Trust; b) all monies received directly and indirectly by J. Kennedy and any and all third parties from the operation of the businesses; c) all monies either loaned or borrowed by J. Kennedy or E. Kennedy on behalf of Kennedy Supply, First Health and the Kidder Trust after J. Kennedy assumed total control over the business; and d) copies of all Invoices to Future Management from February 2004 to the present.

## COUNT XII - DERIVATIVE RELIEF PURSUANT TO
## MASS. R. CIV. P. 23.1

118.   The Plaintiffs repeat and re-allege paragraphs 1 through 117, as if fully set forth herein.

119.   E. Kennedy is the President and 50% shareholder in Kennedy Supply and First Health.

120.   J. Kennedy currently possesses the remaining 50% interest and is the Treasurer and Clerk in the foregoing corporations.

121.    It would be futile for the Plaintiff to make a demand upon J. Kennedy to bring an action on behalf of the corporation, as the director, officer and other remaining shareholder is not disinterested, nor a majority shareholder, and is himself the wrongdoer.

122.    Based upon his conduct as set forth above, J. Kennedy has harmed the foregoing corporations.

123.    Kennedy Supply and First Health have suffered damages as a result of the same.

## COUNT XIII – DISSOLUTION

124.    The Plaintiffs hereby repeat and re-alleges paragraphs 1 through 123 above as if fully set forth herein.

125.    As a matter of law and contract, E. Kennedy is entitled to the dissolution of Kennedy Supply and First Health and distribution of one half of the net assets of the said corporations.

## COUNT XIV – INJUNCTIVE RELIEF AGAINST
## J. KENNEDY AND ENTERPRISE BANK

126.    The Plaintiffs hereby repeat and re-allege paragraphs 1 through 125 above as if fully set forth herein.

127.    The Plaintiffs are entitled to the issuance of an Injunction restraining and enjoining J. Kennedy, as well as his accountants, agents and attorneys, from:

a)    withdrawing, paying, wasting, or spending any monies of Kennedy Supply, First Health, and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining the written authorization of E. Kennedy;  and

b)      in any way dissipating, pledging or encumbering the assets of Kennedy Supply, First Health and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining written authorization by E. Kennedy;

c)      interfering with or prohibiting Edward Kennedy from having direct involvement in any aspect of Kennedy Supply, First Health, or the Kidder Trust including, but not limited to, their operation, management, any and all bank accounts, and decisions regarding any and all disbursements made from the foregoing entities' accounts; and

d)      using any income or assets of Kennedy Supply, First Health, or the Kidder Trust to pay the costs and expenses associated with this litigation.

128.    The Plaintiffs further request that the Court enter an order requiring Enterprise Bank to take any action necessary to prohibit J. Kennedy from:

a)      withdrawing, paying, wasting, transferring or spending any monies of Kennedy Supply, First Health, and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining the written authorization of E. Kennedy;  and

b)      in any way dissipating, pledging or encumbering the assets of Kennedy Supply, First Health and Kidder Trust, or take any action which would affect E. Kennedy' interests individually, for any reason whatsoever during the pendency of this action without first obtaining written authorization by E. Kennedy.

WHEREFORE, the Plaintiffs respectfully request that this Court grant the following relief:

1.      Issue a short order of notice with respect to prayer 2 below;

2.     After notice, issue a preliminary injunction restraining and enjoining 1) J. Kennedy, and 2) Enterprise Bank from permitting J. Kennedy, from conveying, transferring, wasting, pledging, encumbering and/or dissipating or interfering with any of the assets of Kennedy Supply, First Health and Kidder Trust, of every kind and description without prior written authorization from the Plaintiff, including, but not limited to, payment of his attorneys' fees and costs;

3.     Pursuant to Count I, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

4.     Pursuant to Count II, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

5.     Pursuant to Count III, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

6.     Pursuant to Count IV, award such damages as may be proven at trial and order the return of all assets which the Court finds to be wrongfully converted, and award reasonable attorney's fees, costs and interest;

7.     Pursuant to Count V, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

8.     Pursuant to Count VI, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

9.     Pursuant to Count VII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

10.     Pursuant to Count VIII, award such damages which may be proven at trial, including restitution of any profits J. Kennedy made on a corporate opportunity, repayment of

excess compensation to the entities, together with reasonable attorney's fees, costs and interests to the Plaintiffs.

11.    Pursuant to Count IX, award such damages as may be proven at trial and make a finding that the defendants are constructive trustees for the benefit of the Plaintiffs with respect to all assets wrongfully received by them, and award reasonable attorney's fees, costs and interest;

12.    Pursuant to Count X, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

13.    Pursuant to Count XI, order an accounting from the defendants as to a) the operation of Kennedy Supply, First Health, and the Kidder Trust; b) all monies received directly and indirectly by J. Kennedy and any and all third parties from the operation of the businesses; c) all monies either loaned or borrowed by J. Kennedy or E. Kennedy on behalf of Kennedy Supply, First Health and the Kidder Trust after J. Kennedy assumed total control over the business; and d) copies of all Invoices to Future Management from February 2004 to the present.

14.    Pursuant to Count XII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

15.    Pursuant to Count XIII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;  and

16.    Such other and further monetary, injunctive and declaratory relief as this Court deems just and proper.

THE PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE

Respectfully submitted,
EDWARD D. KENNEDY,
By his attorneys,

Stephen A. Greenbaum, Esquire
BBO No. 209360
Natalie R. Sika, Esquire
BBO No. 648408
GREENBAUM, NAGEL,
FISHER & HAMELBURG
200 High Street, 4th Floor
Boston, MA  02110
(617) 423-4300

Dated:  April __, 2005

VERIFICATION

I, Edward D. Kennedy, hereby state that I have personal knowledge with regard to the factual allegations contained in the within Verified Complaint and that the same are known by me to be true and accurate, with the exception of those statements expressly made upon information and belief, which statements I believe in good faith to be true and accurate. Additionally, I am personally familiar with the documents annexed to the Verified Complaint and know the same to be true copies of the originals of those documents.

Signed under the pains and penalties of perjury this 29 day of April, 2005

Edward D. Kennedy

23

# COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, ss.**                    **SUPERIOR COURT DEPARTMENT**
**CIVIL D**
**MICV 2005-00397**

**EDWARD D. KENNEDY**
**v.**
**FUTURE MANAGEMENT**

## AFFIDAVIT OF DR. MICHAEL AMATO

I, Michael Amato, being dully sworn, depose and say as follows:

1.  I have been employed by Future Management Corp. ("FMC") since April 1998. I began as a chiropractor developing a new practice in Quincy, MA. I have worked my way up to Team Leader/Regional Manager and currently oversee eleven offices.

2.  I was first contacted by Dr. Joseph Giampa regarding employment and later interviewed with him to join FMC. I was impressed with his presentation, professionalism and the overall opportunity presented to me and subsequently was hired by Dr. Joseph Giampa.

3.  I dealt exclusively with Dr. Joseph Giampa (Joe) for instruction in practice development, clinical documentation and excellence.

4.  I became aware of Edward Kennedy (Ed) several months after my hire. My contact initially with Ed was minimal and related primarily to office equipment, repairs, supplies and other non-patient or clinical concerns.

5.  I would see Joe routinely 2-3 times per month, sometimes more as required. As time went on, Ed would occasionally join these meetings.

6.  There were times when Ed would visit the office by himself. I began to notice that over time Ed's demeanor and overall behavior began to change. He became more aggressive, demanding, and unprofessional and would often end up yelling and screaming at me.

1

7.   Almost from day one, Ed was upset, expressing his displeasure in vulgar and angry ways if I were to use a sick day; I very rarely missed work due to illness. In addition, infrequent opportunities to vacation home to see my family were always met with Ed's unfounded annoyance and on occasion his borderline fury. Anytime I would take vacation, Ed would give me a hard time, always making sure to make my life miserable just before my vacation. The torment continued when upon returning from vacation, Ed would not speak to me. Each year I would give the required 10-12 months notice of requested vacation time, yet he still made things difficult for me. Each year at Christmas, I would go back to New Jersey to be with family and each year without fail there would always be a fight with Ed. The tirades of abuse, loud and demeaning behavior would continue and last for weeks.

8.   I had been in private practice for myself in New Jersey for six years. During that time, I had never had anyone speak to me the way Ed did with vulgarity and disrespect, nor would I have tolerated it.

9.   Despite his serious personality problems, I worked through the difficulties with Ed mainly because I enjoyed being a chiropractor, and I enjoyed my co-workers and the other owners at FMC.

10.  As a Team Leader, Ed would undermine my authority and my roll at FMC to other clinicians in my group. Despite not being a clinician, he was anxious to override my decisions, give clinical advice and direction, and instruct others what to do in clinical matters.

11.  Although Ed's unprofessional behavior (i.e. loud, moody, swearing) was most often directed at me, I was witness to this behavior directed at other clinical staff, co-workers at FMC, and referring attorney's, as well as individuals not under the employ of FMC.

12.  Dr. Joseph Giampa became sick with an abdominal disorder late in 2002 subsequently undergoing surgery in January 2003. Joe ended up being out for two months but maintained phone contact on a regular basis. I began dealing with Dr. Fred Giampa but Ed discouraged that relationship and told me to deal directly with him.

