UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENCOMPASS INSURANCE COMPANY OF MASSACHUSETTS, <br><br> Plaintiff, <br><br> vs. <br><br> JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, ADVANCED SPINE CENTERS, INC., d/b/a FIRST SPINE REHAB, FUTURE MANAGEMENT CORPORATION, FUTURE MANAGEMENT BUSINESS TRUST, EDWARD KENNEDY, BRIAN J. CULLINEY, D.C. and JENNIFER McCONNELL, D.C. <br><br> Defendants. | Civil Action No.  1:05-cv-11693-RCL |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES

NOW COMES the plaintiff, Encompass Insurance Company of Massachusetts (hereinafter "Encompass"), pursuant to Fed. R. Civ. P. 37 and Local Rule 37.1 and respectfully requests that this Honorable Court enter an Order COMPELLING defendant, Frederick T. Giampa (hereinafter "Giampa"), to provide complete answers to Encompass' First Set of Interrogatories.  Specifically, Giampa has failed to provide any meaningful answers to the interrogatories propounded by Encompass.  Encompass hereby submits the within memorandum of law in support of the instant motion.  As grounds for this request, Encompass avers as follows:

## I.    BACKGROUND

This case is brought pursuant to Title 18 U.S.C. §1962, Racketeer Influenced and Corrupt Organizations Act, Mass. Gen. Laws, ch. 93A, the Massachusetts Consumer Protection Act, and Massachusetts common law of fraud and civil conspiracy.  The defendants acting in concert participated in a concealed, evolving and continuous scheme and conspiracy to defraud

Encompass.  The geographic center of this conspiracy was First Spine Rehab, owned and operated by the Giampa chiropractors and Kennedy Brothers.

The objective of defendants' fraud scheme was to illegally obtain money from the plaintiff through the submission of false medical records and bills (hereinafter "false medical documentation") in connection with alleged motor vehicle accidents.  The defendants collected substantial sums of money as payment in connection with such false medical documentation referencing alleged chiropractic treatment that was never rendered and/or was unnecessary, excessive and unrelated to covered claims.  The defendants successfully executed this scheme to defraud by creating and submitting such false medical documentation to Encompass and others by way of the U.S. Mail.

On March 16, 2007, Encompass served upon Frederick Giampa plaintiff's First Set of Interrogatories.  <u>See</u> Plaintiff's First Set of Interrogatories Propounded to the Defendant, Frederick Giampa, annexed hereto at Exhibit A.  On April 22, 2007, Giampa issued his answers to Encompass' First Set of Interrogatories.  <u>See</u> Defendant, Frederick T. Giampa's, Answers to Plaintiffs' First Set of Interrogatories, annexed hereto at Exhibit B.  The defendant's discovery responses are incomplete.  Encompass now brings this Motion to Compel requesting that this Court order defendant to provide true and accurate responses to Encompass' First Set of Interrogatories.

## II.    <u>STANDARD OF REVIEW</u>

Modern instruments of discovery serve a useful purpose in that, together with pre-trial procedures, they make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.  <u>United States v. Procter & Gamble Co.</u>, 356 U.S. 677, 682 (1958).  Pursuant to Rules 37(a)(2) Fed. R. Civ. P., when a party

fails to answer interrogatories or respond to requests for production of documents, the requesting

party may move for an order compelling discovery.  Included within this discretion is the power

to compel a party to disclose information or otherwise cooperate in the discovery process.  The

authority for this power lies with Fed. R. Civ. P. 37.  Specifically, Fed. R. Civ. P. 37(a)(2)(3)

provides:

> **Evasive or Incomplete Disclosure, Answer or Response.**
> For purposes of this subdivision an evasive or incomplete disclosure, answer or response is to be treated as a failure to disclose, answer or respond.

Moreover, Fed. R. Civ. P. 33 governing interrogatories, provides that:

> Without leave of court or written stipulation, any party may serve upon any other party written interrogatories…to be answered by the party served…who shall furnish such information as is available to the party.
>
> ***
>
> Each interrogatory shall be answered separately and fully in writing under oath, unless it is objected to, in which event the objecting party shall state the reasons for objection and shall answer to the extent the interrogatory is not objectionable.
>
> ***
>
> The party submitting the interrogatories may move for an order under Rule 37(a) with respect to any objection to or failure to answer an interrogatory.

Fed. R. Civ. P. 33(a), (b)(1), (b)(5) (alterations added).

In the instant case, plaintiff requested that defendant respond to discovery requests

designed to discover information defendant possesses relating to the allegations set forth in

plaintiff's Complaint.  The plaintiff's narrowly-tailored discovery requests were designed to

elicit information that is reasonably calculated to lead to the discovery of admissible evidence in

this matter.   The plaintiff's request(s) fall within the purview of Fed. R. Civ. P. 26 and 33 and does not seek the production of materials which are in any way privileged, either as attorney-client communications or work-product.  Therefore, this Court is authorized to compel defendant to produce the request materials.

## III.    THE DEFENDANT HAS FAILED TO PROVIDE ANSWERS TO PLAINTIFF'S DISCOVERY REQUESTS IN ACCORDANCE WITH FED. R. CIV. P. 33 AND LOCAL RULE 33.1

### INTERROGATORY #2

Please describe your understanding, in complete detail, of the Board of Chiropractic Regulations entitled "Improper Solicitations, Inducements or Referrals," codified at 233 CMR 4.12.  A copy of the Regulation is annexed hereto at Tab 1 for your convenience.

### DEFENDANT'S ANSWER #2

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead the discovery of admissible evidence.  Defendant further objects as the interrogatory call for a legal conclusion.

Despite being a licensed and active treating chiropractor, the defendant failed to proffer any answer to this discovery request.  In its Complaint, Encompass alleges that defendants (including Frederick Giampa) intentionally violated 233 CMR 4.12 entitled "Improper Solicitations, Inducements or Referrals."  The Massachusetts Chiropractic Regulations prohibit the payment of money for the referral of patients:

(3)   No licensed chiropractor or agent, servant or employee of a licensed chiropractor or of a chiropractic facility shall offer or pay any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, for the purpose of inducing any person to purchase, lease, order, or arrange for any product, facility, service or item related directly or indirectly to Chiropractic care, treatment or services.

(4)   No licensed chiropractor or agent, servant or employee of a licensed chiropractor or of a chiropractic facility shall offer or pay any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, for the purpose of inducing any person to recommend

> purchasing, leasing, ordering or arranging for any product, facility, service or item related directly or indirectly to Chiropractic care, treatment or services.

233 CMR 4.12 (2006).

The gravamen of the plaintiff's Complaint is that the defendants (including Frederick Giampa) engaged in a systematic pattern and practice of alleged chiropractic treatment in violation of the Chiropractic Regulations: (1) prepared and submitted invoices containing improper and/or deceptive CPT Codes; (2) made material misrepresentations of fact and engaged in intentionally unfair and deceptive business practices by creating medical bills that included CPT Codes for treatment modalities that had not actually been performed at all or not performed consistent with the AMA's CPT requirements; (3) rendered unnecessary treatment that guaranteed that a patient's medical bills would exceed the $2,000 tort threshold codified at Mass. Gen. Laws ch. 231, §6D; (4) created, prepared and processed false and fraudulent documentation including false medical billing invoices and reports; (5) followed identical, pre-ordained assessments and therapy protocols, used identical treatment and billing forms and billed the same amounts as every other FMC clinic and *(6) improper solicitation and referrals for patients through the use of runners.*  Accordingly, plaintiff's referral allegations (and defendant's knowledge of the prohibition on the use of such "runners" and related patient referrals) are at the "heart" of plaintiff's Mass. Gen. Laws ch. 93A count.

In the instant Complaint, plaintiff alleges the defendant's role in the operation of the various FMC clinics violated the letter and spirit of Mass. Gen. Laws. ch. 93A.  Under the language of 940 CMR 3.16, an act or practice is a violation of Mass. Gen. Laws ch. 93A, § 2 if the conduct "fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any

political subdivision thereof intended to provide the consumers of this Commonwealth

protection."  940 CMR 3.16(3).

The payment of referral fees in connection with a medical practice has been deemed

"gross misconduct" in the practice of the profession.  Forziati v. Bd. of Reg. of Medicine, 333

Mass. 125, 127 (1955).  In Forziati, the court was faced with allegations that an attorney and a

duly licensed physician engaged in a conspiracy concerning fee splitting between professionals.

In finding "gross misconduct," the court reasoned that the fee splitting arrangement was in "plain

conflict with [the doctor's] obligations as a physician."  See id. at 127-28.  The court aptly noted

that "[t]he whole scheme was in violation of the trust and confidence reposed in both the lawyer

and the doctor."  Id. at 128. (footnote added).  Moreover, the court characterized this egregious

conduct as follows:

> It [the fee splitting arrangement] tended to increase expenses
> unduly.  It was an inducement to the fomenting of litigation, to the
> exaggeration of claims, to false testimony, and even to the
> lessening of the proper interest of the doctor in promptly curing his
> patients, and it diverted patients from honest lawyers to the
> detriment of the administration of justice."
>
> * * *
>
> The scheme here carried out for a series of years between these
> two men of different learned professions was no matter of mere
> peccadillo.  It tended seriously to undermine public confidence in
> both professions. If such conduct became the rule, rather than,
> fortunately, the exception the effect could be disastrous. The
> amount of money involved was substantial. That both parties knew
> this conduct was wrong is strongly suggested by the pains taken
> through all this time to separate the legitimate payments always
> made by check from the illegitimate payments always made in
> cash.

Id. (alterations added).

Moreover, 233 CMR 4.12 expressly prohibits the payment for the referral of patients.

The defendants' (including Frederick Giampa's) conduct in paying for patient referral fees—

despite the existence of a regulation banning such payments— represents a clear violation of the

regulations governing chiropractors.  As such, a violation of these sections constitutes a violation

of Mass. Gen. Laws ch. 93A, §2.  <u>See</u> 940 CMR 3.16(3).  Accordingly, it is wholly reasonable

for plaintiff to inquire as to defendant's knowledge concerning this regulation whereas the

improper payment of patient referral fees is at the heart of Encompass' ch. 93A allegations.  An

answer to this interrogatory does not require defendant to draw a legal conclusion; instead, an

answer to this interrogatory will establish defendant's awareness (or lack thereof) of this

regulation.  As such, defendant should be compelled to provide an answer to this proper

discovery request.

## INTERROGATORY #4

For each of First Spine's patients listed in the spreadsheet annexed at Tab 1 of the Complaint,
please state:

      (1)     Name, date of birth, Social Security number and attorney of the patient;
      (2)     Dates and location of service;
      (3)     Names of persons involved in patient's treatment;
      (4)     Nature of patient's injuries;
      (5)     Type(s) of treatment rendered to patient;
      (6)     Amount billed by First Spine;
      (7)     Amount paid by Encompass; and
      (8)     Date payment was made by Encompass.

### DEFENDANT'S ANSWER #4

      Objection: This request is objected to as it is unduly broad, burdensome and
beyond the scope of discovery permitted under the Federal Rules of Civil
Procedure and the Local Rules for the District of Massachusetts.  In addition all of
the information is in the possession of the Plaintiffs either through the claims
process or as a result of the Defendants' Response to Plaintiffs' Request for
Production of Documents.

      The defendant failed to answer this narrowly tailored discovery request.  Subpart (3) was

designed to elicit knowledge and information regarding persons involved in the treatment of

FMC clinic patients.  It is beyond dispute that the FMC clinics employed non-licensed, untrained

"chiropractic assistants." These employees were primarily responsible for administering the majority of defendants' "recipe" of treatment. Specifically, these chiropractic assistants administered the adjunctive modalities (i.e. hot/cold packs, electric stimulation, etc...) to each FMC patient. Unlike physical therapy, the Massachusetts chiropractic regulations do not require the use of licensed personnel in the administration of chiropractic services. Because these individuals are not licensed and are not referenced on the FMC patient records, Encompass has no other means of discovering the identities of these persons other than through the discovery process. Without justification or excuse, defendant has failed to adequately respond to this request.

Moreover, defendant further fails to answer any of the above-referenced questions stating that the information sought by these requests is already in Encompass' possession via defendant's response to plaintiff's request for production of documents. As such, it is improper for defendant to refuse to answer the interrogatory and defer to information contained in documents that have never been produced. Because the instant discovery request is reasonably calculated to lead to the discovery of relevant, admissible evidence regarding the allegations set forth in plaintiff's Complaint (i.e. the identity of all persons involved in the treatment of FMC patients), defendant should be compelled to provide a true and accurate answer.

**<u>INTERROGATORY # 6</u>**

Identify the person(s) who oversaw the (1) medical treatment, and (2) billing in connection with the patients listed in the spreadsheet annexed at Tab 1 of the Second Amended Complaint. For each person listed, please provide: name, title, job duties, degree, license information, and length of employment with plaintiff.

**<u>DEFENDANT'S ANSWER #6</u>**

Objection: I object to this request as overly broad and unduly burdensome. In addition I would object as it is impossible for me to ascertain most of the

8

information requested and the Plaintiff is in possession of the medical charts of these patients which indicate the chiropractor who provided services.

By this question, plaintiff is attempting to discover the identity of the person(s) responsible for the billing of services allegedly performed by the various FMC clinics. A portion of the plaintiff's Complaint alleges that defendants billed plaintiff for services that were never rendered and/or "upcoded" various services on their bills. Without knowing the identity of FMC billing personnel, plaintiff is prevented from seeking discovery from these individuals. The plaintiff avers that this request is reasonably calculated to lead to the discovery of admissible evidence (i.e. the identity of persons involved in FMC's billing department). As such, defendant should be compelled to provide a true and accurate answer.

Moreover, in his answer, defendant did disclose Brain Culliney as the person who oversaw the chiropractic treatment at the Lowell clinic. However, defendant failed to provide Culliney's title, job duties, degree, license information and length of employment with defendant. Encompass is entitled to this information. As such, plaintiff requests that defendant be compelled to provide a further answer to this request.

## INTERROGATORY #7

Identify the person(s) who was responsible for (1) training chiropractors regarding treatment of patients, billing protocols, and (2) personnel, including the hiring of all chiropractic and unlicensed employees.

### DEFENDANT'S ANSWER #7

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the above objection, the Chiropractors were trained by qualified persons who changed over the years. The various team leaders trained many of the chiropractors.

There were only a finite number of chiropractors working at the Lowell clinic during the time period at issue in this suit. The defendant's answer provides no substantive information

regarding the identity of these "various team leaders."  The plaintiff is entitled to this information

whereas the disclosure of these persons will allow plaintiff to seek further discovery by way of

depositions.  In addition, based on plaintiff's allegations regarding FMC's billing practices,

plaintiff is seeking the identity of all persons who were involved in training the chiropractors and

the chiropractic assistants in the billing of their services.  Because defendant's answer lacks

sufficient detail regarding these subjects, defendant should be compelled to provide a further,

more detailed answer to the foregoing interrogatory.

**INTERROGATORY #8**

Please identify all employees and/or independent contractors (W2, 1099 and cash) of the First
Spine (Lowell) from 1998 through the present, including in your answer (1) all current contact
information for each such person; and (2) each person's title, job description and salary/rate of
pay.

