UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENCOMPASS INSURANCE COMPANY OF MASSACHUSETTS, | Civil Action No.  1:05-cv-11693-RCL |
| Plaintiff, | |
| vs. | |
| JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, ADVANCED SPINE CENTERS, INC., d/b/a FIRST SPINE REHAB, FUTURE MANAGEMENT CORPORATION, FUTURE MANAGEMENT BUSINESS TRUST, EDWARD KENNEDY, BRIAN J. CULLINEY, D.C. and JENNIFER McCONNELL, D.C. | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL ANSWERS TO INTERROGATORIES

NOW COMES the plaintiff, Encompass Insurance Company of Massachusetts (hereinafter "Encompass"), pursuant to Fed. R. Civ. P. 37 and Local Rule 37.1 and respectfully requests that this Honorable Court enter an Order COMPELLING defendant, Joseph D. Giampa (hereinafter "Giampa"), to provide complete answers to Encompass' First Set of Interrogatories. Specifically, Giampa has failed to provide any meaningful answers to the interrogatories propounded by Encompass.  Encompass hereby submits the within memorandum of law in support of the instant motion.  As grounds for this request, Encompass avers as follows:

## I.    BACKGROUND

This case is brought pursuant to Title 18 U.S.C. §1962, Racketeer Influenced and Corrupt Organizations Act, Mass. Gen. Laws, ch. 93A, the Massachusetts Consumer Protection Act, and Massachusetts common law of fraud and civil conspiracy.  The defendants acting in concert participated in a concealed, evolving and continuous scheme and conspiracy to defraud

Encompass.  The geographic center of this conspiracy was First Spine Rehab, owned and operated by the Giampa chiropractors and Kennedy Brothers.

The objective of defendants' fraud scheme was to illegally obtain money from the plaintiff through the submission of false medical records and bills (hereinafter "false medical documentation") in connection with alleged motor vehicle accidents.  The defendants collected substantial sums of money as payment in connection with such false medical documentation referencing alleged chiropractic treatment that was never rendered and/or was unnecessary, excessive and unrelated to covered claims.  The defendants successfully executed this scheme to defraud by creating and submitting such false medical documentation to Encompass and others by way of the U.S. Mail.

On January 12, 2007, Encompass served upon Joseph Giampa plaintiff's First Set of Interrogatories.  See Plaintiff's First Set of Interrogatories Propounded to the Defendant, Joseph D. Giampa, annexed hereto at Exhibit A.  On April 22, 2007, Giampa issued his answers to Encompass' First Set of Interrogatories.  See Defendant, Joseph D. Giampa's, Answers to Plaintiffs' First Set of Interrogatories, annexed hereto at Exhibit B.  The defendant's discovery responses are incomplete.  Encompass now brings this Motion to Compel requesting that this Court order defendant to provide true and accurate responses to Encompass' First Set of Interrogatories.

## II.    **STANDARD OF REVIEW**

Modern instruments of discovery serve a useful purpose in that, together with pre-trial procedures, they make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.  United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958).  Pursuant to Rules 37(a)(2) Fed. R. Civ. P., when a party

fails to answer interrogatories or respond to requests for production of documents, the requesting

party may move for an order compelling discovery. Included within this discretion is the power

to compel a party to disclose information or otherwise cooperate in the discovery process. The

authority for this power lies with Fed. R. Civ. P. 37. Specifically, Fed. R. Civ. P. 37(a)(2)(3)

provides:

> **Evasive or Incomplete Disclosure, Answer or Response.**
> For purposes of this subdivision an evasive or incomplete
> disclosure, answer or response is to be treated as a failure to
> disclose, answer or respond.

Moreover, Fed. R. Civ. P. 33 governing interrogatories, provides that:

> Without leave of court or written stipulation, any party may serve
> upon any other party written interrogatories…to be answered by
> the party served…who shall furnish such information as is
> available to the party.
>
> ***
>
> Each interrogatory shall be answered separately and fully in
> writing under oath, unless it is objected to, in which event the
> objecting party shall state the reasons for objection and shall
> answer to the extent the interrogatory is not objectionable.
>
> ***
>
> The party submitting the interrogatories may move for an order
> under Rule 37(a) with respect to any objection to or failure to
> answer an interrogatory.

Fed. R. Civ. P. 33(a), (b)(1), (b)(5) (alterations added).


In the instant case, plaintiff requested that defendant respond to discovery requests

designed to discover information defendant possesses relating to the allegations set forth in

plaintiff's Complaint. The plaintiff's narrowly-tailored discovery requests were designed to

elicit information that is reasonably calculated to lead to the discovery of admissible evidence in

this matter. The plaintiff's request(s) fall within the purview of Fed. R. Civ. P. 26 and 33 and does not seek the production of materials which are in any way privileged, either as attorney-client communications or work-product. Therefore, this Court is authorized to compel defendant to produce the request materials.

**III.** **THE DEFENDANT HAS FAILED TO PROVIDE ANSWERS TO PLAINTIFF'S DISCOVERY REQUESTS IN ACCORDANCE WITH FED. R. CIV. P. 33 AND LOCAL RULE 33.1**

**INTERROGATORY #3**

For each of First Spine's patients listed in the spreadsheet annexed at Tab 1 of the Complaint, please state:

    (1)    Name, date of birth, Social Security number and attorney of the patient;
    (2)    Dates and location of service;
    (3)    Names of persons involved in patient's treatment;
    (4)    Nature of patient's injuries;
    (5)    Type(s) of treatment rendered to patient;
    (6)    Amount billed by First Spine;
    (7)    Amount paid by Encompass; and
    (8)    Date payment was made by Encompass.

**DEFENDANT'S ANSWER #3**

    Objection: This request is objected to as it is unduly broad, burdensome and beyond the scope of discovery permitted under the Federal Rules of Civil Procedure and the Local Rules for the District of Massachusetts. In addition all of the information is in the possession of the Plaintiffs either through the claims process or as a result of the Defendants' Response to Plaintiffs' Request for Production of Documents.

    The defendant failed to answer this narrowly tailored discovery request. Subpart (3) was designed to elicit knowledge and information regarding persons involved in the treatment of Future Management clinic (hereinafter "FMC") patients. It is beyond dispute that the FMC clinics employed non-licensed, untrained "chiropractic assistants." These employees were primarily responsible for administering the majority of defendants' "recipe" of treatment. Specifically, these chiropractic assistants administered the adjunctive modalities (i.e. hot/cold

packs, electric stimulation, etc...) to each FMC patient. Unlike physical therapy, the Massachusetts chiropractic regulations do not require the use of licensed personnel in the administration of chiropractic services. Because these individuals are not licensed and are not referenced on the FMC patient records, Encompass has no other means of discovering the identities of these persons other than through the discovery process. Without justification or excuse, defendant has failed to adequately respond to this request.

Moreover, defendant further fails to answer any of the above-referenced questions stating that the information sought by these requests is already in Encompass' possession via defendant's response to plaintiff's request for production of documents. However, Encompass has not received any responsive documents from this defendant regarding this issue.[1] As such, it is improper for defendant to refuse to answer the interrogatory and defer to information contained in documents that have never been produced. Because the instant discovery request is reasonably calculated to lead to the discovery of relevant, admissible evidence regarding the allegations set forth in plaintiff's Complaint (i.e. the identity of all persons involved in the treatment of FMC patients), defendant should be compelled to provide a true and accurate answer.

**INTERROGATORY #4**

> Are you aware of Rosencranz and Associates VIP card program (copy of the VIP card is annexed hereto at Tab A)? If your answer is anything but an unqualified negative, kindly state:
>
> a.     what the VIP card program is;
> b.     your role in administering and/or participating in the VIP card program;
> c.     your knowledge of the role of any of the named defendants in this lawsuit in administering and/or participating in the VIP card program;
> d.     the manner in which the VIP card program was administered by

---

[1] Indeed, defendant has produced certain payroll and financial records requested by plaintiff; however, none of the records produced contain any identification of FMC clinic patients.

Rosencranz and Associates, including in your answer the name, current address and telephone number for all persons involved in the VIP card program at Rosencranz and Associates;

e.    how and who funded the VIP card program (i.e., was the cost of the VIP program split between Future Management and Rosencranz and Associates?);

f.    the approximate date upon which the VIP card program was commenced in conjunction with Rosencranz and Associates and First Spine.

## DEFENDANT'S ANSWER #4

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the above objection, I am aware of the program but I don't know anything specific about it, I am not involved in any way with its organization, administration or participation, when it began, it's [sic] funding and Future Management has no role in the administration, participation or funding of any such program.

Encompass seeks information relating to any and all vouchers and/or "V.I.P." cards that were provided to FMC patients for the purpose of obtaining legal representation. Any information and/or documents that memorialize whether patients were receiving payment or anything of value to treat at the FMC clinics is relevant to as to whether or not the alleged medical treatment each patient received was necessary. The instant discovery request is based upon Encompass' good-faith belief that the payment of referral monies (1) was a common practice at the FMC clinics, and (2) motivated the FMC clinics to render unnecessary medical treatment and generate false medical documents.

To date, Encompass' discovery efforts have revealed that the FMC clinics provided patients with so-called "V.I.P." cards that entitle the patients to receive a discount on "professional" fees. See Deposition Transcript of Phally Samith at pp. 79, 86, annexed hereto at Exhibit C; see also Examination Under Oath Transcript of Sokhira Yang at pp. 36-37, annexed

hereto at Exhibit D; Examination Under Oath Transcript of Veingkhone Khammanivong at pp. 36-37, annexed hereto at Exhibit E. In fact, FMC employee, Phally Samith, admitted that she was paid $100 per referral to a Future Management clinic and an additional $100 to refer the patient to an attorney. Moreover, the testimony of former FMC patients and employees established that the FMC clinics provided patients with gift certificates, gift cards and/or coupons for other goods/services (including V.I.P cards) in exchange for their treatment at Future Management clinics. See Ex. C. at pp. 15, 60, 63, 102, 109; see also Ex. D at pp. 43-44; Examination Under Oath Transcript of Jenifer Soneiga Hell at p. 13, annexed hereto at Exhibit F; Examination Under Oath Transcript of Rada Non at pp. 23-28, annexed hereto at Exhibit G; Examination Under Oath Transcript of Mith Non at p. 6, annexed hereto at Exhibit H; Examination Under Oath Transcript of Marina Non at pp. 16-17, annexed hereto at Exhibit I; Examination Under Oath Transcript of Savet Non at pp. 26-27, annexed hereto at Exhibit J; Deposition Transcript of Jennifer McConnell at pp. 105-06, annexed hereto at Exhibit K.

All of the foregoing supports Encompass' position that the payment of referral monies (including the provision of attorney discount cards/gift certificates) was a common practice at FMC clinics. Given the testimony outlined above, there can be no reasonable debate that FMC and its principals (including Joseph Giampa) played an active role in the provision of so-called "VIP" cards to FMC clinic patients. Therefore, requests for information and documents to support these allegations are reasonably calculated to lead to the discovery of admissible evidence pursuant to Fed. R. Civ. P. 26. Accordingly, this Court should compel defendant to provide a true, accurate and complete response to this discovery request.

**INTERROGATORY # 6**

> Identify the person(s) who oversaw the (1) medical treatment, and (2) billing in connection with the patients listed in the spreadsheet annexed at Tab 1 to Complaint, and

identify the person(s) most knowledgeable with respect to each category. For each person listed, please provide: name, title, job duties, degree, license information, and length of employment with Future Management and/or First Spine.

**DEFENDANT'S ANSWER #6**

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Brian Culliney is the person most knowledgeable. It is my understanding that the balance of this information requested has been requested and received from Brian Culliney in this litigation.

By this question, Encompass is attempting to discover the identity of the person(s): (1) involved in the treatment of FMC clinic patients; and (2) responsible for the billing of services allegedly performed by the various FMC clinics. The gravamen of the plaintiff's Complaint is that the defendants (including Joseph Giampa) engaged in a systematic pattern and practice of insurance fraud that included, *inter alia*: (1) preparing and submitting invoices containing improper and/or deceptive CPT Codes; (2) making material misrepresentations of fact and engaging in intentionally unfair and deceptive business practices by creating medical bills that included CPT Codes for treatment modalities that had not actually been performed at all or not performed consistent with the AMA's CPT requirements; (3) rendering unnecessary treatment that guaranteed that a patient's medical bills would exceed the $2,000 tort threshold codified at Mass. Gen. Laws ch. 231, §6D; (4) creating, preparing and processing false and fraudulent documentation including false medical billing invoices and reports; and (5) following identical, pre-ordained assessments and therapy protocols, using identical treatment and billing forms and billing the same amounts as every other FMC clinic.

Without knowing the identity of FMC clinic employees who oversaw the treatment and billing at the FMC clinics, plaintiff is prevented from seeking discovery from these individuals.

8

This request is reasonably calculated to lead to the discovery of admissible evidence (i.e. the identity of persons involved in FMC's billing department). As such, defendant should be compelled to provide a true and accurate answer.

Moreover, in his answer, defendant did disclose Brain Culliney as the person "most knowledgeable." However, defendant failed to provide any substantive details regarding Culliney's title, job duties, degree, license information and length of employment with defendant. Moreover, defendant declined to answer this question citing Culliney as the source for the requested information. However, Brian Culliney has produced no meaningful discovery to date. In fact, Encompass has filed separately a motion to compel Culliney's answers to interrogatories and a motion to compel Culliney's production of documents. Encompass is entitled to this information. As such, plaintiff requests that defendant be compelled to provide a further answer to this interrogatory.

**INTERROGATORY #7**

Identify the person(s) who was responsible for (1) training chiropractors regarding treatment of patients, billing protocols, (2) training chiropractic aides, and (3) personnel, including the hiring of all chiropractic and unlicensed employees, and identify the person(s) most knowledgeable with respect to each training category.

>   **DEFENDANT'S ANSWER #7**
>
>   Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.
>
>   Answer: The Chiropractors were trained by qualified persons who changed over the years. The various team leaders trained many of the chiropractors.

There were only a finite number of chiropractors working at the Lowell clinic during the time period at issue in this suit. The defendant's answer provides no substantive information regarding the identity of these "various team leaders." The plaintiff is entitled to this information whereas the disclosure of these persons will allow plaintiff to seek further discovery by way of depositions. In addition, based on plaintiff's allegations regarding FMC's billing practices,

plaintiff is seeking the identity of all persons who were involved in training the chiropractors and the chiropractic assistants in the billing of their services. Because defendant's answer lacks sufficient detail regarding these subjects, defendant should be compelled to provide a further, more detailed answer to the foregoing interrogatory.

### INTERROGATORY #9

Other than the named defendants and identified patients, please identify, in complete detail, with current contact information, all persons known to you with information regarding the allegations contained in plaintiff's complaint, including in your answer the full name of each person, the date of birth, social security number, home address, home telephone number, business address, occupation, and business telephone, and identify the subject matter of each person's knowledge regarding the allegations contained in plaintiff's complaint.

#### DEFENDANT'S ANSWER #9

Objection: I object to this interrogatory as overly broad and unduly burdensome.

The defendant's answer to the forgoing interrogatory is wholly deficient. Pursuant to Local Rule 26.1(B)(2)(a), defendants are required to disclose "all persons then known to the defendant or the defendant's attorney who witnessed the transaction or occurrence giving rise to the claim or otherwise is known or believed to have substantial information about the claims or defenses[.]" Under this section, defendant should be required to disclose the identity of <u>all</u> persons involved in the transactions and occurrences (i.e. the treatment of FMC patients giving rise to the instant Complaint) at issue in this matter. As such, defendant should be compelled to provide information regarding all persons who may have information regarding the operation of the FMC clinics.

### INTERROGATORY #12

Please identify all person(s) (including lawyers), including in your answer current contact information, who provided you, First Spine, or any other defendant referral of any personal injury and/or motor vehicle accident claims from 1998 through the present.

#### DEFENDANT'S ANSWER #12

> Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.
>
> Answer: I have never had a personal injury and/or motor vehicle accident claims [sic] referred to me.

The testimony of defendant's employees clearly established that the FMC clinics impermissibly paid for patients. Moreover, FMC clinic employees were paid additional referral monies if the patient agreed to referral to an attorney. Phally Samith, an FMC employee, testified that she received bonus money for referring patients for treatment at the Future Management clinics. See Deposition Transcript of Phally Samith at pp. 15, 60, annexed hereto at Exhibit C. Ms. Samith testified that she was informed of the referral bonus program by chiropractor Brian Culliney. See id. at p. 63. Ms. Samith indicated that Culliney was also responsible for determining which lawyer the patient was referred for representation. Id. at p. 86. When a patient was also referred to an attorney, the referring employee received an additional bonus. Id. at p. 79.

Moreover, Sokah Dy is an employee at a Future Management clinic located in Lowell, MA. See Deposition Transcript of Sokah Dy at p. 27-28, annexed hereto at Exhibit L. Ms. Dy testified that approximately 80% of the FMC clinics' business involves the treatment of injuries allegedly sustained during purported motor vehicle accidents. See id. at p. 38. Notably, according to Ms. Dy, defendant, Joseph Giampa is the "big boss." Id. at p. 40. As a "big boss," Joseph Giampa placed chiropractor, Brian Culliney, in the position of a team leader. See id. at pp. 88-89. As team leader, Brian Culliney determined the performance bonuses of all the individuals on his team. Id. at p. 122. Ms. Dy testified that the performance bonus is actually referral money earned for referring patients for treatment at FMC clinics. Id. at p. 132.

