UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENCOMPASS INSURANCE COMPANY OF MASSACHUSETTS,<br><br>            Plaintiff,<br><br>    vs.<br><br>JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, ADVANCED SPINE CENTERS, INC., d/b/a FIRST SPINE REHAB, FUTURE MANAGEMENT CORPORATION, FUTURE MANAGEMENT BUSINESS TRUST, EDWARD KENNEDY, BRIAN J. CULLINEY, D.C. and JENNIFER McCONNELL, D.C.<br><br>            Defendants. | Civil Action No.  1:05-cv-11693-RCL |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH SUBPOENA DUCES TECUM

### I.    INTRODUCTION

NOW COMES the plaintiff, Encompass Insurance Company of Massachusetts

(hereinafter "Encompass") and respectfully requests that this Honorable Court enter an Order

COMPELLING compliance with the subpoenas served upon: (1) Keeper of Records, Robert T.

Kennedy, Inc. d/b/a Kennedy Professional Supply; (2) Keeper of Records, First Health Products,

Inc.; and (3) Keeper of Records, Advanced Health Products (the successor-in-interest to

Kennedy Professional Supply and First Health Products) (hereinafter collectively referred to as

"the Kennedy Supply entities") in connection with the instant litigation.  By this Motion,

Encompass seeks the production of certain documents related to the business relationship

between Kennedy Supply and defendants, Future Management Corporation (hereinafter "FMC")

and Advanced Spine Centers, Inc. d/b/a First Spine Rehab (hereinafter "First Spine").  See

Subpoena Schedule "As" annexed hereto at Exhibit A.

## II.     **RELEVANT PROCEDURAL HISTORY**

This case is brought pursuant to Title 18 U.S.C. §1962, Racketeer Influenced and Corrupt Organizations Act, Mass. Gen. Laws, ch. 93A, the Massachusetts Consumer Protection Act, and Massachusetts common law of fraud and civil conspiracy. The defendants, acting in concert, participated in a concealed, evolving and continuous scheme and conspiracy to defraud Encompass.

The objective of defendants' fraud scheme was to illegally obtain money from the plaintiff through the submission of false medical records and bills (hereinafter "false medical documentation") in connection with alleged motor vehicle accidents. The defendants collected substantial sums of money as payment in connection with such false medical documentation referencing alleged chiropractic treatment that was never rendered and/or was unnecessary, excessive and unrelated to covered claims. The defendants successfully executed this scheme to defraud by creating and submitting such false medical documentation to Encompass and others by way of the U.S. Mail.

In addition to creating false medical documentation and submitting same to Encompass via the U.S. Mail, Encompass further alleges that defendants employed the use of "runners" to recruit patients for treatment at the Lowell First Spine clinic. In related litigation between the above-captioned defendants, it is alleged that the Kennedy brothers used Kennedy Supply to fraudulently borrow hundreds of thousands of dollars under the guise that FMC was purchasing equipment and supplies. See Verified Complaint ("V.C.") at ¶ 39, Kennedy v. Kennedy, Middlesex Sup. Ct., C.A. No. 2005-01458, annexed hereto at Exhibit B. In fact, defendant, Edward Kennedy, alleges that he found several Kennedy Supply invoices that FMC used to borrow in excess of $760,000.00 from various financial institutions. Id. at ¶ 45. It

was further alleged that funds had been transferred from Kennedy Supply to FMC to facilitate FMC's payment of runners and/or patient referral bonuses.  Id. at ¶¶ 58-60.

Encompass has also pled (and will prove at trial) that the FMC corporate form should be disregarded—and the individual shareholders held personally liable—due to defendants' failure to observe corporate formalities.  Encompass has alleged that the FMC principals treated FMC (and the affiliated Kennedy Supply entities) as their own personal bank.  Moreover, Encompass has alleged that defendants used these entities as a vehicle to fund, perpetrate and/or further their insurance fraud scheme through the payment of "runners" and/or patient referral fees.

During the course of fact discovery, the testimony of Annee L'Heureux (a bookkeeper employed by C&C Professional Services, FMC's outside accounting firm) highlighted the interrelationship that existed between FMC and Kennedy Supply.  According to Ms. L'Heureux, FMC and Kennedy Supply were intertwined wherein FMC would provide medical services while Kennedy Supply would provide all the necessary equipment and supplies to FMC.  See Deposition of Annee L'Heureux at p. 53, annexed hereto at Exhibit C.  Ms. L'Heureux stated that "everyone used to think that [FMC and Kennedy Supply] were kind of the same."  Id. at p. 54.  Ms. L'Heureux further testified that Kennedy Supply "funded a lot of" FMC and that Kennedy Supply was never reimbursed.  Id. at p. 56.  Additionally, Kennedy Supply would execute "round figure" checks (i.e. $4000, $5000, etc.) in FMC's favor with no specificity as to what the amounts were for.  Id. at p. 57.  Finally, Ms. L'Heureux indicated that the methods and terms of payments between FMC and Kennedy Supply were "questionable."  Id. at p. 66

In an attempt to discover relevant, material evidence regarding the relationship between FMC and the Kennedy Supply entities, Encompass served a series of subpoenas requesting the production of documents referencing the business and financial relationship(s) between these companies.  Through these requests, Encompass sought, amongst other things, original records referencing monies paid to or from Kennedy Supply, the individual defendants and the corporate entities.  See Ex. A.  On or about February 28, 2007, Encompass served subpoenas upon the Keeper of Records of Kennedy Professional Supply and First Health.[1]  See Keeper of Records Subpoenas dated February 27, 2007, annexed hereto at Exhibit D.  Pursuant to the terms of the subpoenas, Kennedy Professional Supply was to produce the requested documents by March 26, 2007 and First Health was to comply by March 30, 2007.

After service of these subpoenas, Encompass was informed by Edward Kennedy's former counsel, Jeffery Phillips, that Kennedy Professional Supply had ceased formal business operations.[2]  Thereafter, Encompass directed a subpoena at Kennedy Professional Supply's registered agent, James Kennedy, at his home address, 3 Kirby Lane, Chelmsford, MA.  See Subpoena to Keeper of Records, Kennedy Professional Supply dated March 9, 2007, annexed hereto at Exhibit E.  According to the terms of this subpoena, Kennedy Professional Supply was to produce the requested documents by April 9, 2007.

During the course of fact witness depositions, Encompass discovered that Kennedy Professional Supply and First Health had been succeeded by Advanced Health Products, Inc.

---

[1] According to the testimony of James Kennedy, First Health is the sister corporation of Kennedy Professional Supply and was organized to handle certain managerial aspects of Kennedy Professional Supply.  Encompass served Kennedy Professional Supply at its corporate headquarters and usual place of business at 13 Kidder Road, Chelmsford, MA.  First Health was served at its principal place of business at 1 Lakeside Terrace, Westford, MA.

[2] This information was corroborated by the testimony of James Kennedy who indicated that Kennedy Professional Supply was dissolved in November, 2005.

Based on this information, Encompass served Advanced Health Products, Inc. (as successor-in-interest to Kennedy Professional Supply and First Health), in-hand, at its registered office and principal place of business at 30 Hunt Road, Chelmsford, MA.[3]  The subpoenas, which were served on April 5, 2007, had respective compliance dates of May 8, 2007 (First Health) and May 9, 2007 (Kennedy Supply).  See Exhibit F.

As of May 9, 2007, no documents were produced by any of these third-party entities. To date, neither of the Kennedy Supply entities has attempted to comply with these subpoenas. Encompass now moves this Court to secure such compliance.

### III.    STANDARD OF REVIEW

Modern instruments of discovery serve a useful purpose in that, together with pre-trial procedures, they make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.  United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958).  Pursuant to Fed. R. Civ. P. 45(d)(1)(A), a person responding to a subpoena is required to produce all requested documents as they are maintained in the usual course of business.  However, if the recipient of the subpoena wishes to object to the contents of the subpoena, she may seek relief from the Court in the form of a protective order or motion to quash/modify the subpoena.  See Fed. R. Civ. P. 45(c).  If a recipient does not comply with the terms of a subpoena, the issuing party may move for the entry of contempt against the non-replying recipient under Fed. R. Civ. 45(e) ("Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued.").

---

[3] Notably, Advanced Health's President and Registered Agent is Robin Cunha.  Advanced Health's 2006 Annual Report lists Ms. Cunha as a Director with an address for 3 Kirby Lane, Chelmsford, MA.  This is James Kennedy's home address.

In the instant case, Encompass requested that the Kennedy Supply entities respond to subpoenas and document requests designed to discover information relating to the allegations set forth in plaintiff's Complaint. The plaintiff's narrowly-tailored discovery requests were designed to elicit information that is relevant to the financial relationship between FMC and the Kennedy Supply entities. The plaintiff's requests fall within the purview of Fed. R. Civ. P. 26 and 45(c)(1) and do not seek the production of materials which are in any way unduly burdensome or privileged, either as attorney-client communications or work-product. Therefore, this Court is authorized to compel Kennedy Professional Supply, First Health or their successor-in-interest, Advanced Health Products, to produce the request materials.

**IV. THE KENNEDY SUPPLY ENTITIES SHOULD BE COMPELLED TO COMPLY WITH THE TERMS OF THE INSTANT SUBPOENAS**

As set forth above, Encompass has issued repeated requests for information concerning the business and financial relationships between FMC and the Kennedy Supply entities. Based on statements and testimony from the defendants (and Kennedy Supply principals), Encompass has a good faith belief that the Kennedy Supply entities possess information that is reasonably likely to lead to the discovery of material evidence regarding defendants' insurance fraud scheme. To date, the Kennedy Supply entities have never attempted to comply with the terms of the subpoenas. Moreover, none of these subpoena recipients have objected and/or otherwise sought to narrow the scope of the subpoenas. Finally, none of the party defendants in this matter have objected to Encompass' attempt to secure the information sought by these subpoenas. As stated by this Court:

> What is not proper practice is to refuse to comply with the notice, put the burden on the party noticing the deposition to file a motion to compel, and then seek to justify non-compliance in opposition to the motion to compel. Put simply and clearly, absent agreement, a

party who for one reason or another does not wish to comply with
a notice of deposition must seek a protective order.

New Eng. Carpenters Health Benefits Fund v. First Databank, Inc., 242 F.R.D. 164, 166 (D. Mass. 2007) (order granting motion to compel 30(b)(6) witness).

Whereas the instant subpoenas are reasonably calculated to lead to the discovery of relevant, material evidence regarding defendants' insurance fraud scheme, the Kennedy Supply entities should be compelled to comply with these duly issued subpoenas.

## V.    CONCLUSION

WHEREFORE, for all the foregoing reasons, plaintiff, Encompass Insurance Company, respectfully requests that this Honorable Court enter an Order **COMPELLING** (1) Keeper of Records, Robert T. Kennedy, Inc. d/b/a Kennedy Professional Supply; (2) Keeper of Records, First Health Products, Inc.; and/or (3) Keeper of Records, Advanced Health Products, to comply with subpoenas directed at discovering the relationship between FMC and the Kennedy Supply entities.

Respectfully submitted,
*Encompass Insurance Company,*
By its attorneys,

/s/ Richard D. King, Jr.
_____
Richard D. King, Jr., BBO#638142
Nathan A. Tilden, BBO#647076
Michael W. Whitcher, BBO#663451
SMITH & BRINK, P.C.
122 Quincy Shore Drive
Quincy, Massachusetts 02171
(617) 770-2214

Dated:  September 26, 2007

## **Certificate of Service**

I, Richard D. King, Jr., hereby certify that on this 26th day of September, 2007, this document was filed through the CM/ECF and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

_____/s/ Richard D. King, Jr._____

**Robert T. Kennedy, Inc. d/b/a Kennedy Supply**
**Keeper of Records "SCHEDULE A"**

## I. DEFINITIONS:

1. **"Kennedy Supply"** shall mean Robert T. Kennedy, Inc. d/b/a Kennedy Supply.

2. As used herein, the terms **"document"** or **"documents"** mean all papers and other tangible items and materials upon which information is recorded or from which information may be obtained and includes all documents that you have in your possession, custody, or control, or have the right to obtain upon request or demand. This definition includes all copies, reproductions and facsimiles of documents and includes, but is not limited to, any and all letters, business cards, vouchers, advertisements, bonus logs, correspondence, contracts, agreements, bills, orders, receipts, records, books, computer tapes and print-outs, intracorporation communications, memoranda, notes, vouchers, notebooks, maps, sketches, cablegrams, gift cards, telegrams, reports, press releases, advertising and promotional literature, prints, drawings, plans, photographs, VIP cards, printed forms, manuals, brochures, lists, medical file jackets, publications, VIP cards, catalogues, directories, videotapes, other tape recordings, films, microfilm, runner payment logs, and all other writings, including drafts, typings, printings, minutes or copies or reproductions thereof in the possession, custody, control/or available to the defendant or any other past or present officer, director, agent, employee consultant, or attorney for defendant or any person acting on behalf of defendant. If copies of documents are not identical for any reason, including handwritten notations, initials, or identifying marks, each non-identical copy is a separate document within the meaning of this definition.

3. The term **"relating to"** means referring to, describing, concerning, evidencing, or constituting.

4. **"First Spine"** and/or **"The clinic"** shall mean Advanced Spine Center d/b/a First Spine and Rehab located in Lowell, Massachusetts as well as Future Management Corporation and all its parent corporations and/or subsidiary corporations, agents, representatives, predecessors-in-interest and successors-in-interest.

5. **"Relevant Period"** shall mean 1998 through the present inclusive and/or any portion thereof.

6. **"Future Management Clinics"** shall mean any of the following:

1

First Spine
Robert T. Kennedy
Schedule A

Advanced Spine Center
3 North Beacon Street
Allston, MA 02134

Advanced Spine Centers
420 Common Street
Lawrence, MA 01840

Advanced Spine Centers
553-555 Main Street
Waltham, MA 01089

Advanced Spine Centers
90 Madison Street
Worcester, MA 01606

Advanced Spine Centers
248 Moody Street
Waltham, MA 02453

Advanced Spine Centers
278 Pitchers Way
Hyannis, MA 02601

Advanced Spine Centers
37 Roxbury Street
Roxbury, MA 02119

Associated Health Care Group
180 Exchange Street
Malden, MA 02148

Attleboro Chiropractic Health Ctr.
3 Mill Street
Attleboro, MA 02703

Back & Neck Treatment
935 Washington Street
Norwood, MA 02062

Back & Neck Treatment
158 Concord Street
Framingham, MA 01701

Back & Neck Treatment
948 Bennington Street
East Boston, MA 02128

Brockton Spine & Rehab
365 Westgate Drive, Suite 3-4
Brockton, MA 02301

Excel Physical Therapy
19 Stoughton Street
Dorchester, MA 02125

Excel Physical Therapy
278 Pitchers Way
Hyannis, MA 02601

Excel Physical Therapy
1225 River Street
Hyde Park, MA 02136

First Choice Chiropractic & Rehab
125 Rodman Street
Fall River, MA 02723

First Choice Chiropractic & Rehab
94 Allen Street
Methuen, MA 01844

First Spine & Rehab
180 Exchange Street
Malden, MA 02148

First Spine & Rehab
438 Chestnut Street
Springfield, MA 01107

First Spine & Rehab
252 Maple Street
Holyoke, MA 01040

First Spine & Rehab
835 Dorchester Avenue
Dorchester, MA 02125

First Spine & Rehab
320 Water Street
Fitchburg, MA 01420

First Spine & Rehab
1212 Hancock Street
Quincy, MA 02169

First Spine & Rehab
760 Western Avenue
Lynn, MA 01905

First Spine & Rehab
410 School Street
Lowell, MA 01851

First Spine
Robert T. Kennedy
Schedule A

Haverhill Spine & Rehab
5-7 Dudley Street
Haverhill, MA 01830

Mattapoisett Chiropractic
109 Fairhaven Road, Suite D
Mattapoisett, MA 02739

Methuen Spine & Rehab
30 Hampshire Street
Methuen, MA 01844

Physical Rehab. Group
149A Highland Avenue
Somerville, MA 02143

Physical Rehab. Group
1515-17 Washington Street
Boston, MA 02118

Randolph Spine & Rehab
326 North Main Street, Suite 11
Randolph, MA 02368

Salem Chiropractic Assoc.
72 Washington Street
Salem, MA 01970

Taunton Chiropractic & Rehab
80-86 Main Street
Taunton, MA 02780

Therapy & Rehab Service
50 Meridan Street

East Boston, MA 02128

United Physical Therapy
642 Gorham Street
Lowell, MA 01852

United Physical Therapy
442 Chestnut Street
Springfield, MA 01103

United Physical Therapy
150 Stanford Street
Boston, MA 02114

United Physical Therapy
109 Fairhaven Road, Suite E
Mattapoisett, MA 02739

United Physical Therapy
420 Common Street, Suite 102
Lawrence, MA 01840

United Physical Therapy
243 Church Street
Pembroke, MA 02359

United Physical Therapy
180 Exchange Street
Malden, MA 02148

Wareham Spine & Rehab
45 Main Street, Unit C3
Wareham, MA 0257

7. **"Durable Medical Goods"** shall mean medical supplies and equipment including ambulatory aids, orthopedic products, aids for daily living, chiropractic equipment, physical therapy equipment, modalities and related supplies.

**II. You are requested to produce the following documents:**

1. All original records that relate in any way to monies paid to or from (1) First Spine & Rehab; (2) Advanced Spine Centers, Inc.; (3) Future Management Corporation; (4) Edward Kennedy; (5) James Kennedy; (6) Joseph Giampa; and/or (7) Frederick Giampa for medical supplies provided to First Spine & Rehab.

2. All documents that relate in any way to any business or financial relationship between Kennedy Supply and First Spine or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

3

First Spine
Robert T. Kennedy
Schedule A

3.    All documents that relate in any way to any business or financial relationship between Kennedy Supply and Advanced Spine Center, Inc., or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

4.    All documents that relate in any way to any business or financial relationship between Kennedy Supply and Future Management Corporation or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

5.    All documents that relate in any way to any business or financial relationship between Kennedy Supply and Joseph Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

6.    All documents that relate in any way to any business or financial relationship between Kennedy Supply and Frederick Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

7.    All documents that relate in any way to any business or financial relationship between Kennedy Supply and Edward Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

8.    All documents that relate in any way to any business or financial relationship between  Kennedy Supply and James Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

9.    All documents relating to how First Spine came to receive durable medical goods. Include with your response all records concerning any financial transactions relating in any way to the prescription, purchase or delivery of durable medical goods to First Spine by any third party;

10.    All Federal Tax Returns for the years 1998-2004;

11.    All documents memorializing any instructions given by the management at First Spine to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

12.    All documents memorializing any instructions given by the management at Future Management Corporation to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

First Spine
Robert T. Kennedy
Schedule A

13.    All documents memorializing any instructions given by the management at Future Management Clinics to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

14.    All documents memorializing any instructions given by the management at Advanced Spine Centers, Inc. to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

15.    All documents identifying the person or person(s) who managed Kennedy Supply in the years 1998-2004; and,

16.    All documents showing the name, address and date of birth of any employee of Kennedy Supply for the years 1998-2004.

17.    All documents related to invoices for Durable Medical Goods provided to Future Management clinics by Kennedy Supply.

18.    All documents related to order forms for Durable Medical Goods provided to Future Management Clinics by Kennedy Supply.

19.    Any and all documents relating to payment by Future Management Clinics to Kennedy Supply, including but not limited to Future Management check number 25688 in the amount of $5000.00 issued on April 20, 2004; check number 62 in the amount of $5000.00 issued on April 6, 2004; check number 25422 in the amount of $5000.00 on April 5, 2004; and check number 25254 in the amount of $5000.00 on March 30, 2004.

First Spine
Schedule A

**First Health Products, Inc**
**Keeper of Records "SCHEDULE A"**

## I. DEFINITIONS:

1. **"First Health"** shall mean First Health Products, Inc.

2. As used herein, the terms **"document"** or **"documents"** mean all papers and other tangible items and materials upon which information is recorded or from which information may be obtained and includes all documents that you have in your possession, custody, or control, or have the right to obtain upon request or demand. This definition includes all copies, reproductions and facsimiles of documents and includes, but is not limited to, any and all letters, business cards, vouchers, advertisements, bonus logs, correspondence, contracts, agreements, bills, orders, receipts, records, books, computer tapes and print-outs, intracorporation communications, memoranda, notes, vouchers, notebooks, maps, sketches, cablegrams, gift cards, telegrams, reports, press releases, advertising and promotional literature, prints, drawings, plans, photographs, VIP cards, printed forms, manuals, brochures, lists, medical file jackets, publications, VIP cards, catalogues, directories, videotapes, other tape recordings, films, microfilm, runner payment logs, and all other writings, including drafts, typings, printings, minutes or copies or reproductions thereof in the possession, custody, control/or available to the defendant or any other past or present officer, director, agent, employee consultant, or attorney for defendant or any person acting on behalf of defendant. If copies of documents are not identical for any reason, including handwritten notations, initials, or identifying marks, each non-identical copy is a separate document within the meaning of this definition.

3. The term **"relating to"** means referring to, describing, concerning, evidencing, or constituting.

4. **"First Spine"** and/or **"The clinic"** shall mean Advanced Spine Center d/b/a First Spine and Rehab located in Lowell, Massachusetts as well as Future Management Corporation and all its parent corporations and/or subsidiary corporations, agents, representatives, predecessors-in-interest and successors-in-interest.

5. **"Relevant Period"** shall mean 1998 through the present inclusive and/or any portion thereof.

6. **"Future Management Clinics"** shall mean any of the following:

First Spine
Schedule A

Advanced Spine Center
3 North Beacon Street
Allston, MA 02134

Advanced Spine Centers
420 Common Street
Lawrence, MA 01840

Advanced Spine Centers
553-555 Main Street
Waltham, MA 01089

Advanced Spine Centers
90 Madison Street
Worcester, MA 01606

Advanced Spine Centers
248 Moody Street
Waltham, MA 02453

Advanced Spine Centers
278 Pitchers Way
Hyannis, MA 02601

Advanced Spine Centers
37 Roxbury Street
Roxbury, MA 02119

Associated Health Care Group
180 Exchange Street
Malden, MA 02148

Attleboro Chiropractic Health Ctr.
3 Mill Street
Attleboro, MA 02703

Back & Neck Treatment
935 Washington Street
Norwood, MA 02062

Back & Neck Treatment
158 Concord Street
Framingham, MA 01701

Back & Neck Treatment
948 Bennington Street
East Boston, MA 02128

Brockton Spine & Rehab
365 Westgate Drive, Suite 3-4
Brockton, MA 02301

Excel Physical Therapy
19 Stoughton Street
Dorchester, MA 02125

Excel Physical Therapy
278 Pitchers Way
Hyannis, MA  02601

Excel Physical Therapy
1225 River Street
Hyde Park, MA 02136

First Choice Chiropractic & Rehab
125 Rodman Street
Fall River, MA 02723

First Choice Chiropractic & Rehab
94 Allen Street
Methuen, MA 01844

First Spine & Rehab
180 Exchange Street
Malden, MA 02148

First Spine & Rehab
438 Chestnut Street
Springfield, MA 01107

First Spine & Rehab
252 Maple Street
Holyoke, MA 01040

First Spine & Rehab
835 Dorchester Avenue
Dorchester, MA 02125

First Spine & Rehab
320 Water Street
Fitchburg, MA 01420

First Spine & Rehab
1212 Hancock Street
Quincy, MA 02169

First Spine & Rehab
760 Western Avenue
Lynn, MA 01905

First Spine & Rehab
410 School Street
Lowell, MA 01851

First Spine
Schedule A

Haverhill Spine & Rehab
5-7 Dudley Street
Haverhill, MA 01830

Mattapoisett Chiropractic
109 Fairhaven Road, Suite D
Mattapoisett, MA 02739

Methuen Spine & Rehab
30 Hampshire Street
Methuen, MA 01844

Physical Rehab. Group
149A Highland Avenue
Somerville, MA 02143

Physical Rehab. Group
1515-17 Washington Street
Boston, MA 02118

Randolph Spine & Rehab
326 North Main Street, Suite 11
Randolph, MA 02368

Salem Chiropractic Assoc.
72 Washington Street
Salem, MA 01970

Taunton Chiropractic & Rehab
80-86 Main Street
Taunton, MA 02780

Therapy & Rehab Service
50 Meridan Street

East Boston, MA 02128

United Physical Therapy
642 Gorham Street
Lowell, MA 01852

United Physical Therapy
442 Chestnut Street
Springfield, MA 01103

United Physical Therapy
150 Stanford Street
Boston, MA 02114

United Physical Therapy
109 Fairhaven Road, Suite E
Mattapoisett, MA 02739

United Physical Therapy
420 Common Street, Suite 102
Lawrence, MA 01840

United Physical Therapy
243 Church Street
Pembroke, MA 02359

United Physical Therapy
180 Exchange Street
Malden, MA 02148

Wareham Spine & Rehab
45 Main Street, Unit C3
Wareham, MA 0257

7. **"Durable Medical Goods"** shall mean medical supplies and equipment including ambulatory aids, orthopedic products, aids for daily living, chiropractic equipment, physical therapy equipment, modalities and related supplies.

## II. You are requested to produce the following documents:

1.    All original records that relate in any way to monies paid to or from (1) First Spine & Rehab; (2) Advanced Spine Centers, Inc.; (3) Future Management Corporation; (4) Edward Kennedy; (5) James Kennedy; (6) Joseph Giampa; and/or (7) Frederick Giampa for medical supplies provided to First Spine & Rehab.

2.    All documents that relate in any way to any business or financial relationship between First Health and First Spine or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

3

First Spine
Schedule A

3.    All documents that relate in any way to any business or financial relationship between First Health and Advanced Spine Center, Inc., or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

4.    All documents that relate in any way to any business or financial relationship between First Health and Future Management Corporation or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

5.    All documents that relate in any way to any business or financial relationship between First Health and Joseph Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

6.    All documents that relate in any way to any business or financial relationship between First Health and Frederick Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

7.    All documents that relate in any way to any business or financial relationship between First Health and Edward Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

8.    All documents that relate in any way to any business or financial relationship between  First Health and James Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

9.    All documents relating to how First Spine came to receive durable medical goods. Include with your response all records concerning any financial transactions relating in any way to the prescription, purchase or delivery of durable medical goods to First Spine by any third party;

10.    All Federal Tax Returns for the years 1998-2004;

11.    All documents memorializing any instructions given by the management at First Spine to the employee(s) or agent(s) of First Health relating to the treatment of auto accident victims;

12.    All documents memorializing any instructions given by the management at Future Management Corporation to the employee(s) or agent(s) of First Health relating to the treatment of auto accident victims;

13.    All documents memorializing any instructions given by the management at Future Management Clinics to the employee(s) or agent(s) of First Health relating to the treatment of auto accident victims;

4

First Spine
Schedule A

14.    All documents memorializing any instructions given by the management at
       Advanced Spine Centers, Inc. to the employee(s) or agent(s) of First Health
       relating to the treatment of auto accident victims;

15.    All documents identifying the person or person(s) who managed First Health in
       the years 1998-2004; and,

16.    All documents showing the name, address and date of birth of any employee of
       First Health for the years 1998-2004.

17.    All documents related to invoices for Durable Medical Goods provided to Future
       Management clinics by First Health.

18.    All documents related to order forms for Durable Medical Goods provided to
       Future Management Clinics by First Health.

19.    Any and all documents relating to payment by Future Management Clinics to
       First Health.

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.

SUPERIOR COURT DEPT.
CIVIL ACTION
DOCKET No.

