UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENCOMPASS INSURANCE COMPANY OF MASSACHUSETTS,<br><br>      Plaintiff,<br><br>vs.<br><br>JOSEPH D. GIAMPA, FREDERICK T. GIAMPA, ADVANCED SPINE CENTERS, INC. d/b/a FIRST SPINE & REHAB, FUTURE MANAGEMENT CORPORATION, EDWARD KENNEDY, BRIAN J. CULLINEY and JENNIFER McCONNELL<br><br>      Defendants. | CIVIL ACTION NO.: 05-11693 RCL |

**MEMORANDUM IN REPLY TO DEFENDANTS' OPPOSITION TO
PLAINTIFF'S MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**

The Plaintiff, Encompass Insurance Company of Massachusetts ("Encompass"), submits this memorandum in further support of its Motion for Leave to File Third Amended Complaint.

**ARGUMENT**

**I.     INTRODUCTION**

Defendants' Opposition to Plaintiff's Motion for Leave to File Third Amended Complaint is remarkable for its chutzpah. Defendants argue, among other things, that there is no "relatedness" between the alleged murder-for-hire plot against Encompass' former lead counsel and the Defendants' alleged medical fraud, that the "delay" associated with granting Plaintiff's motion would unfairly prejudice Defendants, and that granting the Motion would also unfairly prejudice the Defendants "in the eyes of any jury."

First, let us be clear that the only reason there has been, or will be, any supposed "delay" in this case is because Defendant Frederick Giampa, in furtherance of the Defendants' medical fraud conspiracy and to maintain the Defendants' fraudulent billing scheme, solicited the murder of Encompass' former lead counsel.  Whether the other individual Defendants were involved in the details of this murder-for-hire plot is not known at this time and will be determined by discovery (and by the current criminal investigation by the U.S. Attorney's Office into this murder-for-hire plot).  But in terms of the Defendants' civil liability, it does not even matter. Under binding First Circuit precedent, "[a] defendant who does not know the 'entire conspiratorial sweep' is nevertheless jointly and severally liable, in the civil context, for all acts in furtherance of the [RICO] conspiracy." *Aetna Cas. Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1562 (1st Cir. 1994).  Stated simply, it is manifestly improper for *any* of the Defendants to suggest that the Court should give one iota of consideration to the "delay" that granting Plaintiff's Motion might cause when such "delay" is solely the result of the attempts on the life of Encompass' former lead counsel.

Second, the alleged murder-for-hire plot is obviously "related" to the alleged RICO enterprise and the Defendants' ongoing medical fraud conspiracy.  As a matter of common sense, how could the attacks against Encompass' former lead counsel *not* be related to the Defendants' fraudulent scheme?  The only connection between the Defendants and Plaintiff's former lead counsel – indeed, the only reason the Defendants even know that Plaintiff's former lead counsel exists – is the legal proceedings against the Defendants.  One would expect (or, at least hope) that Frederick Giampa (or the other individual Defendants) does not go around attempting to murder people for no reason.  Rather, Frederick Giampa's murderous intentions presumably have a purpose.  And that purpose, as alleged, is "to protect, facilitate and maintain the fraudulent

billing scheme described in the Third Amended Complaint" and is "in furtherance of the conspiracy among all the defendants."  Third Am. Compl. ¶ 425.

Third, as for the argument that granting the Motion would unfairly prejudice the Defendants "in the eyes of any jury," the short answer is that there is no "unfairness" involved in permitting Plaintiff the opportunity to prove that Defendants are responsible for attempting to murder Encompass' former lead counsel.  The Defendants here are either responsible for the attacks on Plaintiff's former lead counsel or they are not.  That will be determined by discovery and trial.  Defendants certainly should not be given a free pass at this stage in the proceedings simply because a jury may take a dim view of a murder-for-hire plot against opposing counsel.  And to the extent that discovery or trial may show that one or more of the individual Defendants may not have been privy to the details of the plot, that is of no consequence to the instant Motion because each individual Defendant took his or her chances when joining the fraudulent billing scheme in the first place.  *E.g., United States v. Castro,* 89 F.3d 1443, 1451 n.3 (11th Cir. 1996) (discussing RICO liability and noting that "when a defendant embarks upon a criminal venture of indefinite outline, he takes his chances as to its content and membership, so be it that they fall within the common purposes as he understands them") (internal quotations and citations omitted).  Or, to put it more directly, Congress, in enacting the RICO statute, has decided that murder-for-hire, like mail fraud and other nonviolent predicate acts, qualifies as racketeering activity – "this, of course, ups the ante for RICO violators who personally would not contemplate taking a human life." *United States v. Elliott,* 571 F.2d 880, 905 (5th Cir. 1978).  Nevertheless, "[w]hether there is a moral imbalance in the equation of thieves . . . with murderers is a question whose answer lies in the halls of Congress, not in the judicial conscience." *Id.*