13.  Ed reacted to Joe's illness and sick leave the same way he dealt with mine (angry, upset, demeaning etc.).

14.  Over the ensuing year, 2003, production was not as strong as the previous year and we (FMC) were having problems in billings and collections. There were problems with insurance liens and insurance collections. I recall that since 1998 each year collections would be slower during the first quarter. I can remember that Ed would become increasingly agitated during these times.

15. I recall telling Ed and Joe that stronger billing and collection procedures and personnel were needed. Ed would state that Tracy (Kennedy) was "on top of it".

16. Throughout 2003, I continued to see signs of difficulty at FMC because of Ed's actions. He was not working well with other employees and owners. He had very little respect for anyone of varying opinions or different views than his including his wife Tracy and he became increasingly belligerent and abusive as time went on.

17. I recall speaking with Brian Culliney, (Brian) another Team Leader and asking, "what could be done?" We talked and he stated that perhaps a business counselor would be able to fix the ongoing problems with Ed and FMC.

18. Brian told me on several occasions that he had discussed the idea of a business counselor with Ed and that Ed refused to seek out help and in fact, he became outraged at the idea.

19. During the middle of September 2003, Joe required another surgery and was out for two weeks. Again, Ed was upset. During this time, Ed had a fight with the Lancelloti family, threatening them about matters in Rhode Island and coming between family members. He told them I would take over the state of Rhode Island. Joe asked me to call Dr. Bill Lancelloti and reassure him that things would be okay.

20. Approximately the last week of November and the first week of December, Ed again became very upset and outraged over my vacation. Joe telephoned me and asked how much vacation time I had taken; I informed him I had taken one week to date. He stated Ed told him I had taken 5-6 weeks. I told him that was untrue. Joe said he would confirm this with Tracy.

21. Joe told me that he had contacted Tracy while Brian Culliney was present and asked about our vacation time. Tracy indicated that both Brian and I had only used one week but Ed insisted we used 5-6 weeks. Not only was this false, it would have been impossible as we were only eligible for three weeks. As a result of this misunderstanding, I faxed Ed and Joe the exact amount of sick days and vacation time I had used up. Ed became angrier with me and stopped talking to Joe. Ed would no longer attend meetings or visit offices with Joe and made certain that both of us were given limited information.

22. Each January Joe and Ed would visit all the regional offices for Team Meetings and goal setting. Ed was still not speaking to Joe and went out of his way to make certain Joe was not aware of the meetings. When Joe found out about the meeting Ed would cancel them.

3

23.  At one point, he accused me of telling Joe about a meeting and threatened to fire me. When a meeting eventually took place, he told me to drive around in my car alone toward Boston and he would call me by cell phone as to where the meeting would occur. He was determined Joe did not find out about meeting times or places.

24.  At the 2004 January, meeting Ed reprimanded me about my vacation again in front of Brian Culliney and Louis Pacheco. He gave me unrealistic production goals for my group and asked me to fill out and complete office notes for another practice not in my group. I adamantly refused and he exploded and became outraged and violent. He began shaking his finger in my face, spitting out of his mouth and yelling profanities at me.

25.  I got up, left the room, and proceeded to my car. I telephoned Joe to inform him I was resigning my position at FMC because of Ed. Joe asked me not to do so and stated that he and Fred wanted to meet with me to discuss the matter.

26.  Later that day I met with Joe and Fred and they told me to stay on, that things would somehow get better. They said I was a valued employee and Team Leader, that I had a good work ethic and I had growth potential with FMC. I trusted and respected both Joe and Fred as they had always dealt with me in a professional manner and had always kept their word.

27.  As the months went by Ed became more upset. His behavior worsened and he continued to yell, scream and spin out of control. I spoke to Brian frequently about this and he was still hoping that a counselor could help but Ed continued to refuse this option.

28.  I had made up my mind that despite my friendship and loyalty to Joe and Fred that if Ed Kennedy was to continue as FMC president, I would have to resign. I could no longer tolerate the way he was treating me or the negative effect he was having on the rest of FMC. I was looking forward to a secure future with FMC, but due to Ed's reign of turmoil and hate, it now seemed impossible.

29.  As of March 22, 2004, when Ed and Tracy Kennedy were removed from FMC. Since that time I have witnessed a noticeable improvement in company moral, creating a professional attitude, which generates mutual respect between all FMC employees and owners. There is no comparison; it is like night and day.

30.  I feel like we have made so many positive steps to correct the many problems that existed before March 22, 2004.

4

In particular, in the hiring of a qualified experienced Office Manager and Billing Supervisor as well as establishing protocols for billing and collections, which did not exist previously to a great degree.

31.  The business is now run fairly, each Team Leader has a voice and makes decisions as to how his group is run and we are encouraged to collaborate with one another. FMC has closed many unproductive offices, reduced overhead and put a system in place that rewards verifiable production. This has created more stability and opportunity.

32.  It has taken a little time to clean up the mess of the past administration, but I believe we are all happier and therefore, more productive. The "Future" is much brighter now for my family and I, and the whole FMC family. When Ed and Tracy Kennedy were removed for corporate improprieties, there was some uncertainty as to what the future would bring. The new administration of Joe Giampa, Fred Giampa and Jim Kennedy have done a tremendous job and moved the corporation in a very positive direction with good business principles.

33.  Liz Nelson was my billing specialist in Quincy for several years. There were many times when she was not reliable and responsible in getting billing done on a timely basis. It was well known that she was a very good friend of Tracy Kennedy. I tried repeatedly to work with her to increase collections for several months. She had asked me to speak to Dr. Fred Giampa regarding her working out of a location closer to her home, assuring me that this move would allow her to focus on job duties, increasing production. He agreed. She left the company a few weeks later leaving a complete mess of billing for my office. She did not do her work and left things in a complete shambles.

34.  I am excited about the opportunities that lay ahead for FMC. It is a joy to come to work knowing that there is no strife or conflict. If Ed had stayed on or was to come back, FMC would be in serious trouble as before and I along with many others would resign.

35.  Finally, I am not aware of any slanderous statements regarding Ed or Tracy Kennedy by Jim Kennedy, Joe Giampa or Fred Giampa.

Signed under pains and penalties of perjury this _14_ day of February 2005.

Michael Amato, DC

5

### COMMONWEALTH OF MASSACHUSETTS

**LOWELL, ss**                                          **SUPERIOR COURT DEPARTMENT**
**CIVIL D**
**MICV2005-00397**

**EDWARD D. KENNEDY**
**Plaintiff**
v.
**FUTURE MANAGEMENT**
et al.
                    Defendants

### AFFIDAVIT OF KATHRYN A. DUNCAN

    I, Kathryn A. Duncan, have been actively working in the medical billing industry for over 15 years. I was the billing administrator for a busy 2 doctor oncology practice in Dearborn Michigan for 5 years prior to moving to Massachusetts. Before being employed by Future Management, I was employed by Medical Healthcare Solutions of Andover, Massachusetts.

    I started at Medical Healthcare Solutions as a billing specialist in January 1995. I began managing a large group practice of 15 offices in 1997. I was promoted to General Manager of the company in December 1998. I managed a staff of over 100 people. By 2003 our monthly receipts were over 5 million dollars a month.

    My responsibilities ranged from staff issues within the company to working closely with our clients. I met with potential clients and maintained close working relationships with all of our existing clients.

    I set and maintained billing standards for all our staff regarding data entry, collections and payment posting. MHS does a formal close of each account every month, and it was my duty to oversee the closings and review all of the reports for our clients.

    I joined Future Management as an assistant to Miriam Rojas under the initial framework of the previous administration in June of 2004. I was appointed Billing Manager July 12, 2004 after Miriam submitted her resignation.

    Since joining the company, it was my understanding that a new administration had begun March 22, 2004. In my role as Billing Manager, I have attempted to implement billing guidelines and policies to improve the procedures and increase collections.



I, Kathryn A. Duncan, do hereby swear and depose:

Upon my hire at Future Management, I became acutely aware of some glaring problems within the billing process. I have worked closely with Dr. Fred Giampa, Jim Kennedy and Dr. Joseph Giampa to find solutions to these problems.