**DEFENDANT'S ANSWER #8**

Objection: Defendant objects to this interrogatory as it is overly broad, unduly
burdensome, vague and ambiguous, and not reasonably calculated to lead to the
discovery of admissible evidence.

Answer: Notwithstanding the above objection, the following is a list of persons
who worked in the Lowell office: Brian Culliney; Jennier McConnell; John Klug;
Doris Ortiz; Sohka Dy; Phally Samith; and Kim Kong.  As I understand these
individuals have either (1) been deposed, (2) are parties, or (3) the
payroll/personnel records have been produced in connection with Plaintiffs'
Request for Production of Documents.

Although defendants, Future Management Corporation, Advanced Spine Centers and

Joseph Giampa, recently provided some of the documents requested by plaintiff (i.e. FMC clinic

payroll records), defendant did not respond to this interrogatory with the detail required by

plaintiff' request.  As such, plaintiff requests that defendant be ordered to proffer a more detailed

answer to the foregoing interrogatory.

**INTERROGATORY #9**

What is ADMED, including in your answer the names and address of all ADMED employees,
the purpose of ADMED, the identity of all ADMED shareholders, why ADMED was

incorporated, date of incorporation and all funds transferred between ADMED and Future Management Corporation.

**DEFENDANT'S ANSWER #9**

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the above objection, ADMED is a Massachusetts professional corporation. I am a 50% shareholder in ADMED, Joseph D. Giampa owns the other 50%. Admed was incorporated because it is my understanding that Aricles of Incorporation must be filed with the Secretary of State in Massachusetts in order to form a corporation in Massachusetts. No funds have been transferred between ADMED and Future Management.

The defendant's answer to the foregoing interrogatory is vague, ambiguous and does not provide the information sought by plaintiff regarding defendant's role in the formation and operation of ADMED. Upon information and belief, it is alleged that defendants, Frederick Giampa and Joseph Giampa started a new company, ADMED, that receives monies for account receivables for the FMC clinics.[1] Upon information and belief, defendants organized ADMED for the purpose of carrying out the business operations of Future Management Corporation. ADMED maintains its bank accounts with TD BankNorth. Upon information and belief, the accounts maintained by TD BankNorth for the benefit of ADMED are actually Future Management's business operating accounts. According to the testimony of defendant, James Kennedy, ARMS conducts all billing and collection activities for Future Management and its various chiropractic and physical therapy clinics. Future Management employee, Jennifer Tremblay, testified on March 15, 2007 that ARMS electronically wires Future Management Corporation account receivable funds to ADMED accounts located at TD BankNorth. In turn, Ms. Tremblay wires the Future Management Corporation account receivable funds from the

---

[1] In fact, a review of FMC's 2006 corporate transaction ledger reveals that FMC and ADMED engaged in a series of transactions on December 28, 2006 and December 29, 2006, involving approximately $33,000. These transactions contradict defendant's statement that no funds have ever been transferred between ADMED and FMC.

ADMED account(s) into defendants' Future Management Corporation accounts at TD BankNorth.

Based on the foregoing, it is clear that ADMED is involved in the financial operation of the FMC clinic "enterprise."  Through the instant request, the plaintiff is seeking to determine the nature and extent of AMDED's role in the FMC enterprise.  The defendant's explanation regarding ADMED's formation is intentionally vague and is set forth for no other purpose than to thwart plaintiff's attempt at discovery relevant, admissible evidence regarding (1) defendant's involvement with ADMED, and (2) ADMED's role in the FMC enterprise.  Encompass respectfully requests that defendant be ordered to provide a true and accurate answer regarding the role and function of ADMED.

## INTERROGATORY # 10

Please identify, in complete detail, with current contact information, all persons known to you with information regarding the allegations contained in plaintiff's Second Amended Complaint, including in your answer the full name of each person, the date of birth, social security number, home address, home telephone number, business address, occupation, and business telephone, and identify the subject matter of each person's knowledge regarding the allegations contained in plaintiff's complaint.

### DEFENDANT'S ANSWER #10

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

The defendant's answer to the forgoing interrogatory is wholly deficient.  Pursuant to Local Rule 26.1(B)(2)(a), defendants are required to disclose "all persons then known to the defendant or the defendant's attorney who witnessed the transaction or occurrence giving rise to the claim or otherwise is known or believed to have substantial information about the claims or defenses[.]"  Under this section, defendant should be required to disclose the identity of all persons involved in the transactions and occurrences (i.e. the treatment of FMC patients giving rise to the instant Complaint) at issue in this matter.  As such, defendant should be compelled to

provide information regarding all persons who may have information regarding the operation of the FMC clinics.

## INTERROGATORY #12

What role, if any, did you play in:

      a.     the treatment of the patient(s) identified in the plaintiff's Second Amended Complaint;

      b.     the management of the defendant and/or The Treating Clinic;

      c.     the financial operations of the defendant and/or The Treating Clinic; and

      d.     billing in connection with the patients identified in the Second Amended Complaint.

### DEFENDANT'S ANSWER #12

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the foregoing objection, I played no role in the treatment of patients or corresponding billing at the Lowell clinic, nor did I have management responsibilities at the Lowell clinic.

In his answer, defendant failed to indicate whether (and to what extent) he was involved in the financial operations of Future Management and/or the Lowell First Spine clinic. Upon information and belief, defendant was heavily involved in the financial operations of the FMC enterprise. As such, defendant should be ordered to provide true and accurate information regarding his role in the financial operations of FMC and the various FMC clinics.

## INTERROGATORY #13

Please identify all persons, including in your answer current contact information, from who you and/or anyone working at your direction received client referrals from 1998 through the present, including in your answer all client claim information in the correspondence with the identifying referring party.

### DEFENDANT'S ANSWER #13

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the foregoing objection, neither I nor anyone working at my direction received client referrals relating to the Lowell Clinic between 1998 and the present.

The testimony of defendant's employees clearly established that the FMC clinics impermissibly paid for patients. Moreover, FMC clinic employees were paid additional referral monies if the patient agreed to referral to an attorney. Phally Samith, an FMC employee, testified that she received bonus money for referring patients for treatment at the Future Management clinics. See Deposition Transcript of Phally Samith at pp. 15, 60, annexed hereto at Exhibit C. Ms. Samith testified that she was informed of the referral bonus program by chiropractor Brian Culliney. See id. at p. 63. Ms. Samith indicated that Culliney was also responsible for determining which lawyer the patient was referred for representation. Id. at p. 86. When a patient was also referred to an attorney, the referring employee received an additional bonus. Id. at p. 79.

Moreover, Sokah Dy is an employee at a Future Management clinic (First Spine) located on Lowell, MA. See Deposition Transcript of Sokah Dy at p. 27-28, annexed hereto at Exhibit D. Ms. Dy testified that Future Management in Chelmsford, MA handles all of the billing for the various defendant clinics. Id. at p. 29. Ms. Dy also testified that Brian Culliney was placed in the position of "team leader." See id. at pp. 88-89. Ms. Dy testified that Culliney, as team leader, determined the performance bonuses of all the individuals on his team. Id. at p. 122. Ms. Dy further testified that the performance bonus is actually referral money earned for referring patients for treatment at Future Management clinics. Id. at p. 132. Ms. Dy stated that it was Culliney who informed her about the bonus/referral program. Id. at 137.

Furthermore, in the Verified Complaint filed in Kennedy, et. al. v. Kennedy, et. al., Middlesex Superior Court, C.A. No. 2005-01458, it was alleged that Future Management and the Giampa brothers paid for the referral of patients and the use of runners to recruit these patients.

See Verified Complaint at ¶¶ 57-60, annexed hereto at Exhibit E.  The FMC clinics have also

provided patients with so-called V.I.P. cards that entitle the patients to receive a discount on

"professional" fees.  See Deposition Transcript of Phally Samith at pp. 79, 86, annexed hereto at

Exhibit C.  FMC clinics have also provided patients with gift certificates, gift cards and/or

coupons for other goods/services in exchange for their treatment at Future Management clinics.

See Ex. C at pp. 15, 60, 63, 102, 109; Deposition Transcript of Jennifer McConnell at pp. 105-

06, annexed hereto at Exhibit F.

Based on the foregoing, there can be no reasonable debate that the payment of patient

referral fees was a common practice at defendants' Lowell clinic (and at all other 40+ FMC

clinics).  As such, plaintiff avers that defendant's answer denying the payment of any such

patient referral fees is inaccurate based on the evidence developed to date.  As such, plaintiff

requests that defendant be compelled to answer this interrogatory truthfully and accurately.

## INTERROGATORY #15

Please state all facts pertaining to any and all professional complaints, criminal actions or
lawsuits filed by or against you, First Spine (Lowell) or any treating chiropractor of the patients
listed in the chart attached at Tab 1 of the Complaint for the period 1998 through the present,
including in your answer the date of complaint, the authority, agency, and/or court in which any
such complaint or lawsuit was filed, the name or names of the plaintiffs, defendants, and/or
complainants, the complaint/docket number, and the status of any such complaint and/or lawsuit.

### DEFENDANT'S ANSWER #15

Objection: Defendant objects to this interrogatory as it is overly broad, unduly
burdensome, vague and ambiguous, and not reasonably calculated to lead to the
discovery of admissible evidence.

Answer: Notwithstanding the foregoing objection, Encompass initiated a
Disciplinary Complaint against me with the Massachusetts Board of
Chiropractors.

The defendant's answer to the foregoing interrogatory is incomplete and/or deficient.  On

October 20, 1999, defendant entered into a Consent Agreement with the Massachusetts Board of

Registration of Chiropractors.  See In the Matter of Frederick T. Giampa, D.C., License No.

1426, annexed hereto at Exhibit G.  Under the Consent Agreement, defendant voluntarily agreed to a two (2) year suspension of his chiropractic license based on allegations set forth in three separate docket numbers.  See Ex. G at ¶¶1-2.  By executing the Consent Agreement, defendant agreed that if the three cases were to proceed, there were sufficient facts from which the Board could make findings that Frederick Giampa violated the following regulations/violations: 233 CMR 4.05(1) (failure to maintain accurate chiropractic records); 233 CMR 4.06(m); 233 CMR 4.08(1)(2) (overutilization of practice); 233 CMR 4.11 (making false health claims); 233 CMR 4.12(2)(3) (improper solicitation); and inducement of referrals.  See Ex. G at ¶6.

Despite the existence of this Consent Decree and the three disciplinary complaints referenced therein, defendant, in answering the foregoing interrogatory, failed to disclose the existence of these matters.  The defendant should be compelled to produce to plaintiff information and documents regarding these matters whereas such information is reasonably likely to lead to the discovery of admissible evidence in this matter (i.e. defendant has previously admitted to engaging in impermissible conduct that is at the heart of the dispute in the instant matter—overutilization of practice, false health claims and improper solicitation/referrals).

**INTERROGATORY #17**

Please describe First Spine document destruction policies, including but not limited to, the destruction of any patient files (including but not limited to those patients alleged in the Complaint), including treatment records, invoices, sign-in sheets, daily sheets, travel cards, exam sheets, lists or any other document reflecting the examination, treatment, billing and dates and times in which the patients may have appeared at First Spine.

    **DEFENDANT'S ANSWER #17**

        Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

        Answer: Notwithstanding the foregoing objection, the document destruction policy is as follows: After the Chiropractic Regulations were amended to permit the electronic storage of records, the closed patient files which are identified as

patient's [sic] who have been discharged and for whom the balance on the file is $0.00 are scanned into the system, stored offsite (fireproof box) and onsite.

The defendant's answer to the foregoing interrogatory is inaccurate based on testimony from FMC-related persons in other litigation. In the matter <u>Safety Ins. Co. v. Giampa, et. al.</u>, Middlesex Superior Court, C.A. No. 07-0697, counsel for the various FMC clinics has stated that <u>all</u> of FMC's original paper patient files have been destroyed and converted to electronic files, including those files with outstanding balances. The statement by FMC in this related litigation is wholly inconsistent with the statements proffered by defendant in this case with regard to FMC's document destruction policy. Upon information and belief, defendants have been actively destroying relevant documents during the course of this litigation. Given these inconsistencies, plaintiff respectfully requests that defendant be compelled to amend his answer to this interrogatory to reflect the true nature of FMC's document destruction/retention policy.

IV.    **CONCLUSION**

      WHEREFORE, for all the foregoing reasons, plaintiff, Encompass Insurance Company,

respectfully requests that this Honorable Court enter an Order COMPELLING defendant,

Frederick T. Giampa, to provide true and accurate responses to Encompass' First Set of

Interrogatories within twenty (20) days of this Court's Order.

Respectfully submitted,
*Encompass Insurance Company,*
By its attorneys,

/s/ Nathan A. Tilden

_____

Richard D. King, Jr., BBO#638142
Nathan A. Tilden, BBO#647076
Michael W. Whitcher, BBO#663451
SMITH & BRINK, P.C.
122 Quincy Shore Drive
Quincy, Massachusetts 02171
Dated:  June 25, 2007                  (617) 770-2214

**<u>Certificate of Service</u>**

      I, Nathan A. Tilden, hereby certify that on this 25th day of June, 2007, this document was filed through the CM/ECF and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                                           ____/s/ Nathan A. Tilden_____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENCOMPASS INSURANCE COMPANY OF MASSACHUSETTS, <br><br> Plaintiff, <br><br> vs. <br><br> JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, ADVANCED SPINE CENTERS, INC., d/b/a FIRST SPINE REHAB, FUTURE MANAGEMENT CORPORATION, EDWARD KENNEDY, BRIAN J. CULLINEY, D.C. and JENNIFER McCONNELL, D.C. <br><br> Defendants. | Civil Action No.  1:05-cv-11693-RCL |

## PLAINTIFF'S FIRST SET OF INTERROGATORIES PROPOUNDED TO THE DEFENDANT, FREDERICK GIAMPA

### I.    INTRODUCTION

Pursuant to Fed. R. Civ. P. 26 and 33, the plaintiff, Encompass Insurance Company of

Massachusetts (hereinafter "Encompass"), requests the defendant, Frederick Giampa (hereinafter

"Giampa"), answer the following interrogatories fully and separately in writing and under oath

within thirty (30) days after service.

### II.    INSTRUCTIONS

A.    These interrogatories are continuing in nature and require automatic supplemental

or amended responses to the extent specified in Fed. R. Civ. P. 26, should the defendant, or his

counsel, obtain further supplemental information.

B.    In answering each interrogatory, you are requested to identify and produce all

documents in your possession or control, or in the possession or control of your employees or

agents and other persons purporting to act on your behalf, which contain information utilized to

answer the interrogatories.

C.    The defendant shall produce any non-identical copies of any documents or materials responsive to any of these interrogatories, or any subsequent interrogatories.

D.    If documents are not attached to the answers to these interrogatories, the substance of such documents should be set forth and an explanation given as to why the document or documents are not attached.

E.    If any of these interrogatories cannot be answered in full, answer the interrogatory to the extent possible, specifying each reason for the inability to answer the remainder and stating whatever information or knowledge you have concerning the unanswered portion.

F.    In answering the interrogatories, furnish all information available to you, regardless of whether or not it is based on personal knowledge or records of you, your agents or representatives of others.

G.    State which answers or parts thereof are based upon personal knowledge, and which answers or parts thereof are based upon information and belief.  For each answer or part thereof based upon information and/or belief, describe in detail and with particularity the basis for the information and/or belief.