Furthermore, in the Verified Complaint filed in Kennedy, et. al. v. Kennedy, et. al., Middlesex Superior Court, C.A. No. 2005-01458, it was alleged that Future Management and the

11

Giampa brothers paid for the referral of patients and the use of runners to recruit these patients. See Verified Complaint at ¶¶ 57-60, annexed hereto at Exhibit M. The FMC clinics have also provided patients with so-called V.I.P. cards that entitle the patients to receive a discount on "professional" fees. See Deposition Transcript of Phally Samith at pp. 79, 86, annexed hereto at Exhibit C. FMC clinics have also provided patients with gift certificates, gift cards and/or coupons for other goods/services in exchange for their treatment at FMC clinics. See Ex. C at pp. 15, 60, 63, 102, 109; Deposition Transcript of Jennifer McConnell at pp. 105-06, annexed hereto at Exhibit K.

Based on the foregoing, there can be no reasonable debate that the payment of patient referral fees was a common practice at the Lowell First Spine clinic (and at all other 40+ FMC clinics). As such, defendant's answer denying the existence of a patient referral scheme (and his participation therein) is wholly inconsistent with the evidence developed to date. As such, plaintiff requests that defendant be compelled to answer this interrogatory truthfully and accurately.

**INTERROGATORY #14**

> Describe the computer system(s) including, but not limited to, network servers, workstations, laptops and hand-held computers (including, but not limited to, personal organizers, trios, blackberries, palm pilots) used by First Spine (Lowell), Future Management Corporation and any billing company(ies) of First Spine, currently and at any time within the past six (6) years; including, but not limited to, for each such system, the facility(ies) where such equipment is kept or was used, the brand and model, the amount of memory and capacity of the hard disk(s), the make, model and capacity of any removable media or near-line storage systems, the name and version of the operating system, the name and version of network software, if any, the brand and model of all peripheral devices including tape drives, external disk drives, other storage devices; and the brand and version of major software in use on the system(s) during such period (including, but not limited to, electronic mail programs, workgroup collaboration programs, scheduling software, and encryption or privacy-enhancing programs) during such period.

**DEFENDANT'S ANSWER #14**

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: First Spine does not have a computer system. I am unaware of the computer system used by ARMS who currently does the billing. Future Management has a two (2) server network system (Dell) with five workstations. There is a primary server and a scan server. There is a backup system that has an offsite fireproof storage system and an onsight [sic] secondary storage system. The billing is no longer done at Futuire management [sic] but during the period in question the billing software was Lytec and the email system was Microsoft Outlook.

Encompass seeks documents and information regarding any and all documents relating to any computers, computer programs, or e-mail used by plaintiff and its billing companies Future Management Corporation and ARMS and/or any of their employees in connection with the patients referenced in the Complaint. The defendant has responded claiming that First Spine did not have computers and that FMC no longer handles any billing. The defendant further claims that ARMS currently handles FMC billing. Upon information and belief, FMC and ARMS occupy the same office space in Needham, MA. As a result, the defendant should be required to provide information regarding ARMS's billing system whereas ARMS is not a party and not subject to plaintiff's discovery attempts at this juncture.

The Federal Rules of Civil Procedure were recently amended to address issues regarding the maintenance and production of electronically stored information. See generally Fed. R. Civ. P. 26 and 33, 34. To date, none of the defendants (including Joseph Giampa) have provided any meaningful discovery regarding the computer systems/networks employed by FMC and its various clinics. Moreover, defendants have not provided Encompass with a copy of their document retention policy.

## INTERROGATORY #16

Please describe First Spine/Future Management document destruction/scanning policies, including but not limited to, the destruction/scanning of any patient files (including but not limited to those patients alleged in the Complaint), including treatment records,

invoices, sign-in sheets, lists or any other document reflecting the examination, treatment, billing and dates and times in which the patients may have appeared at First Spine.

**DEFENDANT'S ANSWER #16**

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: The document destruction policy is as follows: After the Chiropractic Regulations were amended to permit the electronic storage of records, the closed patient files which are identified as patient's [sic] who have been discharged and for whom the balance on the file is $0.00 are scanned into the system, stored offsite (fireproof box) and onsite.

The defendant's answer to the foregoing interrogatory is inaccurate based on testimony from FMC-related persons in other litigation. In the matter <u>Safety Ins. Co. v. Giampa, et. al.,</u> Middlesex Superior Court, C.A. No. 07-0697, counsel for the various FMC clinics stated that <u>all</u> of FMC's original paper patient files have been destroyed and converted to electronic files, including those files with outstanding balances. The statement by FMC in this related litigation is wholly inconsistent with the statements proffered by defendant in this case with regard to FMC's document destruction policy. Upon information and belief, defendants have been actively destroying relevant documents during the course of this litigation. Given these inconsistencies, plaintiff respectfully requests that defendant be compelled to amend his answer to this interrogatory to reflect the true nature of FMC's document destruction/retention policy.

**INTERROGATORY #23**

What bank(s) did the defendants, First Spine and/or Future Management use in connection with the patient(s) identified in the Complaint.

**DEFENDANT'S ANSWER #23**

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: None.

The defendant has answered that neither party used any banks in connection with any of the patients listed in plaintiff's Complaint. The answer to the foregoing interrogatory is wholly deficient based on the practical reality of defendants' business. When Encompass (or any other insurer) would remit payment in reliance on defendants' medical records and invoices, a check would be issued to the defendants. Either the defendants, First Spine or Future Management would have had to cash and/or deposit the draft at a financial institution. The foregoing interrogatory was directed at eliciting such information regarding the bank accounts used by defendants.

Encompass seeks information relating to monies paid to third parties, referrals, runners, and vouchers to determine the extent of the insurance fraud in which defendants were engaged. Clearly, any documents memorializing defendants' payments to runners to stage motor vehicle accidents and then recruit and refer purported accident victims to the defendant clinics are relevant as to whether the medical treatments were reasonable and necessary in this case.

If "runners" (or other patient referrers) were involved, and referrals were being made back and forth between defendants and attorneys, this information is essential to plaintiff's preparation for trial. The defendants have clearly stated, in a verified complaint, that FMC employed runners to further FMC's business ventures. See Ex. M. The defendants' financial and banking account information is fundamental to determining the extent of the insurance fraud in this case.

Based on the foregoing, there can be no reasonable debate that information regarding defendant's banking activity is relevant to the allegations set forth in plaintiff's Complaint. As such, defendant should not be permitted to plainly assert that he (nor FMC) never used the services of any banks; instead, defendant should be compelled to answer this interrogatory

15

accurately and truthfully by disclosing the identity of every financial institution used by

defendants during the course of running their business.

## IV.    **CONCLUSION**

WHEREFORE, for all the foregoing reasons, plaintiff, Encompass Insurance Company,

respectfully requests that this Honorable Court enter an Order COMPELLING defendant, Joseph

D. Giampa, to provide true and accurate responses to Encompass' First Set of Interrogatories

within twenty (20) days of this Court's Order.

Respectfully submitted,
*Encompass Insurance Company,*
By its attorneys,

/s/ Nathan A. Tilden

Richard D. King, Jr., BBO#638142
Nathan A. Tilden, BBO#647076
Michael W. Whitcher, BBO#663451
SMITH & BRINK, P.C.
122 Quincy Shore Drive
Quincy, Massachusetts 02171
(617) 770-2214

Dated:  June 25, 2007

**Certificate of Service**

I, Nathan A. Tilden, hereby certify that on this 25th day of June, 2007, this document was filed through the CM/ECF and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

_____/s/ Nathan A. Tilden_____

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENCOMPASS INSURANCE COMPANY OF MASSACHUSETTS,<br><br>        Plaintiff,<br><br>vs.<br><br>JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, ADVANCED SPINE CENTERS, INC., d/b/a FIRST SPINE REHAB, FUTURE MANAGEMENT CORPORATION, EDWARD KENNEDY, BRIAN J. CULLINEY, D.C. and JENNIFER McCONNELL, D.C.<br><br>        Defendants. | Civil Action No.  1:05-cv-11693-RCL |

## PLAINTIFF'S FIRST SET OF INTERROGATORIES PROPOUNDED TO THE DEFENDANT, JOSEPH D. GIAMPA

### I.    INTRODUCTION

Pursuant to Fed. R. Civ. P. 26 and 33, the plaintiff, Encompass Insurance Company of

Massachusetts (hereinafter "Encompass"), requests the defendant, Joseph D. Giampa (hereinafter

"Giampa"), answer the following interrogatories fully and separately in writing and under oath

within thirty (30) days after service.

### II.    INSTRUCTIONS

A.    These interrogatories are continuing in nature and require automatic supplemental

or amended responses to the extent specified in Fed. R. Civ. P. 26, should the defendant, or his

counsel, obtain further supplemental information.

B.    In answering each interrogatory, you are requested to identify and produce all

documents in your possession or control, or in the possession or control of your employees or

agents and other persons purporting to act on your behalf, which contain information utilized to

answer the interrogatories.

C.    The defendant shall produce any non-identical copies of any documents or materials responsive to any of these interrogatories, or any subsequent interrogatories.

D.    If documents are not attached to the answers to these interrogatories, the substance of such documents should be set forth and an explanation given as to why the document or documents are not attached.

E.    If any of these interrogatories cannot be answered in full, answer the interrogatory to the extent possible, specifying each reason for the inability to answer the remainder and stating whatever information or knowledge you have concerning the unanswered portion.

F.    In answering the interrogatories, furnish all information available to you, regardless of whether or not it is based on personal knowledge or records of you, your agents or representatives of others.

G.    State which answers or parts thereof are based upon personal knowledge, and which answers or parts thereof are based upon information and belief.  For each answer or part thereof based upon information and/or belief, describe in detail and with particularity the basis for the information and/or belief.

H.    In the event that the defendant withholds from production any information or document on the grounds of privilege, the defendant shall identify the document or information withheld and shall include an identification and description of the nature of the privilege claimed, and the subject matter of the withheld information or document.

I.    In answering these interrogatories, the defendant is charged with the understanding that reference to any individual shall be considered inclusive of any representative of that person and any entity (legal, business or otherwise) with which the referenced person has an interest.  For instance, an interrogatory which asks whether any money has been paid to "Mr.

X" would require an answer in the affirmative if any money had been paid to (1) Mr. X, (2) any

representative or agent of Mr. X, and (3) any entity in which Mr. X held a legal or equitable

interest.

      J.      Unless otherwise specified, all requests pertain to the **relevant period** as defined

below.

## III.   <u>DEFINITIONS</u>

      A.      The words **"and"** and **"or"** shall be deemed to mean **"and/or"** and the plural shall

include the singular and vice versa.

      B.      The term **"communication"** means any act or instance of transferring,

transmitting, passing, delivering, or giving information, by oral, written, or electronic means,

including, but not limited to, notes, letter, telegram, telex, telephone facsimile, tape, electronic

mail, voice mail, or otherwise.

      C.      **"Create"**, **"created"**, or **"creating"** means to cause to exist, originate, produce,

or cause the creation of.

      D.      As used herein, the terms **"document"** or **"documents"** mean all papers and

other tangible items and materials upon which information is recorded or from which

information may be obtained and includes all documents that you have in your possession,

custody, or control, or have the right to obtain upon request or demand.  This definition includes

all copies, reproductions and facsimiles of documents and includes, but is not limited to, any and

all letters, business cards, advertisements, correspondence, contracts, agreements, bills, orders,

receipts, records, books, computer tapes and print-outs, intracorporation communications,

memoranda, notes, notebooks, maps, sketches, cablegrams, telegrams, reports, press releases,

advertising and promotional literature, prints, drawings, plans, photographs, printed forms,

manuals, brochures, lists, publications, catalogues, directories, videotapes, other tape recordings, films, microfilm, and all other writings, including drafts, typings, printings, minutes or copies or reproductions thereof in the possession, custody or control of defendant or any other past or present officer, director, agent, employee consultant, or attorney for defendant or any person acting on behalf of defendant. If copies of documents are not identical for any reason, including handwritten notations, initials, or identifying marks, each non-identical copy is a separate document within the meaning of this definition.

     E.     When referring to a fact, situation, event or circumstance, **"identify"** means to set forth the time, place, and description thereof, the names of the participants therein and enumerate all documents which refer to or reflect such occurrence.

     F.     When referring to documents, **"identify"** means to give, to the extent known:

     (1)     the title, heading or caption of such document, if any;

     (2)     the identifying number(s), letter(s) or combination thereof, if any and the significance or meaning of such number(s), letter(s) or combination thereof;

     (3)     the inclusive dates of each such document;

     (4)     the general nature or description of such document (i.e., whether it is a letter, memorandum, minutes of meeting, etc.) and the number of pages of which it consists;

     (5)     the name of each author, addressee, or recipient.

     G.     When referring to a person, **"identify"** means to give, to the extent known, the person's full name, present or last known address, and when referring to a natural person, the present or last known place of employment. Once a person has been identified in accordance

with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

      H.     The term **"person"** means, in the plural, as well as the singular, any natural person, firm, association, partnership, corporation, or other entity. All references herein to any person shall include its employees, agents or representatives of such person or entity.

      I.     The term **"relating to"** means referring to, describing, concerning, evidencing, or constituting.

      J.     **"False medical documentation"** means any invoice, treatment record, SOAP note, report or other document containing and/or referencing:

     a.  Inaccurate, inadequate and inappropriate documentation;

     b.  Treatment which exceeds the type, quality and/or amount of the documented and clinically reasonable chiropractic needs of the patient;

     c.  A recipe of treatment absent any individualized medical decision making;

     d.  Treatment which is unrelated to the diagnosed, or reasonably suspected, injury or condition incurred by the patient;

     e.  Treatment which is provided solely for the purpose of enabling the patient to incur medical treatment expenses in excess of the tort threshold established by Mass. Gen. Laws ch. 231, §6D;

     f.  Charges for services which were not performed and/or overstating the amount of time spent evaluating and/or treating patients;

     g.  Charges for billing that exceeds reasonable fees for such services;

     h.  Charges that amount to overutilization of practice;

    i.   Charges for adjustments/manipulations which are not based on currently accepted procedure codes;

    j.   Charges for examinations which are based on a level of coding which is not consistent with the patient's medical history, subjective and objective clinical findings concerning the patient which were made at the time of the visit, the complexity of the clinical decision-making involved in the diagnosis and/or treatment of the patient, or the nature of the care provided to the patient;

    k.   Charges for treatments, procedures or services which were not rendered, were not fully rendered, or were not rendered as represented by the charging chiropractor;

    l.   Charges for excessive and improper use of supportive procedures and therapies;

    m.   Charges for treatment of minors that wholly exceed reasonable and necessary treatment parameters; and

    n.   False and misleading information.

K.    **"I"** and/or **"you"** shall mean Joseph D. Giampa.

L.    **"Chiropractic documentation"** shall mean all invoices, treatment records, SOAP notes, reports and documentation created by Advanced Spine d/b/a First Spine and Rehab.

M.    **"First Spine"** shall mean Advanced Spine Center d/b/a First Spine and Rehab located in Lowell, Massachusetts as well as Future Management Corporation and all its parent corporations and/or subsidiary corporations, agents, representatives, predecessors-in-interest and successors-in-interest.

N.    "**Runner**" shall mean persons who facilitate(d) the referral of patients to chiropractic, therapy and/or massage facility.

O.    "**Relevant Period**" shall mean 1998 through the present inclusive and/or any portion thereof.

P.    "**Incentives**" shall mean the transfer with or without consideration of anything of present or contingent value including, but not limited to, money, bonuses, gift certificates, coupons, vouchers, taxi service, VIP discount/rebate cards.

## IV.    INTERROGATORIES

1.    If you disagree with the opinions of Michael Frustaci, D.C., as expressed in his Affidavit filed in support of Encompass' motion for attachment of real and personal property, then explain in complete detail your basis for disagreeing with Dr. Frustaci's opinion(s) or why you believe his findings are in any way inaccurate or do not reflect established and/or generally accepted chiropractic standards, including in your answer the (1) the identity and current contact information of all persons with whom you consulted concerning Dr. Frustaci's opinion, and (2) any materials, documents and memorializations of any kind upon which you rely to support any opposition to Dr. Frustaci's opinion(s).

2.    For each person who you or your attorney anticipate calling to testify as an expert at the time of trial, please state his/her full name, residential address, occupation and field of expertise; state the subject matter upon which he/she is expected to testify; state the substance of the facts to which he/she is expected to testify and state a summary of the grounds for each such opinion.

3.    For each of First Spine's patients listed in the spreadsheet annexed at Tab 1 of the

Complaint, please state:

   (1)    Name, date of birth, Social Security number and attorney of the
          patient;
   (2)    Dates and location of service;
   (3)    Names of all persons involved in patient's treatment;
   (4)    Nature of patient's injuries;
   (5)    Type(s) of treatment rendered to patient;
   (6)    Amount billed by First Spine;
   (7)    Amount paid by Encompass; and
   (8)    Date payment was made by Encompass.

4.    Are you aware of Rosencranz and Associates VIP card program (copy of the VIP

card is annexed hereto at Tab A)?  If your answer is anything but an unqualified

negative, kindly state:

   a.    what the VIP card program is;
   b.    your role in administering and/or participating in the VIP card
         program;
   c.    your knowledge of the role of any of the named defendants in this
         lawsuit in administering and/or participating in the VIP card program;
   d.    the manner in which the VIP card program was administered by
         Rosencranz and Associates, including in your answer the name, current
         address and telephone number for all persons involved in the VIP card
         program at Rosencranz and Associates;
   e.    how and who funded the VIP card program (i.e., was the cost of
         the VIP program split between Future Management and Rosencranz and
         Associates?);
   f.    the approximate date upon which the VIP card program was
         commenced in conjunction with Rosencranz and Associates and First
         Spine.