05-1458

|  |  |
|---|---|
| EDWARD D. KENNEDY, individually, | ) |
| and as beneficiary of 13 KIDDER ROAD REALTY | ) |
| TRUST and derivatively, on behalf of the | ) |
| corporations FIRST HEALTH PRODUCTS INC. | ) |
| and ROBERT T. KENNEDY INC. d/b/a Kennedy | ) |
| Professional Supply, | ) |
| Plaintiffs | ) |
| v. | ) |
| | ) |
| JAMES KENNEDY, individually and as | ) |
| Trustee of 13 KIDDER ROAD REALTY TRUST; | ) |
| and ENTERPRISE BANK AND TRUST | ) |
| COMPANY, | ) |
| Defendants | ) |
| | ) |

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
MIDDLESEX

APR 29 2005

Edward J. Sullivan
CLERK

**VERIFIED COMPLAINT**

INTRODUCTION

```
6660E000004/29/05CIVIL       240.00
6660E000004/29/05SUR CHARGE   15.00
6660E000004/29/05SUMMONS       10.00
6660E000004/29/05SECC          20.00
```

1.      The Plaintiff in this action, Edward D. Kennedy, has brought this direct and derivative action against the above-named defendant, James Kennedy based upon, *inter alia*,  a) his improper attempt to deprive the Plaintiff of his interest in the family businesses, Robert T. Kennedy Inc. d/b/a Kennedy Professional Supply ("Kennedy Supply") in which the Plaintiff is President and 50% shareholder; b) looting of the income generated by the businesses Kennedy Supply and First Health Products Inc. ("First Health") and assets held by 13 Kidder Road Realty Trust ("Kidder Trust"); c) breach of  fiduciary obligations,  d) self-dealing, e) wrongful exercise of dominion over the corporate and trust assets, f) continued refusal to permit joint control over the financial affairs of the corporations despite demand, g) waste, h) mismanagement, i) theft, j)

forgery, and k) fraud. The Plaintiff is therefore in need of immediate injunctive relief to preserve the remaining corporate and trust assets, and hereby requests the Court to Order the valuation and sale of the Plaintiff's shares in Kennedy Supply, First Health and Kidder Trust, or in the alternative, if the Court sees fit, order the dissolution of Kennedy Supply and First Health pursuant to Mass. Gen. Laws ch. 156D § 14.30 et als.

## PARTIES

2.      Plaintiff Edward D. Kennedy ("E. Kennedy") is an individual who resides in Westford, Middlesex County, Massachusetts. The Plaintiff is currently the President and 50% shareholder of Kennedy Supply and First Health.

3.      Plaintiff Robert T. Kennedy Inc. is a Massachusetts corporation with a current principal place of business at 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts doing business as Kennedy Professional Supply.

4.      Plaintiff First Health Products Inc. is a Massachusetts corporation with a current place of business at 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts.

5.      Plaintiff Edward Kennedy is also a 50% beneficiary of the Kidder Trust, a nominee trust, under a Declaration of Trust recorded at the Middlesex North County Registry of Deeds on June 2, 2000 at Book 10858, Pages 180 through 185. Kidder Trust is the owner of the Premises known as and numbered 13 Kidder Road, Chelmsford, Middlesex County, Massachusetts.

6.      Kennedy Supply and First Health are engaged in the wholesale purchase and sale of health care products, equipment, and supplies to over 1000 chiropractors, chiropractic clinics, hospitals, medical doctors and physical therapists across New England and several other states

including, Florida, Oklahoma, Rhode Island, South Carolina, New Jersey, New York and Pennsylvania.

7.    Defendant James Kennedy ("J. Kennedy") is an individual who resides at 3 Kirby Lane, Chelmsford, Middlesex County, Massachusetts.    J. Kennedy is the Plaintiff's brother, Treasurer, and remaining 50% shareholder in Kennedy Supply and First Health.    J. Kennedy is a co-Trustee of the Kidder Trust.

8.    Defendant Enterprise Bank and Trust Company ("Enterprise Bank") is a Massachusetts banking corporation with a registered principal place of business in Tewksbury, Massachusetts and a banking facility located at 185 Littleton Road, Chelmsford, Massachusetts, which, at all times material hereto, was, and continues to be, the banking institution used by Kennedy Supply, First Health and the Kidder Trust.


## COMMON ALLEGATIONS OF FACT

9.    Kennedy Supply was formed in June 1981 by E. Kennedy and J. Kennedy's late father, Robert T. Kennedy, for the purpose of engaging in wholesale purchase and sale of medical supplies.    *See Articles of Organization of Robert T. Kennedy Inc. attached hereto at Exhibit A.*

10.    Kennedy Supply was formed by Robert Kennedy (its President), his wife, Esther Kennedy, (Treasurer), and his son, Plaintiff E. Kennedy (Clerk).    *See Exhibit A.*

11.    Initially, Robert Kennedy was the sole shareholder and operated and managed Kennedy Supply along with his two youngest sons, Henry and E. Kennedy.

12.    The middle child, J. Kennedy, was a carpet installer who possessed very little knowledge of the family business until Robert Kennedy brought him in to get actively involved in Kennedy Supply.

13    Over time, Kennedy Supply's business developed substantial contacts with individuals and companies in the chiropractic industry.

14.    Through these contacts, E. Kennedy decided to open medical offices to provide chiropractic services to the public.

15.    The first chiropractic/physical therapy office was opened in Lawrence, Massachusetts.

16.    Shortly thereafter, E. Kennedy contacted Dr. Joseph Giampa, a longtime friend who E. Kennedy knew to be a licensed chiropractor in Massachusetts for the purpose of becoming a partner in the new business venture.

17.    The new business, Future Management Corporation ("Future Management"), was formally organized in February 1997.

18.    Initially, the parties agreed that Future Management would have three shareholders, E. Kennedy, (25%), J. Kennedy (25%) and Joseph Giampa (50%).

19.    The creation of Future Management was also intended to benefit Kennedy Supply's business, as Kennedy Supply was to be Future Management's primary distributor of medical and chiropractic equipment and supplies.

20.    In order to focus on developing these respective businesses, E. Kennedy permitted J. Kennedy to assume more control over Kennedy Supply than J. Kennedy previously maintained.

21.     E. Kennedy agreed to have J. Kennedy operate the day to day management business, while E. Kennedy was in charge of overseeing Kennedy Supply's financial operations.

22.     By September 2003, E. Kennedy had expanded Future Management from 1 office in Lawrence, to over 60 offices in Massachusetts and across the United States, including, but not limited to Florida, Oklahoma, Connecticut, Rhode Island, South Carolina, New Hampshire, Pennsylvania, Illinois and Virginia.

23.     In 1996, E, Kennedy and J. Kennedy assumed full control over Kennedy Supply after Robert Kennedy retired from the family business.

24.     Prior to receiving a salary from Future Management, E. Kennedy was Kennedy Supply's President, and J. Kennedy, its Treasurer and Clerk and both received salaries from Kennedy Supply in the amount of $200,000.00 and $125,000.00 respectively.

25.     On or about July 20, 1998, E. Kennedy and J. Kennedy formed First Health, a sister corporation to Kennedy Supply, for the purpose of managing and handling various aspects of Kennedy Supply's business, including, but not limited to, administering Kennedy Supply's salaries.

26.     At all times material hereto, E. Kennedy has been the President of First Health and J. Kennedy, its Treasurer and Secretary.

27.     On or about June 2, 2000, Robert Kennedy sold the property located at 13 Kidder Road, Chelmsford, Massachusetts-- the principal place of business for both Kennedy Supply and First Health -- to E. Kennedy and J. Kennedy as co-Trustees of the 13 Kidder Road Realty Trust for Four Hundred and Fifty Thousand ($450,000.00) Dollars.

28.     Beginning on or about January 2000, E. Kennedy and J. Kennedy began receiving a salary from Future Management in the amount of $2,500.00 per week in addition to receiving stock dividends of approximately $130,000.00 per year.

29.     As a result, E. Kennedy and J. Kennedy stopped taking any salary from Kennedy Supply or First Health.

30.     In January 2004, J. Kennedy began to experience serious personal financial problems on account of his increased spending habits and changes in his lifestyle.

31.     Further exacerbating his financial problems, after separating from his wife Claudia Kennedy, J. Kennedy purchased a home in Chelmsford, Massachusetts for $625,000.00, and took frequent vacations with his girlfriend to various destinations in the Caribbean, and to Myrtle Beach, South Carolina.

32.     On January 22, 2004, pursuant to a Decree of Divorce in the Southern District in Hillsborough County, New Hampshire, Claudia Kennedy, was awarded the marital home in Nashua, New Hampshire, their mobile home in Albany, New Hampshire, and their real estate in Myrtle Beach, South Carolina. *A true and accurate copy of the Decree of Divorce dated January 22, 2004 in the matter of Kennedy v. Kennedy is attached hereto at Exhibit B.*

33.     The Decree of Divorce also Ordered that J. Kennedy pay $7,500.00 per month for child support payments for his two minor children, $5,000.00 per month in alimony payments, turn over all assets held in his 401(k) retirement account, plus pay an additional $15,000.00 per month for a period of seven years to Claudia Kennedy as payment for her share of the property division distributions in Future Management, Kidder Trust, First Health and Kennedy Supply. *See Exhibit B.*

6

34.     As part of its decree, the Court specifically stated that J. Kennedy was "not freely forthcoming with information regarding [his] assets" and failed to list several assets on his financial statements filed with the Court. *See Exhibit B.*

35.     Within hours after learning of the New Hampshire Court's Decree, J. Kennedy stated to E. Kennedy's wife, Tracy Kennedy, and her sister Peggy Arnett, that as a result of this decision from this Court, he was in desperate need of more money. *See Affidavit of Tracy Kennedy and Peggy Arnett attached hereto at Exhibits C and D, respectively.*

36.     Approximately two months later, E. Kennedy discovered that J. Kennedy had caused Kennedy Supply's bank accounts at Enterprise Bank to become overdrawn.

37.     Despite E. Kennedy's attempts to resume joint control over the operation and management of Kennedy Supply and First Health, J. Kennedy prohibited E. Kennedy from having any involvement in the business, notwithstanding E. Kennedy's 50% ownership interest.

38.     J. Kennedy and the two other shareholders of Future Management also conspired to freeze E. Kennedy out of Future Management and, as a result, assumed total control over Future Management, whose net profits had risen to over $3.7 million dollars.

39.     E. Kennedy later discovered documents at Kennedy Supply's office which revealed that J. Kennedy was using Kennedy Supply to enable Future Management to fraudulently borrow hundreds of thousands of dollars from various lending entities under the guise that Future Management was purchasing chiropractic equipment from Kennedy Supply.

40.     One such document included a Security Agreement between Future Management and a lending entity, Maruka U.S.A. Inc., in connection with the acquisition and financing of $71,537.20 in medical equipment, purchased from Kennedy Supply, for Future Management's

chiropractic office in New Bedford, Massachusetts. *A true and accurate copy of the letter and Security Agreement dated June 1, 2004 is attached hereto at Exhibit E.*

41.    Attached to the Security Agreement to Maruka U.S.A. Inc. included documents entitled "Certified Copy of Resolutions of Board of Directors" of Future Management Mass Business Trust and Future Management purportedly containing E. Kennedy's name and signature as Vice President of Future Management, authorizing and approving the loan from Maruka U.S.A. Inc. to Future Management. *See Exhibit E.*

42.    E. Kennedy never signed any of the documents with Maruka U.S.A. Inc. set out in Exhibit E.

43.    Attached to the Security Agreement was a personal Guarantee purportedly signed by E. Kennedy and witnessed by Kennedy Supply's office secretary, Maria King. *A copy of the personal Guarantee is attached hereto at Exhibit F.*

44.    E. Kennedy never signed the personal Guarantee set out in Exhibit F, either in the presence of Maria King, or otherwise.

45.    E. Kennedy also found several invoices from Kennedy Supply to Future Management offices which Future Management utilized to borrow over $765,479.70 from various other lending entities.

46.    These invoices reflected large equipment orders for chiropractic facilities owned by Future Management. However, several of these facilities were already fully equipped and one invoice stated that Kennedy Supply purportedly sold chiropractic equipment totaling $118,655.00 to Future Management for its clinic in Danbury, Connecticut -- a clinic that had been closed down for several months at the time of the issuance of that invoice. *True and accurate copies of the foregoing Invoices are attached hereto at Exhibit G.*

47.     E. Kennedy also discovered that J. Kennedy had been withdrawing funds from a line of credit at Enterprise Bank which was secured with a personal guarantee by E. Kennedy and J. Kennedy.

48.     On January 12, 2005, E. Kennedy, through counsel made formal demand to inspect the financial records of Kennedy Supply, Kidder Trust, and First Health.

49.     After reviewing the financial records, E. Kennedy discovered that substantial payments and disbursements totaling over Three Hundred Thousand ($300,000.00) dollars had been transferred by J. Kennedy from Kennedy Supply's accounts to himself, his personal attorneys, and to Future Management and its shareholders, including, but not limited to:

   a.     Payments to American Express, MBNA credit card and Discover credit card payments in excess of $5,000.00 per month;

   b.     Payments exceeding $37,000.00 to a Citizens Bank personal line of credit held in the name of James and Claudia Kennedy;

   c.     Check dated March 10, 2004 payable to Future Management in the amount of $3,743.20;

   d.     Check dated May 7, 2004 payable to Future Management in the amount of $1,700.00;

   e.     Check payable to the law firm of Manchel & Brennan, P.C. dated May 10, 2004 in the amount of $2,277.49;

   f.     Check payable to Fred Giampa dated June 10, 2004 for $8,000.00;

   g.     Check payable to Joe Giampa dated June 10, 2004 for $25,000.00;

   h.     Check payable to Fred Giampa dated July 13, 2004 for $4,500.00;

   i.     Check payable to James Kennedy dated August 31, 2004 for $50,000.00;

   j.     Check payable to Future Management dated September 21, 2004 for $113,000.00; and

   k.     Check payable to Future Management dated December 13, 2004 in the amount of $6,521.96.

*True and accurate copies of the foregoing documents are attached hereto at Exhibit H.*

50.    E. Kennedy has never authorized the retention of Manchel & Brennan, P.C. by Kennedy Supply and, through counsel, formally informed them that they were not to be paid from Kennedy Supply's funds. *See attached letter from Stephen A. Greenbaum dated February 11, 2005 attached hereto at Exhibit I.*

51.    After discovering this information, E. Kennedy, through counsel, requested that Enterprise Bank refuse to accept any further checks or withdrawals from Kennedy Supply's accounts that did not possess dual signatures or authorizations from both E. Kennedy and J. Kennedy. *See attached letter from Stephen A. Greenbaum to Mary Jane Nardone, Vice President Commercial Lending, Enterprise Bank dated February 7, 2005 attached hereto at Exhibit J.*

52.    On February 10, 2005, Enterprise Bank informed E. Kennedy that it would not accept his request without the consent of J. Kennedy, or in the alternative, a court order. *See attached letter from Mary Jane Nardone dated February 10, 2005 attached hereto at Exhibit K.*

53.    At that time, E. Kennedy asked Ms. Nardone at Enterprise Bank about the status of the Kennedy Supply line of credit personally guaranteed by J. Kennedy and E. Kennedy.

54.    Ms. Nardone stated that the line of credit maintained a "zero" balance.

55.    When E. Kennedy instructed Ms. Nardone to take his name off of the account, Ms. Nardone assured E. Kennedy that she would, but in any event, due to the dispute that had arisen between the E. Kennedy and J. Kennedy, that Enterprise Bank would no longer lend any money to Kennedy Supply.

56.    E. Kennedy questioned J. Kennedy on several occasions about his continued use of Kennedy Supply's funds to pay for his increasing personal debts.

57.     While J. Kennedy admitted taking money from Kennedy Supply, he refused to reimburse any monies inappropriately withdrawn for his personal use back to Kennedy Supply or E. Kennedy.

58.     J. Kennedy further admitted to E. Kennedy in September 2004 that he had transferred money from Kennedy Supply to Future Management to pay for Future Management's payment for referrals to its chiropractic clinics across Massachusetts.

59.     Specifically, in a telephone conversation, J. Kennedy admitted to E. Kennedy that he had used money from Kennedy Supply and given it to Future Management and the Giampa brothers to pay for "runners", i.e. individuals paid to refer clients to Future Management's chiropractic offices.

60.     At the time J. Kennedy made this admission, he was aware that there was a law which was going to be passed by the Massachusetts legislature making the use of "runners" a criminal act.   The legislature subsequently passed Mass. Gen. Laws ch. 266 § 111C which imposed criminal sanctions for this practice.   *See copy of foregoing statute passed by Massachusetts legislature effective January 3, 2005  attached hereto at Exhibit L.*

61.     No longer able to jointly run and operate the business, E. Kennedy and K. Kennedy began negotiations for J. Kennedy to purchase E. Kennedy's 50% shares in Kennedy Supply, First Health, and his interest in Kidder Trust.

62.     After attempts to agree on a price for E. Kennedy's shares failed, the parties discussed selling Kennedy Supply, First Health and the building at 13 Kidder Road to outside third parties.   *See attached letter from J. Kennedy's counsel to E. Kennedy's counsel dated March 31, 2005 attached hereto at Exhibit M.*

63.     The parties continued the foregoing negotiations until April 14, 2005 when E. Kennedy discovered that J. Kennedy was continuing to deplete Kennedy Supply's assets by withdrawing $2,000.00 per week beginning in January 2005 for his personal use, and withdrawing $12,000.00 from Kennedy Supply's line of credit at Enterprise Bank – the same line of credit personally guaranteed by E. Kennedy.

64.     From or about January 1, 2004, J. Kennedy withdrew an additional $2,000.00 a month from Kennedy Supply's accounts to pay for a personal line of credit taken out jointly in his name and his ex-wife's name, held at Citizens Bank. *See attached general ledger at Exhibit N.*

65.     After an Order from the New Hampshire Probate Court that he pay off the outstanding line of credit, J. Kennedy issued a check from Kennedy Supply's checking account in the amount of $18,039.89. *See copy of check payable to Citizens Bank attached hereto at Exhibit O.*

66.     Furthermore, the $2,000.00 disbursement each month from Kennedy Supply for J. Kennedy's line of credit that was originally reflected on his tax returns as a payment of dividends, was subsequently omitted from Kennedy Supply's financial records prepared by its accountant, William Chapman. *See attached revised ledger from Kennedy Supply's accountant, William Chapman, attached hereto at Exhibit P.*

67.     In addition to the foregoing, following their father's death in April 2004, E. Kennedy is informed, believes, and hereby avers that J. Kennedy converted the proceeds from their father's life insurance policy held in the Kidder Trust and used those funds for his personal use.

12

68.     On March 31, 2005, the New Hampshire Probate Court found J. Kennedy in contempt for failing to pay Claudia Kennedy her portion of the property distribution in accordance with the Court's Order. *A true and accurate copy of the Court's Order is attached hereto at Exhibit Q.*

69.     As a result, the Court ordered that J. Kennedy pay Claudia Kennedy $68,214.00 in payment arrearages through November 2004 within 10 days of the date of the Order. *See Exhibit Q.*

70.     On April 15, 2005, Claudia Kennedy filed a Motion to Show Cause for J. Kennedy's failure to tender payment in accordance with the Court's second Order. *A true and accurate copy of the foregoing Motion is attached hereto at Exhibit R.*

71.     E. Kennedy is informed, believes, and hereby avers that J. Kennedy has failed to pay Claudia Kennedy $15,000.00 per month since November 2004 and is in default of the Court Order.

72.     J. Kennedy's conduct as aforesaid is wrongful and in direct violation of his obligations to Kennedy Supply, First Health, Kidder Trust, and to E. Kennedy.

73.     E. Kennedy, individually, and on behalf of Kennedy Supply, First Health and Kidder Trust, ("the Plaintiffs") are in need of immediate injunctive relief against J. Kennedy and Enterprise Bank in order to preserve the status quo and prevent the further dissipation the business' assets.

74.     In the absence of injunctive relief, the Plaintiffs' assets will be subject to continued waste and loss.

75.     E. Kennedy is informed, believes and hereby avers that his brother is financially unable to purchase his interests in Kennedy Supply and First Health, and all attempts to negotiate a sale of the business and the property at 13 Kidder Road to third parties have failed.

76.     Accordingly, following the imposition of a restraining order to preserve the status quo, the Plaintiffs hereby petition the Court for an accounting of all funds J. Kennedy misappropriated and converted from Kennedy Supply, First Health, and the Kidder Trust.

77.     The Plaintiffs are in further need of judicial intervention to either supervise the sale of the foregoing entities, or in the alternative, dissolve Kennedy supply and First Health.

## COUNT I – BREACH OF CONTRACT

78.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 77 above as if fully set forth herein.

79.  Based upon his conduct as set forth above, J. Kennedy is in breach of his contractual obligations to the Plaintiff and to Kennedy Supply, First Health, and Kidder Trust.

80.  The aforesaid breach of contract was knowing and willful.

81.  The Plaintiffs have suffered damages as a result of the same.

## COUNT II – BREACH OF FIDUCIARY DUTY

82.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 81 above as if fully set forth herein.

83.  Based upon his conduct as set forth above, J. Kennedy, as a partner, director, and shareholder in a close corporation is in breach of his fiduciary duty owed to the Plaintiffs.

84.  The aforesaid breach of fiduciary duty was knowing and willful.

85.  The Plaintiffs have suffered damages as a result of the same.

14

## COUNT III – BREACH OF DUTY OF GOOD FAITH AND LOYALTY

86. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 85 above as if fully set forth herein.

87. Based upon his conduct as set forth above, J. Kennedy as a partner, director, and shareholder in a close corporation, is in breach of his duty of utmost good faith and loyalty owed to the Plaintiffs.

88. The aforesaid breach of duty was knowing and willful.

89. The Plaintiffs have suffered damages as a result of the same.

## COUNT IV – CONVERSION

90. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 89 above as if fully set forth herein.

91. Based upon his conduct as set forth above, J. Kennedy has directly and indirectly converted funds and assets of Kennedy Supply, First Health, and the Kidder Trust, a portion of which properly belong to the Plaintiffs.

92. The aforesaid conversion was knowing and willful.

93. The Plaintiffs have suffered damages as a result of the same.

## COUNT V – FRAUD

94. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 93 above as if fully set forth herein.

95. Based upon his conduct as set forth above, J. Kennedy has defrauded the Plaintiff individually, and also Kennedy Supply, First Health and the Kidder Trust in having misappropriated and looted substantial sums of money from the foregoing entities.

15

96. The aforesaid fraudulent conduct was knowing and willful.

97. The Plaintiffs have suffered damages as a result of the same.

## COUNT VI – VIOLATION OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

98. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 97 above as if fully set forth herein.

99. Based upon his conduct as aforesaid, J. Kennedy has violated the covenant of good faith and fair dealing implied in every contract.

100. The aforesaid violation was knowing and willful.

101. The Plaintiffs have suffered damages as a result of the same.

## COUNT VII – NEGLIGENCE

102. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 101 above as if fully set forth herein.

103. Based upon his conduct as set forth above, J. Kennedy failed to exercise due care in the management and operation of Kennedy Supply, First Health, and the Kidder Trust and is thus guilty of negligence.

104. The Plaintiffs have suffered damages as a result of the same.

## COUNT VIII – UNJUST ENRICHMENT (ALL DEFENDANTS)

105. The Plaintiffs hereby repeat and re-allege paragraphs 1 through 104 above as if fully set forth herein.

16

106.  J. Kennedy will be unjustly enriched if he is allowed to retain the funds that he either directly or indirectly misappropriated from Kennedy Supply, First Health, and/or the Kidder Trust.

107.  The Plaintiffs are entitled to an order from the Court that J. Kennedy disgorge all such amounts and deposit the same with the Court for appropriate distribution to the Plaintiffs.

## COUNT IX – CONSTRUCTIVE TRUST

108.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 107 above as if fully set forth herein.

109.  As set forth above, J. Kennedy misappropriated monies from Kennedy Supply, First Health, and the Kidder Trust for himself, and for the benefit of others, to which they were not entitled.

110.  The Plaintiffs are entitled to have the Court impose a constructive trust upon these monies, including any assets acquired with the same, for the benefit of the Plaintiffs.

## COUNT X – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

111.  The Plaintiffs hereby repeat and re-allege paragraphs 1 through 110 above as if fully set forth herein.

112.  J. Kennedy is a fiduciary to the Plaintiffs.

113.  J. Kennedy breached his fiduciary duties to the Plaintiff by his actions and omissions.

114.  J. Kennedy's breach has caused, and continues to cause the Plaintiff extreme emotional distress.

115.    The Plaintiff has suffered both physical and economic damages as a result of the defendants' actions and omissions as aforesaid.

## COUNT XI – ACCOUNTING

116.    The Plaintiffs hereby repeat and re-allege paragraphs 1 through 115 above as if fully set forth herein.

117.    The Plaintiffs are entitled to and hereby demand an accounting from J. Kennedy as to a) the operation of Kennedy Supply, First Health, and the Kidder Trust; b) all monies received directly and indirectly by J. Kennedy and any and all third parties from the operation of the businesses; c) all monies either loaned or borrowed by J. Kennedy or E. Kennedy on behalf of Kennedy Supply, First Health and the Kidder Trust after J. Kennedy assumed total control over the business; and d) copies of all Invoices to Future Management from February 2004 to the present.

## COUNT XII - DERIVATIVE RELIEF PURSUANT TO MASS. R. CIV. P. 23.1

118.    The Plaintiffs repeat and re-allege paragraphs 1 through 117, as if fully set forth herein.

119.    E. Kennedy is the President and 50% shareholder in Kennedy Supply and First Health.

120.    J. Kennedy currently possesses the remaining 50% interest and is the Treasurer and Clerk in the foregoing corporations.

121.    It would be futile for the Plaintiff to make a demand upon J. Kennedy to bring an action on behalf of the corporation, as the director, officer and other remaining shareholder is not disinterested, nor a majority shareholder, and is himself the wrongdoer.

122.    Based upon his conduct as set forth above, J. Kennedy has harmed the foregoing corporations.

123.    Kennedy Supply and First Health have suffered damages as a result of the same.

## COUNT XIII – DISSOLUTION

124.    The Plaintiffs hereby repeat and re-alleges paragraphs 1 through 123 above as if fully set forth herein.

125.    As a matter of law and contract, E. Kennedy is entitled to the dissolution of Kennedy Supply and First Health and distribution of one half of the net assets of the said corporations.

## COUNT XIV – INJUNCTIVE RELIEF AGAINST
## J. KENNEDY AND ENTERPRISE BANK

126.    The Plaintiffs hereby repeat and re-allege paragraphs 1 through 125 above as if fully set forth herein.

127.    The Plaintiffs are entitled to the issuance of an Injunction restraining and enjoining J. Kennedy, as well as his accountants, agents and attorneys, from:

a)    withdrawing, paying, wasting, or spending any monies of Kennedy Supply, First Health, and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining the written authorization of E. Kennedy; and

b)      in any way dissipating, pledging or encumbering the assets of Kennedy Supply, First Health and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining written authorization by E. Kennedy;

c)      interfering with or prohibiting Edward Kennedy from having direct involvement in any aspect of Kennedy Supply, First Health, or the Kidder Trust including, but not limited to, their operation, management, any and all bank accounts, and decisions regarding any and all disbursements made from the foregoing entities' accounts; and

d)      using any income or assets of Kennedy Supply, First Health, or the Kidder Trust to pay the costs and expenses associated with this litigation.

128.    The Plaintiffs further request that the Court enter an order requiring Enterprise Bank to take any action necessary to prohibit J. Kennedy from:

a)      withdrawing, paying, wasting, transferring or spending any monies of Kennedy Supply, First Health, and Kidder Trust for any reason whatsoever during the pendency of this action without first obtaining the written authorization of E. Kennedy;  and

b)      in any way dissipating, pledging or encumbering the assets of Kennedy Supply, First Health and Kidder Trust, or take any action which would affect E. Kennedy' interests individually, for any reason whatsoever during the pendency of this action without first obtaining written authorization by E. Kennedy.