As discussed in more detail below, none of Defendants' arguments has any merit whatsoever. Accordingly, the Court should grant Plaintiff's Motion.

## II. DEFENDANTS FACE A DIFFICULT TASK IN OPPOSING A MOTION TO SUPPLEMENT THE PLEADINGS.

In their Opposition, Defendants give short shrift to the standard of review, breezing by it in one sentence. Defendant's Opposition ("Opposition"), at 6.[1] This is not surprising, given that the standard of review, correctly stated, presents a major problem for the Defendants. As an initial matter, "[l]iberality is the rule in permitting supplemental pleadings." *Structural Sys., Inc. v. Sulfaro,* 692 F. Supp. 34, 36 (D. Mass. 1988) (citing *Weisbord v. Michigan State Univ.*, 495 F. Supp. 1347, 1350 (W.D. Mich. 1980)); *see also Nkihtaqmikon v. BIA,* 453 F. Supp. 2d 193, 201 (D. Me. 2006) (noting that leave to supplement pleadings "should be freely granted"). The purpose of Federal Rule of Civil Procedure 15(d) "is to make pleadings a means to achieve an orderly and fair administration of justice." *BIA,* 453 F. Supp. 2d at 201 (quoting *Griffin v. County Sch. Bd.,* 377 U.S. 218, 227 (1964)) (internal quotations omitted). It would be the height of *unfairness*, however, for Plaintiff to be precluded from supplementing its pleadings to include the murder-for-hire plot against its former lead counsel when the Third Amended Complaint alleges that the plot was executed to maintain the Defendants' fraudulent billing scheme.

The standard of review for a motion to supplement the pleadings is even more relaxed than that applying to a Rule 12(b)(6) motion to dismiss the complaint for failure to state a claim.

---

[1] Defendants' Opposition was due on July 10, 2008, per the Court's June 26, 2008 Scheduling Order. The Opposition was electronically filed at 11:56 p.m. on July 10, 2008, and thus, under the Court's Local Rules, the Opposition was not timely filed. *Local Rules of the United States District Court for the District of Massachusetts,* Rule 5.4(D) ("All electronic transmissions of documents must be completed prior to 6:00 p.m. to be considered timely filed that day."). On this basis alone, the Court may disregard the Opposition and thus decline to save Defendants "from a self-dug hole." *Daimlerchrysler Corp. v. Commissioner,* No. Civ.A. 93-10799-MA, 2001 WL 1772353, at *4 (D. Mass. Oct. 23, 2001) (Dein, M.J.).

As this Court has previously explained, a motion to supplement the pleadings should *not* be denied on the basis that the "defendant contests the plaintiff's allegations set out in the supplemental complaint, and argues that the claim which plaintiff seeks to add is unfounded." *Sulfaro,* 692 F. Supp. at 36.  Rather, "[s]uch an argument would be more properly addressed to a motion to dismiss or a motion for judgment on the pleadings." *Id.*  Yet that is exactly what Defendants are attempting to do here: the bulk of their Opposition is, in reality, a motion to dismiss the supplemental allegations concerning the murder-for-hire plot, as Defendants argue, for example, that the allegations lack "relatedness" with Defendants' alleged medical fraud, or that the "purpose" of the attacks on Plaintiff's former lead counsel were not intended to "advance the alleged insurance fraud," or that the attacks were not committed "in furtherance" of the alleged conspiracy, or that Plaintiff "has no standing" to bring the supplemental allegations. Opposition, at 6-13.  As such, the Court should reject such premature arguments out of hand. *Sulfaro,* 692 F. Supp. at 36.