1. The software, Eclipse that was in place from the previous administration of Tracy Kennedy and Miriam Rojas is grossly inadequate to maintain a practice of this size. The software is not capable to run a simple aging report. The statistic reports do not report accurately. I do not know how anyone was able to determine how the practice was doing. There was no record of adjustments or write offs. The staff was submitting written lists of write offs, but it didn't appear all the staff was keeping track and nor was it accurate. **Since becoming Manager, adjustments and write offs are now reported with weekly stats for each office along with payments and charges. Dr Fred Giampa and I are actively searching for a new software product. One that will equip our staff to work the accounts and also report effectively in order to manage the practice as a whole.**

2. Fees – The procedure table was inappropriately set up with multiple fees depending on the insurance carrier. I was told this was done to avoid adjustments. Insurances were billed according to what they paid. The procedure table had the same CPT with multiple codes with different fees for each insurance. This is not only inappropriate but also non-compliant with insurance carriers. A practice should not base fees on what will pay, nor should it ever bill different fees to different payors. **I reviewed all the fees with Dr.Fred Giampa, Jim Kennedy and Dr Joseph Giampa and we determined an appropriate fee schedule for all services for each division. This has been implemented for the Chiropractic, Orthopedic and Physical Therapy divisions.**

3. Procedure Codes – The previous administration had set up the procedure table with number and letter codes for CPT codes and the clinics were instructed to use those codes in place of CPT codes. This led to discrepancies throughout the clinics as to what each code actually meant. Furthermore it resulted in accurate coding and ultimately loss of payment, ie(Some clinics were recording a level of an E&M code for discharge and exams in their notes but a different level was being billed because of not knowing exactly what the codes meant). With so many clinics in so many locations it is very difficult to keep everyone up on changes made to coding. It is always most compliant and efficient to use CPT codes and not exchange them for codes made up by the office. **Under the current administration, all divisions are now using CPT codes to code their services, to avoid discrepancies in billing. We base our correct coding on the current CPT book published by the AMA.**

2

4. Under the previous administration, many practitioners did not have appropriate provider numbers to be reimbursed by the insurance carriers, Medicare, BCBS etc. I was given a copy of a memo dated 4/22/2002 from a meeting with Miriam Rojas, that stated if a practitioner did not have a provider number for the patient's insurance, the charge was not to be entered. I did not see any effort to promote the practitioners obtaining proper credentialing. This creates an area of huge losses for the company. Many insurance companies require the provider contract with them directly or their services will not be paid. It is also an issue when auto cases reach the 2K exhaust and the doctor is not a provider for the health insurance, again we suffer a loss for all the services after the 2K exhaust date.
**Under recommendation of the new administration, I have mailed out to each doctor in Massachusetts, a credentialing packet to equip him or her with the appropriate forms and or instructions on how to be credentialed with the main insurances in Massachusetts. I will also do the same for our providers who are out of Massachusetts.**

5. Another area of compromise was in the orthopedic clinics. The billing staff was instructed definitively by Ed Kennedy to bill all initial visits with CPT code 99205 and all subsequent visits with 99214. The doctors and PA's on site used these codes. After issues with Medicare of Mass, the policy changed and for Medicare only they were to bill all services with 99213 instead of 99214. When I questioned the PA's about their coding, they told me there were told to bill with the higher levels of service or they would be fired! This is completely non-compliant with any insurance for coding. All coding must have appropriate documentation to support the level of service billed. Medicare implemented a pre-payment review on all of Dr. Awbrey's services. Given the way they were billing, I wasn't surprised to see it. A pre-payment review requires documentation be submitted with all services so Medicare can review each claim for appropriate coding. Medicare and Workers Comp were down coding numerous services for AHCG after review of the reports. **Currently, I have given clear documentation to each provider in AHCG regarding E&M coding and am personally reviewing reports before sending the claims out to Medicare. Inappropriate coding when not corrected can set a practice up for audits and potential recoupment of payments, and fines. The previous administration did nothing to avoid such audits.**

6. Prior to the current administration, emphasis appeared to be on rebilling and sending letters rather than direct collection calls on outstanding balances. If claims are not paid, there is usually a reason. A small percentage of unpaid claims are due to the insurances not receiving the claim. By far the majority of unpaid claims are pended or denied for a specific reason. Rebilling a claim or sending a letter requesting status accomplishes nothing in getting the claim resolved for payment. **Dr Fred Giampa has instituted a requirement of collection calls by each collector to reach each day. They are also required to maintain a call log to**

report the calls made each day. **I support this policy 100 percent, as collection calls are the most efficient and cost effective way to follow up on unpaid claims. A lack of doing so results in a large accounts receivable of unpaid claims.**

7. I have found an alarming number of claims with no follow up done. I found no consistent means to do routine follow up on outstanding claims. Some staff ran lists of open services, while others did not. I could not understand this , there appeared to be no continuity of how the accounts receivable was being worked. Essentially, in the previous administration, there appeared to be no real "billing and collection" department, but only billing. This would appear to account for the tremendous losses with regards to the aged accounts receivable. Many unpaid claims are now to old to be collected. **Currently, I emphasize the need to run reports to insure consistent follow up. I have instructed staff on how to methodically work the older accounts in order to eventually work all open claims. Because of the reporting limitations of the software I have had to rely on patient lists to equip our collection staff. I have not been able to determine what our actual accounts receivable is, as the software cannot produce such a report.**

8. There was no means to balance or reconcile payments posted in Eclipse software and the deposits made to the bank. I was very uncomfortable with having no way to insure what was being posted was actually being deposited. Apparently this was never a concern of the previous administration. **Currently, I have coordinated with Daisy Foster in the business office to work at reconciling our numbers. I now have the staff report their weekly posting to match the deposit week, Wednesday through Tuesday. Once I have all the stats reported to me, I can total by practice and compare to what Daisy has for deposits. If we find a large discrepancy, we can narrow it down to the specific office and determine what the discrepancy is due to. This allows us to balance and also sets up a means of checks and balances for our staff to insure careful and accurate posting.**

9. Under the prior administration the staff were required to perform all billing activities, including, data entry, research and document gathering as well as bi-weekly billing, correspondence and payment posting, with an obvious absence of collection phone calls. This system is grossly flawed and results in potentially millions of dollars in losses from uncollected claims. Quite simply, each staff member could not perform all the duties asked of them in a forty hour work week. Currently, Dr. Fred Giampa and I have implemented a fast track and slow track system. The slow track handles data entry, information gathering, document

gathering and billing. The fast track is responsible for payment posting, addressing all denials and aggressive phone calls along with phone logs. This 2 track system has resulted in better production by our staff as their tasks are more clearly defined. We have a much more thorough review of unpaid claims as the fast track is more focused on collection calls. Essentially, we are now actually working the entire accounts receivable.

10. Unnecessary and expensive office supplies had been the standard. **I make an effort to use cost effective materials that also equip our staff with appropriate supplies.**

SIGNED UNDER PAINS AND PENALTY OF PERJURY,

Kathryn A. Duncan                    Date   2-9-05

# KATHYRN DUNCAN
803 Wellman Avenue
North Chelmsford, MA 01863
(978) 251-2214   Cell (978) 764-8814

**Software Tools:**

Microsoft Excel, Microsoft Word, Medisence, Medical Automation, Ntierprise,
Medical Billing Assistant, Provider, Infinity

**Employment History:**

*Medical Healthcare Solutions*                                    *January 1995 to March 2004*
General Manager
- Charge Entry – CPT and ICD9.  Train staff to correctly assign ICD9 with CPT and modifiers.
- Address denials and appeals for all third party payors.  Insure proper training for staff.
- Management of personnel, staff of 85 – 100.
- Direct staff on accounts receivable management.  Meet regularly to assess areas of need.
  Assure standards of aged accounts are being met.  Set goals and train in areas necessary to
  maintain standards.
- Attend meetings with potential clients.
- Arrange meetings with existing clients to review their account.  Give assistance to clients to
  maximize their efficiency as well as maintain compliance.

*Joseph C. Won, MD, PC Hematology Oncology*                        *1990 to 1994*
Front Office Manager/Billing Manager
- Maintain electronic appointment schedule.  Office and Chemotherapy schedules.  Schedule
  and obtain pre-authorization for hospital admissions and procedures and tests needed for
  patients.  Front desk receptionist.
- Charge entry for Internal Medicine and Oncology practice, CPT and ICD9.  Chemotherapy
  billing.  Billing for non-coded drugs used for cancer treatment.
- Payment posting, manual and electronically.
- Follow up on all denials and insurance correspondence.  Maintain the accounts receivable.

*Concentrated on my husband's pastoral ministry and family*         *1982 to 1989*

*Dispatcher for County Sheriff and City police Department*          *1981 to 1982*

**Personal Information:**
- High School Graduate 1976
- Enlisted United States Air Force 1977
- Awarded Commendation Medal 1979
- Honorable discharge 1981

References Available

**1982 through 1989 Concentrated on my husband's pastoral ministry and family.**
- As a minister's wife I have gained much experience in relational, communication and management skills.

**1981 to 1982 Dispatcher for County Sheriff and City police Department.**
- Radio dispatcher.
- Answer all incoming calls.
- Verify DMV information with NCIC.
- Dispatch additional emergency agencies when needed.

**Software Tools:**
Microsoft Excel
Microsoft Word

Practice management software:

| | |
|---|---|
| Medisence | Medical Automation |
| NTierprise | Medical Billing Assistant |
| Provider | Infinity |

**References:**

Charlene Levy, VP
Medical Healthcare Solutions
100 Brickstone Square
Andover, MA 01810
(978) 474-8885 x 160

Ginny Fiander, Senior Manager
Medical Healthcare Solutions
100 Brickstone Square
Andover, MA 01810
(978) 474-8885 x 163

Rev Robert Crosby
Mount Hope Assembly of God
3 McGinnis Drive
Burlington, MA  01803
(781) 272-1014 x 110

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.                                      SUPERIOR COURT DEPARTMENT
                                                   C.A. NO.  MICV 2005-00397

EDWARD KENNEDY                    )
                                  )
                     Plaintiff    )
VS.                               )
                                  )
FUTURE  MANAGEMENT CORP.)
et al.                            )
                     Defendants   )
_____)

## AFFIDAVIT OF JOSEPH D. GIAMPA

I, Joseph D. Giampa, hereby swear and depose:

1.      I am a Defendant in the above-captioned action.  I am presently the President of

Future Management Corp. ("FMC" or "Corporation"), and was the President when FMC was

originally incorporated on February 23, 1996 (see Exhibit "1").  I am also a duly licensed

chiropractor.