H.    In the event that the defendant withholds from production any information or document on the grounds of privilege, the defendant shall identify the document or information withheld and shall include an identification and description of the nature of the privilege claimed, and the subject matter of the withheld information or document.

I.    In answering these interrogatories, the defendant is charged with the understanding that reference to any individual shall be considered inclusive of any representative of that person and any entity (legal, business or otherwise) with which the referenced person has an interest.  For instance, an interrogatory which asks whether any money has been paid to "Mr.

X" would require an answer in the affirmative if any money had been paid to (1) Mr. X, (2) any

representative or agent of Mr. X, and (3) any entity in which Mr. X held a legal or equitable

interest.

## III.    DEFINITIONS

A.    The words **"and"** and **"or"** shall be deemed to mean **"and/or"** and the plural shall

include the singular and vice versa.

B.    The term **"communication"** means any act or instance of transferring,

transmitting, passing, delivering, or giving information, by oral, written, or electronic means,

including, but not limited to, notes, letter, telegram, telex, telephone facsimile, tape, electronic

mail, voice mail, or otherwise.

C.    **"Create"**, **"created"**, or **"creating"** means to cause to exist, originate, produce,

or cause the creation of.

D.    As used herein, the terms **"document"** or **"documents"** mean all papers and

other tangible items and materials upon which information is recorded or from which

information may be obtained and includes all documents that you have in your possession,

custody, or control, or have the right to obtain upon request or demand.  This definition includes

all copies, reproductions and facsimiles of documents and includes, but is not limited to, any and

all letters, business cards, advertisements, correspondence, contracts, agreements, bills, orders,

receipts, records, books, computer tapes and print-outs, intracorporation communications,

memoranda, notes, notebooks, maps, sketches, cablegrams, telegrams, reports, press releases,

advertising and promotional literature, prints, drawings, plans, photographs, printed forms,

manuals, brochures, lists, publications, catalogues, directories, videotapes, other tape recordings,

films, microfilm, and all other writings, including drafts, typings, printings, minutes or copies or

reproductions thereof in the possession, custody or control of defendant or any other past or present officer, director, agent, employee consultant, or attorney for defendant or any person acting on behalf of defendant. If copies of documents are not identical for any reason, including handwritten notations, initials, or identifying marks, each non-identical copy is a separate document within the meaning of this definition.

E.     When referring to a fact, situation, event or circumstance, **"identify"** means to set forth the time, place, and description thereof, the names of the participants therein and enumerate all documents which refer to or reflect such occurrence.

F.     When referring to documents, **"identify"** means to give, to the extent known:

    (1)    the title, heading or caption of such document, if any;

    (2)    the identifying number(s), letter(s) or combination thereof, if any and the significance or meaning of such number(s), letter(s) or combination thereof;

    (3)    the inclusive dates of each such document;

    (4)    the general nature or description of such document (i.e., whether it is a letter, memorandum, minutes of meeting, etc.) and the number of pages of which it consists;

    (5)    the name of each author, addressee, or recipient.

G.     When referring to a person, **"identify"** means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

4

H.    The term **"person"** means, in the plural, as well as the singular, any natural person, firm, association, partnership, corporation, or other entity.  All references herein to any person shall include its employees, agents or representatives of such person or entity.

I.    The term **"relating to"** means referring to, describing, concerning, evidencing, or constituting.

J.    **"False medical documentation"** means any invoice, treatment record, SOAP note, report or other document containing and/or referencing:

    a.  Inaccurate, inadequate and inappropriate documentation;

    b.  Treatment which exceeds the type, quality and/or amount of the documented and clinically reasonable chiropractic needs of the patient;

    c.  A recipe of treatment absent any individualized medical decision making;

    d.  Treatment which is unrelated to the diagnosed, or reasonably suspected, injury or condition incurred by the patient;

    e.  Treatment which is provided solely for the purpose of enabling the patient to incur medical treatment expenses in excess of the tort threshold established by Mass. Gen. Laws ch. 231, §6D;

    f.  Charges for services which were not performed and/or overstating the amount of time spent evaluating and/or treating patients;

    g.  Charges for billing that exceeds reasonable fees for such services;

    h.  Charges that amount to overutilization of practice;

    i.  Charges for adjustments/manipulations which are not based on currently accepted procedure codes;

j.  Charges for examinations which are based on a level of coding which is not consistent with the patient's medical history, subjective and objective clinical findings concerning the patient which were made at the time of the visit, the complexity of the clinical decision-making involved in the diagnosis and/or treatment of the patient, or the nature of the care provided to the patient;

k.  Charges for treatments, procedures or services which were not rendered, were not fully rendered, or were not rendered as represented by the charging chiropractor;

l.  Charges for excessive and improper use of supportive procedures and therapies;

m.  Charges for treatment of minors that wholly exceed reasonable and necessary treatment parameters; and

n.  False and misleading information.

K.  **"I"** and/or **"you"** shall mean Frederick Giampa.

L.  **"Future Management Clinics"** shall mean any of the following:

Advanced Spine Center
3 North Beacon Street
Allston, MA 02134

Advanced Spine Centers
420 Common Street
Lawrence, MA 01840

Advanced Spine Centers
553-555 Main Street
Waltham, MA 01089

Advanced Spine Centers
90 Madison Street
Worcester, MA 01606

Advanced Spine Centers
248 Moody Street
Waltham, MA 02453

Advanced Spine Centers
278 Pitchers Way
Hyannis, MA 02601

Advanced Spine Centers
37 Roxbury Street
Roxbury, MA 02119

Associated Health Care Group
180 Exchange Street
Malden, MA 02148

Back & Neck Treatment
158 Concord Street
Framingham, MA 01701

Brockton Spine & Rehab
365 Westgate Drive, Suite 3-4
Brockton, MA 02301

Excel Physical Therapy
278 Pitchers Way
Hyannis, MA  02601

First Choice Chiropractic & Rehab
125 Rodman Street
Fall River, MA 02723

First Spine & Rehab
180 Exchange Street
Malden, MA 02148

First Spine & Rehab
252 Maple Street
Holyoke, MA 01040

First Spine & Rehab
320 Water Street
Fitchburg, MA 01420

First Spine & Rehab
760 Western Avenue
Lynn, MA 01905

Haverhill Spine & Rehab
5-7 Dudley Street
Haverhill, MA 01830

Methuen Spine & Rehab
30 Hampshire Street
Methuen, MA 01844

Physical Rehab. Group
1515-17 Washington Street
Boston, MA 02118

Salem Chiropractic Assoc.
72 Washington Street
Salem, MA 01970

Back & Neck Treatment
948 Bennington Street
East Boston, MA 02128

Excel Physical Therapy
19 Stoughton Street
Dorchester, MA 02125

Excel Physical Therapy
1225 River Street
Hyde Park, MA 02136

First Choice Chiropractic & Rehab
94 Allen Street
Methuen, MA 01844

First Spine & Rehab
438 Chestnut Street
Springfield, MA 01107

First Spine & Rehab
835 Dorchester Avenue
Dorchester, MA 02125

First Spine & Rehab
1212 Hancock Street
Quincy, MA 02169

First Spine & Rehab
410 School Street
Lowell, MA 01851

Mattapoisett Chiropractic
109 Fairhaven Road, Suite D
Mattapoisett, MA 02739

Physical Rehab. Group
149A Highland Avenue
Somerville, MA 02143

Randolph Spine & Rehab
326 North Main Street, Suite 11
Randolph, MA 02368

Taunton Chiropractic & Rehab
80-86 Main Street
Taunton, MA 02780

Therapy & Rehab Service
50 Meridan Street
East Boston, MA 02128

United Physical Therapy
442 Chestnut Street
Springfield, MA 01103

United Physical Therapy
109 Fairhaven Road, Suite E
Mattapoisett, MA 02739

United Physical Therapy
243 Church Street
Pembroke, MA 02359

Wareham Spine & Rehab
45 Main Street, Unit C3
Wareham, MA 0257

United Physical Therapy
642 Gorham Street
Lowell, MA 01852

United Physical Therapy
150 Stanford Street
Boston, MA 02114

United Physical Therapy
420 Common Street, Suite 102
Lawrence, MA 01840

United Physical Therapy
180 Exchange Street
Malden, MA 02148

M.     **"Durable Medical Goods"** shall mean medical supplies and equipment including ambulatory aids, orthopedic products, aids for daily living, chiropractic equipment, physical therapy equipment, modalities and related supplies.

N.     **"Chiropractic Documentation"** shall mean all invoices, treatment records, SOAP notes, reports and documentation created by Future Management Corporation.

O.     **"Runner"** shall mean persons who facilitate(d) the referral of patients to chiropractic, therapy and/or massage facility.

P.     **"Relevant Period"** shall mean 1998 through the present inclusive and/or any portion thereof.

Q.     **"Incentives"** shall mean the transfer with or without consideration of anything of present or contingent value, including, but not limited to, money, bonuses, gift certificates, coupons, vouchers, taxi service, VIP discount/rebate cards.

R.    **"The Patient Treatment Period"** shall mean the period when the patient(s)

referred to in the Complaint was/were receiving treatments at First Spine.

S.    **"The Treating Clinic"** shall mean Advanced Spine Centers, Inc. d/b/a First

Spine, 410 School Street, Lowell, Massachusetts.

## IV.    <u>INTERROGATORIES</u>

1.    Please fully identify yourself by stating your full name, Social Security number,

date of birth, present residential address, occupation, present business address,

and position.

2.    Please describe your understanding, in complete detail, of the Board of

Chiropractic Regulations entitled "Improper Solicitations, Inducements or

Referrals," codified at 233 CMR 4.12.  A copy of the Regulation is annexed

hereto at Tab 1 for your convenience.

3.    For each person who you or your attorney anticipate calling to testify as an expert

at the time of trial, please state his/her full name, residential address, occupation

and field of expertise; state the subject matter upon which he/she is expected to

testify; state the substance of the facts to which he/she is expected to testify and

state a summary of the grounds for each such opinion.

4.    For each of First Spine's patients listed in the spreadsheet annexed at Tab 1 of the

Complaint, please state:

> (1)    Name, date of birth, Social Security number and attorney of the
>         patient;
> (2)    Dates and location of service;
> (3)    Names of persons involved in patient's treatment;
> (4)    Nature of patient's injuries;
> (5)    Type(s) of treatment rendered to patient;

(6)    Amount billed by First Spine;

(7)    Amount paid by Encompass; and

(8)    Date payment was made by Encompass.

5.    Please identify all patients during the Relevant Period wherein the at-fault vehicle was insured by Encompass, including in your answer the name of the patient, the amount paid to The Treating Clinic date of payment, and the amount.

6.    Identify the person(s) who oversaw the (1) medical treatment, and (2) billing in connection with the patients listed in the spreadsheet annexed at Tab 1 of the Second Amended Complaint. For each person listed, please provide: name, title, job duties, degree, license information, and length of employment with plaintiff.

7.    Identify the person(s) who was responsible for (1) training chiropractors regarding treatment of patients, billing protocols, and (2) personnel, including the hiring of all chiropractic and unlicensed employees.

8.    Please identify all employees and/or independent contractors (W2, 1099 and cash) of the First Spine (Lowell) from 1998 through the present, including in your answer (1) all current contact information for each such person; and (2) each person's title, job description and salary/rate of pay.

9.    What is ADMED, including in your answer the names and address of all ADMED employees, the purpose of ADMED, the identity of all ADMED shareholders, why ADMED was incorporated, date of incorporation and all funds transferred between ADMED and Future Management Corporation.

10.    Please identify, in complete detail, with current contact information, all persons known to you with information regarding the allegations contained in plaintiff's

Second Amended Complaint, including in your answer the full name of each

person, the date of birth, social security number, home address, home telephone

number, business address, occupation, and business telephone, and identify the

subject matter of each person's knowledge regarding the allegations contained in

plaintiff's complaint.

11.    Do you or anyone working in concert with you or at your direction and control

create false medical documentation.  If your answer to the foregoing interrogatory

is anything other than an unqualified negative, please state:

    a.    the name, address, and telephone number of each patient in connection
        with whom false medical documentation was created;

    b.    all insurance carriers involved in connection with each claim wherein false
        medical documentation was created;

    c.    corresponding insurance carrier claim numbers pertaining to the
        information provided in (a) and (b) above;

    d.    date of loss;

    e.    type of claim/coverage involved;

    f.    disposition of claim;

    g.    referral fees paid in connection with each such claim;

    h.    identity of person(s) paid any such referral fee(s); and

    i.    identify the person and/or entity to whom/which any such false medical
        documentation was submitted and the manner in which it was submitted
        (i.e., via the U.S. Mail).

12.    What role, if any, did you play in:

    a.    the treatment of the patient(s) identified in the plaintiff's Second Amended
        Complaint;

    b.    the management of the defendant and/or The Treating Clinic;

    c.    the financial operations of the defendant and/or The Treating Clinic; and

    d.    billing in connection with the patients identified in the Second Amended
        Complaint.

13.  Please identify all persons, including in your answer current contact information, from who you and/or anyone working at your direction received client referrals from 1998 through the present, including in your answer all client claim information in the correspondence with the identifying referring party.

14.  Did you or anyone working in concert with you ever misrepresent facts to Encompass in connection with insurance claims.  If your answer to the foregoing interrogatory is anything other than an unqualified negative, please state:

    a.  the date, time, substance of and identity of the maker(s) each such misrepresentations;

    b.  the claimant name and claim number related to your answer (a), above;

    c.  the substance of each such misrepresentation; and

    d.  the manner in which each misrepresentation was communicated and to whom it was communicated at the insurance company.

15.  Please state all facts pertaining to any and all professional complaints, criminal actions or lawsuits filed by or against you, First Spine (Lowell) or any treating chiropractor of the patients listed in the chart attached at Tab 1 of the Complaint for the period 1998 through the present, including in your answer the date of complaint, the authority, agency, and/or court in which any such complaint or lawsuit was filed, the name or names of the plaintiffs, defendants, and/or complainants, the complaint/docket number, and the status of any such complaint and/or lawsuit.

16.  Please list all banks and account numbers used by you and/or First Spine clinics in connection with the operation of the First Spine (Lowell) clinics for the period 1998 through the present.

17. Please describe First Spine document destruction policies, including but not limited to, the destruction of any patient files (including but not limited to those patients alleged in the Complaint), including treatment records, invoices, sign-in sheets, daily sheets, travel cards, exam sheets, lists or any other document reflecting the examination, treatment, billing and dates and times in which the patients may have appeared at First Spine.

18. If you disagree with the opinions of Michael Frustaci, D.C., as expressed in his Affidavit filed in support of Encompass' Motion for Attachment of Real and Personal Property, a copy of which is attached hereto as Exhibit A, then explain in complete detail your basis for disagreeing with Michael Frustaci's opinions or why you believe his findings are in any way inaccurate or do not reflect established and/or generally accepted chiropractic standards.

19. Please describe the defendants' protocol for memorializing and/or documenting employee referral of patients to First Spine, Future Management Clinics and/or personal injury attorneys, as testified to by Philly Samith in her deposition. Include in your answer the name of the document, ledger, notebook, etc., the current whereabouts of such documentation, the contents thereof, and why it has not been provided to Encompass.