5.    Please state the full name, credentials and license number of each and every

individual (including but not limited to chiropractors, chiropractic aides,

receptionists, runners, etc.) who provided treatment, physical therapy,

physiotherapy, manipulations, adjustments, supportive procedures, and/or any

other type of therapy or rehabilitation to the patients listed in the spreadsheet

annexed at Tab 1 to Complaint, and identify the person(s) most knowledgeable with respect to each.

6.  Identify the person(s) who oversaw the (1) medical treatment, and (2) billing in connection with the patients listed in the spreadsheet annexed at Tab 1 to Complaint, and identify the person(s) most knowledgeable with respect to each category.  For each person listed, please provide: name, title, job duties, degree, license information, and length of employment with Future Management and/or First Spine.

7.  Identify the person(s) who was responsible for (1) training chiropractors regarding treatment of patients, billing protocols, (2) training chiropractic aides, and (3) personnel, including the hiring of all chiropractic and unlicensed employees, and identify the person(s) most knowledgeable with respect to each training category.

8.  Please identify all employees and/or independent contractors (W2, 1099 and cash) of First Spine (Lowell) from 1998 through the present, including in your answer (1) all current contact information for each such person; and (2) each person's title, job description and salary/rate of pay, date of termination and reson for leaving.

9.  Other than the named defendants and identified patients, please identify, in complete detail, with current contact information, all persons known to you with information regarding the allegations contained in plaintiff's complaint, including in your answer the full name of each person, the date of birth, social security number, home address, home telephone number, business address, occupation,

and business telephone, and identify the subject matter of each person's

knowledge regarding the allegations contained in plaintiff's complaint.

10.    Did you or anyone working in concert with you or at your direction and control

create false medical documentation.  If your answer to the foregoing interrogatory

is anything other than an unqualified negative, please state:

  a.    the name, address, and telephone number of each patient in connection
        with whom false medical documentation was created;

  b.    all insurance carriers involved in connection with each claim wherein false
        medical documentation was created;

  c.    corresponding insurance carrier claim numbers pertaining to the
        information provided in (a) and (b) above;

  d.    date of loss;

  e.    type of claim/coverage involved;

  f.    disposition of claim;

  g.    referral fees/incentives paid in connection with each such claim;

  h.    identity of person(s) paid any such referral fees/incentives; and

  i.    identify the person and/or entity to whom/which any such false medical
        documentation was submitted and the manner in which it was submitted
        (i.e., via the U.S. Mail).

11.    Please identify all person(s) (including employees), including in your answer

current contact information, to whom you and/or First Spine provided any

incentive for the referral of any personal injury and/or motor vehicle accident

claims from 1998 through the present.

12.    Please identify all person(s) (including lawyers), including in your answer current

contact information, who provided you, First Spine, or any other defendant

referral of any personal injury and/or motor vehicle accident claims from 1998

through the present.

13.    Did you or anyone working in concert with you ever misrepresent facts to

Encompass in connection with insurance claims.  If your answer to the foregoing

interrogatory is anything other than an unqualified negative, please state:

    a.    the date, time, substance of and identity of the maker(s) each such
       misrepresentations;

    b.    the claimant name and claim number related to your answer (a), above;

    c.    the substance of each such misrepresentation; and

    d.    the manner in which each misrepresentation was communicated and to
       whom it was communicated at the insurance company.

14.    Describe the computer system(s) including, but not limited to, network servers,

workstations, laptops and hand-held computers (including, but not limited to,

personal organizers, trios, blackberries, palm pilots) used by First Spine (Lowell),

Future Management Corporation and any billing company(ies) of First Spine,

currently and at any time within the past six (6) years; including, but not limited

to, for each such system, the facility(ies) where such equipment is kept or was

used, the brand and model, the amount of memory and capacity of the hard

disk(s), the make, model and capacity of any removable media or near-line

storage systems, the name and version of the operating system, the name and

version of network software, if any, the brand and model of all peripheral devices

including tape drives, external disk drives, other storage devices; and the brand

and version of major software in use on the system(s) during such period

(including, but not limited to, electronic mail programs, workgroup collaboration

programs, scheduling software, and encryption or privacy-enhancing programs)

during such period.

11

15.    Please state all facts pertaining to any and all professional complaints, criminal actions or lawsuits filed by or against you, First Spine (Lowell) or any treating chiropractor of the patients listed in the chart attached at Tab 1 of the Complaint for the period 1998 through the present, including in your answer the date of complaint, the authority, agency, and/or court in which any such complaint or lawsuit was filed, the name or names of the plaintiffs, defendants, and/or complainants, the complaint/docket number, and the status of any such complaint and/or lawsuit.

16.    Please describe First Spine/Future Management document destruction/scanning policies, including but not limited to, the destruction/scanning of any patient files (including but not limited to those patients alleged in the Complaint), including treatment records, invoices, sign-in sheets, lists or any other document reflecting the examination, treatment, billing and dates and times in which the patients may have appeared at First Spine.

17.    Please list/describe all exhibits you intend to introduce into evidence at the time of trial.

18.    Did you, First Spine and/or Future Management ever have informational meetings/seminars with personal injury attorneys including, but not limited to, the Law Offices of Mark E. Solomone, Dana M. Rosencranz, Louis Haskell, or John King and Associates.  If your answer is anything but an unqualified negative, kindly provide the following:

a.    the date(s) of any such meetings;
b.    the location of each meeting;
c.    the identity, including the name, current address, and telephone

number of all persons in attendance at each such meeting;

d.    the identity, including name, current address, and telephone number of each person presenting at each such meeting;

e.    describe any and all documents discussed and/or disseminated at any such meeting.

19.    Who was involved in the creation of the First Spine's/Future Management's fee schedule? List the full name, date of birth, address and Social Security Number of each person listed in your answer to this interrogatory.

20.    Did the plaintiff and/or treating clinic(s) use computers, computer programs or e-mail in their day to day operations? If your answer to this question is anything other than an unqualified negative, then state:

(a) How the computers were used in the plaintiff and/or treating clinic(s) operations;

(b) The names of the persons involved in said computer operations;

(c) The identity of any e-mail accounts (i.e. AOL, Comcast, Hotmail, etc.);

(d) The present location of any computers that were used by the plaintiff and/or the treating clinic(s) in their business operations;

(e) What software programs were used by the plaintiff and/or treating clinics in their computer operations; and

(f) Who currently has possession of the plaintiff and/or treating clinic(s) business operations computer data and the address(es) where such data is being kept?

21.    If you claim that the prices for medical treatment, testing, examination, therapy and/or physiotherapy for the patient(s) identified in the Complaint are reasonable, then explain in complete detail, the basis for such prices. To the extent that the defendant relies on documents to support its claim that the prices charged by the defendant and/or treating clinic(s) are reasonable, please identify all such documents.

22.    What role, if any, did you play in:

(a) The treatment of the patient(s) identified in the plaintiff's Complaint;

(b) The management of the plaintiff and/or treating clinic(s); and

(c) The financial operations of the plaintiff and/or treating clinic(s).

23. What bank(s) did the defendants, First Spine and/or Future Management use in connection with the patient(s) identified in the Complaint.

24. Have you ever paid or provided/facilitated the payment of incentive(s) for (1) runners and/or (2) the referral of patients? If the answer to Interrogatory No. 24 is anything other than an unqualified negative, please identify the following for each runner:

    (a)    Name and address of the runner(s);

    (b)    Name and the location of each clinic to which each runner made referrals;

    (c)    The period of time during which the runner made referrals to each clinic;

    (d)    Names, addresses and dates of birth of the individuals the runner referred to each clinic;

    (e)    The amount of money paid to the runner for each referral; and

    (f)    The names of the employees, representatives, and/or agents of each clinic who met with, contacted and/or gave money to the runner.

Respectfully submitted,
*Encompass Insurance Company,*
By its attorneys,

Richard D. King, Jr., BBO#638142
Nathan A. Tilden, BBO#647076
SMITH & BRINK, P.C.
122 Quincy Shore Drive
Quincy, Massachusetts 02171
(617) 770-2214

Dated: January ____, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETS**

---

ENCOMPASS INSURANCE COMPANY OF
MASSACHUSETS,

        Plaintiff,

    v.                                                        Case No. 05-11693 RCL

JOSEPH D. GIAMPA, FREDERICK T. GIAMPA,
ADVANCED SPINE CENTERS, INC. d/b/a
FIRST SPINE REHAB, FUTURE
MANAGEMENT CORPORATION,
FUTURE MANAGEMENT BUSINESS TRUST,
EDWARD KENNEDY, BRIAN J. CULLINEY,
D.C., and JENNIFER McCONNELL, D.C.,

        Defendants.

---

**DEFENDANT JOSEPH D. GIAMPA'S  ANSWERS TO PLAINTIFFS' FIRST SET**
**OF INTERROGATORIES**

Now appears the Defendant Joseph D. Giampa (hereinafter "the Defendant"), by his

attorneys BELESI & CONROY, P.C., as and for his Answers to Plaintiff's First Set of

Interrogatories, answers and objects as follows:

**General Objections**

    Without limiting or waiving any specific objections set forth in response to any

particular response to interrogatories the Defendant objects generally to the plaintiff's 1st

set of interrogatories as follows:

1

Defendant objects to the interrogatories to the extent that such interrogatories infringe upon or request information subject to and protected by the attorney client privilege or attorney work product doctrine.

Defendant generally objects to plaintiff's 1st set of interrogatories. To the extent such interrogatories request information based upon, either directly or indirectly, documents, information or materials not in the possession custody or control of the defendant.

Defendant generally objects to the plaintiff's 1st set of interrogatories to the extent that such interrogatories seek information which is beyond the scope of discoverable materials pursuant to the Federal Rules of Civil Procedure or the local rules of the Massachusetts District Court.

Defendant generally objects to the plaintiff's 1st set of interrogatories to the extent such interrogatories are overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible materials.

Defendant specifically reserves the right to supplement, modify or alter these responses.

## ANSWERS

1.    If you disagree with the opinions of Michael Frustaci, D.C., as expressed in his Affidavit filed in support of Encompass' motion for attachment of real and personal property, then explain in complete detail your basis for disagreeing with Dr. Frustaci's opinion(s) or why you believe his findings are in any way inaccurate or do not reflect established and/or generally accepted chiropractic standards, including in your answer the (1) the identity and current contact information of all persons with whom you consulted concerning Dr. Frustaci's opinion, and (2) any materials, documents and memorializations of any kind upon which you rely to support any opposition to Dr. Frustaci's opinion(s).

Objection: Defendant objects to this interrogatory as such information is premature and the subject matter of automatic disclosure pursuant to Fed.R.Civ.P.26(a)(2).

2.      For each person who you or your attorney anticipate calling to testify as an expert at the time of trial, please state his/her full name, residential address, occupation and field of expertise; state the subject matter upon which he/she is expected to testify; state the substance of the facts to which he/she is expected to testify and state a summary of the grounds for each such opinion.

Objection: Defendant objects to this interrogatory as such information is premature and the subject matter of automatic disclosure pursuant to Fed.R.Civ.P.26(a)(2).

3.      For each of First Spine's patients listed in the spreadsheet annexed at Tab 1 of the Complaint, please state:

     (1)      Name, date of birth, Social Security number and attorney of the patient;
     (2)      Dates and location of service;
     (3)      Names of all persons involved in patient's treatment;
     (4)      Nature of patient's injuries;
     (5)      Type(s) of treatment rendered to patient;
     (6)      Amount billed by First Spine;
     (7)      Amount paid by Encompass; and
     (8)      Date payment was made by Encompass.

Objection: This request is objected to as it is unduly broad, burdensome and beyond the scope of discovery permitted under the Federal Rules of Civil Procedure and the Local Rules for the District of Massachusetts. In addition all of the information is in the possession of the Plaintiffs either through the claims process or as a result of the Defendants' Response to Plaintiffs' Request for Production of Documents.

4.      Are you aware of the Rosencranz & Associates VIP card program (copy of the VIP card is annexed hereto at Tab A)? If your answer is anything but an unqualified negative, kindly state:

     a.      what the VIP card program is;
     b.      your role in administering and/or participating in the VIP card program;
     c.      your knowledge of the role of any of the named defendants in this lawsuit in administering and/or participating in the VIP card program;
     d.      the manner in which the VIP card program was administered by Rosencranz & Associates, including in your answer the name, current

address and telephone number for all persons involved in the VIP card
program at Rosencranz & Associates;

e.      how and who funded the VIP card program (i.e., was the cost of the
VIP program split between Future Management and Rosencranz &
Associates?); and

f.      the approximate date upon which the VIP card program was
commenced in conjunction with Rosencranz & Associates and First
Spine.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly
burdensome, vague and ambiguous, and not reasonably calculated to lead to the
discovery of admissible evidence.

Answer:    Notwithstanding the above objection, I am aware of the program but I don't
know anything specific about it, I am not involved in any way with its organization,
administration or participation, when it began, it's funding and Future Management has
no role in the administration, participation or funding of any such program.

5.      Please state the full name, credentials and license number of each and every
individual (including but not limited to chiropractors, chiropractic aides,
receptionists, runners, etc.) who provided treatment, physical therapy,
physiotherapy, manipulations, adjustments, supportive procedures, and/or any
other type of therapy or rehabilitation to the patients listed in the spreadsheet
annexed at Tab 1 to Complaint, and identify the person(s) most
knowledgeable with respect to each.

Objection: I object to this request as overly broad and unduly burdensome.  In addition I
would object as it is impossible for me to ascertain most of the information requested and
the Plaintiff is in possession of the medical charts of these patients which indicate the
chiropractor who provided services.

6.      Identify the person(s) who oversaw the (1) medical treatment, and (2) billing
in connection with the patients listed in the spreadsheet annexed at Tab 1 to
Complaint, and identify the person(s) most knowledgeable with respect to
each category.  For each person listed, please provide: name, title, job duties,
degree, license information, and length of employment with Future
Management and/or First Spine.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly
burdensome, vague and ambiguous, and not reasonably calculated to lead to the
discovery of admissible evidence.

Answer: Brian Culliney is the person most knowledgeable.  It is my understanding that
the balance of the information requested has been requested from and received from
Brian Culliney in this litigation.

7.    Identify the person(s) who was responsible for (1) training chiropractors regarding treatment of patients, billing protocols, (2) training chiropractic aides; and (3) personnel, including the hiring of all chiropractic and unlicensed employees, and identify the person(s) most knowledgeable with respect to each training category.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer:  The Chiropractors were trained by qualified persons who changed over the years. The various team leaders trained many of the chiropractors

8.    Please identify all employees and/or independent contractors (W2, 1099 and cash) of First Spine (Lowell) from 1998 through the present, including in your answer (1) all current contact information for each such person; and (2) each person's title, job description and salary/rate of pay, date of termination and reason for leaving.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer:    I am not the proper person to be answering this question.  Notwithstanding, the following is a list of persons who worked in the Lowell office:

Brian Culliney
Jennifer McConnell
John Klug
Doris Ortiz
Sohka Dy
Phally Samith
Kim Kong

As I understand these individuals have either (1) been deposed, (2) are parties or (3) the payroll/personnel records have been produced in connection with Plaintiffs' Request for Production of Documents.

9.    Other than the named defendants and identified patients, please identify, in complete detail, with current contact information, all persons known to you with information regarding the allegations contained in plaintiff's complaint, including in your answer the full name of each person, the date of birth, social security number, home address, home telephone number, business address, occupation, and business telephone, and identify the subject matter of each person's knowledge regarding the allegations contained in plaintiff's complaint.

Objection: I object to this interrogatory as overly broad and unduly burdensome.

10.   Did you or anyone working in concert with you or at your direction and control create false medical documentation. If your answer to the foregoing interrogatory is anything other than an unqualified negative, please state:

   a.   The name, address, and telephone number of each patient in connection with whom false medical documentation was created;
   b.   All insurance carriers involved in connection with each claim wherein false medical documentation was created;
   c.   Corresponding insurance carrier claim numbers pertaining to the information provided in (a) and (b) above;
   d.   Date of loss;
   e.   Type of claim/coverage involved;
   f.   Disposition of claim;
   g.   Referral fees/incentives paid in connection with each such claim;
   h.   Identity of person(s) paid any such referral fees/incentives; and
   i.   Identify the person and/or entity to whom/which any such false medical documentation was submitted and the manner in which it was submitted (i.e., via the U.S. Mail).

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Neither I nor anyone working in concert with me has ever created false medical documentation.

11.   Please identify all person(s) (including employees), including in your answer current contact information, to whom you and/or First Spine provided any incentive for the referral of any personal injury and/or motor vehicle accident claims from 1998 through the present.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: I have never provided any incentive for the referral of any personal injury and/or motor vehicle accident claims from 1998 through the present.

12.   Please identify all person(s) (including lawyers), including in your answer current contact information, who provided you, First Spine, or any other defendant referral of any personal injury and/or motor vehicle accident claims from 1998 through the present.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: I have never had a personal injury and/or motor vehicle accident claims referred to me.

13.    Did you or anyone working in concert with you ever misrepresent facts to Encompass in connection with insurance claims. If your answer to the foregoing interrogatory is anything other than an unqualified negative, please state:

a.    the date, time, substance of and identity of the maker(s) each such misrepresentations;

b.    the claimant name and claim number related to your answer (a), above;

c.    the substance of each such misrepresentation; and

d.    the manner in which each misrepresentation was communicated and to whom it was communicated at the insurance company.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: I have never misrepresented any material facts to Encompass.