.  WHEREFORE, the Plaintiffs respectfully request · that this Court grant the following relief:

1.      Issue a short order of notice with respect to prayer 2 below;

2.     After notice, issue a preliminary injunction restraining and enjoining 1) J. Kennedy, and 2) Enterprise Bank from permitting J. Kennedy, from conveying, transferring, wasting, pledging, encumbering and/or dissipating or interfering with any of the assets of Kennedy Supply, First Health and Kidder Trust, of every kind and description without prior written authorization from the Plaintiff, including, but not limited to, payment of his attorneys' fees and costs;

3.     Pursuant to Count I, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

4.     Pursuant to Count II, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

5.     Pursuant to Count III, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

6.     Pursuant to Count IV, award such damages as may be proven at trial and order the return of all assets which the Court finds to be wrongfully converted, and award reasonable attorney's fees, costs and interest;

7.     Pursuant to Count V, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

8.     Pursuant to Count VI, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

9.     Pursuant to Count VII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

10.     Pursuant to Count VIII, award such damages which may be proven at trial, including restitution of any profits J. Kennedy made on a corporate opportunity, repayment of

excess compensation to the entities, together with reasonable attorney's fees, costs and interests to the Plaintiffs.

11.    Pursuant to Count IX, award such damages as may be proven at trial and make a finding that the defendants are constructive trustees for the benefit of the Plaintiffs with respect to all assets wrongfully received by them, and award reasonable attorney's fees, costs and interest;

12.    Pursuant to Count X, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

13.    Pursuant to Count XI, order an accounting from the defendants as to a) the operation of Kennedy Supply, First Health, and the Kidder Trust; b) all monies received directly and indirectly by J. Kennedy and any and all third parties from the operation of the businesses; c) all monies either loaned or borrowed by J. Kennedy or E. Kennedy on behalf of Kennedy Supply, First Health and the Kidder Trust after J. Kennedy assumed total control over the business; and d) copies of all Invoices to Future Management from February 2004 to the present.

14.    Pursuant to Count XII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;

15.    Pursuant to Count XIII, award such damages as may be proven at trial, together with reasonable attorney's fees, costs and interest;  and

16.    Such other and further monetary, injunctive and declaratory relief as this Court deems just and proper.

THE PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE

Respectfully submitted,
EDWARD D. KENNEDY,
By his attorneys,

Stephen A. Greenbaum, Esquire
BBO No. 209360
Natalie R. Sika, Esquire
BBO No. 648408
GREENBAUM, NAGEL,
FISHER & HAMELBURG
200 High Street, 4th Floor
Boston, MA  02110
(617) 423-4300

Dated:  April __, 2005

VERIFICATION

I, Edward D. Kennedy, hereby state that I have personal knowledge with regard to the factual allegations contained in the within Verified Complaint and that the same are known by me to be true and accurate, with the exception of those statements expressly made upon information and belief, which statements I believe in good faith to be true and accurate. Additionally, I am personally familiar with the documents annexed to the Verified Complaint and know the same to be true copies of the originals of those documents.

Signed under the pains and penalties of perjury this 29 day of April, 2005

Edward D. Kennedy

Volume: I
Pages:118
Exhibits: 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.05-11693 RCL

ENCOMPASS INSURANCE COMPANY OF
MASSACHUSETTS
Plaintiff-Counterclaim Defendant,

vs.

JOSEPH D. GIAMPA, FREDERICK T. GIAMPA
ADVANCED SPINE CENTERS, INC. d/b/a
FIRST SPINE REHAB, FUTURE
MANAGEMENT CORPORATION, FUTURE
MANAGEMENT BUSINESS TRUST, EDWARD
KENNEDY, BRIAN J. CULLINEY, D.C. AND
JENNIFER McCONNELL, D.C.

  Defendants-Counterclaim Plaintiffs.

JOSEPH D. GIAMPA, FREDERICK T. GIAMPA
ADVANCED SPINE CENTERS, INC.
  Third-Party Plaintiffs

vs.

ALLSTATE INSURANCE COMPANY

  Third-Party Defendant

**DEPOSITION OF ANNEE L'HEUREUX**

A Witness called by and on behalf of the
Plaintiff, pursuant to the Massachusetts Rules of
Civil Procedure, before Elizabeth Ann Everson, a
Court Reporter and Notary Public within and for the
Commonwealth of Massachusetts, at the Law Offices of
Smith & Brink, P.C., 122 Quincy Shore Drive, Quincy,
Massachusetts, commencing on Wednesday, April 4, 2007,
at 10:53 a.m.

2

A P P E A R A N C E S

Richard King, Esquire
Smith & Brink, P.C.
122 Quincy Shore Drive
Second Floor
Quincy, Massachusetts 02171
(617) 770-2214

    Representing: Encompass Insurance Company

Nathan Tilden, Esquire
Smith & Brink, P.C.
122 Quincy Shore Drive
Second Floor
Quincy, Massachusetts 02171
(617) 770-2214

    Representing: Encompass Insurance Company

Meghan Monahan Hart
Seyfarth Shore
World Trade Center East
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
(617) 946-4979

    Representing: Encompass Insurance Company

Daniel Treger, Esquire
Phillips & Angley
One Bowdoin Square
Boston, Massachusetts 02114
(617) 367-8787

    Representing: Edward Kennedy

3

**I N D E X**

| Witness | Direct | Cross | Redirect | Recross |
|---------|--------|-------|----------|---------|
| Annee L'Heureux | | | | |
| MR. KING: | 8 | | | |
| MS. HART: | | 107 | | |

4

**E X H I B I T S**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | Subpoena | 9 |
| 2 | August 2006 Affidavit of Annee L'Heureux | 13 |
| 3 | February 2005Affidavit of Annee L'Heureux | 73 |

5

```
1               P R O C E E D I N G S
2                              April 4, 2007
3                              10:53 a.m.
4        ANNEE L'HEUREUX, having been
5    satisfactorily identified by the production
6    of her Massachusetts driver's license, and
7    duly sworn by the Notary Public, was examined
8    and testified as follows:
9        MR. KING: We're on the record.  My name
10   is Richard King.  I'm here with my co-counsel
11   Nate Tilden.  We represent the plaintiff,
12   Encompass Insurance Company.  With us today
13   is Annee, A-N-N-E-E, L'Heureux, L-'-H-E-U-R-
14   E-U-X.
15       MR. KING: Good morning, ma'am.
16       THE WITNESS: Good morning.
17       MR. KING: I understand you're a little
18   under the weather today.
19       THE WITNESS: Uh-huh.
20       MR. KING:  Have you ever been deposed
21   before?
22       THE WITNESS: No.  I don't think so.
23       MR. KING: Okay.  We had a brief
24   telephone conversation.  I guess it was last
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

6

```
1    week sometime; is that right?
2        THE WITNESS: Right.
3        MR. KING: Okay.  And at that time, --
4        THE WITNESS: Friday.
5        MR. KING: Was it Friday?
6        THE WITNESS: Yeah.
7        MR. KING: You told me you weren't
8    feeling well.  I suggested that if you wanted
9    to reschedule, we could do that, but you've
10   elected to go forward today?
11       THE WITNESS: Mm-hmm.
12       MR. KING: Okay.  You're here pursuant to
13   a subpoena that was served on you?
14       THE WITNESS: Yes.
15       MR. KING: Okay.  I guess your residence
16   is 12 Mark Street in Burlington; is that
17   correct?
18       THE WITNESS: Yes.
19       MR. KING: All right.  Why don't we just
20   go around the room.  The people that are here
21   can introduce themselves and who they
22   represent.
23       MR. TREGER: I'm Daniel Treger.  I
24   represent Edward Kennedy.
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

7

```
1        MS. HART: Meghan Hart.  I represent
2    Encompass.
3        MR. TILDEN: I'm Nathan Tilden on behalf
4    of Encompass.  Just for the record, I
5    notified both Attorney Ciampa who represents
6    Brian Culliney and Jennifer McConnell, as
7    well as Matthew Conroy's office this morning.
8    They were also sent email confirmation that
9    Ms. L'Heureux would be here on Friday.
10       MR. KING: So to make a long story short,
11   all parties have been notified that this
12   deposition was going to go forward and was
13   confirmed by the subpoenaed witness.
14       A couple of things about being deposed,
15   this is not going to be very long.  We'll get
16   you out of here.  We had to wait for the
17   counsel that did want to be here.  I'm going
18   to ask you some questions about who you are
19   and your knowledge about Future Management
20   and the other defendants in this case.  I
21   just need you to listen to my question before
22   you start to answer, all right?  I have one
23   important thing and I know you have a low
24   voice and you don't feel well today, you need
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

8

```
1    to answer all the questions orally.  You have
2    to speak an answer.  Just try to keep your
3    voice up as much as possible.  If I ask you a
4    question and you're confused by the question,
5    you don't understand it, I want you to tell
6    me that.  I'll ask a different question.  If
7    I ask you a question and you do answer, we'll
8    presume that you understood the question and
9    answered it under oath truthfully.  If you
10   want something to drink, like I said before,
11   or use the ladies room, just let me know and
12   I'll show you where it is.
13   D-I-R-E-C-T  E-X-A-M-I-N-A-T-I-O-N
14   (BY MR. KING)
15   Q.   Why don't you state your complete name for
16        the record?
17   A.   Annee L'Heureux.
18   Q.   All right.  And where do you work?
19   A.   C&C Professional Business Services.
20   Q.   How long have you been with C&C?
21   A.   C&C came into existence in 2004, but I was
22        with the other owner since 2000.
23   Q.   All right.  The other owner was who?
24   A.   William Chapman.
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

9

| | | |
|---|---|---|
| 1 | Q. | Okay.  Did he sell his practice to C&C or it |
| 2 | | became C&C? |
| 3 | A. | It became C&C. |
| 4 | Q. | And that's C ampersand C, right? |
| 5 | A. | Yeah. |
| 6 | | MR. KING:  We'll just mark that. |
| 7 | | **(Whereupon, Exhibit 1, Subpoena, is** |
| 8 | | **marked for identification.)** |
| 9 | (BY MR. KING) | |
| 10 | Q. | Are you still employed at C&C? |
| 11 | A. | Yes. |
| 12 | Q. | Okay.  What is your job title or what job |
| 13 | | function do you perform at C&C? |
| 14 | A. | Bookkeeping. |
| 15 | Q. | Have you always been a bookkeeper for Mr. |
| 16 | | Chapman and then for C&C? |
| 17 | A. | Yes. |
| 18 | Q. | Okay.  What did you do before being employed |
| 19 | | at C&C? |
| 20 | A. | I've been a bookkeeper for 40 years. |
| 21 | Q. | When you were with William Chapman, did there |
| 22 | | come a time where you worked, performed work |
| 23 | | for Future Management Corporation? |
| 24 | A. | Yeah.  I think 2002, something like that. |

10

| | | |
|---|---|---|
| 1 | Q. | Okay.  All right.  So it wasn't just during |
| 2 | | the time that it's been C&C, but it was also |
| 3 | | with Mr. Chapman? |
| 4 | A. | Right. |
| 5 | Q. | Okay.  All right.  When you were with Mr. |
| 6 | | Chapman, was it at the same actual office |
| 7 | | space? |
| 8 | A. | No.  Different location. |
| 9 | Q. | When you were with Mr. Chapman, how many |
| 10 | | other employees were there at that company? |
| 11 | A. | Three or four. |
| 12 | Q. | Okay.  There was Mr. Chapman and is he a CPA? |
| 13 | A. | Yes, he is. |
| 14 | Q. | And then you were one of the bookkeepers; |
| 15 | | were there other bookkeepers? |
| 16 | A. | Right. |
| 17 | Q. | Any other bookkeepers to your knowledge that |
| 18 | | worked on the Future Management account? |
| 19 | A. | Yes. |
| 20 | Q. | Who? |
| 21 | A. | Robin, Robin Von Winkle, I think her name is. |
| 22 | Q. | Robin Van Winkle? |
| 23 | A. | Or something like that.  I don't know.  No. |
| 24 | | It's Robin something else.  I don't know her |

11

| | | |
|---|---|---|
| 1 | | last name. |
| 2 | Q. | Okay.  Is she still with C&C? |
| 3 | A. | No. |
| 4 | Q. | She was your coworker just when it was |
| 5 | | Chapman's office? |
| 6 | A. | Right. |
| 7 | Q. | All right.  Who else? |
| 8 | A. | The office manager, Karen Sullo. |
| 9 | Q. | Okay.  Can you spell the last name? |
| 10 | A. | S-U-L-L-O. |
| 11 | Q. | Did she work on the Future Management |
| 12 | | Corporation account? |
| 13 | A. | Yes. |
| 14 | Q. | All right.  Who else was there? |
| 15 | A. | Patricia Gilgun.  She's retired. |
| 16 | Q. | G-I? |
| 17 | A. | G-I-L-G-U-N. |
| 18 | Q. | What did she do? |
| 19 | A. | She's a bookkeeper. |
| 20 | Q. | Did she work on the Future Management |
| 21 | | account? |
| 22 | A. | No. |
| 23 | Q. | Anyone else? |
| 24 | A. | Florianne Tobin. |

12

| | | |
|---|---|---|
| 1 | Q. | And what did she do? |
| 2 | A. | She's a bookkeeper as well. |
| 3 | Q. | Did she work on the FMC account? |
| 4 | A. | No. |
| 5 | Q. | Was there anyone else at Chapman's office who |
| 6 | | worked on the FMC account? |
| 7 | A. | Robin. |
| 8 | Q. | All right.  Other than who we've mentioned? |
| 9 | A. | No, that's everyone. |
| 10 | Q. | That's everyone?  Okay.  Now, at C&C are |
| 11 | | there any other persons besides yourself that |
| 12 | | worked on the FMC account or Future |
| 13 | | Management? |
| 14 | A. | Karen Sullo did last year, not last year, '04, |
| 15 | | '05?  It must be '04. |
| 16 | Q. | All right. |
| 17 | A. | I don't know. |
| 18 | Q. | Do you currently work on FMC accounts? |
| 19 | A. | No, no. -- We're no longer employed -- |
| 20 | Q. | And when did it stop?  I'm sorry. |
| 21 | A. | We're no longer employed by them.  '04, I |
| 22 | | guess or '05.  I don't know. |
| 23 | Q. | All right. |
| 24 | A. | I think it was late. |

13

```
 1    Q.    It was late in '04?
 2    A.    It must have been '05, but it was late.
 3    Q.    When you say, "late," late in the year?
 4    A.    We went on extension, yeah.
 5    Q.    Okay.  Do you know where the account went
 6          after your outfit?
 7    A.    You know, we have the name but I don't have
 8          it on me.  Yeah, but we know the new
 9          accountants.
10    Q.    Who was the accountant -- is there an
11          accountant at C&C?
12    A.    A CPA, Mr. Carlton, David Carlton.
13    Q.    He obviously worked on the FMC account?
14    A.    Yeah.
15          MR. KING:  Now, let me just pass these
16          out here.
17          (Whereupon, Exhibit 2, August 2006
18          Affidavit of Annee L'Heureux, is marked for
19          identification.)
20          THE WITNESS:  So we must have finished
21          '03, '04.  I guess we did do '05.
22    Q.    All right.  I've marked as Exhibit Number 2
23          -- Exhibit Number 1, just for the record, is
24          the subpoena that you were served; is that
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

14

```
 1          your recollection?
 2    A.    Yeah.
 3    Q.    Which brings you here today.  Exhibit Number
 4          2 is the affidavit of Annee L'Heureux and
 5          there's some fax information at the top
 6          there.  It looks like it was faxed from
 7          Carlton's office there at C&C?
 8    A.    Right.
 9    Q.    All right.  Did you draft this affidavit?
10    A.    No.  They did.
11    Q.    Who's, "They"?
12    A.    What's her name, Kathy Duncan.
13    Q.    Okay.  Does she work at C&C?
14    A.    No.  She's Future Management.
15    Q.    Okay.  Do you have a lawyer in this case?
16    A.    Me?
17    Q.    Yes.
18    A.    No.
19    Q.    Is Kathy Duncan a lawyer?
20    A.    No.  She's their accounts receivable manager.
21    Q. .  Okay.  All right.  And when did you last
22          speak with her?
23    A.    August of 2006.
24    Q.    Okay.  Did she contact you or you contacted
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

15

```
 1          her?
 2    A.    No.  They kept contacting me.
 3    Q.    They, being Future Management?
 4    A.    Right.  She, representing them.
 5    Q.    Okay.  Was that someone that you knew from
 6          your handling of the account?
 7    A.    Yes.
 8    Q.    Was she your primary contact at FMC during
 9          the time that you handled the account both
10          for Chapman and C&C?
11    A.    No.
12    Q.    Who was your primary contact?
13    A.    They had -- what's that idiot's name?  Daisy
14          --
15    Q.    Daisy Foster?
16    A.    Oh, yeah.
17    Q.    And you say she's an idiot?
18    A.    Well, you weren't supposed to hear that, I
19          guess.  No.  She's a very bright woman,
20          actually.
21    Q.    All right.
22    A.    Too bright.
23    Q.    All right.  Why do you say she was too
24          bright?
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

16

```
 1    A.    Well, she was an overbearing woman.
 2    Q.    That's what made her idiotic?
 3    A.    No.  But she did do idiotic stuff.
 4    Q.    Okay.  Well, I want to get into that.  Before
 5          you worked on the FMC account for Chapman,
 6          had you ever worked for FMC at all?
 7    A.    No.
 8    Q.    All right.  Had you ever worked for any of
 9          the FMC managed entities?
10    A.    No.
11    Q.    The clinics?
12    A.    No.
13    Q.    All right.  Do you understand the nature of
14          FMC's business?
15    A.    Well, they're a management company that
16          manages all these clinics.  They pay the
17          doctors and they receive all their revenues
18          and they in turn pay the doctors and they pay
19          all their expenses.  That's the deal,
20          primitive.
21    Q.    Okay.  Primitive?
22    A.    Yeah.
23    Q.    And that's what you handled, the bookkeeping,
24          for at least on the accounting side, right?
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

17

```
1    A.    Yes.
2    Q.    And these are medical clinics; is that what
3          your understanding is?
4    A.    Yeah.
5    Q.    Were there any other -- other than the so-
6          called medical clinics, were there any other
7          entities that were associated with Future
8          Management Corporation?
9    A.    I had to do the realty.  They owned some
10         property, buildings and properties.  They had
11         a realty.
12   Q.    Was that a separate corporation?
13   A.    Yes, it is.
14   Q.    Was that Future Management Realty?
15   A.    Future Management Mass. Business Trust.  Oh,
16         no.  Future Management Realty, yeah, realty
17         corporation.
18   Q.    Okay.  Where was that property located?
19   A.    They had three properties.  They had two in
20         Springfield -- one Springfield, one West
21         Springfield and one in New Bedford.
22   Q.    All right.  Two in the Springfield area, one
23         in New Bedford.  Do you remember the address
24         at New Bedford?
```

18

```
1    A.    No.
2    Q.    Okay.
3    A.    I mean, I have that in the office all of
4          that.
5    Q.    You still maintain --
6    A.    All that information is in the office.
7    Q.    -- the records?  How long do you maintain
8          records, accounts that you longer are
9          employed --
10   A.    Well, they'll put them in archives and they
11         haven't moved them there yet.
12   Q.    Okay.  What's the policy at the office in
13         terms of retention of those records?
14   A.    Oh, that's Mr. Carlton's call.  I don't know.
15   Q.    You don't know?  You also mentioned another
16         entity in addition to the medical clinics and
17         Future real estate holdings.  There's a
18         business trust you say?
19   A.    Oh, they file tax returns on the business
20         trust.
21   Q.    What's that?
22   A.    They file a tax, a Mass. tax return under a
23         business trust.
24   Q.    Is that just an accounting procedure or --
```

19

```
1    A.    Yeah.  It's the same company.  It's just a
2          filing.
3    Q.    When the receivables are collected, if you
4          know, by FMC, where did the money first land?
5    A.    The clinics collect the money and they
6          deposit it.  They all have separate bank
7          accounts.  They deposit it in their bank
8          accounts.
9    Q.    Each clinic has a separate bank account?
10   A.    Right.  They deposit their money in there.
11         Then I guess, I don't understand insurance
12         too much, but I guess a lot of these claims
13         take a long time.  So then, I guess, when
14         they finally settle -- a lot of the money
15         also went directly to Future's -- I'll just
16         say headquarters.
17   Q.    That's in Chelmsford?
18   A.    Right.  And then that all had to be
19         identified by what clinic the receipt was
20         from.
21   Q.    All right.  Were the accounts -- during the
22         time that you were there, were all the
23         accounts for these -- the various clinic
24         accounts and the FMC accounts housed in one
```

20

```
1          bank?
2    A.    The ones that went right to Chelmsford, yes.
3          I call it the parent bank.  It went to the
4          mother bank.
5    Q.    What was the mother bank?
6    A.    That's their account, Chelmsford's.
7    Q.    Right.  What bank did they use?
8    A.    Enterprise.
9    Q.    Enterprise Bank?
10   A.    I think it's still Enterprise.  Oh, they
11         switched.  They switched from Enterprise to
12         Northern.  No, it's not -- yeah, Northern.
13   Q.    Okay.  Northern, okay.  What about the
14         individual clinic accounts, were they --
15   A.    They never switched.
16   Q.    They were at Enterprise, though?
17   A.    Correct.
18   Q.    The Mass Business Trust, same question, that
19         was at Northern?
20   A.    Right.  They started at Enterprise and went
21         to Northern.
22   Q.    All right.  Now, in August of 2006, you were
23         contacted by Kathy Duncan for what reason?
24   A.    Well, you know, you ask them and they won't
```

21

```
1              tell you.  I says, "What is this about?"  I
2         was under the impression there was, I guess
3         against something to do with Daisy Foster,
4         was the impression I got.
5    Q.   Okay.  How did you get that impression?
6    A.   Because I asked her, "What is this for?"
7    Q.   You asked Kathy Duncan?
8    A.   Yeah.  You know, but I'm not going to sign
9         stuff --
10   Q.   Did she just send this to you or did she call
11        you to discuss this?
12   A.   She called first.  Talked about it and made a
13        draft.  Sent it back for corrections and then
14        they sent this final one.
15   Q.   Okay.  You signed it?  That's your signature
16        on Exhibit 2?
17   A.   Yeah.
18   Q.   All right.  When you asked her what it was
19        about, did she mention Daisy Foster?
20   A.   I think so, yeah.
21   Q.   What did she mention about her, anything that
22        you can recall?
23   A.   I don't know.  I guess Daisy Foster was
24        filing for unlawful firing, not firing, but
```

22

```
1              let go.  I guess they had to countersuit or
2         something.
3    Q.   So you learned this information from Duncan?
4    A.   Well, second-hand, yeah.
5    Q.   From Duncan, though?
6    A.   Yeah.
7    Q.   All right.
8    A.   A bunch of, you know, gossip around their
9         office.
10   Q.   All right.  Who else did you talk to at FMC
11        about this affidavit other than Duncan?
12   A.   Just -- the Giampa's didn't even speak to me.
13   Q.   All right.  So with respect to Exhibit 2,
14        this August 2006 affidavit, it was just Kathy
15        Duncan in terms of what's in this affidavit?
16   A.   Right.
17   Q.   Okay.  With respect to the Daisy Foster
18        issue, if you will, you talked to other
19        people at FMC?
20   A.   Right.
21   Q.   Who did you talk to in addition to Duncan
22        regarding Foster?
23   A.   What was her name?  Alicia.  I can't think of
24        her last name.  She's got a bunch of last
```

23

```
1              names.  She was a former employee there.
2    Q.   Former employee of FMC?
3    A.   Yes.  I'd have to look up her last name.
4    Q.   All right.  But she had worked at the
5         Chelmsford location?
6    A.   Yes.
7    Q.   All right.  And you came to know her in your
8         role as --
9    A.   Right.
10   Q.   -- their bookkeeper?  What did she tell you
11        about Daisy Foster?
12   A.   She worked for Daisy Foster.  The woman took
13        a heart attack.  I guess it was a heart
14        attack.
15   Q.   Daisy?
16   A.   Yeah.  I know the day she had surgery was my
17        son's birthday.  That's the only reason I
18        know it.  So that was July 14th.  She had a
19        heart attack the week before.  Did they carry
20        her out of there?  No, no, no.  It was at her
21        home.  It didn't happen on site.  She was
22        just telling me, you know, how that all went
23        down.  But she had known her I guess
24        personally, a little bit of a personal level,
```

24

```
1              just personal stuff about her.  That's all.
2    Q.   Did she talk to you about Daisy being let go?
3    A.   Oh, yeah.
4    Q.   All right.  What did she tell you about that?
5    A.   Was she still there when she got let go?  No,
6         she was gone.  But she would call at the
7         time.
8    Q.   But she talked to you about Daisy being let
9         go?
10   A.   Yeah.
11   Q.   All right.  Alicia did?
12   A.   Yes, she did.
13   Q.   And what did she tell you?
14   A.   Well, they replaced her really quickly.  I
15        don't know why.  It was just, you know, I
16        mean like they just replaced her immediately.
17        Well, actually not replaced her.  I mean the
18        workload got shifted around a little bit.
19   Q.   Who took over her bookkeeping
20        responsibilities?
21   A.   They had a girl, an accounts payable clerk
22        that did that.  What's her name?  I can't
23        think of it.  I can picture her, but I can't
24        think of her name.
```

25

1   Q.   When you would work with the people at FMC,
2        like you said, you primarily worked with
3        Duncan, but before her Daisy Foster?
4   A.   Right.
5   Q.   And Daisy Foster's role at FMC at that time,
6        your understanding was what?
7   A.   Well, I guess technically you could call her
8        controller.  She was like a controller.
9   Q.   All right.
10  A.   But they gave her a lot of other titles.
11  Q.   All right.
12  A.   I went up there to work for Joe Pimentel.  He
13       was the controller.
14  Q.   Joe Pimentel?
15  A.   Yeah.  His name is here somewhere.
16  Q.   I see it in paragraph three.
17  A.   Number three.  Mm-hmm.
18  Q.   All right.  Is that someone who would have
19       been employed at FMC when--
20  A.   Right.  When Ed was out of the picture --
21  Q.   Ed who?
22  A.   Oh, Ed Kennedy.  When he left, by whatever
23       means he left, Joe was hired as a controller.
24       He's a CPA himself.

26

1   Q.   All right.  And then you worked with him?
2   A.   I was sent up in June.  Yeah, June of 2004.
3   Q.   Okay.  Had you --
4   A.   He went up in March.
5   Q.   Joe did?
6   A.   Yes.
7   Q.   When you say, "He went up," he went up from
8        where?
9   A.   Well, they employed him.
10  Q.   Okay.  He was an employee of FMC?
11  A.   Yes.  He was an employee.
12  Q.   All right.  Just so I'm clear, in June of
13       '04, is that when you first worked on FMC
14       accounts?
15  A.   No.  That's when I went on the physical
16       property.
17  Q.   Okay.
18  A.   I used to work for them before that.
19  Q.   All right.  I want to talk about that early
20       time when it was with Daisy Foster, okay?
21       When you working --
22  A.   Daisy is after Joe Pimentel.
23  Q.   Daisy Foster's role as the controller or --
24  A.   Was after him.