Even if the Court were to evaluate the instant Motion under the motion to dismiss standard, such a standard still weighs heavily in Plaintiff's favor.  The Court must "accept as true all well-pleaded allegations and give plaintiffs the benefit of all reasonable inferences," and denial of Encompass' Motion would "only [be] appropriate if the [amended] complaint, so viewed, presents no set of facts justifying recovery."  *Cooperman v. Individual, Inc.,* 171 F.3d 43, 46 (1st Cir. 1999); *see also Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir. 1996) ("There is no practical difference, in terms of review, between a denial of a motion to amend based on futility and the grant of a motion to dismiss for failure to state a claim."). Moreover, in applying this standard, "[a]s a general rule, a court is to consider only the pleadings

in rendering a decision . . . ." *Edwin v. Blenwood Assoc., Inc.,* 9 F. Supp. 2d 70, 71-72 (D. Mass 1998).

Finally, it is important to keep in mind that while the RICO activity described in the Third Amended Complaint refers to criminal offenses, Encompass need only prove those acts by a preponderance of the evidence. *E.g., Aetna,* 43 F.3d at 1560.

### III. THE MURDER-FOR-HIRE PLOT IS PART OF THE "PATTERN OF RACKETEERING" ALLEGED IN THE THIRD AMENDED COMPLAINT.

Defendants do not dispute, nor can they, that the supplemental allegations concerning the attacks on Plaintiff's former lead counsel qualify as racketeering activity under the RICO statute. Specifically, this racketeering activity has been properly pled as murder-for-hire, attempted murder and obstruction of justice. Third Am. Compl. ¶¶ 462-469. Defendants maintain, however, that the supplemental allegations do not meet the requisite standard for a "pattern of racketeering activity." Opposition, at 6-10.

It is worth noting that the Defendants' argument on this issue is presented in a confused and muddled way because Defendants, perhaps unwittingly, mix this argument (which applies only to Counts I and II, the substantive RICO counts) with a discussion of the U.S. Supreme Court's *Grunewald* case (which applies only to Count III, the RICO conspiracy count). For purposes of this section, Plaintiff addresses only the Defendants' misunderstanding of the "pattern of racketeering" requirement, and leaves the Defendants' misapplication of *Grunewald* to section IV., *infra*.

As the U.S. Supreme Court has explained, Congress intended, when enacting the RICO statute, for "the concept of a pattern of racketeering activity" to be "broad indeed." *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 237 (1989). Furthermore, "Congress intended to take a flexible approach, and envisaged that a pattern might be demonstrated by reference to a

range of different ordering principles or relationships between predicates, within the expansive bounds set." *Id.* at 238. Therefore, "Congress indeed had a fairly flexible concept of a pattern in mind." *Id.* at 239. More specifically, the First Circuit has held that an actionable "pattern of racketeering activity" exists if the defendant commits the racketeering acts "by consequence of [or] by reason of . . . his association with the [RICO] enterprise." *United States v. Marino,* 277 F.3d 11, 27 (1st Cir. 2002).

The supplemental allegations concerning the attacks on Encompass' former lead counsel easily meet this standard. The first attack, on August 29, 2007, occurred "in the middle of deposition discovery in the instant case," as "Frederick Giampa's deposition had occurred the week before" and "plaintiff's former lead counsel was originally scheduled to depose [defendant] Joseph Giampa" on the day after the first attack. Third Am. Compl. ¶ 435. "Immediately following" the first attack, "the attacker ('Attacker 1') placed a cell phone call" to Frederick Giampa's long time-friend and close business associate, Rocco Talluto – who "then immediately called Frederick Giampa." *Id.* ¶¶ 425, 436.