2.      I have carefully reviewed the Verified Complaint filed in this matter, as well as

the twenty (20) exhibits attached thereto, including the four (4) affidavits, and there are

numerous inaccuracies and misstatements.

3.      On March 22, 2004, a special meeting of the Directors and Shareholders of FMC

was held at the office of the then counsel for the Corporation.  All four Shareholders were

present -- Ed Kennedy (25%), James Kennedy (25%), Frederick Giampa (19%) and myself

(31%).  The four (4) of us were all Directors also.  All of the Shareholders/Directors, except for

Ed Kennedy, voted that Ed should be removed as a Director, and as an officer (See Exhibit "2").

Ed Kennedy held the office as President. For the reasons set forth below, notwithstanding my long term relationship with Ed, I reluctantly voted as I did.

4. I am well aware, as I was on March 22, 2004, of the duty of loyalty the four (4) shareholders of FMC owe to each other. However, 75% of the shareholders agreed, after serious discussions it was not only appropriate but necessary to remove Ed Kennedy from his position as a member of the Board of Directors and as President. Unfortunately, as will be detailed below, Ed Kennedy had simply lost control of his ability to effectively run FMC, and the remaining shareholders/directors unanimously agreed that action has to be taken, (including even Ed Kennedy's own brother, Jim Kennedy). In fact, approximately a week after the March 22, 2004 meeting, Ed Kennedy told me that "I understand what you did and why you did it. I was out of control. I didn't like the guy I was becoming," or words to that effect.

5. As referenced above, one of the shareholders is Ed Kennedy's brother. All of us had been working together as partners (technically shareholders) for almost ten (10) years. In October, 1995, before FMC's incorporation, we opened our first chiropractic facility in Lawrence, Massachusetts. Notwithstanding the duty owed to fellow shareholders, the majority (75%) felt it had to take appropriate action based on our business judgment, which we did. There was absolutely no intent to "freeze out" Ed Kennedy or take any other action with any bad motive. Our only goal was to preserve the Corporation and make sure it was operated in an efficient, fair and reasonable fashion for the benefit of the owners, the employees and our client base.

6. It should be noted, that at the March 22, 2004 meeting, by agreement of all parties, Ed Kennedy was relieved of his duties as an employee of FMC. Although be continued to receive his full salary and all benefits, he has not performed any work for FMC since that date

2

(approximately ten (10) months). Ed was also receiving his equal share of the dividends. Then, after discovery of some very alarming information, the Board of Directors determined it was in the best interest of the Corporation to terminate Ed Kennedy's employment and escrow any dividends pending a completion of an investigation into Ed Kennedy's misappropriation of corporate funds.

7.    For a period of time prior to March 22, 2004, I pleaded with Ed Kennedy, both orally and in writing, that change was needed for the benefit of FMC. By way of example, attached as Exhibit "3" is a memo I sent to Ed as well as the other shareholders outlining objectives and goals (as well as concerns) regarding the future of FMC. Many of the issues directly involved Ed Kennedy as the President, specifically billing/collection matter. By another memo dated August 18, 2003, I outlined a series of proposed changes which I believed were necessary for future success of FMC. See Exhibit "4". The changes I proposed were, I believe, necessary and appropriate and should have been seriously considered and discussed. Unfortunately, Ed did not take them seriously. In fact, for years I complained to Ed Kennedy that we had no long-term strategy, business plans or structure. He refused to seek professional assistance to help with such tasks and ignored my suggestions.

8.    Ed Kennedy is an individual who very much enjoyed having the title of "President" and exercising the power that he believed it carried. (I have no idea how he came to be President as I originally held that title and at sometime, I do not believe with my knowledge or consent, Ed Kennedy filed a change of officer's form with the Secretary of State's office.) Ed Kennedy tried to run FMC as if it was a sole proprietorship. It was not unusual for Ed Kennedy to say "I am the President, I can do what I want", or words to that affect.

9.     Ed Kennedy had an extremely abusive management style and would often yell at employees (including physicians and chiropractors), swear at them, demean them and otherwise conduct himself in an unprofessional manner (See Affidavit of Brian J. Awbrey, M.D.; Affidavit of William Lancellotti). His management approach (which often could be characterized as a dictatorship) also carried over to his dealings with our landlords, accountants, insurance agents, and even our bank. (See our bank loan officer's affidavit, Affidavit of Donald Queenin), Mr. Queenin is an Executive Vice President of Northern Bank & Trust Company ("Northern Bank"), who states that after some harsh words, Ed Kennedy had to be "shown the door", which resulted in termination of FMC's bank relationship with Northern Bank. The relationship with Northern Bank was re-established, however, after Ed Kennedy was removed as President. FMC's prior accountant also dropped FMC as a client based on Ed's aberrant behavior.

10.     No only did I and the other shareholders disagree with Ed Kennedy's "management style", it also has resulted in numerous lawsuits for which FMC has spent hundreds of thousands of dollars for legal fees and settlements, and there still are between $850,000.00 to $1,000,000.00 in outstanding claims which must be dealt with. The majority of these claims involve specific allegations attributable to Ed Kennedy, including sexual harassment charges. On many occasions, myself and other shareholders told Ed he must stop acting out as not only was his behavior wrong and unprofessional, but also costly. In addition, we feared that the FMC image would be tarnished by his bad will, which would adversely affect our business.

11.     In December 2003, a very bizarre series of events occurred. An issue arose involving two of our team leaders/doctors who were seeking to take vacation during the holiday season. Ed insisted they had no vacation time due then, while each insisted they had not used up their vacation time. I then checked with Tracy Kennedy, Ed's wife and secretary, who kept the

vacation records, who confirmed each of the employees had vacation time due them. Ed was outraged that I questioned him (although he was wrong), and Ed virtually stopped talking to or communicating with me from that point forward. Furthermore, he did not invite or provide me any notice of regional meetings as he had done in the past. I felt I was being "frozen out", notwithstanding my being the largest shareholder and my primary responsibilities involved relationships with clinicians and new patient acquisition, two (2) crucial components of our business.

12.    In October 2003, Jim Kennedy told me Ed was arrested for driving under the influence, driving about 90 miles per hour, all with his son in the car. We all feared that Ed was having problems with alcohol, drugs, or other such "personal problems." In fact, Ed himself mentioned he was going into rehabilitation, and perhaps taking a leave of absence to get his life together. Ed's actions became more outrageous to the point that, according to Jim Kennedy when he came to his brother's house, Ed called the police on him. (On one other occasion, the police were called to our offices when Ed went on one of his yelling tirades.)

13.    Ed Kennedy often made significant decisions without ever consulting his fellow shareholders, many of which were plainly wrong. These include, but are by no means limited to:

　　　　a.    opening new facilities in bad, unproductive locations, including opening three (3) offices in Florida, a new territory for FMC, without exercising due diligence. This resulted in the loss of between $750,000.00 to $1,000,000.00 for FMC;

　　　　b.    signing unfavorable long-term leases;

　　　　c.    providing one employee 18 weeks maternity leaves with full salary, contrary to company policy;

     d.      paying his wife, Tracy, a high school graduate who initially worked for me prior to FMC as a chiropractic assistant, and later got involved in billing and administrative matters at FMC, at a salary of $263,000.00 per year in 2003. This was in addition to a $160,000.00 Mercedes Benz that Ed solely authorized the Corporation to pay for her. None of the other shareholders had any knowledge of Tracy's salary until after Ed stopped working at FMC as he refused to provide financial details such as the payroll. (In addition, Ed did not require his wife to work 40 hours per week, as other employees were so required);

     e.      Ed unilaterally authorized other employees to have vehicles paid for by FMC, contrary to our policy and without consent of (or even discussion with) the other shareholders; and

     f.      made a unilateral decision to purchase a chiropractic business that resulted in a $300,000.00 loss for FMC.

While certainly mistakes or bad business decisions can be made, the fact is that Ed refused to consult or discuss material matters with his fellow shareholders, and it was his "I am the President and can do as I want" attitude that contributed to calling the March 22, 2004 special meeting.

14.     Interestingly, Ed never asked to come back to work after March 22, 2004. I believe he was content collecting his full salary and benefits. In fact, around October, I ran into Ed and he stated that he understood where he was at before the 3/22/04 events, and that he did not like the old Ed Kennedy.

15.     In conjunction with his removal as Director, Ed Kennedy made it known that he wanted out of FMC and suggested selling the company or having his interest be bought out. He said he had a broker in Chicago who thought he could sell FMC and related real estate for

6

$30,000,000.00. Fred, Jim and I thought this was outrageously high price and authorized him to proceed. See Exhibit "5". Nothing came of this because as expected, the price was too high.

16.     Given that Ed wanted out of FMC, counsel began attempting to negotiate the purchase of Ed's interest. Ed insisted that FMC was worth between $30,000,000.00 to $35,000,000.00. Again, we thought this was ridiculous. I said, take the lower figure, $30,000,000, reduce it by $2,000,000.00, to $28,000,000.00, and Ed could buy out the other shareholder at this number (actually for 75% of $28,000,000.00). He did not accept this offer.