20. Please describe the defendants' protocol and/or procedure for training Future Management billing personnel (during the Patient Treatment Period) in Current Procedural Terminology codes and/or ICD-9 codes.  Include in your answer any written training materials, the current whereabouts of such documentation, the contents thereof and why it has not been provided to Encompass.

Respectfully submitted,
*Encompass Insurance Company,*
By its attorneys,

Richard D. King, Jr., BBO#638142
Nathan A. Tilden, BBO#647076
SMITH & BRINK, P.C.
122 Quincy Shore Drive
Quincy, Massachusetts 02171
(617) 770-2214

Dated: March 1/2007

14

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETS

---

ENCOMPASS INSURANCE COMPANY OF
MASSACHUSETS,

        Plaintiff,

    v.                                Case No. 05-11693 RCL

JOSEPH D. GIAMPA, FREDERICK T. GIAMPA,
ADVANCED SPINE CENTERS, INC. d/b/a
FIRST SPINE REHAB, FUTURE
MANAGEMENT CORPORATION,
FUTURE MANAGEMENT BUSINESS TRUST,
EDWARD KENNEDY, BRIAN J. CULLINEY,
D.C., and JENNIFER McCONNELL, D.C.

        Defendants.

---

## DEFENDANT FREDERICK T. GIAMPA'S  ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Now appears the Defendant Frederick T. Giampa (hereinafter "the Defendant"), by his

attorneys BELESI & CONROY, P.C., as and for his Answers to Plaintiff's First Set of

Interrogatories, answers and objects as follows:

### General Objections

    Without limiting or waiving any specific objections set forth in response to any

particular response to interrogatories the Defendant objects generally to the plaintiff's 1st

set of interrogatories as follows:

Defendant objects to the interrogatories to the extent that such interrogatories infringe upon or request information subject to and protected by the attorney client privilege or attorney work product doctrine.

Defendant generally objects to plaintiff's 1st set of interrogatories. To the extent such interrogatories request information based upon, either directly or indirectly, documents, information or materials not in the possession custody or control of the defendant.

Defendant generally objects to the plaintiff's 1st set of interrogatories to the extent that such interrogatories seek information which is beyond the scope of discoverable materials pursuant to the Federal Rules of Civil Procedure or the local rules of the Massachusetts District Court.

Defendant generally objects to the plaintiff's 1st set of interrogatories to the extent such interrogatories are overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible materials.

Defendant specifically reserves the right to supplement, modify or alter these responses.

## ANSWERS

1.    Please fully identify yourself by stating your full name, Social Security number, date of birth, present residential address, occupation, present business address, and position.

Answer:      Frederick T. Giampa, ss# 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, 06/01/64, 9 Glenhill Road, Sharon, MA, Chiropractor, 948 Bennington Street, East Boston, MA, Treating Chiropractor.

2.    Please describe your understanding, in complete detail, of the Board of Chiropractic Regulations entitled "Improper Solicitations, Inducements or

Referrals," codified at 233 CMR 4.12. A copy of the Regulation is annexed hereto at Tab 1 for your convenience.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects as the interrogatory calls for a legal conclusion.

3.  For each person who you or your attorney anticipate calling to testify as an expert at the time of trial, please state his/her full name, residential address, occupation and field of expertise; state the subject matter upon which he/she is expected to testify; state the substance of the facts to which he/she is expected to testify and state a summary of the grounds for each such opinion.

Objection: Defendant objects to this interrogatory as such information is premature and the subject matter of automatic disclosure pursuant to Fed.R.Civ.P.26(a)(2).

4.  For each of First Spine's patients listed in the spreadsheet annexed at Tab 1 of the Complaint, please state:

    (1)  Name, date of birth, Social Security number and attorney of the patient;
    (2)  Dates and location of service;
    (3)  Names of persons involved in patient's treatment;
    (4)  Nature of patient's injuries;
    (5)  Type(s) of treatment rendered to patient;
    (6)  Amount billed by First Spine;
    (7)  Amount paid by Encompass; and
    (8)  Date payment was made by Encompass.

Objection: This request is objected to as it is unduly broad, burdensome and beyond the scope of discovery permitted under the Federal Rules of Civil Procedure and the Local Rules for the District of Massachusetts. In addition all of the information is in the possession of the Plaintiffs either through the claims process or as a result of the Defendants' Response to Plaintiffs' Request for Production of Documents.

5.  Please identify all patients during the Relevant Period wherein the at-fault vehicle was insured by Encompass, including in your answer the name of the patient, the amount paid to The Treating Clinic date of payment, and the amount.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the

discovery of admissible evidence. Defendant further objects as the interrogatory calls for a legal conclusion.

Answer: Notwithstanding the foregoing objection, Defendant states that he is unable to ascertain the degree of fault in any accident giving rise to the treatment of patients.

6.    Identify the person(s) who oversaw the (1) medical treatment, and (2) billing in connection with the patients listed in the spreadsheet annexed at Tab 1 of the Second Amended Complaint. For each person listed, please provide: name, title, job duties, degree, license information, and length of employment with plaintiff.

Objection: I object to this request as overly broad and unduly burdensome. In addition I would object as it is impossible for me to ascertain most of the information requested and the Plaintiff is in possession of the medical charts of these patients which indicate the chiropractor who provided services.

Answer: Notwithstanding the above objection, Brian Culliney oversaw treatment of patients at the Lowell clinic during all relevant time periods.

7.    Identify the person(s) who was responsible for (1) training chiropractors regarding treatment of patients, billing protocols, and (2) personnel, including the hiring of all chiropractic and unlicensed employees.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the above objection, the Chiropractors were trained by qualified persons who changed over the years. The various team leaders trained many of the chiropractors

8.    Please identify all employees and/or independent contractors (W2, 1099 and cash) of the First Spine (Lowell) from 1998 through the present, including in your answer (1) all current contact information for each such person; and (2) each person's title, job description and salary/rate of pay.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the above objection, the following is a list of persons who worked in the Lowell office:

Brian Culliney

Jennifer McConnell
John Klug
Doris Ortiz
Sohka Dy
Phally Samith
Kim Kong

As I understand these individuals have either (1) been deposed, (2) are parties or (3) the payroll/personnel records have been produced in connection with Plaintiffs' Request for Production of Documents.

9.   What is ADMED, including in your answer the names and addresses of all ADMED employees, the purpose of ADMED, the identity of all ADMED shareholders, why ADMED was incorporated, date of incorporation and all funds transferred between ADMED and Future Management Corporation.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the above objection, ADMED is a Massachusetts professional corporation. I am a 50% shareholder in ADMED, Joseph D. Giampa owns the other 50%. Admed was incorporated because it is my understating that Articles of Incorporation must be filed with the Secretary of State in Massachusetts in order to form a corporation in Massachusetts. No funds have been transferred between ADMED and Future Management.

10.  Please identify, in complete detail, with current contact information, all persons known to you with information regarding the allegations contained in plaintiff's Second Amended Complaint, including in your answer the full name of each person, the date of birth, social security number, home address, home telephone number, business address, occupation, and business telephone, and identify the subject matter of each person's knowledge regarding the allegations contained in plaintiff's complaint.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

11.  Do you or anyone working in concert with you or at your direction and control create false medical documentation. If your answer to the foregoing interrogatory is anything other than an unqualified negative, please state:

a.   the name, address, and telephone number of each patient in connection with whom false medical documentation was created;

b.     all insurance carriers involved in connection with each claim wherein false medical documentation was created;

c.     corresponding insurance carrier claim numbers pertaining to the information provided in (a) and (b) above;

d.     date of loss;

e.     type of claim/coverage involved;

f.     disposition of claim;

g.     referral fees paid in connection with each such claim;

h.     identity of person(s) paid any such referral fee(s); and

i.     identify the person and/or entity to whom/which any false medical documentation was submitted and the manner in which it was submitted (i.e., via the U.S. Mail).

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the foregoing objection, neither I nor anyone working in concert with me or at my direction and control have created false medical documentation.

12.    What role, if any, did you play in:

a.     the treatment of the patient(s) identified in the plaintiff's Second Amended Complaint;

b.     the management of the defendant and/or The Treating Clinic;

c.     the financial operations of the defendant and/or The Treating Clinic; and

d.     billing in connection with the patients identified in the Second Amended Complaint.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the foregoing objection, I played no role in the treatment of patients or corresponding billing at the Lowell clinic, nor did I have management responsibilities at the Lowell clinic.

13.    Please identify all persons, including in your answer current contact information, from who you and/or anyone working at your direction received client referrals from 1998 through the present, including in your answer all client claim information in the correspondence with the identifying referring party.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the foregoing objection, neither I nor anyone working at my direction have received client referrals relating to the Lowell Clinic between 1998 and the present.

14. Did you or anyone working in concert with you ever misrepresent facts to Encompass in connection with insurance claims. If your answer to the foregoing interrogatory is anything other than an unqualified negative, please state:

   a. the date, time, substance of and identity of the maker(s) each such misrepresentations;
   b. the claimant name and claim number related to your answer (a) above;
   c. the substance of each such misrepresentation; and
   d. the manner in which each misrepresentation was communicated and to whom it was communicated at the insurance company.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the foregoing objection, neither I nor anyone working at in concert with me have ever misrepresented facts to Encompass.

15. Please state all facts pertaining to any and all professional complaints, criminal actions or lawsuits filed by or against you, First Spine (Lowell) or any treating chiropractor of the patients listed in the chart attached at Tab 1 of the Complaint for the period 1998 through the present, including in your answer the date of complaint, the authority, agency, and/or court in which any such complaint or lawsuit was filed, the name or names of the plaintiffs, defendants, and/or complainants, the complaint/docket number, and the status of any such complaint and/or lawsuit.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the foregoing objection, Encompass initiated a Disciplinary Complaint against me with the Massachusetts Board of Chiropractors.

16. Please list all banks and account numbers used by you and/or First Spine clinics in connection with the operation of the First Spine (Lowell) clinics for the period 1998 through the present.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the foregoing objection, I did not use any bank accounts in connection with the operation of the First Spine clinics. The relevant bank account information is being provided in connection with Future Management Corporation's Response to Plaintiffs' First Request for Production of Documents.

17. Please describe First Spine document destruction policies, including but not limited to, the destruction of any patient files (including but not limited to those patients alleged in the Complaint), including treatment record, invoices, sign-in sheets, daily sheets, travel cards, exam sheets, lists or any other document reflecting the examination, treatment, billing and dates and times in which the patients may have appeared at First Spine.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the foregoing objection, The document destruction policy is as follows:

After the Chiropractic Regulations were amended to permit the electronic storage of records, the closed patient files which are identified as patient's who have been discharged and for whom the balance on the file is $0.00 are scanned into the system, stored offsite (fireproof box) and onsite.

18. If you disagree with the opinions of Michael Frustaci, M.D., as expressed in his Affidavit filed in support of Encompass' Motion for Attachment of Real and Personal Property, a copy of which is attached hereto as Exhibit A, then explain in complete detail your basis for disagreeing with Michael Frustaci's opinions or why you believe his findings are in any way inaccurate or do not reflect established and/or generally accepted chiropractic standards.

Objection: Defendant objects to this interrogatory as such information is premature and the subject matter of automatic disclosure pursuant to Fed.R.Civ.P.26(a)(2).

19. Please describe the defendants' protocol for memorializing and/or documenting employee referral of patients to First Spine, Future Management Clinics and/or personal injury attorneys, as testified to by Philly Samith in her deposition. Include in your answer the name of the document, ledger, notebook, etc., the current whereabouts of such documentation, the contents thereof, and why it has not been provided to Encompass.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the foregoing objection, it is my understanding that the Lowell clinic maintained a sheet detailing patient referrals which was faxed to the Future Management office. It is my further understanding that the fax copy was then placed in the employee's personnel file.

20.    Please describe the defendants' protocol and/or procedure for training Future Management billing personnel (during the Patient Treatment Period) in Current Procedural Terminology codes and/or ICD-9 codes. Include in your answer any written training materials, the current whereabouts of such documentation, the contents thereof any why it has not been provided to Encompass.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the foregoing objection, billing personnel were trained by the billing supervisor at the relevant time.

Signed this 20th day of April 2007 under the pains and penalties of perjury.

_____
Frederick T. Giampa

For objections:

_____
Matthew J. Conroy
BELESI & CONROY, P.C.
114 Waltham Street
Lexington, MA 02421
(781) 862-8060

## CERTIFICATE OF SERVICE

I, Matthew J. Conroy do hereby certify that a true and accurate copy of the foregoing pleading was served upon all counsel of record this 22d day of April 2007 by email, and by 1st class US Mail postage prepaid.

/s/ Matthew J. Conroy
Matthew J. Conroy

Volume:     I
Pages:   1-145
Exhibits:    None

COMMONWEALTH OF MASSACHUSETTS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

ENCOMPASS INSURANCE COMPANY OF          )
MASSACHUSETTS,                          )
    Plaintiff—Counterclaim Defendant,   )
                                        )
Vs.                                     )
                                        )
JOSEPH D. GIAMPA, FREDERICK T. GIAMPA,  )
ADVANCED SPINE CENTERS, INC., d/b/a     )
FIRST SPINE REHAB, FUTURE MANAGEMENT    )
CORPORATION, FUTURE MANAGEMENT          )
BUSINESS TRUST, EDWARD KENNEDY,         )
BRIAN J. CULLINEY, D.C. and             )
JENNIFER MCCONNELL, D.C.                ) CA NO.:05—111693 RCL
                                        )
    Defendants—Counterclaim Plaintiffs,)

---

                                        )
JOSEPH D. GIAMPA, FREDERICK T. GIAMPA,  )
ADVANCE SPINE CENTERS, INC.             )
                                        )
    Third—Party Plaintiffs              )
                                        )
Vs.                                     )
                                        )
ALLSTATE INSURANCE COMPANY,             )
                                        )
    Third—Party Defendant.              )
                                        )

---

### DEPOSITION OF PHALLY SAMITH

A witness called by and on behalf of the Plaintiff—Counterclaim Defendant, pursuant to the Massachusetts Rules of Civil Procedure, before Kathleen M. Mullin, a Certified Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Offices of Smith & Brink, P C, 122 Quincy Shore Drive, Quincy, Massachusetts, commencing on Friday, February 16, 2007 at 10:30 a.m.

15

```
 1    A.   No.

 2    Q.   And you said Morn, M-o-r-n, is your mom?

 3    A.   Yes.

 4    Q.   Was she involved in one of the accidents that you

 5         just testified about where you received treatment

 6         at First Spine?

 7    A.   Yes.

 8    Q.   Did she also receive treatment at First Spine in

 9         connection with that same accident?

10    A.   Yes.

11    Q.   Was she paid by First Spine or by Brian Culliney to

12         treat at First Spine?

13    A.   No.

14    Q.   Did you receive a bonus for referring her to First

15         Spine, Morn?

16    A.   Yes.

17    Q.   How about Savonn Yonn?  Did he receive a bonus as

18         well?

19    A.   Excuse me?

20    Q.   Did Savonn Yonn also receive a bonus for Morn

21         Samith being treated at First Spine?

22    A.   No.

23    Q.   Just you?

24    A.   Yes.
```

60

```
 1    Q.   Can you estimate for me -- or if you know the exact
 2         date you can tell me -- when you last received a
 3         bonus?
 4    A.   I don't remember.
 5    Q.   What did you need to do in order to receive a bonus
 6         at First Spine?
 7    A.   Recommend injured patient.
 8    Q.   Bring in a patient, right?
 9    A.   Recommend them.
10    Q.   Would you bring them in so they would get treatment
11         at First Spine?
12    A.   I don't know what you mean.
13    Q.   Well if they didn't get treatment at First Spine
14         would you get a bonus?
15    A.   No.
16    Q.   Okay.  So they had to come in and get some
17         treatment; correct?
18    A.   Yes.
19    Q.   How was the bonus paid?
20    A.   By check, payroll.
21    Q.   So it would come in your weekly check?
22    A.   Yes.
23    Q.   Were you paid weekly?
24    A.   Bi—weekly.
```

63

1      tells you not to answer it.  Did you receive

2      bonuses on a weekly basis?