14.    Describe the computer system(s) including, but not limited to, network servers, workstations, laptops and hand-held computers (including, but not limited to, personal organizers, trios, blackberries, palm pilots) used by First Spine (Lowell), Future Management Corporation and any billing company(ies) of First Spine, currently and at any time within the past six (6) years; including, but not limited to, for each such system, the facility(ies) where such equipment is kept or was used, the brand and model, the amount of memory and capacity of the hard disk(s), the make, model and capacity of any removable media or near-line storage systems, the name and version of the operating system, the name and version of network software, if any, the brand and model of all peripheral devices including tape drives, external disk drives, other storage devices; and the brand and version of major software in use on the system(s) during such period (including, but not limited to, electronic mail programs, workgroup collaboration programs, scheduling software, and encryption or privacy-enhancing programs) during such period.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer:   First Spine does not have a computer system.  I am unaware of the computer system used by ARMS who currently does the billing.  Future Management has a two (2) server network system (Dell) with five workstations.  There is a primary server and a scan server.  There is a backup system that has an offsite fireproof storage system and an onsight secondary storage system.  The billing is no longer done at Futuire management but during the period in question the billing software was Lytec and the email system was Microsoft Outlook.

15.   Please state all facts pertaining to any and all professional complaints, criminal actions or lawsuits filed by or against you, First Spine (Lowell) or any treating chiropractor of the patients listed in the chart attached at Tab 1 of the Complaint for the period 198 through the present, including in your answer the date of complaint, the authority, agency, and/or court in which any such complaint or lawsuit was filed, the name or names of the plaintiffs, defendants, and/or complainants, the complaint/docket number, and the status of any such complaint and/or lawsuit.

Objection:   I object to this interrogatory as it is ambiguous, vague, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: Notwithstanding the above objection, Encompass initiated a Disciplinary Complaint against me with the Massachusetts Board of Chiropractors.

16.   Please describe First Spine/Future Management document destruction/scanning policies, including but not limited to, the destruction/scanning of any patient files (including but not limited to those patients alleged in the Complaint), including treatment records, invoices, sign-in sheets, lists or any other document reflecting the examination, treatment, billing and dates and times in which the patients may have appeared at First Spine.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer:   The document destruction policy is as follows:

After the Chiropractic Regulations were amended to permit the electronic storage of records, the closed patient files which are identified as patient's who have been discharged and for whom the balance on the file is $0.00 are scanned into the system, stored offsite (fireproof box) and onsite.

17.   Please list/describe all exhibits you intend to introduce into evidence at the time of trial.

Objection: This request is objected to as it is overly broad, unduly burdensome and beyond the scope of permissible inquiry of the Fed.R.Civ.P. and the Local Rules of the District of Massachusetts.

18. Did you, First Spine and/or Future Management ever have informational meetings/seminars with personal injury attorneys including, but not limited to, the Law Offices of Mark E. Solomone, Dana M. Rosencranz, Louis Haskell, or John King and Associates. If your answer is anything but an unqualified negative, kindly provide the following:

   a. the date(s) of any such meetings;
   b. the location of each meeting;
   c. the identity, including the name, current address, and telephone number of all persons in attendance at each such meeting;
   d. the identity, including name, current address, and telephone number of each person presenting at each such meeting;
   e. describe any and all documents discussed and/or disseminated at any such meeting.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: No.

19. Who was involved in the creation of the First Spine's/Future Management's fee schedule? List the full name, date of birth, address and Social Security Number of each person listed in your answer to this Interrogatory.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: The fee schedule is created by the Worker's Compensation CPT Code Fee Schedule. I believe this was created in 1966 by a Board comprised of medical professionals, insurance company representatives and representatives of various governmental agencies.

20. Did the plaintiff and/or treating clinic(s) use computers, computer programs or e-mail in their day to day operations? If you answer to this question is anything other than an unqualified negative, then state:

   (a) How the computers were used in the plaintiff and/or treating clinic(s) operations;
   (b) The names of the persons involved in said computer operations;

(c)    The identity of any e-mail accounts (i.e. AOL, Comcast, Hotmail, etc.);

(d)    The present location of any computers that were used by the plaintiff and/or the treating clinic(s) in their business operations;

(e)    What software programs were used by the plaintiff and/or treating clinics in their computer operations; and

(f)    Who currently has possession of the plaintiff and/or treating clinic(s) business operations computer data and he address(es) where such data is being kept?

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: I don't know anything about the Plaintiffs' computer systems but the clinics did not have computers.

21.    If you claim that the prices for medical treatment, testing, examination, therapy and/or physiotherapy for the patient(s) identified in the Complaint are reasonable, then explain in complete detail, the basis for such prices. To the extent that the defendant relies on documents to support its claim that the prices charged by the defendant and/or treating clinic(s) are reasonable, please identify all such documents.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: All charges are in accordance with the CPT Code fee schedule.

22.    What role, if any, did you play in:

(a)    The treatment of the patient(s) identified in the plaintiff's Complaint;

(b)    The management of the plaintiff and/or the treating clinic(s); and

(c)    The financial operations of the plaintiff and/or the treating clinic(s).

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: None.

23.    What bank(s) did the defendants, First Spine and/or Future Management use in connection with the patient(s) identified in the Complaint.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: None.

24.     Have you ever paid or provided/facilitated the payment of incentive(s) for (1) runners and/or (2) the referral of patients?  If the answer to Interrogatory No. 24 is anything other than an unqualified negative, please identify the following for each runner:

(a)     Name and address of the runner(s);
(b)     Name and the location of each clinic to which each runner made referrals;
(c)     The period of time during which the runner made referrals to each clinic;
(d)     Names, addresses and dates of birth of the individuals the runner referred to each clinic;
(e)     The amount of money paid to the runner for each referral; and
(f)     The names of the employees, representatives, and/or agents of each clinic who met with, contacted and/or gave money to the runner.

Objection: Defendant objects to this interrogatory as it is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.

Answer: No.

11

Signed this 20th day of April 2007 under the pains and penalties of perjury.

_____
Joseph Champa

For objections:

Matthew J. Conroy, Esq.
BELESI & CONROY P.C.
114 Waltham St.
Lexington, MA 02421
(781) 862-8060

## CERTIFICATE OF SERVICE

I, Matthew J. Conroy do hereby certify that a true and accurate copy of the foregoing pleading was served upon all counsel of record this 22d day of April 2007 by email, and by 1st class US Mail postage prepaid.


/s/ Matthew J. Conroy
Matthew J. Conroy

Volume:      I
Pages:   1-145
Exhibits:     None

COMMONWEALTH OF MASSACHUSETTS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ENCOMPASS INSURANCE COMPANY OF )
MASSACHUSETTS, )
   Plaintiff—Counterclaim Defendant, )
                )
Vs. )
                )
JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, )
ADVANCED SPINE CENTERS, INC., d/b/a )
FIRST SPINE REHAB, FUTURE MANAGEMENT )
CORPORATION, FUTURE MANAGEMENT )
BUSINESS TRUST, EDWARD KENNEDY, )
BRIAN J. CULLINEY, D.C. and )
JENNIFER MCCONNELL, D.C. ) CA NO.:05—111693 RCL
                )
   Defendants—Counterclaim Plaintiffs,)
                )
JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, )
ADVANCE SPINE CENTERS, INC. )
                )
   Third—Party Plaintiffs )
                )
Vs. )
                )
ALLSTATE INSURANCE COMPANY, )
                )
   Third—Party Defendant. )
                )

DEPOSITION OF PHALLY SAMITH

   A witness called by and on behalf of the Plaintiff—Counterclaim Defendant, pursuant to the Massachusetts Rules of Civil Procedure, before Kathleen M. Mullin, a Certified Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Offices of Smith & Brink, P C, 122 Quincy Shore Drive, Quincy, Massachusetts, commencing on Friday, February 16, 2007 at 10:30 a.m.

| | | |
|---|---|---|
| 1 | Q. | Do you also get a bonus if the patient goes to a |
| 2 | | lawyer? |
| 3 | A. | Yes. |
| 4 | Q. | What lawyer does the patient have to go to? |
| 5 | | **MR. CIAMPA:**  Objection. |
| 6 | A. | Does -- I don't know.  Doesn't matter. |
| 7 | | **(BY MR. KING)** |
| 8 | Q. | So as long as a patient goes to a lawyer then you |
| 9 | | get an additional bonus? |
| 10 | A. | Yes. |
| 11 | Q. | So if you bring in Jean Smith you get one bonus, |
| 12 | | right? |
| 13 | A. | Yes. |
| 14 | Q. | And then if that person retains an attorney then |
| 15 | | you get an additional bonus? |
| 16 | A. | Yes. |
| 17 | Q. | We'll call that the attorney bonus, okay, just to |
| 18 | | differentiate? |
| 19 | A. | Yes. |
| 20 | Q. | Is the attorney bonus the same as bringing in the |
| 21 | | patient bonus? |
| 22 | A. | I don't know. |
| 23 | Q. | It could be more or could be less, you just have no |
| 24 | | idea? |

1    Q.   And that would be the second part of the bonus;

2         correct?

3    A.   Yes.

4    Q.   Now would there be a conversation with Dr. Culliney

5         about who the attorney should be that gets the

6         referral or was that your decision?

7    A.   It's not my decision.

8    Q.   Whose decision was it?  Well, it certainly wasn't

9         Mr. Ferrante's.  Do you know whose decision it was?

10   A.   Can you say question again?

11   Q.   It wasn't your decision to decide who was going to

12        get that attorney referral, right?

13   A.   No.

14   Q.   Whose decision was it?

15   A.   I don't know who the decision it is.

16   Q.   You talked to Dr. Culliney about it, right?

17   A.   Yes.

18   Q.   So he told you who gets the referral?

19   A.   Yes.

20   Q.   You never had some more conversations with Jen

21        McConnell?

22   A.   I don't remember, no.

23   Q.   What did you say?  You don't remember?

24   A.   No.

15

1    A.    No.

2    Q.    And you said Morn, M-o-r-n, is your mom?

3    A.    Yes.

4    Q.    Was she involved in one of the accidents that you

5          just testified about where you received treatment

6          at First Spine?

7    A.    Yes.

8    Q.    Did she also receive treatment at First Spine in

9          connection with that same accident?

10    A.    Yes.

11    Q.    Was she paid by First Spine or by Brian Culliney to

12          treat at First Spine?

13    A.    No.

14    Q.    Did you receive a bonus for referring her to First

15          Spine, Morn?

16    A.    Yes.

17    Q.    How about Savonn Yonn?  Did he receive a bonus as

18          well?

19    A.    Excuse me?

20    Q.    Did Savonn Yonn also receive a bonus for Morn

21          Samith being treated at First Spine?

22    A.    No.

23    Q.    Just you?

24    A.    Yes.

60

1    Q.   Can you estimate for me -- or if you know the exact

2         date you can tell me -- when you last received a

3         bonus?

4    A.   I don't remember.

5    Q.   What did you need to do in order to receive a bonus

6         at First Spine?

7    A.   Recommend injured patient.

8    Q.   Bring in a patient, right?

9    A.   Recommend them.

10   Q.   Would you bring them in so they would get treatment

11        at First Spine?

12   A.   I don't know what you mean.

13   Q.   Well if they didn't get treatment at First Spine

14        would you get a bonus?

15   A.   No.

16   Q.   Okay.  So they had to come in and get some

17        treatment; correct?

18   A.   Yes.

19   Q.   How was the bonus paid?

20   A.   By check, payroll.

21   Q.   So it would come in your weekly check?

22   A.   Yes.

23   Q.   Were you paid weekly?

24   A.   Bi—weekly.

63

```
 1          tells you not to answer it.  Did you receive
 2          bonuses on a weekly basis?
 3    A.    I don't remember.
 4    Q.    Who else received bonuses?
 5    A.    I don't know.
 6    Q.    Who kept track of how much bonus you should receive
 7          every week?
 8    A.    I don't know.
 9    Q.    Well if you bring a patient in, right?
10    A.    Yes.
11    Q.    And they get treatment, right?
12    A.    Yes.
13    Q.    You knew you were going to get a bonus; correct?
14    A.    Yes.
15    Q.    How did you know that?
16    A.    Because I recommend them.
17    Q.    How did you know you were going to get a bonus?
18    A.    How do I know?
19    Q.    Yes.
20    A.    I talk to the doctor.
21    Q.    Who?
22    A.    Brian Culliney.
23    Q.    So Brian Culliney he was the one that told you
24          about the bonus?
```

102

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | And it may have been ten or it may have been more |
| 3 | | than ten times, right? |
| 4 | A. | Yes. |
| 5 | Q. | And they were gift cards to what? |
| 6 | A. | Just like a VISA gift card. |
| 7 | Q. | Useable anywhere VISA is accepted? |
| 8 | A. | Yes. |
| 9 | Q. | Any other types of gift certificates other than the |
| 10 | | VISA gift card? |
| 11 | A. | Yes. |
| 12 | Q. | Describe them for me. |
| 13 | A. | China Buffet. |
| 14 | Q. | What is that? |
| 15 | A. | A restaurant, Chinese restaurant.  Buffet. |
| 16 | Q. | Is that in Lowell? |
| 17 | A. | That's in Lowell. |
| 18 | Q. | Are you sure? |
| 19 | A. | I know one in Lowell. |
| 20 | Q. | Have you been to the China Buffet? |
| 21 | A. | Yes. |
| 22 | Q. | Did you buy the gift certificates? |
| 23 | A. | Yes. |
| 24 | Q. | Would you use the van and go buy them or how does |

```
 1    A.   Don't remember.

 2    (BY MR. KING)

 3    Q.   So sometimes you would give them a VISA gift card.

 4         Did everybody get one or the other, a VISA gift

 5         card or a China Buffet?

 6    A.   I don't know.

 7    Q.   Well the patients that you handled.

 8    A.   Yes.

 9    Q.   So all of your patients got one or the other;

10         correct?

11    A.   Yes.

12    Q.   Would you ask the patient what they would rather

13         have, the Buffet or a gift card?

14    A.   Yes.

15    Q.   So it was sort of up to them?

16    A.   Yes.

17    Q.   And then you would go see Culliney and get it for

18         them; correct?

19    A.   Yes.

20    Q.   Your testimony I guess will be that you don't know

21         if Sokha Dy ever did anything with gift cards or

22         Buffet; correct?

23    A.   Yes.

24    Q.   Have you had conversations with her about not
```

145

## C E R T I F I C A T E   P A G E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF NORFOLK, SS

     I, Kathleen M. Mullin, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing Deposition of **Phally Samith**, was taken before me on February 16, 2007.  The said witness was duly sworn before the commencement of her testimony; that the said testimony was taken by me, by the voice writing method and translated into text via speech recognition.  To the best of my knowledge, the within transcript is a complete, true and accurate record of said testimony.

     I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter at hand.

     I have hereunto set my hand and Notary Seal this 22nd day of February, 2007.

               _____

               Kathleen M. Mullin, CVR, Notary Public
               My Commission Expires:
               June 22, 2012

**THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.**

## COMMONWEALTH OF MASSACHUSETTS

## EXAMINATION UNDER OATH

| | |
|---|---|
| Witness: | Sokhira Yang |
| Insured: | Venken Srey |
| Claim/Loss No.: | 03526598 |
| Insurer: | Encompass Insurance Company |
| Date of Loss: | 5/6/05 |
| S&B File No.: | 1075-0739 |

EXAMINATION OF SOKHIRA YANG, a witness called by and on behalf of the Insurer, before Susan Baxter, a Professional Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink P.C., 122 Quincy Shore Drive, Second Floor, Quincy, Massachusetts 02171, on Wednesday, October 26, 2005, commencing at 10:20 a.m.

36

1    A.  Yes.

2    Q.  No other equipment was used?

3    A.  No.

4    Q.  Did you get any treatment on that first day?

5    A.  No.

6    Q.  Now, did Mr. Baez give you one of these cards?

7    A.  Brian gave me one of those cards.

8    Q.  Who's Brian?

9    A.  He's the, I think the owner of First Spine.

10   Q.  So you actually spoke to this Brian?

11   A.  Yes.

12   Q.  Do you know Brian's last name?

13   A.  No.

14   Q.  When did you speak to Brian?

15   A.  I don't remember.

16   Q.  Was it soon after the first evaluation or

17       examination?

18   A.  Yes.

19   Q.  Do you still have your card with you?

20   A.  Yes.

21   Q.  You have it with you today?  Could you show it to

22       me, please?

23               MR. CONRAN:  Let's mark this as

24           Exhibit 3.

1              (Whereupon, Exhibit No. 3 Photocopy of

2              VIP Card from Rosencrantz & Associates,

3              marked for identification.)

4    Q.   When Brian gave you this card, did he explain what

5         the purpose of the card was?

6    A.   No.

7    Q.   What is your understanding as to what the card is

8         for?

9    A.   I thought it was to get like a discount or

10        something.

11   Q.   A discount on what?

12   A.   On the accident case.

13   Q.   A discount on your medical expenses or your

14        attorney's fees?

15   A.   I think attorney's fees.

16   Q.   Did he explain whether this card was for your

17        accident that we're here today for or if this was

18        for future accidents?

19   A.   I'm not quite sure.  He just gave it to me and

20        then when I gave it to the lawyer, he said that

21        it's for if you, like, tell somebody to -- like if

22        you recruit somebody to go to Rosencrantz or

23        something like that, and then in a future

24        accident, that's when you can use it.