27

1   Q.   All right.  Was she there -- before you
2        started to work with her as the controller or
3        bookkeeper, do you know if she was employed
4        at FMC?
5   A.   She was employed in May.
6   Q.   Of 2004?
7   A.   '04, right.
8   Q.   What was her role at that time?
9   A.   Well, they brought her on as human resources
10       and then she used to help him out with
11       accounts payable.  That's how she, you know,
12       eventually worked her way up the food chain.
13  Q.   Okay.  When she was working her way up the
14       food chain, at some point did Pimentel -- was
15       he no longer there?
16  A.   She backstabbed that son-of-a-gun like you
17       wouldn't believe.  Oh, dear God in heaven.
18  Q.   Can you tell me about that?
19  A.   Well, Joe was a very competent man, but he
20       was overwhelmed when he first got up there.
21       It's a big operation.  Maybe he didn't manage
22       himself quite that well at first either.
23       That didn't help.  So everything was in
24       chaos.  It's a very hectic place.  You know,

28

1        you get one day behind and you're
2        overwhelmed.  So she was going to help him do
3        accounts payable.  Then she would run to the
4        Giampa's and tell them everything Joe was
5        doing, evert bathroom run, if you want to put
6        it that way.
7   Q.   He was going to the bathroom a lot?
8   A.   No, he wasn't.  I'm just saying --
9   Q.   No.  I understand.
10  A.   -- she would mention everything.  Like I say,
11       Joe was just used to being the big boss.  He
12       was a controller of a big organization he
13       sold his stocks on.  He wasn't used to doing
14       the grunt work, you know.  He was a little
15       more the overseer type.  So he wasn't used to
16       getting down into the trenches.  So anyway,
17       she ran to the Giampa's and she basically got
18       him fired.
19  Q.   Was there something with respect to his
20       accounting? --
21  A.   Well, you know, the Giampa's just didn't like
22       him personally.  His abilities were right
23       there.  It was just a personal thing, you
24       know.

29

```
 1    Q.    Do you still see him from time-to-time, Mr.
 2          Pimentel?
 3    A.    No.
 4    Q.    Do you know where he landed after FMC?
 5    A.    Yeah.  The company he sold his stocks to, he
 6          started up another company.  He's doing very
 7          well.
 8    Q.    What's the name of that?
 9    A.    I don't know.  I don't know.  See, Joe
10          Pimentel comes up and gets his tax returns
11          done still.
12    Q.    At C&C?
13    A.    Yeah.
14    Q.    Oh, okay.  Now, Daisy Foster, when you had to
15          be interacting with her --
16    A.    A very difficult person.
17    Q.    All right.  What was it specifically --
18          forgive me, I'm not an accountant.  When you
19          say bookkeeping, I have a vague idea of what
20          you're talking about.  But what was it that
21          Daisy Foster did after Pimentel was gone that
22          she was your main contact?  What types of
23          things would you deal with?
24    A.    Well, I was brought up there to put the
```

30

```
 1          entries on the books.  You know, she did the
 2          deposits, everyday deposits, and wrote some
 3          checks.  And then eventually after doing the
 4          bookkeeping -- they never reconciled the bank
 5          account to save their lives and neither did
 6          she.  I had to go up there and make sure --
 7          reconcile the bank account, the bank to the
 8          book, because we just don't pick numbers out
 9          of a hat.  And --
10    Q.    They weren't doing that beforehand as far as
11          you could tell?
12    A.    No.  Joe never did a bank rec either.  They
13          were massive.  They took a day to do.  And
14          then when I had to sit with her -- she'd do
15          all her daily work and when she had to sit
16          with me to do the journal entries, I had to
17          show her how to bring on journal entries.
18          She'd wait until 5:00 at night.  I mean it
19          was just ridiculous.
20    Q.    So it wasn't the way you would prefer to
21          work?
22    A.    No.  I mean, I finally said -- they sent me
23          up there and they didn't have an adding
24          machine.  So, finally, it just -- the work
```

31

```
 1          wasn't getting done.  The Giampa's would ask
 2          for financial statements.  I'd say, "I can't
 3          get the entries on.  It's not available."  So
 4          they finally got me a computer to work on
 5          independently.  I didn't have to work with
 6          her.
 7    Q.    All right.  In her role there, whatever you
 8          want to call her, the controller or the
 9          bookkeeper, did she keep track of all
10          expenditures by all employees at FMC?
11    A.    Yeah.
12    Q.    All right.  And you in turn would see those
13          records?
14    A.    They were there.  I didn't go looking at
15          them.  I mean, but they're available.  I saw
16          some, yeah.
17    Q.    Did you have to reconcile those spreadsheets
18          against --
19    A.    Not the expenditures, no.
20    Q.    Okay.  What would you reconcile against the
21          bank?
22    A.    Oh, you know, the checks written, cleared,
23          not cleared, payroll, keeping track of
24          payroll, balance payroll, too.  That was a
```

32

```
 1          separate checking account.
 2    Q.    At the same bank, though, correct?
 3    A.    Yeah, same bank.
 4    Q.    All right.  Did Daisy Foster ever express to
 5          you any concern to you about how certain
 6          expenditures or reimbursements to employees
 7          were --
 8    A.    Oh, yeah, that was her big quest.  You know,
 9          who got what, who got reimbursed for what.
10          She use to carry on about that.
11    Q.    All right.  Tell me about that.
12    A.    Well, I guess people would submit their
13          invoices and the paid bills and stuff to be
14          reimbursed.  I guess she had her favorites
15          who would, you know, who qualified, if it was
16          a legitimate expense, to be reimbursed.  It
17          was mostly the doctors.
18    Q.    That she felt had legitimate expenses or
19          illegitimate?
20    A.    Well, some she would rule out.  She would
21          disqualify, you know, wouldn't reimburse
22          them.
23    Q.    On what basis, if you remember?
24    A.    Well, I don't know.  Half of it with her is
```

33

1       how many people kissed her ass. She had a
2       power problem, you know.
3  Q.  That's like a lot of offices.
4  A.  Oh, she was a want-to-be.
5  Q.  Did she ever bring any of these concerns to
6       you?
7  A.  Yeah. She would mouth off about -- as you're
8       walking through the office, you know, "What's
9       his name, thinks he's going get paid for
10      blah, blah, blah. I'm not going to allow
11      this." Well, I said, "Don't the Giampa's
12      give their final approval?"
13  Q.  What was your understanding with respect to
14      the approval?
15  A.  Yeah, I think it was. It was presented to
16      them. They yes or no stuff. Matter of fact,
17      stuff that she no'd, they over road her.
18  Q.  Was her concern with expenses not being
19      related to work?
20  A.  Yeah. Personal related, personally related.
21      Maybe, like a lunch, they might have taken
22      someone to a lunch, a perspective client or
23      something, you know. She felt maybe it might
24      have been a little personal.

34

1  Q.  All right. So it was de minimis -- I mean it
2      was minutia in your opinion?
3  A.  Yeah.
4  Q.  Did she ever discuss with you -- well, let's
5      start with that. Did she ever discuss with
6      you expenses relating to marketing or
7      promotions?
8  A.  No.
9  Q.  Did you ever --
10  A.  They had a lot of it, though.
11  Q.  They had a lot of what?
12  A.  Oh, marketing expense, promotional expense.
13  Q.  All right. And you saw those records?
14  A.  Yeah.
15  Q.  All right. Was that a routine entry in their
16      ledger?
17  A.  Yeah.
18  Q.  Okay. When I say the ledger, the general
19      ledger was maintained by Daisy?
20  A.  No. I maintained it.
21  Q.  You maintained it? Okay. What were
22      marketing expenses in --
23  A.  I said, you know, "What the hell are you
24      spending all this money on," I'd go to them,

35

1       you know.
2  Q.  When you say, "Go to them," you're talking
3      about --
4  A.  Daisy, yeah. Because they were high. They
5      were high. They would buy -- at China
6      Buffet, they would buy all the gift
7      certificates and there would be like -- to
8      have people come to the clinic, like a
9      thank you, I guess, a gift certificate or
10      something, stuff like that.
11  Q.  This is something that you noticed as --
12  A.  Yeah. Because it was a lot of money.
13  Q.  What kind of money are we talking about?
14  A.  Oh, I don't know. Marketing was
15      unbelievable. I don't know. I'll say
16      50,000.
17  Q.  Okay. What period of time would we be
18      talking about?
19  A.  Well, over a year, in a year's time, just a
20      year.
21  Q.  So 50,000 to the China Buffet?
22  A.  Yeah. I'll just say off the top of my head.
23  Q.  All right. But that's not -- In other
24      words, you're not sure it was 50,000, but you

36

1       --
2  A.  No.
3  Q.  -- wouldn't be surprised if it were?
4  A.  I knew it was a lot. It was high. It was
5      high.
6  Q.  All right. Enough that it caused you some
7      concern?
8  A.  Yeah. Well, I raised the question and she
9      answered it and I also brought it to Chapman
10      and Carlton's attention. Don't you think
11      this is -- I just found it strange that she
12      had to have that for chiropractic clinics,
13      but that's what they do.
14  Q.  When you brought it to Daisy's attention,
15      what was her explanation?
16  A.  Oh, that's what she said it was for and
17      everything.
18  Q.  And when you said, "Gee, it seems high," did
19      she give you further explanation?
20  A.  She didn't respond, no, not really.
21  Q.  And did you talk to anyone else at FMC about
22      your concern regarding the China Buffet?
23  A.  Well, years ago before that, I used to deal
24      with Tracey Kennedy. I talked to her about

**37**

```
 1          it and she said, "That's what they do.  They
 2          use promotions," gimmicks like that, I guess.
 3     Q.   What's that?
 4     A.   I just call it gimmicks to bring people in.
 5     Q.   Yes.  Okay.  All right.  So Tracey Kennedy
 6          was your contact before Joe and Daisy and
 7          then Duncan?
 8     A.   Right.
 9     Q.   And was Tracey Kennedy in charge of the
10          bookkeeping as far as you were concerned?
11     A.   All Tracey did was write checks and make
12          deposits.  That's all they do.
13     Q.   All right.  Keeping on the topic of
14          promotions, was there -- my understanding,
15          and you tell me if yours is similar, is that
16          there is clinics located throughout
17          Massachusetts that --
18     A.   Right.
19     Q.   -- FMC manages?
20     A.   And throughout the country.
21     Q.   Throughout the country.  And would there be
22          other similar expenditures for other --
23     A.   Not from them places, no.
24     Q.   Okay.  But when you say there was 50,000 to
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

**38**

```
 1          the China Buffet or thereabouts, was that for
 2          one clinic or was --
 3     A.   I guess they spread it around through this
 4          local area.
 5     Q.   Okay.  Or northern, North Shore?
 6     A.   Yeah.
 7     Q.   Were there similar expenditures for other
 8          restaurant chains?
 9     A.   No.
10     Q.   All right.  Can you remember, talking about
11          China Buffet, when you would say 50,000, was
12          that --
13     A.   That place is horrible.  That's the reason I
14          know that name.
15     Q.   Was there --
16     A.   I wouldn't eat there free.
17     Q.   That 50,000, they were bought one or two at a
18          time or was it just --
19     A.   Oh, big bulks, big bulks of them,
20          certificates.
21     Q.   Do you remember what the denominations were
22          when they would buy them?  Were they $50 gift
23          certificates or --
24     A.   No.  I think 25, like 25.
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

**39**

```
 1     Q.   All right.  But they would buy thousands of
 2          dollars worth at a time?
 3     A.   Oh, yeah.
 4     Q.   Were they paid by check?
 5     A.   Yes.  That's how I seen it.
 6     Q.   Yes.  You saw that multiple times?
 7     A.   Oh, yes.
 8     Q.   All right.  Was it just that one year or were
 9          there --
10     A.   Several years.
11     Q.   Several years?  Similar types of
12          expenditures?
13     A.   Mm-hmm.
14     Q.   Now, in connection with your function there,
15          did you see other similarly large marketing
16          expenses other than the Chine Buffet?
17     A.   Well, that one stood out.  Yeah, that's about
18          it.
19     Q.   There's been testimony --
20     A.   There was some other stuff, too.  I guess
21          printed materials they would pay for, send
22          out.  That was the only one really that stuck
23          out.
24     Q.   There's been some testimony about so-called
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

**40**

```
 1          Simon Mall gift certificates.  Do you know
 2          anything about that?
 3     A.   At Christmas time, yeah.  You're right.
 4          Yeah, they did.  That's right, Simon Malls,
 5          yeah.
 6     Q.   All right.  Was that a similarly large
 7          expenditure?
 8     A.   Yeah.  But that was again, I think again
 9          around the holidays, not year round.
10     Q.   Was it in that range of $50,000?
11     A.   No, no.  Not as much.
12     Q.   Okay.  And was that something that was being
13          paid by an FMC check --
14     A.   Yeah, with a check.
15     Q.   -- by either Tracey or Daisy or --
16     A.   Yeah.
17     Q.   Okay.  What about --
18     A.   Well, the Simon Mall stuff was cut out after
19          the Kennedy's were gone.  That didn't
20          continue.
21     Q.   Okay.  What was the difference between --
22     A.   But the other stuff continued.
23     Q.   -- the Kennedy versus non-Kennedy
24          involvement?
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

41

1   A.   Oh, I don't know.  That didn't happen
2        anymore.
3   Q.   Okay.  What about -- are you familiar with
4        Dana Rosencranz?
5   A.   No.
6   Q.   Or Dana Rosencranz & Associates, the law
7        firm?
8   A.   No.
9   Q.   Was there any money paid to, other than their
10       corporate counsel -
11  A.   Oh, they loved to pay every lawyer that came
12       down the highway.
13  Q.   Okay.
14  A.   Their legal fees was astronomical.
15  Q.   Okay.  Can you tell me -- when you say, "They
16       paid every lawyer that came down the
17       highway," --
18  A.   I asked them, "What are you paying all these
19       lawyers for?"  Supposedly, when they started
20       up a clinic, opened up a clinic, they would
21       hire attorneys.  Daisy had a file, dial a
22       lawyer.  That's how many lawyers they called.
23  Q.   What was it called?
24  A.   It's in the reference, dial a lawyer, so you

42

1        can get a lawyer referred to you.  I says,
2        "That's unbelievable."
3   Q.   Now, when --
4   A.   That's what she had on her Rolodex, dial a
5        lawyer.  I seen it.  Amazing.
6   Q.   Yes.  Was that something in their computer
7        system or on a Rolodex?
8   A.   On the Rolodex.
9   Q.   All right.  What was your understanding of
10       that?
11  A.   I asked her, "Why do you need so many
12       lawyers?  Can't you stay with one?"  Well,
13       when they were working out of state, I guess
14       you had to get local lawyers.  It was 11
15       states, 56 clinics.  I got it memorized in my
16       head.  Well, that I can understand, you know.
17       But the rest of it --
18  Q.   Okay.  What I'm trying to appreciate is, when
19       you say, "They used a lot of lawyers or they
20       paid a lot of lawyers," what was your
21       understanding about these lawyers?  Were they
22       representing FMC or --
23  A.   Well, yeah, I guess so, supposedly.
24  Q.   All right.

43

1   A.   I think we come to find out some of it was
2        for personal too in regards to -- what's that
3        other lawyer's name -- Jim Kennedy.
4   Q.   Jim Kennedy was using money to pay his
5        personal lawyer?
6   A.   Mm-hmm.
7   Q.   That's yes, right?
8   A.   Oh, yes.
9   Q.   And was that Roland Milliard?
10  A.   Yes.  He's a big fat guy from New Hampshire.
11  Q.   Right.
12          MR. KING:  That's him, right?
13          THE WITNESS:  He's big.  You'll know him
14       if it's him.
15  Q.   Was there -- are there any other lawyers, the
16       identities, you can recall?
17  A.   No.  It was just him.  I remember his name.
18       There's just so many of them, I don't
19       remember.
20  Q.   All right.
21  A.   I dealt with a Mike something, Ganlin.  But
22       that was business.  I had to deal with him a
23       lot.
24  Q.   Were there -- would you see on the ledger

44

1        that you kept all checks made out to cash,
2        for instance?  If Future Management --
3   A.   Well, very few cash, very few.
4   Q.   Did they use a petty cash account?
5   A.   Well, they tried to, yeah.  The backup was
6        there for the few things there were cash.
7        Very few because that's frowned on.  They
8        don't -- not to do cash.
9   Q.   It's frowned on by accountants?
10  A.   Yeah, by accountants.  That's just a bad
11       procedure.
12  Q.   Okay.  Were there cash payments made to
13       lawyers?
14  A.   No.  I think it was checks.
15  Q.   Ever hear of Lizette Sierra?  Do you know
16       her?
17  A.   Lizette Sierra, no.  I can't say I do.
18       Robin's last name is Von Pebbles or something
19       like that.  Oh, it's driving me crazy what
20       her name is.
21  Q.   You mean Robin?
22  A.   Yeah.
23  Q.   Yes, well --
24  A.   It's Von and I can't get the last name.

45

```
1    Q.   Let's just look at this affidavit we marked
2         as Exhibit 2.  That one there, the August
3         2006.  Just if you would, read it, not into
4         the record, just read it and then I want to
5         ask you a question about it.
6    A.   Start at the top?
7    Q.   Yes.
8    A.   I, Annee L'Heureux --
9    Q.   You don't need to read it into the record,
10        just read it to yourself.
11   A.   Oh.
12   Q.   I just want to make sure you're familiar with
13        it as we sit here today.
14   A.   Oh, yeah.  That was what they did.  Yeah,
15        that's it.
16   Q.   Okay.  So you've had a chance to read this
17        again, this document that --
18   A.   Refreshed my memory.
19   Q.   Sure.  That you executed back in August of
20        '06.  Is there anything on that document that
21        is not true?
22   A.   Oh, no.
23   Q.   Okay.  It's accurate?
24   A.   Absolutely.
```

46

```
1    Q.   All right.  Did you execute it voluntarily?
2    A.   No.  I went up there under protest.  Quite
3         frankly, I used to do all the accounting work
4         for Future Management and then when they had
5         their fallout with Ed and Tracey, for a lack
6         of a better word, I was let go and they hired
7         Joe, you know, to do all that.  He couldn't
8         do it.  So they sent me up there because he
9         hadn't balanced the bank statement in three
10        months.  They sent me up there and I was a
11        little reluctant to go because I just -- I
12        said, "Well, you released me of it.  So now
13        what are you telling me?  You hired someone
14        for triple the money and tell me I got to go
15        up and help him."  You know, you would feel
16        resentful, too.  You know, just treat you
17        like a little shlep and then bring in all
18        these big fancy high-priced guns and they
19        can't do it.  Then expect you to go up there
20        and do the mop up work.
21   Q.   Yes.  So you were --
22   A.   So I let them know.
23   Q.   -- personally angry about it?
24   A.   Absolutely.  It was no secret.
```

47

```
1    Q.   All right.  Sort of like you let me know
2         about coming here today?
3    A.   Right.
4    Q.   All right.  Now, --
5    A.   I'm very bashful that way.
6    Q.   All right.  In terms of the accuracy of
7         what's in here that, you know, for instance
8         it says, "Among the services I've provided,"
9         and we've spoken about them briefly here this
10        morning reconciling the company bank accounts
11        and those other bullets on Exhibit 2, that's
12        all accurate?  You did that?  You had access
13        to this information.
14   A.   Yeah, I did.  You're looking at her.  Yeah.
15        I'm the only one who did them.
16   Q.   All right.  And you mentioned, and I want to
17        get back to it later, but you mentioned Ed
18        Kennedy and was it Tracey Kennedy --
19   A.   Yeah.
20   Q.   You worked at FMC or in connection with their
21        accounting during the time when those two
22        people were --
23   A.   Right.  When I first --
24   Q.   -- more involved?
```

48

```
1    A.   After Robin left, I was assigned it and
2         that's who I dealt with, was Ed and Tracey.
3    Q.   All right.  And before --
4    A.   To begin with.
5    Q.   All right.  And you have a recollection of
6         working with them?
7    A.   Oh, yeah.  One never forgets.
8    Q.   All right.  Let me start with a couple of
9         other people I don't know if you have any
10        knowledge about, but I want to ask you.
11        Cellinet Morton?
12   A.   Morton?  That sounds -- that's a lawyer,
13        isn't it?  I think it is.
14   Q.   I don't -- no, I think it's a woman.  But
15        you don't have a good memory of her?
16   A.   No.
17   Q.   Andy --
18             MR. KING: How do you pronounce this
19        name?
20             MR. TILDEN: I think it's Zugistabar.
21   (BY MR. KING)
22   Q.   Zugistabar?  Andrew Zugistabar, do you know
23        that person?
24   A.   I wouldn't have forgot that, no.
```

49

1    Q.    How about Mr. Salerno?

2    A.    John Salerno?

3    Q.    Yes.

4    A.    A fast talking salesman.

5    Q.    Was he an employee of --

6    A.    He was an employee.

7    Q.    -- FMC or was he a 1099?

8    A.    No.  He was on payroll.

9    Q.    All right.  Did you meet him while working in

10         connection with this account?

11   A.    Did I meet John once while I was up there?  I

12         think I might have one time.  I talked to him

13         a million times.  John was their front guy.

14         They send him in.  They'd go into states and

15         start operating before they had filed for any

16         federal numbers.  They'd go in ass backwards.

17         They start operating, shooting first before

18         they get everything.  Then we had to clean up

19         and chase them for the paperwork and articles

20         of organization.  They never did any of that.

21         They did everything backwards.  Before they

22         established businesses, they just grabbed

23         that cash, think later.

24   Q.    So tell me about that.  Was he in charge of

Lee & Associates * Certified Court Reporters * (781) 848-9693

50

1          setting up new offices?

2    A.    Yes.  He was the front guy.

3    Q.    Who did he work with in that connection, any

4          other principals?

5    A.    All of them.

6    Q.    And the principals are who?

7    A.    The Giampa's and the Kennedy's, he dealt

8          with.

9    Q.    All right.  But he wasn't in the office when

10         you were there very often?

11   A.    No.  He was on the road.

12   Q.    Okay.

13   A.    Matter of fact, I asked him one day, "What is

14         your legitimate address?"  Because they used

15         something for his payroll that wasn't his

16         address.  I said, "What's your legitimate

17         home state?"  I think it was Connecticut.

18   Q.    Okay.  Was it your understanding that he was,

19         as you called him, the point person?

20   A.    Yes.

21   Q.    For out of state only?

22   A.    I think in-state, too.

23   Q.    So to the extent they were going to open in-

24         state offices, he would be that person as

Lee & Associates * Certified Court Reporters * (781) 848-9693

51

1          well?

2    A.    Yeah.  I know a lot out-of-state, usually,

3          definitely.

4    Q.    To the extent that you have knowledge about

5          it, what is it that he would -- was he a

6          chiropractor?

7    A.    No.

8    Q.    A lawyer?

9    A.    No.  I don't know what his credentials were.

10   Q.    Well, he was a salesman to a certain extent?

11   A.    Oh, to me, yeah.

12   Q.    Okay.  Why do you say it like that?

13   A.    Because he was your typical salesman, I'll

14         tell you.

15   Q.    Meaning what?

16   A.    He wanted to endear himself to you.

17   Q.    Was he trying to get something from you?

18   A.    I just think it's just his personality.

19   Q.    What is your understanding, if you have one,

20         about what he actually did to open clinics?

21   A.    They never told me.  I just assumed he went

22         out scouting for clinics that might have been

23         wanting to sell or doctors that had been

24         wanting to sell and they were just looking

Lee & Associates * Certified Court Reporters * (781) 848-9693

52

1          for them.

2    Q.    All right.  Was he still there when they took

3          the account from C&C?

4    A.    Oh, did John get fired just before -- he got

5          fired right near the end.  He finally got let

6          go.  I was amazed.

7    Q.    What was he let go -- on what basis if you

8          know?

9    A.    Oh, I don't know.  I just -- I don't know why

10         he got let go.  I was just surprised because

11         he did do a lot of work for them.  He got

12         things started right or wrong, but he got

13         them started.

14   Q.    And you say he was on the payroll.  Do you

15         remember what his compensation was?

16   A.    No.  John was -- He even had a car.  Well,

17         but they would have provided the car.  That's

18         nothing.  Well, they give a lot of doctors

19         cars.  Oh, the assets were unbelievable.