The second attack, on October 30, 2007, followed a similar blueprint. It, too, occurred in the middle of deposition discovery, as "[t]he continuation of Frederick Giampa's deposition originally had been scheduled" for the day before the attack. *Id.* ¶ 438. Additionally, "Joseph Giampa had been scheduled to be deposed" on the day after the attack, but that deposition had been postponed earlier in the month. *Id.* "On the morning of October 30, 2007, shortly following the attack, [the] masked, baseball bat-wielding attacker ('Attacker 2') sent several text messages" and "made several phone calls to Attacker 1." *Id.* ¶ 442. "After Attackers 1 and 2 spoke, Attacker 1 immediately called Talluto, who shortly thereafter phoned Frederick Giampa." *Id.*

After a series of incidents in early November 2007 in which Plaintiff's former lead counsel was stalked, his private security officer (together with the Massachusetts State Police) chased Attacker 2 and yet another attacker ("Attacker 3") on November 15, 2007. *Id.* ¶¶ 443-50. During this high-speed chase, Attackers 2 and 3 "thr[ew] objects out of the passenger window" of their Camry, including "a mace, which is a ball-and-chain weapon." *Id.* ¶¶ 448, 450. "The high speed chase and ultimate arrest of Attackers 2 and 3 occurred between 7:00 a.m. and 8:00 a.m. on November 15, 2007." *Id.* ¶ 451. Significantly, "[d]uring this time, Attacker 2 made several unsuccessful calls to Attacker 1," who "then called Attacker 2 repeatedly between 8:30 a.m. and 1:00 p.m." *Id.* Yet by that time, "Attacker 2 was in police custody." *Id.*

At minimum, the Court must accept the above well-pleaded allegations as true, and it must draw all reasonable inferences in Plaintiff's favor. It is certainly reasonable to infer that Frederick Giampa was directing the attacks, and that the phone calls from Attacker 1 to Rocco Talluto and then to Frederick Giampa (as well as the calls from Attacker 2 to Attacker 1 on November 15, 2007) were not a series of amazing coincidences. It is also reasonable to infer – in fact, the conclusion is inescapable – that Frederick Giampa directed the attacks "by consequence of [or] by reason of . . . his association with the [RICO] enterprise." *Marino,* 277 F.3d at 27.

As noted in the Introduction, as a matter of common sense, how could the attacks against Encompass' former lead counsel *not* be "by consequence of" or "by reason of" the Defendants' fraudulent billing scheme? The only connection between Frederick Giampa and Plaintiff's former lead counsel is legal proceedings against the Defendants. Presumably, Frederick Giampa does not attempt to murder people for no reason. Rather, his murderous intentions have a purpose. And that purpose, as alleged, is that "Frederick Giampa intended that his attacks on plaintiff's former lead counsel would prevent him and his firm from continuing to prosecute

Encompass' action against the defendants," Third Am. Compl. ¶ 467, and thereby "protect, facilitate and maintain the fraudulent billing scheme described in the Third Amended Complaint," *id.* ¶ 425.

Unfortunately, the attacks did serve their purpose by derailing the case, at least temporarily. After the attacks, Encompass' former lead counsel withdrew his appearance (fearing for his life), Plaintiff had to locate and hire replacement counsel from outside Massachusetts in order to help insulate replacement counsel from possible further attack, replacement counsel had to learn the details of Defendants' sprawling medical fraud, and the case was stayed for several months. These circumstances made it much more difficult (and time-consuming) for Plaintiff to prosecute its claims. At the very least, the supplemental allegations in the Third Amended Complaint present a set of facts justifying recovery – namely, that Frederick Giampa directed the attacks in order to protect, facilitate and maintain the alleged RICO enterprise – and thus the instant Motion must be granted. *E.g., Cooperman,* 171 F.3d at 46.

**IV.   THE SUPREME COURT'S *GRUNEWALD* DECISION IS INAPPLICABLE TO THIS CASE.**

Defendants, relying on *Grunewald v. United States,* 353 U.S. 391 (1957), argue that the supplemental allegations concerning the attacks on Plaintiff's former lead counsel are merely "acts of concealment" and therefore not in furtherance of the alleged RICO conspiracy. Opposition, at 8-9. Defendants are wrong. As explained below, *Grunewald* is inapplicable to this case.

In *Grunewald*, three individuals had fraudulently succeeded in obtaining "no prosecution" rulings from the Bureau of Internal Revenue in 1948 and 1949 for their tax evasion cases. *Grunewald*, 353 U.S. at 394-95. Subsequent activities of the conspirators (such as

- 9 -

destroying records and persuading witnesses to keep quiet or lie to the grand jury) were directed at preventing detection of the fraudulent manner in which they had secured the favorable rulings. *Id.* at 395-96, 403. The Supreme Court held that these subsequent activities could not be used to extend the original conspiracy for statute of limitations purposes because the main objective of the conspiracy – obtaining the "no prosecution" rulings – had long been accomplished. *Id.* at 401-06. The Court emphasized, however, that "a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up the crime." *Id.* at 405.