17.     We offered to buy his 25% interest at a much lower figure which we believed represented the fair market value. Given that parties can certainly differ as to value, it was suggested by the then counsel for FMC that both sides hire their own appraisers and if the appraisals are within 10% of each other, they would be averaged, and FMC would redeem Ed's shares for 25% of the average amount; or if the two (2) appraisers were more than 10% apart of each other then the two appraisers agree on the engagement of a third independent appraiser, and the higher of the independent appraiser or the average of two individual appraisals shall be established as appraised price, and Ed would accept 25% (see Exhibit "6", also Plaintiff's Exhibit "F").

18.     For some unknown reason, Ed would not accept the proposed mechanism to determine the value of the Corporation or, it was my understanding any other mechanism for the valuation of the Corporation. Perhaps Ed was pleased doing no work and while receiving full compensation.

19.     After Ed left, we began a review of some financial records and discovered for the first time some very troubling information:

a.      As referred to above, we discovered for the first time that Ed's wife was being paid $263,000.00 in 2003, and for prior years she was paid $239,500.00 in 2002, $169,000.00 in 2001, and $124,000.00 in 2000). From 1997, 1998 and 1999, she was paid $68,000.00, $75,700, and $81,000.00 respectively. This salary is unconscionable given her duties, skills, experience and hours. None of the other shareholders were aware of this, as again, Ed refused to provide specific financial information such as payroll. In my opinion, the salary paid to Ed's wife was outrageously excessive and a way for Ed to disguise additional payments to himself.

b.      During the years 2000 to 2003, it was recently discovered that Ed Kennedy and his wife Tracy were reimbursed over $276,000.00 for personal credit card charges for personal purchases which they submitted were for "business expenses." However, no supporting documentation was provided to substantiate the charges were actually for legitimate business expenses. No other shareholder submitted their business expenses for reimbursement and, in fact, Ed told us, as President, that all shareholders needed to personally pay for all business expenses without reimbursement. (As will be discussed below, we each did take a $7,500.00 payment for "reimbursement of expenses" in 2004, including Ed Kennedy, but the $276,000.00 that Ed and Tracy got reimbursed was in addition to the $7,500.00 payment.) This information is referred in to the Affidavit of William Chapman, FMC's certified public accountant.

20.     We have also learned that Ed Kennedy paid directly with company funds personal expenses. We have at least one statement from a third party vender, an electrician, Gregory Taylor, whereby he states provided valuable services at Ed Kennedy's private residence at 1 Lakeside Terrace in Westford, Massachusetts for which he was paid with Future Management

checks, including installation of a generator totaling $5,000. In 2002 he also installed 8 recessed cams on Mr. Kennedy's premises and was again paid by Future Management check. Ed Kennedy also had the electrician combine bills for work done at clinics with Ed's personal work and paid all with FMC funds. According to Mr. Taylor, Ed Kennedy represented that all the shareholders were in agreement and there was no need to discuss this method of practice. (See Exhibit "7", a copy of the Affidavit of Gregory Taylor.) I believe we will uncover a substantial amount of additional evidence as to Ed Kennedy having FMC pay for repairs to his homes. (He also has a residence in Oregon).

21.    On January 19, 2005, the Board of Directors made a decision to terminate Ed Kennedy's employment at FMC (while he had been relieved of his duties some ten (10) months earlier, as noted above, but continued to receive full salary and benefits). In effect, Ed had received ten (10) months of severance pay. This decision was based, at least in part, on our initial investigation that Ed Kennedy had grossly mismanaged and misappropriated substantial corporate funds for his personal benefit (see Paragraph 19(a) and (b), and 20 above). It was decided, therefore, to escrow future dividends until the completion of the accounting. See January 19, 2005 letter to Ed Kennedy's counsel attached as Exhibit "8." The first dividend check was escrowed on or about February 7, 2005 (see Exhibit "9"). The Board determined that these actions were in the best interest of FMC.

22.    Ed Kennedy's lawyer apparently is trying to imply that FMC is withholding documentation and our January 19, 2005 termination letter was in response to the request for this documentation. This is simply not true. The fact is, according to our attorneys, they only actually received the initial demand addressed to them dated January 13, 2005 (see Exhibit "10"), on January 19, 2005, after the decision to terminate had been made and the letter drafted

(see Exhibit "8", first paragraph). (I believe Attorney Rudolph was out of town for a number of days.) Attorney Rudolph responded to a demand for documents two (2) days after receipt of the letter, by a letter January 21, 2005. See Exhibit "11", referencing, among other things that the January 13, 2005 letter did not comply with the new business statute (Chapter 156D). Ed Kennedy's attorney then apparently attempted to comply with the new law according to our attorney, and our counsel responded by making records available on the date requested, January 31, 2005 (see Exhibit "12"). Then, instead of inspecting the records, Ed Kennedy's attorney for some reason requested a listing of the documents to be produced (see Exhibit "13"). Our attorney responded that there was no legal requirement to list the documents to be produced and again, stated that the records were available at a mutually convenient time. See Exhibit "14". The fact is neither Ed Kennedy nor his attorney ever came to inspect any records, and the next action they took was to file the lawsuit.

23.    Unfortunately, based on my personal knowledge, I knew Ed Kennedy often did not tell the truth (and this is the case with respect to many of the assertions in his Verified Complaint and affidavits he submitted). Obviously, "lying" is not a good trait for the President of the Corporation. The fact that Ed Kennedy "lies" was confirmed by his wife Tracy. Included within the business records at FMC were certain notes that Tracy had written (I recognize her handwriting) which includes the following excerpts which I believe refer to Ed Kennedy:

> **He frequently lies, which he calls exaggeration,**
> **yet he does this professionally always and**
> **privately a lot.** (see Exhibit "15").

24.    Mrs. Kennedy's notes also confirm other behavior traits of Ed which, as outlined above, caused great concern for me and the other shareholders.

He must hurt others to feel good about himself.
He feels he must be in control "always". He
continually contradicts himself with actions and
words (see Exhibit "15").

I feel as if he does not like himself or feel
successful unless he is demeaning others. . .He
must hurt others to feel good about himself. He
must be in control "always." He continuously
contradicts himself with actions and words (see
Exhibit "15").

25.    While, as noted above, there are many, many misstatements of facts in the

Plaintiff's pleadings, I feel it is important to note some of them:

a.    FMC was not started by the Plaintiff, but all four (4) shareholders were

involved in some capacity. I was initially a 50% shareholder with the two (2) Kennedy brothers.

A licensed chiropractor is needed to open a chiropractic office, and Ed Kennedy is not a licensed

chiropractor. The Plaintiff could not open the first chiropractic office in Lawrence as he was not

licensed to do so.  (See Verified Complaint ("VC"), Paragraphs 7 & 8.

b.    FMC grew and expanded as a result of all four (4) shareholder's efforts,

not just the efforts of Plaintiff and his wife, as alleged.  In fact, we have had to close down

several offices that the Plaintiff inappropriately opened without consent of the other shareholders

as part of the "expansion" (VC, Paragraph 15).

c.    While the Plaintiff attempts to boast the accomplishments of his wife

Tracy (with a $263,000.00 salary) regarding the billing department, (VC, Paragraph 19) the

successor to the former billing supervisor Miriam Rojas (who worked under Tracy) found

numerous problems with FMC's billing system. See Affidavit of Kathryn Duncan. Billing and

collections was an area that I constantly complained to Ed about, but he refused to listen.

d.    Ed Kennedy did not provide detailed reports of books and records, even upon request. This was also a constant problem. VC, Paragraph 22.

e.    It is absurd to suggest Jim Kennedy and Fred Giampa were "silent partners" or that it was agreed that Tracy would receive the same salary as all shareholders. (In fact, as we recently discovered, she received double the shareholders salaries). (VC, Paragraph 24).

f.    The only "expense accounts" for shareholders were those secretly effectuated by Ed Kennedy and his wife (VC, Paragraph 26). Other shareholders were told all shareholders pay their own business expenses.

g.    According to the Plaintiff's own exhibits, Exhibit "A", the Plaintiff plainly misstates Jim Kennedy's divorce settlement as to the property settlement and child support, even if this was relevant. The agreement speaks for itself. (VC, Paragraph 33).

h.    The reason the tax liability (which was $350,000, not $450,000) became an issue is that Plaintiff and/or his wife failed to timely inform the other shareholders of the issue. (VC, Paragraph 34).

i.    We were never requested to "reschedule" the March 17, 2004 meeting, but simply advised, "[h]e will not be attending", because it was Ed's birthday. See Exhibit "16". At the March 22, 2004 shareholders and directors meeting, the Plaintiff was present so he knew at the meeting what decisions were made; decisions were not "following" the meeting. See VC, Paragraphs 39, 40. Also no "Separation Agreement" was ever agreed to, finalized or executed by all parties. (VC, Paragraph 42).