3   A.    I don't remember.

4   Q.    Who else received bonuses?

5   A.    I don't know.

6   Q.    Who kept track of how much bonus you should receive

7      every week?

8   A.    I don't know.

9   Q.    Well if you bring a patient in, right?

10   A.    Yes.

11   Q.    And they get treatment, right?

12   A.    Yes.

13   Q.    You knew you were going to get a bonus; correct?

14   A.    Yes.

15   Q.    How did you know that?

16   A.    Because I recommend them.

17   Q.    How did you know you were going to get a bonus?

18   A.    How do I know?

19   Q.    Yes.

20   A.    I talk to the doctor.

21   Q.    Who?

22   A.    Brian Culliney.

23   Q.    So Brian Culliney he was the one that told you

24      about the bonus?

79

```
 1    Q.   Do you also get a bonus if the patient goes to a
 2         lawyer?
 3    A.   Yes.
 4    Q.   What lawyer does the patient have to go to?
 5              MR. CIAMPA:   Objection.
 6    A.   Does -- I don't know.  Doesn't matter.
 7    (BY MR. KING)
 8    Q.   So as long as a patient goes to a lawyer then you
 9         get an additional bonus?
10    A.   Yes.
11    Q.   So if you bring in Jean Smith you get one bonus,
12         right?
13    A.   Yes.
14    Q.   And then if that person retains an attorney then
15         you get an additional bonus?
16    A.   Yes.
17    Q.   We'll call that the attorney bonus, okay, just to
18         differentiate?
19    A.   Yes.
20    Q.   Is the attorney bonus the same as bringing in the
21         patient bonus?
22    A.   I don't know.
23    Q.   It could be more or could be less, you just have no
24         idea?
```

*Lee & Associates *Certified Court Reporters* (781) 848-9693*

1    Q.    And that would be the second part of the bonus;

2         correct?

3    A.    Yes.

4    Q.    Now would there be a conversation with Dr. Culliney

5         about who the attorney should be that gets the

6         referral or was that your decision?

7    A.    It's not my decision.

8    Q.    Whose decision was it?  Well, it certainly wasn't

9         Mr. Ferrante's.  Do you know whose decision it was?

10   A.    Can you say question again?

11   Q.    It wasn't your decision to decide who was going to

12        get that attorney referral, right?

13   A.    No.

14   Q.    Whose decision was it?

15   A.    I don't know who the decision it is.

16   Q.    You talked to Dr. Culliney about it, right?

17   A.    Yes.

18   Q.    So he told you who gets the referral?

19   A.    Yes.

20   Q.    You never had some more conversations with Jen

21        McConnell?

22   A.    I don't remember, no.

23   Q.    What did you say?  You don't remember?

24   A.    No.

102

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And it may have been ten or it may have been more |
| 3 | | than ten times, right? |
| 4 | A. | Yes. |
| 5 | Q. | And they were gift cards to what? |
| 6 | A. | Just like a VISA gift card. |
| 7 | Q. | Useable anywhere VISA is accepted? |
| 8 | A. | Yes. |
| 9 | Q. | Any other types of gift certificates other than the |
| 10 | | VISA gift card? |
| 11 | A. | Yes. |
| 12 | Q. | Describe them for me. |
| 13 | A. | China Buffet. |
| 14 | Q. | What is that? |
| 15 | A. | A restaurant, Chinese restaurant.  Buffet. |
| 16 | Q. | Is that in Lowell? |
| 17 | A. | That's in Lowell. |
| 18 | Q. | Are you sure? |
| 19 | A. | I know one in Lowell. |
| 20 | Q. | Have you been to the China Buffet? |
| 21 | A. | Yes. |
| 22 | Q. | Did you buy the gift certificates? |
| 23 | A. | Yes. |
| 24 | Q. | Would you use the van and go buy them or how does |

```
1    A.   Don't remember.

2    (BY MR. KING)

3    Q.   So sometimes you would give them a VISA gift card.

4         Did everybody get one or the other, a VISA gift

5         card or a China Buffet?

6    A.   I don't know.

7    Q.   Well the patients that you handled.

8    A.   Yes.

9    Q.   So all of your patients got one or the other;

10        correct?

11   A.   Yes.

12   Q.   Would you ask the patient what they would rather

13        have, the Buffet or a gift card?

14   A.   Yes.

15   Q.   So it was sort of up to them?

16   A.   Yes.

17   Q.   And then you would go see Culliney and get it for

18        them; correct?

19   A.   Yes.

20   Q.   Your testimony I guess will be that you don't know

21        if Sokha Dy ever did anything with gift cards or

22        Buffet; correct?

23   A.   Yes.

24   Q.   Have you had conversations with her about not
```

145

C E R T I F I C A T E   P A G E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF NORFOLK, SS

   I, Kathleen M. Mullin, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing Deposition of **Phally Samith**, was taken before me on February 16, 2007.  The said witness was duly sworn before the commencement of her testimony; that the said testimony was taken by me, by the voice writing method and translated into text via speech recognition.  To the best of my knowledge, the within transcript is a complete, true and accurate record of said testimony.

   I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter at hand.

   I have hereunto set my hand and Notary Seal this 22nd day of February, 2007.

_____
Kathleen M. Mullin, CVR, Notary Public
My Commission Expires:
June 22, 2012

**THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.**

Pages: 1-251
Vol. I
Exhibits: 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

ENCOMPASS INSURANCE COMPANY          )
OF MASSACHUSETTS,                    )
    Plaintiff-Counterclaim Defendants, )
                           )
VS.                                  )
                           )
JOSEPH D. GIAMPA, FREDERICK T. GIAMPA )
ADVANCED SPINE CENTERS, INC. d/b/a   )
FIRST SPINE REHAB, FUTURE MANAGEMENT )
CORPORATION, FUTURE MANAGEMENT       )
BUSINESS TRUST, EDWARD KENNEDY, BRIAN )
J. CULLINEY, D.C. and JENNIFER        )
McCONNELL, D.C.                      )Civil Action
    Defendants-Counterclaim Plaintiffs.)No.05-11693RCL
—————————————————————————————————————)
                           )
JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, )
ADVANCED SPINE CENTERS, INC.         )
    Third-Party Plaintiffs               )
                           )
VS.                                  )
                           )
ALLSTATE INSURANCE COMPANY,          )
    Third-Party Defendant                )
—————————————————————————————————————)

**DEPOSITION OF SOKHA DY**

       A witness called by and on behalf of the
Encompass Insurance Company, taken pursuant to the
Massachusetts Rules of Civil Procedure, before Jo-Anne M.
Golden, a Professional Court Reporter and Notary Public
within and for the Commonwealth of Massachusetts, at the
Law Offices of Smith & Brink, P.C., 122 Quincy Shore
Drive, Quincy, Massachusetts 02171. Commencing on
Thursday, February 15, 2007 at 10:18 a.m.

27

| | | |
|---|---|---|
| 1 | | supervisor ever since? |
| 2 | A. | Yes. |
| 3 | Q. | And he continues to be to this day, correct? |
| 4 | A. | Yes. |
| 5 | Q. | How long have you been employed by First Spine? |
| 6 | A. | Over nine years. |
| 7 | Q. | And during that nine-year period, has that been |
| 8 | | your sole.source of income? |
| 9 | A. | Yes. |
| 10 | Q. | Do you file state income taxes in Massachusetts? |
| 11 | A. | Yes. |
| 12 | Q. | And do you file federal income taxes? |
| 13 | A. | Yes. |
| 14 | Q. | Do you have an accountant that takes care of that |
| 15 | | for you or do you the form yourself? |
| 16 | A. | Somebody do it for me. |
| 17 | Q. | Who is that? |
| 18 | A. | Michael Feinberg. |
| 19 | Q. | Is that an attorney or an accountant? |
| 20 | A. | No.  I pay somebody to do it. |
| 21 | Q. | And his name is Michael Feinberg? |
| 22 | A. | Yes. |
| 23 | Q. | And he's located where? |
| 24 | A. | Westford Street. |

28

1    Q.   Is that in Lowell?

2    A.   In Lowell, yes.

3    Q.   And has he been doing your taxes all these past

4        nine years?

5    A.   Yeah.  Maybe five, six.

6    Q.   Now, when you were -- was there a period of time

7        that you were unemployed between the time that

8        Raudamaker's business closed down and you were

9        hired at First Spine?

10   A.   (No verbal response)

11   Q.   Was there a gap in there that you were unemployed,

12       or did you just start right in at First Spine?

13   A.   I start right in.

14   Q.   And that was some time around 1997 I guess?

15   A.   Yes.

16   Q.   What were you hired to do at First Spine?

17   A.   Clinical assistant like calling for the claim,

18       helping patients and put in therapy.

19   Q.   So you would put patients into therapy?

20   A.   Therapy, yes, and the front desk.

21   Q.   Like you did at -- I'm sorry.

22   A.   The same as the front desk, answering the phone

23       and put patients in therapy.

24   Q.   So that was similar to what you did at Donahue's

29

| | | |
|---|---|---|
| 1 | | place and Raudamaker's place? |
| 2 | A. | That's right, yes. |
| 3 | Q. | And you'd also answer the phone, receptionist type |
| 4 | | duties? |
| 5 | A. | Right.  That's right. |
| 6 | Q. | What other ,if any, duties did you perform or do |
| 7 | | you perform at First Spine? |
| 8 | A. | Like what? |
| 9 | Q. | Well, do you contact insurance companies to ask |
| 10 | | them to pay their bill? |
| 11 | A. | No.  I don't do that stuff.  We have the medical |
| 12 | | billing. |
| 13 | Q. | Who is that? |
| 14 | A. | At the Future Medical building, at the Future |
| 15 | | Management. |
| 16 | Q. | Where is that located? |
| 17 | A. | Chelmsford Street. |
| 18 | Q. | In Lowell? |
| 19 | A. | Chelmsford, Mass. -- yes. |
| 20 | Q. | Oh, Chelmsford, Mass.? |
| 21 | A. | Yes. |
| 22 | Q. | Have you been to that building? |
| 23 | A. | Yes. |
| 24 | Q. | When were you last at that building? |

88

1 Q. About the last 12 months have been a little bit

2   slow?

3 A. Yes.

4 Q. Yeah.  Has anyone been fired?  Do you understand

5   what I mean by fired?

6 A. Fired?

7 Q. Yes.  From First Spine in the last year?

8 A. No.   .

9 Q. Do you know what I mean by the term "fired",

10   terminated?

11 A. Terminated, fired, no.

12 Q. Do you know what I mean by that term though?

13 A. Yeah.  Yeah.

14 Q. What does it mean?

15 A. Like fired.

16 Q. Like the boss says we don't want you anymore,

17   right?

18 A. Yes.

19 Q. Has Brian Culliney gotten rid of anyone in the

20   last year?

21 A. No.

22 Q. And he's the supervisor there, correct?

23 A. Yes.

24 Q. Have you ever heard the term "team leader"?

89

```
 1    A.   Yes.  Him, yes.

 2    Q.   And he refers to himself as the team leader?

 3    A.   Himself, yes.

 4    Q.   Yes.  Have you heard anyone else call him the team

 5         leader?

 6    A.   Dr. Giampa, he's the team leader so.

 7    Q.   Joe Giampa?

 8    A.   Joe Giampa.

 9    Q.   Said what?

10    A.   Team leader Dr. Brian, if you need something you

11         speak to -- speak to your team leader.

12    Q.   And is he the team leader for everybody there in

13         Lowell?

14    A.   I think, yes.

15    Q.   In other words, Doris doesn't have a separate team

16         leader?  I mean her team leader is Culliney as

17         well, correct?

18    A.   Mm-hmm.  Yes.

19    Q.   And is he the team leader for other facilities or

20         clinics?

21    A.   I don't know.

22    Q.   Does he work every day in the Lowell clinic?

23    A.   Yes.

24    Q.   When he's on duty at Lowell, Brian Culliney --
```

122

1    A.   No, less than that.

2    Q.   Less than 10?  All right.  And the performance

3         bonus is based on what?

4    A.   Doing good job and -- at work.

5    Q.   Who decides that you're entitled to this

6         performance bonus?

7    A.   I believe Dr. Culliney.

8    Q.   Does he tell you in advance of your receipt of the

9         bonus that you've been awarded this performance

10        bonus?

11   A.   Yes.

12   Q.   How does he convey that to you?  Is there a plaque

13        at the office there?  Does he just say it to you?

14        How does that work?

15   A.   He just told us.

16   Q.   He tells you?

17   A.   Yes.

18   Q.   He says you -- and who came up with the term

19        performance bonus?

20   A.   Dr. Culliney.

21   Q.   So that's his term?

22   A.   Yes.

23   Q.   Has this program been in place through the nine

24        years that you've been there?

132

1    Q.   And what did she say?

2    A.   She just said like if you bring some like -- if

3         your family got into a car accident just bring

4         them in and get some performance bonus.

5    Q.   So that's what the performance bonus is all about?

6    A.   Mm-hmm.

7    Q.   Right?  Does it have anything to do with doing

8         paperwork?

9    A.   No.

10   Q.   Okay.  And it doesn't have to do with making sure

11        that the clinic is clean, right?

12   A.   No.

13   Q.   It has to do with bringing patients in, correct?

14   A.   Yes.

15   Q.   And you knew that all along, correct?

16   A.   Yes.

17   Q.   Okay.  And you knew it the whole time we've been

18        going back and forth here, I've been asking you

19        these questions, correct?

20   A.   Yes.

21   Q.   Okay.  But you didn't want to tell me that at

22        first; is that right?

23   A.   Right.

24             **MR. CIAMPA:**  Objection.

137

| | | |
|---|---|---|
| 1 | A. | Yeah. |
| 2 | Q. | Is she the one that told you what you have to do |
| 3 | | to get the bonus? |
| 4 | A. | No. |
| 5 | Q. | Who told you? |
| 6 | A. | I think Dr. Culliney. I don't know. |
| 7 | Q. | Well, do you know, because these gentlemen want to |
| 8 | | make sure.that you know when you answer the |
| 9 | | question. I heard them saying to you outside in |
| 10 | | the hall if you don't know, don't answer or words |
| 11 | | to that effect. You know that though, right? You |
| 12 | | already know about being a deponent, you don't |
| 13 | | guess, right? You know if you know, then you |
| 14 | | answer, right? |
| 15 | A. | Okay. |
| 16 | Q. | Okay. So Doris didn't tell you about what it |
| 17 | | takes to get a bonus. Brian Culliney told you |
| 18 | | that; isn't that right? |
| 19 | A. | Right. |
| 20 | Q. | Okay. Is there any doubt in your mind that it was |
| 21 | | Brian that told you that? |
| 22 | A. | Yes. |
| 23 | Q. | There's no doubt in your mind, right? |
| 24 | A. | No doubt, yes. |

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

251

### C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF NORFOLK, SS.

I, JO-ANNE GOLDEN, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing Deposition of SOKHA DY was taken before me on February 15, 2007.  The said witness was duly sworn before the commencement of her testimony; that the said testimony was taken audiographically by myself and then transcribed under my direction.  To the best of my knowledge, the within transcript is a complete, true and accurate record of said Deposition.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter in controversy.