43

| | | |
|---|---|---|
| 1 | | manipulation, any other treatment? |
| 2 | A. | No. |
| 3 | Q. | How many days a week would you go? |
| 4 | A. | Probably three, three days a week. |
| 5 | Q. | Was there a regular schedule; would you go Monday, |
| 6 | | Wednesday, Friday or just when you could get |
| 7 | | there? |
| 8 | A. | No.  They gave me a schedule. |
| 9 | Q. | Okay.  What days would you go? |
| 10 | A. | It usually would be Monday, Wednesday and |
| 11 | | Thursday. |
| 12 | Q. | Was there a specific time you would normally go? |
| 13 | A. | Three. |
| 14 | Q. | 3:00 p.m.? |
| 15 | A. | Yes. |
| 16 | Q. | How long would you be there for the treatment? |
| 17 | A. | Half an hour. |
| 18 | Q. | How would you get to the facility? |
| 19 | A. | My dad would drop me off. |
| 20 | Q. | He'd come back and pick you up? |
| 21 | A. | Yup. |
| 22 | Q. | Did you ever receive any vouchers from First Spine |
| 23 | | for travel or gift certificates? |
| 24 | A. | Gift certificates. |

44

```
 1    Q.   What kind of gift certificates would you get from
 2         them?
 3    A.   Simon's gift card.
 4    Q.   Do you remember how much?
 5    A.   Fifty dollars.
 6    Q.   Do you still have that with you?
 7    A.   No.
 8    Q.   You used it to purchase something?
 9    A.   Yes.
10    Q.   Do you recall what you purchased?
11    A.   No.
12    Q.   This is for a mall; correct?
13    A.   Yes.
14    Q.   Any particular mall or just any Simon's mall?
15    A.   Any mall that you can use a Simon's gift card.
16    Q.   Now, outside the gift certificate, did you receive
17         any other compensation from First Spine?
18    A.   No.
19    Q.   Do you know the address for First Spine?
20    A.   No.
21    Q.   It's in Lowell though?
22    A.   Yes.
23    Q.   Can you describe the building it's located in?
24    A.   Small, brick building.
```

61

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF NORFOLK, SS

I, SUSAN BAXTER, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing Examination Under Oath of SOKHIRA YANG was taken before me on October 26, 2005.  The witness was duly sworn before the commencement of her testimony; that the said testimony was taken audiographically by myself and then transcribed under my direction.  To the best of my knowledge, the within transcript is a complete, true and accurate record of said Examination Under Oath.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter in controversy.

In witness whereof, I have hereunto set my hand and Notary Seal this 2nd day of November, 2005.

Susan Baxter, Notary Public
My Commission Expires:
March 10, 2011

PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND\OR DIRECTION OF THE CERTIFYING REPORTER.

# COMMONWEALTH OF MASSACHUSETTS

## EXAMINATION UNDER OATH

| | |
|---|---|
| Witness: | Viengkhone Khammanivong |
| Insured: | Viengkhone Khammanivong |
| Claim/Loss No.: | 03528572 |
| Insurer: | Encompass Insurance Company |
| Date of Loss: | 06/18/05 |
| Smith & Brink File No.: | 1075-0743 |

**EXAMINATION OF Viengkhone Khammanivong,** a witness called by and on behalf of the Insurer, before Kathleen M. Mullin, a Professional Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith and Brink, P.C., 122 Quincy Shore Drive, Quincy, Massachusetts, 02171, on Tuesday, October 25, 2005, commencing at 10:10 a.m.

36

```
 1   A.   I go to the chiropractic.

 2   Q.   What chiropractor did you go to?

 3   A.   First Spine.

 4   Q.   How come you chose First Spine?

 5   A.   I used to pass that very often, I know they were

 6        there, so.

 7   Q.   Where are they located?

 8   A.   At Lowell.

 9   Q.   Where in Lowell?  What street?

10   A.   Umm.

11   Q.   Do you know what street they are located on, sir?

12   A.   I cannot recall.

13   Q.   You don't know what street they are located on?

14   A.   School Street.

15   Q.   And you used to pass by there all the time?

16   A.   Yeah.

17   Q.   How did you choose your attorney?

18   A.   My friend gave me a card.

19   Q.   Your friend gave you a card?  Do you have that card

20        with you today?

21             MR. CHOROSZEJ:  Can I see that?

22   Q.   Your friend gave you this card?

23   A.   Yes.

24   Q.   I'm going to, again, take this card and when we have
```

1          an opportunity will label it as exhibit six.

2                    **(Whereupon Exhibit No. 6, Business card,**

3              **was marked for identification.)**

4    Q.   When did your friend give you this card?

5    A.   Monday.

6    Q.   And that is the Monday after the accident, sir?

7    A.   Yes.

8    Q.   What is your friend's name?

9    A.   A person I know but I don't know the name of the

10        person, I know him from the community.  I asked that

11        I probably need a lawyer for my case.  When I go to

12        the therapy they said if you don't have a lawyer I

13        know lawyer so I gave this card.  I need a lawyer, I

14        need a card, so he handled that.

15   Q.   You went into the chiropractor and told them you

16        didn't have a lawyer; is that correct?

17   A.   Yes.

18   Q.   And then someone at the chiropractor referred you to

19        your attorney now; is that correct?

20   A.   Yes.

21   Q.   What is the name of the person that referred you to

22        Attorney Rosencranz?

23   A.   I don't know the name.

24   Q.   But that person is your friend?

CERTIFICATE PAGE

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF NORFOLK, SS

     I, Kathleen M. Mullin, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing Examination Under Oath of **Viengkhone Khammanivong**, was taken before me on October 25, 2005.  The said witness was duly sworn before the commencement of his testimony; that the said testimony was taken and transcribed audiographically by myself.  To the best of my knowledge, the within transcript is a complete, true and accurate record of said testimony.

     I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter at hand.

     I have hereunto set my hand and Notary Seal this 3rd day of November, 2005.

_____
Kathleen M. Mullin, Notary Public
My Commission Expires:
June 22, 2012

**THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.**

## COMMONWEALTH OF MASSACHUSETTS

### EXAMINATION UNDER OATH

Witness:                   Jenifer Soneiga Hell

Insured:                 Bun Sok

Claim/Loss No.:         03547961

Insurer:                 Encompass Insurance Company

Date of Loss:          09/04/04

S&B File No.:          28045.ENC

        **EXAMINATION OF JENIFER SONEIGA HELL**, a minor witness called by and on behalf of the Insurer, before Susan K. Arvidson, a Certified Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink, P.C., 122 Quincy Shore Drive, Second Floor, Quincy, Massachusetts, 02171, on Friday, March 18, 2005, commencing at 3:11 p.m.

13

1    Q.    Did anyone give you any money or anything to treat

2          there?

3    A.    (No response.)

4    Q.    Did you get any money?

5    A.    No.

6    Q.    Did your mom or your sister get any money?

7    A.    Yeah, we get money.  Yeah, we get money.

8    Q.    You got money from the clinic?  How much, do you

9          know?

10             **MS. BODARY HELL:**  No, we got like the

11          card, like some other store.

12             **MR. TILDEN:**  Like a Simon gift card or

13          something?

14             **MS. BODARY HELL:**  Yeah.

15             **MR. TILDEN:**  What else did you get,

16          anything else?

17             **MS. BODARY HELL:**  No.

18             **MR. TILDEN:**  All right, I'm all set.

19          Thanks, I appreciate your help.  You did a

20          good job.

21

22             **(Whereupon, the Examination Under Oath**

23          **was concluded at 3:20 p.m.)**

24

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

16

## C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF NORFOLK, SS

I, SUSAN K. ARVIDSON, a Certified Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing Examination Under Oath of JENIFER SONEIGA HELL was taken before me on March 18, 2005. The witness was duly sworn before the commencement of her testimony; that the said testimony was taken audiographically by myself and then transcribed under my direction. To the best of my knowledge, the within transcript is a complete, true and accurate record of said Examination Under Oath.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter in controversy.

In witness whereof, I have hereunto set my hand and Notary Seal this 3rd day of April, 2005.

_____
Susan K. Arvidson, Notary Public

My Commission Expires:
February 9, 2012

**PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND\OR DIRECTION OF THE CERTIFYING REPORTER.**

# COMMONWEALTH OF MASSACHUSETTS

## EXAMINATION UNDER OATH

Witness:                    Rada Non

Insured:                    Savet Non

Claim/Loss:                 03544179

Insurer:                    Encompass Insurance Company

Date of Loss:               7/14/04

File No.:                   27408.ENC


EXAMINATION OF RADA NON, a witness called by and on behalf of the Insurer, before Karen M. Parlee, a Professional Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink, P.C., on November 22, 2004 commencing at 9:49 a.m.

23

1    Q.    How did you find that facility?

2    A.    Through a friend.

3    Q.    Who was that?

4    A.    A friend that works there that works at the clinic

5          also.

6    Q.    Can I guess?

7    A.    Sorry?

8    Q.    What's her name Phally?

9    A.    That's -- that's some guessing, yeah.

10   Q.    Yes.   That's her name, right?

11   A.    Yeah.

12   Q.    Yes.

13                MR. CHOROSZEJ:   I must say you're a very

14         excellent guesser.

15   (BY MR. TILDEN)

16   Q.    Yes.

17                Phally Smith, right?

18   A.    Yeah.

19   Q.    Yes.   How do you know her?

20   A.    My mom knows her.

21   Q.    How does she know her?

22   A.    Oh, I have no idea.

23   Q.    Did anyone give you any money or anything to treat

24         there?

24

1    A.    Yeah, they -- the -- I don't -- I forgot his name,

2          but he gave us gift certificates.

3    Q.    For what?

4    A.    Just -- just for -- for birthday, for -- for my

5          brother's birthday.

6    Q.    What were they for, the gift certificates?

7    A.    It was -- it was for -- for my brother cause --

8          cause -- cause his birthday was just close by.

9    Q.    Yes, but how much?

10   A.    Fifty.

11   Q.    To where?

12   A.    To the -- to the Simons Mall.

13   Q.    Did everyone get one or just your brother?

14   A.    Just my brother.

15   Q.    Which one?

16   A.    Mith.

17   Q.    Did you get anything?

18   A.    No.

19   Q.    How about the -- your sisters, did they get

20         anything?

21   A.    Yeah.  Well, yeah she -- she -- she got -- she got

22         --

23   Q.    Which one?

24   A.    Marina.

25

1   Q.   What did she get?

2   A.   I -- I don't remember.

3   Q.   You don't remember what it was?

4   A.   I know -- I believe it was a gift certificate also

5        but...

6   Q.   You don't know who gave it to you?

7   A.   It -- it was -- it was a male doctor.

8   Q.   Doctor Cullinie, Brian?

9   A.   I believe so.

10  Q.   Any other male doctors there?

11  A.   No.

12  Q.   How come you didn't get anything?

13  A.   I -- oh, I just -- to be honest, I don't know, but

14       -- it was -- it was -- I was -- I didn't really

15       expect anything but --  He hasn't given us any --

16       he has given -- he has given my brother and sister

17       through the situation that my mom kept asking him

18       he didn't give us any.

19  Q.   I don't even understand what you mean by that.

20  A.   I'm sorry.  Since --

21  Q.   Why don't you just go slow and tell me what --

22       what you did or did not get?

23  A.   Oh, I -- I didn't get any just my younger brother

24       and sister.

26

1   Q.   What about your older sister?

2   A.   No.

3   Q.   Are you still treating there?

4   A.   No, we're done.

5   Q.   I don't understand why -- your mom kept asking him

6        about what?

7   A.   Oh she said do -- oh, like do -- do you have those

8        gift certificates that are -- or any money and

9        then he -- he got mad.

10  Q.   Why did he get mad?

11  A.   Too -- too much asking and then he wasn't in the

12       mood I guess.

13  Q.   Why was he giving them away to your sister's then?

14  A.   Oh, my sister -- oh it was -- it was just a little

15       token for her report card.

16  Q.   Oh, that's nice.

17           MR. TILDEN:   Let's just go off for a

18       second?

19               (OFF THE RECORD)

20  (BY MR. TILDEN)

21  Q.   When did your pain go away?

22  A.   Two months after.   Two and a half months after.

23  Q.   Two months?

24  A.   Yes.

27

1    Q.   Were you still treating after the two months?

2    A.   Yes.

3    Q.   Why?

4    A.   Oh, the -- that was just a -- all those sort of

5         fading away at the pain during those two and a

6         half months and then going onto three months.

7    Q.   The pain was gone, but you were still treating?

8    A.   No, it was -- the pain was just slowly fading away

9         because it used to be stronger when -- when I

10        first went there.

11   Q.   Okay.  So it ended sometime in September?

12   A.   Around October.

13   Q.   October?

14   A.   Yes.

15   Q.   All right.  When in October?

16   A.   Around October the 14th I believe -- the four --

17        the 13th, 14th, somewhere around there.

18   Q.   And when did you stop treating there?

19   A.   October 25th.

20   Q.   Two days before your birthday?

21   A.   Yes.

22   Q.   But you didn't get anything though, huh?

23   A.   No.

24   Q.   That doesn't seem fair.

28

1   A.   No.

2   Q.   How about your mom, did she get anything?

3   A.   She got two tickets to a concert.

4   Q.   Which concert?

5   A.   A Cambodian concert at Mohegan.

6   Q.   Do you know if anyone else was given anything in

7        your family, any cash or anything?

8   A.   Cash?  I don't remember cause some -- cause

9        sometime we were going in different -- different

10       schedules.  Because we usually sometime we go in a

11       whole pack of family to therapy and then sometime

12       I would go by myself.

13  Q.   Other than the tickets and the two gift

14       certificates to your little brother and sister do

15       you know if anyone in your family got anything

16       else?

17  A.   No, I don't think so.

18  Q.   Would you know I mean wouldn't they come home and

19       say hey look what I got today?

20  A.   Oh, they wouldn't tell me.

21  Q.   No, they don't -- why -- how come?

22  A.   They probably think I'll take it.

23  Q.   Oh, all right.  So you don't know if anyone else

24       got anything?

## COMMONWEALTH OF MASSACHUSETTS

### EXAMINATION UNDER OATH

Witness:              Mith Non

Insured:              Savet Non

Claim/Loss:           03544179

Insurer:              Encompass Insurance Company

Date of Loss:         7/14/04

File No.:             27408.ENC

        EXAMINATION OF MITY NON, a witness called by and on behalf of the Insurer, before Karen M. Parlee, a Professional Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink, P.C., on November 22, 2004 commencing at 10:46 a.m.

6

1          accident?

2     A.   Yes.

3     Q.   What part of your body?

4     A.   My back spine -- lower and middle spine.

5     Q.   Anywhere else?

6     A.   It was a little pain and feeling in my arm, but

7          then...

8     Q.   Which arm?

9     A.   It was my right arm.

10    Q.   Did you go somewhere to get some treatment?

11    A.   No, it was just a little temporary pain.

12    Q.   Did you go to a chiro at all?

13    A.   Oh, yeah.  Chiropractor, yeah.

14    Q.   Where did you go?

15    A.   First Spine.

16    Q.   And why did you go there?

17    A.   It was for the back.

18    Q.   Yes, but how come you went to that place?

19    A.   Cause my mom brought us there.

20    Q.   Do you know why she brought you there?

21    A.   I don't know.  Cause for our backs I guess.

22    Q.   Did you get any money or anything to treat there?

23    A.   We had a gift certificate for...

24    Q.   What did you get?

7

1    A.   We -- I just -- I didn't use it though.

2               MS. NON:   It was only one.

3    (BY THE WITNESS)

4    A.   It was only one.

5    Q.   How much was it for?

6    A.   I think it was fifty.

7    Q.   Do you know to where?

8    A.   It was to any mall.

9    Q.   And that was for the whole family?

10   A.   Yeah.

11   Q.   Did you they get anything else?

12   A.   No, I don't think so.

13   Q.   Did anyone else in your family get anything else?

14   A.   I don't know, I'm not sure.  I don't know.

15   Q.   Okay.

16   A.   I don't know.

17   Q.   All right.  Do you know your social security

18        number?

19   A.   I don't know it.  It was in my jacket.  I left it

20        out there.

21   Q.   Okay.  Is your jacket --

22               MR. CHOROSZEJ:   I can give it to you if

23        you like?

24               MR. TILDEN:  All right.  I'll take it

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

## COMMONWEALTH OF MASSACHUSETTS

### EXAMINATION UNDER OATH

| | |
|---|---|
| Witness: | Marina Non |
| Insured: | Savet Non |
| Claim/Loss: | 03544179 |
| Insurer: | Encompass Insurance Company |
| Date of Loss: | 7/14/04 |
| File No.: | 27408.ENC |

EXAMINATION OF MARINA NON, a witness called by and on behalf of the Insurer, before Karen M. Parlee, a Professional Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink, P.C., on November 22, 2004 commencing at 10:32 a.m.

16

1    machine with the patches on your back, right?

2  A.  Yes.

3  Q.  And with that they give you the heat together?

4  A.  Heat and ice.

5  Q.  And ice?

6  A.  Yeah.

7  Q.  And that would be about ten to fifteen minutes?

8  A.  Just ten.

9  Q.  Ten minutes?

10  A.  Yeah.

11  Q.  And then from there the next thing you do -- what

12    would you do next the rolling bed?

13  A.  No, that was after like a month later.  They --

14    after that they -- they give us a short massage

15    like they crack our backs.

16  Q.  How long does that take?  When you say short --

17  A.  Only like one minute or so.

18  Q.  Okay.  And then you do the bike or some weight

19    training?

20  A.  That was after two months or a month.

21  Q.  Oh, okay.

22    And did anyone give you any money or

23    anything?