20   Q.    In addition to the three properties that you

21         mentioned earlier in Springfield and New

22         Bedford, they own the property in Chelmsford?

23   A.    No.  They rent that.

24   Q.    They rented that.  That was rented from whom;

Lee & Associates * Certified Court Reporters * (781) 848-9693

53

```
 1            do you know?
 2       A.   Whoever those people were.
 3       Q.   Oh, you don't know?
 4       A.   No.  I don't know their names.
 5       Q.   Did you do work for Kennedy Supply?
 6       A.   Oh, yeah.  That's a separate entity.
 7       Q.   Did you have to perform accounting functions?
 8       A.   Yeah.
 9       Q.   All right.
10       A.   That's separate.  That was the two brothers,
11            Jim and Ed.
12       Q.   All right.  How would you get paid for your
13            work on the Kennedy Supply accounting?
14       A.   Oh, they paid separately, their own accounts.
15       Q.   They had a separate relationship with Chapman
16            and/or C&C?
17       A.   Correct.
18       Q.   Okay.  So you're familiar with their
19            accounting as well?
20       A.   Right.  I did theirs as well.
21       Q.   Was there --
22       A.   I always used to say that Future Management
23            provided the service and R. T. Kennedy was
24            the store.  They sold the products.
```

54

```
 1       Q.   Were they one and the same in your mind?
 2       A.   No, no.  But I mean everyone use to think
 3            that they were kind of the same.  That's how
 4            I explained it, one's a store, one's a
 5            service.
 6       Q.   Okay.  Can you tell me based on your working
 7            at FMC, what the principals primary
 8            responsibilities were if they had any?
 9       A.   The Giampa's?
10       Q.   Yes.  Let's start with Joe Giampa.
11       A.   Yeah.  Well, they're principals and it seemed to
12            me their primary concern was to just keep
13            clients and you know, the health of the
14            clinics' clients and stuff like that.  They
15            didn't get into the administrative that much.
16       Q.   Were they in the office there at Chelmsford
17            when you were there?
18       A.   Yes.
19       Q.   Did they --
20       A.   Not Joe.  He was sick for a long time.  So he
21            was not --
22       Q.   Was he a practicing chiropractor at that
23            time?
24       A.   Oh, yeah.  I think they're both are licensed
```

55

```
 1            chiropractors.
 2       Q.   But while you were spending time at the FMC
 3            operation, Fred was in the office --
 4       A.   Quite a bit.
 5       Q.   -- more often?
 6       A.   Yeah.
 7       Q.   Did he maintain a separate office for himself
 8            there?
 9       A.   No.  He used the conference room.  He
10            actually never had an office.
11       Q.   And what was his involvement or primary
12            responsibility with respect to FMC?
13       A.   Well, he met a lot with the doctors.  They
14            used to have a lot of meetings.
15       Q.   At the Chelmsford location?
16       A.   Yes.  And like I said, I think it was more
17            with the doctors and the clinics.
18       Q.   Did you deal with him one-on-one that often?
19       A.   Not that much.  Just a few times.
20       Q.   What about Dr. Culliney?
21       A.   Brian Culliney?
22       Q.   Yes.
23       A.   I didn't deal with him direct.  I knew him.
24       Q.   Okay.  Was he somebody that you would meet
```

56

```
 1            from time-to-time at FMC headquarters?
 2       A.   No.
 3       Q.   Okay.  On the Kennedy Supply, there's -- you
 4            were involved, at least tangentially my
 5            understanding, in this lawsuit that Edward
 6            Kennedy filed against Future Management?
 7       A.   Right.  Well, I wasn't involved.  I knew of
 8            it.
 9       Q.   You weren't a party?
10       A.   No.
11       Q.   No.  That's one of the things first --
12       A.   Like that was the separation in '04, March of
13            '04.
14       Q.   Right.  Are you familiar with the lawsuit
15            that was filed between the Kennedy brothers?
16       A.   Yeah.  I heard talk of that.
17       Q.   One of the things that was talked about was
18            moneys being transferred from Kennedy Supply
19            to FMC?
20       A.   Well, I think Kennedy Supply funded a lot of
21            FMC.  Kennedy Supply wasn't always paid.
22       Q.   And you would know that in your role as their
23            bookkeeper?
24       A.   Right.  Because I saw the checks to Kennedy
```

57

```
 1        Supply.  But they would just be round
 2        figures, 5,000, 4,000, nothing specific.
 3   Q.   What specifically do you mean, though?
 4        Again, because I'm not an accountant --
 5   A.   Well, because I did the books for Kennedy
 6        Supply.  I saw that they were fronting up a
 7        lot of -- to start up clinics, all the
 8        supplies, equipment and stuff.
 9   Q.   Okay.  And you said --
10   A.   I don't know if that was the Kennedy's ways
11        of showing the Giampa's that this is what we
12        can bring to the table or what.  It seems
13        that way.
14   Q.   All right.  Let's just take a step back.  We
15        talked about the Giampa's role as best as you
16        could tell at FMC.  What was James Kennedy's
17        role at FMC?
18   A.   What did Jim do?  I don't know.  Jim traveled
19        a lot and I guess his -- I thought he was
20        overseeing the clinics a lot, too.  I don't
21        know if they had to split that up.  There was
22        56 clinics.  So I guess each person overseen
23        so many.
24   Q.   I don't want you to guess.  I mean did you
```

58

```
 1        see him at FMC a lot?
 2   A.   Yeah.  He would come up.  Yeah, he'd meet
 3        with the Giampa's.
 4   Q.   All right.  What do you know, if anything,
 5        specific about what his role at FMC was?
 6   A.   Managing the clinics.  Helping them manage
 7        the clinics.
 8   Q.   Okay.  Did he maintain an office there at
 9        FMC?
10   A.   No.  They used the conference room.
11   Q.   All of the principals used the conference
12        room?
13   A.   Yeah.
14   Q.   Did they have their own personal computers
15        there or --
16   A.   No.  They didn't use any computers.
17   Q.   All right.  Is it fair to say that when --
18        and then same question for Ed Kennedy.  What
19        was his role before he --
20   A.   Ed I guess was doing the administrative part.
21        You know, he hired his wife.  Getting the
22        receipts down to the bank and paying the
23        bills.  I don't know how much interaction he
24        had with each clinic.  Oh, yeah, yeah.  He
```

59

```
 1        went into clinics because they didn't like
 2        him.
 3   Q.   Who didn't like him?
 4   A.   Everybody at every clinic.
 5   Q.   Why?
 6   A.   Ed was very aggressive and arrogant.  Not
 7        with me, he wasn't.
 8   Q.   Why not?
 9   A.   Well, he tried a few times and I hung up on
10        him.  That's just Ed's personality.
11   Q.   Let's go to what you were talking about a
12        minute ago.  When you were privy to Kennedy
13        ledger and FMC ledger for a period of time,
14        several years, right?
15   A.   From '01, '02.  Yeah, something like that.
16   Q.   '01 until '05 or thereabouts?
17   A.   Right.
18   Q.   All right.  From time-to-time you would see
19        what, expenditures or orders that weren't
20        paid for?
21   A.   Right.  Kennedy had a big -- I guess Future
22        Management owed him a lot of money, big
23        accounts receivables, yeah, through them.
24        Maria King was their person.  Maria knows
```

60

```
 1        everything.
 2   Q.   Maria King was Kennedy's person?
 3   A.   Yeah.
 4   Q.   Is she still alive?
 5   A.   Oh, God, yeah.
 6   Q.   Is she still there?
 7   A.   No.
 8   Q.   Do you know where she is?
 9   A.   I don't know if she's in Chelmsford.  Yeah,
10        she lives in Chelmsford, I think.
11   Q.   All right.  Do you know where she works?
12   A.   She works for her dad.  Her dad's got a
13        nightclub somewhere.
14   Q.   Okay.  Did you interact with her?
15   A.   Oh, yeah.  She was my contact.  She knows
16        everything.
17   Q.   When you say everything like that --
18   A.   Personally, business.  She's unbelievable.
19   Q.   I'm just trying to get through -- because you
20        understand it.  You've got 40 years of
21        experience.  Were there accounting
22        shenanigans going on between Kennedy and FMC?
23             MR. TREGER:  Objection.
24   (BY MR. KING)
```

61

```
 1   Q.   If you know what the word shenanigans means?
 2   A.   No.  It was there, what they owed them.  But
 3        it's just, you know, you buy something from
 4        somebody, whether or not you pay them -- you
 5        know, it's their thing.  That's their
 6        accounts receivable.
 7   Q.   So was there an agreement to deliver goods --
 8   A.   I don't know what that agreement was between
 9        that bunch.  Like I say, my impression was
10        the Kennedy's were trying to show the
11        Giampa's I guess, bring something to the
12        table.
13   Q.   By doing what, though?  By providing --
14   A.   By providing -- setting up the clinics.  The
15        clinics, provide all the supplies for the
16        clinics and everything.  Whether or not
17        Future got around to paying it sooner or
18        later or if ever, later.
19   Q.   Okay.  And sometimes it wasn't paid?
20   A.   That's what I've been told.
21   Q.   Okay.  But did you see it as the bookkeeper?
22   A.   Well, you see, they filed everything on a
23        cash basis.  So we don't keep track of an
24        accounts receivable, only accounts payable
```

62

```
 1        when you file a cash basis.  They weren't an
 2        accrual method.
 3   Q.   Did you see -- with respect to this finite
 4        issue about delivering goods and no payment
 5        back, were there accounting records at
 6        Kennedy showing that payment was --
 7   A.   There must be.  Maria would know that.
 8   Q.   All right.  You wouldn't know?
 9   A.   No.  That was internal.
10   Q.   Okay.  From an accounting perspective, if you
11        know, what would be the point of showing
12        falsely documented that the bills had been
13        paid?
14             MR. TREGER: Objection.
15             THE WITNESS: I don't think they --
16             MR. KING: What's the objection?
17             MR. TREGER: Just to the form.  I mean
18        just I don't know the foundation.  I don't
19        think she's here as an expert.  It's a
20        hypothetical.  Maybe, you can make it a
21        little clearer.
22   (BY MR. KING)
23   Q.   You're not here as an expert today?
24   A.   No.  I don't know how they dealt internally
```

63

```
 1        with them.
 2   Q.   Maria King would know that?
 3   A.   Of course, I would say to Maria, "How come
 4        you get a payment for just $5,000?  What
 5        invoice is it against and blah, blah, blah."
 6        She had all that jazz there.  I brought it
 7        up.  I got answered and that was that.
 8        That's their internal control.  Because I
 9        just found it strange.  I don't know how many
10        things that might have been donated.  It
11        takes a lot of money to setup those clinics.
12   Q.   You're familiar you had said, at least
13        through the grapevine as it were, about the
14        Kennedy versus Kennedy lawsuit?
15   A.   Yeah.
16   Q.   Okay.  What's your understanding of that
17        lawsuit?
18   A.   How did that blow up!  Fred Giampa had to
19        renew his prenuptial agreement and he needed
20        financial statements.  Fred talked to me
21        directly about this.  And I asked Fred,
22        "Fred, every time the tax returns are done, I
23        prepare four sets of financial statements."
24        Ed would come into me and say to me, "Oh, no.
```

64

```
 1        They don't need them."
 2   Q.   "They" being?
 3   A.   Jim and the Giampa's.  Because they were the
 4        four directors.  So I met my responsibility.
 5        I presented it to him.  They trusted him to
 6        do all that.
 7             MR. KING: Off the record.
 8             (Whereupon, the parties go off the
 9        record.)
10             MR. KING: Back on the record.
11             THE WITNESS: So I says, "Fred, I never
12        understood why you didn't take your financial
13        statements."  He admitted it, which was
14        stupid.  I says, "I mean, I always, I want
15        you to know, to be perfectly clear, I always
16        prepared four of them.  One for all of you.
17        Why you did not take them?  That's your
18        responsibility."  I said to him saying, "I
19        gave them to Ed.  Then he'd come flying out
20        and say, 'Oh, no they don't need them,' which
21        I found peculiar."
22             MR. KING: Just off the record for a
23        second.
24             (Whereupon, the parties go off the
```

65

```
 1        record.)
 2              MR. KING: Back on the record.
 3     (BY MR. KING)
 4     Q.    We were talking briefly about this Edward
 5           Kennedy versus James Kennedy lawsuit before
 6           we took the break.  This suit was filed in
 7           2005.  I want to just ask you some questions
 8           about it and ask you if you know anything
 9           about the facts that are alleged in this
10           lawsuit, all right?
11     A.    (No verbal response.)
12     Q.    Ed alleged that James Kennedy and two other
13           shareholders of Future Management froze him
14           out of Future Management.
15     A.    Right.  They changed the board of directors.
16           They had it legally changed.  He was removed.
17     Q.    Ed Kennedy was removed?
18     A.    Yes, he was.
19     Q.    Okay.  Do you know why?
20     A.    To make a long story short, he refused to
21           give financial statements to the other
22           directors.  They never asked.
23     Q.    In this allegation it says at that time,
24           which I believe was 2004; is that consistent?
```

66

```
 1     A.    March of '04.
 2     Q.    All right.  The net profits of FMC were
 3           approximately 3.7 million dollars?
 4     A.    Oh, net, yeah.  There gross sales were 19
 5           million.
 6     Q.    Okay.  Ed Kennedy alleges that he found
 7           documents at Kennedy Supply's office that
 8           revealed that James Kennedy was using Kennedy
 9           Supply to enable Future Management to
10           fraudulently borrow hundreds of thousands of
11           dollars from various lending entities under
12           the guise that Future Management was
13           purchasing chiropractic equipment from
14           Kennedy Supply.
15     A.    Well, they were purchasing chiropractic
16           equipment.  Methods of payment, you know, and
17           terms of payment were questionable.
18     Q.    Can you expand on that?
19     A.    Like I say, I don't know if they ever got all
20           their money for the equipment.  It was shown,
21           the sales and whatnot but the payment,
22           whether or not they got full payment was the
23           issue.
24     Q.    And do you have an understanding why showing
```

67

```
 1           the payment would be important or necessary
 2           to borrow the money?
 3     A.    Well, they had to make it -- to show that
 4           they were still, you know, paying on account.
 5           That there wasn't a bad debt.
 6     Q.    Did you see evidence of that in your role as
 7           bookkeeper for Kennedy or Future Management?
 8              MR. TREGER: Objection.  Evidence of
 9           what?
10              MR. KING: Evidence of what she just
11           described.
12              THE WITNESS: They were making payments.
13           But, you know, I mean if you're paying 5,000
14           against 100,000 -- I don't know, but whatever
15           the debt was.  I don't know the debt.  That
16           was Maria King internally.
17     (BY MR. KING)
18     Q.    All right.  So you don't know what the scope
19           of the debt was?
20     A.    Exactly.
21     Q.    Do you know if -- did you make any
22           determination that there were, as you call it
23           bad debt that was a write-off rather than --
24     A.    No.  They didn't write off anything.
```

68

```
 1     Q.    All right.  Would that be a determination
 2           that you would make or Maria King?
 3     A.    No.  We know from filing the tax returns.
 4           There was no bad debt write-offs.
 5     Q.    And Maria King would be the person with the
 6           most knowledge regarding that?
 7     A.    Oh, absolutely.  Yeah.  She did their
 8           internal receivables and payables.
 9     Q.    Ed Kennedy alleges in this 2005 lawsuit that
10           James Kennedy admitted in September '04 that
11           he had transferred money from Kennedy Supply
12           to Future Management to pay for Future
13           Management's payment for referrals to its
14           chiropractic clinics.
15     A.    There was no check to Future from RTK.
16     Q.    RTK being the Kennedy supply?
17     A.    Yeah.
18     Q.    You didn't see any evidence in the form of a
19           check of that type of transfer?
20     A.    No.  Because I would have had to question it,
21           "What is this for?"
22     Q.    What's your understanding of the status of
23           the Kennedy Supply as an entity?  Is it still
24           a going concern or --
```

69

| | | |
|---|---|---|
| 1 | A. | Supposedly, they filed the '05 return and |
| 2 | | then, you know, we were released from that as |
| 3 | | well. They sold stock. My boss can explain |
| 4 | | that better. |
| 5 | Q. | Mr. Carlton? |
| 6 | A. | Yes. And it was just not executed correctly |
| 7 | | according to him. |
| 8 | Q. | What wasn't? |
| 9 | A. | This stock exchange because it's really not a |
| 10 | | sale. I'm a little vague about that. He |
| 11 | | dealt with that. |
| 12 | Q. | The exchange of stock between Kennedy and |
| 13 | | FMC? |
| 14 | A. | And they -- no, no, no. No, FMC is not |
| 15 | | involved with Kennedy. Kennedy sold stock. |
| 16 | | I think the Giampa's father, Tom Giampa, he |
| 17 | | had a supply business as well. They either |
| 18 | | merged or he came on board to buy it. They |
| 19 | | said to -- my boss said that technically he |
| 20 | | didn't buy it. He just sold sock or |
| 21 | | something and it wasn't executed correctly. |
| 22 | Q. | What's the name of that entity that Tom -- |
| 23 | A. | I think it's just Giampa Supply. I think it |
| 24 | | was. |

70

| | | |
|---|---|---|
| 1 | Q. | Giampa Supply? |
| 2 | A. | Yeah. |
| 3 | Q. | With a G? Just like the -- |
| 4 | A. | Just like the sons, the sons' name. And |
| 5 | | that's the last of my recollection where that |
| 6 | | went. |
| 7 | Q. | Tracey Kennedy was deposed partially in this |
| 8 | | case about a -- |
| 9 | A. | Against the brothers? |
| 10 | Q. | No, no. In the case were here for today. |
| 11 | A. | For Future, yeah. |
| 12 | Q. | She testified about a myriad of things. But |
| 13 | | one of things she testified about was paying |
| 14 | | the Kennedy Supply invoices. |
| 15 | A. | Right. Like I said to you, Maria said it was |
| 16 | | against products. |
| 17 | Q. | Right. She mentioned that she would get an |
| 18 | | invoice or a call from Maria King. They were |
| 19 | | in the same building essentially. |
| 20 | A. | Oh, they were at one time. Yeah, that's |
| 21 | | right. |
| 22 | Q. | And that she would pay on the invoice |
| 23 | | sometimes -- |
| 24 | A. | A flat amount. |

71

| | | |
|---|---|---|
| 1 | Q. | Right. But is it your understanding that |
| 2 | | there was ever any sort of receiving, like a |
| 3 | | shipping-receiving log? |
| 4 | A. | Maria has all that. Yeah, the invoices I had |
| 5 | | seen a few, yeah, not on Futures. Well, |
| 6 | | maybe on Futures. Yes, I did. There were |
| 7 | | paid bills. They had some invoices up there. |
| 8 | Q. | But on those invoices, was there ever any |
| 9 | | reconciliation between what the supplies were |
| 10 | | actually received and -- |
| 11 | A. | Well, it had a description of the products, |
| 12 | | yeah. |
| 13 | Q. | But were the products received at FMC's |
| 14 | | headquarters or at the individual clinics? |
| 15 | A. | Oh, no. They would show where they would go. |
| 16 | | They would show the delivery. |
| 17 | Q. | Okay. I'm sorry. Was there an accounting |
| 18 | | back to FMC headquarters? Does it say, We |
| 19 | | actually received eight cervical collars and |
| 20 | | -- |
| 21 | A. | I don't know how they justified it when they |
| 22 | | paid the bill. |
| 23 | Q. | Did you see any protocols in place to -- |
| 24 | A. | I never tested it, no. I just came across |

72

| | | |
|---|---|---|
| 1 | | them in the files. |
| 2 | Q. | All right. You don't know one way or the |
| 3 | | other whether the actual goods received were |
| 4 | | ever verified against the invoices? |
| 5 | A. | Exactly. There must be signatures on the |
| 6 | | deliveries. |
| 7 | Q. | All right. |
| 8 | A. | They were delivered. That's a fact. |
| 9 | Q. | Well, when you say, "They," you mean the |
| 10 | | supplies? |
| 11 | A. | Yeah, the materials. |
| 12 | Q. | To the individual clinics? |
| 13 | A. | Right. |
| 14 | Q. | And how do you know that it's a fact that -- |
| 15 | A. | I seen some of the invoices and I seen the |
| 16 | | delivery slips and whatnot. They didn't, you |
| 17 | | know, fall off a truck or something. |
| 18 | Q. | Just to clarify something, I know that in |
| 19 | | your affidavit that we marked as Exhibit 2, |
| 20 | | you talk about resuming sort of your in-house |
| 21 | | time at FMC in 2004. |
| 22 | A. | Right. |
| 23 | Q. | But just so I get your whole history with |
| 24 | | FMC, you were actually in-house or partially |

73

```
 1          in-house there beginning when?
 2    A.    I started June of '04 at the physical
 3          location.
 4    Q.    Right.  When did you start to perform
 5          accounting or bookkeeping functions for FMC,
 6          though?  Was it in '01?
 7    A.    Let me see.  2001 was the 9/11, right?
 8          Because I'm trying to determine when Robin
 9          left.  She went to Paris that same year and
10          she left -- 2001.
11    Q.    Okay.
12    A.    October of 2001 you could technically say I
13          did Future Management.
14    Q.    All right.  Pretty much straight through
15          until '05?
16    A.    Until '05.  Then Karen Sullo had to finish
17          '05.
18    Q.    Were you primarily involved, in contact with
19          Ed Kennedy and Tracey Kennedy from '01 until
20          they were --
21    A.    04, yeah.
22    Q.    Oh, March of '04.  Okay.  And --
23          MR. KING: We'll mark this as 3.
24          (Whereupon, Exhibit 3, February 2005
```

74

```
 1          Affidavit of Annee L'Heureux, is marked for
 2          identification.)
 3    (BY MR. KING)
 4    Q.    I've circulated another affidavit here.  You
 5          have it right there in front of you.  And
 6          this we marked as Exhibit 3.  If you turn to
 7          Page 2 of that, that's your signature at the
 8          bottom there?
 9    A.    I don't even remember this thing.
10    Q.    This was signed and dated in February of '05?
11    A.    Oh, this was regarding the P&L, yeah.
12    Q.    This was in regard to the what?
13    A.    Profit and loss statements that he wouldn't
14          give to Fred.
15    Q.    Okay.  And this was, as it says on the top of
16          Exhibit 3, this was an affidavit that was
17          drafted and executed in connection with this
18          Ed Kennedy lawsuit against Future Management
19          Corp?
20    A.    Okay.  I don't --
21    Q.    Did you draft this affidavit?
22    A.    No.  I don't even remember signing this, but
23          that is my signature.  I didn't draft it.
24    Q.    Okay.  Just take a second and just read
```

75

```
 1          through it if you will from Page 1 to Page 2
 2          so I can ask you some questions about it.
 3    A.    Oh, yeah.  My favorite was office expense.
 4          Okay.
 5    Q.    All right.  Who drafted this affidavit?
 6    A.    I don't remember.
 7    Q.    All right.
 8    A.    It must have been -- it looks like a lot of
 9          Bill Chapman input.
10    Q.    All right.  He's still involved at C&C at
11          that time --
12    A.    Yes.
13    Q.    -- in 2005?
14    A.    And '04, yeah.
15    Q.    Do you know who requested that you execute
16          this affidavit?
17    A.    I don't remember.
18    Q.    All right.  Did you sign the affidavit after
19          having reviewed it?
20    A.    I'm reading it all now.  It's familiar.  It
21          all comes back to me.  I must have.
22    Q.    All right.  Is there anything in this
23          affidavit that you believe is inaccurate or
24          you disagree with?
```

76

```
 1    A.    No.
 2    Q.    All right.  I think when I spoke to you
 3          previously, you had mentioned -- I had
 4          referred to some of the information in this
 5          affidavit and you suggested that you were
 6          told you had to sign the affidavit?
 7    A.    Yeah.
 8    Q.    By whom?
 9    A.    I was never told, but, you know, it was
10          pretty much out there.  I was still working
11          for them.  If, you know, you want to get
12          paid, you got to cooperate.
13    Q.    Who told you that?
14    A.    Well, no one really came out and said, you
15          know, you got the general drift.  Well, Bill
16          Chapman might have said, you know, "If you
17          want to get paid, you got to cooperate, blah,
18          blah, blah."  Maybe, Bill said it.
19    Q.    Okay.  Let's just go through it briefly, all
20          right?  In Paragraph 4, you said one of your
21          job functions was you needed to gather
22          information, accounting information from Ed
23          and Tracey Kennedy?
24    A.    Right.
```

77

1  Q.  All right. And You say, "Often there was
2      inadequate paperwork and I was met with rude
3      and defiant answers." What do you --
4  A.  They were very difficult.
5  Q.  Tracey and Ed?
6  A.  Mm-hmm.
7  Q.  And what was the inadequate -- what was the
8      paperwork that you deemed inadequate?
9  A.  Well, I'll question a check that she wrote to
10     somebody. "I don't know," was her standard
11     answer. "I'll have to ask Ed. You'll have
12     to ask Ed." "Well, Tracey, why don't you ask
13     Ed since you'll see him this evening and I
14     won't," I said, "Because he doesn't answer."
15     Eventually -- then all of a sudden Ed will
16     get a big burst of energy and give me
17     everything after begging for all this stuff
18     for a month or so. For instance, cars, they
19     buy cars like candy. He'd never get me the
20     paperwork. We had to setup the assets. I
21     didn't even know how much the car cost.
22 Q.  They being --
23 A.  Ed. He says, "It's in the glove compartment
24     of my car." I says, "Well, my eyes don't

78

1      reach that far." I says, "You've got to give
2      me the paperwork." He was so difficult.
3      Eventually, he had to do it if he had to get
4      a tax return. I didn't even know the cost of
5      the vehicles. He had the paperwork.
6  Q.  What was Ed's --
7  A.  Do you know how I found out they got a new
8      car? They'd started making car payments. I
9      says, "What's this for?"
10 Q.  What was your understanding of Ed's position
11     at that time that you're describing in this?
12 A.  Ed was trying to be all, do all, and he just
13     up and burned and crashed. He just tried to
14     do too much.
15 Q.  Was he the president of the FMC Corporation?
16 A.  No, Joe Giampa, of Future Management.
17 Q.  Future Management.
18 A.  He was president of Kennedy.
19 Q.  But he essentially was, as far as you're
20     concerned, in charge of the administrative --
21 A.  Yes.
22 Q.  And that would include billing?
23 A.  Oh, no. Billing, that's all through the
24     insurance companies.

79

1  Q.  Who was in charge of the medical billing that
2      went to the insurance companies?
3  A.  Well, Kathy Duncan was the head of that, the
4      receivables.
5  Q.  No. I'm talking back at the time we're
6      talking about 2001 until --
7  A.  Oh, I don't know anything about their billing
8      practices.
9  Q.  Okay.
10 A.  That was very in-house.
11 Q.  During the time 2001 to March '04, who was in
12     charge of the accounts payable?
13 A.  After Ed left, they had a gal there.
14 Q.  During the time that Ed was there?
15 A.  Oh, Tracey paid all the -- wrote all the
16     checks, accounts payable.
17 Q.  Who was that?
18 A.  Tracey Kennedy.
19 Q.  All right. Tracey Kennedy! If she didn't
20     know an answer, the person that she pointed
21     you to was Ed Kennedy; is that right?
22 A.  Yeah. They'd just ping pong me back and
23     forth, hoping I'd go away.
24 Q.  Continuing in Paragraph 4, you say, "This

80

1      inadequate paperwork, etcetera, this resulted
2      in incomplete and inaccurate P&L statements."
3  A.  Right. He wants some P&L's for banks and
4      things and I wouldn't have the cars on there
5      for instance. The assets wouldn't be on
6      there. I showed the expense of payment, but
7      you know, it didn't have the vehicle there.
8      It didn't have the asset on the books.
9  Q.  At that time, --
10 A.  They were half assed.
11 Q.  At that time that you were doing this, you
12     had been working as a bookkeeper for 35-plus
13     years, right?
14 A.  Yes.
15 Q.  And did you service other corporate accounts
16     or --
17 A.  Yeah.
18 Q.  Okay. Was this the typical closed
19     corporation accounting procedures that you
20     would find with your other clients?
21     MR. TREGER: Objection. Foundation.
22     THE WITNESS: Well, yeah, the other ones
23     too. They all dragged their feet getting
24     paperwork over to you. That wasn't uncommon.