*Grunewald* does not control here because the Third Amended Complaint does not simply describe "acts of concealment done after [the conspiracy's] central objectives have been attained," but rather alleges that the attacks were perpetrated in furtherance of the Defendants' *ongoing* medical billing fraud. In other words, unlike in *Grunewald*, the main objective of the RICO conspiracy here – the fraudulent collection of insurance proceeds – has not been "finally attained" but is ongoing.[2]

This is evident throughout the allegations in the Third Amended Complaint. *E.g.,* Third Am. Compl. ¶¶ 470, 483 (stating that "[t]he attacks were intended to protect and further the conspiracies and enterprises described in Counts I, II and III," that the attacks "help to demonstrate that there is a threat this [fraudulent billing] activity will continue to occur and may even occur after the resolution of this litigation," and that the Defendants engaged in a pattern of

---

[2] Additionally, the chief policy consideration that animated the *Grunewald* decision is not present here, either. The Supreme Court was concerned that broadening "the already pervasive and wide-sweeping nets of conspiracy prosecutions" could "open the very floodgates" against which the Court's prior cases had warned. *Grunewald,* 353 U.S. at 404-05. It is probably safe to assume that few litigants are likely to follow Frederick Giampa's lead and attempt to murder their adversary's lead counsel, no matter how contentious the litigation.

racketeering activity by "filing numerous claims in an ongoing scheme over a substantial period of time and perpetuating this scheme through the attempted murder of plaintiff's former lead counsel"); *id.* ¶ 425 ("In order to protect, facilitate and maintain the fraudulent billing scheme described in the Third Amended Complaint, and in furtherance of the conspiracy among all the defendants, defendant Frederick Giampa, working with his long-time friend and close business associate, Rocco Talluto, solicited the murder of plaintiff's former lead counsel."); *id.* ¶ 1 (the attacks "were launched to protect and perpetuate defendants' fraudulent scheme"); *id.* ¶ 452(6) (stating that Encompass' injury includes "the past and continuing financial burden incurred by Encompass (and other insurance carriers[3]) to establish and carry out systems and policies to detect false, fraudulent, and inflated claims"); *id.* ¶ 114 ("Encompass' investigation is ongoing and new facts concerning defendants' scheme continue to be revealed."). Moreover, Encompass has asked the Court not only for damages but also for injunctive relief under Counts I-III – which is necessary only because Defendants' billing fraud is ongoing. *Id.*, section XIII, p. 90-91 ("Demand for Relief").

Furthermore, an insurance fraud conspiracy, like the one here, continues to exist as a matter of law until the claim for insurance proceeds is paid by the insurance company or withdrawn by the defendants. *E.g., United States v. Burton,* 724 F.2d 1283, 1287 (7th Cir. 1984) (discussing an arson conspiracy and stating that "[p]rimarily, of course, as long as [defendant's] [insurance] claim continued, and it was never satisfied or withdrawn, the conspiracy continued,

---

[3] For example, Metropolitan Property and Casualty Insurance Company has brought suit in the District of Massachusetts against all the defendants in the instant case (except for Edward Kennedy), alleging the same type of medical billing scheme as that alleged here. *Metropolitan Prop. and Cas. Ins. Co. v. Advanced Spine Center, et al.,* No. 07-CV-10746 (D. Mass.). Notably, Plaintiff Metropolitan recently moved for a temporary restraining order against all the defendants in that case based on the safety concerns raised by Encompass' proposed Third Amended Complaint. *Id.* (document 160, filed 7/8/08).

in law, to exist"); *see also United States v. Howard,* 770 F.2d 57, 60 (6th Cir. 1985) (explaining that "the [arson] conspiracy's central objective to secure the insurance proceeds had not been achieved or abandoned" because "the insurance company had not settled the insurance claim"). Here, there are numerous examples in the Third Amended Complaint in which the Defendants and their "Collection Agency" are attempting to collect insurance proceeds that have *not* yet been paid, including fraudulent mailings from the "Collection Agency" to Encompass in 2005. *Compare* Third Am. Compl., Exhibit 2 ("Mail Fraud Chart") *with* Exhibit 3 ("Damages Chart"). Thus, the Defendants' conspiracy is, as a matter of law, ongoing.