12

j.    Prior to the recent correspondence between our counsel, the Plaintiff never requested copies of books and records of the Defendants, therefore, it is disingenuous to state that they were "never provided". (VC, Paragraph 56).

k.    Defendants deny they made any improper payments from FMC's accounts to themselves or various corporate entities controlled by them and third parties as alleged in VC, Paragraph 57. They rely on Exhibit H, the Affidavit of Miriam Rojas. Upon review of that Affidavit, it appears that the only alleged payment referenced therein is $7,500, which Ms. Rojas stated were paid to "Jim Kennedy, Joseph Giampa and Fred Giampa". Reference is also made to Exhibit I of the VC. However, Defendants failed to include the fact that Ed Kennedy also received a $7,500 "reimbursement" check in or around that time, namely May 11, 2004, as Plaintiff deceitfully attached only the check register for 3/22 to 4/29. See Exhibit "17".

l.    As set forth in the Affidavit of Donald Queenin, Executive Vice President of Northern Bank, the loan from the bank was not $400,000, but was $350,000 and was used to pay-off a prior obligation with Enterprise Bank and Trust Company, a debt incurred while Edward Kennedy operated FMC. Therefore, this is not new money taken out by the Corporation. VC, Paragraph 58.

m.    I deny Defendants "repeatedly" ignored and failed to pay financial obligations of the company. (VC, Paragraph 59) In fact, the bills which are attached as Exhibit M of the VC were addressed to Kennedy's home and are not even for FMC. Any delay in payments would have been a result of the Plaintiff failing to forward the bills to FMC's office after they were to be sent to Ed's home, at his or Tracy's request. I believe if there were any further problems in paying any bills, most likely it was a result of a disarray caused by the Plaintiff's bookkeeping operations while he was in control.

13

n.      I emphatically deny that there were substantial monies diverted from the Corporation for Defendants' personal use.  (VC, Paragraph 63) The <u>Affidavits of Donald Queenin</u> (FMC's banker) and <u>Affidavit of William R. Chapman</u> (FMC's banker) are independent third party witnesses who dispute any impropriety on Defendants' part.  These are individuals charged with monitoring the financial operations of FMC.

o.      Any loss of profits is not a result of the closing of chiropractic offices, as these were closed solely because they were unproductive.  (VC, Paragraph 64) There are many reasons why profits have decreased, part of which has to do with the poor billing, collections and business practices established when Ed Kennedy operated the business. There has also been a significant change in climate towards chiropractic medicine and legislation has decreased revenue throughout the industry.  We are addressing the prior poor billing and collection practices under Ed Kennedy's regime.

p.      At VC, Paragraph 75, Plaintiff complains he never received notice of "shareholder meetings" at which his termination and ceasing of benefits was discussed.  That is because there was <u>no shareholder</u> meetings as the actions taken to terminate his employment and benefits was approved by the Board of Directors, not shareholders.

q.      Again, Ed Kennedy has not been denied books and records of the company to which he is entitled.  Those records have been available since January 31, 2005 per the lawyer's request and they still have not been inspected.

26      The appointment of a Receiver is not only unnecessary, but would have extremely detrimental effect upon the operation of the company and would be a significant additional unnecessary expense for the company.  The three shareholders who own 75% of the company had taken appropriate action with appropriate votes.  While we recognize our obligation to a

14

minority shareholder and believe we have always complied with those obligations, the majority I believe has the right to run its business and exercise our business judgments. Again, the Affidavits of our accountant and the banker evidence how we have operated the company. As Mr. Queenin set forth in his Affidavit, the bank had terminated his banking relationship with FMC when Kennedy was in control and re-established it after Defendants gained control. He states that we are **"extremely professional, and there are absolutely no problems with our banking relationship with the bank. Future Management Corp. is current on all its obligations with the bank, is an excellent customer who we greatly value. Future Management is presently in good standing with the bank."** The corporation's accountant states that since I was elected President on March 22nd, he has **"not witnessed any 'self-dealings', wrongful exercise of dominium over the assets of [FMC]…'waste', 'mismanagement' or 'theft' by…"** by any of the Defendants, as alleged by the Plaintiff.

27.     Defendants intend to raise substantial counterclaims against Mr. Kennedy, concerning his misappropriation of funds as evidenced by our accountant's review of the records. Based on our investigation to date, I believe the damages are at least $1.2 million.

28.     Unfortunately I believe we have reached just the tip of the iceberg regarding Edward Kennedy's misappropriation of corporate funds. Our investigation continues. In the meantime, Mr. Kennedy should not be paid a salary as he is not working for FMC and he has not worked for the past 10 months. The dividends are being held in escrow by our attorney until there is a full determination as to amounts that have been misappropriated. This is the only liquid security that I know that will be available to reimburse the Corporation.

29.     On February 7, 2005, in response to the lawsuit, the three members of Board of Directors voted to appoint a Special Litigation Committee to determine the propriety of Ed

Kennedy's derivative claims, and to advise as to whether those claims should be pursued or dismissed. (See Exhibit "18") This is a recognized procedure in shareholder derivative actions according to our attorney. We appointed Edward Pendergast, who I understand is a well respected CPA, as the sole member of the committee, (See Exhibit "19") and authorized him to retain J. Owen Todd as counsel to the Special Litigation Committee as to any issues that may arise. A Receiver is unnecessary, as Mr. Pendergast can report as to what derivative claims he believes have validity or no validity.

Signed under the pains and penalties of perjury this _15_ day of February, 2005.

Joseph D. Giampa

COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS.                                SUPERIOR COURT DEPARTMENT
                                          C.A. NO.  MICV 2005-00397

| | |
|---|---|
| EDWARD KENNEDY | ) |
| | ) |
| Plaintiff | ) |
| VS. | ) |
| | ) |
| FUTURE  MANAGEMENT CORP. | ) |
| et al. | ) |
| Defendants | ) |

## AFFIDAVIT OF WILLIAM R. CHAPMAN

I, William R. Chapman, hereby swear and depose:

1.      I am a Certified Public Accountant and do business for C&C Professional

Business Services, and am the accountant for Future Management Corp ("FMC").  I have

been FMC's accountant since 1999, and worked directly with Ed Kennedy until March

22, 2004, when I understand he was removed as President of FMC.

2.      While Ed Kennedy was President, he was very secretive about the

financial operations of the FMC with regard to the other shareholders.  Ed Kennedy

specifically instructed my office not to give any information to Joseph Giampa or

Fredrick Giampa.  In fact, I remember vividly him saying "don't give them any f _ _ _ _

information.  Nothing!".  I thought this was very strange as all the individuals were

shareholders.

3.      Since March 22, 2004, when I understand Joseph Giampa was elected

President, I have not witnessed any "self-dealings", "wrongful exercise of dominion over

the assets of [FMC]…", "waste", "mismanagement" or "theft" by Joseph Giampa, Fredrick Giampa or James Kennedy, as I understand Ed Kennedy has alleged.

4.    In fact, we have recently discovered that both Ed Kennedy and his wife Tracy were paid over $276,000.00 by FMC for their personal credit cards during the period of 2000 to 2003 for "requests for reimbursement" which we discovered were for their personal purchases.  When we asked for documentation to support the expenditures as "business expenses", we received none.  During this same period, there were no requests for reimbursement for credit card expenses (or any business expenses) by Joseph Giampa, Frederick Giampa or James Kennedy.

5.    I was also asked to compile the salary paid to Tracy Kennedy.  From 1997 to 1999 she made between $68,000 to $81,000 per year.  In 2000, her salary went to $124,000; 2001 to $169,000; 2002 to $239,500; and 2003 to $263,000.  This is in addition to the credit card purchases reimbursements she received as discussed above.

6.    FMC's records further shows that the corporation paid for a very high end Mercedes Benz (approximate cost of $160,000.) for her.

7.    In my opinion, based on my observations and dealings, Joseph Giampa, Fredrick Giampa and James Kennedy have been acting professionally and in good faith in their operation of FMC, and I am not aware of any improper conduct.


Signed under the pains and penalties of perjury this _9TH_ day of _FEBRUARY_,2005.


_William R. Chapman CPA_
WILLIAM R. CHAPMAN, CPA

# COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, ss**                    **SUPERIOR COURT DEPARTMENT**
                                      **MICV2005-00397**


**EDWARD D. KENNEDY**
      **Plaintiff**
v.
**FUTURE MANAGEMENT**
et al.
            Defendants


AFFIDAVIT OF JAMES KENNEDY


I, James Kennedy, do hereby swear and depose:

1.  I am the brother of the plaintiff Edward Kennedy and a defendant in the above
    action.  While I recognize some of the information contained in the affidavit may
    be "private or sensitive", I am reluctantly providing the information to the court as I
    believe it is important for the court to know why I and the other Directors felt
    compelled to take the actions we did to remove Ed as a Director and the President
    of Future Management Corp. ("FMC").


2.  Initially I had worked with Ed for 20 years in Robert T. Kennedy, Inc (Kennedy
    Supply).  Within this time (1996) Ed had gone through a nasty divorce.  He ended
    up in alcohol rehabilitation at a "stay over facility" where I visited and supported
    him.   In our venture with Kennedy Supply we shared responsibilities with regard
    to day-to-day operations.  We ventured into FMC, along with Joseph Giampa in
    February of 1996.

3. We started our first office together in Lawrence Massachusetts in late 1995 (Advanced Spine Centers). Things appeared to go well with Joseph Giampa responsible for hiring and training the doctors as well as marketing each office locale. Ed and I were supportive in all ways initially. This continued for the first two to three years with growth and development of multiple offices. Ed and I sought new locations and got offices started and supplied. There appeared to be success with this formula.