In witness whereof, I have hereunto set my hand and Notary Seal this 23rdth day of February, 2007.

_____
Jo-Anne M. Golden, Notary Public

My Commission Expires:
December 6, 2007

PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND\OR DIRECTION OF THE CERTIFYING REPORTER.

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPT.
CIVIL ACTION
DOCKET No.

05-1458

|  |  |
|---|---|
| EDWARD D. KENNEDY, individually, ) | |
| and as beneficiary of 13 KIDDER ROAD REALTY ) | |
| TRUST and derivatively, on behalf of the ) | |
| corporations FIRST HEALTH PRODUCTS INC. ) | |
| and ROBERT T. KENNEDY INC. d/b/a Kennedy ) | |
| Professional Supply, ) | |
|       Plaintiffs ) | |
| v. ) | |
| JAMES KENNEDY, individually and as ) | |
| Trustee of 13 KIDDER ROAD REALTY TRUST; ) | |
| and ENTERPRISE BANK AND TRUST ) | |
| COMPANY, ) | |
|       Defendants ) | |

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
MIDDLESEX

APR 29 2005

Edward J. Sullivan
CLERK

**VERIFIED COMPLAINT**

| | |
|---|---|
| 6660E000004/29/05CIVIL | 240.00 |
| 6660E000004/29/05SUR CHARGE | 15.00 |
| 6660E000004/29/05SUMMONS | 10.00 |
| 6660E000004/29/05SECC | 20.00 |

INTRODUCTION

1.    The Plaintiff in this action, Edward D. Kennedy, has brought this direct and

derivative action against the above-named defendant, James Kennedy based upon, *inter alia*, a)

his improper attempt to deprive the Plaintiff of his interest in the family businesses, Robert T.

Kennedy Inc. d/b/a Kennedy Professional Supply ("Kennedy Supply") in which the Plaintiff is

President and 50% shareholder; b) looting of the income generated by the businesses Kennedy

Supply and First Health Products Inc. ("First Health") and assets held by 13 Kidder Road Realty

Trust ("Kidder Trust"); c) breach of fiduciary obligations, d) self-dealing, e) wrongful exercise

of dominion over the corporate and trust assets, f) continued refusal to permit joint control over

the financial affairs of the corporations despite demand, g) waste, h) mismanagement, i) theft, j)

forgery, and k) fraud. The Plaintiff is therefore in need of immediate injunctive relief to preserve the remaining corporate and trust assets, and hereby requests the Court to Order the valuation and sale of the Plaintiff's shares in Kennedy Supply, First Health and Kidder Trust, or in the alternative, if the Court sees fit, order the dissolution of Kennedy Supply and First Health pursuant to Mass. Gen. Laws ch. 156D § 14.30 et als.

## PARTIES

2.      Plaintiff Edward D. Kennedy ("E. Kennedy") is an individual who resides in Westford, Middlesex County, Massachusetts. The Plaintiff is currently the President and 50% shareholder of Kennedy Supply and First Health.

3.      Plaintiff Robert T. Kennedy Inc. is a Massachusetts corporation with a current principal place of business at 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts doing business as Kennedy Professional Supply.

4.      Plaintiff First Health Products Inc. is a Massachusetts corporation with a current place of business at 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts.

5.      Plaintiff Edward Kennedy is also a 50% beneficiary of the Kidder Trust, a nominee trust, under a Declaration of Trust recorded at the Middlesex North County Registry of Deeds on June 2, 2000 at Book 10858, Pages 180 through 185. Kidder Trust is the owner of the Premises known as and numbered 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts.

6.      Kennedy Supply and First Health are engaged in the wholesale purchase and sale of health care products, equipment, and supplies to over 1000 chiropractors, chiropractic clinics, hospitals, medical doctors and physical therapists across New England and several other states

including, Florida, Oklahoma, Rhode Island, South Carolina, New Jersey, New York and Pennsylvania.

7.      Defendant James Kennedy ("J. Kennedy") is an individual who resides at 3 Kirby Lane, Chelmsford, Middlesex County, Massachusetts.  J. Kennedy is the Plaintiff's brother, Treasurer, and remaining 50% shareholder in Kennedy Supply and First Health.  J. Kennedy is a co-Trustee of the Kidder Trust.

8.      Defendant Enterprise Bank and Trust Company ("Enterprise Bank") is a Massachusetts banking corporation with a registered principal place of business in Tewksbury, Massachusetts and a banking facility located at 185 Littleton Road, Chelmsford, Massachusetts, which, at all times material hereto, was, and continues to be, the banking institution used by Kennedy Supply, First Health and the Kidder Trust.


## COMMON ALLEGATIONS OF FACT

9.      Kennedy Supply was formed in June 1981 by E. Kennedy and J. Kennedy's late father, Robert T. Kennedy, for the purpose of engaging in wholesale purchase and sale of medical supplies.  *See Articles of Organization of Robert T. Kennedy Inc. attached hereto at Exhibit A.*

10.     Kennedy Supply was formed by Robert Kennedy (its President), his wife, Esther Kennedy, (Treasurer), and his son, Plaintiff E. Kennedy (Clerk).  *See Exhibit A.*

11.     Initially, Robert Kennedy was the sole shareholder and operated and managed Kennedy Supply along with his two youngest sons, Henry and E. Kennedy.

3

12.    The middle child, J. Kennedy, was a carpet installer who possessed very little knowledge of the family business until Robert Kennedy brought him in to get actively involved in Kennedy Supply.

13    Over time, Kennedy Supply's business developed substantial contacts with individuals and companies in the chiropractic industry.

14.    Through these contacts, E. Kennedy decided to open medical offices to provide chiropractic services to the public.

15.    The first chiropractic/physical therapy office was opened in Lawrence, Massachusetts.

16.    Shortly thereafter, E. Kennedy contacted Dr. Joseph Giampa, a longtime friend who E. Kennedy knew to be a licensed chiropractor in Massachusetts for the purpose of becoming a partner in the new business venture.

17.    The new business, Future Management Corporation ("Future Management"), was formally organized in February 1997.

18.    Initially, the parties agreed that Future Management would have three shareholders, E. Kennedy, (25%), J. Kennedy (25%) and Joseph Giampa (50%).

19.    The creation of Future Management was also intended to benefit Kennedy Supply's business, as Kennedy Supply was to be Future Management's primary distributor of medical and chiropractic equipment and supplies.

20.    In order to focus on developing these respective businesses, E. Kennedy permitted J. Kennedy to assume more control over Kennedy Supply than J. Kennedy previously maintained.

4

21.    E. Kennedy agreed to have J. Kennedy operate the day to day management business, while E. Kennedy was in charge of overseeing Kennedy Supply's financial operations.

22.    By September 2003, E. Kennedy had expanded Future Management from 1 office in Lawrence, to over 60 offices in Massachusetts and across the United States, including, but not limited to Florida, Oklahoma, Connecticut, Rhode Island, South Carolina, New Hampshire, Pennsylvania, Illinois and Virginia.

23.    In 1996, E, Kennedy and J. Kennedy assumed full control over Kennedy Supply after Robert Kennedy retired from the family business.

24.    Prior to receiving a salary from Future Management, E. Kennedy was Kennedy Supply's President, and J. Kennedy, its Treasurer and Clerk and both received salaries from Kennedy Supply in the amount of $200,000.00 and $125,000.00 respectively.

25.    On or about July 20, 1998, E. Kennedy and J. Kennedy formed First Health, a sister corporation to Kennedy Supply, for the purpose of managing and handling various aspects of Kennedy Supply's business, including, but not limited to, administering Kennedy Supply's salaries.

26.    At all times material hereto, E. Kennedy has been the President of First Health and J. Kennedy, its Treasurer and Secretary.

27.    On or about June 2, 2000, Robert Kennedy sold the property located at 13 Kidder Road, Chelmsford, Massachusetts-- the principal place of business for both Kennedy Supply and First Health -- to E. Kennedy and J. Kennedy as co-Trustees of the 13 Kidder Road Realty Trust for Four Hundred and Fifty Thousand ($450,000.00) Dollars.

28.    Beginning on or about January 2000, E. Kennedy and J. Kennedy began receiving a salary from Future Management in the amount of $2,500.00 per week in addition to receiving stock dividends of approximately $130,000.00 per year.

29.    As a result, E. Kennedy and J. Kennedy stopped taking any salary from Kennedy Supply or First Health.

30.    In January 2004, J. Kennedy began to experience serious personal financial problems on account of his increased spending habits and changes in his lifestyle.

31.    Further exacerbating his financial problems, after separating from his wife Claudia Kennedy, J. Kennedy purchased a home in Chelmsford, Massachusetts for $625,000.00, and took frequent vacations with his girlfriend to various destinations in the Caribbean, and to Myrtle Beach, South Carolina.

32.    On January 22, 2004, pursuant to a Decree of Divorce in the Southern District in Hillsborough County, New Hampshire, Claudia Kennedy, was awarded the marital home in Nashua, New Hampshire, their mobile home in Albany, New Hampshire, and their real estate in Myrtle Beach, South Carolina. *A true and accurate copy of the Decree of Divorce dated January 22, 2004 in the matter of Kennedy v. Kennedy is attached hereto at Exhibit B.*

33.    The Decree of Divorce also Ordered that J. Kennedy pay $7,500.00 per month for child support payments for his two minor children, $5,000.00 per month in alimony payments, turn over all assets held in his 401(k) retirement account, plus pay an additional $15,000.00 per month for a period of seven years to Claudia Kennedy as payment for her share of the property division distributions in Future Management, Kidder Trust, First Health and Kennedy Supply. *See Exhibit B.*

34.     As part of its decree, the Court specifically stated that J. Kennedy was "not freely forthcoming with information regarding [his] assets" and failed to list several assets on his financial statements filed with the Court. *See Exhibit B.*

35.     Within hours after learning of the New Hampshire Court's Decree, J. Kennedy stated to E. Kennedy's wife, Tracy Kennedy, and her sister Peggy Arnett, that as a result of this decision from this Court, he was in desperate need of more money. *See Affidavit of Tracy Kennedy and Peggy Arnett attached hereto at Exhibits C and D, respectively.*

36.     Approximately two months later, E. Kennedy discovered that J. Kennedy had caused Kennedy Supply's bank accounts at Enterprise Bank to become overdrawn.

37.     Despite E. Kennedy's attempts to resume joint control over the operation and management of Kennedy Supply and First Health, J. Kennedy prohibited E. Kennedy from having any involvement in the business, notwithstanding E. Kennedy's 50% ownership interest.

38.     J. Kennedy and the two other shareholders of Future Management also conspired to freeze E. Kennedy out of Future Management and, as a result, assumed total control over Future Management, whose net profits had risen to over $3.7 million dollars.

39.     E. Kennedy later discovered documents at Kennedy Supply's office which revealed that J. Kennedy was using Kennedy Supply to enable Future Management to fraudulently borrow hundreds of thousands of dollars from various lending entities under the guise that Future Management was purchasing chiropractic equipment from Kennedy Supply.

40.     One such document included a Security Agreement between Future Management and a lending entity, Maruka U.S.A. Inc., in connection with the acquisition and financing of $71,537.20 in medical equipment, purchased from Kennedy Supply, for Future Management's

chiropractic office in New Bedford, Massachusetts. *A true and accurate copy of the letter and Security Agreement dated June 1, 2004 is attached hereto at Exhibit E.*

41.    Attached to the Security Agreement to Maruka U.S.A. Inc. included documents entitled "Certified Copy of Resolutions of Board of Directors" of Future Management Mass Business Trust and Future Management purportedly containing E. Kennedy's name and signature as Vice President of Future Management, authorizing and approving the loan from Maruka U.S.A. Inc. to Future Management. *See Exhibit E.*

42.    E. Kennedy never signed any of the documents with Maruka U.S.A. Inc. set out in Exhibit E.

43.    Attached to the Security Agreement was a personal Guarantee purportedly signed by E. Kennedy and witnessed by Kennedy Supply's office secretary, Maria King. *A copy of the personal Guarantee is attached hereto at Exhibit F.*

44.    E. Kennedy never signed the personal Guarantee set out in Exhibit F, either in the presence of Maria King, or otherwise.

45.    E. Kennedy also found several invoices from Kennedy Supply to Future Management offices which Future Management utilized to borrow over $765,479.70 from various other lending entities.

46.    These invoices reflected large equipment orders for chiropractic facilities owned by Future Management. However, several of these facilities were already fully equipped and one invoice stated that Kennedy Supply purportedly sold chiropractic equipment totaling $118,655.00 to Future Management for its clinic in Danbury, Connecticut -- a clinic that had been closed down for several months at the time of the issuance of that invoice. *True and accurate copies of the foregoing Invoices are attached hereto at Exhibit G.*

8

47.    E. Kennedy also discovered that J. Kennedy had been withdrawing funds from a line of credit at Enterprise Bank which was secured with a personal guarantee by E. Kennedy and J. Kennedy.

48.    On January 12, 2005, E. Kennedy, through counsel made formal demand to inspect the financial records of Kennedy Supply, Kidder Trust, and First Health.

49.    After reviewing the financial records, E. Kennedy discovered that substantial payments and disbursements totaling over Three Hundred Thousand ($300,000.00) dollars had been transferred by J. Kennedy from Kennedy Supply's accounts to himself, his personal attorneys, and to Future Management and its shareholders, including, but not limited to:

a.    Payments to American Express, MBNA credit card and Discover credit card payments in excess of $5,000.00 per month;

b.    Payments exceeding $37,000.00 to a Citizens Bank personal line of credit held in the name of James and Claudia Kennedy;

c.    Check dated March 10, 2004 payable to Future Management in the amount of $3,743.20;

d.    Check dated May 7, 2004 payable to Future Management in the amount of $1,700.00;

e.    Check payable to the law firm of Manchel & Brennan, P.C. dated May 10, 2004 in the amount of $2,277.49;

f.    Check payable to Fred Giampa dated June 10, 2004 for $8,000.00;

g.    Check payable to Joe Giampa dated June 10, 2004 for $25,000.00;

h.    Check payable to Fred Giampa dated July 13, 2004 for $4,500.00;

i.    Check payable to James Kennedy dated August 31, 2004 for $50,000.00;

j.    Check payable to Future Management dated September 21, 2004 for $113,000.00; and

k.    Check payable to Future Management dated December 13, 2004 in the amount of $6,521.96.