24  A.  No.

17

1    Q.   Gift certificates?

2    A.   Yeah, we got a gift certificate -- certificate for

3         I think it was Simon -- Simon --

4    Q.   How come you got that?

5    A.   I don't know.

6    Q.   You have no idea?  No -- no one told you?

7    A.   It was -- I think it was like -- I don't know.

8    Q.   Okay.  Who got the gift certificates?

9    A.   I think it was my mom.  I don't know.  Someone --

10   Q.   How many did you get?

11   A.   Just one.

12   Q.   For you or for the whole family?

13   A.   I think it was for the whole family.

14   Q.   Do you remember how much it was?

15   A.   I think it was only like a five dollar

16        certificate.  I don't know.

17   Q.   Oh.  Did you --

18   A.   And we got a China Buffet certificate.

19   Q.   Okay.  How much was that do you remember?

20   A.   I think it was a fifty dollar.

21   Q.   And did you get anything else while you were

22        there?

23   A.   No.

24   Q.   Do you know if your mom or anyone else got

## COMMONWEALTH OF MASSACHUSETTS

### EXAMINATION UNDER OATH

| | |
|---|---|
| Witness: | Savet Non |
| Insured: | Savet Non |
| Claim/Loss No.: | 03544179 |
| Insurer: | Encompass Insurance Company |
| Date of Loss: | 07/14/04 |
| S&B File No.: | 27408.ENC |

EXAMINATION OF SAVET NON, a witness called by and on behalf of the Insurer, before Susan K. Arvidson, a Certified Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink, P.C., 122 Quincy Shore Drive, Quincy, Massachusetts, 02171, on Monday, December 27, 2004, commencing at 1:05 p.m.

*Lee and Associates*
*Certified Court Reporters*
*346 Washington • Suite 181 • Braintree, MA  02184*
*Voice/Fax  781-848-9693*

1    A.    No.

2    Q.    Did he ever give you any gifts?

3    A.    He gave me something, but I was not treating

4          there, only my children treated.

5    Q.    What did he give you?

6    A.    Like my children had already told you, I believe,

7          that it was some sort of certificate or something.

8    Q.    What was the certificate for?

9    A.    They gave it to me, and then my children went and

10         used it.  It's for a meal somewhere, Chinese food.

11   Q.    What else did Dr. Culliney give to you or to your

12         children?

13   A.    They didn't give it to my children, he gave it to

14         me.

15   Q.    What else did he give to you?

16   A.    That certificate, that's all.

17   Q.    What about the tickets to the concert at Mohegan

18         Sun?

19   A.    Yes, he gave it to me and then I gave it to my

20         children.

21   Q.    The gift certificates to the Mohegan Sun?

22   A.    Because in that place, they give the doctor for

23         free.

24   Q.    So, the doctor gave you gift certificates to go to

1        the Mohegan Sun, and you gave them to your

2        children?

3   A.   Yes, because my children wanted it.

4   Q.   What was the gift certificate for at the Mohegan

5        Sun?

6   A.   It was a Cambodian group of artists that were

7        coming there to give concert there from Cambodia.

8   Q.   What else did the doctor give you?

9   A.   That's all.

10  Q.   What did the doctor give directly to your

11       children?

12  A.   No.

13  Q.   He didn't give anything directly to your children?

14  A.   No.

15  Q.   What about gift certificates to the Simon Mall?

16  A.   I'm trying to remember.  Maybe, I forget.

17  Q.   How much money did he actually give to you?

18  A.   Not money, but certificate.  It's the equivalent

19       of about $50.

20  Q.   Did you ask him for money?

21  A.   I was asking him, like, could he help me with some

22       sort of food or something.

23  Q.   Money for food?

24  A.   Yes.

*Lee & Associates * Certified Court Reporters * (781) 848-9693*

Volume:  I
Pages: 1-112
Exhibits: 2

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss                    LOWELL DISTRICT COURT


BLANCA RIVERA,                   )
       Plaintiff,                )
                                 )    CIVIL ACTION
v.                               )    NO. 0511-CV-2582
                                 )
BETH A. CORROW and               )
ENCOMPASS INSURANCE COMPANY,     )
       Defendants.               )
                                 )
                                 )


DEPOSITION OF JENNIFER McCONNELL

A Witness called by and on behalf of the

Defendants, pursuant to the Massachusetts Rules of

Civil Procedure, before Cheryl Ann Walker, Court

Reporter and Notary Public within and for the

Commonwealth of Massachusetts, at the Law Offices of

Smith & Brink, P.C., 122 Quincy Shore Drive, Quincy,

Massachusetts, 02171, commencing on Thursday,

September 21, 2006, at 10:06 a.m.

---

2

A P P E A R A N C E S

Erika M.D. Barrie, Esquire
Smith & Brink, P.C.
122 Quincy Shore Drive
Second Floor
Quincy, Massachusetts 02171
(617) 770-2214

COUNSEL FOR:  Encompass Insurance Company


Thomas M. Ciampa, Esquire
Ciampa & Associates
20 Park Plaza
Suite 804
Boston, Massachusetts 02116
(617) 742-5955

COUNSEL FOR:  Jennifer McConnell

---

3

I N D E X

| Witness | Direct | Cross | Redirect |
|---------|--------|-------|----------|
| Jennifer McConnell | | | |
| By Ms. Barrie | 9 | | |
| By Mr. Ciampa | | | |

---

4

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | Attorney Howard's Letter | 7 |
| 2 | Packet of Documents | 109 |

(Exhibits were retained by Attorney Barrie.)

105

1   A.  Three.

2   Q.  And who would be in them besides you?

3         MR. CIAMPA:  Objection.

4   A.  There was an office for myself, an office for Dr.

5      Culliney, and one other treatment room.

6  (BY MS. BARRIE)

7   Q.  Okay.  Do you know if First Spine offered any kind

8      of a gift certificate or referral or bonus system

9      for referrals of patients to the facility?

10        MR. CIAMPA:  Objection.

11   A.  Yes.

12  (BY MS. BARRIE)

13   Q.  What kind of bonuses, gift certificates, or

14      referrals were there?

15   A.  Gift certificate.

16   Q.  To where?

17   A.  The Simon Mall.

18   Q.  And who gave those out?

19   A.  It could be myself or Dr. Culliney.

20   Q.  And how would you know to give those out?  •

21   A.  It was usually based on if a patient had been a

22      patient and they were coming back.

23   Q.  Would you give them to patients if they were

24      referred by a former patient?

Lee & Associates * Certified Court Reporters * (781) 848-9693

106

1   A.  Not usually.

2   Q.  Would you give one to the former patient who

3      referred the new patient?

4   A.  Sometimes.

5   Q.  Any other kinds of bonuses or payments or gifts to

6      patients or other people who referred patients?

7   A.  Restaurant gift certificates.

8   Q.  To the Lowell area?

9   A.  Yes.

10   Q.  Anything else?

11   A.  Not that I recall.

12   Q.  Did the administrative staff ever give out gift

13      certificates?

14        MR. CIAMPA:  Objection.

15   A.  They may have given them to people that needed

16      translation.

17  (BY MS. BARRIE)

18   Q.  Why?

19   A.  To explain how to use it.

20   Q.  So if a patient came in and didn't speak English

21      you'd give the gift certificate to the translator

22      and the translator would then give it to them?

23   A.  Yes.

24   Q.  Did First Spine offer transportation to patients?

Lee & Associates * Certified Court Reporters * (781) 848-9693

107

1   A.  Yes.

2   Q.  And how was that arranged?

3   A.  Through a taxi service.

4   Q.  And how was the taxi service paid?

5   A.  I don't know.

6   Q.  Did the patients get vouchers or --

7   A.  No, I believe they just told them whether they got

8      dropped off at the office or got picked up at the

9      office and dropped off at home.

10   Q.  And would the patients call for the taxi or would

11      the office call for the taxi?

12   A.  The office would call for the taxi.

13   Q.  And did patients have appointments?

14   A.  Yes.

15   Q.  So the office staff would know on a given day that,

16      you know, Joe Schmoe was coming at one o'clock and

17      he lives 15 minutes away so I've got to call the

18      cab and tell them to go pick him up at whatever

19      time?

20   A.  No.  We would have the patients call us when they

21      were ready.

22   Q.  And then your office would call the cabs?

23   A.  Yes.

24   Q.  I think this is my final question or set of

Lee & Associates * Certified Court Reporters * (781) 848-9693

108

1      questions.  If I send a subpoena to First Spine for

2      all the medical records and bills and the patient

3      file for a given patient, who pulls the file, puts

4      it all together, puts the response together?

5   A.  The administrative staff usually pulls everything

6      and copies it.

7   Q.  Okay.  And does a chiropractor review that set of

8      documents before it goes out?

9   A.  It depends.

10   Q.  What would it depend on?

11   A.  If the -- whoever was subpoening the record, some

12      specifically say they want the doctor to do it and

13      others don't.

14   Q.  So with the ones that don't it would just be office

15      staff?

16   A.  Yeah, occasionally it would be the doctor, but

17      usually the office staff.

18   Q.  And with this one -- well, who would certify the

19      records if the doctor wasn't on the subpoena?

20        MR. CIAMPA:  Objection.

21   A.  It could be one of the administrative staff.

22  (BY MS. BARRIE)

23   Q.  We talked about how the history that the patient

24      filled out isn't in this record and that you would

Lee & Associates * Certified Court Reporters * (781) 848-9693

109

```
 1        consider that to be part of the medical record;
 2        right?
 3   A.   Yes.
 4   Q.   In your practice at First Spine were the medical
 5        histories typically put into a subpoenaed set or
 6        23379G set of records?
 7   A.   Not that I'm aware of.
 8   Q.   Okay.  And what's the reason for that?
 9             MR. CIAMPA:  Objection.
10   A.   Ignorance.
11  (BY MS. BARRIE)
12   Q.   Okay.
13             MS. BARRIE:  All right.  That's all the
14        questions I have.  Thank you very much.  I
15        appreciate you taking the time to come in.  Do you
16        have anything?
17             MR. CIAMPA:  I don't have anything.
18             MS. BARRIE:  Okay.
19
20             (Whereupon, Exhibit No. 2, Packet of
21        Documents, was marked for identification.)
22
23             (Whereupon, the Deposition was concluded
24        at 12:53 p.m.)
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

110

### E R R A T A   S H E E T

Deposition of: JENNIFER McCONNELL
In Re:   Blanca Rivera v. Beth A. Corrow and Encompass
         Insurance Company

| Page No. | Line No. | Transcript Reads | Change Made |
|----------|----------|------------------|-------------|
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |
|          |          |                  |             |

Lee & Associates * Certified Court Reporters * (781) 848-9693

111

### C E R T I F I C A T E

I, <u>JENNIFER McCONNELL</u>, do hereby certify that
I have read the foregoing transcript of my testimony,
and further certify that said transcript is a true,
accurate and complete record of said testimony.

              Dated at _____ ,

This _____ day of _____, 2006,

under the pains and penalties of perjury.


              _____



              Sworn to and subscribed before me
this _____ day of _____, 2006.


              _____

              Notary Public

Lee & Associates * Certified Court Reporters * (781) 848-9693

112

### C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF PLYMOUTH, SS

         I, CHERYL ANN WALKER, a Court Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, do hereby certify that the foregoing
Deposition of JENNIFER McCONNELL was taken before me on
September 21, 2006; that the witness was duly sworn by
me before the commencement of her testimony; that the
said testimony was taken audiographically by myself and
then transcribed under my direction.  To the best of my
knowledge, the within transcript is a complete, true
and accurate record of said Deposition.

         I am not connected by blood or marriage
with any of the said parties, nor interested directly
or indirectly in the matter in controversy.

         In witness whereof, I have hereunto set
my hand and Notary Seal this 4th day of October, 2006.


              _____
              Cheryl Ann Walker,
              Notary Public
              My Commission Expires:
              March 10, 2011


PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS
TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE
SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
AND/OR DIRECTION OF THE CERTIFYING REPORTER.

Lee & Associates * Certified Court Reporters * (781) 848-9693

Pages: 1-251
Vol. I
Exhibits: 1

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

```
ENCOMPASS INSURANCE COMPANY              )
OF MASSACHUSETTS,                        )
     Plaintiff-Counterclaim Defendants,  )
                                         )
VS.                                      )
                                         )
JOSEPH D. GIAMPA, FREDERICK T. GIAMPA    )
ADVANCED SPINE CENTERS, INC. d/b/a       )
FIRST SPINE REHAB, FUTURE MANAGEMENT     )
CORPORATION, FUTURE MANAGEMENT           )
BUSINESS TRUST, EDWARD KENNEDY, BRIAN    )
J. CULLINEY, D.C. and JENNIFER           )
McCONNELL, D.C.                          )Civil Action
     Defendants-Counterclaim Plaintiffs.)No.05-11693RCL
_____)
                                         )
JOSEPH D. GIAMPA, FREDERICK T. GIAMPA,   )
ADVANCED SPINE CENTERS, INC.             )
     Third-Party Plaintiffs              )
                                         )
VS.                                      )
                                         )
ALLSTATE INSURANCE COMPANY,              )
     Third-Party Defendant               )
_____)
```

### DEPOSITION OF SOKHA DY

A witness called by and on behalf of the Encompass Insurance Company, taken pursuant to the Massachusetts Rules of Civil Procedure, before Jo-Anne M. Golden, a Professional Court Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Offices of Smith & Brink, P.C., 122 Quincy Shore Drive, Quincy, Massachusetts 02171. Commencing on Thursday, February 15, 2007 at 10:18 a.m.

27

1          supervisor ever since?

2    A.    Yes.

3    Q.    And he continues to be to this day, correct?

4    A.    Yes.

5    Q.    How long have you been employed by First Spine?

6    A.    Over nine years.

7    Q.    And during that nine-year period, has that been

8          your sole source of income?

9    A.    Yes.

10   Q.    Do you file state income taxes in Massachusetts?

11   A.    Yes.

12   Q.    And do you file federal income taxes?

13   A.    Yes.

14   Q.    Do you have an accountant that takes care of that

15         for you or do you the form yourself?

16   A.    Somebody do it for me.

17   Q.    Who is that?

18   A.    Michael Feinberg.

19   Q.    Is that an attorney or an accountant?

20   A.    No.  I pay somebody to do it.

21   Q.    And his name is Michael Feinberg?

22   A.    Yes.

23   Q.    And he's located where?

24   A.    Westford Street.

```
1    Q.   Is that in Lowell?

2    A.   In Lowell, yes.

3    Q.   And has he been doing your taxes all these past

4         nine years?

5    A.   Yeah.  Maybe five, six.

6    Q.   Now, when you were -- was there a period of time

7         that you were unemployed between the time that

8         Raudamaker's business closed down and you were

9         hired at First Spine?

10   A.   (No verbal response)

11   Q.   Was there a gap in there that you were unemployed,

12        or did you just start right in at First Spine?

13   A.   I start right in.

14   Q.   And that was some time around 1997 I guess?

15   A.   Yes.

16   Q.   What were you hired to do at First Spine?

17   A.   Clinical assistant like calling for the claim,

18        helping patients and put in therapy.

19   Q.   So you would put patients into therapy?

20   A.   Therapy, yes, and the front desk.

21   Q.   Like you did at -- I'm sorry.

22   A.   The same as the front desk, answering the phone

23        and put patients in therapy.

24   Q.   So that was similar to what you did at Donahue's
```

38

```
 1              treat at First Spine automobile accident patients?
 2       A.    Not all of them.
 3       Q.    What other types of patients --
 4       A.    Work comp., private health insurance, auto --
 5       Q.    When you say auto --
 6       A.    -- slip and fall --
 7       Q.    -- is auto, auto accidents?
 8       A.    Auto accidents, yes.
 9       Q.    Is auto accidents, is that the majority of the
10              patients who you see there?
11       A.    Yes.
12       Q.    Could you put a percentage on it?
13       A.    (No verbal response)
14       Q.    What percentage of patients do you see that are
15              auto accident patients?  Is it 99 percent?
16       A.    Like 80 percent.
17       Q.    And the balance, the 20 percent is worker's comp.,
18              slip and fall?
19       A.    Mm-hmm.
20       Q.    How are you paid at First Spine?
21       A.    Hour.
22       Q.    Say that --
23       A.    The amount?
24       Q.    Yes.
```

40

```
 1          and then he asked the big boss.