81

```
1   (BY MR. KING)
2   Q.   Was there anything uncommon about what was
3        your experience with Tracey and Ed?
4             MR. TREGER: Objection.  Foundation.
5             THE WITNESS: I mean Tracey tried to be
6        helpful.  You know, she would get exasperated
7        herself, quite frankly.  I said, "Well, you
8        got to do what you got to do.  You got to
9        tell Ed this what we need and that's that."
10       It was just the hard way of going about doing
11       something.  It wasn't, you know -- I don't
12       know if he was too busy.  Like I said, I
13       think he tried to do too much.
14  (BY MR. KING)
15  Q.   Now, you say Tracey would get exasperated at
16       whom?
17  A.   She'd be tired, too.  She says, "I can't get
18       it from him."  I don't know when she would
19       ask him, how he would react or what.
20  Q.   Further on in here, when you mentioned
21       earlier, that Ed wouldn't deliver the
22       financial statements to the other partners or
23       shareholders.
24  A.   Oh, no.  That was --
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

82

```
1   Q.   And he was the person that was --
2   A.   They entrusted him to do the administrative
3        work.
4   Q.   He wasn't providing that information or
5        sharing that information with his partners?
6   A.   Yeah.
7   Q.   And similarly with respect to expenditures,
8        company expenditures, at least during this
9        period 2001 to '04, he was primarily in
10       control of that?
11  A.   Yeah.  Absolute control.
12  Q.   In Paragraph 5 here, you talk about "I
13       suspected the other directors, Jim Kennedy,
14       Fred Giampa and Joe Giampa, stockholders did
15       not know what was going on and that they also
16       were kept in the dark."
17  A.   I don't think they ever got financial
18       statements.  If you were part of a 19 million
19       dollar operation, wouldn't you want to look
20       at a piece of paper once in awhile?
21  Q.   You go on to say, "This suspicion was
22       confirmed when I was told by Tracey Kennedy
23       not to give payroll information to either
24       Fred or Joe Giampa."  Now, do --
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

83

```
1   A.   To get back to where I started, Fred needed
2        to update -- he needed financial statements
3        to update his prenuptial agreement.  That's
4        what brought all this to a head.  Then I
5        guess they were questioning payroll, you
6        know, the volume of payroll.  They wanted to
7        know how much Tracey was making.  Away they
8        went.  That's what started it, opened up the
9        flood gates.
10  Q.   Was there an issue about her pay?
11  A.   Yeah.
12  Q.   What was it?
13  A.   Overpaid.
14  Q.   Do you remember what she was being paid at
15       that time?
16  A.   I think $52,000.  I had the scale.  I gave
17       them that.  No, it went up to almost 78,000.
18       One of them remarked saying, "My doctors
19       don't even get that."
20  Q.   Actually, when she testified here a week and
21       a half ago, she testified that her last year
22       there, she made in excess of $260,000.
23  A.   Oh, yeah.  Maybe, it was that much, yeah.
24       Well, they got it.  They got the paperwork so
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

84

```
1        they know what it is.  Yeah, it was high.
2        And company cars, which a clerk of the
3        company doesn't need company cars.
4   Q.   Primarily she made deposits and wrote checks?
5   A.   That's it.
6   Q.   Okay.
7   A.   I don't know what other decisions she might
8        have made for the clinics.
9   Q.   Paragraph 6 on Page 2 referring to your
10       concern about sharing information with the
11       other shareholders, you say, "When I would
12       speak to Ed Kennedy or Bill Chapman spoke to
13       Ed, he," meaning Ed, "would say, 'they don't
14       need any of this information --
15  A.   Yeah, he said that.
16  Q.   -- with regard to P&L or W2 information."  Is
17       it your understanding that at that time 2001
18       to 2004, Ed was --
19  A.   I don't know why Ed objected so much to that.
20       There was no big deal to give them the P&L
21       unless they would have saw big credit card
22       expenditures, expenses.  Maybe that's the
23       only thing I could think, he might have been
24       -- wanted to avoid them to see it.
```

Lee & Associates * Certified Court Reporters * (781) 848-9693

85

```
1    Q.   What big credit card expenditures?
2    A.   Well, they pay a credit card.  I'd says,
3         "What is this for?  I need the credit card
4         statement."  Never got a statement.  You
5         know, if you write a check out to a credit
6         card company for 3, 4,000 for what, you know?
7         Mr. Chapman had to create the expense account
8         credit card expenditures.
9    Q.   How would he reconcile those?
10   A.   Well, we never did.  I just -- whatever they
11        spent, that was the amount in the expense
12        account, that credit card.  That's all we'd,
13        -- the only way we would keep track.  Mr.
14        Chapman used to say to come, "You'd better
15        hang on to all your credit card statements.
16        If you ever get audited, you're going to have
17        to produce them."  They didn't want to
18        produce them to us, they would have to
19        produce them to the IRS.  I think that might
20        have been one bone of contention there
21        because everything else was fine.  Like Fred
22        Giampa said, "When the money was rolling and
23        everyone was flying high, everyone was fine."
24   Q.   Well, when you say the money was rolling, the
```

86

```
1         money was rolling in 2004, correct?
2    A.   Yeah, oh, yeah.  19 million was there biggest
3         revenue year.
4    Q.   Next paragraph 7, "Whenever I would question
5         receipts or why checks were written, the way
6         they were, or to whom, or where they were
7         going, I would always be met with confusing
8         thought processes from either Ed Kennedy or
9         Tracey Kennedy."
10   A.   Never a straight answer.
11   Q.   These two were the persons in absolute
12        control of the expenditures of future
13        Management Corporation, correct?
14   A.   Fred Giampa had trust in Tracey.  She was a
15        former employee of his.  She, I guess,
16        managed a clinic at one time or another and
17        that's how she came into the picture.  That
18        is as much as I know about that.
19   Q.   And you go on and you say, "The reasons they
20        gave to my boss and me were nonsensical and
21        often lacked any business continuity or
22        business reason.  I felt Tracey had no
23        business skills."
24   A.   Oh, yes.  Some silly answers whatever they
```

87

```
1         were.  I don't recall now.
2    Q.   Well, I just want to get clear from you as a
3         40 year bookkeeper with experience in not
4         just this company but other small
5         corporations, correct?
6    A.   Mm-hmm.
7    Q.   Closed Corporations?
8    A.   Right.
9    Q.   And you said a couple of times here, "Well,
10        you know, Ed tried to do too much or Tracey
11        you know, was tired and whatnot."  Is it your
12        understanding and conclusion that she lacked
13        business skills?
14   A.   Yeah.
15             MR. TREGER:  Object.  Foundation.  You
16        can answer.
17             THE WITNESS:  That's okay.  I tried to
18        explain to Tracey.  She loved -- her favorite
19        one was office expense.  I tried to explain
20        to her, that's the biggest red flag for the
21        IRS.  They see a big office expense.  I mean
22        you're just putting yourself up on the
23        sacrificial alter, looking for it.  I was
24        trying to say to her, "Office expense for
```

88

```
1         what?"  She didn't -- some of these doctors
2         they pay, there was some subcontractors.  I'd
3         say, "Well, that's not an office expense.  If
4         you're paying a subcontractor, you have to
5         put it under separate subcontractors and
6         you've got to give me a 1099.  So I mean she
7         didn't even know that.
8    (BY MR. KING)
9    Q.   Were the problems with expense checks being
10        written -- earlier you said that you
11        suspected that maybe Ed and/or Tracey didn't
12        want to give this information to the partners
13        because A., Tracey's salary and B., Your
14        testimony was because of these expenses,
15        okay?
16   A.   Identifying expenses.
17   Q.   Identifying?
18   A.   Yes.
19   Q.   All right.  Did you have conversations with
20        Ed and/or Tracey regarding whether they were
21        using corporate money to pay for personal
22        expenses?
23   A.   I didn't see a credit card, so I wasn't aware
24        of that first-hand until they investigated it
```

89

```
 1        themselves.
 2   Q.   Who?
 3   A.   The Giampa's, Jim and Jim's girlfriend, her
 4        name was Robin also.  But --
 5   Q.   Cuna?
 6   A.   Is that her last name?  I didn't know it.
 7        Yes, that is her last name.  They finally did
 8        find all the credit card statements and they
 9        went through them.  Robin went through them
10        for months and months.
11   Q.   What was the --
12   A.   Well, the outcome of that is that they found
13        a lot of personal expenses paid for by the --
14        I don't think we need to have liquor at rehab
15        clinics or chiropractic offices.  Things like
16        that.
17   Q.   I missed that last part.
18   A.   Liquor stores.  I don't think you need liquor
19        at chiropractic clinics.  I don't think
20        that's the cure, but liquor charges and stuff
21        like that.
22   Q.   Were there questionable expenses back to what
23        we were talking about earlier where, you
24        know, there would be a charge for a luncheon
```

90

```
 1        --
 2   A.   Yeah.
 3   Q.   -- insignificant or were they significant --
 4   A.   There were a lot of luncheons.  I never seen
 5        someone eat so much in all my life.
 6   Q.   In Paragraph 8, you say, "Since the new
 7        administration has been in place," which is
 8        after Ed and Tracey left, right?
 9   A.   Yeah.
10   Q.   "I have noticed a shift in emphasis to
11        maintain a high standard not only from an
12        accounting standpoint but also from a proper
13        checks and balances standpoint."  Okay.  From
14        an accounting standpoint, the standard was
15        better after Ed and Tracy were gone?
16   A.   Oh, yeah.  They questioned everything, yeah.
17        They had -- they still had an employee there
18        for awhile who I was told by Daisy she paid
19        some checks she shouldn't have.  I can't
20        remember that girl's name.  Marcia?  I don't
21        know.  It begins with an M.  I can't think of
22        it.  I have it back at the office somewhere.
23        But they had a computer system which Tracey
24        could never utilize because she wouldn't know
```

91

```
 1        how to operate it.  It was just a glorified
 2        checking account and they wanted to utilize
 3        their system.  That's why I had to go up on
 4        site.  The system is excellent but you have
 5        to know how to execute it.  She didn't have
 6        the computer knowledge to do it or accounting
 7        knowledge to do it.  They were keeping track
 8        of receipts from each clinic.  It was very
 9        fine tuned.  Keeping track of the
10        expenditures, so they would know if a clinic
11        was making any money, you know, after
12        expenses.
13   Q.   This is something that wasn't being done when
14        Ed and Tracey --
15   A.   No.  She just didn't have the ability to do
16        it.
17   Q.   Just to finish my thought, this was not being
18        done when Ed and Tracey were in control of
19        the accounting?
20   A.   No.
21   Q.   At the bottom of Paragraph 8, you used an
22        example.  You say, "For example, categories,
23        descriptions of checks written were incorrect
24        and did not conform to proper bookkeeping or
```

92

```
 1        accounting --
 2   A.   Right.
 3   Q.   -- and tax law."
 4   A.   Like I said to you, the office expense, she
 5        would write a subcontractor doctor, you don't
 6        put it to that.
 7   Q.   Then you say, "Tracey Kennedy never turned in
 8        the W2 forms from employees to the accounting
 9        office."
10   A.   No.
11   Q.   What's the problem with not doing that?
12   A.   Well, why wouldn't she?  The office copies --
13        she did have them up there, though, I must
14        say, in Chelmsford.  They were there in the
15        files, but we never saw them.  I just saw,
16        you know, the W3's, the totals, not
17        individuals.  Oh, and the problem -- no,
18        there was no problem there.
19   Q.   Then in Paragraph 9, you talk about the
20        current administration again.  Jim, Joe and
21        Fred providing all information for
22        accounting.  That last sentence there, it
23        says, "They also have in place a proper
24        administrative department with a strong
```

93

1  awareness of human resource issues." What's
2  the significance of that from a bookkeeping
3  perspective if there is one?
4  A.  I don't know what that was supposed to have
5  meant.
6  Q.  But those weren't your words?
7  A.  Well, meaning I guess the Giampa's, you know.
8  Because Joe Pimentel wasn't there yet. In
9  other words, they took charge of it finally.
10  I guess is what I mean.
11  Q.  If I could, to summarize what you said, if
12  I'm incorrect, I want you to expand upon it
13  or correct me. During the time that Ed and
14  Tracey were in absolute control of the books
15  and finances, proper accounting procedures
16  weren't in place; is that right?
17       MR. TREGER: Objection.
18       THE WITNESS: Well, eventually they have
19  to fess up before you get a tax return. But
20  as I say, it was a hard road. But if they
21  wanted financial statements for a bank, at
22  that point in time when you're giving that
23  financial statement, it's really, it's
24  incomplete, not necessarily inaccurate.

94

1  (BY MR. KING)
2  Q.  It's not the best practices?
3  A.  No. I mean incomplete because all the
4  paperwork wasn't forthcoming. But the last
5  one, the December 31st one was finally
6  finalized.
7       MR. KING: Let me just take a minute,
8  all right?
9       (Whereupon the parties go off the
10  record.)
11       MR. KING: Back on the record.
12  (BY MR. KING)
13  Q.  Earlier you said that all the records that
14  you maintained, you being either Chapman or
15  C&C, with respect to the accounting work done
16  for FMC, you still have those records at the
17  office?
18  A.  Just the last year of them.
19  Q.  What was that?
20  A.  Just the last year of them and the rest of
21  them are in archives.
22  Q.  All right. But they're available to your
23  office?
24  A.  Right, the last year.

95

1  Q.  Okay. Who would we speak to at your office
2  about obtaining copies of those records?
3  A.  David Carlton.
4  Q.  David Carlton, okay. The FMC -- or earlier I
5  asked you about Robert Kennedy whether that's
6  still a going concern. Have you ever heard
7  of the entity called Advanced Health
8  Supplies?
9  A.  They used that name so many times, yeah. Oh,
10  Advanced Health, oh, that's Tom Giampa.
11  Q.  That's Tom Giampa?
12  A.  Yeah. That's the name I couldn't think of
13  it.
14  Q.  Okay. That's where the business went?
15  A.  Yeah.
16  Q.  Who handles your archives at C&C? Is it Iron
17  Mountain or --
18  A.  I don't know who he uses.
19  Q.  All right. Some third-party vendor, though?
20  A.  Yeah. Storage facility.
21  Q.  Okay. One of the things that I neglected to
22  ask you about earlier when we spoke last week
23  or what have you, and I reminded you about
24  this earlier affidavit, or the affidavit that

96

1  you signed in February '05 marked as Exhibit
2  3, you indicated to me something about Ed
3  Kennedy was a drug fiend?
4  A.  It was only something that was said to me.
5  Q.  What was that?
6  A.  It was only what was said to me. So it's
7  gossip. Now, whether the truth of it or not,
8  I'm not the --
9  Q.  What was it that was said to you?
10       MR. TREGER: Objection. Hearsay.
11       THE WITNESS: Well, it was hearsay from
12  one of their employees. There was a lot of
13  talk going on. Ed's behavior was erratical.
14  (BY MR. KING)
15  Q.  Tell me about what you heard with respect to
16  him.
17       MR. TREGER: Objection.
18       THE WITNESS: Couple of employees at
19  Future Management, they had to settle with
20  them because -- I don't know if he made
21  sexist remarks, off-color remarks or he was
22  just being rude to some of them in that
23  office there. I know there's one, if not two
24  that people said it to me whether I wanted to

97

```
1              hear it or not.
2    (BY MR. KING)
3    Q.   You say, "They settled with"?
4    A.   Yeah.
5    Q.   FMC settled?
6    A.   Yeah.  They had to pay them.
7    Q.   Okay.  Who were those people?
8    A.   One was a chiropractic doctor.  It was a
9         woman.  I don't her name.  I can't think of
10        it.  I went up there to do accounting work.
11        You never seen so many people come up to me.
12        You'd think I had on my face, "Tell me all
13        the gossip in the world you know."  It was
14        amazing.
15   Q.   You were told by whom that there was a female
16        chiropractor that had been settled with?
17   A.   Was that Daisy that told me that one?  That
18        happened way before the '04.
19   Q.   That had something to do with Ed, though?
20   A.   Yeah.  Because he spoke to a chiropractic
21        doctor out of line, you know, unacceptable.
22        She sued.  She physically sued.  So it must
23        be in the records out there somewhere.  That
24        is a fact.
```

98

```
1    Q.   And your best recollection was that Daisy was
2         the one that told you about that?
3    A.   Yes.
4    Q.   All right.  You said there was a couple of
5         people that settled?
6    A.   I know that one and I think there was some
7         girls that he said some terrible things to on
8         the floor.
9    Q.   At Chelmsford?
10   A.   Yeah.  It was outrageous things.
11   Q.   Did you speak to those women?
12   A.   No.
13   Q.   Who told you about these outrageous things?
14   A.   I think it was Daisy.
15   Q.   All right.  Can you tell us what they were?
16   A.   Wow, it's terrible.  I don't --
17             MR. TREGER: Objection.
18             THE WITNESS: -- think I want to repeat
19        what he said.
20   (BY MR. KING)
21   Q.   Well, we're all adults here.  What was it
22        that you were told by Daisy that --
23             MR. TREGER: Objection.
24             THE WITNESS: He'd go up and they're
```

99

```
1         doing billing, trying to do some billing
2         things and he would tell them, "Do this or do
3         that," or something.  The girls would go, "I
4         can't.  It's not proper insurance procedure."
5         Whatever the issue was, he said to one, "Suck
6         my dick."  That guy would have been right out
7         the window with me.
8    (BY MR. KING)
9    Q.   He never treated you like that?
10   A.   Oh, no.  I used to hang up on him all the
11        time.  Then he'd call me and say, "Are you
12        feeling better now?  Can we speak?"  I
13        wouldn't put up with his outrageous behavior.
14   Q.   Did you ever personally witness any of this -
15        -
16   A.   No.
17   Q.   -- outrageous behavior?
18   A.   No.
19   Q.   With respect to the drug fiend comment, what
20        --
21   A.   That came from Maria.
22   Q.   Maria King?
23   A.   Yeah.
24   Q.   What was -- tell me about what she told you.
```

100

```
1              MR. TREGER: Objection.
2              THE WITNESS:  She socialized with him
3         personally.  So --
4    (BY MR. KING)
5    Q.   Did she have an affair with him?
6    A.   Oh, God, no.  Jesus, he would be the last
7         guy.  She witnessed him reaching for illegal
8         substances in his home.
9              MR. TREGER: Objection.
10             THE WITNESS: Again, like I said, it was
11        just told me to me.  I didn't see anything.
12   (BY MR. KING)
13   Q.   No, no.  This is just legalese.  I mean he's
14        entitled to object.  You're entitled to
15        answer the question.  So --
16   A.   Okay.  Yeah.
17   Q.   She told you that he reached for what illegal
18        substance himself?  What --
19   A.   I think she said cocaine.
20   Q.   Is that the only thing you heard about him?
21   A.   And plus he drank.
22   Q.   So with respect to the drug fiend comment, it
23        was Maria King saying that he used cocaine
24        and that he drank?
```

101

1   A.   Yeah.

2   Q.   Any other sources of knowledge regarding

3        that?

4   A.   About Ed?  No.

5   Q.   How about anyone else?

6   A.   No.

7   Q.   When I use the term general ledger, am I

8        using a correct term?

9   A.   Yes, yes.

10  Q.   That's something that --

11  A.   That's your books.

12  Q.   Right.  That's maintained by FMC?

13  A.   Right.

14  Q.   And they keep that, right?

15  A.   They have them.  Yes, they do.

16  Q.   All right.  When you were last there which

17       was in '05, they maintained yearly -- is it

18       yearly or quarterly ledgers?

19  A.   It's technically a year but they can do

20       quarterlies if they choose to, but those are

21       all interim things.  They're not -- you know,

22       they're all superceded by the next one.

23  Q.   Okay.  Do you know what their protocol was

24       for maintaining hard copies of those general

102

1        ledgers from time-to-time, whether it's

2        yearly or --

3   A.   Well, it's in their system.  They can go

4        right in there in their computer system and

5        print one out.

6   Q.   Right.  And they can go back to any time?

7   A.   Oh, yeah.

8   Q.   But did they, if you know, have a procedure

9        where they would take a snapshot of time

10       whether it was the fiscal year or the

11       quarterly report and reduce it to a hard copy

12       and maintain it somewhere in --

13  A.   I think Daisy used to print some out.  Prior

14       to Tracey, no, because she just didn't.

15  Q.   Prior to Tracey?

16  A.   Yeah.  I mean, Tracey couldn't, no.  We kept

17       -- all the paperwork came to the office, we

18       prepared the financial statements and the

19       general ledgers.

20  Q.   So you would have that same information in

21       hard copy at C&C?

22  A.   Right.

23  Q.   Okay.

24  A.   Because we have their tax returns.  Ed was

103

1        always given -- Ed has the financials.

2        Because I remember him saying he put them in

3        the safe at his house.  So Ed had those

4        financial statements, permanent copies of

5        financial statements when he was dealing with

6        it because he didn't have a general ledger.

7        They were from our office and he also had

8        copies of the tax returns.  So Ed has those.

9        And then in 2004 on, it's up at Future

10       Management and their accountants, their

11       controller's office.

12  Q.   All right.  In connection with the same

13       lawsuit in which you filed or executed the

14       affidavit marked Exhibit 3 --

15  A.   The February one?

16  Q.   The February '05.

17  A.   Oh, yeah.

18  Q.   William Chapman also executed an affidavit.

19       Did you ever discuss his affidavit with him?

20  A.   No.  I didn't even know.

21  Q.   Okay.  When you parted company with William

22       Chapman, that was due to the sale of the

23       business?

24  A.   Right.  He's got I think like a one percent

104

1        interest still.

2   Q.   Were you on good terms with him at that time?

3   A.   Oh, yeah.  Bill's still is in the office now

4        during tax season.

5   Q.   In his affidavit -- I'm not going to ship it

6        around.  We're all familiar with it.  I want

7        to get your impression of some of the things

8        that Bill Chapman said.  In Paragraph 2 of

9        his affidavit, he says, "While Ed Kennedy was

10       president, he was very secretive about the

11       financial operations of the FMC with regard

12       to other shareholders."  Do you agree with

13       that?

14  A.   Oh, yeah.

15  Q.   In Paragraph 3, he says, "Since March 22,

16       2004, when I understand that Joseph Giampa

17       was elected president, I have not witnessed

18       any, 'self dealings,' 'Wrongful exercise of

19       dominion over the assets of FMC,' 'Waste,

20       mismanagement' or 'theft' by Joseph Giampa,

21       Frederick Giampa or James Kennedy."  Do you

22       agree with that?

23            MR. TREGER:  Objection.  Foundation.

24            THE WITNESS: Oh, yeah.  Joe Giampa, he

105

1      I mean, he's as tight as they come.
2  (BY MR. KING)
3  Q.   In Paragraph 4, Mr. Chapman goes on.  He
4       says, "In fact, we have recently discovered
5       that both Ed Kennedy and his wife Tracey were
6       paid over $276,000 by FMC for their personal
7       credit cards during the period 2000 to 2003
8       for 'requests for reimbursements,' which we
9       discovered were for their personal
10      purchases."
11          MR. TREGER: Objection.
12          THE WITNESS: I didn't realize it was
13      that high, yeah.
14  (BY MR. KING)
15  Q.   Is that consistent with your understanding of
16       the bookkeeping --
17  A.   What they -- Robin showed it to me up there,
18       the statements.
19  Q.   Robin Cuna?
20  A.   Yes.  And what was on them.
21  Q.   The number that Mr. Chapman references,
22       $276,000 for personal credit cards, that's
23       consistent with your review of those records?
24          MR. TREGER: Objection.

Lee & Associates * Certified Court Reporters * (781) 848-9693

106

1          THE WITNESS: Oh, no.  I just looked at
2       a few statements.  They would have that
3       information.  Robin Cuna compiled it.  I
4       never knew what the amount was.
5  (BY MR. KING)
6  Q.   With respect to your involvement at FMC
7       during that entire time, 2001 to 2005, did
8       you have any responsibility or did your job
9       entail maintaining any of the corporate
10      records, corporate minutes, anything like
11      that?
12  A.   No.
13  Q.   Strictly reconciling the books?
14  A.   Right.  Just bookkeeping services.
15  Q.   All right.  Just give me one second.  Have
16       you been contacted by anyone other than my
17       office with respect to your work with FMC?
18  A.   No.
19  Q.   To your knowledge -- you've discussed
20       obviously your appearance here today with
21       your boss Mr. Carlton, I take it?
22  A.   Oh, yes.
23  Q.   Right.  Has his office been contacted by any
24       of the other attorneys involved in this

Lee & Associates * Certified Court Reporters * (781) 848-9693

107

1       lawsuit other than --
2  A.   Mr. Carlton himself?
3  Q.   Yes.
4  A.   No.  He just said that Jim's divorce lawyers
5       in the past.
6  Q.   Okay.  Not with respect with your appearance
7       here today?
8  A.   No.
9  Q.   Okay.  I want to thank you for your patience
10      and attendance here today under the
11      circumstances.  If we have further questions
12      about these accounting issues, can we call
13      you?
14  A.   Aren't we done?
15  Q.   Will you take my call?
16  A.   I'll take the call.  But I don't feel like
17      schlupping back.
18          MR. KING: I'm all set.
19          C R O S S E X A M I N A T I O N
20  (BY MS. HART)
21  Q.   I just have a few questions for you if that's
22       okay?  My name is Meghan Hart.  I'll try to
23       keep it fairly short.  In conjunction with
24       your work for FMC, did Mr. Chapman or C&C

Lee & Associates * Certified Court Reporters * (781) 848-9693

108

1       afterwards audit FMC's financial statements?
2  A.   No, not an audit.  No, not physically go in
3       there and go through every piece of paper,
4       no.
5  Q.   Not a forensic audit, but did they produce
6       audited financial statements?
7  A.   No.  There was never an audited one.  It was
8       just -- there are three types of financials.
9       There's the review and then the -- I just
10      went blank.  The audited one is very high
11      demand.  So they were never audited on their
12      financial statements.
13  Q.   Did you produce anything other than a profit
14       and loss statement?
15  A.   The balance sheet and the P&L, the general
16       ledger and the compliance.  That's what they
17       were doing, the compliance and then the
18       review and then the audit.  We just provided
19       the first one, compliance.  It's the least
20       stringent.
21  Q.   And how often did you produce profit and loss
22       statements, quarterly?
23  A.   No.  I used to do it every month when I was
24       doing it with Ed and Tracey.  It was a

Lee & Associates * Certified Court Reporters * (781) 848-9693

109

1      monthly basis. But the volume just exploded.
2      You know, they grew to 11 states and 56
3      locations. Then they got to the point every
4      three months -- these were all tentative
5      financials, you know. There incomplete until
6      you get your final, your annual one at the
7      end of the year.
8 Q.   So what period of time did you produce
9      monthly financials, early on?
10 A.   Yeah, like within 10, 15 days after I
11      received it, mid month of the following
12      month.
13 Q.   In 2005, were you producing monthly P&L's or
14      had you gone to a quarterly P&L?
15 A.   Quarterly, yeah.
16 Q.   In your office records, do you maintain
17      copies of those P&L's?
18 A.   Yeah. From '04 on, they'd be in storage. So
19      that might be difficult. In-house is the
20      '05.
21 Q.   And you also maintained a copy of FMC's tax
22      returns for 2005?
23 A.   Oh, yeah. We have them. They have them as
24      well.

110

1 Q.   Do you know what FMC's fiscal year is?
2 A.   It's December 31st.
3 Q.   Before you received the subpoena in this
4      case, were you aware of the current case that
5      you're here for today?
6 A.   No. I knew about the brothers. I thought Ed
7      was back in the big bed with them for awhile.
8      He got put back on payroll. I think it was
9      in March of '06. Yeah, I thought he was put
10      back on payroll. So I don't know what's
11      happened consequently since then. Ed told me
12      they were all reconciled.
13 Q.   You weren't aware that Encompass had sued the
14      Giampa's and Ed Kennedy?
15 A.   The rumor mill, someone told me that the
16      insurance -- Ed said something to an
17      insurance company, you know, in retaliation
18      for being let go or removed and then he
19      retracted his statement it was said to me.
20      But then, you know, he let the genie out of
21      the bottle and the insurance company was
22      going to investigate is what was told to me.
23 Q.   But you weren't aware that as a result of
24      that investigation, the insurance company had

111

1      sued?
2 A.   No. I didn't know that. This is what this
3      is, right? This is about -- oh, okay. No.
4      I didn't know that.
5 Q.   So you hadn't read any news articles or any
6      press releases about Encompass suing?
7 A.   No. That's all. I didn't even know the name
8      of the insurance company when, you know,
9      gossip was told to me about that.
10 Q.   What was the gossip that you had heard?
11 A.   That Ed told them that they were using
12      fraudulent billing practices and then he
13      retracted the statement. So it just started
14      this all. I guess the retraction isn't
15      enough because you have to investigate it.
16 Q.   In conjunction with your -- you worked on
17      FMC's books until December of 2005, correct?
18 A.   Well, I worked through '06 when we got the
19      tax return numbers. We must have got the tax
20      return done by October of '06. No, it was
21      September of '06. That was the six month
22      extension. Actually, I didn't work on it too
23      much at the end. It was Karen Sullo.
24 Q.   When would you say that you stopped working

112

1      on it?
2 A.   I went up there December of '05. I had to
3      work in conjunction with Karen but she
4      wrapped it up. Then we worked on it. I know
5      we filed in September, the tax return. I
6      know it was filed by September 15th. That
7      was the extension deadline. So, we worked on
8      it during the summer, yeah.
9 Q.   September 15, 2006?
10 A.   '06, yeah.
11 Q.   During that time, you worked in '05 for the
12      company?
13 A.   Right. I went up two days a week. Plus when
14      I came back to the office, I had to do some
15      more work too.
16 Q.   Did you have any discussions with any pending
17      litigations with --
18 A.   Oh, God, no, no. Everything is gossip. I
19      got everything through gossip. Oh, no, they
20      didn't speak to me.
21 Q.   FMC, does it file consolidated financial
22      statements or just financial statements for
23      FMC itself?
24 A.   They have to file financial statements for

113

```
 1          every clinic and FMC as well.
 2     Q.   So you don't do them on a consolidated basis?
 3     A.   No.  They're all independent tax numbers.
 4     Q.   How often did you produce financials --
 5     A.   Once a year for the clinics.
 6     Q.   Once a year for each clinic?
 7     A.   Yeah, just annually.  The arrangement was the
 8          receipts came in, they deposited it to their
 9          own accounts and then the money went out as
10          management fees.  Then they wrote a check and
11          it was deposited into the parent company's
12          checking account.  So it was in and out.  It
13          was receipts and management fees with a net
14          effect of practically zero.  It was just a
15          matter of control to see, you know, to see
16          how much revenue was being made.
17     Q.   And does your office maintain copies of the
18          individual clinics' P&L statements and tax
19          returns?
20     A.   Yeah.  We prepare them.
21     Q.   Do you make any -- did the company take any
22          reserves for any pending litigations on the
23          profit & loss statements that you're aware
24          of?
```

114

```
 1     A.   No.  I think Mr. Carlton had to tell them how
 2          much his fee was going to be to complete the
 3          work.  And they did, in advance I guess, sent
 4          some payment in advance so we would complete
 5          the work.  Yeah, Jim had to sign an agreement
 6          with Mr. Carlton, how much the fee was going
 7          to be, how much up front to begin with and
 8          payment at time of getting the tax returns,
 9          release of the tax returns.  I'm sure that
10          was an arrangement they made.  I think I
11          remember seeing that.  They did something in
12          writing, you know.
13     Q.   An engagement letter?
14     A.   Yeah.
15     Q.   Between your boss and FMC?
16     A.   Right.  That's why I had to cooperate with
17          all these ding-dong statements to get his
18          payment.
19     Q.   My question is more when you were doing the
20          profit and loss statements or your bosses
21          were doing the profit and loss statements,
22          did they take any reserves for any litigation
23          that was pending that they might not --
24     A.   Oh, no, no.  Jim never even paid him for his
```

115

```
 1          services for his personal divorce.  He still
 2          owes him for that.
 3               MS. HART:  Okay.  I don't have anything
 4          else.
 5               (Whereupon, the Deposition was
 6          concluded at 1:33 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

116

E R R A T A   S H E E T

Deposition of:  ANNEE L'HEUREUX

In Re:  Civil Action No.
        vs.  NO.05-11693 RCL

| Page No. | Line No. | Transcript Reads | Change Made |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

C E R T I F I C A T E

    I, <u>ANNEE L'HEUREUX</u>, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that said transcript is a true, accurate and complete record of said testimony.