Additionally, under controlling First Circuit precedent, "[w]here a conspiracy contemplates a continuity of purpose and a continued performance of acts," as is the case here, the conspiracy "is presumed to exist until there has been an affirmative showing that it has terminated." *United States v. Piper,* 298 F.3d 47, 53 (1st Cir. 2002) (quoting *United States v. Elwell,* 984 F.2d 1289, 1293 (1st Cir. 1993)) (internal quotations omitted). It is the defendant's burden to prove affirmatively that the conspiracy has terminated. *E.g., United States v. Gardiner,* 463 F.3d 445, 463-64 (6th Cir. 2006); *United States v. Spero,* 331 F.3d 57, 61 (2d Cir. 2003).

In opposing the instant Motion, the Defendants have not even attempted to prove affirmatively that the alleged medical fraud conspiracy has "terminated." Nor could they. As the First Circuit has explained, "[w]e have made manifest that in order to withdraw from a conspiracy, 'a conspirator must act affirmatively either to defeat or disavow the purposes of the conspiracy.'" *Piper,* 298 F.3d at 53 (quoting *United States v. Juodakis,* 834 F.2d 1099, 1102 (1st Cir. 1987)). This requires either "a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals." *Id.* There is

no evidence in this case that any of the individual Defendants has made a full confession to authorities, nor that the individual Defendants have all communicated to each other that they have abandoned the alleged enterprise. And even if there were such evidence, now would not be the appropriate time to present it because the instant Motion should be decided only with reference to the pleadings. *E.g., Edwin,* 9 F. Supp. 2d at 71-72.

Finally, it is worth reiterating that *all* the Defendants can be held responsible for the attempted murder of Plaintiff's former lead counsel as long as this attempted murder was in furtherance of the RICO conspiracy in Count III, even if discovery and trial ultimately demonstrate that Frederick Giampa acted without the knowledge of the other individual Defendants when he solicited the murder. *E.g., Aetna Cas. Sur. Co.,* 43 F.3d at 1562 ("A defendant who does not know the 'entire conspiratorial sweep' is nevertheless jointly and severally liable, in the civil context, for all acts in furtherance of the [RICO] conspiracy."); *United States v. Boylan,* 898 F.2d 230, 242 (1st Cir. 1990) ("A RICO conspiracy does not demand total fusion or that all defendants participate in all racketeering acts, know of the entire conspiratorial sweep, or be acquainted with all other defendants.").

## V. DEFENDANTS' REMAINING ARGUMENTS ARE NONSENSICAL AND IRRELEVANT.

Defendants argue that Encompass has no standing to bring the supplemental pleading because it supposedly "does not allege, nor can it allege, any injury or harm to its own business as a result of the newly alleged predicate offenses." Instead, "the only injury sustained was that of Plaintiff's former lead counsel." Opposition, at 12. This argument is nonsense. Encompass does not allege personal injury to its former lead counsel. Rather, as explained in detail above, the Third Amended Complaint makes clear that Encompass has alleged that the murder-for-hire plot was executed in order to protect, facilitate and maintain Defendants' fraudulent billing

scheme, and thus the attacks are part of the pattern of racketeering activity that has caused injury to Encompass' business. Third Am. Compl. ¶ 452(1)-(8).