4. Change had to be made because of conflict in supplies business, therefore it was agreed that I would continue with Kennedy Supply and he with FMC. At this time Joe and Ed were at the helm and Fred and I as support as needed. All Directors were comfortable with this arrangement. Each having shared responsibilities. Fred Giampa joined our group the end of 1996, beginning of 1997 as one of the directors/owners, but even before had assisted with marketing our offices.

5. Things began to breakdown three years into the relationship; Ed became more secretive. This was seen in a big way when Fred Giampa asked for more information for a prenuptial agreement before his wedding plans in January 1999. I noticed Ed was nervous regarding giving Fred any information that was needed for this prenuptial. I also noticed Ed became more combative with employees that Joe was responsible for. This started the "break down" of morale. Similar "issues" arose in my extended family. Ed became combative at the "drop of a hat" with anyone who did not agree with him. In the family we suspected these personality changes were due to possible further alcohol abuse but at that time could not confirm this.

6. At one directors meeting over dinner, Joe simply requested information regarding our new FMC life insurance policies and corporate papers to start a folder for future references. Ed exploded and publicly embarrassed Joe. He told Joe to "just focus

on doing your job and don't worry about paperwork", or words to that effect. This
was a common reaction by Ed. "None of you need to worry about paperwork, just
do your jobs", or words to that effect, was also a common phase of Ed's. It must
also be noted that Joe Giampa was the first President of FMC. All of a sudden
when new filings came up, Ed was listed as President. All of which occurred
without a single vote being taken, nor any paperwork to support this action. Joe
reacted politely and wanted to "keep the peace". He did not contest Ed's actions.

7.  Ed went from using proper language to use of cursing and abusive language. Joe
spoke to him personally on many occasions that it was "disruptive" and caused
break down of morale. Essentially the "bottom line" would be affected. Through
multiple conversations, Joe got Ed to adhere to some protocol of decorum.
Eventually, this "wore off" and Ed resorted to base line defaming of Joe and others
under his management for no apparent reason. Joe and I insisted that only Joe or
Fred speak to the clinicians because they were also clinicians. This seemed
appropriate and reasonable and would serve to prevent "blow ups" from Ed, that
were less and less tolerable from staff. We also asked that Ed not speak to any of
the referral sources because of his harsh ways. This would lead to more bad will.
(Referral sources are MDs, various specialists, attorneys and community
businesses). Also, see Affidavit of Brian J. Awbrey, M.D., an orthopedic surgeon
employed by FMC.

8.  Human Resource issues appeared to have been problematic because of how Ed and
his wife Tracy Kennedy applied them, often showing favoritism to certain
employees (i.e. cars, bonuses, expenses, vacations, etc.). Joe insisted that we have
a manual to standardize things similar to one he used in his own corporation. Ed
and Tracy were resistant, but eventually gave in to this reasonable demand. It was
not complied with fully, but only excerpts from it therefore resulting in a
breakdown of Human Resources (see Affidavit of Daisy Foster). Joe and I noted

3

that the manual that Tracy Kennedy had sent to the offices was not a complete one. Many employees felt it was not of any help (this further broke down morale).

9. From the very beginning Ed and Tracy were responsible for keeping the "minutes" of the corporation to be filed and sent to our corporate attorney and accountant. This has never occurred under their "watch". Essentially we were never properly "papered" and therefore this affected all aspects of our business (i.e. see <u>Affidavit of Kathy Duncan</u> regarding filing for corporate provider numbers). Ed was notorious for writing information on napkins or scrap paper and giving half information to our attorney and CPA (see <u>Affidavit of Annee L'Heureux</u>). Again, this surfaced when Fred or Joe needed information for their CPA and Attorneys.

10. I began to become aware that Ed and Tracy Kennedy were hiding more and more information. When I would ask questions, I would be told, "don't worry about it". This would lead me to think that they had something to hide! This became very apparent toward the end of 2003 when more information was requested by all (myself, Joe and Fred) and we were refused. By way of example, Fred called Tracy Kennedy to update his prenuptial at the request of his attorney. Ed took offense and misrepresented what Fred wanted. Ed told me that Fred was just stirring trouble to sue FMC. Ed told me that Fred called screaming at the FMC lawyers and accountant. I called them and found this never occurred. They said what Fred needed was reasonable for his prenuptial. I then confronted Ed as to his lies. He told me to "fuck off" and "why couldn't I see what the Giampas were trying to do"?

11. Ed exhibited greater **"paranoia"** as time went on. I witnessed he was more irrational, and I had trouble speaking to him. I became increasingly concerned about Ed's actions and conduct and whether he should continue to be President of FMC. For example, I talked with Tracy Kennedy about my concerns and she

4

acknowledged that she also had "issues" with Ed, some of which were of a more serious nature. (This was confirmed in her journal that she had left in the corporate storage box with bills and receipts.) I was later told by Tracy Kennedy that she had found out Ed had issues of infidelity associated with women at the pool house at my home in South Carolina while he had children with him. Ed later told me that he was upset because his nephew told his mother, Peggy Arnet, that Ed was seen with naked women in the hot tub and in the pool house.

12. Ed's irrational and inappropriate behavior was noted along with other more serious issues. For example, police caught him driving under the influence at 90 MPH with his young son in the front seat. Ed was arrested. He called me to come with his wife to bail him out. Now he had a threat of losing his license. Thereby he retained a driver (Brian Leakas). The driver was paid out of Kennedy Supply so as to avoid conflict with the Giampa brothers. This did not slow Ed down. I later found out that Ed had issues of indiscretion here in Massachusetts as well. He was often seen in "strip clubs" in Western Massachusetts, often at times drunk and disorderly. This was verified by his driver and is evidenced by his credit card statements for which he reimbursed himself through FMC. I have been told Ed used illicit drugs in these facilities. He was supposed to be out in Western Massachusetts to assist the doctors in building and maintaining the practices at 3 of our facilities. This was not happening. It was bad enough that Ed was getting reimbursed from FMC for these ventures, but while at these clubs he would often brag about having medical offices in those locales and also went as far as to hand out FMC's corporate business cards (these cards had all the clinics addresses along with Ed's cell and fax numbers). This all got worse, as I was told Ed shared some substances with girls in the club. Some of these girls had reportedly been through rehab. All this was confirmed by threatening phone calls to our Springfield office. Moreover, two men showed up to our office to see if Ed Kennedy was in town. They had his business card that he handed out at the strip club. One of these two men also called John Salerno (does marketing for FMC), and threatened him because Ed "fed these girls drugs" and got them "off the wagon". They were not

happy. John called me panicking and frantic. I assured him I would try to help in any way. All this occurred during the end of 2003 and the beginning of 2004, and demonstrated to me that something drastic had to be done in order to preserve the health of FMC. I have known Ed my whole life, and without a doubt, in my opinion Ed was out of control and could not continue operating FMC.

13. During the second week of March 2004, Ed became more and more combative with everyone, while still on "leave of absence". (This "leave of absence" was self-imposed by Ed, and began at the beginning of March, 2004). For example on March 12, Ed was yelling and screaming about the "taxes" due (state taxes 3-15-04). Tracy was told about the new law passed by Governor Romney by FMC's CPA some six months earlier. She did not remember and failed to plan. Ed panicked! Thus his "emergency" demand was made (irrationally to cover for his wife). Ed was combative with the CPA and all other directors. "Tell those fucking Giampas to get 50 thousand each in here by Monday", was the cry from Ed. I went over to his house to discuss this with him, and he proceeded to call the police on me.

14. On this same day, March 12, Ed went on to demand to know why were Joe and Fred calling the CPA and attorney for information. When I checked, I found, in fact, they had not called that day, and had not for weeks. Joe and Fred were clearly entitled to any corporate documents. But Ed refused for no rational reason. When I said Joe and Fred were entitled to corporate information, I was told again to "go fuck myself" if I sided with them, in spite of being his brother.

15. On the following Monday, 3-15-04, I received a hand written note from Tracy Kennedy dictated from Ed. It stated, that they (Ed and Tracy) no longer had a need for me in their life. I became very concerned about the future of FMC. I believed

we all needed a meeting with corporate counsel as soon as possible. All shareholders attended except Ed, he refused.

16. Ed has always ignored and resisted any form of counsel except his own! He had no use for sitting down with corporate attorneys, FMC's CPA and the directors. This type of corporate meeting never took place under Ed's "time of leadership". He had no use for such a "waste of time" in his mind. We could no longer function as a corporation if "good business principles" were not in place. Therefore, something had to be done. We could not have any "normal" discussions with Ed. Ed would not even take our calls.

17. On March 22, 2004 we held a special meeting of directors and shareholders. In my opinion, we had no alternative but to take the action we did. Since that time, I have had the opportunity to review some of the corporate financial records for the first time and am shocked at the money Ed and Tracy took from FMC. See Affidavit of William Chapman.

This affidavit is based upon my own personal knowledge, information and belief, and so far as upon information and belief, I believe the information to be true.

SIGNED UNDER PAINS AND PENALTY OF PERJURY,

James Kennedy                                    Date 2/15/05

# COMMONWEALTH OF MASSACHUSETTS

**LOWELL, ss**

**SUPERIOR COURT DEPARTMENT
CIVIL D**

**MICV2005-00397**

EDWARD D. KENNEDY
     Plaintiff

vs.