9

*True and accurate copies of the foregoing documents are attached hereto at Exhibit H.*

50.    E. Kennedy has never authorized the retention of Manchel & Brennan, P.C. by Kennedy Supply and, through counsel, formally informed them that they were not to be paid from Kennedy Supply's funds. *See attached letter from Stephen A. Greenbaum dated February 11, 2005 attached hereto at Exhibit I.*

51.    After discovering this information, E. Kennedy, through counsel, requested that Enterprise Bank refuse to accept any further checks or withdrawals from Kennedy Supply's accounts that did not possess dual signatures or authorizations from both E. Kennedy and J. Kennedy. *See attached letter from Stephen A. Greenbaum to Mary Jane Nardone, Vice President Commercial Lending, Enterprise Bank dated February 7, 2005 attached hereto at Exhibit J.*

52.    On February 10, 2005, Enterprise Bank informed E. Kennedy that it would not accept his request without the consent of J. Kennedy, or in the alternative, a court order. *See attached letter from Mary Jane Nardone dated February 10, 2005 attached hereto at Exhibit K.*

53.    At that time, E. Kennedy asked Ms. Nardone at Enterprise Bank about the status of the Kennedy Supply line of credit personally guaranteed by J. Kennedy and E. Kennedy.

54.    Ms. Nardone stated that the line of credit maintained a "zero" balance.

55.    When E. Kennedy instructed Ms. Nardone to take his name off of the account, Ms. Nardone assured E. Kennedy that she would, but in any event, due to the dispute that had arisen between the E. Kennedy and J. Kennedy, that Enterprise Bank would no longer lend any money to Kennedy Supply.

56.    E. Kennedy questioned J. Kennedy on several occasions about his continued use of Kennedy Supply's funds to pay for his increasing personal debts.

10

57.    While J. Kennedy admitted taking money from Kennedy Supply, he refused to reimburse any monies inappropriately withdrawn for his personal use back to Kennedy Supply or E. Kennedy.

58.    J. Kennedy further admitted to E. Kennedy in September 2004 that he had transferred money from Kennedy Supply to Future Management to pay for Future Management's payment for referrals to its chiropractic clinics across Massachusetts.

59.    Specifically, in a telephone conversation, J. Kennedy admitted to E. Kennedy that he had used money from Kennedy Supply and given it to Future Management and the Giampa brothers to pay for "runners", i.e. individuals paid to refer clients to Future Management's chiropractic offices.

60.    At the time J. Kennedy made this admission, he was aware that there was a law which was going to be passed by the Massachusetts legislature making the use of "runners" a criminal act.  The legislature subsequently passed Mass. Gen. Laws ch. 266 § 111C which imposed criminal sanctions for this practice.  *See copy of foregoing statute passed by Massachusetts legislature effective January 3, 2005 attached hereto at Exhibit L.*

61.    No longer able to jointly run and operate the business, E. Kennedy and K. Kennedy began negotiations for J. Kennedy to purchase E. Kennedy's 50% shares in Kennedy Supply, First Health, and his interest in Kidder Trust.

62.    After attempts to agree on a price for E. Kennedy's shares failed, the parties discussed selling Kennedy Supply, First Health and the building at 13 Kidder Road to outside third parties.  *See attached letter from J. Kennedy's counsel to E. Kennedy's counsel dated March 31, 2005 attached hereto at Exhibit M.*

63.     The parties continued the foregoing negotiations until April 14, 2005 when E. Kennedy discovered that J. Kennedy was continuing to deplete Kennedy Supply's assets by withdrawing $2,000.00 per week beginning in January 2005 for his personal use, and withdrawing $12,000.00 from Kennedy Supply's line of credit at Enterprise Bank – the same line of credit personally guaranteed by E. Kennedy.

64.     From or about January 1, 2004, J. Kennedy withdrew an additional $2,000.00 a month from Kennedy Supply's accounts to pay for a personal line of credit taken out jointly in his name and his ex-wife's name, held at Citizens Bank. *See attached general ledger at Exhibit N.*

65.     After an Order from the New Hampshire Probate Court that he pay off the outstanding line of credit, J. Kennedy issued a check from Kennedy Supply's checking account in the amount of $18,039.89. *See copy of check payable to Citizens Bank attached hereto at Exhibit O.*

66.     Furthermore, the $2,000.00 disbursement each month from Kennedy Supply for J. Kennedy's line of credit that was originally reflected on his tax returns as a payment of dividends, was subsequently omitted from Kennedy Supply's financial records prepared by its accountant, William Chapman. *See attached revised ledger from Kennedy Supply's accountant, William Chapman, attached hereto at Exhibit P.*

67.     In addition to the foregoing, following their father's death in April 2004, E. Kennedy is informed, believes, and hereby avers that J. Kennedy converted the proceeds from their father's life insurance policy held in the Kidder Trust and used those funds for his personal use.

68. On March 31, 2005, the New Hampshire Probate Court found J. Kennedy in contempt for failing to pay Claudia Kennedy her portion of the property distribution in accordance with the Court's Order. *A true and accurate copy of the Court's Order is attached hereto at Exhibit Q.*

69. As a result, the Court ordered that J. Kennedy pay Claudia Kennedy $68,214.00 in payment arrearages through November 2004 within 10 days of the date of the Order. *See Exhibit Q.*

70. On April 15, 2005, Claudia Kennedy filed a Motion to Show Cause for J. Kennedy's failure to tender payment in accordance with the Court's second Order. *A true and accurate copy of the foregoing Motion is attached hereto at Exhibit R.*

71. E. Kennedy is informed, believes, and hereby avers that J. Kennedy has failed to pay Claudia Kennedy $15,000.00 per month since November 2004 and is in default of the Court Order.

72. J. Kennedy's conduct as aforesaid is wrongful and in direct violation of his obligations to Kennedy Supply, First Health, Kidder Trust, and to E. Kennedy.

73. E. Kennedy, individually, and on behalf of Kennedy Supply, First Health and Kidder Trust, ("the Plaintiffs") are in need of immediate injunctive relief against J. Kennedy and Enterprise Bank in order to preserve the status quo and prevent the further dissipation the business' assets.

74. In the absence of injunctive relief, the Plaintiffs' assets will be subject to continued waste and loss.

13

75. E. Kennedy is informed, believes and hereby avers that his brother is financially unable to purchase his interests in Kennedy Supply and First Health, and all attempts to negotiate a sale of the business and the property at 13 Kidder Road to third parties have failed.

76. Accordingly, following the imposition of a restraining order to preserve the status quo, the Plaintiffs hereby petition the Court for an accounting of all funds J. Kennedy misappropriated and converted from Kennedy Supply, First Health, and the Kidder Trust.

77. The Plaintiffs are in further need of judicial intervention to either supervise the sale of the foregoing entities, or in the alternative, dissolve Kennedy supply and First Health.

## COUNT I – BREACH OF CONTRACT

78. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 77 above as if fully set forth herein.

79. Based upon his conduct as set forth above, J. Kennedy is in breach of his contractual obligations to the Plaintiff and to Kennedy Supply, First Health, and Kidder Trust.

80. The aforesaid breach of contract was knowing and willful.

81. The Plaintiffs have suffered damages as a result of the same.

## COUNT II – BREACH OF FIDUCIARY DUTY

82. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 81 above as if fully set forth herein.

83. Based upon his conduct as set forth above, J. Kennedy, as a partner, director, and shareholder in a close corporation is in breach of his fiduciary duty owed to the Plaintiffs.

84. The aforesaid breach of fiduciary duty was knowing and willful.

85. The Plaintiffs have suffered damages as a result of the same.

14

## COUNT III – BREACH OF DUTY OF GOOD FAITH AND LOYALTY

86. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 85 above as if fully set forth herein.

87. Based upon his conduct as set forth above, J. Kennedy as a partner, director, and shareholder in a close corporation, is in breach of his duty of utmost good faith and loyalty owed to the Plaintiffs.

88. The aforesaid breach of duty was knowing and willful.

89. The Plaintiffs have suffered damages as a result of the same.

## COUNT IV – CONVERSION

90. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 89 above as if fully set forth herein.

91. Based upon his conduct as set forth above, J. Kennedy has directly and indirectly converted funds and assets of Kennedy Supply, First Health, and the Kidder Trust, a portion of which properly belong to the Plaintiffs.

92. The aforesaid conversion was knowing and willful.

93. The Plaintiffs have suffered damages as a result of the same.

## COUNT V – FRAUD

94. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 93 above as if fully set forth herein.

95. Based upon his conduct as set forth above, J. Kennedy has defrauded the Plaintiff individually, and also Kennedy Supply, First Health and the Kidder Trust in having misappropriated and looted substantial sums of money from the foregoing entities.

15

96. The aforesaid fraudulent conduct was knowing and willful.

97. The Plaintiffs have suffered damages as a result of the same.

## COUNT VI – VIOLATION OF THE COVENANT OF
## GOOD FAITH AND FAIR DEALING

98. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 97 above as if fully set forth herein.

99. Based upon his conduct as aforesaid, J. Kennedy has violated the covenant of good faith and fair dealing implied in every contract.

100. The aforesaid violation was knowing and willful.

101. The Plaintiffs have suffered damages as a result of the same.

## COUNT VII – NEGLIGENCE

102. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 101 above as if fully set forth herein.

103. Based upon his conduct as set forth above, J. Kennedy failed to exercise due care in the management and operation of Kennedy Supply, First Health, and the Kidder Trust and is thus guilty of negligence.

104. The Plaintiffs have suffered damages as a result of the same.

## COUNT VIII – UNJUST ENRICHMENT (ALL DEFENDANTS)

105. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 104 above as if fully set forth herein.

106.  J. Kennedy will be unjustly enriched if he is allowed to retain the funds that he either directly or indirectly misappropriated from Kennedy Supply, First Health, and/or the Kidder Trust.

107.  The Plaintiffs are entitled to an order from the Court that J. Kennedy disgorge all such amounts and deposit the same with the Court for appropriate distribution to the Plaintiffs.

## COUNT IX – CONSTRUCTIVE TRUST

108.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 107 above as if fully set forth herein.

109.  As set forth above, J. Kennedy misappropriated monies from Kennedy Supply, First Health, and the Kidder Trust for himself, and for the benefit of others, to which they were not entitled.

110.  The Plaintiffs are entitled to have the Court impose a constructive trust upon these monies, including any assets acquired with the same, for the benefit of the Plaintiffs.

## COUNT X – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

111.    The Plaintiffs hereby repeat and re-allege paragraphs 1 through 110 above as if fully set forth herein.

112.    J. Kennedy is a fiduciary to the Plaintiffs.

113.    J. Kennedy breached his fiduciary duties to the Plaintiff by his actions and omissions.

114.    J. Kennedy's breach has caused, and continues to cause the Plaintiff extreme emotional distress.

115.   The Plaintiff has suffered both physical and economic damages as a result of the defendants' actions and omissions as aforesaid.

## COUNT XI – ACCOUNTING

116.   The Plaintiffs hereby repeat and re-allege paragraphs 1 through 115 above as if fully set forth herein.

117.   The Plaintiffs are entitled to and hereby demand an accounting from J. Kennedy as to a) the operation of Kennedy Supply, First Health, and the Kidder Trust; b) all monies received directly and indirectly by J. Kennedy and any and all third parties from the operation of the businesses; c) all monies either loaned or borrowed by J. Kennedy or E. Kennedy on behalf of Kennedy Supply, First Health and the Kidder Trust after J. Kennedy assumed total control over the business; and d) copies of all Invoices to Future Management from February 2004 to the present.

## COUNT XII - DERIVATIVE RELIEF PURSUANT TO
## MASS. R. CIV. P. 23.1

118.   The Plaintiffs repeat and re-allege paragraphs 1 through 117, as if fully set forth herein.

119.   E. Kennedy is the President and 50% shareholder in Kennedy Supply and First Health.

120.   J. Kennedy currently possesses the remaining 50% interest and is the Treasurer and Clerk in the foregoing corporations.

121.    It would be futile for the Plaintiff to make a demand upon J. Kennedy to bring an action on behalf of the corporation, as the director, officer and other remaining shareholder is not disinterested, nor a majority shareholder, and is himself the wrongdoer.

122.    Based upon his conduct as set forth above, J. Kennedy has harmed the foregoing corporations.

123.    Kennedy Supply and First Health have suffered damages as a result of the same.

## COUNT XIII – DISSOLUTION

124.    The Plaintiffs hereby repeat and re-alleges paragraphs 1 through 123 above as if fully set forth herein.

125.    As a matter of law and contract, E. Kennedy is entitled to the dissolution of Kennedy Supply and First Health and distribution of one half of the net assets of the said corporations.

## COUNT XIV – INJUNCTIVE RELIEF AGAINST
## J. KENNEDY AND ENTERPRISE BANK

126.    The Plaintiffs hereby repeat and re-allege paragraphs 1 through 125 above as if fully set forth herein.

127.    The Plaintiffs are entitled to the issuance of an Injunction restraining and enjoining J. Kennedy, as well as his accountants, agents and attorneys, from:

a)    withdrawing, paying, wasting, or spending any monies of Kennedy Supply, First Health, and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining the written authorization of E. Kennedy; and

19

b)      in any way dissipating, pledging or encumbering the assets of Kennedy Supply, First Health and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining written authorization by E. Kennedy;

c)      interfering with or prohibiting Edward Kennedy from having direct involvement in any aspect of Kennedy Supply, First Health, or the Kidder Trust including, but not limited to, their operation, management, any and all bank accounts, and decisions regarding any and all disbursements made from the foregoing entities' accounts; and

d)      using any income or assets of Kennedy Supply, First Health, or the Kidder Trust to pay the costs and expenses associated with this litigation.

128.    The Plaintiffs further request that the Court enter an order requiring Enterprise Bank to take any action necessary to prohibit J. Kennedy from:

a)      withdrawing, paying, wasting, transferring or spending any monies of Kennedy Supply, First Health, and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining the written authorization of E. Kennedy;  and

b)      in any way dissipating, pledging or encumbering the assets of Kennedy Supply, First Health and Kidder Trust, or take any action which would affect E. Kennedy' interests individually, for any reason whatsoever during the pendency of this action without first obtaining written authorization by E. Kennedy.

WHEREFORE, the Plaintiffs respectfully request that this Court grant the following relief:

1.      Issue a short order of notice with respect to prayer 2 below;

2.      After notice, issue a preliminary injunction restraining and enjoining 1) J. Kennedy, and 2) Enterprise Bank from permitting J. Kennedy, from conveying, transferring, wasting, pledging, encumbering and/or dissipating or interfering with any of the assets of Kennedy Supply, First Health and Kidder Trust, of every kind and description without prior written authorization from the Plaintiff, including, but not limited to, payment of his attorneys' fees and costs;

3.      Pursuant to Count I, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

4.      Pursuant to Count II, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

5.      Pursuant to Count III, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

6.      Pursuant to Count IV, award such damages as may be proven at trial and order the return of all assets which the Court finds to be wrongfully converted, and award reasonable attorney's fees, costs and interest;

7.      Pursuant to Count V, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

8.      Pursuant to Count VI, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

9.      Pursuant to Count VII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

10.     Pursuant to Count VIII, award such damages which may be proven at trial, including restitution of any profits J. Kennedy made on a corporate opportunity, repayment of

21

excess compensation to the entities, together with reasonable attorney's fees, costs and interests to the Plaintiffs.