 2     Q.   Who is the big boss?

 3     A.   Dr. Giampa.

 4     Q.   What's his first name?

 5     A.   Joseph Giampa.

 6     Q.   And he's the boss, the big boss overall?

 7     A.   The big boss, yes.

 8     Q.   And have you ever met him?

 9     A.   Yes.

10     Q.   When did you first meet the big boss?

11     A.   I don't remember.

12     Q.   Who hired you at First Spine?

13     A.   I get interview by Dr. Culliney.

14     Q.   Who you knew from Raudamaker's facility, correct?

15     A.   Yes.

16     Q.   Did anyone else interview you at First Spine in

17          Lowell?

18     A.   I don't remember.

19     Q.   Where was the interview conducted if you remember?

20     A.   In the office I think.

21     Q.   At School Street?

22     A.   Yeah.

23     Q.   Is the office the First Spine facility been

24          located at School Street the entire time you've
```

88

| | | |
|---|---|---|
| 1 | Q. | About the last 12 months have been a little bit |
| 2 | | slow? |
| 3 | A. | Yes. |
| 4 | Q. | Yeah.  Has anyone been fired?  Do you understand |
| 5 | | what I mean by fired? |
| 6 | A. | Fired? |
| 7 | Q. | Yes.  From First Spine in the last year? |
| 8 | A. | No. |
| 9 | Q. | Do you know what I mean by the term "fired", |
| 10 | | terminated? |
| 11 | A. | Terminated, fired, no. |
| 12 | Q. | Do you know what I mean by that term though? |
| 13 | A. | Yeah.  Yeah. |
| 14 | Q. | What does it mean? |
| 15 | A. | Like fired. |
| 16 | Q. | Like the boss says we don't want you anymore, |
| 17 | | right? |
| 18 | A. | Yes. |
| 19 | Q. | Has Brian Culliney gotten rid of anyone in the |
| 20 | | last year? |
| 21 | A. | No. |
| 22 | Q. | And he's the supervisor there, correct? |
| 23 | A. | Yes. |
| 24 | Q. | Have you ever heard the term "team leader"? |

1   A.   Yes.  Him, yes.

2   Q.   And he refers to himself as the team leader?

3   A.   Himself, yes.

4   Q.   Yes.  Have you heard anyone else call him the team

5        leader?

6   A.   Dr. Giampa, he's the team leader so.

7   Q.   Joe Giampa?

8   A.   Joe Giampa.

9   Q.   Said what?

10  A.   Team leader Dr. Brian, if you need something you

11       speak to -- speak to your team leader.

12  Q.   And is he the team leader for everybody there in

13       Lowell?

14  A.   I think, yes.

15  Q.   In other words, Doris doesn't have a separate team

16       leader?  I mean her team leader is Culliney as

17       well, correct?

18  A.   Mm-hmm.  Yes.

19  Q.   And is he the team leader for other facilities or

20       clinics?

21  A.   I don't know.

22  Q.   Does he work every day in the Lowell clinic?

23  A.   Yes.

24  Q.   When he's on duty at Lowell, Brian Culliney --

122

| | | |
|---|---|---|
| 1 | A. | No, less than that. |
| 2 | Q. | Less than 10?  All right.  And the performance |
| 3 | | bonus is based on what? |
| 4 | A. | Doing good job and -- at work. |
| 5 | Q. | Who decides that you're entitled to this |
| 6 | | performance bonus? |
| 7 | A. | I believe Dr. Culliney. |
| 8 | Q. | Does he tell you in advance of your receipt of the |
| 9 | | bonus that you've been awarded this performance |
| 10 | | bonus? |
| 11 | A. | Yes. |
| 12 | Q. | How does he convey that to you?  Is there a plaque |
| 13 | | at the office there?  Does he just say it to you? |
| 14 | | How does that work? |
| 15 | A. | He just told us. |
| 16 | Q. | He tells you? |
| 17 | A. | Yes. |
| 18 | Q. | He says you -- and who came up with the term |
| 19 | | performance bonus? |
| 20 | A. | Dr. Culliney. |
| 21 | Q. | So that's his term? |
| 22 | A. | Yes. |
| 23 | Q. | Has this program been in place through the nine |
| 24 | | years that you've been there? |

1    Q.  And what did she say?

2    A.  She just said like if you bring some like -- if

3         your family got into a car accident just bring

4         them in and get some performance bonus.

5    Q.  So that's what the performance bonus is all about?

6    A.  Mm-hmm.

7    Q.  Right?  Does it have anything to do with doing

8         paperwork?

9    A.  No.

10   Q.  Okay.  And it doesn't have to do with making sure

11        that the clinic is clean, right?

12   A.  No.

13   Q.  It has to do with bringing patients in, correct?

14   A.  Yes.

15   Q.  And you knew that all along, correct?

16   A.  Yes.

17   Q.  Okay.  And you knew it the whole time we've been

18        going back and forth here, I've been asking you

19        these questions, correct?

20   A.  Yes.

21   Q.  Okay.  But you didn't want to tell me that at

22        first; is that right?

23   A.  Right.

24              MR. CIAMPA:  Objection.

251

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF NORFOLK, SS.


I, JO-ANNE GOLDEN, a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing Deposition of SOKHA DY was taken before me on February 15, 2007. The said witness was duly sworn before the commencement of her testimony; that the said testimony was taken audiographically by myself and then transcribed under my direction. To the best of my knowledge, the within transcript is a complete, true and accurate record of said Deposition.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter in controversy.

In witness whereof, I have hereunto set my hand and Notary Seal this 23rdth day of February, 2007.


_____
Jo-Anne M. Golden, Notary Public

My Commission Expires:
December 6, 2007


PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND\OR DIRECTION OF THE CERTIFYING REPORTER.

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPT.
CIVIL ACTION
DOCKET No.

05-1458

|  |  |
|---|---|
| EDWARD D. KENNEDY, individually, and as beneficiary of 13 KIDDER ROAD REALTY TRUST and derivatively, on behalf of the corporations FIRST HEALTH PRODUCTS INC. and ROBERT T. KENNEDY INC. d/b/a Kennedy Professional Supply, | ) ) ) ) ) ) ) |
| Plaintiffs | ) |
| v. | ) ) |
| JAMES KENNEDY, individually and as Trustee of 13 KIDDER ROAD REALTY TRUST; and ENTERPRISE BANK AND TRUST COMPANY, | ) ) ) ) ) |
| Defendants | ) ) |

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
MIDDLESEX

APR 29 2005

Edward J. Sullivan
CLERK