          Dated at _____,

this _____ day of _____, 2007

under the pains and penalties of perjury.

        _____

        Sworn to and subscribed before me

this _____ day of _____, 2007.

        _____

            Notary Public

Lee & Associates * Certified Court Reporters * (781) 848-9693

---

118

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF PLYMOUTH, SS

    I, ELIZABETH ANN EVERSON, a Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing Deposition of ANNEE L'HEUREUX was taken before me on April 4, 2007; that the witness was duly sworn by me before the commencement of her testimony; that the said testimony was taken audiographically by myself and then transcribed under my direction. To the best of my knowledge, the within transcript is a complete, true and accurate record of said Deposition.

    I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter in controversy.

    In witness whereof, I have hereunto set my hand and Notary Seal this 18th day of April, 2007.

      Elizabeth Ann Everson, Notary Public
      My Commission Expires:
      March 24, 2011

PLEASE NOTE: THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND\OR DIRECTION OF THE CERTIFYING REPORTER.

Lee & Associates * Certified Court Reporters * (781) 848-9693

OAO88 (Rev: 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

——— DISTRICT OF MASSACHUSETTS ———

### SUBPOENA IN A CIVIL CASE

Encompass Insurance Company of Massachusetts
    Plaintiff-Counterclaim Defendant,

            v.

Joseph D. Giampa, Frederick T. Giampa, Advanced
Spine Centers Inc. d/b/a First Spine Rehab, Future
Management Corporation, Future Management
Business Trust, Edward Kennedy, Brian J. Culliney, D.C. and
Jennifer McConnell, D.C,
        Defendants-Counterclaim Plaintiffs.

CASE NO: [1] 05-11693 RCL

A TRUE COPY ATTEST
DAVID D. AYLES, PROCESS SERVER
AND DISINTERESTED PERSON

TO:  **Keeper of Records**
     **Robert T. Kennedy, Inc. d/b/a Kennedy Professional Supply**
     **13 Kidder Road**
     **Chelmsford, MA 01824**

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Law Offices of Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 | March 26, 2007 9:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
**YOU ARE FURTHER REQUIRED** to bring with you to the deposition those items listed in the attached Schedule A.
*IF THE ITEMS LISTED IN SCHEDULE A ARE PRODUCED AT THE OFFICES OF SMITH & BRINK, P.C. PRIOR TO THE DATE OF THE DEPOSITION, YOUR ATTENDANCE AT THE DEPOSITION FOR THIS SUBPOENA ONLY WILL BE WAIVED.*

| PLACE | DATE AND TIME |
|---|---|
| Law Offices of Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 | March 26, 2007 9:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE 2/27/07 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Richard D. King, Jr., Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 (617) 770-2214

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26 (b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

First Spine
Robert T. Kennedy
Schedule A

## Robert T. Kennedy, Inc. d/b/a Kennedy Supply
## Keeper of Records "SCHEDULE A"

## I. DEFINITIONS:

1. **"Kennedy Supply"** shall mean Robert T. Kennedy, Inc. d/b/a Kennedy Supply.

2. As used herein, the terms **"document"** or **"documents"** mean all papers and other tangible items and materials upon which information is recorded or from which information may be obtained and includes all documents that you have in your possession, custody, or control, or have the right to obtain upon request or demand. This definition includes all copies, reproductions and facsimiles of documents and includes, but is not limited to, any and all letters, business cards, vouchers, advertisements, bonus logs, correspondence, contracts, agreements, bills, orders, receipts, books, computer tapes and print-outs, intracorporation communications, memoranda, notes, vouchers, notebooks, maps, sketches, cablegrams, gift cards, telegrams, reports, press releases, advertising and promotional literature, prints, drawings, plans, photographs, VIP cards, printed forms, manuals, brochures, lists, medical file jackets, publications, VIP cards, catalogues, directories, videotapes, other tape recordings, films, microfilm, runner payment logs, and all other writings, including drafts, typings, printings, minutes or copies or reproductions thereof in the possession, custody, control/or available to the defendant or any other past or present officer, director, agent, employee consultant, or attorney for defendant or any person acting on behalf of defendant. If copies of documents are not identical for any reason, including handwritten notations, initials, or identifying marks, each non-identical copy is a separate document within the meaning of this definition.

3. The term **"relating to"** means referring to, describing, concerning, evidencing, or constituting.

4. **"First Spine"** and/or **"The clinic"** shall mean Advanced Spine Center d/b/a First Spine and Rehab located in Lowell, Massachusetts as well as Future Management Corporation and all its parent corporations and/or subsidiary corporations, agents, representatives, predecessors-in-interest and successors-in-interest.

5. **"Relevant Period"** shall mean 1998 through the present inclusive and/or any portion thereof.

6. **"Future Management Clinics"** shall mean any of the following:

1

First Spine
Robert T. Kennedy
Schedule A

Advanced Spine Center
3 North Beacon Street
Allston, MA 02134

Advanced Spine Centers
420 Common Street
Lawrence, MA 01840

Advanced Spine Centers
553-555 Main Street
Waltham, MA 01089

Advanced Spine Centers
90 Madison Street
Worcester, MA 01606

Advanced Spine Centers
248 Moody Street
Waltham, MA 02453

Advanced Spine Centers
278 Pitchers Way
Hyannis, MA 02601

Advanced Spine Centers
37 Roxbury Street
Roxbury, MA 02119

Associated Health Care Group
180 Exchange Street
Malden, MA 02148

Attleboro Chiropractic Health Ctr.
3 Mill Street
Attleboro, MA 02703

Back & Neck Treatment
935 Washington Street
Norwood, MA 02062

Back & Neck Treatment
158 Concord Street
Framingham, MA 01701

Back & Neck Treatment
948 Bennington Street
East Boston, MA 02128

Brockton Spine & Rehab
365 Westgate Drive, Suite 3-4
Brockton, MA 02301

Excel Physical Therapy
19 Stoughton Street
Dorchester, MA 02125

Excel Physical Therapy
278 Pitchers Way
Hyannis, MA 02601

Excel Physical Therapy
1225 River Street
Hyde Park, MA 02136

First Choice Chiropractic & Rehab
125 Rodman Street
Fall River, MA 02723

First Choice Chiropractic & Rehab
94 Allen Street
Methuen, MA 01844

First Spine & Rehab
180 Exchange Street
Malden, MA 02148

First Spine & Rehab
438 Chestnut Street
Springfield, MA 01107

First Spine & Rehab
252 Maple Street
Holyoke, MA 01040

First Spine & Rehab
835 Dorchester Avenue
Dorchester, MA 02125

First Spine & Rehab
320 Water Street
Fitchburg, MA 01420

First Spine & Rehab
1212 Hancock Street
Quincy, MA 02169

First Spine & Rehab
760 Western Avenue
Lynn, MA 01905

First Spine & Rehab
410 School Street
Lowell, MA 01851

2

First Spine
Robert T. Kennedy
Schedule A

Haverhill Spine & Rehab
5-7 Dudley Street
Haverhill, MA 01830

Mattapoisett Chiropractic
109 Fairhaven Road, Suite D
Mattapoisett, MA 02739

Methuen Spine & Rehab
30 Hampshire Street
Methuen, MA 01844

Physical Rehab. Group
149A Highland Avenue
Somerville, MA 02143

Physical Rehab. Group
1515-17 Washington Street
Boston, MA 02118

Randolph Spine & Rehab
326 North Main Street, Suite 11
Randolph, MA 02368

Salem Chiropractic Assoc.
72 Washington Street
Salem, MA 01970

Taunton Chiropractic & Rehab
80-86 Main Street
Taunton, MA 02780

Therapy & Rehab Service
50 Meridan Street

East Boston, MA 02128

United Physical Therapy
642 Gorham Street
Lowell, MA 01852

United Physical Therapy
442 Chestnut Street
Springfield, MA 01103

United Physical Therapy
150 Stanford Street
Boston, MA 02114

United Physical Therapy
109 Fairhaven Road, Suite E
Mattapoisett, MA 02739

United Physical Therapy
420 Common Street, Suite 102
Lawrence, MA 01840

United Physical Therapy
243 Church Street
Pembroke, MA 02359

United Physical Therapy
180 Exchange Street
Malden, MA 02148

Wareham Spine & Rehab
45 Main Street, Unit C3
Wareham, MA 0257

7. **"Durable Medical Goods"** shall mean medical supplies and equipment including ambulatory aids, orthopedic products, aids for daily living, chiropractic equipment, physical therapy equipment, modalities and related supplies.

**II. You are requested to produce the following documents:**

1.   All original records that relate in any way to monies paid to or from (1) First Spine & Rehab; (2) Advanced Spine Centers, Inc.; (3) Future Management Corporation; (4) Edward Kennedy; (5) James Kennedy; (6) Joseph Giampa; and/or (7) Frederick Giampa for medical supplies provided to First Spine & Rehab.

2.   All documents that relate in any way to any business or financial relationship between Kennedy Supply and First Spine or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

3

First Spine
Robert T. Kennedy
Schedule A

3.   All documents that relate in any way to any business or financial relationship between Kennedy Supply and Advanced Spine Center, Inc., or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

4.   All documents that relate in any way to any business or financial relationship between Kennedy Supply and Future Management Corporation or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

5.   All documents that relate in any way to any business or financial relationship between Kennedy Supply and Joseph Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

6.   All documents that relate in any way to any business or financial relationship between Kennedy Supply and Frederick Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

7.   All documents that relate in any way to any business or financial relationship between Kennedy Supply and Edward Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

8.   All documents that relate in any way to any business or financial relationship between Kennedy Supply and James Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

9.   All documents relating to how First Spine came to receive durable medical goods. Include with your response all records concerning any financial transactions relating in any way to the prescription, purchase or delivery of durable medical goods to First Spine by any third party;

10.  All Federal Tax Returns for the years 1998-2004;

11.  All documents memorializing any instructions given by the management at First Spine to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

12.  All documents memorializing any instructions given by the management at Future Management Corporation to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

4

First Spine
Robert T. Kennedy
Schedule A

13. All documents memorializing any instructions given by the management at Future Management Clinics to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

14. All documents memorializing any instructions given by the management at Advanced Spine Centers, Inc. to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

15. All documents identifying the person or person(s) who managed Kennedy Supply in the years 1998-2004; and,

16. All documents showing the name, address and date of birth of any employee of Kennedy Supply for the years 1998-2004.

17. All documents related to invoices for Durable Medical Goods provided to Future Management clinics by Kennedy Supply.

18. All documents related to order forms for Durable Medical Goods provided to Future Management Clinics by Kennedy Supply.

19. Any and all documents relating to payment by Future Management Clinics to Kennedy Supply, including but not limited to Future Management check number 25688 in the amount of $5000.00 issued on April 20, 2004; check number 62 in the amount of $5000.00 issued on April 6, 2004; check number 25422 in the amount of $5000.00 on April 5, 2004; and check number 25254 in the amount of $5000.00 on March 30, 2004.

5

FEBRUARY  28, 2007

## RETURN OF SERVICE

*I this day summoned the within named* KEEPER OF RECORDS
ROBERT T. KENNEDY, INC.
D/B/A/ KENNEDY PROFESSIONAL SUPPLY

*to appear as within directed by delivering to* (2) ATTEMPTS. CLOSED DURING BUSINESS
HOURS. COPY LEFT POSTED AT DOOR.

*in hand, or*
*leaving at last and usual place of abode, to wit:*

*No.*      13 KIDDER ROAD
*in the* CHELMSFORD      *District of said* MIDDLESEX      *County an attested*
*copy of the subpoena together with* $          *fees for attendance and travel*

*Service and travel*      28

*Paid Witness*

*it being necessary I actually used a*
*motor vehicle in the distance of*
35      *miles in the service of*
*this process*

Michael R Steele

Process Server

OAO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

──────── DISTRICT OF MASSACHUSETTS ────────

Encompass Insurance Company of Massachusetts
    Plaintiff-Counterclaim Defendant,

          v.

Joseph D. Giampa, Frederick T. Giampa, Advanced
Spine Centers Inc. d/b/a First Spine Rehab, Future
Management Corporation, Future Management
Business Trust, Edward Kennedy, Brian J. Culliney, D.C. and
Jennifer McConnell, D.C.
       Defendants-Counterclaim Plaintiffs.

**SUBPOENA IN A CIVIL CASE**

CASE NO: [1] 05-11693 RCL

*A TRUE COPY ATTEST
DAVID D. AYLES, PROCESS SERVER
AND DISINTERESTED PERSON*

TO:   **Keeper of Records**
     **First Health Products, Inc.**
     **1 Lakeside Terrace**
     **Westford, MA 01886**

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Law Offices of Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 | March 30, 2007 9:00 AM |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
**YOU ARE FURTHER REQUIRED to bring with you to the deposition those items listed in the attached Schedule A.**
*IF THE ITEMS LISTED IN SCHEDULE A ARE PRODUCED AT THE OFFICES OF SMITH & BRINK, P.C. PRIOR TO THE DATE OF THE DEPOSITION, YOUR ATTENDANCE AT THE DEPOSITION FOR THIS SUBPOENA ONLY WILL BE WAIVED.*

| PLACE | DATE AND TIME |
|---|---|
| Law Offices of Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 | March 30, 2007 9:00 AM |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE 2/27/07 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Richard D. King, Jr., Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 (617) 770-2214

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

──────────

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 12/06) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject

to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26 (b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

First Spine
Schedule A

## First Health Products, Inc
### Keeper of Records "SCHEDULE A"

### I. DEFINITIONS:

1. **"First Health"** shall mean First Health Products, Inc.

2. As used herein, the terms **"document"** or **"documents"** mean all papers and other tangible items and materials upon which information is recorded or from which information may be obtained and includes all documents that you have in your possession, custody, or control, or have the right to obtain upon request or demand. This definition includes all copies, reproductions and facsimiles of documents and includes, but is not limited to, any and all letters, business cards, vouchers, advertisements, bonus logs, correspondence, contracts, agreements, bills, orders, receipts, records, books, computer tapes and print-outs, intracorporation communications, memoranda, notes, vouchers, notebooks, maps, sketches, cablegrams, gift cards, telegrams, reports, press releases, advertising and promotional literature, prints, drawings, plans, photographs, VIP cards, printed forms, manuals, brochures, lists, medical file jackets, publications, VIP cards, catalogues, directories, videotapes, other tape recordings, films, microfilm, runner payment logs, and all other writings, including drafts, typings, printings, minutes or copies or reproductions thereof in the possession, custody, control/or available to the defendant or any other past or present officer, director, agent, employee consultant, or attorney for defendant or any person acting on behalf of defendant. If copies of documents are not identical for any reason, including handwritten notations, initials, or identifying marks, each non-identical copy is a separate document within the meaning of this definition.

3. The term **"relating to"** means referring to, describing, concerning, evidencing, or constituting.

4. **"First Spine"** and/or **"The clinic"** shall mean Advanced Spine Center d/b/a First Spine and Rehab located in Lowell, Massachusetts as well as Future Management Corporation and all its parent corporations and/or subsidiary corporations, agents, representatives, predecessors-in-interest and successors-in-interest.

5. **"Relevant Period"** shall mean 1998 through the present inclusive and/or any portion thereof.

6. **"Future Management Clinics"** shall mean any of the following:

1

First Spine
Schedule A

Advanced Spine Center
3 North Beacon Street
Allston, MA 02134

Advanced Spine Centers
420 Common Street
Lawrence, MA 01840

Advanced Spine Centers
553-555 Main Street
Waltham, MA 01089

Advanced Spine Centers
90 Madison Street
Worcester, MA 01606

Advanced Spine Centers
248 Moody Street
Waltham, MA 02453

Advanced Spine Centers
278 Pitchers Way
Hyannis, MA 02601

Advanced Spine Centers
37 Roxbury Street
Roxbury, MA 02119

Associated Health Care Group
180 Exchange Street
Malden, MA 02148

Attleboro Chiropractic Health Ctr.
3 Mill Street
Attleboro, MA 02703

Back & Neck Treatment
935 Washington Street
Norwood, MA 02062

Back & Neck Treatment
158 Concord Street
Framingham, MA 01701

Back & Neck Treatment
948 Bennington Street
East Boston, MA 02128

Brockton Spine & Rehab
365 Westgate Drive, Suite 3-4
Brockton, MA 02301

Excel Physical Therapy
19 Stoughton Street
Dorchester, MA 02125

Excel Physical Therapy
278 Pitchers Way
Hyannis, MA 02601

Excel Physical Therapy
1225 River Street
Hyde Park, MA 02136

First Choice Chiropractic & Rehab
125 Rodman Street
Fall River, MA 02723

First Choice Chiropractic & Rehab
94 Allen Street
Methuen, MA 01844

First Spine & Rehab
180 Exchange Street
Malden, MA 02148

First Spine & Rehab
438 Chestnut Street
Springfield, MA 01107

First Spine & Rehab
252 Maple Street
Holyoke, MA 01040

First Spine & Rehab
835 Dorchester Avenue
Dorchester, MA 02125

First Spine & Rehab
320 Water Street
Fitchburg, MA 01420

First Spine & Rehab
1212 Hancock Street
Quincy, MA 02169

First Spine & Rehab
760 Western Avenue
Lynn, MA 01905

First Spine & Rehab
410 School Street
Lowell, MA 01851

2

First Spine
Schedule A

Haverhill Spine & Rehab
5-7 Dudley Street
Haverhill, MA 01830

Mattapoisett Chiropractic
109 Fairhaven Road, Suite D
Mattapoisett, MA 02739

Methuen Spine & Rehab
30 Hampshire Street
Methuen, MA 01844

Physical Rehab. Group
149A Highland Avenue
Somerville, MA 02143

Physical Rehab. Group
1515-17 Washington Street
Boston, MA 02118

Randolph Spine & Rehab
326 North Main Street, Suite 11
Randolph, MA 02368

Salem Chiropractic Assoc.
72 Washington Street
Salem, MA 01970

Taunton Chiropractic & Rehab
80-86 Main Street
Taunton, MA 02780

Therapy & Rehab Service
50 Meridan Street

East Boston, MA 02128

United Physical Therapy
642 Gorham Street
Lowell, MA 01852

United Physical Therapy
442 Chestnut Street
Springfield, MA 01103

United Physical Therapy
150 Stanford Street
Boston, MA 02114

United Physical Therapy
109 Fairhaven Road, Suite E
Mattapoisett, MA 02739

United Physical Therapy
420 Common Street, Suite 102
Lawrence, MA 01840

United Physical Therapy
243 Church Street
Pembroke, MA 02359

United Physical Therapy
180 Exchange Street
Malden, MA 02148

Wareham Spine & Rehab
45 Main Street, Unit C3
Wareham, MA 0257

7. **"Durable Medical Goods"** shall mean medical supplies and equipment including ambulatory aids, orthopedic products, aids for daily living, chiropractic equipment, physical therapy equipment, modalities and related supplies.

## II. You are requested to produce the following documents:

1.  All original records that relate in any way to monies paid to or from (1) First Spine & Rehab; (2) Advanced Spine Centers, Inc.; (3) Future Management Corporation; (4) Edward Kennedy; (5) James Kennedy; (6) Joseph Giampa; and/or (7) Frederick Giampa for medical supplies provided to First Spine & Rehab.

2.  All documents that relate in any way to any business or financial relationship between First Health and First Spine or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

3

First Spine
Schedule A

3.    All documents that relate in any way to any business or financial relationship between First Health and Advanced Spine Center, Inc., or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

4.    All documents that relate in any way to any business or financial relationship between First Health and Future Management Corporation or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

5.    All documents that relate in any way to any business or financial relationship between First Health and Joseph Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

6.    All documents that relate in any way to any business or financial relationship between First Health and Frederick Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

7.    All documents that relate in any way to any business or financial relationship between First Health and Edward Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

8.    All documents that relate in any way to any business or financial relationship between First Health and James Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

9.    All documents relating to how First Spine came to receive durable medical goods. Include with your response all records concerning any financial transactions relating in any way to the prescription, purchase or delivery of durable medical goods to First Spine by any third party;

10.   All Federal Tax Returns for the years 1998-2004;

11.   All documents memorializing any instructions given by the management at First Spine to the employee(s) or agent(s) of First Health relating to the treatment of auto accident victims;

12.   All documents memorializing any instructions given by the management at Future Management Corporation to the employee(s) or agent(s) of First Health relating to the treatment of auto accident victims;

13.   All documents memorializing any instructions given by the management at Future Management Clinics to the employee(s) or agent(s) of First Health relating to the treatment of auto accident victims;

4

First Spine
Schedule A

14.    All documents memorializing any instructions given by the management at
Advanced Spine Centers, Inc. to the employee(s) or agent(s) of First Health
relating to the treatment of auto accident victims;

15.    All documents identifying the person or person(s) who managed First Health in
the years 1998-2004; and,

16.    All documents showing the name, address and date of birth of any employee of
First Health for the years 1998-2004.

17.    All documents related to invoices for Durable Medical Goods provided to Future
Management clinics by First Health.

18.    All documents related to order forms for Durable Medical Goods provided to
Future Management Clinics by First Health.

19.    Any and all documents relating to payment by Future Management Clinics to
First Health.

5

FEBRUARY  28, 2007

# RETURN OF SERVICE

*I this day summoned the within named* KEEPER OF RECORDS
                                        FIRST HEALTH PRODUCTS, INC.

*to appear as within directed by delivering to*   (2) ATTEMPTS. THIS IS A RESIDENCE. COPY
                                                   LEFT TAPED TO DOOR, SECOND COPY
                                                   MAILED.

        *in hand, or*
   **X**  *leaving at last and usual place of abode, to wit:*

*No.*    1 LAKESIDE TERRACE
*in the* WESTFORD            *District of said* MIDDLESEX        *County an attested*
*copy of the subpoena together with*  $           *fees for attendance and travel*

*Service and travel*          28            *it being necessary I actually used a*
                                            *motor vehicle in the distance of*
*Paid Witness*                              35      *miles in the service of*
                                            *this process*

                                            _Michael R Steele_
                                            ――――――――――――――――――
                                            Process Server

OAO88 (Rev. 12/06) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

—— DISTRICT OF MASSACHUSETTS ——

Encompass Insurance Company of Massachusetts
    Plaintiff-Counterclaim Defendant,

         v.

Joseph D. Giampa, Frederick T. Giampa, Advanced
Spine Centers Inc. d/b/a First Spine Rehab, Future
Management Corporation, Future Management
Business Trust, Edward Kennedy, Brian J. Culliney, D.C. and
Jennifer McConnell, D.C.
    Defendants-Counterclaim Plaintiffs.

**SUBPOENA IN A CIVIL CASE**

CASE NO: [1]  05-11693 RCL

*A TRUE COPY ATTEST
DAVID D. AYLES, PROCESS SERVER
AND DISINTERESTED PERSON*

TO:   Keeper of Records
      Robert T. Kennedy, Inc. d/b/a Kennedy Professional Supply
      c/o James Kennedy
      3 Kirby Lane
      Chelmsford, MA 01824

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Law Offices of Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 | Monday, April 9, 2007 9:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
YOU ARE FURTHER REQUIRED to bring with you to the deposition those items listed in the attached Schedule A.
*IF THE ITEMS LISTED IN SCHEDULE A ARE PRODUCED AT THE OFFICES OF SMITH & BRINK, P.C. PRIOR TO THE DATE OF THE DEPOSITION, YOUR ATTENDANCE AT THE DEPOSITION ONLY WILL BE WAIVED.*

| PLACE | DATE AND TIME |
|---|---|
| Law Offices of Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 | Monday, April 9, 2007 9:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| | 3/9/07 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Richard D. King, Jr., Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 (617) 770-2214

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

First Spine
Robert T. Kennedy
Schedule A

### Robert T. Kennedy, Inc. d/b/a Kennedy Supply
### Keeper of Records "SCHEDULE A"

## I.  DEFINITIONS:

1.  **"Kennedy Supply"** shall mean Robert T. Kennedy, Inc. d/b/a Kennedy Supply.

2.  As used herein, the terms **"document"** or **"documents"** mean all papers and other tangible items and materials upon which information is recorded or from which information may be obtained and includes all documents that you have in your possession, custody, or control, or have the right to obtain upon request or demand. This definition includes all copies, reproductions and facsimiles of documents and includes, but is not limited to, any and all letters, business cards, vouchers, advertisements, bonus logs, correspondence, contracts, agreements, bills, orders, receipts, records, books, computer tapes and print-outs, intracorporation communications, memoranda, notes, vouchers, notebooks, maps, sketches, cablegrams, gift cards, telegrams, reports, press releases, advertising and promotional literature, prints, drawings, plans, photographs, VIP cards, printed forms, manuals, brochures, lists, medical file jackets, publications, VIP cards, catalogues, directories, videotapes, other tape recordings, films, microfilm, runner payment logs, and all other writings, including drafts, typings, printings, minutes or copies or reproductions thereof in the possession, custody, control/or available to the defendant or any other past or present officer, director, agent, employee consultant, or attorney for defendant or any person acting on behalf of defendant. If copies of documents are not identical for any reason, including handwritten notations, initials, or identifying marks, each non-identical copy is a separate document within the meaning of this definition.

3.  The term **"relating to"** means referring to, describing, concerning, evidencing, or constituting.

4.  **"First Spine"** and/or **"The clinic"** shall mean Advanced Spine Center d/b/a First Spine and Rehab located in Lowell, Massachusetts as well as Future Management Corporation and all its parent corporations and/or subsidiary corporations, agents, representatives, predecessors-in-interest and successors-in-interest.

5.  **"Relevant Period"** shall mean 1998 through the present inclusive and/or any portion thereof.