Moreover, as the U.S. Supreme Court has explained, the concept of RICO injury "is to be read broadly," and "RICO is to be liberally construed to effectuate its remedial purposes." *Sedima, S.P.R.L. v. Imrex, Co., Inc.,* 473 U.S. 479, 497-98 (1985). Once a plaintiff "alleges each element of the [RICO] violation, the compensable injury necessarily is the harm caused by the predicate acts sufficiently related to constitute a pattern," and "[a]ny recoverable damages occurring by reason of a [RICO] violation . . . will flow from the commission of the predicate acts." *Id.* at 497. Here, the alleged "compensable injury" is the monetary harm to Encompass' business caused by the predicate acts – including the murder-for-hire, attempted murder, and obstruction predicates – that constitute the pattern of racketeering. Third Am. Compl. ¶ 452(1)-(8). Plaintiff's "standing" argument, therefore, is nothing but a red herring.[4]

Next, Defendants complain that they would be "unduly prejudiced" by the "delay" associated with allowing the supplemental pleading. Opposition, at 13-15. This argument hardly merits a response. As noted in the Introduction, any supposed "delay" is solely the result of the murder-for-hire plot against Encompass' former lead counsel. Indeed, for Defendants to bemoan any possible "delay" is a bit like the defendant who has murdered his parents asking the Court for leniency because he is an orphan. And the Defendants' assertion that this case "is essentially trial-ready" is false. *Id.* at 14. The parties are in the middle of discovery, with a trial not

---

[4] To the extent that Defendants suggest that personal injury-type predicates (such as murder-for-hire or attempted murder) cannot contribute to business injury, that makes no sense because then such offenses could not be RICO predicates in the first place. *See generally Diaz v. Gates,* 420 F.3d 897, 905 (9th Cir. 2005) (Kleinfeld, J., concurring) (noting that "[m]urder and kidnapping can cause [RICO] injury to business or property, as well as personal injury"). In fact, a RICO plaintiff can allege *nothing* but personal injury and still state a valid RICO claim, as long as "the personal injury caused injury to business or property." *Id.* at 904-05.

scheduled to occur until some time in 2009.  Notably, several of Plaintiff's discovery requests are outstanding and long overdue: for example, Defendant Future Management Corporation has yet to respond to Plaintiff's third request for production of documents, served over ten months ago, on September 19, 2007, and Defendant Edward Kennedy has yet to respond to Plaintiff's first set of interrogatories, served over 16 months ago, on March 16, 2007.  Defendants' document production to-date also has several holes that must be filled, including the production of no emails, no documents concerning the training of chiropractors, clinic staff or billing personnel, and woefully incomplete patient medical records.

Lastly, Defendant Jennifer McConnell attaches an affidavit to Defendants' Opposition and argues that the supplemental pleading should not be allowed against her because she supposedly "abandoned the alleged enterprise and conspiracy."  *Id.* at 15-17.  This argument is both procedurally and substantively flawed.  Procedurally, now is not the time for affidavits and the Court cannot consider them in ruling on the Motion.  If the Court were to consider the affidavit, it would be converting the Opposition into a motion for summary judgment.  *E.g., Edwin,* 9 F. Supp. 2d at 72.  But this can only be done if "[a]ll parties [are] given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d). That is obviously not possible here, given that Plaintiff has yet to have the opportunity to take any discovery regarding the attacks.  In any event, the affidavit itself accomplishes nothing substantively.  As noted above, withdrawal from a conspiracy requires either "a full confession to authorities or a communication by the accused to his co-conspirators that he has abandoned the enterprise and its goals."  *Piper,* 298 F.3d at 53.  In other words, "[m]ere cessation of activity in furtherance of the conspiracy does not constitute withdrawal from a conspiracy."  *Id.* (internal quotations and citation omitted).  The McConnell affidavit simply points to a supposed cessation

of activity, and says nothing about a full confession to authorities or communications to the other co-conspirators that McConnell has abandoned the RICO enterprise and its goals.

## CONCLUSION

For all the reasons set forth above, as well as the reasons set forth in Plaintiff's Motion for Leave to File Third Amended Complaint, the Court should grant Plaintiff's Motion.

Respectfully submitted,

July 21, 2008

/s/ Barry Gross
Barry Gross (*admitted pro hac vice*)
William M. McSwain (*admitted pro hac vice*)
Richard E. Coe (*admitted pro hac vice*)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103
(215) 988-2700

*Counsel for Plaintiff Encompass Insurance Company of Massachusetts*

**CERTIFICATE OF SERVICE**

      I, Barry Gross, hereby certify on this 21st day of July, 2008, that the foregoing MEMORANDUM IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing. Copies were also sent to the attorney of record for each party via Federal Express.

                                    /s/ Barry Gross
                                    Barry Gross