FUTURE MANAGEMENT CORP.
et al.

     **Defendants**

## AFFIDAVIT OF ANNEE L'HEUREUX

I, Annee L'Heureux, do hereby swear and depose:

1. I have been employed by C&C Professional Business Services of 91 Montvale Ave, Stoneham, MA 02180 for five (5) years.

2. C&C Professional Business Services is the accounting firm for Future Management Corporation (FMC). I have been appointed by my employer to service this account (FMC) since September 2001.

3. I have dealt with Ed Kennedy and Tracy Kennedy, the former administration of FMC until March of 2004.

4. I was responsible for the accounting system management as well as Profit and Loss Statement Productions. This included information gathering from Ed Kennedy and Tracy Kennedy. Often there was inadequate paperwork and I was often met with rude and defiant answers. Often attempting to compile P&L statements without any substantial receipts or statements to help me do my job. This resulted in incomplete and inaccurate P&L statements.

5. I suspected the other directors (Jim Kennedy, Fred Giampa and Joe Giampa)/stockholders did not know what was going on and that they also were kept in the "dark". This suspicion was confirmed when I was told by Tracy Kennedy not to give payroll information to either Fred or Joe Giampa. I was concerned

about withholding information from the other stockholders/directors (Jim Kennedy, Fred Giampa and Joe Giampa). I conveyed this concern to my employer.

6. When I would speak to Ed Kennedy or if Bill Chapman spoke to Ed, he would say "they don't need any of this information" (with regard to P&L or W2 information).

7. Whenever I would question receipts or why checks were written the way they were, or to whom or where they were going, I would always be met with confusing thought processes from either Ed Kennedy or Tracy Kennedy. The reasons they gave to my boss and me were nonsensical and often lacking any business continuity or business reason. I felt Tracy had no business skills!

8. Since the new administration has been in place (March 22, 2004), I have noticed a shift in emphasis to maintain a high standard, not only from an accounting standpoint, but also from a proper "checks and balances" standpoint. As a result, this has helped to improve their accuracy of the spreadsheets and P&L's. Previously, when questioning anything relative to banking or P&L information, I was always met with sighing or silence and I thought, in fact, that Tracy had no idea what she was doing and had no real knowledge of how to run a business. For example; categories/descriptions of checks written were incorrect and did not conform to proper bookkeeping or accounting and tax law.
Tracy Kennedy never turned in the W2 forms from employees to the accounting office.

9. The current administration (Jim Kennedy, Joe Giampa and Fred Giampa, since March 22, 2004) has provided all information for accounting. They have been professional and have never attempted to "hide" anything. I have found them to be professional and business like in their approach. They also have in place a proper administrative department with a strong awareness of human resource issues.

SIGNED UNDER PAINS AND PENALTY OF PERJURY,

*Annee L'Heureux*

Annee L'Heureux                    Date    2/9/05

## COMMONWEALTH OF MASSACHUSETTS

LOWELL,ss.

SUPERIOR COURT DEPARTMENT

CIVIL D

MICV2005-00397

EDWARD D. KENNEDY

v.

FUTURE MANAGEMENT

AFFIDAVIT OF GREGORY TAYLOR

This affidavit is being provided on February 9,2005 in response to the actions of Edward Kennedy and the requests made of him to me over the course of the last 8 (eight) years.

Incidents that come immediately to mind for the services provided to Edward Kennedy at the private residence, 1 Lakeside Terrace, Westford Massachusetts. In the Spring of 2002 the installation of a generator system totaling $5000.00 was paid with a Future Management check.

During the course of the year 2002 8 (eight) recessed cams were installed in 1 Lakeside Terrace and once again the Future Management check paid for the expenses.

Over the course of the last 8 (eight) years other various repairs and upgrades have been made for Edward Kennedy at the same time other repairs were made at the various clinics in the company and when the time for the settling of the account balances all were combined and paid through the Future Management check account.

All of which I had been assured that Edward Kennedy spoke for the corporation and that all were in agreement with these actions and that I need not have to

speak to any of them about this method of payment. It has only come to light since the separation of the partners that this was not an accepted practice.

Signed under pains and penalties of perjury

_Gregory Taylor_          2/9/05

Gregory Taylor.                    Date

COMMONWEALTH OF MASSACHUSETTS

Essex, SS.

Superior Court Department
C.A. NO. MICV 2005-00397

EDWARD KENNEDY

     Plaintiff

V.S.

FUTURE MANAGEMENT CORP.
Et al.

    Defendant

## AFFIDAVIT OF DR. BRIAN CULLINEY

I, Dr. Brian Culliney, being duly sworn, depose and say as follows:

1.    I have worked for Future Management Corp. ("FMC") since October of 1997. I started out as a clinician and worked my way up to senior team leader/regional manager with over 12 offices.

2.    I was first contacted by James Kennedy and Dr. Joseph Giampa to work for FMC

3.    I was made aware that Edward Kennedy was later the President of FMC.

4.    During Edward Kennedy' tenure as president, I was aware and observed his unprofessional behavior on many occasions. This included yelling and screaming at employees, swearing at co-workers and doctors and at several meetings where he disparaged and "put down" other owners/directors and team leaders. All of this wore on me and others in the organization and hurt other morale of our employees. I began to see a division of the employees occurring in the corporation which was unsettling for me. I had hoped to have harmony and was interested in further growth with FMC.

5.    On several occasions I asked Edward Kennedy to consider a business counselor to help remedy the poor work atmosphere and tension. He refused and dismissed it as idiotic and a waste of money. After several months of further deterioration I asked him again to seek out a business counselor; he again refused.

6.    Finally, hoping to resolve the ongoing issue, I sought out a business counselor from Attorney Vincent DiCianni at Rubin and Rudman. He gave me a business card of Attorney Jay Theise. I put the card in my wallet. Again, I asked Edward Kennedy if he was interested; he said no.

7.    In early January of 2004, while visiting an office in Lynn I met Joseph Giampa to discuss the office production At that time I offered Joe the business card of Jay Theise. He accepted it and indicated he would call and set up an appointment. He thought it was a good idea and asked me to encourage Ed to attend.

8.    Again, I spoke to Ed. He refused to be part of any business counseling.

9.    During the first week of December there was some controversy over how much vacation time I had used. This created further problems in the corporation and between Ed and Joe. Ed stated I had taken five to six weeks of vacation and told Joe to verify this.

10.    Joe called Tracy Kennedy (Ed's wife) to confirm this. Tracy reported that the computer showed I used only one week and had another two weeks coming to me.

11.    Joe said he would follow up with Ed to clarify this and would handle this; not to worry. Shortly after this, Ed refused to talk to Joe at all because many issues, this being an example.

12.    Ed would not speak to Joe during the following months because of multiple issues and poor communication between them, and this became a problem as far as operations were concerned. It resulted in tense and difficult times and made it very hard to do my job.

13.    During these difficult times I observed unprofessional, distracting and abbrasive behavior from Ed towards other co-workers and owners.

14.    There were a number of billing problems during this time frame under Ed's management of FMC, and throughout the previous year.

15.  I was in contact with Miriam Rojas, the Billing Manager, and tried on several occasions to clarify these issues with her. They were not resolved nor acknowledged and were left unchanged. It appeared there were no set procedures. Once the new administration stepped in, I found that Kathy Duncan and Dr. Frederick Giampa handled all issues professionally and promptly.

16.  I feel confident in Kathy Duncan's ability in the Billing function. She returns telephone calls promptly, answers questions and is competent, courteous and professional.

17.  Dr. Darren Risley was initially placed in my group. I worked with him and helped with practice building ideas. Unfortunately Dr. Risley was not a go-getter and was not motivated and he was uninterested in developing a quality business. He also had personal problems which hindered him from growing the Oklahoma offices.

18.  His attitude became more complacent and he displayed very poor follow-through from the outset. He was not competent, successful, or motivated to be a team leader.

19.  Because Ed liked him, he was given a salary of $2,000.00 per week, which is roughly two times what he should have been paid, plus he received a 2003 Lincoln Navigator and a bonus incentive four times that of other doctors, more competent successful, and motivated.

20.  In my opinion, there was no reason to give these benefits to Dr. Risley. He did not earn them or deserve them based upon his performance and productivity. On many occasions Dr. Risley would show up to work late or not at all.

21.  He did not take his job seriously and FMC lost money virtually every month due to his poor performance.

22.  He was offered a 90-day period to increase his production and performance or his practice would no longer be part of the group.

23.  Dr. Risley as of this date is no longer part of the group due to the above reasons.

24.     Since March 22, 2004, when Ed Kennedy ceased running FMC there has been an overall improvement in the quality of business, and a more professional attitude from management towards doctors, owners, and billing staff.

25.     The business of FMC is run fairly; I have a voice in how to improve things, my opinions and concerns are addressed fairly, I am treated with respect and believe that FMC is moving in the right direction.

26.     I am not aware of any slander by anyone in or out of administration or ownership.

27.     I believe that the current management of FMC has given me the tools and opportunity to grow and to be successful.

28.     In terms of staff, employee issues and performance issues have now been dealt with in an appropriate fashion, and our retention rate is only getting better.

Signed under the pains and penalties of perjury this ___ day of February, 2005.

_____
Brian Cuffney