11.      Pursuant to Count IX, award such damages as may be proven at trial and make a finding that the defendants are constructive trustees for the benefit of the Plaintiffs with respect to all assets wrongfully received by them, and award reasonable attorney's fees, costs and interest;

12.      Pursuant to Count X, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

13.    Pursuant to Count XI, order an accounting from the defendants as to a) the operation of Kennedy Supply, First Health, and the Kidder Trust; b) all monies received directly and indirectly by J. Kennedy and any and all third parties from the operation of the businesses; c) all monies either loaned or borrowed by J. Kennedy or E. Kennedy on behalf of Kennedy Supply, First Health and the Kidder Trust after J. Kennedy assumed total control over the business; and d) copies of all Invoices to Future Management from February 2004 to the present.

14.      Pursuant to Count XII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

15.      Pursuant to Count XIII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest; and

16.    Such other and further monetary, injunctive and declaratory relief as this Court deems just and proper.

THE PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL CLAIMS SO
TRIABLE

Respectfully submitted,
EDWARD D. KENNEDY,
By his attorneys,

Stephen A. Greenbaum, Esquire
BBO No. 209360
Natalie R. Sika, Esquire
BBO No. 648408
GREENBAUM, NAGEL,
FISHER & HAMELBURG
200 High Street, 4th Floor
Boston, MA 02110
(617) 423-4300

Dated: April __, 2005

VERIFICATION

I, Edward D. Kennedy, hereby state that I have personal knowledge with regard to the
factual allegations contained in the within Verified Complaint and that the same are known by
me to be true and accurate, with the exception of those statements expressly made upon
information and belief, which statements I believe in good faith to be true and accurate.
Additionally, I am personally familiar with the documents annexed to the Verified Complaint
and know the same to be true copies of the originals of those documents.

Signed under the pains and penalties of perjury this 27 day of April, 2005

Edward D. Kennedy

23

Volume:   I
Pages: 1-112
Exhibits: 2

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss                    LOWELL DISTRICT COURT

BLANCA RIVERA,                   )
            Plaintiff,           )
                                 )     CIVIL ACTION
v.                               )     NO. 0511-CV-2582
                                 )
BETH A. CORROW and               )
ENCOMPASS INSURANCE COMPANY,     )
            Defendants.          )
                                 )

DEPOSITION OF JENNIFER McCONNELL

A Witness called by and on behalf of the
Defendants, pursuant to the Massachusetts Rules of
Civil Procedure, before Cheryl Ann Walker, Court
Reporter and Notary Public within and for the
Commonwealth of Massachusetts, at the Law Offices of
Smith & Brink, P.C., 122 Quincy Shore Drive, Quincy,
Massachusetts, 02171, commencing on Thursday,
September 21, 2006, at 10:06 a.m.

---

2

A P P E A R A N C E S

Erika M.D. Barrie, Esquire
Smith & Brink, P.C.
122 Quincy Shore Drive
Second Floor
Quincy, Massachusetts 02171
(617) 770-2214

COUNSEL FOR:  Encompass Insurance Company

Thomas M. Ciampa, Esquire
Ciampa & Associates
20 Park Plaza
Suite 804
Boston, Massachusetts 02116
(617) 742-5955

COUNSEL FOR:  Jennifer McConnell

---

3

I N D E X

| Witness | Direct | Cross | Redirect |
|---------|--------|-------|----------|
| Jennifer McConnell | | | |
| By Ms. Barrie | 9 | | |
| By Mr. Ciampa | | | |

---

4

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | Attorney Howard's Letter | 7 |
| 2 | Packet of Documents | 109 |

(Exhibits were retained by Attorney Barrie.)

105

1   A.   Three.

2   Q.   And who would be in them besides you?

3          MR. CIAMPA:  Objection.

4   A.   There was an office for myself, an office for Dr.

5      Culliney, and one other treatment room.

6  (BY MS. BARRIE)

7   Q.   Okay.  Do you know if First Spine offered any kind

8      of a gift certificate or referral or bonus system

9      for referrals of patients to the facility?

10         MR. CIAMPA:  Objection.

11   A.   Yes.

12  (BY MS. BARRIE)

13   Q.   What kind of bonuses, gift certificates, or

14      referrals were there?

15   A.   Gift certificate.

16   Q.   To where?

17   A.   The Simon Mall.

18   Q.   And who gave those out?

19   A.   It could be myself or Dr. Culliney.

20   Q.   And how would you know to give those out?   *

21   A.   It was usually based on if a patient had been a

22      patient and they were coming back.

23   Q.   Would you give them to patients if they were

24      referred by a former patient?

106

1   A.   Not usually.

2   Q.   Would you give one to the former patient who

3      referred the new patient?

4   A.   Sometimes.

5   Q.   Any other kinds of bonuses or payments or gifts to

6      patients or other people who referred patients?

7   A.   Restaurant gift certificates.

8   Q.   To the Lowell area?

9   A.   Yes.

10   Q.   Anything else?

11   A.   Not that I recall.

12   Q.   Did the administrative staff ever give out gift

13      certificates?

14         MR. CIAMPA:  Objection.

15   A.   They may have given them to people that needed

16      translation.

17  (BY MS. BARRIE)

18   Q.   Why?

19   A.   To explain how to use it.

20   Q.   So if a patient came in and didn't speak English

21      you'd give the gift certificate to the translator

22      and the translator would then give it to them?

23   A.   Yes.

24   Q.   Did First Spine offer transportation to patients?

107

1   A.   Yes.

2   Q.   And how was that arranged?

3   A.   Through a taxi service.

4   Q.   And how was the taxi service paid?

5   A.   I don't know.

6   Q.   Did the patients get vouchers or --

7   A.   No, I believe they just told them whether they got

8      dropped off at the office or got picked up at the

9      office and dropped off at home.

10   Q.   And would the patients call for the taxi or would

11      the office call for the taxi?

12   A.   The office would call for the taxi.

13   Q.   And did patients have appointments?

14   A.   Yes.

15   Q.   So the office staff would know on a given day that,

16      you know, Joe Schmoe was coming at one o'clock and

17      he lives 15 minutes away so I've got to call the

18      cab and tell them to go pick him up at whatever

19      time?

20   A.   No.  We would have the patients call us when they

21      were ready.

22   Q.   And then your office would call the cabs?

23   A.   Yes.

24   Q.   I think this is my final question or set of

108

1      questions.  If I send a subpoena to First Spine for

2      all the medical records and bills and the patient

3      file for a given patient, who pulls the file, puts

4      it all together, puts the response together?

5   A.   The administrative staff usually pulls everything

6      and copies it.

7   Q.   Okay.  And does a chiropractor review that set of

8      documents before it goes out?

9   A.   It depends.

10   Q.   What would it depend on?

11   A.   If the -- whoever was subpoenaing the record, some

12      specifically say they want the doctor to do it and

13      others don't.

14   Q.   So with the ones that don't it would just be office

15      staff?

16   A.   Yeah, occasionally it would be the doctor, but

17      usually the office staff.

18   Q.   And with this one -- well, who would certify the

19      records if the doctor wasn't on the subpoena?

20         MR. CIAMPA:  Objection.

21   A.   It could be one of the administrative staff.

22  (BY MS. BARRIE)

23   Q.   We talked about how the history that the patient

24      filled out isn't in this record and that you would

109

```
1       consider that to be part of the medical record;
2       right?
3    A. Yes.
4    Q. In your practice at First Spine were the medical
5       histories typically put into a subpoenaed set or
6       23379G set of records?
7    A. Not that I'm aware of.
8    Q. Okay. And what's the reason for that?
9           MR. CIAMPA: Objection.
10   A. Ignorance.
11   (BY MS. BARRIE)
12   Q. Okay.
13          MS. BARRIE: All right. That's all the
14      questions I have. Thank you very much. I
15      appreciate you taking the time to come in. Do you
16      have anything?
17          MR. CIAMPA: I don't have anything.
18          MS. BARRIE: Okay.
19
20          (Whereupon, Exhibit No. 2, Packet of
21      Documents, was marked for identification.)
22
23          (Whereupon, the Deposition was concluded
24      at 12:53 p.m.)
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

---

110

ERRATA SHEET

Deposition of: JENNIFER McCONNELL
In Re:   Blanca Rivera v. Beth A. Corrow and Encompass
         Insurance Company

| Page No. | Line No. | Transcript Reads | Change Made |
|----------|----------|------------------|-------------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Lee & Associates * Certified Court Reporters * (781) 848-9693

---

111

CERTIFICATE

I, JENNIFER McCONNELL, do hereby certify that
I have read the foregoing transcript of my testimony,
and further certify that said transcript is a true,
accurate and complete record of said testimony.

Dated at _____ ,

This _____ day of _____, 2006,

under the pains and penalties of perjury.


_____


                    Sworn to and subscribed before me
this _____ day of _____, 2006.


_____
                    Notary Public

Lee & Associates * Certified Court Reporters * (781) 848-9693

---

112

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF PLYMOUTH, SS

I, CHERYL ANN WALKER, a Court Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, do hereby certify that the foregoing
Deposition of JENNIFER McCONNELL was taken before me on
September 21, 2006; that the witness was duly sworn by
me before the commencement of her testimony; that the
said testimony was taken audiographically by myself and
then transcribed under my direction. To the best of my
knowledge, the within transcript is a complete, true
and accurate record of said Deposition.

I am not connected by blood or marriage
with any of the said parties, nor interested directly
or indirectly in the matter in controversy.

In witness whereof, I have hereunto set
my hand and Notary Seal this 4th day of October, 2006.


                    Cheryl Ann Walker,
                    Notary Public
                    My Commission Expires:
                    March 10, 2011


PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS
TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE
SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
AND\OR DIRECTION OF THE CERTIFYING REPORTER.

Lee & Associates * Certified Court Reporters * (781) 848-9693

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK COUNTY                    BOARD OF REGISTRATION
                                 OF CHIROPRACTORS

In The Matter Of                 )        DOCKET NOS. CH-97-072
Frederick T. Giampa, D.C.,       )                   CH-97-012
                                 )                   CH-98-029
License No. 1426                 )
_____)

## CONSENT AGREEMENT

The Massachusetts Board of Registration of Chiropractors ("Board") and Frederick
T. Giampa, D.C. ("Licensee") do hereby stipulate and agree that the following
information shall be entered into and become a permanent part of the record of the
Licensee which is maintained by the Board:

1)    The Licensee acknowledges that this Consent Agreement ("Agreement") is
entered into in resolution of the allegations as set forth in Docket Nos. CH-97-072, CH-
97-012, and CH-98-029.

2)    The Licensee states that he is voluntarily agreeing to a two (2) year
SUSPENSION of his Massachusetts license to practice as a Licensed Chiropractor,
license no. 1426. The Board and the Licensee agree that said suspension shall be stayed
for a period of one year and six months with 6 months to be served immediately upon full
execution of this agreement. The Licensee's license shall be placed on PROBATION for
two (2) years ("Probationary Period") to run concurrent with the suspension period,
provided that the licensee comply with the following terms and conditions of probation:

    a)    the Licensee shall direct himself toward completing one-hundred (150)
hours of continuing education in the field of chiropractic at a diplomate level (i.e., in
chiropractic neurology or chiropractic orthopedics) in the areas of recordkeeping,
differential diagnosis, treatment planning and billing practices; taken to meet this
requirement all continuing education classes must be approved by the Board;

    b)    the Licensee shall submit to the Board written verification from the
continuing education sponsor(s) that he has completed said continuing education hours;

    c)    the Licensee has not had any findings entered against him for violation of
any Board regulation, or state/federal law;  and

d)  the Licensee shall notify the Board of any change in his practice status or address of record;

3)  The Licensee and the Board agree that within sixty (60) days of the expiration of the Probationary Period, the Licensee may, in writing, request that the Board terminate the Probationary Period by certifying under oath that he has complied with the terms of this Consent Agreement. The Board, in its discretion, may require the Licensee to appear before the Board to demonstrate his compliance with said terms prior to terminating the Probationary Period.

4)  The Licensee hereby agrees no to refer any patients to any facility in which he has any financial interest or further will.

5)  Further, the Board states and the Licensee agree that if the Licensee fails to demonstrate to the satisfaction of the Board that he has complied with the terms of this Consent Agreement, or if the Board receives any similar allegations as those contained in the Order to Show Cause issued in this case, the Board by majority vote may impose the following

a)  the Licensee shall surrender his license to practice chiropractic for a period of not less than five (5) years; **and, thereafter,**.

b)  the Licensee's license shall be placed on probation for not less than five (5) years, with the Board reserving the right to set forth specific probationary terms as it deems appropriate at that time;

6)  The Licensee, in executing this Consent Agreement, hereby agrees that if the above-captioned cases were to proceed to a full adjudicatory hearing before the Board there are sufficient facts from which the Board could make findings that the Licensee, in his examination, evaluation and treatment of the patients referred to in complaints CH-97-071, CH-97-012, CH-98-029, violated Board regulations (effective 9/4/98) 233 CMR 4.05(1) for failure to maintain an accurate chiropractic treatment records; and 233 CMR 4.06(m) disciplinary; 233 CMR 4.08(1)(2) for overutilization of practice; 233 CMR 4.11 for making false health claims, 233 CMR 4.12 (2)(3) for improper solicitation, and inducement of referrals.

7)  The Licensee understands and agrees that his action in entering this Consent Agreement is a final act and not subject to reconsideration, collateral attack, appeal or judicial review under any form or in any forum.

8)  The Licensee understands that this Consent Agreement is effective immediately after it is signed by the Board, and continuing for a period of at least two (2) years thereafter.

9)       The Licensee and the Board agree that this Consent Agreement shall have the same force and effect as if ordered by the Board after a full adjudicatory hearing held pursuant to G.L. c. 112, ss. 61 and 93, 233 CMR 4.05. The Board further states and the Licensee agrees that this Consent Agreement shall constitute and may be disseminated as a public record evidencing disciplinary action of the Board.

10)     The Board agrees that in return for the Licensee executing this Consent Agreement, the Board will not conduct any prosecution of Docket No. CH-97-071, CH-97-012, CH-98-029, according to the terms and conditions as set forth in this Agreement. If the Licensee violates this Consent Agreement, the Board, if it so chooses, may initiate formal action under the State Administrative Procedure Act, G.L. c. 30A and the Standard Adjudicatory Rules of Practice and Procedure, 801 CMR 1.00 *et. seq.* regarding the incident complaints and the Licensee's failure to satisfy the terms of this Agreement.

11)     The Licensee certifies that he has read and understood this document entitled "Consent Agreement". The Licensee understands that he has a right to a formal hearing concerning Docket Nos. CH-97-071, CH-97-012, CH-98-029, and that at said hearing he would possess the right to be represented by counsel, to confront and cross-examine witnesses, to call witnesses, to present evidence, to testify on his own behalf, to contest the allegations, to oral argument, to appeal to the courts, and all other rights set forth in G.L. c. 30A, and 801 CMR 1.00 *et. seq.* The Licensee states that he further understands that in executing this Agreement he is knowingly and voluntarily waiving his right to a formal hearing and to all of the above-listed rights attendant thereto.

Witness of Licensee's signature:
Sworn to and subscribed before me
this _____ day of October, 1999

_____
                                                    Frederick T. Giampa, D.C.
                                                    Licensee
_____                    License No. 1426
NOTARY PUBLIC
My commission expires:

                                                    Joseph M. Boyle, D.C.
                                                    Chairman
                                                    Board of Registration of Chiropractors

                                                    Effective Date: 10-20-99

3