```
6660E000004/29/05CIVIL         240.00
6660E000004/29/05SUR CHARGE     15.00
6660E000004/29/05SUMMONS        10.00
6660E000004/29/05SECC           20.00
```

## VERIFIED COMPLAINT

### INTRODUCTION

1.     The Plaintiff in this action, Edward D. Kennedy, has brought this direct and derivative action against the above-named defendant, James Kennedy based upon, *inter alia*, a) his improper attempt to deprive the Plaintiff of his interest in the family businesses, Robert T. Kennedy Inc. d/b/a Kennedy Professional Supply ("Kennedy Supply") in which the Plaintiff is President and 50% shareholder; b) looting of the income generated by the businesses Kennedy Supply and First Health Products Inc. ("First Health") and assets held by 13 Kidder Road Realty Trust ("Kidder Trust"); c) breach of fiduciary obligations, d) self-dealing, e) wrongful exercise of dominion over the corporate and trust assets, f) continued refusal to permit joint control over the financial affairs of the corporations despite demand, g) waste, h) mismanagement, i) theft, j)

forgery, and k) fraud. The Plaintiff is therefore in need of immediate injunctive relief to preserve the remaining corporate and trust assets, and hereby requests the Court to Order the valuation and sale of the Plaintiff's shares in Kennedy Supply, First Health and Kidder Trust, or in the alternative, if the Court sees fit, order the dissolution of Kennedy Supply and First Health pursuant to Mass. Gen. Laws ch. 156D § 14.30 et als.

## PARTIES

2.    Plaintiff Edward D. Kennedy ("E. Kennedy") is an individual who resides in Westford, Middlesex County, Massachusetts. The Plaintiff is currently the President and 50% shareholder of Kennedy Supply and First Health.

3.    Plaintiff Robert T. Kennedy Inc. is a Massachusetts corporation with a current principal place of business at 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts doing business as Kennedy Professional Supply.

4.    Plaintiff First Health Products Inc. is a Massachusetts corporation with a current place of business at 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts.

5.    Plaintiff Edward Kennedy is also a 50% beneficiary of the Kidder Trust, a nominee trust, under a Declaration of Trust recorded at the Middlesex North County Registry of Deeds on June 2, 2000 at Book 10858, Pages 180 through 185. Kidder Trust is the owner of the Premises known as and numbered 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts.

6.    Kennedy Supply and First Health are engaged in the wholesale purchase and sale of health care products, equipment, and supplies to over 1000 chiropractors, chiropractic clinics, hospitals, medical doctors and physical therapists across New England and several other states

including, Florida, Oklahoma, Rhode Island, South Carolina, New Jersey, New York and Pennsylvania.

7.      Defendant James Kennedy ("J. Kennedy") is an individual who resides at 3 Kirby Lane, Chelmsford, Middlesex County, Massachusetts.  J. Kennedy is the Plaintiff's brother, Treasurer, and remaining 50% shareholder in Kennedy Supply and First Health.  J. Kennedy is a co-Trustee of the Kidder Trust.

8.      Defendant Enterprise Bank and Trust Company ("Enterprise Bank") is a Massachusetts banking corporation with a registered principal place of business in Tewksbury, Massachusetts and a banking facility located at 185 Littleton Road, Chelmsford, Massachusetts, which, at all times material hereto, was, and continues to be, the banking institution used by Kennedy Supply, First Health and the Kidder Trust.

## COMMON ALLEGATIONS OF FACT

9.      Kennedy Supply was formed in June 1981 by E. Kennedy and J. Kennedy's late father, Robert T. Kennedy, for the purpose of engaging in wholesale purchase and sale of medical supplies.  *See Articles of Organization of Robert T. Kennedy Inc. attached hereto at Exhibit A.*

10.     Kennedy Supply was formed by Robert Kennedy (its President), his wife, Esther Kennedy, (Treasurer), and his son, Plaintiff E. Kennedy (Clerk).  *See Exhibit A.*

11.     Initially, Robert Kennedy was the sole shareholder and operated and managed Kennedy Supply along with his two youngest sons, Henry and E. Kennedy.

3

12. The middle child, J. Kennedy, was a carpet installer who possessed very little knowledge of the family business until Robert Kennedy brought him in to get actively involved in Kennedy Supply.

13 Over time, Kennedy Supply's business developed substantial contacts with individuals and companies in the chiropractic industry.

14. Through these contacts, E. Kennedy decided to open medical offices to provide chiropractic services to the public.

15. The first chiropractic/physical therapy office was opened in Lawrence, Massachusetts.

16. Shortly thereafter, E. Kennedy contacted Dr. Joseph Giampa, a longtime friend who E. Kennedy knew to be a licensed chiropractor in Massachusetts for the purpose of becoming a partner in the new business venture.

17. The new business, Future Management Corporation ("Future Management"), was formally organized in February 1997.

18. Initially, the parties agreed that Future Management would have three shareholders, E. Kennedy, (25%), J. Kennedy (25%) and Joseph Giampa (50%).

19. The creation of Future Management was also intended to benefit Kennedy Supply's business, as Kennedy Supply was to be Future Management's primary distributor of medical and chiropractic equipment and supplies.

20. In order to focus on developing these respective businesses, E. Kennedy permitted J. Kennedy to assume more control over Kennedy Supply than J. Kennedy previously maintained.

4

21.    E. Kennedy agreed to have J. Kennedy operate the day to day management business, while E. Kennedy was in charge of overseeing Kennedy Supply's financial operations.

22.    By September 2003, E. Kennedy had expanded Future Management from 1 office in Lawrence, to over 60 offices in Massachusetts and across the United States, including, but not limited to Florida, Oklahoma, Connecticut, Rhode Island, South Carolina, New Hampshire, Pennsylvania, Illinois and Virginia.

23.    In 1996, E, Kennedy and J. Kennedy assumed full control over Kennedy Supply after Robert Kennedy retired from the family business.

24.    Prior to receiving a salary from Future Management, E. Kennedy was Kennedy Supply's President, and J. Kennedy, its Treasurer and Clerk and both received salaries from Kennedy Supply in the amount of $200,000.00 and $125,000.00 respectively.

25.    On or about July 20, 1998, E. Kennedy and J. Kennedy formed First Health, a sister corporation to Kennedy Supply, for the purpose of managing and handling various aspects of Kennedy Supply's business, including, but not limited to, administering Kennedy Supply's salaries.

26.    At all times material hereto, E. Kennedy has been the President of First Health and J. Kennedy, its Treasurer and Secretary.

27.    On or about June 2, 2000, Robert Kennedy sold the property located at 13 Kidder Road, Chelmsford, Massachusetts-- the principal place of business for both Kennedy Supply and First Health -- to E. Kennedy and J. Kennedy as co-Trustees of the 13 Kidder Road Realty Trust for Four Hundred and Fifty Thousand ($450,000.00) Dollars.

28.      Beginning on or about January 2000, E. Kennedy and J. Kennedy began receiving a salary from Future Management in the amount of $2,500.00 per week in addition to receiving stock dividends of approximately $130,000.00 per year.

29.      As a result, E. Kennedy and J. Kennedy stopped taking any salary from Kennedy Supply or First Health.

30.      In January 2004, J. Kennedy began to experience serious personal financial problems on account of his increased spending habits and changes in his lifestyle.

31.      Further exacerbating his financial problems, after separating from his wife Claudia Kennedy, J. Kennedy purchased a home in Chelmsford, Massachusetts for $625,000.00, and took frequent vacations with his girlfriend to various destinations in the Caribbean, and to Myrtle Beach, South Carolina.

32.      On January 22, 2004, pursuant to a Decree of Divorce in the Southern District in Hillsborough County, New Hampshire, Claudia Kennedy, was awarded the marital home in Nashua, New Hampshire, their mobile home in Albany, New Hampshire, and their real estate in Myrtle Beach, South Carolina. *A true and accurate copy of the Decree of Divorce dated January 22, 2004 in the matter of Kennedy v. Kennedy is attached hereto at Exhibit B.*

33.      The Decree of Divorce also Ordered that J. Kennedy pay $7,500.00 per month for child support payments for his two minor children, $5,000.00 per month in alimony payments, turn over all assets held in his 401(k) retirement account, plus pay an additional $15,000.00 per month for a period of seven years to Claudia Kennedy as payment for her share of the property division distributions in Future Management, Kidder Trust, First Health and Kennedy Supply. *See Exhibit B.*

34.    As part of its decree, the Court specifically stated that J. Kennedy was "not freely forthcoming with information regarding [his] assets" and failed to list several assets on his financial statements filed with the Court. *See Exhibit B.*

35.    Within hours after learning of the New Hampshire Court's Decree, J. Kennedy stated to E. Kennedy's wife, Tracy Kennedy, and her sister Peggy Arnett, that as a result of this decision from this Court, he was in desperate need of more money. *See Affidavit of Tracy Kennedy and Peggy Arnett attached hereto at Exhibits C and D, respectively.*

36.    Approximately two months later, E. Kennedy discovered that J. Kennedy had caused Kennedy Supply's bank accounts at Enterprise Bank to become overdrawn.

37.    Despite E. Kennedy's attempts to resume joint control over the operation and management of Kennedy Supply and First Health, J. Kennedy prohibited E. Kennedy from having any involvement in the business, notwithstanding E. Kennedy's 50% ownership interest.

38.    J. Kennedy and the two other shareholders of Future Management also conspired to freeze E. Kennedy out of Future Management and, as a result, assumed total control over Future Management, whose net profits had risen to over $3.7 million dollars.

39.    E. Kennedy later discovered documents at Kennedy Supply's office which revealed that J. Kennedy was using Kennedy Supply to enable Future Management to fraudulently borrow hundreds of thousands of dollars from various lending entities under the guise that Future Management was purchasing chiropractic equipment from Kennedy Supply.

40.    One such document included a Security Agreement between Future Management and a lending entity, Maruka U.S.A. Inc., in connection with the acquisition and financing of $71,537.20 in medical equipment, purchased from Kennedy Supply, for Future Management's

7

chiropractic office in New Bedford, Massachusetts. *A true and accurate copy of the letter and Security Agreement dated June 1, 2004 is attached hereto at Exhibit E.*

41.    Attached to the Security Agreement to Maruka U.S.A. Inc. included documents entitled "Certified Copy of Resolutions of Board of Directors" of Future Management Mass Business Trust and Future Management purportedly containing E. Kennedy's name and signature as Vice President of Future Management, authorizing and approving the loan from Maruka U.S.A. Inc. to Future Management. *See Exhibit E.*

42.    E. Kennedy never signed any of the documents with Maruka U.S.A. Inc. set out in Exhibit E.

43.    Attached to the Security Agreement was a personal Guarantee purportedly signed by E. Kennedy and witnessed by Kennedy Supply's office secretary, Maria King. *A copy of the personal Guarantee is attached hereto at Exhibit F.*

44.    E. Kennedy never signed the personal Guarantee set out in Exhibit F, either in the presence of Maria King, or otherwise.

45.    E. Kennedy also found several invoices from Kennedy Supply to Future Management offices which Future Management utilized to borrow over $765,479.70 from various other lending entities.

46.    These invoices reflected large equipment orders for chiropractic facilities owned by Future Management. However, several of these facilities were already fully equipped and one invoice stated that Kennedy Supply purportedly sold chiropractic equipment totaling $118,655.00 to Future Management for its clinic in Danbury, Connecticut -- a clinic that had been closed down for several months at the time of the issuance of that invoice. *True and accurate copies of the foregoing Invoices are attached hereto at Exhibit G.*

8

47.    E. Kennedy also discovered that J. Kennedy had been withdrawing funds from a line of credit at Enterprise Bank which was secured with a personal guarantee by E. Kennedy and J. Kennedy.

48.    On January 12, 2005, E. Kennedy, through counsel made formal demand to inspect the financial records of Kennedy Supply, Kidder Trust, and First Health.

49.    After reviewing the financial records, E. Kennedy discovered that substantial payments and disbursements totaling over Three Hundred Thousand ($300,000.00) dollars had been transferred by J. Kennedy from Kennedy Supply's accounts to himself, his personal attorneys, and to Future Management and its shareholders, including, but not limited to:

a.    Payments to American Express, MBNA credit card and Discover credit card payments in excess of $5,000.00 per month;

b.    Payments exceeding $37,000.00 to a Citizens Bank personal line of credit held in the name of James and Claudia Kennedy;

c.    Check dated March 10, 2004 payable to Future Management in the amount of $3,743.20;

d.    Check dated May 7, 2004 payable to Future Management in the amount of $1,700.00;

e.    Check payable to the law firm of Manchel & Brennan, P.C. dated May 10, 2004 in the amount of $2,277.49;

f.    Check payable to Fred Giampa dated June 10, 2004 for $8,000.00;

g.    Check payable to Joe Giampa dated June 10, 2004 for $25,000.00;

h.    Check payable to Fred Giampa dated July 13, 2004 for $4,500.00;

i.    Check payable to James Kennedy dated August 31, 2004 for $50,000.00;

j.    Check payable to Future Management dated September 21, 2004 for $113,000.00; and

k.    Check payable to Future Management dated December 13, 2004 in the amount of $6,521.96.

9

*True and accurate copies of the foregoing documents are attached hereto at Exhibit H.*

50.     E. Kennedy has never authorized the retention of Manchel & Brennan, P.C. by Kennedy Supply and, through counsel, formally informed them that they were not to be paid from Kennedy Supply's funds. *See attached letter from Stephen A. Greenbaum dated February 11, 2005 attached hereto at Exhibit I.*

51.     After discovering this information, E. Kennedy, through counsel, requested that Enterprise Bank refuse to accept any further checks or withdrawals from Kennedy Supply's accounts that did not possess dual signatures or authorizations from both E. Kennedy and J. Kennedy. *See attached letter from Stephen A. Greenbaum to Mary Jane Nardone, Vice President Commercial Lending, Enterprise Bank dated February 7, 2005 attached hereto at Exhibit J.*

52.     On February 10, 2005, Enterprise Bank informed E. Kennedy that it would not accept his request without the consent of J. Kennedy, or in the alternative, a court order. *See attached letter from Mary Jane Nardone dated February 10, 2005 attached hereto at Exhibit K.*

53.     At that time, E. Kennedy asked Ms. Nardone at Enterprise Bank about the status of the Kennedy Supply line of credit personally guaranteed by J. Kennedy and E. Kennedy.

54.     Ms. Nardone stated that the line of credit maintained a "zero" balance.

55.     When E. Kennedy instructed Ms. Nardone to take his name off of the account, Ms. Nardone assured E. Kennedy that she would, but in any event, due to the dispute that had arisen between the E. Kennedy and J. Kennedy, that Enterprise Bank would no longer lend any money to Kennedy Supply.

56.     E. Kennedy questioned J. Kennedy on several occasions about his continued use of Kennedy Supply's funds to pay for his increasing personal debts.

57.     While J. Kennedy admitted taking money from Kennedy Supply, he refused to reimburse any monies inappropriately withdrawn for his personal use back to Kennedy Supply or E. Kennedy.

58.     J. Kennedy further admitted to E. Kennedy in September 2004 that he had transferred money from Kennedy Supply to Future Management to pay for Future Management's payment for referrals to its chiropractic clinics across Massachusetts.

59.     Specifically, in a telephone conversation, J. Kennedy admitted to E. Kennedy that he had used money from Kennedy Supply and given it to Future Management and the Giampa brothers to pay for "runners", i.e. individuals paid to refer clients to Future Management's chiropractic offices.

60.     At the time J. Kennedy made this admission, he was aware that there was a law which was going to be passed by the Massachusetts legislature making the use of "runners" a criminal act.  The legislature subsequently passed Mass. Gen. Laws ch. 266 § 111C which imposed criminal sanctions for this practice.  *See copy of foregoing statute passed by Massachusetts legislature effective January 3, 2005 attached hereto at Exhibit L.*

61.     No longer able to jointly run and operate the business, E. Kennedy and K. Kennedy began negotiations for J. Kennedy to purchase E. Kennedy's 50% shares in Kennedy Supply, First Health, and his interest in Kidder Trust.

62.     After attempts to agree on a price for E. Kennedy's shares failed, the parties discussed selling Kennedy Supply, First Health and the building at 13 Kidder Road to outside third parties.  *See attached letter from J. Kennedy's counsel to E. Kennedy's counsel dated March 31, 2005 attached hereto at Exhibit M.*

11

63.    The parties continued the foregoing negotiations until April 14, 2005 when E. Kennedy discovered that J. Kennedy was continuing to deplete Kennedy Supply's assets by withdrawing $2,000.00 per week beginning in January 2005 for his personal use, and withdrawing $12,000.00 from Kennedy Supply's line of credit at Enterprise Bank – the same line of credit personally guaranteed by E. Kennedy.

64.    From or about January 1, 2004, J. Kennedy withdrew an additional $2,000.00 a month from Kennedy Supply's accounts to pay for a personal line of credit taken out jointly in his name and his ex-wife's name, held at Citizens Bank. *See attached general ledger at Exhibit N.*

65.    After an Order from the New Hampshire Probate Court that he pay off the outstanding line of credit, J. Kennedy issued a check from Kennedy Supply's checking account in the amount of $18,039.89. *See copy of check payable to Citizens Bank attached hereto at Exhibit O.*

66.    Furthermore, the $2,000.00 disbursement each month from Kennedy Supply for J. Kennedy's line of credit that was originally reflected on his tax returns as a payment of dividends, was subsequently omitted from Kennedy Supply's financial records prepared by its accountant, William Chapman. *See attached revised ledger from Kennedy Supply's accountant, William Chapman, attached hereto at Exhibit P.*

67.    In addition to the foregoing, following their father's death in April 2004, E. Kennedy is informed, believes, and hereby avers that J. Kennedy converted the proceeds from their father's life insurance policy held in the Kidder Trust and used those funds for his personal use.

12

68.    On March 31, 2005, the New Hampshire Probate Court found J. Kennedy in contempt for failing to pay Claudia Kennedy her portion of the property distribution in accordance with the Court's Order. *A true and accurate copy of the Court's Order is attached hereto at Exhibit Q.*

69.    As a result, the Court ordered that J. Kennedy pay Claudia Kennedy $68,214.00 in payment arrearages through November 2004 within 10 days of the date of the Order. *See Exhibit Q.*

70.    On April 15, 2005, Claudia Kennedy filed a Motion to Show Cause for J. Kennedy's failure to tender payment in accordance with the Court's second Order. *A true and accurate copy of the foregoing Motion is attached hereto at Exhibit R.*

71.    E. Kennedy is informed, believes, and hereby avers that J. Kennedy has failed to pay Claudia Kennedy $15,000.00 per month since November 2004 and is in default of the Court Order.

72.    J. Kennedy's conduct as aforesaid is wrongful and in direct violation of his obligations to Kennedy Supply, First Health, Kidder Trust, and to E. Kennedy.

73.    E. Kennedy, individually, and on behalf of Kennedy Supply, First Health and Kidder Trust, ("the Plaintiffs") are in need of immediate injunctive relief against J. Kennedy and Enterprise Bank in order to preserve the status quo and prevent the further dissipation the business' assets.

74.    In the absence of injunctive relief, the Plaintiffs' assets will be subject to continued waste and loss.

75.    E. Kennedy is informed, believes and hereby avers that his brother is financially unable to purchase his interests in Kennedy Supply and First Health, and all attempts to negotiate a sale of the business and the property at 13 Kidder Road to third parties have failed.

76.    Accordingly, following the imposition of a restraining order to preserve the status quo, the Plaintiffs hereby petition the Court for an accounting of all funds J. Kennedy misappropriated and converted from Kennedy Supply, First Health, and the Kidder Trust.

77.    The Plaintiffs are in further need of judicial intervention to either supervise the sale of the foregoing entities, or in the alternative, dissolve Kennedy supply and First Health.

## COUNT I – BREACH OF CONTRACT

78.    The Plaintiffs hereby repeat and re-allege paragraphs 1 through 77 above as if fully set forth herein.

79.    Based upon his conduct as set forth above, J. Kennedy is in breach of his contractual obligations to the Plaintiff and to Kennedy Supply, First Health, and Kidder Trust.

80.    The aforesaid breach of contract was knowing and willful.

81.    The Plaintiffs have suffered damages as a result of the same.

## COUNT II – BREACH OF FIDUCIARY DUTY

82.    The Plaintiffs hereby repeat and re-allege paragraphs 1 through 81 above as if fully set forth herein.

83.    Based upon his conduct as set forth above, J. Kennedy, as a partner, director, and shareholder in a close corporation is in breach of his fiduciary duty owed to the Plaintiffs.

84.    The aforesaid breach of fiduciary duty was knowing and willful.

85.    The Plaintiffs have suffered damages as a result of the same.

14

## COUNT III – BREACH OF DUTY OF GOOD FAITH AND LOYALTY

86. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 85 above as if fully set forth herein.

87. Based upon his conduct as set forth above, J. Kennedy as a partner, director, and shareholder in a close corporation, is in breach of his duty of utmost good faith and loyalty owed to the Plaintiffs.

88. The aforesaid breach of duty was knowing and willful.

89. The Plaintiffs have suffered damages as a result of the same.

## COUNT IV – CONVERSION

90. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 89 above as if fully set forth herein.

91. Based upon his conduct as set forth above, J. Kennedy has directly and indirectly converted funds and assets of Kennedy Supply, First Health, and the Kidder Trust, a portion of which properly belong to the Plaintiffs.

92. The aforesaid conversion was knowing and willful.

93. The Plaintiffs have suffered damages as a result of the same.

## COUNT V – FRAUD

94. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 93 above as if fully set forth herein.

95. Based upon his conduct as set forth above, J. Kennedy has defrauded the Plaintiff individually, and also Kennedy Supply, First Health and the Kidder Trust in having misappropriated and looted substantial sums of money from the foregoing entities.

96. The aforesaid fraudulent conduct was knowing and willful.

97. The Plaintiffs have suffered damages as a result of the same.

## COUNT VI – VIOLATION OF THE COVENANT OF
## GOOD FAITH AND FAIR DEALING

98. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 97 above as if fully set forth herein.

99. Based upon his conduct as aforesaid, J. Kennedy has violated the covenant of good faith and fair dealing implied in every contract.

100. The aforesaid violation was knowing and willful.

101. The Plaintiffs have suffered damages as a result of the same.

## COUNT VII – NEGLIGENCE

102. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 101 above as if fully set forth herein.

103. Based upon his conduct as set forth above, J. Kennedy failed to exercise due care in the management and operation of Kennedy Supply, First Health, and the Kidder Trust and is thus guilty of negligence.

104. The Plaintiffs have suffered damages as a result of the same.

## COUNT VIII – UNJUST ENRICHMENT (ALL DEFENDANTS)

105. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 104 above as if fully set forth herein.

106. J. Kennedy will be unjustly enriched if he is allowed to retain the funds that he either directly or indirectly misappropriated from Kennedy Supply, First Health, and/or the Kidder Trust.

107. The Plaintiffs are entitled to an order from the Court that J. Kennedy disgorge all such amounts and deposit the same with the Court for appropriate distribution to the Plaintiffs.

## COUNT IX – CONSTRUCTIVE TRUST

108. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 107 above as if fully set forth herein.

109. As set forth above, J. Kennedy misappropriated monies from Kennedy Supply, First Health, and the Kidder Trust for himself, and for the benefit of others, to which they were not entitled.

110. The Plaintiffs are entitled to have the Court impose a constructive trust upon these monies, including any assets acquired with the same, for the benefit of the Plaintiffs.

## COUNT X – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

111. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 110 above as if fully set forth herein.

112. J. Kennedy is a fiduciary to the Plaintiffs.

113. J. Kennedy breached his fiduciary duties to the Plaintiff by his actions and omissions.

114. J. Kennedy's breach has caused, and continues to cause the Plaintiff extreme emotional distress.

115.   The Plaintiff has suffered both physical and economic damages as a result of the defendants' actions and omissions as aforesaid.

## COUNT XI – ACCOUNTING

116.   The Plaintiffs hereby repeat and re-allege paragraphs 1 through 115 above as if fully set forth herein.

117.   The Plaintiffs are entitled to and hereby demand an accounting from J. Kennedy as to a) the operation of Kennedy Supply, First Health, and the Kidder Trust; b) all monies received directly and indirectly by J. Kennedy and any and all third parties from the operation of the businesses; c) all monies either loaned or borrowed by J. Kennedy or E. Kennedy on behalf of Kennedy Supply, First Health and the Kidder Trust after J. Kennedy assumed total control over the business; and d) copies of all Invoices to Future Management from February 2004 to the present.

## COUNT XII - DERIVATIVE RELIEF PURSUANT TO
## MASS. R. CIV. P. 23.1

118.   The Plaintiffs repeat and re-allege paragraphs 1 through 117, as if fully set forth herein.

119.   E. Kennedy is the President and 50% shareholder in Kennedy Supply and First Health.

120.   J. Kennedy currently possesses the remaining 50% interest and is the Treasurer and Clerk in the foregoing corporations.

121.    It would be futile for the Plaintiff to make a demand upon J. Kennedy to bring an action on behalf of the corporation, as the director, officer and other remaining shareholder is not disinterested, nor a majority shareholder, and is himself the wrongdoer.

122.    Based upon his conduct as set forth above, J. Kennedy has harmed the foregoing corporations.

123.    Kennedy Supply and First Health have suffered damages as a result of the same.

## COUNT XIII – DISSOLUTION

124.    The Plaintiffs hereby repeat and re-alleges paragraphs 1 through 123 above as if fully set forth herein.

125.    As a matter of law and contract, E. Kennedy is entitled to the dissolution of Kennedy Supply and First Health and distribution of one half of the net assets of the said corporations.

## COUNT XIV – INJUNCTIVE RELIEF AGAINST
## J. KENNEDY AND ENTERPRISE BANK

126.    The Plaintiffs hereby repeat and re-allege paragraphs 1 through 125 above as if fully set forth herein.

127.    The Plaintiffs are entitled to the issuance of an Injunction restraining and enjoining J. Kennedy, as well as his accountants, agents and attorneys, from:

a)      withdrawing, paying, wasting, or spending any monies of Kennedy Supply, First Health, and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining the written authorization of E. Kennedy;  and

19

b)    in any way dissipating, pledging or encumbering the assets of Kennedy Supply, First Health and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining written authorization by E. Kennedy;

c)    interfering with or prohibiting Edward Kennedy from having direct involvement in any aspect of Kennedy Supply, First Health, or the Kidder Trust including, but not limited to, their operation, management, any and all bank accounts, and decisions regarding any and all disbursements made from the foregoing entities' accounts; and

d)    using any income or assets of Kennedy Supply, First Health, or the Kidder Trust to pay the costs and expenses associated with this litigation.

128.    The Plaintiffs further request that the Court enter an order requiring Enterprise Bank to take any action necessary to prohibit J. Kennedy from:

a)    withdrawing, paying, wasting, transferring or spending any monies of Kennedy Supply, First Health, and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining the written authorization of E. Kennedy; and

b)    in any way dissipating, pledging or encumbering the assets of Kennedy Supply, First Health and Kidder Trust, or take any action which would affect E. Kennedy' interests individually, for any reason whatsoever during the pendency of this action without first obtaining written authorization by E. Kennedy.

WHEREFORE, the Plaintiffs respectfully request that this Court grant the following relief:

1.    Issue a short order of notice with respect to prayer 2 below;

2.    After notice, issue a preliminary injunction restraining and enjoining 1) J. Kennedy, and 2) Enterprise Bank from permitting J. Kennedy, from conveying, transferring, wasting, pledging, encumbering and/or dissipating or interfering with any of the assets of Kennedy Supply, First Health and Kidder Trust, of every kind and description without prior written authorization from the Plaintiff, including, but not limited to, payment of his attorneys' fees and costs;

3.    Pursuant to Count I, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

4.    Pursuant to Count II, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

5.    Pursuant to Count III, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

6.    Pursuant to Count IV, award such damages as may be proven at trial and order the return of all assets which the Court finds to be wrongfully converted, and award reasonable attorney's fees, costs and interest;

7.    Pursuant to Count V, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

8.    Pursuant to Count VI, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

9.    Pursuant to Count VII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

10.    Pursuant to Count VIII, award such damages which may be proven at trial, including restitution of any profits J. Kennedy made on a corporate opportunity, repayment of

21

excess compensation to the entities, together with reasonable attorney's fees, costs and interests to the Plaintiffs.

11.    Pursuant to Count IX, award such damages as may be proven at trial and make a finding that the defendants are constructive trustees for the benefit of the Plaintiffs with respect to all assets wrongfully received by them, and award reasonable attorney's fees, costs and interest;

12.    Pursuant to Count X, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

13.    Pursuant to Count XI, order an accounting from the defendants as to a) the operation of Kennedy Supply, First Health, and the Kidder Trust; b) all monies received directly and indirectly by J. Kennedy and any and all third parties from the operation of the businesses; c) all monies either loaned or borrowed by J. Kennedy or E. Kennedy on behalf of Kennedy Supply, First Health and the Kidder Trust after J. Kennedy assumed total control over the business; and d) copies of all Invoices to Future Management from February 2004 to the present.

14.    Pursuant to Count XII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

15.    Pursuant to Count XIII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest; and

16.    Such other and further monetary, injunctive and declaratory relief as this Court deems just and proper.

22

THE PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL CLAIMS SO
TRIABLE

Respectfully submitted,
EDWARD D. KENNEDY,
By his attorneys,

Stephen A. Greenbaum, Esquire
BBO No. 209360
Natalie R. Sika, Esquire
BBO No. 648408
GREENBAUM, NAGEL,
FISHER & HAMELBURG
200 High Street, 4th Floor
Boston, MA  02110
(617) 423-4300

Dated:  April __, 2005

VERIFICATION

I, Edward D. Kennedy, hereby state that I have personal knowledge with regard to the
factual allegations contained in the within Verified Complaint and that the same are known by
me to be true and accurate, with the exception of those statements expressly made upon
information and belief, which statements I believe in good faith to be true and accurate.
Additionally, I am personally familiar with the documents annexed to the Verified Complaint
and know the same to be true copies of the originals of those documents.

Signed under the pains and penalties of perjury this 27day of April, 2005

Edward D. Kennedy

23