6.  **"Future Management Clinics"** shall mean any of the following:

1

First Spine
Robert T. Kennedy
Schedule A

Advanced Spine Center
3 North Beacon Street
Allston, MA 02134

Advanced Spine Centers
420 Common Street
Lawrence, MA 01840

Advanced Spine Centers
553-555 Main Street
Waltham, MA 01089

Advanced Spine Centers
90 Madison Street
Worcester, MA 01606

Advanced Spine Centers
248 Moody Street
Waltham, MA 02453

Advanced Spine Centers
278 Pitchers Way
Hyannis, MA 02601

Advanced Spine Centers
37 Roxbury Street
Roxbury, MA 02119

Associated Health Care Group
180 Exchange Street
Malden, MA 02148

Attleboro Chiropractic Health Ctr.
3 Mill Street
Attleboro, MA 02703

Back & Neck Treatment
935 Washington Street
Norwood, MA 02062

Back & Neck Treatment
158 Concord Street
Framingham, MA 01701

Back & Neck Treatment
948 Bennington Street
East Boston, MA 02128

Brockton Spine & Rehab
365 Westgate Drive, Suite 3-4
Brockton, MA 02301

Excel Physical Therapy
19 Stoughton Street
Dorchester, MA 02125

Excel Physical Therapy
278 Pitchers Way
Hyannis, MA 02601

Excel Physical Therapy
1225 River Street
Hyde Park, MA 02136

First Choice Chiropractic & Rehab
125 Rodman Street
Fall River, MA 02723

First Choice Chiropractic & Rehab
94 Allen Street
Methuen, MA 01844

First Spine & Rehab
180 Exchange Street
Malden, MA 02148

First Spine & Rehab
438 Chestnut Street
Springfield, MA 01107

First Spine & Rehab
252 Maple Street
Holyoke, MA 01040

First Spine & Rehab
835 Dorchester Avenue
Dorchester, MA 02125

First Spine & Rehab
320 Water Street
Fitchburg, MA 01420

First Spine & Rehab
1212 Hancock Street
Quincy, MA 02169

First Spine & Rehab
760 Western Avenue
Lynn, MA 01905

First Spine & Rehab
410 School Street
Lowell, MA 01851

First Spine
Robert T. Kennedy
Schedule A

Haverhill Spine & Rehab
5-7 Dudley Street
Haverhill, MA 01830

Mattapoisett Chiropractic
109 Fairhaven Road, Suite D
Mattapoisett, MA 02739

Methuen Spine & Rehab
30 Hampshire Street
Methuen, MA 01844

Physical Rehab. Group
149A Highland Avenue
Somerville, MA 02143

Physical Rehab. Group
1515-17 Washington Street
Boston, MA 02118

Randolph Spine & Rehab
326 North Main Street, Suite 11
Randolph, MA 02368

Salem Chiropractic Assoc.
72 Washington Street
Salem, MA 01970

Taunton Chiropractic & Rehab
80-86 Main Street
Taunton, MA 02780

Therapy & Rehab Service
50 Meridan Street

East Boston, MA 02128

United Physical Therapy
642 Gorham Street
Lowell, MA 01852

United Physical Therapy
442 Chestnut Street
Springfield, MA 01103

United Physical Therapy
150 Stanford Street
Boston, MA 02114

United Physical Therapy
109 Fairhaven Road, Suite E
Mattapoisett, MA 02739

United Physical Therapy
420 Common Street, Suite 102
Lawrence, MA 01840

United Physical Therapy
243 Church Street
Pembroke, MA 02359

United Physical Therapy
180 Exchange Street
Malden, MA 02148

Wareham Spine & Rehab
45 Main Street, Unit C3
Wareham, MA 0257

7. **"Durable Medical Goods"** shall mean medical supplies and equipment including ambulatory aids, orthopedic products, aids for daily living, chiropractic equipment, physical therapy equipment, modalities and related supplies.

## II. You are requested to produce the following documents:

1.  All original records that relate in any way to monies paid to or from (1) First Spine & Rehab; (2) Advanced Spine Centers, Inc.; (3) Future Management Corporation; (4) Edward Kennedy; (5) James Kennedy; (6) Joseph Giampa; and/or (7) Frederick Giampa for medical supplies provided to First Spine & Rehab.

2.  All documents that relate in any way to any business or financial relationship between Kennedy Supply and First Spine or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

3

3.    All documents that relate in any way to any business or financial relationship between Kennedy Supply and Advanced Spine Center, Inc., or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

4.    All documents that relate in any way to any business or financial relationship between Kennedy Supply and Future Management Corporation or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

5.    All documents that relate in any way to any business or financial relationship between Kennedy Supply and Joseph Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

6.    All documents that relate in any way to any business or financial relationship between Kennedy Supply and Frederick Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

7.    All documents that relate in any way to any business or financial relationship between Kennedy Supply and Edward Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

8.    All documents that relate in any way to any business or financial relationship between Kennedy Supply and James Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

9.    All documents relating to how First Spine came to receive durable medical goods. Include with your response all records concerning any financial transactions relating in any way to the prescription, purchase or delivery of durable medical goods to First Spine by any third party;

10.    All Federal Tax Returns for the years 1998-2004;

11.    All documents memorializing any instructions given by the management at First Spine to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

12.    All documents memorializing any instructions given by the management at Future Management Corporation to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

4

First Spine
Robert T. Kennedy
Schedule A

13.   All documents memorializing any instructions given by the management at Future
      Management Clinics to the employee(s) or agent(s) of Kennedy Supply relating to
      the treatment of auto accident victims;

14.   All documents memorializing any instructions given by the management at
      Advanced Spine Centers, Inc. to the employee(s) or agent(s) of Kennedy Supply
      relating to the treatment of auto accident victims;

15.   All documents identifying the person or person(s) who managed Kennedy Supply
      in the years 1998-2004; and,

16.   All documents showing the name, address and date of birth of any employee of
      Kennedy Supply for the years 1998-2004.

17.   All documents related to invoices for Durable Medical Goods provided to Future
      Management clinics by Kennedy Supply.

18.   All documents related to order forms for Durable Medical Goods provided to
      Future Management Clinics by Kennedy Supply.

19.   Any and all documents relating to payment by Future Management Clinics to
      Kennedy Supply, including but not limited to Future Management check number
      25688 in the amount of $5000.00 issued on April 20, 2004; check number 62 in
      the amount of $5000.00 issued on April 6, 2004; check number 25422 in the
      amount of $5000.00 on April 5, 2004; and check number 25254 in the amount of
      $5000.00 on March 30, 2004.

MARCH 13, 2007

# RETURN OF SERVICE

*I this day summoned the within named* KEEPER OF RECORDS

ROBERT T. KENNEDY, INC. C/O JAMES KENNEDY

D/B/A KENNEDY PRO. SUPPLY

*to appear as within directed by delivering to* (2) ATTEMPTS, COPY LEFT TAPED TO DOOR, SECOND COPY MAILED

     *in hand*

**X**   *leaving at last and usual place of abode, to wit:*

*No.*   3 KIRBY LANE

*in the* CHELMSFORD     *District of said* MIDDLESEX     *County an attested copy of the subpoena together with* $     *fees for attendance and travel*

*Service and travel*     28

*Paid Witness*

*it being necessary I actually used a motor vehicle in the distance of*
35   *miles in the service of this process*

Michael R Steele
_____
Process Server

OAO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

―――――――― DISTRICT OF MASSACHUSETTS ――――――――

Encompass Insurance Company of Massachusetts
    Plaintiff-Counterclaim Defendant,

        v.

Joseph D. Giampa, Frederick T. Giampa, Advanced
Spine Centers Inc. d/b/a First Spine Rehab, Future
Management Corporation, Future Management
Business Trust, Edward Kennedy, Brian J, Culliney, D.C. and
Jennifer McConnell, D.C.
    Defendants-Counterclaim Plaintiffs.

**SUBPOENA IN A CIVIL CASE**

CASE NO: [1] 05-11693 RCL

*A TRUE COPY ATTEST*
*DAVID D. AYLES, PROCESS SERVER*
*AND DISINTERESTED PERSON*

TO:   **Keeper of Records**
     **Advanced Health Products**
     **Successor in Interest to Robert T. Kennedy d/b/a Kennedy Supply**
     **30 Hunt Road**
     **Chelmsford, MA 01824**

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
| | DATE AND TIME |

☒  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
| --- | --- |
| Law Offices of Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 | Wednesday, May 9, 2007 9:00 AM |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
**YOU ARE FURTHER REQUIRED to bring with you to the deposition those items listed in the attached Schedule A.**
*IF THE ITEMS LISTED IN SCHEDULE A ARE PRODUCED AT THE OFFICES OF SMITH & BRINK, P.C. PRIOR TO THE DATE OF THE DEPOSITION, YOUR ATTENDANCE AT THE DEPOSITION FOR THIS SUBPOENA ONLY WILL BE WAIVED.*

| PLACE | DATE AND TIME |
| --- | --- |
| Law Offices of Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 | Wednesday, May 9, 2007 9:00 AM |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE 9/4/07 |
| --- | --- |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Richard D. King, Jr., Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 (617) 770-2214

(See Rule 45, Federal Rules of Civil Procedure, Subdivision (c), (d), and (e), on next page)

First Spine
Robert T. Kennedy
Schedule A

**ADVANCED HEALTH PRODUCTS,**
**SUCCESSOR IN INTEREST TO ROBERT T. KENNEDY, INC. D/B/A KENNEDY SUPPLY**
Keeper of Records "SCHEDULE A"

## I. DEFINITIONS:

1. **"Kennedy Supply"** shall mean Robert T. Kennedy, Inc. d/b/a Kennedy Supply.

2. As used herein, the terms **"document"** or **"documents"** mean all papers and other tangible items and materials upon which information is recorded or from which information may be obtained and includes all documents that you have in your possession, custody, or control, or have the right to obtain upon request or demand. This definition includes all copies, reproductions and facsimiles of documents and includes, but is not limited to, any and all letters, business cards, vouchers, advertisements, bonus logs, correspondence, contracts, agreements, bills, orders, receipts, records, books, computer tapes and print-outs, intracorporation communications, memoranda, notes, vouchers, notebooks, maps, sketches, cablegrams, gift cards, telegrams, reports, press releases, advertising and promotional literature, prints, drawings, plans, photographs, VIP cards, printed forms, manuals, brochures, lists, medical file jackets, publications, VIP cards, catalogues, directories, videotapes, other tape recordings, films, microfilm, runner payment logs, and all other writings, including drafts, typings, printings, minutes or copies or reproductions thereof in the possession, custody, control/or available to the defendant or any other past or present officer, director, agent, employee consultant, or attorney for defendant or any person acting on behalf of defendant. If copies of documents are not identical for any reason, including handwritten notations, initials, or identifying marks, each non-identical copy is a separate document within the meaning of this definition.

3. The term **"relating to"** means referring to, describing, concerning, evidencing, or constituting.

4. **"First Spine"** and/or **"The clinic"** shall mean Advanced Spine Center d/b/a First Spine and Rehab located in Lowell, Massachusetts as well as Future Management Corporation and all its parent corporations and/or subsidiary corporations, agents, representatives, predecessors-in-interest and successors-in-interest.

5. **"Relevant Period"** shall mean 1998 through the present inclusive and/or any portion thereof.

6. **"Future Management Clinics"** shall mean any of the following:

1

First Spine
Robert T. Kennedy
Schedule A

Brockton, MA 02301

Advanced Spine Center
3 North Beacon Street
Allston, MA 02134

Excel Physical Therapy
19 Stoughton Street
Dorchester, MA 02125

Advanced Spine Centers
420 Common Street
Lawrence, MA 01840

Excel Physical Therapy
278 Pitchers Way
Hyannis, MA 02601

Advanced Spine Centers
553-555 Main Street
Waltham, MA 01089

Excel Physical Therapy
1225 River Street
Hyde Park, MA 02136

Advanced Spine Centers
90 Madison Street
Worcester, MA 01606

First Choice Chiropractic & Rehab
125 Rodman Street
Fall River, MA 02723

Advanced Spine Centers
248 Moody Street
Waltham, MA 02453

First Choice Chiropractic & Rehab
94 Allen Street
Methuen, MA 01844

Advanced Spine Centers
278 Pitchers Way
Hyannis, MA 02601

First Spine & Rehab
180 Exchange Street
Malden, MA 02148

Advanced Spine Centers
37 Roxbury Street
Roxbury, MA 02119

First Spine & Rehab
438 Chestnut Street
Springfield, MA 01107

Associated Health Care Group
180 Exchange Street
Malden, MA 02148

First Spine & Rehab
252 Maple Street
Holyoke, MA 01040

Attleboro Chiropractic Health Ctr.
3 Mill Street
Attleboro, MA 02703

First Spine & Rehab
835 Dorchester Avenue
Dorchester, MA 02125

Back & Neck Treatment
935 Washington Street
Norwood, MA 02062

First Spine & Rehab
320 Water Street
Fitchburg, MA 01420

Back & Neck Treatment
158 Concord Street
Framingham, MA 01701

First Spine & Rehab
1212 Hancock Street
Quincy, MA 02169

Back & Neck Treatment
948 Bennington Street
East Boston, MA 02128

First Spine & Rehab
760 Western Avenue
Lynn, MA 01905

Brockton Spine & Rehab
365 Westgate Drive, Suite 3-4

First Spine & Rehab
410 School Street

2

First Spine
Robert T. Kennedy
Schedule A

Lowell, MA 01851

Haverhill Spine & Rehab
5-7 Dudley Street
Haverhill, MA 01830

Mattapoisett Chiropractic
109 Fairhaven Road, Suite D
Mattapoisett, MA 02739

Methuen Spine & Rehab
30 Hampshire Street
Methuen, MA 01844

Physical Rehab. Group
149A Highland Avenue
Somerville, MA 02143

Physical Rehab. Group
1515-17 Washington Street
Boston, MA 02118

Randolph Spine & Rehab
326 North Main Street, Suite 11
Randolph, MA 02368

Salem Chiropractic Assoc.
72 Washington Street
Salem, MA 01970

Taunton Chiropractic & Rehab
80-86 Main Street
Taunton, MA 02780

Therapy & Rehab Service

50 Meridan Street
East Boston, MA 02128

United Physical Therapy
642 Gorham Street
Lowell, MA 01852

United Physical Therapy
442 Chestnut Street
Springfield, MA 01103

United Physical Therapy
150 Stanford Street
Boston, MA 02114

United Physical Therapy
109 Fairhaven Road, Suite E
Mattapoisett, MA 02739

United Physical Therapy
420 Common Street, Suite 102
Lawrence, MA 01840

United Physical Therapy
243 Church Street
Pembroke, MA 02359

United Physical Therapy
180 Exchange Street
Malden, MA 02148

Wareham Spine & Rehab
45 Main Street, Unit C3
Wareham, MA 0257

7. **"Durable Medical Goods"** shall mean medical supplies and equipment including ambulatory aids, orthopedic products, aids for daily living, chiropractic equipment, physical therapy equipment, modalities and related supplies.

## II. You are requested to produce the following documents:

1. All original records that relate in any way to monies paid to or from (1) First Spine & Rehab; (2) Advanced Spine Centers, Inc.; (3) Future Management Corporation; (4) Edward Kennedy; (5) James Kennedy; (6) Joseph Giampa; and/or (7) Frederick Giampa for medical supplies provided to First Spine & Rehab.

2. All documents that relate in any way to any business or financial relationship between Kennedy Supply and First Spine or any agent, manager or employee

3

First Spine
Robert T. Kennedy
Schedule A

thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

3.     All documents that relate in any way to any business or financial relationship between Kennedy Supply and Advanced Spine Center, Inc., or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

4.     All documents that relate in any way to any business or financial relationship between Kennedy Supply and Future Management Corporation or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

5.     All documents that relate in any way to any business or financial relationship between Kennedy Supply and Joseph Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

6.     All documents that relate in any way to any business or financial relationship between Kennedy Supply and Frederick Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

7.     All documents that relate in any way to any business or financial relationship between Kennedy Supply and Edward Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

8.     All documents that relate in any way to any business or financial relationship between  Kennedy Supply and James Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

9.     All documents relating to how First Spine came to receive durable medical goods. Include with your response all records concerning any financial transactions relating in any way to the prescription, purchase or delivery of durable medical goods to First Spine by any third party;

10.    All Federal Tax Returns for the years 1998-2004;

11.    All documents memorializing any instructions given by the management at First Spine to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

12.    All documents memorializing any instructions given by the management at Future Management Corporation to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

4

First Spine
Robert T. Kennedy
Schedule A

13.    All documents memorializing any instructions given by the management at Future Management Clinics to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

14.    All documents memorializing any instructions given by the management at Advanced Spine Centers, Inc. to the employee(s) or agent(s) of Kennedy Supply relating to the treatment of auto accident victims;

15.    All documents identifying the person or person(s) who managed Kennedy Supply in the years 1998-2004; and,

16.    All documents showing the name, address and date of birth of any employee of Kennedy Supply for the years 1998-2004.

17.    All documents related to invoices for Durable Medical Goods provided to Future Management clinics by Kennedy Supply.

18.    All documents related to order forms for Durable Medical Goods provided to Future Management Clinics by Kennedy Supply.

19.    Any and all documents relating to payment by Future Management Clinics to Kennedy Supply, including but not limited to Future Management check number 25688 in the amount of $5000.00 issued on April 20, 2004; check number 62 in the amount of $5000.00 issued on April 6, 2004; check number 25422 in the amount of $5000.00 on April 5, 2004; and check number 25254 in the amount of $5000.00 on March 30, 2004.

APRIL 5, 2007

# RETURN OF SERVICE

*I this day summoned the within named* KEEPER OF RECORDS
ADVANCED HEALTH PRODUCTS
SUCCESSOR TO KENNEDY SUPPLY

*to appear as within directed by delivering to*   MONICA CUNHA, SALES DEPT, 8:25 AM

**X**   *in hand*
*leaving at last and usual place of abode, to wit:*

*No.*   30 HUNT ROAD
*in the* CHELMSFORD   *District of said* MIDDLESEX   *County an attested*
*copy of the subpoena together with*  $   *fees for attendance and travel*

*Service and travel*   28

*Paid Witness*

*it being necessary I actually used a*
*motor vehicle in the distance of*
35   *miles in the service of*
*this process*

_____
Process Server

OAO88 (Rev. 12/06) Subpoena in a Civil Case

### Issued by the
# UNITED STATES DISTRICT COURT

—————— DISTRICT OF MASSACHUSETTS ——————

Encompass Insurance Company of Massachusetts
    Plaintiff-Counterclaim Defendant,

v.

Joseph D. Giampa, Frederick T. Giampa, Advanced
Spine Centers Inc. d/b/a First Spine Rehab, Future
Management Corporation, Future Management
Business Trust, Edward Kennedy, Brian J. Culliney, D.C. and
Jennifer McConnell, D.C.
    Defendants-Counterclaim Plaintiffs.

**SUBPOENA IN A CIVIL CASE**

CASE NO: [1] 05-11693 RCL

*A TRUE COPY ATTEST
DAVID D. AYLES, PROCESS SERVER
AND DISINTERESTED PERSON*

TO:    Keeper of Records
       **Advanced Health Products**
       **Successor in Interest to First Health Products, Inc.**
       **30 Hunt Road**
       **Chelmsford, MA 01824**

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
     testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
     in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Law Offices of Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 | Tuesday, May 8, 2007 9:00 AM |

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
     place, date, and time specified below (list documents or objects):
**YOU ARE FURTHER REQUIRED to bring with you to the deposition those items listed in the attached Schedule A.**
*IF THE ITEMS LISTED IN SCHEDULE A ARE PRODUCED AT THE OFFICES OF SMITH & BRINK, P.C. PRIOR TO THE
DATE OF THE DEPOSITION, YOUR ATTENDANCE AT THE DEPOSITION FOR THIS SUBPOENA ONLY WILL BE WAIVED.*

| PLACE | DATE AND TIME |
|---|---|
| Law Offices of Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 | Tuesday, May 8, 2007 9:00 AM |

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other
persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure,
30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
|  | 5/4/07 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Richard D. King, Jr., Smith & Brink PC, 122 Quincy Shore Drive, Quincy, MA 02171 (617) 770-2214

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

**ADVANCED HEALTH PRODUCTS,
SUCCESSOR IN INTEREST TO FIRST HEALTH PRODUCTS, INC**
Keeper of Records "SCHEDULE A"

## I.  DEFINITIONS:

1.  **"First Health"** shall mean First Health Products, Inc.

2.  As used herein, the terms **"document"** or **"documents"** mean all papers and other tangible items and materials upon which information is recorded or from which information may be obtained and includes all documents that you have in your possession, custody, or control, or have the right to obtain upon request or demand. This definition includes all copies, reproductions and facsimiles of documents and includes, but is not limited to, any and all letters, business cards, vouchers, advertisements, bonus logs, correspondence, contracts, agreements, bills, orders, receipts, records, books, computer tapes and print-outs, intracorporation communications, memoranda, notes, vouchers, notebooks, maps, sketches, cablegrams, gift cards, telegrams, reports, press releases, advertising and promotional literature, prints, drawings, plans, photographs, VIP cards, printed forms, manuals, brochures, lists, medical file jackets, publications, VIP cards, catalogues, directories, videotapes, other tape recordings, films, microfilm, runner payment logs, and all other writings, including drafts, typings, printings, minutes or copies or reproductions thereof in the possession, custody, control/or available to the defendant or any other past or present officer, director, agent, employee consultant, or attorney for defendant or any person acting on behalf of defendant. If copies of documents are not identical for any reason, including handwritten notations, initials, or identifying marks, each non-identical copy is a separate document within the meaning of this definition.

3.  The term **"relating to"** means referring to, describing, concerning, evidencing, or constituting.

4.  **"First Spine"** and/or **"The clinic"** shall mean Advanced Spine Center d/b/a First Spine and Rehab located in Lowell, Massachusetts as well as Future Management Corporation and all its parent corporations and/or subsidiary corporations, agents, representatives, predecessors-in-interest and successors-in-interest.

5.  **"Relevant Period"** shall mean 1998 through the present inclusive and/or any portion thereof.

6.  **"Future Management Clinics"** shall mean any of the following:

1

First Spine
Schedule A

Brockton, MA 02301

Advanced Spine Center
3 North Beacon Street
Allston, MA 02134

Excel Physical Therapy
19 Stoughton Street
Dorchester, MA 02125

Advanced Spine Centers
420 Common Street
Lawrence, MA 01840

Excel Physical Therapy
278 Pitchers Way
Hyannis, MA 02601

Advanced Spine Centers
553-555 Main Street
Waltham, MA 01089

Excel Physical Therapy
1225 River Street
Hyde Park, MA 02136

Advanced Spine Centers
90 Madison Street
Worcester, MA 01606

First Choice Chiropractic & Rehab
125 Rodman Street
Fall River, MA 02723

Advanced Spine Centers
248 Moody Street
Waltham, MA 02453

First Choice Chiropractic & Rehab
94 Allen Street
Methuen, MA 01844

Advanced Spine Centers
278 Pitchers Way
Hyannis, MA 02601

First Spine & Rehab
180 Exchange Street
Malden, MA 02148

Advanced Spine Centers
37 Roxbury Street
Roxbury, MA 02119

First Spine & Rehab
438 Chestnut Street
Springfield, MA 01107

Associated Health Care Group
180 Exchange Street
Malden, MA 02148

First Spine & Rehab
252 Maple Street
Holyoke, MA 01040

Attleboro Chiropractic Health Ctr.
3 Mill Street
Attleboro, MA 02703

First Spine & Rehab
835 Dorchester Avenue
Dorchester, MA 02125

Back & Neck Treatment
935 Washington Street
Norwood, MA 02062

First Spine & Rehab
320 Water Street
Fitchburg, MA 01420

Back & Neck Treatment
158 Concord Street
Framingham, MA 01701

First Spine & Rehab
1212 Hancock Street
Quincy, MA 02169

Back & Neck Treatment
948 Bennington Street
East Boston, MA 02128

First Spine & Rehab
760 Western Avenue
Lynn, MA 01905

Brockton Spine & Rehab
365 Westgate Drive, Suite 3-4

First Spine & Rehab
410 School Street

2

First Spine
Schedule A

Lowell, MA 01851

Haverhill Spine & Rehab
5-7 Dudley Street
Haverhill, MA 01830

Mattapoisett Chiropractic
109 Fairhaven Road, Suite D
Mattapoisett, MA 02739

Methuen Spine & Rehab
30 Hampshire Street
Methuen, MA 01844

Physical Rehab. Group
149A Highland Avenue
Somerville, MA 02143

Physical Rehab. Group
1515-17 Washington Street
Boston, MA 02118

Randolph Spine & Rehab
326 North Main Street, Suite 11
Randolph, MA 02368

Salem Chiropractic Assoc.
72 Washington Street
Salem, MA 01970

Taunton Chiropractic & Rehab
80-86 Main Street
Taunton, MA 02780

Therapy & Rehab Service

50 Meridan Street
East Boston, MA 02128

United Physical Therapy
642 Gorham Street
Lowell, MA 01852

United Physical Therapy
442 Chestnut Street
Springfield, MA 01103

United Physical Therapy
150 Stanford Street
Boston, MA 02114

United Physical Therapy
109 Fairhaven Road, Suite E
Mattapoisett, MA 02739

United Physical Therapy
420 Common Street, Suite 102
Lawrence, MA 01840

United Physical Therapy
243 Church Street
Pembroke, MA 02359

United Physical Therapy
180 Exchange Street
Malden, MA 02148

Wareham Spine & Rehab
45 Main Street, Unit C3
Wareham, MA 0257

7.  **"Durable Medical Goods"** shall mean medical supplies and equipment including ambulatory aids, orthopedic products, aids for daily living, chiropractic equipment, physical therapy equipment, modalities and related supplies.

## II. You are requested to produce the following documents:

1.  All original records that relate in any way to monies paid to or from (1) First Spine & Rehab; (2) Advanced Spine Centers, Inc.; (3) Future Management Corporation; (4) Edward Kennedy; (5) James Kennedy; (6) Joseph Giampa; and/or (7) Frederick Giampa for medical supplies provided to First Spine & Rehab.

2.  All documents that relate in any way to any business or financial relationship between First Health and First Spine or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

3

3.  All documents that relate in any way to any business or financial relationship between First Health and Advanced Spine Center, Inc., or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

4.  All documents that relate in any way to any business or financial relationship between First Health and Future Management Corporation or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

5.  All documents that relate in any way to any business or financial relationship between First Health and Joseph Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

6.  All documents that relate in any way to any business or financial relationship between First Health and Frederick Giampa or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

7.  All documents that relate in any way to any business or financial relationship between First Health and Edward Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

8.  All documents that relate in any way to any business or financial relationship between First Health and James Kennedy or any agent, manager or employee thereof including checks, bills, invoices, payments, receipts, correspondence and e-mails;

9.  All documents relating to how First Spine came to receive durable medical goods. Include with your response all records concerning any financial transactions relating in any way to the prescription, purchase or delivery of durable medical goods to First Spine by any third party;

10. All Federal Tax Returns for the years 1998-2004;

11. All documents memorializing any instructions given by the management at First Spine to the employee(s) or agent(s) of First Health relating to the treatment of auto accident victims;

12. All documents memorializing any instructions given by the management at Future Management Corporation to the employee(s) or agent(s) of First Health relating to the treatment of auto accident victims;

4

First Spine
Schedule A

13.  All documents memorializing any instructions given by the management at Future Management Clinics to the employee(s) or agent(s) of First Health relating to the treatment of auto accident victims;

14.  All documents memorializing any instructions given by the management at Advanced Spine Centers, Inc. to the employee(s) or agent(s) of First Health relating to the treatment of auto accident victims;

15.  All documents identifying the person or person(s) who managed First Health in the years 1998-2004; and,

16.  All documents showing the name, address and date of birth of any employee of First Health for the years 1998-2004.

17.  All documents related to invoices for Durable Medical Goods provided to Future Management clinics by First Health.

18.  All documents related to order forms for Durable Medical Goods provided to Future Management Clinics by First Health.

19.  Any and all documents relating to payment by Future Management Clinics to First Health.

APRIL 5, 2007

## RETURN OF SERVICE

*I this day summoned the within named* KEEPER OF RECORDS
ADVANCED HEALTH PRODUCTS
SUCCESSOR TO FIRST HEALTH

*to appear as within directed by delivering to* MONICA CUNHA, SALES DEPT, 8:25 AM

   **X**    *in hand*
        *leaving at last and usual place of abode, to wit:*

*No.*    30 HUNT ROAD
*in the* CHELMSFORD     *District of said* MIDDLESEX     *County an attested*
*copy of the subpoena together with* $       *fees for attendance and travel*

*Service and travel*      28

*Paid Witness*

*it being necessary I actually used a*
*motor vehicle in the distance of*
35    *miles in the service of*
*this process*

Michael R Steele

Process Server